# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER<br>1411 East 31st Street<br>Oakland, CA 94602,<br><br>NATIONAL ASSOCIATION OF PUBLIC<br>HOSPITALS AND HEALTH SYSTEMS<br>1301 Pennsylvania Avenue, NW<br>Suite 950<br>Washington, DC 20004,<br><br>AMERICAN HOSPITAL ASSOCIATION<br>325 Seventh Street, NW<br>Washington, DC 20004, and<br><br>ASSOCIATION OF AMERICAN MEDICAL<br>COLLEGES<br>2450 N Street, NW<br>Washington, DC 20004,<br><br>           Plaintiffs,<br><br>    v.<br><br>MICHAEL O. LEAVITT, in his official capacity as<br>Secretary, United States Department of Health and<br>Human Services<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>UNITED STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>KERRY WEEMS, in his official capacity as Acting<br>Administrator, Centers for Medicare & Medicaid<br>Services, and<br><br>CENTERS FOR MEDICARE & MEDICAID<br>SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>           Defendants. | Civil Action No. |

1

7295680_9.DOC

## COMPLAINT

Plaintiffs, Alameda County Medical Center ("Alameda"), the National Association of

Public Hospitals and Health Systems ("NAPH"), the American Hospital Association ("AHA"),

and the Association of American Medical Colleges ("AAMC"), by their undersigned attorneys,

sue Defendants, Michael O. Leavitt, in his official capacity as Secretary, United States

Department of Health and Human Services, the United States Department of Health and Human

Services ("HHS"), Kerry Weems, in his official capacity as Acting Administrator, Centers for

Medicare & Medicaid Services, and the Centers for Medicare & Medicaid Services ("CMS"),

and allege as follows:

### INTRODUCTION

1.    This is an action for declaratory, injunctive and other relief. Plaintiffs seek

injunctive and declaratory relief barring the enforcement of and declaring unlawful a sweeping

Medicaid rule issued by Defendant HHS, through Defendant CMS, which Defendants purported

to finalize on May 25, 2007 and published on May 29, 2007 ("the Rule"). 72 Fed. Reg. 29748.

The Rule has not yet been finalized, however, because on May 25, 2007, a law took effect

prohibiting the finalization and implementation of the Rule for one year. This legislative

moratorium expires on May 25, 2008.

2.    The Rule imposes unlawful and ill-advised new limitations on federal financial

participation ("FFP") in expenditures by State Medicaid programs that are directly contrary to

the express will of Congress and longstanding CMS policy and practice.

3.    The Rule imposes a "cost limit" that would unlawfully restrict Medicaid

payments to government providers to each such provider's cost in violation of Sections

1902(a)(13)(A) and 1902(a)(30)(A) of the Social Security Act as amended over the years, and in

2

violation of Section 705 of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000. Currently Medicaid payments to all providers are subject to a flexible regulatory upper payment limit that is based on amounts that would be paid using Medicare payment principles, and that allows for above-cost payments. The Rule does not apply a provider-specific cost limit on payments to non-governmental providers, and States could continue to pay these providers based on Medicare payment principles at rates that exceed their costs.

4.    Congress previously repealed a statutory cost limit that is strikingly similar to the limit that CMS now seeks to impose on governmental providers. Because Congress has directly spoken on this issue, Title XIX of the Social Security Act (the "Medicaid Statute," 42 U.S.C. §§ 1396—1396v) cannot now be interpreted to authorize the agency to re-impose the cost limit administratively. Defendants have failed to supply any reasoned explanation for resurrecting a regulatory scheme that Congress has expressly rejected. Their actions are contrary to law and are arbitrary and capricious.

5.    The Rule further violates the Medicaid Statute by impermissibly narrowing the statutory definition of a unit of government, overriding Congress' intended deference to State determinations regarding local governmental units. Since its inception, the Medicaid Statute has permitted States to fund their share of Medicaid expenditures from either State or "local sources," regardless of whether the local source has direct access to tax revenues. 42 U.S.C. § 1396a(a)(2). Under the Rule, CMS limits local contributions to units of government, which it narrowly defines as entities with taxing authority or direct access to tax revenues (or that receive appropriations as a State university teaching hospital or are Indian Tribes).

3

6.      The new limitation in the Rule impermissibly narrows the types of governmental entities that are permitted to fund the non-federal share of Medicaid program expenditures, and eliminates matching federal financial participation that would otherwise be available in violation of Sections 1902(a)(2), 1903(w)(6)(A) and 1903(w)(7)(G) of the Social Security Act. It is not supported by the Medicaid Statute, Congressional intent, or CMS' own past interpretations. In addition, Defendants have not offered a reasoned explanation for its change in policy.

7.      In addition to substantively violating the Medicaid Statute, Defendants, in an unseemly rush to attempt to finalize the Rule before Congress barred further agency action, violated a legislative moratorium (the "Moratorium") specifically prohibiting such action. The one-year Moratorium prohibits Defendants from finalizing, implementing, or taking "any action" on this Rule. The President signed the Moratorium into law on May 25, 2007, and it took effect that day. Nevertheless, CMS purports to have finalized the Rule on May 25, 2007 and published it in the Federal Register on May 29, 2007, despite the Moratorium. Because the Moratorium had already taken effect, the Rule is invalid and Defendants may not take any action in furtherance of the Rule until the Moratorium expires.

8.      These sweeping new limitations on the federal government's financial participation in State Medicaid programs will impermissibly and unwisely shift the burden of paying for the care of the Medicaid population to the States. The Rule will destabilize State Medicaid programs, thereby threatening the viability of critical hospitals and other providers that constitute the safety net for Medicaid beneficiaries and their communities. For instance, the Plaintiff hospital, Alameda, and Declarants, the Hurley Medical Center ("Hurley"), Lee Memorial Health System ("Lee Memorial"), Oregon Health & Science University ("OHSU"), El Paso County Hospital District (R.E. Thomason General Hopsital) ("Thomason"), University of

4

Colorado Hospital ("UCH"), and University of Utah Hospitals & Clinics ("UUHC"), each stand to lose millions of dollars annually in federal Medicaid funds for which they are eligible under federal law. Each of these hospitals, and many other impacted providers, will need to take steps immediately upon expiration of the Moratorium on May 25, 2008 to reduce services, staffing or other expenditures to absorb this loss of funds. The impact of these immediate cuts on their patients and communities cannot be subsequently redressed. On March 3, 2008, the House Committee on Oversight and Government Reform issued a report concluding that the expected loss of federal funding as a result of the Rule exceeded $21 billion over five years. Such a massive loss would cripple the fragile safety net system. The harm from the Rule, if allowed to take effect, would be irreparable.

9.    CMS' issuance of the Rule is contrary to the express intent of Congress, arbitrary, capricious, an abuse of discretion, and not in accordance with law in at least four major respects:

(a)    The Rule is not authorized by the Medicaid Statute as amended over the years, and violates the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA").

(b)    Issuance of the Rule violates the one-year moratorium issued by Congress in the U.S. Troop Readiness, Veterans; Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007 ("Moratorium").

(c)    The Rule is not a reasonable construction of the Medicaid Statute or BIPA.

(d)    The Rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

7295680_9.DOC

**JURISDICTION**

10.    Subject matter jurisdiction is founded on 5 U.S.C. §§ 702 and 706 and 28 U.S.C. § 1331.

11.    This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**VENUE**

12.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants include an officer or employee of an agency of the United States government and at least one Plaintiff resides within this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**PARTIES**

13.    Plaintiff, Alameda County Hospital Authority, doing business as Alameda County Medical Center ("Alameda"), is a public hospital authority established as a "government entity separate and apart from the county" pursuant to State law and Alameda County ordinance, and is located in Alameda County, California. Alameda provides a full range of services to vulnerable populations and specialty services to both the uninsured and insured that are not provided elsewhere in their communities. These include trauma care, specialty services, acute rehabilitation inpatient services, acute psychiatric services, and outpatient services. Alameda operates: Highland Hospital in Oakland, a general acute care hospital with a daily average patient load of 236 beds; John Georges Psychiatric Pavilion, an acute care psychiatric hospital in San Leandro that averages 80 beds per day, a 159-bed rehabilitation and skilled nursing facility at Fairmont Hospital, as well as outpatient clinics and free-standing community health centers. 53 percent of Alameda's patients are enrolled in Medi-Cal (California's Medicaid program), and

6

28 percent are uninsured. As a governmental entity, Alameda is not-for-profit; any revenues in excess of its costs are reinvested into the hospital system to improve our facilities, expand services and access, and secure its financial viability. Alameda stands to lose approximately $85 million annually in federal funds under the Rule.

14.    Plaintiff, National Association of Public Hospitals and Health Systems ("NAPH"), is a non-profit corporation, organized and existing under the laws of the District of Columbia. NAPH is headquartered in Washington, D.C. NAPH is a national association comprised of approximately 100 of the nation's largest urban and metropolitan area safety net hospitals and health systems, committed to providing health care services to all individuals without regard to ability to pay. NAPH members rely heavily on Medicaid revenues to support their operations and mission. A majority of NAPH members are recognized as governmental hospitals under their State laws. NAPH brings this suit on behalf of its members, which include Plaintiff Alameda and Declarants Hurley, Lee Memorial, Thomason, UCH, and UUHC.

15.    Plaintiff, American Hospital Association ("AHA"), is a non-profit corporation organized and existing under the laws of the State of Illinois. Headquartered in Chicago, Illinois, AHA's members include approximately 5,000 hospitals, health systems, networks, and other providers of medical care. AHA represents its members' interests in matters before Congress, the Executive Branch, and the courts, as well as other public and private entities. AHA brings this suit on behalf of its members, which include Declarants Hurley, Lee Memorial, Thomason, UCH, OHSU, and UUHC.

16.    Plaintiff, the Association of American Medical Colleges ("AAMC"), is a non-profit corporation organized and existing under the laws of the State of Illinois and headquartered in Washington, D.C. AAMC represents approximately 400 major public and

7

private teaching hospitals and health systems, all 129 accredited U.S. allopathic medical schools, approximately 94 professional and academic societies, and medical students and residents. The mission of AAMC is to improve the health of the public by enhancing the effectiveness of academic medicine. AAMC brings this suit on behalf of its members, which include Declarant Hurley, UCH, OHSU, and UUHC.

17.    At least one of each of the Association Plaintiffs' members possesses standing to sue in its own right. Medicaid payments are of vital concern to the members of each of the Association Plaintiffs; neither the claims asserted nor the relief demanded necessitates the participation of individual members.

18.    Defendant, the Honorable Michael O. Leavitt, is the Secretary of the United States Department of Health and Human Services, whose responsibility is, *inter alia*, to implement the provisions of the Medicaid Statute. The Secretary is sued in his official capacity only.

19.    Defendant, the United States Department of Health and Human Services ("HHS"), is responsible for implementing the provisions of the Medicaid Statute. Asserting authority under various provisions of the Social Security Act, and through the Centers for Medicare & Medicaid Services ("CMS"), HHS published the Proposed Rule on January 18, 2007. 72 Fed. Reg. 2236. Through CMS, HHS published the Rule on May 29, 2007, purportedly as a final rule, with an effective date of July 30, 2007. 72 Fed. Reg. 29748.

20.    Defendant, the Honorable Kerry N. Weems, is the Acting Administrator of CMS, the component of HHS charged with administering the Medicaid program. The Acting Administrator is sued in his official capacity only.

8

21.    Defendant, CMS, is the component of HHS that administers the Medicaid program.  CMS published the Proposed Rule on January 18, 2007.  72 Fed. Reg. 2236.  CMS published the Rule on May 29, 2007, purportedly as a final rule, with an effective date of July 30, 2007.  72 Fed. Reg. 29748.

## FACTUAL BACKGROUND

### The Medicaid Program

22.    Medicaid is a joint federal-State program established under Title XIX of the Social Security Act (42 U.S.C. §§ 1396—1396v) that pays for comprehensive health care services for more than 55 million low-income Americans.  HHS administers the Medicaid program through CMS.  Each State is given significant discretion to administer its Medicaid program, subject to a federally-approved State Medicaid Plan and to the Social Security Act and Medicaid regulations.  Section 1902(a) sets out the requirements applicable to State Medicaid Plans.

23.    Medicaid is predicated on a partnership in which the federal government shares with each State the expenses of its Medicaid program at Congressionally-determined matching rates.  These matching rates vary among States and are expressed as a Federal Medical Assistance Percentage ("FMAP").  The federal government, by statute, is responsible for between 50 percent and up to 83 percent of each State's Medicaid expenditures.  42 C.F.R. § 433.10(b).  Since the inception of the Medicaid program, federal law has permitted States to fund their share of Medicaid expenditures from sources other than state general revenues.  42 U.S.C. § 1396a(a)(2).

9

## Statutory Requirements for Medicaid Payments

24.    Two provisions of Section 1902(a) of the Social Security Act govern States'
adoption of payment methodologies for providers.  Section 1902(a)(30)(A) establishes a
substantive standard applicable to payments to all providers.  42 U.S.C. § 1396a(a)(30)(A).
Section 1902(a)(13)(A) currently establishes procedural requirements by which States must
adopt methodologies for payments to institutional providers (such as hospitals and nursing
facilities).  42 U.S.C. § 1396a(a)(13)(A).  In earlier versions of the statute, however, Section
1902(a)(13)(A) also contained substantive standards governing institutional provider payments.

25.    CMS relies upon Section 1902(a)(30)(A) as its authority for imposing a cost limit
on governmental providers.  72 Fed. Reg. 2236, 2241 (Jan. 18, 2007).  This provision is the
authority for the current regulatory upper payment limits applicable to all institutional providers
that are based on amounts paid by Medicare and that permit above-cost payments.  67 Fed. Reg.
2602, 2603 (January 18, 2002).

26.    In enacting Section 1902(a)(30)(A) in 1968, Congress required States to "assure
that payments ... *are not in excess of reasonable charges* consistent with efficiency, economy,
and quality of care."  Pub. L. No. 90-248, § 237(b) (1968) (emphasis added).  Thus, the original
provision imposed an absolute limit prohibiting payments in excess of a provider's charges.

27.    In the Omnibus Reconciliation Act of 1981, Congress amended Section
1902(a)(30)(A) to remove the provider-specific charge limit to give States more flexibility in
establishing payment methodologies.  Pub. L. No. 97-35, § 2174 (1981).

28.    In light of the fact that Congress previously repealed the provider-specific charge
limit and its justification for doing so, CMS does not have authority under Section
1902(a)(30)(A), as amended, to impose a provider-specific cost limit.  The plain language of this

provision in its current form requires that a State Medicaid plan must provide such payment

methodologies:

> as may be necessary to safeguard against unnecessary utilization of such care and
> services and to assure that payments are consistent with efficiency, economy, and
> quality of care and are sufficient to enlist enough providers so that care and
> services are available under the plan at least to the extent that such care and
> services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).

29.   Section 1902(a)(30)(A) therefore grants States wide discretion to establish

payment rates so long as they are consistent with efficiency and economy. At the same time, the

payment rates must be sufficient to be consistent with "quality of care" and must be high enough

to ensure that beneficiaries have access to local providers equal to that of the general population.

Finally, the rate structure and methods of rate-setting must "safeguard against unnecessary

utilization" of services by providers.

30.   Section 1902(a)(13) evolved along a similar path. In 1965, as part of the original

Medicaid Statute, Congress enacted Section 1902(a)(13) of the Social Security Act requiring

States to provide reimbursement for inpatient hospital services at "reasonable cost." Pub. L. 89-

97, § 121(a) (1965). In 1972, Congress imposed a Medicare-related cost limit on States'

calculation of "reasonable cost," such that payment for inpatient hospital services could not

exceed reasonable costs as such costs are calculated for inpatient hospital services in the

Medicare program. Pub. L. No. 92-603, § 232 (1972). This cost limit is strikingly similar to the

one imposed by CMS in the Rule, which also requires States to calculate the cost limit on a

provider-specific basis using Medicare reasonable cost principles. 72 Fed. Reg. at 29749.

31.   Over time, Congress grew disillusioned with the reasonable cost framework of

Section 1902(a)(13). The Boren Amendment, adopted in 1980, eliminated reasonable cost-based

payments for long term care services under Medicaid. Pub. L. No. 96-499, § 962(a) (1980).

11

Congress then applied this change to hospital services in 1981, eliminating both the requirement that States pay based on reasonable costs and the provider-specific limit based on Medicare costs. Pub. L. No. 97-35, § 2173 (1981).

32.    The legislative history of the Boren Amendment explains Congress' reasons for abandoning the cost-based reimbursement system. The Senate described the existing cost-based system as "inherently inflationary" and lacking of "incentives for efficient performance." Sen. Rep. No. 96-471, at 28 (1979); H.R. No. 97-158, 293 (1981).

33.    The move away from cost-based reimbursement in the Medicaid program mirrored a similar move in the Medicare program, where Congress adopted a prospective payment system for reimbursing hospitals for inpatient services. *See* Tax Equity and Fiscal Responsibility Act of 1982 Pub. L. 97-248, 96 Stat. 596, codified at 26 U.S.C. § 103(j); Social Security Amendments of 1983, Pub. L. No. 98-21.

34.    Prospective payment involves predetermined payments for services, and does not require the administrative burden of reconciling payments to actual costs. The prospective payment system was intended "to create incentives for hospitals to operate in a more efficient manner, since hospitals would be allowed to keep payment amounts in excess of their costs and would be required to absorb any costs in excess of the [prospective payment]." S. Rep. No. 98-23, at 47, *reprinted in* 1983 U.S.C.C.A.N. 143, 187.

35.    In 1997, Congress repealed the Boren Amendment to give States even greater flexibility over rate-setting. The current version of Section 1902(a)(13) grants States broad authority to set payment rates for institutional services subject to providing "a public process for determination of rates of payment ...." 42 U.S.C. § 1396a(a)(13)(A).

### The Upper Payment Limit Rules

36.    Under the authority of Section 1902(a)(30)(A), HHS by regulation requires that

State Medicaid payments to institutional providers not exceed upper payments limits ("UPLs")

based on what Medicare would pay for similar services. *See* 42 C.F.R. §§ 447.272(b) &

447.321(b) (2006). These UPLs are applied in the aggregate to different categories of providers.

As a result, Medicaid payments to an individual provider may exceed both the provider's costs

and the amount that Medicare would have paid to that provider, so long as aggregate payments to

providers do not exceed the applicable UPL. This approach has been endorsed by Congress.

37.    The use of Medicare payment principles as the basis for the Medicaid UPL is

consistent with the long parallel histories of the two programs. Today, Medicare has adopted

prospective payment systems for nearly all provider types – hospitals, nursing facilities,

psychiatric hospitals, home health providers, etc.

38.    With respect to hospitals, the Medicare prospective payment system explicitly

provides a range of rate enhancements that often exceed costs for certain types of providers

because of their unique and important roles in the health care system. For example, Medicare

provides indirect medical education ("IME") payments for teaching hospitals, 42 U.S.C.

§ 1395ww(d)(5)(B), "disproportionate share hospital" ("DSH") adjustments for hospitals that

serve large volumes of low income patients, 42 U.S.C. § 1395ww(d)(5)(F), and specified

payment rates for "critical access hospitals" in rural areas. 42 U.S.C. § 1395f(l). All of these

special Medicare payment provisions result in payments for some providers that are in excess of

their Medicare costs. In short, Medicare payment systems, which are not viewed as excessive or

unreasonable and which *define* reasonableness for purposes of Medicaid, allow hospitals some

margin on Medicare patients in order to ensure the viability of hospitals playing unique and

important roles in the health care system. These enhanced Medicare rates are incorporated into the regulatory UPLs established by CMS as the limit on Medicaid payments.

39. CMS has refined the UPL rules several times over the years. Through each of these refinements, CMS has preserved State flexibility to tailor Medicaid payment systems to their own needs, consistently rejecting suggestions to make the UPL apply on a provider-specific rather than aggregate basis or to base the UPL on costs rather than Medicare rates.

40. In 2000, Congress directed CMS to finalize a then-pending UPL regulation using aggregate rather than provider-specific payment limits, based on Medicare principles rather than costs. *See* The Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), § 705.

### Funding the Non-Federal Share of Medicaid Expenditures

41. Section 1902(a)(2) of the Social Security Act allows States to draw upon State and local sources to help fund their Medicaid programs, specifically permitting "local sources" to fund up to 60 percent of the non-federal share. The provision does not restrict what local sources may contribute to the non-federal share of Medicaid expenditures. Furthermore, this provision does not include any requirement that a local source of funds meet a federal definition of "unit of government" or "local unit of government." 42 U.S.C. § 1396a(a)(2).

42. Pursuant to longstanding regulations, CMS has interpreted 1902(a)(2) to allow States to use "[p]ublic funds ... as the State's share in claiming FFP" (federal financial participation) as long as "the public funds are appropriated directly to the State or local Medicaid agency, or transferred from other public agencies (including Indian tribes) to the State or local agency and under its administrative control, or certified by the contributing public agency as representing expenditures eligible for FFP under this section." 42 C.F.R. § 433.51 (2006).

14

43.    In the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments

of 1991 ("Provider Tax Amendments") Congress narrowed the scope of local funds that may be

used as the non-federal share by adding Section 1903(w) limiting federal matching of

expenditures derived from certain provider-related donations and health care-related taxes. Pub.

L. No. 102-234 (1991). CMS relies on the Provider Tax Amendments as its authority for

implementing a new definition of a unit of government.

44.    Section 1903(w)(7)(G) defines a "unit of local government" as "a city, county,

special purpose district, or other governmental unit in the State." It does not require an entity to

have taxing authority or direct access to tax revenues. In any event, this definition is provided

only for "purposes of" the limitations on provider taxes and donations, and does not address the

full range of contributions by units of local government to the non-federal share. 42 U.S.C.

§ 1396b(w)(7)(G).

45.    HHS also relies on another provision added in the Provider Tax Amendments to

support its actions—Section 1903(w)(6)(A), which limits the Secretary's authority to restrict

States' use of funds from units of government but does not limit the types of entities that may

contribute to the non-federal share:

> Notwithstanding the provisions of this subsection, the Secretary may not restrict
> States' use of funds where such funds are derived from State or local taxes (or
> funds appropriated to State university teaching hospitals) transferred from or
> certified by units of government within a State as the non-Federal share of
> expenditures under this subchapter, regardless of whether the unit of government
> is also a health care provider, except as provided in section 1396a(a)(2) of this
> title, unless the transferred funds are derived by the unit of government from
> donations or taxes that would not otherwise be recognized as the non-Federal
> share under this section.

42 U.S.C. § 1396b(w)(6)(A). This provision is a limitation on HHS' and CMS' authority to

restrict sources of non-federal share funding. It provides no additional authority for Defendants

to restrict local funding sources and does not amend the broad range of local sources recognized

15

in Section 1902(a)(2), except for the limitations on provider taxes and donations described

elsewhere in Section 1903(w) (as added by the Provider Tax Amendments).

46.    In the legislative history of the Provider Tax Amendments, Congress confirmed

its intention to protect States' use of local governmental funds from HHS regulation.   The

Conference Report explained:

> The conferees note that current transfers from county or other local teaching
> hospitals continue to be permissible if not derived from sources of revenue
> prohibited under this act.   The conferees intend the provision of section
> 1903(w)(6)(A) to prohibit the Secretary from denying Federal financial
> participation for expenditures resulting from State use of funds referenced in that
> provision.

H.R. Conf. Rep. No. 102-409 (1991).

### The Rule and Congressional Objections

47.    Beginning in the summer of 2003, CMS began closely scrutinizing States' use of

local funding sources used to finance the non-federal share of Medicaid expenditures in an effort

to enhance the fiscal integrity of the program.   CMS had been concerned about inappropriate

financing mechanisms used by some States, as documented in a series of reports issued by the

Government Accountability Office (GAO).   CMS released data in November 2006, indicating

that this initiative had been enormously successful in eliminating the problems it had identified.

The GAO confirmed the success of CMS' activity in a report issued in March, 2007.  *Medicaid

Financing: Federal Oversight Initiative Is Consistent with Medicaid Payment Principles but

Needs Greater Transparency,* GAO-07-0214 (March 2007).

48.    Despite this success, HHS included legislative proposals in both its Fiscal Year

("FY") 2005 and 2006 budget proposals to limit Medicaid payments for governmental providers

to cost and restrict the use of local funding sources.  In August 2005, the agency submitted to

Congress detailed legislative language substantially similar to the provisions of the Rule.

16

Congress declined to act on any of these proposals. By the time HHS submitted the next year's

(FY 2007) budget proposal in January 2006, CMS had apparently abandoned its effort to

convince Congress to change the statute and instead proposed to impose the changes unilaterally

through regulations. In the course of 2006, 55 Senators and 300 Representatives signed letters to

HHS urging the agency not to proceed administratively in this area.

<em>The Proposed Rule</em>

49.    CMS proposed the Rule on January 18, 2007. 72 Fed. Reg. 2236 (Jan. 18, 2007)

("Proposed Rule"). The Proposed Rule set out to make sweeping changes to the governmental

provider payment and financing arrangements with State Medicaid programs, with the effect of

significantly reducing FFP in State Medicaid programs. Specifically, CMS proposed to: (1)

impose a cost limit on Medicaid payments to governmental providers; (2) impose a new federal

definition of unit of government status that hinged on having taxing authority; and (3) require

providers to receive and retain the full amount of Medicaid payments received.

50.    CMS received over 400 comment letters responding to the Proposed Rule. These

commenters included each of the Plaintiffs, as well as numerous State Medicaid agencies, State

hospital associations, other individual hospitals, and other providers. Of the more than 400

letters, the vast majority either criticized the Proposed Rule, called for a delay or amendments to

it, or called for HHS to withdraw it. Not one commenter uniformly approved of the Proposed

Rule. Many commenters described the Proposed Rule as inconsistent with the Social Security

Act and Congressional intent, and harmful to safety net providers and to Medicaid beneficiaries.

<em>Congressional Action</em>

51.    Congress' response to the Proposed Rule was overwhelmingly negative.

Members of both the House and the Senate quickly took action against its implementation.

17

43 Senators sent a letter to the Finance Committee leadership and 226 members of the House

sent a letter to the Energy & Commerce and Ways & Means Committee leadership stating their

opposition to the Rule and the negative impact it would have on governmental providers and

their patients. In addition, 60 Senators and 153 Representatives sent letters to HHS Secretary

Leavitt expressing their concerns. In all, 263 members of the House and 69 Senators are on

record in opposition to the Rule.

52.    Frustrated with CMS' and HHS' persistent disregard for clearly expressed

Congressional will, Congress began work to impose legal restrictions on the agency's authority

to finalize the Proposed Rule. In March of 2007, Congress approved a one-year moratorium to

prevent HHS from taking any further action on the Proposed Rule. The moratorium was

attached to an emergency supplemental appropriations bill that was vetoed. Two months later,

Congress again included a one-year moratorium in the U.S. Troop Readiness, Veterans' Care,

Katrina Recovery and Iraq Accountability Appropriations Act of 2007, which it passed on May

24, 2008. On May 25th, the President signed the bill into law, and the Moratorium took effect

the same day.

53.    The Moratorium prohibits Defendants from taking "any action" to promulgate,

finalize, or implement the Rule, or take any "other administrative action" relating to the Rule

"prior to the date that is one year after the date of enactment." The provision reads as follows:

> Notwithstanding any other provision of law, the Secretary of Health and Human
> Services shall not, prior to the date that is 1 year after the date of enactment of this
> Act, take any action (through promulgation of regulation, issuance of regulatory
> guidance, or other administrative action) to –
> (A) finalize or otherwise implement provisions contained in the proposed rule
> published on January 18, 2007, on pages 2236 through 2248 of volume 72,
> Federal Register (relating to parts 433, 447, and 457 of title 42, Code of Federal
> Regulations);
> (B) promulgate or implement any rule or provisions similar to the provisions
> described in subparagraph (A) pertaining to the Medicaid program established

18

under title XIX of the Social Security Act of the State Children's Health
Insurance Program established under title XXI of such Act; or
(C) promulgate or implement any rule or provisions restricting payments for
graduate medical education under the Medicaid program.

Pub. L. No. 110-28. The Moratorium took effect immediately upon the date of

enactment, May 25, 2007, and will remain in place through May 24, 2008.

54.    Throughout the Spring of 2007, Defendants were well aware of Congress' strong

opposition to the Rule and that a Moratorium was on the verge of being enacted by Congress and

signed into law by the President. In addition to public statements about the Moratorium by

Senate leadership, the Acting Administrator of CMS wrote a letter to Finance Committee

leadership on March 27, 2007 expressing the agency's opposition to the Moratorium.

Nonetheless, CMS rushed the Rule into purportedly final form (with numerous obvious

typographical, grammatical and other errors) and placed it on display at the Federal Register

office on May 25, 2007, the day the Moratorium took effect, in an ill-advised effort to "beat the

clock" and circumvent the unmistakable will of Congress that further action on the Rule cease.

CMS then published the Rule on May 29, 2007, to be made effective July 30, 2007. 72 Fed.

Reg. 29748 (May 29, 2007).

### Safety Net Hospitals

55.    "Safety net providers," including many of the nation's public hospitals, form the

core of the provider network on which State Medicaid programs rely to guarantee services for

their Medicaid populations. The mission of safety net hospitals is to provide access to care for

all, regardless of ability to pay. Many also provide highly sophisticated specialty and tertiary

care services (Level I trauma units, burn care units, neonatal intensive care, psychiatric

emergency services, to name a few) upon which entire communities rely. Many of the nation's

doctors are trained at safety net teaching hospitals. These institutions are often located in poor,

19

underserved areas; they cater to diverse and needy patient populations, and they treat many of the nation's most vulnerable Medicaid beneficiaries and uninsured patients.

56.    Safety net hospitals are dependent on Medicaid revenues for survival, including revenues that exceed their direct costs of providing Medicaid services. These revenues help stabilize the operations of these facilities which would otherwise be financially precarious, and are used to maintain and expand access to care and services for Medicaid patients. States, in turn, have a keen interest in providing sufficient Medicaid funding for these financially distressed institutions to ensure their viability and ongoing availability to serve the Medicaid population. These payments are made within the regulatory UPLs, consistent with, the framework Congress has established as an aggregate limit on Medicaid payments to providers.

57.    The Rule denies States the ability to provide a potential Medicaid margin to those very hospitals (governmental hospitals) that are most likely to be financially distressed because of high losses on care for the uninsured, have the least ability to "cross subsidize" losses with revenue from other payers (Medicare, commercial insurance), and whose viability (or lack thereof) will most directly impact access to care for Medicaid patients.

58.    Local governments, including governmental providers, often provide the non-federal share of enhanced Medicaid rates paid to safety net hospitals. This practice is consistent with a long tradition of local government funding of health care for the poor. Without the opportunity to match these local funding sources, Medicaid reimbursement for safety net hospitals would be significantly lower.

### Harm

59.    The Rule eliminates billions of dollars in critical federal financial participation that the federal government is obligated to provide State Medicaid programs under the Social

7295680_9.DOC

Security Act. The Rule impermissibly restricts States to a cost-based limit on payments to governmental providers, subject to retroactive reconciliation. The Rule also impermissibly prevents providers and other entities recognized to be governmental under State law and traditionally regarded as governmental from contributing to the State share of Medicaid program expenditures. The loss of funding will result in the destabilization of the Medicaid program and threaten the continued operation of governmental hospitals. Many of the providers affected by the Rule operate on very thin margins. The elimination of enhanced reimbursement and the cost-based limit will result in substantial negative margins for many providers, forcing them to eliminate essential services, staff, and capital improvement efforts. Furthermore, if local funding sources no longer qualify for federal matching funds, there will be no other available source of non-federal share funding, which will further reduce Medicaid payments made to providers and jeopardize the viability of the Medicaid program.

60.    The annual losses in federal Medicaid funds anticipated by Alameda and the Declarant hospitals if the Rule is implemented are summarized below. These projected losses will require Alameda and the Declarant hospitals, as well as many other members of the Association Plaintiffs, to reduce or eliminate critical inpatient and outpatient services. These same institutions also will be forced to reduce essential community-wide services, to lay off staff, and to abandon capital and technology improvements. Medicaid beneficiaries will suffer the direct consequences of these cutbacks through reduced services, longer waiting times and less access to high quality care.

61.    Alameda would lose $85 million annually, which constitutes 19 percent of its $460 million operating budget. If Alameda remains a viable institution, it estimates this loss of funds would result in:  longer waits in the emergency room for inpatient beds, aggravating an

21

already significant problem; rationing of care and longer wait times in the clinics for specialists and primary care; delayed surgeries; complete closing of some outpatient primary and specialty clinics; closure of some inpatient units; a forced shift in focus to acute services rather than preventative services, resulting in sicker patients entering the acute care setting; reduction in HIV services, physician training programs, health education and outreach programs, and dental services; and, reduction in work force.

62.     Lee Memorial would lose $23.2 million annually, which constitutes 52 percent of its $44 million budgeted margin from operations. Even though it is the only trauma center in the region, it will be forced to delay or eliminate significant capital projects related to patient care, and will be forced to consider whether the safety net services it provides can continue.

63.     UCH would lose $30-35 million annually, which constitutes 6 percent of its operating revenues. As a result, UCH will have to reexamine its future participation in the Colorado Indigent Care Program.

64.     Thomason would lose $22 million annually, which constitutes nearly 7 percent of its overall operating budget. In order to remain operational, Thomason will be forced to curtail or eliminate services to a community that is already underserved, limit further expansion of some services despite a growing community need, and cut costly services.

65.     Hurley would lose $6 million to $12.8 million annually, which represents between 2 and 4 percent of the Medical Center's operating budget. This loss will result in the potential reduction in staffing and curtailment of plans for future capital projects, including the much needed expansion of its emergency department. Hurley's emergency department is the tri-county region's center for disaster preparedness. The threat to Hurley's emergency department puts the community and the 22 additional counties Hurley serves in jeopardy.

22

66.   OHSU would lose $2.8 million annually, which will significantly damage its ability to continue to provide health care and fulfill its mission of teaching.  OHSU will be forced to face cuts to its programs, including under-reimbursed specialty services, and Medicaid and charity care.

67.   UUHC will lose at least $25 million annually, which constitutes more than 3.5 percent of its operating budget.  UUHC will be forced to make cuts or reductions among services such as inpatient psychiatric services, pain clinic services, community clinics, inpatient beds, and medical school support.  UUHC will have to delay or cease efforts to make needed improvements to its facilities and equipment and will have to limit needed expansions of some services.

68.   The children's hospital members of declarant the National Association of Children's Hospitals ("N.A.C.H.") will face decreases in reimbursement either from reductions in benefits or coverage for their Medicaid patients or from cuts to payments to providers, both of which will have a profound impact on their ability to provide critical medical services to all children.  N.A.C.H.'s members will quickly confront decisions about service cutbacks that impact access to services for all children, include the 29 million children currently covered by Medicaid.

69.   All Plaintiffs and their member hospitals have an interest in guaranteeing and delivering high quality health care to Medicaid recipients in an efficient manner and at payment rates sufficient to enable them to continue to meet patients' needs.  Plaintiffs are interested in maintaining access to federal financial participation in their States' Medicaid programs, and in ensuring that unlawful reductions in federal financial participation do not jeopardize Medicaid beneficiaries' access to services.

7295680_9.DOC

70.    Substantial, imminent, and irreparable injury will result because Plaintiff Alameda and members of the Plaintiff associations will be unable to recover the funding lost due to the Rule. Moreover, these hospitals and similarly situated providers will be unable to adequately care for the Medicaid population due to the decrease in payments, jeopardizing the entire safety net system.

71.    A survey of State Medicaid Directors undertaken by the Committee on Oversight and Government Reform of the U.S. House of Representative in February 2008 regarding the expected impact of the Rule on individual States found that the expected loss of federal funding across the 43 States and the District of Columbia that responded to the survey was $21 billion over five years, rather than the $5 billion estimated by CMS. Several States projected severe consequences for their health care systems. *See* Committee on Oversight and Government Reform, *The Administration's Medicaid Regulations: State-by-State Impacts*, March 2008.

### Appropriateness of Injunctive Relief

72.    Plaintiffs do not have an adequate remedy at law. If the Rule takes effect, the Plaintiff hospital and the Plaintiff Associations' members, will lose, and be unable to recover, substantial federal funds for which they qualify under federal law. These items and services that these lost funds would have provided to patients cannot subsequently be provided on a retroactive basis.

73.    The balance of equities favors injunctive relief because:

(a) Plaintiff Alameda and the Plaintiff Associations' members will incur substantial, imminent and irreparable harm if the Rule goes into effect; and

24

(b) Enjoining and invalidating the Rule will not harm HHS because the Rule and its issuance is unlawful, contrary to the will of Congress, and not rationally related to harms identified by the agency.

74. Issuance of an injunction is in the public interest because:

(a) It is always in the public interest that agencies faithfully fulfill statutory mandates; and

(b) Protection of the health and wellbeing of Medicaid beneficiaries and preservation of the fiscal viability of the hospitals that provide Medicaid services defines the public interest in this case.

75. Plaintiffs have no effective administrative remedies.

76. Plaintiffs have complied with all necessary conditions to bring this action.

### Count One
### (Action Not in Accordance with Law)

77. Plaintiffs incorporate Paragraphs 1-76 above as if fully set forth herein.

78. This is a claim for declaratory and injunctive relief.

79. The APA, 5 U.S.C. § 551 *et seq.* and 5 U.S.C. § 702 *et seq.*, provides for judicial review of federal agency actions.

80. The APA provides that a court may "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

81. In promulgating the Rule, Defendants violated the APA for the following reasons:

(a) The Rule is inconsistent with, and is not a reasonable construction of, Section 1902(a)(30)(A) of the Social Security Act as amended,

which reflects Congress' intent not to impose a provider-specific

limit on Medicaid payments to governmental providers, and to

grant flexibility to the States to provide incentives to establish

efficient and economic payment rates.

(b) The Rule is inconsistent, and is not a reasonable construction of,

Section 1902(a)(13) of the Social Security Act as amended, which

reflects Congress' intent not to require States to limit Medicaid

payments to governmental providers to their costs, and to grant

States flexibility in establishing institutional provider payment

methodologies.

(c) The Rule is inconsistent with, and is not a reasonable construction

of, the Medicare, Medicaid, and SCHIP Benefits Improvement and

Protection Act of 2000 ("BIPA"), through which Congress

required that HHS allow States to establish Medicaid upper

payment limits for payments to governmental providers on an

aggregate, categorical basis rather than based on each provider's

costs.

(d) The Rule is inconsistent with, and is not a reasonable construction

of, Section 1902(a)(2) of the Social Security Act, which does not

restrict the use of governmental funds as the non-federal share of

Medicaid expenditures in the manner required by the Rule.

(e) The Rule is inconsistent with, and is not a reasonable construction

of, Section 1903(w)(7)(G) of the Social Security Act, which

26

contains a deliberately broad definition of a "unit of local government" that is impermissibly narrowed by the Rule, and which does not establish a limitation on contributions to the non-federal share except as provided in Section 1903(w);

(f) By publishing, and purporting to finalize, the Rule, HHS violated the Moratorium provided in the U.S. Troop Readiness, Veterans; Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, which prohibits HHS from taking any action on the Rule for one year effective May 25, 2007.

### Count Two
### (Arbitrary and Capricious Action)

82.    Plaintiffs incorporate Paragraphs 1-81 above as if fully set forth herein.

83.    This is a claim for declaratory and injunctive relief.

84.    The APA, 5 U.S.C. §§ 551 *et seq.* and 5 U.S.C. §§ 702 *et seq.*, provides for judicial review of federal agency actions.

85.    The APA provides that a court may "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

86.    In promulgating the Rule, Defendants acted in an arbitrary and capricious manner because the Rule is not rationally related to any objectives provided by Congress for the Medicaid program or that Defendants have proffered in support of the Rule. Moreover, Defendants have failed sufficiently to explain the basis for their new interpretations of the Social Security Act. Defendants have provided no basis for establishing different payment limits for governmental providers and other providers. The provision will not accomplish Defendants'

27

stated goals and is unnecessary. The unit of government definition also will not result in accomplishing Defendants' stated goals, sharply departs from principles of federalism that are the underpinning of the Medicaid program, and will result in legitimate governmental providers no longer qualifying as governmental and therefore no longer qualifying to contribute to the non-federal share of Medicaid expenditures.

WHEREFORE, Plaintiffs pray that this Honorable Court enter the following relief:

(a) A preliminary and permanent injunction vacating the Rule, requiring Defendants to withdraw the Rule, and enjoining the Secretary from enforcing the Rule;

(b) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Rule is, and was issued, in violation of federal law;

(c) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Rule is not a reasonable construction of the Medicaid Statute or BIPA.

(d) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Secretary's issuance of the Rule was effected in an arbitrary and capricious fashion, and is therefore unlawful under the APA; and

(e) Such other and further relief as this Court deems appropriate.

Dated: March 11, 2008

7295680_9.DOC

Respectfully submitted,


WILLIAM C. CRENSHAW
D.C. Bar No. 968545
POWELL GOLDSTEIN LLP
901 New York Avenue, NW, Third Floor
Washington, DC 20001
(202) 347-0066


NATHAN A. BROWN
D.C. Bar No. 468750
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4600


Of Counsel:

LARRY S. GAGE
D.C. Bar No. 165332
BARBARA D.A. EYMAN
D.C. Bar No. 439684
CHARLES LUBAND
D.C. Bar No. 458319
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4600

Attorneys for Plaintiffs

7295680_9.DOC

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER et al. | MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Service, et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

NATHAN A. BROWN         WILLIAM C. CRENSHAW
ROPES & GRAY LLP        POWELL GOLDSTEIN LLP
700 12th Street, NW     901 New York Avenue, NW, Third Floor
Suite 900               Washington, DC 20001
Washington, DC 20005    (202) 347-0066
(202) 508-4600

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. Antitrust
☐ 410 Antitrust

○ B. Personal Injury/ Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

◉ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. _Habeas Corpus/_ _2255_** | ○ **H. _Employment_ _Discrimination_** | ○ **I. _FOIA/PRIVACY_ _ACT_** | ○ **J. _Student Loan_** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. _Labor/ERISA_** **_(non-employment)_** | ○ **L. _Other Civil Rights_** **_(non-employment)_** | ○ **M. _Contract_** | ○ **N. _Three-Judge Court_** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original    ○ 2 Removed    ○ 3 Remanded from    ○ 4 Reinstated    ○ 5 Transferred from    ○ 6 Multi district    ○ 7 Appeal to
   Proceeding     from State      Appellate Court    or Reopened     another district     Litigation      District Judge
                Court                                   (specify)                          from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. § 551 et seq.; 5 U.S.C. § 702 et seq.

**VII. REQUESTED IN**
    **COMPLAINT**     ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     **DEMAND $** [_____]   Check YES only if demanded in complaint
                                                      **JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S)**
      **IF ANY**     (See instruction)     YES ☐   NO ☒   If yes, please complete related case form.

DATE  3/11/2008     SIGNATURE OF ATTORNEY OF RECORD  _Matt A. B_____

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.       COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.