## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER, <br><br> *et al.* <br><br> **Plaintiffs,** <br><br> v. <br><br> MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, <br><br> *et al.* <br><br> **Defendants.** | Civil Action No. 1:08-00422 |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, pursuant to Fed. R. Civ. P. 56(a), respectfully move for summary judgment on their Complaint, which seeks injunctive and declaratory relief against Defendants' issuance of a regulation, *Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("the Rule").

There are no disputed issues of material fact and Plaintiffs are entitled to judgment as a matter of law. This case involves the review of agency action, namely the issuance of the Rule. As such, the material facts are not in dispute. Whether this Rule violates federal law or is arbitrary and capricious is a matter of law for the Court. The Rule violates: (1) various provisions of Title XIX of the Social Security Act, as amended through the years, 42 U.S.C. § 1396—1396v ("the Medicaid Statute"); (2) Section 705 of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000,

H.R. 5661, 106th Cong. (1999), enacted into law by reference in Pub. L. No. 106-554,

§ 1(a)(6), 114 Stat. 2763 (2000); and (3) the U.S. Troop Readiness, Veterans' Care,

Katrina Recovery and Iraq Accountability Appropriations Act of 2007, which imposed a

one-year moratorium on Defendants' issuance of the Rule or any other action in

furtherance of the Rule, effective May 25, 2007.  Pub. L. No. 110-28, § 7002(a), 121 Stat.

112 (2007).  In addition, Defendants' interpretation of the Medicaid Statute is not a

reasonable construction of the Statute and the Rule is otherwise arbitrary and capricious.

Accordingly, Plaintiffs respectfully submit that their Motion for Summary

Judgment should be granted.  In support of their Motion, Plaintiffs submit their (i)

Memorandum in Support of Motion for Summary Judgment; (ii) Statement of Material

Facts; and (iii) Exhibit File.

Dated: April 4, 2008

Respectfully submitted,

WILLIAM C. CRENSHAW
D.C. Bar No. 968545
POWELL GOLDSTEIN, LLP
901 New York Avenue, NW, Third Floor
Washington, DC 20001
(202) 347-0066

/s/ Nathan A. Brown
NATHAN A. BROWN
D.C. Bar No. 468750
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4600

Of Counsel:

LARRY S. GAGE
D.C. Bar No. 165332
BARBARA D.A. EYMAN
D.C. Bar No. 439684
CHARLES A. LUBAND
D.C. Bar No. 458319
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4600

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of April 2008, I caused a true and accurate copy of the foregoing to be filed electronically and therefore available for viewing and downloading from the Electronic Case Filing system.  Electronic service of the Notice of Electronic Case Filing constitutes service of this document on the following:

Tamra T. Moore
Lead Counsel for Defendants
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530

/s/ Nathan A. Brown

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER, <br><br> *et al.* <br><br><br> **Plaintiffs,** <br><br> **v.** <br><br> THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, <br><br> *et al.* <br><br> **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Civil Action No. 1:08-00422**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

PARTIES ..............................................................................................................2

BACKGROUND ....................................................................................................2

LEGAL STANDARD FOR SUMMARY JUDGMENT AND REVIEW OF
     AGENCY ACTION ..........................................................................................13

ARGUMENT ......................................................................................................16

I.     THE COST LIMIT PROVISIONS OF THE RULE ARE INCONSISTENT
     WITH THE MEDICAID STATUTE, AS IT HAS BEEN AMENDED
     THROUGH THE YEARS, ARE AN UNREASONABLE
     CONSTRUCTION OF THE MEDICAID STATUTE, AND ARE
     ARBITRARY AND CAPRICIOUS. ......................................................................17

     A.     Congress Has Plainly Addressed, and Rejected, a Cost Limit on
          Payments to Medicaid Providers .................................................................17

     B.     CMS' Reimposition of a Cost Limit on Payments to Governmental
          Providers is Not a Reasonable Construction of the Medicaid Statute
          and is Arbitrary and Capricious....................................................................22

II.    THE RULE VIOLATES BIPA'S STATUTORY REQUIREMENT THAT
     CMS ESTABLISH AGGREGATE UPPER PAYMENT LIMITS AND IS
     AN UNREASONABLE CONSTRUCTION OF BIPA...................................................28

III.   THE UNIT OF GOVERNMENT PROVISIONS OF THE RULE ARE
     INCONSISTENT WITH THE MEDICAID STATUTE, ARE AN
     UNREASONABLE CONSTRUCTION OF THE MEDICAID STATUTE,
     AND ARE ARBITRARY AND CAPRICIOUS...........................................................29

     A.     The Medicaid Statute Does Not Condition Eligibility to Participate in
          Funding the Non-Federal Share on Direct Access to Tax Revenues.......................30

     B.     The Rule's Focus on Tax Revenues is Not a Reasonable Construction
          of the Statute, is Arbitrary and Capricious, and is Inconsistent with
          Federalism....................................................................................................34

IV.   ISSUANCE OF THE RULE VIOLATES THE STATUTORY
     MORATORIUM AGAINST TAKING ANY ACTION IN
     FURTHERANCE OF THE RULE .........................................................................37

REMEDY............................................................................................................39

CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Adams Fruit Co. v. Barrett*,
    494 U.S. 638 (1990)..................................................................................................16

*Alabama Education Ass'n v. Chao*,
    455 F.3d 386 (D.C. Cir. 2006)....................................................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................13, 14

*AFL-CIO v. Brock*,
    835 F.2d 912 (D.C. Cir. 1987)....................................................................................23

*Anna Jacques Hospital v. Leavitt*,
    No. 05-625, 2008 WL 510337 (D.D.C. Feb. 26, 2008)............................................22

*Ashley County Med. Ctr. v. Thompson*,
    205 F. Supp. 2d 1026 (E.D. Ark. 2002)......................................................................23

*Ass'n of Civilian Tecnicians v. Federal Labor Relations Auth.*,
    269 F.3d 1112 (D.C. Cir. 2001)..................................................................................16

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
    412 U.S. 800 (1973)....................................................................................................24

*Bank of Am. NT & SA v. Riley*,
    940 F.Supp. 348 (D.D.C 1996)..................................................................................15

*Bd. of Comm'rs of Kearny County Kan. v. Vandriss*,
    115 F. 866 (8th Cir. 1902), *cert. denied* 187 U.S. 642 (1902)................................38

*Block v. Powell*,
    227 F. Supp. 2d 25 (D.D.C 2002)..............................................................................14

*Bowen v. American Hospital Ass'n*,
    476 U.S. 610 (1986)..............................................................................................23, 26

*Brown v. Summers*,
    201 F. Supp. 2d 60 (D.D.C. 2002)..............................................................................16

*Burgess v. Salmon*,
    97 U.S. 381 (1878)......................................................................................................38

*Burlington N. & Santa Fe Railway Co. v. Surface Transp. Bd.*,
    403 F.3d 771 (D.C. Cir. 2005)..............................................................................26, 35

*Bush-Quayle '92 Primary Comm., Inc. v. FEC,*
  104 F.3d 448 (D.C. Cir. 1997) ....................................................................23

*Camp v. Pitts,*
  411 U.S. 138 (1973)................................................................................14

*Celotex v. Catrett,*
  477 U.S. 317 (1986)................................................................................13

*\*Chevron U.S.A. Inc. v. Natural Resources Defense Council,*
  467 U.S. 837 (1984)................................................................14, 22, 29

*City of Newark v. New Jersey,*
  262 U.S. 192 (1923)................................................................................32

*Connecticut Nat'l Bank v. Germain,*
  503 U.S. 249 (1992)................................................................................32

*Davis County Solid Waste Mgmt. & Energy Rec. Sp. Service District v. EPA,*
  108 F.3d 1454 (D.C. Cir. 1997) ....................................................................40

*\*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000)................................................................................15

*Gardner v. Collector,*
  73 U.S. (6 Wall.) 499 (1867) ....................................................................38

*Goldstein v. SEC,*
  451 F.3d 873 (D.C. Cir. 2006) ....................................................................23, 26

*Gozlon-Peretz v. United States,*
  498 U.S. 395 (1991)................................................................................38

*Holloway v. United States,*
  526 U.S. 1 (1999)................................................................................38

*Kmart Corp. v. Cartier Inc.,*
  486 U.S. 281 (1988)................................................................................15, 40

*MCI Telecomm. Corp. v. AT& T Co.,*
  512 U.S. 218 (1994)................................................................................22, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)................................................................................23, 24

*Mova Pharm. Corp. v. Shalala,*
  140 F.3d 1060 (D.C. Cir. 1998) ....................................................................15

*Muscogee (Creek) Nation v. Hodel,*
    851 F.2d 1439 (D.C. Cir. 1988) ............................................................21

*Nat'l Ass'n of Broadcasters v. Librarian of Congress,*
    146 F.3d 907 (D.C. Cir. 1998) ..............................................................22

*National Black Media Coalition v. FCC,*
    775 F.2d 342 (D.C. Cir. 1985) ..............................................................23

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ............................................................40

*N.C. Fisheries Ass'n v. Gutierrez,*
    518 F. Supp. 2d 62 (D.D.C 2007)) ........................................................14

*Ohio v. DOI,*
    880 F.2d 432 (D.C. Cir. 1989) ..............................................................15

*Professional Reactor Operator Soc. v. NRC,*
    939 F.2d 1047 (D.C. Cir. 1991) ............................................................16

*Rempfer v. U.S. Depar't of Air Force Board for Correction of Military Records,*
    2008 U.S. Dist. LEXIS 19641 (D.D.C. 2008) ........................................16

*Republican Nat'l Comm. v. FEC,*
    76 F.3d 400 (D.C. Cir. 1996) ................................................................23

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ..............................................................................36

*Scheduled Airlines Traffic Offices, Inc. v. DOD,*
    87 F.3d 1356 (D.C. Cir. 1996) ..............................................................16

*Shays v. FEC,*
    414 F.3d 76 (D.C. Cir. 2005) ................................................................15

*Taylor v. Brown,*
    147 U.S. 640 (1893) ..............................................................................39

*Tripoli Rocketry Ass'n v. BATFE,*
    437 F.3d 75 (D.C. Cir. 2006) ...........................................................25, 26

*United States v. Will,*
    449 U.S. 200 (1980) ..............................................................................38

*Watt v. Alaska,*
    451 U.S. 259 (1981) .........................................................................23, 35

*Wilder v. Virginia Hosp. Ass'n,*
   496 U.S. 498 (1990) ........................................................................................21

*Wilderness Soc'y v. DOI,*
   205 U.S. Dist. LEXIS 20042 (D.D.C 2005) ....................................................14


**STATUTES AND LEGISLATIVE MATERIALS**

5 U.S.C. § 551(13) ...................................................................................................39

5 U.S.C. § 552 .........................................................................................................37

5 U.S.C. § 706(2) ..............................................................................................14, 23

42 U.S.C. § 1395f .....................................................................................................5

42 U.S.C. § 1395ww ..................................................................................................5

42 U.S.C. §§ 1396-1396v ..........................................................................................2

42 U.S.C. § 1396a ............................................................................................*passim*

42 U.S.C. § 1396b ............................................................................................*passim*

42 U.S.C. § 1396r-4 ................................................................................................27

44 U.S.C. § 1507 .....................................................................................................37

Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000
   ("BIPA") ....................................................................................................4, 28

U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability
   Appropriations Act of 2007, Pub. L. No. 110-28, § 7002(a), 121 Stat. 112 (2007) .......9, 10, 37

Pub. L. 89-97, § 121(a), 79 Stat. 286 (1965) ....................................................3, 6, 20

Pub. L. 102-234, 105 Stat. 1793 (1991) ("Provider Tax Amendments") ..........7, 31, 34

Pub. L. No. 90-248, § 237(b), 81 Stat. 821 (1967) .............................................3, 18, 19

Pub. L. No. 92-603, § 232, 86 Stat. 1329 (1972) ....................................................3, 20

Pub. L. No. 96-499, § 962(a), 94 Stat. 2599 (1980) ................................................3, 20

Pub. L. No. 97-35, § 2174, 95 Stat. 357 (1981) .............................................3, 18, 19, 20

Pub. L. No. 98-21, 97 Stat. 65 (1983) .........................................................................20

Pub. L. No. 106-554, § 1(a)(6), 114 Stat. 2763 (2000)..................................................4

H.R. 1591, 110th Cong. § 6002 (2007) .......................................................................10

H.R. 5661, 106th Cong. (1999)................................................................................4, 28

H.R. Rep. No. 105-149 (1997)........................................................................................20

H.R. Rep. No. 97-158 (1981)....................................................................................19, 21

Sen. Rep. No. 96-471 (1979) ...................................................................................20, 21

Sen. Rep. No. 97-139 (1981) .........................................................................................21

## REGULATIONS AND OTHER REGULATORY MATERIALS

42 C.F.R. § 430.10 ...........................................................................................................3

42 C.F.R. § 433.10 ...........................................................................................................3

42 C.F.R. § 433.50 ......................................................................................................4, 30

42 C.F.R. § 433.51 ..................................................................................................4, 7, 31

42 C.F.R. § 447.206 .........................................................................................................4

42 C.F.R. § 447.207 ....................................................................................................4, 28

42 C.F.R. § 447.253 .......................................................................................................24

42 C.F.R. § 447.271 .........................................................................................................4

42 C.F.R. § 447.272 ....................................................................................................4, 28

42 C.F.R. § 447.321 .........................................................................................................4

42 C.F.R. § 457.220 .........................................................................................................4

42 C.F.R. § 457.628 .........................................................................................................4

41 Fed. Reg. 27300 (July 1, 1976).................................................................................20

46 Fed. Reg. 47964 (Sep. 30, 1981) ..............................................................................24

48 Fed. Reg. 56046 (Dec. 19, 1983) .........................................................................4, 24

52 Fed. Reg. 28141 (Jul. 28, 1987).................................................................................4

58 Fed. Reg. 51735 (Oct. 4, 1993) ........................................................................36

65 Fed. Reg. 60151 (Oct. 10, 2000) ......................................................................28

66 Fed. Reg. 3148 (Jan. 12, 2001) .....................................................................4, 29

67 Fed. Reg. 2602 (Jan. 18, 2002) .........................................................................4

72 Fed. Reg. 2236 (Jan. 18, 2007) ................................................................ *passim*

72 Fed. Reg. 2763 (Jan. 23, 2007) ......................................................................36

72 Fed. Reg. 29748 (May 29, 2007) ............................................................ *passim*

72 Fed. Reg. 55160 (Sept. 28, 2007) ...................................................................37

## FEDERAL RULES

Fed. R. Civ. P. 56(c) ..........................................................................................13

## OTHER

JOHN MARTINEZ ET AL., LOCAL GOVERNMENT LAW § 23:2 (2006) ..............................34

## PRELIMINARY STATEMENT

Plaintiffs submit this Memorandum in support of their Motion for Summary Judgment in their legal challenge to the Medicaid rule entitled *Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("the Rule"), purportedly finalized by the Department of Health and Human Services ("HHS").  *See* Defendants' Administrative Record (hereinafter, "Adm. Rec.") 1-89.  The Rule would contravene the Medicaid Statute as it has evolved over the last forty years, and would fundamentally alter the federal-state partnership that is at the core of the Medicaid program—with catastrophic results to public hospitals.  In particular,

- The Rule re-establishes a cost-based limit on Medicaid payments, which Congress repealed as inefficient and administratively burdensome, and imposes this cost limit on payments to governmental providers, but not other providers, in violation of Sections 1902(a)(30)(A) and 1902(a)(13)(A) of the Social Security Act as amended;

- By imposing a provider-specific cost limit, the Rule overrides the Congressional mandate for regulations that recognize aggregate limits based on Medicare payment principles, as contained in the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000; and

- The Rule restricts the permissible sources of the State's contribution to Medicaid expenditures to units of government with direct access to tax revenues, a condition that Congress has never imposed on States and that contravenes decades of Medicaid payment policies, in violation of Section 1902(a)(2) and 1903(w) of the Social Security Act.

Moreover, in this Rule HHS has discarded its own longstanding interpretations of the Medicaid Statute in favor of arbitrary and capricious policies not rationally related to the agency's stated objectives.  The Congressional opposition to the Rule has been clear and emphatic, culminating in a legislative moratorium barring its implementation, which took effect May 25, 2007.  HHS nevertheless issued the Rule over the objections of Congress and in violation of the moratorium.

There are no disputed issues of material fact and Plaintiffs are entitled to judgment as a matter of law.

## PARTIES

Plaintiff Alameda County Medical Center ("Alameda") is a governmental provider that participates in California's Medicaid program—the Medi-Cal program. Ex. 2, Declaration of Wright Lassiter, CEO, Alameda (hereinafter "Lassiter Decl."), ¶ 5.[1] Plaintiffs the National Association of Public Hospitals and Health Systems ("NAPH"), the American Hospital Association ("AHA"), and the Association of American Medical Colleges ("AAMC") (together, "Associations") are national hospital associations whose members include governmental "safety net" hospitals that form the core of the provider network on which State Medicaid programs rely to serve their Medicaid populations. Ex. 9, Declaration of Christine Capito Burch, Executive Director, NAPH (hereinafter "Burch Decl."), ¶ 6-7; Ex. 10, Declaration of Melinda Reid Hatton, General Counsel, AHA (hereinafter "Hatton Decl."), ¶¶ 5-6, 15; Ex. 11, Declaration of Ivy Baer, Regulatory Counsel, AAMC (hereinafter "Baer Decl."), ¶¶ 5, 7.

Defendant Michael O. Leavitt is the Secretary of Defendant HHS (the "Secretary"), and is responsible for implementing Title XIX of the Social Security Act ("SSA" or "the Act"), as amended, 42 U.S.C. §§ 1396-1396v, which establishes the Medicaid program ("Medicaid Statute"). Defendant Kerry Weems is the Acting Administrator of Defendant Centers for Medicare and Medicaid Services ("CMS"), the agency within HHS that administers the Medicaid program.

## BACKGROUND

### The Medicaid Federal-State Partnership

Medicaid is a joint federal-state program providing coverage of comprehensive health care services for eligible low-income persons. 42 U.S.C. §§ 1396a-1396b. Each State is given

---

[1] The appendix to this Memorandum includes Plaintiffs' exhibits in support of their Motion for Summary Judgment.

significant discretion to administer its Medicaid program, subject to a federally-approved State

Medicaid Plan and to broad national guidelines and applicable Medicaid regulations.  *See* 42

U.S.C. § 1396a; 42 C.F.R. § 430.10.  Medicaid is predicated on a partnership in which the

federal government shares with each State the expenses of its Medicaid program at statutorily-

determined matching rates.  These rates of federal financial participation ("FFP") vary among

States and are expressed as a Federal Medical Assistance Percentage ("FMAP").  *See* 42 C.F.R.

§ 433.10.

### Medicaid Requirements for Payments to Providers

In the early years of the program, federal Medicaid law imposed provider-specific limits

on the amount States could pay providers.  Payments could not exceed a provider's charges for

the services provided.  Pub. L. No. 90-248, § 237(b), 81 Stat. 821 (1967) (creating

§ 1902(a)(30)(A) of the SSA).  Payments to hospitals could not exceed the provider's reasonable

costs.  Pub. L. No. 89-97, § 121(a), 79 Stat. 346 (1965).  Congress then amended the Medicaid

Statute to establish Medicare reimbursement principles as the limit on reasonable costs.  Pub. L.

No. 92-603, § 232, 86 Stat. 1329 (1972).  Over time, Congress specifically rejected these

provider-specific payment limits in favor of providing States flexibility to adopt incentives to

contain costs, reward efficiency, permit bonuses, and reduce administrative burdens.  Pub. L. No.

96-499, § 962(a), 94 Stat. 2599 (1980); Pub. L. No. 97-35, § 2174, 95 Stat. 357 (1981).  Under

current law, the primary substantive standard governing provider payments requires State

payment methodologies to be consistent with "efficiency, economy and quality of care."  42

U.S.C. § 1396a(a)(30)(A).  A separate procedural standard provides for States to use a public

process for rate-setting.  *Id.* § 1396a(a)(13)(A).  These two provisions are at issue in this

challenge.

CMS (previously named the Health Care Financing Administration or "HCFA") has interpreted this "efficiency, economy and quality of care" standard in regulations imposing relatively flexible "upper payment limits" ("UPLs") on overall payments, based on what Medicare would pay for similar services. *See* 42 C.F.R. §§ 447.272(b), 447.321(b) (2006).[2] The UPLs are not applied on a provider-specific basis, but rather in the aggregate to different categories of providers.[3] As a result, Medicaid payments to an individual provider may exceed both costs and what Medicare would have paid that provider, so long as aggregate payments to each category of provider do not exceed the aggregate UPL.

CMS has refined the UPL rules several times over the years.[4] Through each of these refinements, CMS has rejected proposals to apply the UPL on a provider-specific rather than aggregate basis, and has maintained a UPL based on Medicare rates—acknowledging the Congressional mandate for State flexibility to tailor payment systems to their own needs.[5] Congress even directed CMS to finalize regulations using aggregate, rather than provider-specific, payment limits, which are based on Medicare principles, not costs. *See* The Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), § 705(a).[6]

---

[2] Despite the moratorium on the Rule's implementation (see *infra* pp. 9-10), the Rule appears in the Code of Federal Regulations, 42 C.F.R. §§ 433.50, 433.51, 447.206, 447.207, 447.271, 447.272, 447.321, 457.220, 457.628 (2007). The currently effective version of these regulations can be found in the 2006 Code of Federal Regulations.

[3] The categories are State government-owned or operated facilities, non-State government-owned or operated facilities, and privately-owned or operated facilities. 42 C.F.R. §§ 447.272(a); 447.321(a).

[4] *See* 67 Fed. Reg. 2602 (Jan. 18, 2002); 66 Fed. Reg. 3148 (Jan. 12, 2001); 52 Fed. Reg. 28141 (Jul. 28, 1987); 48 Fed. Reg. 56046 (Dec. 19, 1983).

[5] *See, e.g.,* 67 Fed. Reg. at 2607; 66 Fed. Reg. at 3152, 3174; 52 Fed. Reg. at 28145; 48 Fed. Reg. at 56054-55.

[6] H.R. 5661, 106th Cong. (1999), enacted into law by reference in Pub. L. No. 106-554, § 1(a)(6), 114 Stat. 2763 (2000). BIPA required that HHS "[I]ssue ... a final regulation based on the proposed rule announced on October 5, 2000 that ... modifies the upper payment limit test ... by applying an aggregate upper payment limit to payments made to government facilities that are not State-owned or operated facilities."

## Medicaid Payments for Safety Net Providers

As described in the attached Declarations,[7] Plaintiff Alameda and many member hospitals of the Plaintiff Associations are governmental "safety net" hospitals that form the core of the provider network on which State Medicaid programs rely to serve their Medicaid populations. Medicare's payment systems for hospitals, upon which Medicaid upper payment limits are based, provide above-cost supplemental payments and adjustments for certain types of hospitals, in recognition of their unique role in the health care system.[8] Consistent with the aggregate UPL based on Medicare payment principles and with explicit federal approval, States often establish enhanced payment rates for governmental hospitals to support their unique roles serving Medicaid beneficiaries.

The ability of State Medicaid programs to make targeted above-cost Medicaid payments is absolutely essential for the maintenance of safety net hospitals, including Alameda and many members of the Associations. Such payments help maintain the stability and viability of these

---

[7] Plaintiffs have submitted the following Declarations in support of this Motion: Ex. 2, Declaration of Wright Lassiter, CEO, Alameda (hereinafter "Lassiter Decl."); Ex. 3, Declaration of Patrick Wardell, CEO, Hurley Medical Center ("Hurley") (hereinafter "Wardell Decl."); Ex. 4, Declaration of James R. Nathan, CEO, Lee Memorial (hereinafter "Nathan Decl."); Ex. 5, Declaration of Peter Rapp, Executive Director, OHSU Hospitals and Clinics (hereinafter "Rapp Decl."); Ex. 6, Declaration of James N. Valenti, CEO, Thomason General Hospital ("Thomason") (hereinafter "Valenti Declaration"); Ex. 7, Declaration of Bruce Schroffel, CEO, UCH (hereinafter "Schroffel Decl."); Ex. 8, Declaration of David Entwistle, CEO, University of Utah Hospitals and Clinics ("UUHC") (hereinafter "Entwistle Declaration"); Ex. 9, Declaration of Christine Capito Burch, Executive Director, NAPH (hereinafter "Burch Dec."); Ex. 10, Declaration of Melinda Reid Hatton, General Counsel, AHA (hereinafter "Hatton Decl."); Ex. 11, Declaration of Ivy Baer, Regulatory Counsel, AAMC (hereinafter "Baer Decl."); Ex. 12, Declaration of Lawrence A. McAndrews, CEO, N.A.C.H. (hereinafter "McAndrews Decl."); and Ex. 13, Declaration of George B. Hernández, Jr., President/Chief Executive Officer, University Health System ("UHS") (hereafter "Hernández Declaration"). All but the Hernandez Declaration were originally submitted with Plaintiffs' Motion for Preliminary Injunction.

[8] For example, Medicare provides indirect medical education ("IME") adjustments for teaching hospitals. 42 U.S.C. § 1395ww(d)(5)(B). Congress has consistently refused to reduce IME payments to a cost-based level, acknowledging how critical these payments are to these providers. *See* MedPAC, Rep. to the Congress on Medicare Payment Policy, at 49 (Mar. 2007) ("[T]he IME adjustment has always been set higher than the estimated effect of teaching on hospitals' costs per case."). Medicare also provides additional disproportionate share hospital ("DSH") payments to support hospitals that serve large volumes of low income patients to ensure that these hospitals remain viable and available to serve the Medicare population. *See* 42 U.S.C. § 1395ww(d)(5)(F); MedPAC, Rep. to the Congress, at 70, 77. As with IME payments, Congress has maintained the DSH adjustment at existing levels, despite being advised that the adjustment has "a weak relationship to the cost of treating low-income patients." *Id.* at 68. Medicare also explicitly reimburses "critical access hospitals" at above-cost rates to ensure access to services for Medicare patients in rural areas. 42 U.S.C. § 1395f(l).

providers, and allow them to address local Medicaid needs by expanding services and access.[9]

These hospitals, which are disproportionately affected by the Rule, provide a significant amount

of care to Medicaid beneficiaries and the uninsured.[10]  Approximately 53 percent of Plaintiff

Alameda's patients are enrolled in Medicaid, and nearly 28 percent are uninsured.  Ex. 2,

Lassiter Decl. ¶ 10.  Given that such a significant portion of safety net hospital services is

provided free or through Medicaid, the enhanced Medicaid payments are even more critical to

the viability of these institutions.[11]  Without the supplemental Medicaid payments supported

through FFP, the average public hospital's expenditures would exceed its revenues by 7.8

percent—a condition under which no hospital could maintain operations.  *See, e.g.,* Ex. 9, Burch

Decl. ¶ 11.

### <u>Funding the Non-Federal Share of Medicaid Expenditures</u>

Although State governments directly fund the majority of the non-federal share of

Medicaid expenditures through general revenue funds, since its enactment in 1965 the Medicaid

Statute has permitted States to draw on other "local sources" to fund up to 60 percent of the non-

federal share.  Pub. L. 89-97, § 121(a), 79 Stat. 286 (1965); 42 U.S.C. § 1396a(a)(2).  These local

funds, along with State general revenue funds, are then matched with federal funds at the

applicable FMAP, or federal matching rate.  The challenged Rule significantly restricts which

entities can contribute to the non-federal share of Medicaid expenditures.

Longstanding CMS regulations allow as the non-federal share State or local "[p]ublic

funds" that "are appropriated directly to the State or local Medicaid agency, or transferred from

other public agencies ... to the State or local agency and under its administrative control"—

---

[9] Ex. 2, Lassiter Decl. ¶ 21; Ex. 4, Nathan Decl. ¶ 19; Ex. 5, Rapp Dec. ¶¶ 5, 9; Ex. 6, Valenti Decl. ¶¶ 8-11, 13; Ex. 7, Schroffel Decl. ¶ 15; 8, Entwistle Decl. ¶¶ 6-9, 11; Ex. 13, Hernández Decl., ¶ 15.
[10] *See* Ex. 9, Burch Decl. ¶ 7; Ex. 11, Baer Decl. ¶ 7; Ex. 12, McAndrews Decl. ¶ 8; Ex. 13, Hernández Decl., ¶¶ 7, 12.
[11] *See, e.g.,* Ex. 2, Lassiter Decl. ¶¶ 10-11; Ex. 4, Nathan Decl. ¶¶ 8-10, 19; Ex. 7, Schroffel Decl. ¶¶ 9, 15; Ex. 13, Hernández Decl. ¶¶ 14-15.

known as intergovernmental transfers ("IGTs"), "or certified by the contributing public agency

as representing expenditures eligible for FFP"—known as certified public expenditures

("CPEs").  42 C.F.R. § 433.51(b) (2006).  The federal government has traditionally deferred to

States in determining which state or local entities are public for this purpose.

Congress has acted to prevent agency attempts to restrict States' use of local

governmental funding sources.  In 1991, in the course of enacting limits on two types of local

sources—provider donations and provider taxes—Congress explicitly limited CMS' ability to

restrict IGTs and CPEs.[12]  For purposes of these new restrictions, Congress established a broad,

inclusive definition of "unit of government."[13]

Around the country, governmental hospitals, including members of the Plaintiff

Associations, contribute to the non-federal share pursuant to this longstanding statutory and

regulatory authority, and as part of a long tradition of local government funding of health care

for the poor.  *See, e.g.*, Ex. 2, Lassiter Decl. ¶¶ 5, 21; Ex. 3, Wardell Decl. ¶¶ 9, 15; Ex. 7,

Schroffel Decl. ¶ 14.[14]  Without the use these local funding sources, many States would be

unable to fund these enhanced Medicaid payments, which often are the difference between

viability and closure for safety net providers.  *See, e.g.*, Ex. 9, Burch Decl. ¶¶ 11, 26; Ex. 7,

Schroffel Decl. ¶ 24; Ex. 8, Entwistle Decl. ¶ 15.

Although IGTs and CPEs have been a permissible and integral component of Medicaid

funding for local safety net systems, some States abused them in elaborate financing schemes to

---

[12] *See* 42 U.S.C. § 1396b(w)(6)(A), enacted in the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. 102-234, 105 Stat. 1793 ("Provider Tax Amendments").
[13] 42 U.S.C. § 1396b(w)(7)(G).
[14] For example, Plaintiff Alameda, whose mission for over 140 years has been to maintain and improve the health of all county residents regardless of ability to pay, has participated in financing the non-federal share of California's Medicaid expenditures for over a decade.  Ex. 2, Lassiter Decl. ¶¶ 5, 21.  Declarant UCH, which since 1921 has served as a primary teaching hospital for the University of Colorado, has participated in financing the non-federal share of supplemental payments for DSH and other safety net payments since 1999.  Ex. 7, Schroffel Decl. ¶ 14.

draw down federal matching funds improperly.[15]  CMS has expressed concern that some State

Medicaid programs required providers to "recycle" Medicaid payments back to the State for

other uses.  "Recycling" occurs when a State does not permit a provider to retain the full amount

of Medicaid payments received but instead requires it to return some or all of the payments

through IGTs.[16]

Determined to end this practice, CMS, beginning in the summer of 2003, embarked upon

a nationwide effort to uncover and terminate such abuses.  Through its authority to review and

approve State Plan Amendments and demonstration programs, and through its regular program

review and audit procedures, CMS closely scrutinized IGTs on a State-by-State basis, and either

blessed their use or insisted upon changes.  This initiative was so successful that, by November

2006, CMS' own data indicated that it had virtually eliminated the problem (and IGT programs

in only three States were still under review at that time).[17]

Despite this success, CMS requested that Congress enact proposals limiting Medicaid

payments for governmental providers to cost and restricting the use of IGTs.[18]  Congress

declined to do so.  *See* Letter from Sens. John Rockefeller, Gordon Smith, *et al.*, to Sec. Michael

Leavitt (Mar. 16, 2007);  Letter from Rep. Henry Waxman, *et al.*, to Sec. Michael O. Leavitt

(Mar. 19, 2007).  CMS then proposed to impose the changes unilaterally, despite the fact that

---

[15] *See* Government Accountability Office ("GAO") GAO-04-574, Medicaid: Intergovernmental Transfers Have Facilitated State Financing Schemes (Mar. 18, 2004).

[16] Adm. Rec. 2396, 72 Fed. Reg. 2236, 2244 (Jan. 18, 2007).

[17] Adm. Rec. 664-671, 671, Letter from the University of Utah to Leslie Norwalk (Mar. 16, 2007).  In particular, CMS confirmed that IGT programs in 40 States are properly structured or have been revised so that they are not abusive.  *See also* Adm. Rec. 2401-2454, GAO-07-214, Medicaid Financing: Federal Oversight Initiative Is Consistent with Medicaid Payment Principles but Needs Greater Transparency (Mar. 30, 2007).

[18] CMS included legislative proposals in both its Fiscal Year ("FY") 2005 and 2006 budget proposals.  Budget of the United States Government, Fiscal Year 2005, at 149-50; Budget of the United States Government, Fiscal Year 2006, at 143.  In August 2005, the agency submitted detailed legislative language substantially similar to the provisions of the Rule to Congress requesting that Congress give the language prompt and favorable consideration.  Adm. Rec. 3095-3096, Letter from Sec. Michael O. Leavitt, Secretary of CMS, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives (Aug. 5, 2005).

Congress refused to grant the agency the requested legislative authority.  *See* Budget of the

United States Government, Fiscal Year 2007, at 125.

## The Rule

After CMS was unsuccessful in convincing Congress to pass legislation, CMS

unilaterally issued a proposed rule on January 18, 2007 ("Proposed Rule").  Adm. Rec. 2388-

2400, 72 Fed. Reg. 2236.  CMS proposed to:

- limit Medicaid payments to governmental providers to their provider-specific costs of delivering Medicaid services, while retaining the existing UPL for private providers;
- greatly restrict the permissible sources of the non-federal share of Medicaid expenditures by limiting the use of IGTs and CPEs to federally-defined "units of government"; and
- require providers to receive and retain the full amount of their Medicaid payments.

CMS received over 400 comment letters from providers and national associations, not a single

one of which uniformly supported the Proposed Rule.  *See* Adm. Rec. 435-2383; Ex. 9, Burch

Decl. ¶ 14.  Among other things, the commenters challenged the legal basis for the Proposed

Rule and pointed out that the Rule was not directly related to CMS' objective of enhancing fiscal

integrity.  CMS also received comments from Members of Congress criticizing the Rule,

questioning HHS' and CMS' statutory authority, and urging withdrawal of the Rule.[19]

On May 24, 2007, Congress passed a one-year moratorium to prevent HHS from taking

further action on the Proposed Rule.  U.S. Troop Readiness, Veterans' Care, Katrina Recovery

and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 7002(a), 121 Stat.

---

[19] *See* Letter from Reps. Anne Eshoo and Peter King, *et. al.*, to Energy & Commerce and Ways & Means Committees (Feb. 26, 2007); Letter from Rep. Gene Green, *et al.*, to Sec. Michael Leavitt (Mar. 8, 2007); Letter from Rep. Henry Waxman, *et al.*, to Sec. Michael Leavitt (Mar. 19, 2007); Letter from Sens. John Rockefeller, Gordon Smith, *et al.*, to Sec. Michael Leavitt (Mar. 16, 2007); Letter from Chairman John Dingell, *et al.*, to Sec. Michael Leavitt (Mar. 12, 2007).  In all, 263 Members of the House and 69 Senators are on record in opposition to the Rule as of  March 2008, based on these letters and an additional letter of opposition from Senators to Congressional leadership in December 2007.  Letter from Sens. Jeff Bingaman and Elizabeth Dole, *et. al.*, to Senate Finance, Energy & Commerce and Ways & Means Committees. (Dec. 12, 2007).

112 (2007) ("Moratorium").  On May 25, 2007, the President signed the bill into law.[20]  The

Moratorium provides in pertinent part:

> Notwithstanding any other provision of law, the Secretary of Health and Human
> Services shall not, prior to the date that is 1 year after the date of enactment of this
> Act, *take any action (through promulgation of regulation, issuance of regulatory
> guidance, or other administrative action)* to −
> (A) *finalize or otherwise implement provisions contained in the proposed rule
> published on January 18, 2007*, on pages 2236 through 2248 of volume 72,
> Federal Register (relating to parts 433, 447, and 457 of title 42, Code of Federal
> Regulations);
> (B) *promulgate or implement any rule or provisions similar to the provisions
> described in subparagraph (A)* pertaining to the Medicaid program established
> under title XIX of the Social Security Act of the State Children's Health
> Insurance Program established under title XXI of such Act; or
> (C) promulgate or implement any rule or provisions restricting payments for
> graduate medical education under the Medicaid program.

*Id.* (emphases added).  The Moratorium will remain in place through May 24, 2008.

CMS was well aware of the pending Congressional moratorium and Congress' strong

opposition to the Proposed Rule.[21]  Nonetheless, CMS rushed the rule into final form (with

numerous obvious typographical, grammatical and other errors that are typically edited out in a

final proofreading)[22] and put it on "emergency" display at the Office of the Federal Register

("O.F.R.") on May 25, 2007, the day the Moratorium took effect— in a failed attempt "to ensure

issuance of this rule and associated savings before issuance of legislation that prohibits actions to

publicize this rule."  Adm. Rec. 365, Letter from Evell Barco, CMS, to Raymond Mosley, O.F.R.

(May 24, 2007); *see also* Adm. Rec. 89, 72 Fed. Reg. at 29836 (recording date and time of

submission).  CMS published the Rule on May 29, 2007, to be effective July 30, 2007.  Adm.

---

[20] Congress originally approved a one-year moratorium in March 2007 as part of an emergency supplemental
appropriations bill, which the President vetoed.  H.R. 1591, 110th Cong. § 6002 (2007).
[21] In addition to public statements about the moratorium by Senate leadership, and the earlier moratorium in the
vetoed Iraq funding bill, *supra* notes 19-20, the Acting Administer of CMS wrote a letter to Finance Committee
leadership on March 27, 2007 expressing the agency's opposition to the moratorium.  Adm. Rec. 366-67, Letter
from Leslie Norwalk to Sens. Max Baucus and Charles Grassley (Mar. 27, 2007).
[22] *See* Adm. Rec. 104-109, Letter from Carol A. Herrmann-Steckel, Commissioner Alabama Medicaid Agency to
Leslie V. Norwalk (Jul. 10, 2007).

Rec. 1, *Id.* at 29748 ("Rule").[23]  Attached as Exhibit 1 is a timeline of the Rule's development,

along with the numerous Congressional acts and communications expressing Congress'

opposition.

The Rule purports to finalize sweeping restrictions on Medicaid payments to

governmental providers and on the permissible sources of non-federal Medicaid funding.

According to Office of Management and Budget estimates, the Rule will cut $5 billion in federal

Medicaid participation between 2008 and 2013.  *See* Budget of the United States Government,

Fiscal Year 2008, at 63.[24]  For governmental providers only, the Rule replaces the longstanding

aggregate UPL based on Medicare payment principles, with a limit to the "individual provider's

cost of providing Medicaid services."  Adm. Rec. 86, 72 Fed. Reg. at 29833.  This cost limit will

eliminate federal participation in any payments in excess of the Rule's definition of costs.  It also

would significantly increase administrative burdens by requiring:  (1) providers to submit a

burdensome new cost report, which for some providers would be in addition to existing State

Medicaid forms, and for other providers, such as local school health clinics, would be an entirely

new obligation, having never before submitted Medicaid cost reports; and (2) providers and

States to undertake a lengthy reconciliation of interim payments based on audited cost reports

finalized years later, a process which is not required under current law.  *See id.*

The Rule limits for the first time the definition of a unit of government (eligible to

participate in the non-federal share of Medicaid program expenditures) to entities that have

---

[23] To the best of Plaintiffs' knowledge, CMS has not formally acknowledged that the Rule's purported effective date of July 30, 2007 is effectively superseded by the Moratorium and could not have effect prior to May 25, 2008, even if the Rule had been validly finalized.

[24] A survey of State Medicaid Directors undertaken by the Committee on Oversight and Government Reform of the U.S. House of Representative in February 2008 regarding the expected impact of the Rule on individual States found that the expected loss of federal funding across the 43 States and the District of Columbia that responded to the survey was $21 billion over five years.  Committee on Oversight and Government Reform, *The Administration's Medicaid Regulations: State-by-State Impacts*, March 2008.

taxing authority, have direct access to tax revenues,[25] or receive direct appropriations from the

State as a State university teaching hospital or are a qualifying Indian Tribe.  *See* Adm. Rec. 85,

*Id.* at 29832.  This definition excludes traditionally governmental providers significantly

integrated within their State or local governments but lacking the direct access to tax revenues

that CMS has decided is the hallmark of a governmental entity.  *See* Ex. 2, Lassiter Decl. ¶¶ 5,

12-15, 21-23; Ex. 7, Schroffel Decl. ¶¶ 5, 11-13, 16-18; Ex. 4, Nathan Decl. ¶¶ 5, 6, 11-14, 20-

21.  States will be required to determine the governmental status of their providers pursuant to a

lengthy list of newly introduced criteria requiring substantial legal analysis to evaluate.[26]

### Harm to Association Plaintiffs' Members and to Plaintiff Alameda

If the Rule is not vacated and enjoined, Alameda and the other members of the Plaintiff

Associations will incur substantial injury.  Those hospitals that are governmental providers will

lose millions of dollars in Medicaid payments.  Those hospitals that will no be longer considered

units of government eligible to contribute to the non-federal share will lose millions of dollars in

Medicaid payments that those contributions have financed, and will in some cases no longer be

eligible under their State Medicaid programs to receive enhanced payments.  Many of these

providers will be unable to recover the federal Medicaid funding lost due to the Rule, as the

federal government enjoys sovereign immunity.

As examples, the Declarations demonstrate the losses faced by safety net hospital

systems under the Rule:  Alameda will lose $85 million; Hurley, $6-$12.8 million; Lee

---

[25] The provider must be a sufficiently integral part of an entity with taxing authority, meaning that the unit of government must be legally obligated to fund the health care provider's expenses, liabilities, and deficits.  Adm. Rec. 85, 72 Fed. Reg. at 29832.

[26] The Rule also requires States to permit providers to retain the full amount of Medicaid payments, expands federal authority to examine associated transactions related to a provider's Medicaid payments, and imposes new requirements on documentation of CPEs.  Adm. Rec. 86-87, *Id*. at 29833-34.  The Rule applies to State Medicaid programs operating under demonstration authority, for example the authority provided by 42 U.S.C. § 1315.  Adm. Rec. 66, *Id*. at 29813 ("All Medicaid payments made under Medicaid waiver and demonstration authorities are subject to all provisions of this regulation.").

Memorial, $23.2 million; Thomason, $22 million; OHSU, $2.8 million; UCH, $30-35 million;

UHS, $31 million, and UUHC, $25 million.  These hospitals do not have other sources of

revenue to help absorb Medicaid revenue losses of this magnitude, and have no reasonable

expectation that the lost federal funds will be made up by their States.[27]  These losses will in at

least one case threaten the hospital's ongoing viability,[28] and force other hospitals to reduce

access to critical services for Medicaid patients, [29] lay off staff, [30] and forego maintenance and

improvement to their facilities and equipment,[31] and will undermine their role in disaster

preparedness[32].

## LEGAL STANDARD FOR SUMMARY JUDGMENT AND REVIEW OF AGENCY ACTION

Summary judgment should be entered where the record "show[s] that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  The moving party should prevail if it shows that the nonmoving

party "failed to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  *Celotex v.

Catrett*, 477 U.S. 317, 322 (1986).  Although the Court must draw all justifiable inferences in the

nonmoving party's favor, the nonmoving party "must establish more than 'the mere existence of

a scintilla of evidence' in support of its position."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[27] *See* Ex. 7,  Schroffel Decl. ¶¶ 24-25; Ex. 3, Wardell Decl. ¶¶ 23-24; Ex. 4, Nathan Decl. ¶26; Ex. 2, Lassiter Decl. ¶¶ 29-30; Ex. 6, Valenti Decl. ¶ 18; Ex. 8, Entwistle Decl. ¶ 15; Ex. 9, Burch Decl. ¶ 24.  Even if States provided additional funds, it would not remove the harm suffered simply as a result of the loss of federal funds for which these providers rightly qualify.

[28] Ex. 2, Lassiter Decl. ¶ 28.

[29] Ex. 2, Lassiter Decl. ¶ 28; Ex. 7, Schroffel Decl. ¶ 7-8, 22-23; Ex. 4, Nathan Decl. ¶ 24-25; Ex. 6, Valenti Decl. ¶ 15-17; Ex. 3, Wardell Decl. ¶ 20-21; Ex. 5, Rapp Decl. ¶ 12-14; Ex. 13, Hernández Decl. ¶ 18; Ex. 9, Burch Decl., ¶ 19, 21-22; Ex. 10, Hatton Decl., ¶ 15-16; Ex. 11, Baer Decl. ¶ 15, 19; Ex. 12, McAndrews Decl. ¶ 14-18.

[30] Ex. 2, Lassiter Decl. ¶ 28; Ex. 3, Wardell Decl. ¶ 20-21; Ex. 8, Entwistle Decl. ¶ 13-15; Ex. 13, Hernández Decl. ¶ 18.

[31] Ex. 4, Nathan Decl. ¶ 24-25; Ex. 8, Entwistle Decl. ¶ 13-15; Ex. 13, Hernández Decl. ¶ 17.

[32] Ex. 3, Wardell Decl. ¶ 20-21; Ex. 13, Hernández Decl. ¶ 17.

242, 252, 255 (1986); *accord Bloch v. Powell*, 227 F. Supp. 2d 25, 30-31 (D.D.C. 2002).  The

mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See*

*Anderson*, 477 U.S. at 248; *Wilderness Soc'y v. DOI*, 2005 U.S. Dist. LEXIS 20042 (D.D.C.

2005).

      The Administrative Procedure Act ("APA") requires a reviewing court to "hold unlawful

and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  In reviewing

the Agency's justification for its action under the arbitrary and capricious standard of the APA

(5. U.S.C. § 706 (2)(A)), "the focal point for judicial review should be the administrative record

already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*,

411 U.S. 138, 142 (1973); *see also N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 78-79

(D.D.C. 2007) ("[T]he function of the district court is to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did.")

(citing *Occidental Engineering Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)).

      The substantive provisions of the Rule are subject to review under the two-part test

outlined in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*:

> First, always, is the question whether Congress has directly spoken to the precise
> question at issue.  If the intent of Congress is clear, that is the end of the matter;
> for the court, as well as the agency, must give effect to the unambiguously
> expressed intent of Congress.  If, however, the court determines Congress has not
> directly addressed the precise question at issue, the court does not simply impose
> its own construction on the statute, as would be necessary in the absence of  an
> administrative interpretation.  Rather, if the statute is silent or ambiguous with
> respect to the specific issue, the question for the court is whether the agency's
> answer is based on a permissible construction of the statute.

467 U.S. 837, 842-43 (1984).

In determining whether Congress has "directly spoken" to the issues at hand, this Court should consider the text and structure of the relevant statute and the over-arching statutory scheme. As the Supreme Court has explained:

> It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." . . . A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," . . . , and "fit, if possible, all parts into an harmonious whole." . . . Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (citations omitted) (holding that review of tobacco-related legislation supported conclusion that the FDA did not have authority to regulate tobacco); *see also Kmart Corp. v. Cartier Inc.*, 486 U.S. 281, 291 (1988) (invalidating portion of regulation as an unreasonable construction of the statute and reaffirming *Chevron*'s direction that the court "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole"); *Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005) (under *Chevron* step one, a court should use the traditional tools of statutory interpretation, including "'examination of the statute's text, legislative history, and structure, as well as its purpose'") (quoting *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1069-70 (D.C. Cir. 1998) (holding FDA's regulation was inconsistent with the text and structure of the Food, Drug, and Cosmetic Act); *Ohio v. DOI*, 880 F.2d 432, 441 (D.C. Cir. 1989) ("If the court having studied the statutory text, structure and history, is left with the unmistakable conclusion that Congress had an intention on the precise question at issue 'that intention is the law and must be given effect.'").

Deference is not granted to an agency's interpretation of legislative history or understanding of statutory meaning when examining Congressional intent under *Chevron* step one. *See Bank of Am. NT & SA v. Riley,* 940 F. Supp. 348, 353 (D.D.C. 1996) ("In resolving the

threshold question whether Congressional intent is sufficiently clear ... to review the case under

step 1 of Chevron, we are not required to grant any particular deference to the Agency's parsing

of statutory language or its interpretation of legislative history.") (quoting *First Nat. Bank &*

*Trust v. Credit Union,* 90 F. 3d. 525, 527 (D.C. Cir. 1996) (quotations omitted)).

*Chevron* does not apply to the validity of CMS' issuance of the Rule under the

Moratorium.  Defendants are granted no deference on this issue, which is "a pure question of

statutory interpretation" and does not involve a statute Defendants are entrusted to administer.

*Scheduled Airlines Traffic Offices, Inc. v. DOD*, 87 F.3d 1356, 1361 (D.C. Cir. 1996); *see also*

*Ass'n of Civilian Technicians v. Federal Labor Relations Auth.*, 269 F.3d 1112, 1115 (D.C. Cir.

2001) (interpretations of statutes not committed to an agency's administration reviewed de

novo); *Professional Reactor Operator Soc. v. NRC*, 939 F.2d 1047, 1051 (D.C. Cir. 1991) (no

*Chevron* deference owed to agency interpretation of statutes "outside the agency's particular

expertise and special charge to administer"); *Rempfer v. U.S. Depar't of Air Force Board for*

*Correction of Military Records*, 2008 U.S. Dist. LEXIS 19641 (D.D.C. 2008) ("it is unlikely an

interpretation by the AFBCMR of federal statutes governing the drug approval process would be

entitled to significant deference"); *Brown v. Summers*, 201 F. Supp. 2d 60 (D.D.C. 2002) (the

Treasury Department's interpretation not entitled to deference where the agency was not charged

with implementing the Act at issue); *accord Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990).

## ARGUMENT

Plaintiffs are entitled to summary judgment for each of the following reasons:

- The cost limit provisions of the Rule are inconsistent with the Medicaid Statute, as it has been amended through the years, are an unreasonable construction of the Medicaid Statute, and are arbitrary and capricious.

- The cost limit provisions of the Rule violate BIPA and are an unreasonable construction of that statute.

- The unit of government provisions of the Rule are inconsistent with the Medicaid Statute, are an unreasonable construction of the Medicaid Statute, and are arbitrary and capricious.
- Issuance of the Rule violates the Moratorium.

Each of these arguments is addressed below.

I.    **The Cost Limit Provisions of the Rule are Inconsistent with the Medicaid Statute, as it has been Amended Through the Years, are an Unreasonable Construction of the Medicaid Statute, and are Arbitrary and Capricious.**

Section 1902(a) of the Social Security Act establishes the standard for States' payment methodologies for Medicaid providers. These standards have evolved since the 1970s, with Congress granting States increasingly broad authority over provider payments. Congress has purposefully repealed prescriptive, provider-specific payment limits—including a reasonable cost limit and a reasonable charge limit—so that States could adopt flexible payment systems that reward efficiency, create incentives, and minimize administrative burdens on the State, providers, and the federal government. In imposing a cost limit now, CMS is returning to an approach Congress unmistakably rejected, and imposing it on the very providers for whom States most need payment flexibility. Although CMS may have discretion reasonably to fill in the details of the Medicaid Statute, it is not free to impose a fundamental revision to the Statute, much less a methodology that Congress has consciously disavowed.

A.    **Congress Has Addressed, and Rejected, a Cost Limit on Payments to Medicaid Providers**

The history of Section 1902(a) of the Medicaid Statute makes it abundantly clear that Congress has rejected provider-specific cost limits of the sort adopted by CMS in its Rule. Congress experimented with cost-based payments in the 1960s and 1970s, and imposed a hospital-specific cost limit based on Medicare cost methodologies akin to the limit imposed in the Rule. Congress further adopted provider-specific limits based on charges applicable to all

provider types.  Based on concerns about (1) the inherently inflationary nature of cost reimbursement; (2) the inability under a provider-specific limit to provide payment incentives to improve care; and (3) the administrative burden of applying provider-specific limits, Congress rejected this approach on a wholesale basis in the early 1980s.  Pub. L. No. 97-35, § 2174 (Omnibus Reconciliation Act of 1981).  At the same time, Congress made clear that the general payment standards remaining in the Medicaid Statute were to be based on Medicare payment principles applied on an average or aggregate, rather than provider-specific, basis.

Two provisions of Section 1902(a) of the Act govern States' adoption of payment methodologies for providers.  Section 1902(a)(30)(A) establishes a substantive standard applicable to payments to all providers.  42 U.S.C. § 1396a(a)(30)(A).  This is the provision upon which CMS relies as its authority for imposing a cost limit on governmental providers. Adm. Rec. 2393, 72 Fed. Reg. at 2241.  Section 1902(a)(13) currently establishes procedural requirements by which States must adopt methodologies for payments to *institutional* providers (such as hospitals and nursing facilities).  42 U.S.C. § 1396a(a)(13).  In earlier versions of the statute, however, Section 1902(a)(13) also contained substantive standards governing institutional provider payments.  Taken together, the history of these two provisions definitively establishes that Congress has addressed and rejected provider-specific cost limits.

As originally enacted in 1967, Section 1902(a)(30)(A) required States to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments ... *are not in excess of reasonable charges consistent with efficiency, economy, and quality of care*.

Pub. L. No. 90-248, § 237(b) (emphasis added).  Thus, the original provision imposed an absolute limit prohibiting payments in excess of a provider's charges.[33]  Congress removed this provider-specific reasonable charge limit in the Omnibus Reconciliation Act of 1981 to give States more flexibility in establishing payment methodologies.  Pub. L. No. 97-35, § 2174.  In particular, Congress sought to "remove the administrative burdens this requirement of current law imposes on the States and to provide States with the flexibility to create incentives to improve the availability and utilization of physician services under Medicaid."[34]  Congress thus granted States additional discretion "to be more creative and offer incentives for improved delivery of care" and to "structure their physician payment levels to build in incentives or bonuses for physicians who provide care in more cost effective arrangements."[35]

> In its current form, Section 1902(a)(30)(A) requires that a State Medicaid plan must:
>
> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary *to safeguard against unnecessary utilization* of such care and services and to assure that payments are consistent with *efficiency, economy, and quality of care and are sufficient to enlist enough providers* so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A) (emphases added).  This provision does not limit States to a cost-based methodology.  In fact, as the legislative history demonstrates, Congress adopted this standard to allow other approaches, such as prospective payment systems, which in some instances might pay a provider above its costs yet may be consistent with "efficiency" and "economy," and may better safeguard against "unnecessary utilization" of services while ensuring access to quality care.

---

[33] This limitation is separate from another charges limitation contained in Section 1903(i)(3).  42 U.S.C. § 1396b(i)(3).

[34] H.R. Rep. No. 97-158, at 312, Vol. II (1981).  The provision governs physician payments, hospital payments, and other providers.

[35] *Id.* at 313.

Section 1902(a)(13) evolved along a similar path.  As originally enacted, this provision required States to pay for inpatient hospital services at "reasonable cost (as determined in accordance with standards approved by the Secretary and included in the plan)."  Pub. L. No. 89-97, § 121(a) (1965).  In 1972, Congress imposed a Medicare-related cost limit under which States' calculation of hospitals' "reasonable cost" "shall not exceed the amount which would be determined" under the Medicare statute.  Pub. L. No. 92-603, § 232.  This cost limit is strikingly similar to the one imposed by CMS in the Rule, which also requires States to calculate the cost limit using Medicare reasonable cost principles.  Adm. Rec. 2, 72 Fed. Reg. at 29749. [36]

Just as Congress rejected subsection (a)(30)(A)'s charge limit, Congress became disillusioned with the reasonable cost framework of Section 1902(a)(13).  In 1980, Congress adopted the Boren Amendment, which eliminated cost-based payment limits for long term care services under Medicaid that had first been adopted in 1972.  Pub. L. No. 96-499, § 962(a).[37] Congress then repealed the cost limit on hospital services in 1981.  Pub. L. No. 97-35, § 2173.[38] Through the Boren Amendment, Congress permitted States to use prospective payment systems that provided greater incentives to providers to control costs, *i.e.*, to adopt standards consistent with efficiency and economy.  The Senate Report described cost-based reimbursement as

---

[36] The Secretary later issued detailed implementing regulations for long-term care payments, including cost-finding and cost reporting requirements, desk analysis of cost reports, and periodic audits.  41 Fed. Reg. 27300 (July 1, 1976).  These requirements are similar to the detailed requirements imposed on States in the Rule, that providers must submit cost reports, States must review and reconcile payments made with the cost reports, and the cost limits must be subjected to periodic audits.  Adm. Rec. 81, 86-87, 72 Fed. Reg. 29748, 29828, 33-34 (May 29, 2007).

[37] The Boren Amendment required States to pay rates "which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards."  Pub. L. No. 96-499, § 962(a) (1980).  Medicare, at that time, was also in the process of rejecting reasonable cost reimbursement for similar reasons, and migrating to prospective payment systems.  Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65 (1983).

[38] In 1997, Congress repealed the Boren Amendment to give States even greater rate-setting flexibility.  *See* H.R. Rep. No. 105-149, at 590-91 (1997).  Section 1902(a)(13)(A) now grants States broad authority to set payment rates for hospital services, subject to providing "a public process for determination of rates of payment."  42 U.S.C. § 1396a(a)(13)(A).  The current provision thus places no cost limit or other substantive payment standard on States.

"inherently inflationary" and lacking "incentives for efficient performance."  Sen. Rep. No. 96-471, at 28 (1979).  The House Report echoed this sentiment:

> The Committee recognizes the inflationary nature of the current cost reimbursement system and intends to give States greater latitude in developing and implementing alternative reimbursement methodologies that promote the efficient and economical delivery of such services.  The Committee is especially interested in the development of prospective rate methodologies as a replacement for the current reasonable cost reimbursement system under Medicaid.

H.R. Rep. No. 97-158, at 293.[39]

Congress also expected CMS (then HCFA) to apply limits on Medicaid payments on an average or aggregate, rather than provider-specific, basis.  The Senate Report indicated that the regulatory limits based on Medicare payment principles would continue but that "the Secretary would only be expected to compare the *average* rates paid to SNFs [skilled nursing facilities] participating in Medicare with the *average* rates paid to SNFs participating in Medicaid in applying the limitation."  Sen. Rep. No. 96-471, at 29 (emphasis added).  The report accompanying the 1981 Boren Amendment legislation contains a similar expectation that "the Secretary would only be expected to compare the aggregate amounts paid to hospitals by Medicaid in applying [a Medicare-related] limit."  Sen. Rep. No. 97-139, at 478 (1981).

Given this history of Congressional repeals of provider-specific cost and charge limits, CMS does not have the authority to impose provider-specific cost limits on government providers.  *See Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) (rejecting Department of Interior's statutory interpretation because, "It is contrary to common sense as well as sound statutory construction to read the later, more general language to

---

[39] This report listed the Boren Amendment among a number of provisions "which provide States with flexibility to institute a number of measures in their programs to reduce cost and make them more efficient."  H.R. Rep. No. 97-158, at 279.  Courts have also acknowledged that the Boren Amendment granted States flexibility in setting payment rates, to control Medicaid costs while maintaining quality care and access to providers.  *See, e.g., Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 506 (1990) ("Congress blamed mounting Medicaid costs on the complexity and rigidity of the Secretary's reimbursement regulations.... Thus, while Congress affirmed its desire that state reimbursement rates be 'reasonable,' it afforded States greater flexibility in calculating those 'reasonable rates.'").

incorporate the precise limitations of the earlier statute.  Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning.").  Congress rejected a cost-limit as lacking incentives for efficiency; a return to a provider-specific cost limit is antithetical to the statutory requirement that States set rates consistent with economy and efficiency.

In *National Ass'n of Broadcasters v. Librarian of Congress*, the D.C. Circuit expressly relied on Congress' repeal of a statutory provision to ascertain Congressional intent.  146 F.3d 907, 919 (D.C. Cir. 1998).  The court reasoned that the rescission of language by Congress in a subsequent legislative act was "plain evidence of the Congress's intent" to apply a different standard and the court must defer to "Congress's intent [which] is sufficiently clear."  *Id*. at 919. By repealing the payment limit based on reasonable costs in Section 1902(a)(13)(A) and the payment limit of reasonable charges in Section 1902(a)(30)(A), Congress did not merely leave the issue of payment standards to agency discretion; it explicitly authorized States to adopt prospective payment methodologies not limited by each provider's individual costs.  In the face of this statutory evolution, CMS is not free to re-impose a provider-specific, cost-based payment limit on governmental providers.[40]

**B.**    **CMS' Reimposition of a Cost Limit on Payments to Governmental Providers is Not a Reasonable Construction of the Medicaid Statute and is Arbitrary and Capricious**

Although further analysis is unnecessary given that Congress has plainly expressed its opposition to a cost limit, CMS' interpretation of Section 1902(a) must also be overturned under the second step of *Chevron* as an unreasonable construction of the Statute, and because it is

---

[40] *See also MCI Telecomm. Corp. v. AT& T Co.*, 512 U.S. 218, 231-32 (1994) (rejecting Federal Communications Commission's elimination of certain tariffs under the guise of its statutory authority to "modify" statutory requirements: "What we have here, in reality, is a fundamental revision of the statute ....  That may be a good idea, but it was not the idea Congress enacted into law . . . ."); *Anna Jacques Hospital v. Leavitt*, No. 05-625, 2008 WL 510337 (D.D.C. Feb. 26, 2008) (holding that the CMS had "violated Congress' clear command" as evidenced by a Congressional amendment to the Medicare statutory scheme).

arbitrary and capricious.  *Chevron*, 467 U.S. at 843.  Under step two, an agency's interpretation

must be "reasonable 'in light of the language, legislative history, and policies of the statute.'"

*Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 406 (D.C. Cir. 1996) (quoting *Natural Resources*

*Defense Council v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987)).[41]

Although agencies are granted deference in interpreting statutes they are charged with

implementing, this deference is not without limits.  In particular, an agency is entitled to less

deference where it has changed its interpretation of a statute without a reasoned explanation.[42]

*See Watt v. Alaska*, 451 U.S. 259, 273 (1981) ("The Department's current interpretation, being in

conflict with its initial position, is entitled to considerably less deference.").  When an agency

changes its position, "[w]hatever the ground for the departure from prior norms ... it must be

clearly set forth so that the reviewing court may understand the basis of the agency's action and

---

[41] The APA provides for a court to set aside agency action found to be arbitrary or capricious.  5 U.S.C. § 706(2).
That the Rule is arbitrary and capricious renders it unreasonable under step two of *Chevron* and is also a separate
basis for invalidating the Rule under the APA.  "An agency rule would be arbitrary and capricious if the agency has
relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of
the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so
implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle
Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted); *see also Ashley County
Med. Ctr. v. Thompson*, 205 F. Supp. 2d 1026, 1048 (E.D. Ark. 2002) ("[B]efore an agency finalizes a rule it 'must
examine the relevant data and articulate a satisfactory explanation for its action including a rational connection
between the facts found and the choice made.'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S.
156, 168 (1962)); *Bowen v. American Hospital Ass'n*, 476 U.S. 610, 626-27 (1986) (In striking down a HCFA
regulation for not containing the reasoning and evidence necessary to sustain the agency's intervention into a
historically state-administered decisional process, explaining, "that there is some rational basis within the knowledge
and experience of the regulators, under which they might have concluded that the regulation was necessary to
discharge their statutorily authorized mission, will not suffice to validate agency decision making.") (citations
omitted).
[42] This principle has been applied by the D.C. Circuit numerous times.  *See, e.g.*, *Alabama Education Ass'n v. Chao*,
455 F.3d 386, 389 (D.C. Cir. 2006) (in challenge to change to long-standing agency policy, the court remanded the
case to the agency because "'the Department did not provide a reasoned explanation for its new policy'") (quoting
*AFL-CIO v. Brock*, 835 F.2d 912, 913 (D.C. Cir. 1987)); *Goldstein v. SEC*, 451 F.3d 873, 883 (D.C. Cir. 2006)
(holding that the SEC's Hedge Fund Rule was inconsistent with prior SEC determinations and stating the SEC "has
failed adequately to justify departing from its own prior interpretation"); *Bush-Quayle '92 Primary Comm., Inc. v.
FEC*, 104 F.3d 448 (D.C. Cir. 1997) (vacating determination by the FEC because the FEC's determination was
inconsistent with a similar ruling made during prior presidential primary campaign); *AFL-CIO*, 835 F.2d 912
(remanding case to the Department of Labor for a reasoned explanation of why it reversed a two decade old policy);
*National Black Media Coalition v. FCC*, 775 F.2d 342, 356 n.17 (D.C. Cir. 1985) ("[A]n agency may not repudiate
precedent simply to conform with a shifting political mood.  Rather, the agency must demonstrate that its new policy
is consistent with the mandate with which Congress has charged it.").

so may judge the consistency of that action with the agency's mandate." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42 ("an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change.") CMS' new cost limit policy would contravene years of statutory and regulatory developments. The agency's administrative record fails to provide a sufficient rationale for this drastic change.

Since Congress repealed the restrictive cost and reasonable charge limits, CMS has made several conforming revisions to its provider payment rules, all of which contradict this new cost limit policy. In the aftermath of Congress' repeal of these limits, HCFA adopted aggregate, rather than provider-specific, Medicare-based UPLs. 46 Fed. Reg. 47964, 47968 (Sep. 30, 1981).[43] The Medicare-based UPL adopted by HCFA prohibited payment in excess of "the amount that the agency reasonably estimates would be paid for the services under the Medicare principles of reimbursement." 48 Fed. Reg. 56046, 56057 (Dec. 19, 1983) (adopting 42 C.F.R. § 447.253(b)(1)(ii)(C)(2)). HCFA based this standard on "the legislative intent" of Section 1902(a)(13) and the efficiency, economy, and quality of care standard of Section 1902(a)(30)(A). *Id.* at 56054. HCFA acknowledged in the preamble to this rule that Congress intended for an aggregate UPL based on Medicare payments. *Id.*

Several additional refinements of the UPL followed in subsequent years. Throughout this process, CMS (and HCFA) consistently rejected proposals to abandon the aggregate, rather than

---

[43] HCFA admitted that the elimination of cost-based payment limits signaled that "each State should be free to decide, in setting its payment rate, whether to allow facilities an opportunity for profit." 46 Fed. Reg. at 47968. HCFA also stated that permitting "a State to use an aggregate versus facility-specific application of the limit ... was in keeping with the congressional intent that the calculation of the limit not be administrative burden on States." 48 Fed. Reg. at 56053.

individualized, nature of the UPL, and rejected proposals to abandon use of estimated Medicare payments, rather than actual and reconciled, costs.[44]

The Rule's unexplained return to a cost limit that Congress disavowed undermines the very Congressional objectives in Section 1902(a)(30)(A) that CMS previously acknowledged. A cost limit is inherently inflationary because governmental providers will have an incentive to increase, rather than reduce, costs and to provide unnecessary services (to maximize payment). It deprives States of the flexibility to adopt incentives to improve care through "pay for performance" and other types of bonus payments for meeting quality standards. Finally, the Rule re-imposes the kind of administrative burden that Congress sought to eliminate, by requiring States to develop, implement, review, and audit annual cost reports and perform reconciliations that are completely unnecessary for prospective payment systems. Adm. Rec. 86-87, 72 Fed. Reg. at 29833-34.

Aside from derogating clear Congressional intent and a quarter century of consistent agency interpretation, the Rule's cost limit on governmental providers is not rationally related to any legitimate purpose, will not accomplish the agency's objectives, and in important respects is redundant and unnecessary. CMS contends that the Rule is needed "to ensure the integrity of federal-state financial partnership" and to "strengthen[] accountability to ensure that statutory requirements within the Medicaid program are met." Adm. Rec. 2388-2400, 72 Fed. Reg. at 2236-37. A cost limit will not advance these objectives.

To begin, the Rule's imposition of a strict cost limit only on governmental providers—and not other providers—defies logic, lacks any support in the record offered by CMS, and is arbitrary and capricious. The D.C. Circuit has warned that, "[t]o survive review under the arbitrary and capricious standard, an agency must examine the relevant data and articulate a

---

[44] *See supra* note 5.

satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tripoli Rocketry Ass'n v. BATFE*, 437 F.3d 75, 81 (D.C. Cir. 2006); *see also Bowen*, 476 U.S. at 643 ("Even according the greatest respect to the Secretary's action ... deference cannot fill the lack of an evidentiary foundation on which the Final Rules must rest."). CMS has failed to explain adequately why the cost limit only should apply to governmental providers, much less justify the reversal of decades of development of Medicaid (and Medicare) payment policy. *See supra* at 17-22.

For CMS to have authority to implement a cost limit on governmental providers pursuant to Section 1902(a)(30)(A), the agency must determine that costs are the ultimate ceiling on "efficient and economic" payments for these providers. *See* Adm. Rec. 76, 72 Fed. Reg. at 29823 (citing 42 U.S.C. § 1396a(a)(30)(A). By imposing this limit on governmental providers only, CMS has inexplicably concluded that payments higher than cost may only be consistent with efficiency and economy by dint of a provider's non-governmental status.

Agencies must treat similarly situated parties similarly, absent a legitimate rationale for a distinction; yet CMS offers no explanation for this disparate treatment. *See, e.g.*, *Goldstein*, 451 F.3d at 884 (vacating as arbitrary a SEC rule that created different requirements for different-sized investment companies); *Burlington N. & Santa Fe Railway Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld."). Remarkably, CMS makes this distinction between efficient and economic payment levels for non-governmental providers and governmental providers for offering the *same services*. If high quality Medicaid services will be available to all Medicaid enrollees at cost-based payment

levels, it stands to reason that above-cost payments would be *per se* unreasonable for *any* provider.[45]

CMS offers up two justifications for returning to a cost limit for governmental providers, neither of which withstands scrutiny. CMS asserts that (1) governmental providers are more likely to "use the excess of Medicaid revenue over cost to subsidize health care operations that are unrelated to Medicaid," and (2) "they may return a portion of the supplemental payments to the State as a source of revenue." Adm. Rec. 2393, 72 Fed. Reg. at 2241.

As to the first concern, CMS has either overlooked or ignored the fact that private providers are just as capable of shifting their Medicaid revenues to non-Medicaid operations as governmental providers. Moreover, CMS has offered no explanation as to why "integrity" demands that only governmental providers cease such practices. *Id.* As to CMS' concern that governmental providers may return a portion of Medicaid payments to their State Medicaid agencies, the cost limit is both inadequate to prevent this result and overbroad to the extent it applies to governmental providers not engaged in such "recycling." A cost limit on payments offers no assurance that States will not require governmental providers to return a portion of their payments to the State; indeed, none of the recycling arrangements CMS has criticized in recent years has been premised upon a return of only above-cost revenues. In other words, payment *levels* have no bearing on whether providers are made to return funds.[46] In any event, there is a separate provision in the Rule that requires providers to retain the full amount of Medicaid

---

[45] In reality, governmental providers often require higher payment rates than other providers, as they frequently serve as the provider of last resort and cannot turn away Medicaid beneficiaries and the uninsured as many private providers can. Governmental providers contribute a disproportionate share of care to low income patients and offer critical yet under-reimbursed community-wide services (such as trauma care, burn care, neonatal intensive care, first response services, standby readiness capabilities, etc.). Congressional Budget Office, Nonprofit Hospitals and the Provision of Community Benefits (Dec. 2006); *see also* Ex. 9, Burch Decl. ¶¶ 6-11.

[46] For instance, Medicaid disproportionate share hospital ("DSH") payments have been subject to a cost limit imposed by Congress since 1993. 42 U.S.C. § 1396r-4(g). Nevertheless, CMS and the Office of Inspector General ("OIG") have found instances in which providers were returning DSH payments to their States. *See, e.g.*, Letter from Daniel R. Levinson, Inspector General to Mark B. McClellan, CMS Administrator (Mar. 16, 2006).

payments received.  Adm. Rec. 87, 72 Fed. Reg. at 29834 (adding 42 C.F.R. § 447.207).  This

provision alone is sufficient to accomplish CMS' stated purpose of preventing recycling.

Moreover, as CMS itself has acknowledged, it has been able to eliminate nearly all instances of

recycling through IGTs,[47] meaning that the cost limit will primarily impact governmental

providers that are *not* engaged in recycling.

## II.    The Rule Violates BIPA's Statutory Requirement that CMS Establish Aggregate Upper Payment Limits and is an Unreasonable Construction of BIPA

The cost limit provision also violates BIPA.  *See supra* at 4.  On October 5, 2000, CMS

proposed to revise the aggregate UPLs by requiring States to calculate separate, aggregate UPLs

for three provider categories:  State government owned or operated providers, non-State

government owned or operated public providers, and private providers.  65 Fed. Reg. 60151

(Oct. 10, 2000).  These UPLs were based on Medicare payment principles.  42 C.F.R. § 447.272.

Shortly after CMS issued this proposed rule, Congress passed BIPA.  Section 705(a) of BIPA

required that CMS:

> Issue ... a final regulation *based on the proposed rule announced on October 5, 2000 that ... modifies the upper payment limit test ... by applying an aggregate* upper payment limit to payments made *to governmental facilities that are not State-owned or operated facilities*.

H.R. 5661, 106th Cong. (emphases added).  Congress thereby directed CMS to adopt UPL

regulations (1) with aggregate, rather than provider-specific, payment limits, and (2) with one of

the aggregate groups being "governmental facilities that are not State-owned or operated."

Moreover, the requirement that the final rule be "based on the proposed rule announced October

5, 2000" mandates that the limits must be based on Medicare payment principles as had been

proposed (and not costs).  BIPA therefore established UPL standards with which CMS must

---

[47] *See supra* at 8.

comply.  Because Congress has clearly spoken to the issue through explicit statutory language

mandating aggregate upper limits on Medicaid payments to non-State *governmental* providers,

CMS is not free now to adopt a provider-specific, cost-based limit on governmental providers.

*See, e.g.*, *Chevron*, 467 U.S. at 846 ("[T]he agency must give effect to the unambiguously

expressed intent of Congress.").

  In response to commenters to the Proposed Rule who pointed out the BIPA violation

inherent in adoption of a cost limit, CMS suggested that it had fulfilled its BIPA obligation when

it finalized the October 5, 2000 rule in January of 2001.  Adm. Rec. 28, 72 Fed. Reg. at 29775

(citing 66 Fed. Reg. 3147 (Jan. 12, 2001)).  But this self-serving interpretation saps all meaning

from the Congressional directive.  In BIPA, Congress specifically singled out certain provisions

of the pending proposed rule for implementation—including the aggregate payment limit and the

category of non-State governmental providers.  Congress defined for CMS the proper contours of

the upper payment limits, which plainly permit governmental providers to be paid in excess of

costs.  In requiring CMS to adopt specific aggregate upper payment limits, Congress could not

have intended for CMS subsequently to undo those limits after they were finalized.  Such an

understanding of the BIPA mandate is irrational and unsustainable.  Thus, the cost limit violates

Section 705(a) of BIPA (and is also an unreasonable construction of that statute).

## III. The Unit of Government Provisions of the Rule are Inconsistent with the Medicaid Statute, are an Unreasonable Construction of the Medicaid Statute, and are Arbitrary and Capricious.

  In the Rule, CMS adopts a definition of "unit of government" that requires an entity to

have "generally applicable taxing authority" or "direct access to generally applicable tax

revenues," by being an integral part of a unit of government with taxing authority and that is

legally obligated to fund the provider's expenses and liabilities.  Adm. Rec. 85, 72 Fed. Reg. at

29832.[48]  These conditions contradict the standards for permissible local sources found in the

Medicaid Statute and the statutory definition of a unit of local government.  42 U.S.C. §§

1396a(a)(2) & 1396b(w)(7)(G).  Despite the seemingly technical nature of a definitional change,

its effect would be a severe constriction in the scope of State and local entities that can share in

the costs of supporting the Medicaid program, based on an arbitrary distinction between

governmental entities that have direct access to tax revenues and the many types of legitimate

governmental entities that do not.[49]  In turn, this curtailing of legitimate public sources will

significantly scale back federal financial support for the Medicaid program—due to the loss of

federal matching funds for the contributions of legitimate "local sources" of the non-federal

share.  Congress plainly did not empower CMS to make such a fundamental change to the

Medicaid program, and this new definition is patently unreasonable.  *See, e.g.*, *MCI Telecomm.*

*Corp. v. AT&T Co.*, 512 U.S. 218, 231-32 (1994) (rejecting FCC's attempt to make fundamental

revision to Federal Communications Act).

> **A.    The Medicaid Statute Does Not Condition Eligibility to Participate in Funding the Non-Federal Share on Direct Access to Tax Revenues**

In establishing joint federal-state financing for the Medicaid program, Congress spoke to

the broad scope of permissible sources for funding the non-federal share, and granted States

discretion to use local as well as State funds for up to 60 percent of their share.[50]  42 U.S.C. §

1396a(a)(2).  Congress has required States to report quarterly to CMS "the amount appropriated

or made available by the State *and its political subdivisions*" for Medicaid expenditures.  42

---

[48] Amending 42 C.F.R. § 433.50(a)(1)(i).  Also meeting the new definition are entities receiving appropriated State funds as a State university teaching hospital and Indian Tribes or Tribal Organizations meeting specified criteria.

[49] Ex. 2, Lassiter Decl. ¶¶ 22-24; Ex. 4, Nathan Decl. ¶¶ 20-22, 24; Ex. 7, Schroffel Decl. ¶¶ 16-20.

[50] This broad financing base is reflected in the terminology Congress chose to use throughout Title XIX.  The Statute does not establish a "State share" of Medicaid program expenditures but rather consistently refers to the "non-federal share" to denote the portion of program expenditures not paid for by the federal government.  *See, e.g.*, 42 U.S.C. §§ 1396a(a)(2); 1396b(w)(5); 1396b(w)(6).  Indeed, the only statutory mandate with respect to "State" funding of the program is contained in Section 1902(a)(2) of the Act, requiring the State to provide at least 40 percent of the non-federal share of the funding.

U.S.C. § 1396b(d)(1) (emphasis added).  In keeping with our federalist system, Congress has

refrained from dictating to States which of its political subdivisions are sufficiently governmental

to participate in Medicaid funding and has not conditioned local contributions on a source's

access to tax revenues.

CMS has long acknowledged the broad scope of permissible contributions from "local

sources" pursuant to Section 1902(a)(2) of the Act.  Longstanding regulations allow States to use

"[p]ublic funds" as the non-federal share if they "are appropriated directly to the State or local

Medicaid agency, or transferred from other public agencies (including Indian tribes) to the State

or local agency and under its administrative control, or certified by the contributing public

agency as representing expenditures eligible for FFP under this section."  42 C.F.R. § 433.51(b).

This is the interpretation that CMS is now discarding.

In so doing, CMS does not seek support in the founding provisions of the Medicaid

Statute.  Rather, CMS bases its dramatic restrictions of non-federal sources on a new

interpretation of the 1991 Provider Tax Amendments.  Pub. L. No. 102-234.  This legislation

imposed limitations only on non-federal share funding derived from provider taxes and

donations.  It did not purport to impose restrictions on other sources permitted under Section

1902(a)(2), and did not restrict the use of IGTs or CPEs.  *See* 42 U.S.C. § 1396b(w)(1)(A).

For purposes of these restrictions, Congress set out in the 1991 legislation a definition of

units of local government, which it described as a "city, county, special purpose district, or other

governmental unit in the State."  *Id*. § 1396b(w)(7)(G).  CMS contends that, under the 1991

Amendments, *only* funds from "units of government" (including States as well as units of local

government) are permissible non-federal sources.  Adm. Rec. 5, 85, 72 Fed. Reg. at 29752,

29832.  And yet, the Rule is unfaithful to this statutory definition.  The Rule defines "unit of

government" as, "a State, a city, a county, a special purpose district, or other governmental unit in the State that *has taxing authority, has direct access to tax revenues*," or meets other narrow criteria. Adm. Rec. 72, 72 Fed. Reg. at 29832 (emphasis added). Congress' inclusion of "other governmental unit[s] in the State" in the definition recognizes the wide variety of political subdivisions that States may adopt. If Congress had intended to narrow the definition to only those political subdivisions with direct access to taxes, it could have done so. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Instead, Congress stopped far short of such a dramatic intrusion into a function (defining the scope of State and local government) assiduously reserved for the States. *See City of Newark v. New Jersey*, 262 U.S. 192, 196 (1923) (holding that "[t]he regulation of municipalities is a matter peculiarly within the domain of the State").

In any event, the statutory definition at Section 1396b(w)(7)(G) by its terms applies only "[f]or purposes of this subsection [1903(w)]," which only addresses provider taxes and donations. 42 U.S.C. § 1396b(w)(7). In and of itself, it provides no independent basis for limiting *all* local sources to those with access to tax revenues.

CMS seeks further refuge in Section 1903(w)(6)(A). CMS contends that this provision reflects Congress' "clearly expressed" intent that an entity "must be able to use funds derived from State or local taxes (or funds appropriated to State university teaching hospitals)." Adm. Rec. 6, 72 Fed. Reg. at 29753. In keeping with Congress' discrete purpose to restrict only certain donations and taxes, however, Section 1903(w)(6)(A) actually *limits* CMS from restricting other forms of contributions by providers, including the IGTs and CPEs restricted in the Rule:

> The Secretary *may not restrict* States' use of funds where such funds are derived from State or local taxes (or funds appropriated to State university teaching hospitals) transferred from or certified by units of government within a State as the non-Federal share of expenditures under this subchapter, regardless of whether the unit of government is also a health care provider, except as provided in section 1396a(a)(2) of this title [Section 1902(a)(2)], unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-Federal share under this section.

42 U.S.C. § 1396b(w)(6)(A) (emphasis added).  Congress did *not* address in subsection (w)(6)(A) contributions from local governmental sources that are neither (1) prohibited donations or taxes under Section 1903(w) (*i.e.*, "that would not otherwise be recognized as the non-Federal share"), nor (2) "derived from State or local taxes."  The natural reading of this provision is that sources not mentioned in this provision continue to be permissible pursuant to Section 1902(a)(2), which contains no tax-based limitations.  42 U.S.C. § 1396a(a)(2).

CMS instead reads the provision to delineate which funds from local governments are considered to be provider taxes or donations—and are subject to the strict requirements of the Provider Tax Amendments—*and* which funds are considered to be permissible IGTs and CPEs—notwithstanding the standard in Section 1902(a)(2).  According to CMS' revised interpretation, "Section 1903(w)(6)(A) of the Act carved out an exception to the financing restrictions that Congress itself enacted in section 1903(w)."  Adm. Rec.7, 72 Fed. Reg. at 29754.  In other words, according to CMS, Section 1903(w)(6)(A) describes the *only* transfers and contributions that continue to be permissible in the wake of the 1991 law.  This is flatly incorrect.  By selectively restricting provider donations and taxes—but not other contributions—Congress spoke to the continuing validity of other such sources authorized in Section 1902(a)(2).

CMS has not suggested that its new unit of government definition is a matter of agency discretion.  Rather, CMS views the 1991 Provider Tax Amendments as Congress' "*clearly expressed* ... intent."  Adm. Rec. 6, 72 Fed. Reg. at 29753 (emphasis added).  If this 1991

33

legislation "clearly" required such a restriction, however, one wonders why CMS waited until 2007 to implement this dramatic change, particularly given that the Provider Tax Amendments *required* the agency to issue conforming regulations.[51] If, as CMS now believes, Congress passed Section 1903(w) in 1991 to require the disqualification of all governmental funds not derived from taxes, then the legislation specifically mandated the agency's immediate issuance of implementing regulations. The intervening 15 years belie this interpretation.

### B.    The Rule's Focus on Tax Revenues is Not a Reasonable Construction of the Statute, is Arbitrary and Capricious, and is Inconsistent with Federalism

The new requirement that entities have direct access to tax revenues in order to contribute to the non-federal share of Medicaid expenditures, and the resulting reduction in federal financial participation, is an unreasonable construction of the Statute, arbitrary and capricious, and lacks any rational basis in the agency's administrative record. CMS would require States and providers long-recognized as governmental under State law to undertake burdensome reviews to assess compliance with a vague, arbitrarily determined federal definition, where the basis for this new policy is non-existent. CMS points to nothing in the legal canon that equates access to tax revenues with governmental status.[52] Many a provider established as governmental under State law and charged with a uniquely governmental mission will suddenly be disqualified from contributing to its State's share of Medicaid funding—merely because the provider does not have direct access to tax revenues.[53] Yet, these providers' expenses related to providing Medicaid services will be no less real than before the Rule, and States' financial burdens will be exacerbated.

---

[51] Under Section 5(a), "the Secretary ... *shall issue* such regulations (on an interim or final basis) as may be necessary to implement this Act and the amendments made by this Act." Pub. L. No. 102-234, § 5(a) (emphasis added).

[52] *See, e.g.*, JOHN MARTINEZ ET AL., LOCAL GOVERNMENT LAW § 23:2 (2006) ("Local government units do not have inherent power to tax because, in contrast to the state which creates them, they are viewed as subordinate units exercising only delegated competence.")

[53] *See, e.g.*, *supra* at 12.

The arbitrary nature of CMS' delineation of appropriate units of State and local government underscores why this area has historically been left to States.  In the preamble to the Rule, CMS suggests that *taxing authority* is not necessarily required, but that direct access to *tax revenues*, via "standard appropriations processes and without the need for a contractual arrangement . . . is a characteristic that reflects a health care provider's governmental status." Adm. Rec. 5, 72 Fed. Reg. at 29752.  CMS' assertion merely begs the question.  Private entities may be eligible to receive appropriations of State or local tax revenues from legislatures just as governmental providers can, and yet the Rule would exclude historically public institutions that have long contributed to their State's Medicaid programs, merely because they sustain themselves without resort to tax revenues.  Ex. 2, Lassiter Decl. ¶ 22-23; Ex. 7, Schroffel Decl. ¶ 17-19; Ex. 9, Nathan Decl. ¶ 20-21.  Providers that have legitimately been deemed governmental under State law and held to be "political subdivisions" and "public agencies" by the courts will not qualify as units of government under the Rule.  Ex. 4, Nathan Decl. ¶¶ 6, 12-14; Ex. 2, Lassiter Decl. ¶ 14-15; Ex. 7, Schroffel Decl. ¶ 11-12.

As noted above, a rule is arbitrary and capricious if it purports to make distinctions between similarly situated parties without a legitimate rationale for doing so.  *See, e.g.*, *Goldstein*, 451 F.3d at 884; *Burlington N. & Santa Fe Railway Co.*, 403 F.3d at 777.  The unit of government provision distinguishes between providers with  taxing authority (or access to tax revenues) and those without such taxing authority (or access to tax revenues), without a legitimate basis for this distinction.  In addition, the Defendants have changed their interpretation of the Statute without providing an adequate explanation for doing so.  *See Watt*, 451 U.S. at 273 ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference.").

Over the past few years, CMS has consistently raised concerns about certain financing arrangements, including many that are legally permissible under existing federal law. *See supra* at 7-8, 27-28. Plaintiffs are not insensitive to the agency's efforts to curtail certain abusive practices, but this new unit of government definition does not address these concerns. It will prevent legally authorized contributions from heretofore governmental providers that are not abusive at all, while continuing to allow practices that may be abusive. The consequences of this arbitrary new definition will be a reduction in the legitimate sources of non-federal revenues to support health care for the Medicaid population. The agency has offered no factual support for imposing these crippling new restrictions on State Medicaid programs and providers.

More fundamentally, CMS' imposition of a restrictive nationwide definition of units of government contravenes a core aspect of State sovereignty and principles of federalism embodied in applicable Executive Orders and the United States Constitution. The Supreme Court has held that "[p]olitical subdivisions of States– counties, cities ... are 'created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them,' and the 'number, nature and duration of the powers conferred upon [them] ... and the territory over which they shall be exercised rests in the absolute discretion of the State.'" *Reynolds v. Sims*, 377 U.S. 533, 575 (1964) (quoting *Hunter v. City of Pittsburgh*, 207 U.S. 161, 179 (1907)). CMS has abandoned any notion of State discretion in this Rule.[54] CMS should not upset the balance established by Congress in the Medicaid Statute, which from its inception recognized the role of States as sovereign partners in the Medicaid program.

---

[54] The agency also failed to "minimize those burdens that uniquely or significantly affect such governmental entities" or "seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions." 58 Fed. Reg. 51735, 51736 (Oct. 4, 1993) (Executive Order 12866). President Bush recently amended Order 12866, but did not change these principles. 72 Fed. Reg. 2763 (Jan. 23, 2007) (Executive Order 13422).

## IV.    Issuance of the Rule Violates the Statutory Moratorium Against Taking Any Action in Furtherance of the Rule

Summary judgment is warranted based on the Rule's substantive violations of the Social Security Act and BIPA, described above, and Plaintiffs urge the Court to rule on those bases. In addition, summary judgment should issue based on CMS' violation of the Moratorium.

Simply put, CMS issued the Rule in direct violation of the Congressional Moratorium prohibiting the agency from doing exactly that. Perhaps more troubling, CMS' rushed timing in issuing the Rule evidences a deliberate attempt to subvert Congressional intent. On this basis, the purportedly final Rule should be declared invalid. The Moratorium expressly provides that CMS, for the year-long moratorium period, shall not:

> take any action (through promulgation of regulation, issuance of regulatory guidance, or other administrative action) to—(A) finalize or otherwise implement provisions contained in the proposed rule published on January 18, 2007 ... [or] (B) promulgate or implement any rule or provisions similar to the provisions described in subparagraph (A).

Pub. L. No. 110-28, § 7002(a).[55] The prohibition on CMS action took effect on May 25, 2007, when the Moratorium was signed by the President. Nevertheless, CMS published the purportedly final Rule in the Federal Register on May 29, 2007 in direct and knowing violation of the Congressional Moratorium. Adm. Rec. 1-89, 72 Fed. Reg. 29748.[56] This publication of the Rule in the Federal Register is an action attributable to CMS as part and parcel of the substantive rulemaking process required by the APA. 5 U.S.C. § 552(a)(1)(D).[57] CMS cannot avoid its responsibility for this "action" by hiding behind the ministerial role of the Office of the Federal Register in effecting the publication.

---

[55] *See supra* at 10.
[56] *See also* 72 Fed. Reg. 55160 (Sept 28, 2007) (CMS acknowledging that, "on May 29, 2007 (72 FR 29748), CMS published a final rule (CMS–2258–FC) ...").
[57] The "action" finalizing the Rule is its publication, in accordance with the APA. The Federal Register Act recognizes that an agency issuance or notice can be "valid as against a person" when displayed in the Office of the Federal Register. 44 U.S.C. § 1507. By its terms, however, the Rule was not to be immediately effective. *See* Adm. Rec. 1, 72 Fed. Reg. at 29748 (providing a July 30, 2007 effective date).

CMS may contend that it should be credited with having the Rule displayed with the Office of the Federal Register on May 25th, and purportedly doing so earlier in the day than the President signed the legislation. *See* Adm. Rec. 89, 72 Fed. Reg. at 29836 (recording date and time of submission). This is irrelevant, given that the action finalizing the Rule occurred four days later. 5 U.S.C. § 552(a)(1)(D).[58] Moreover, unless otherwise specified, statutes have effect the first moment of the day they are signed into law. *See, e.g.*, *Bd. of Comm'rs of Kearny County Kan. v. Vandriss*, 115 F. 866, 871 (8th Cir. 1902), *cert. denied* 187 U.S. 642 (1902) ("[A] legislative act, when nothing is said to the contrary, takes effect on the day of its passage or approval and is to be regarded as in effect during the whole of that day."); *United States v. Will*, 449 U.S. 200, 225 (1980) ("[T]he law generally rejects all fractions of a day, in order to avoid disputes."); *see also Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("It is well established that, absent a clear direction ... to the contrary, a law takes effect on the date of its enactment."); *Gardner v. Collector*, 73 U.S. (6 Wall.) 499, 504 (1867) (holding that congressional acts become effective on the date they are signed by the President). As a result, the Moratorium took legal effect and was binding on CMS at 12:01 a.m. on May 25, 2007—regardless of the actual time of day the President signed the Moratorium into law.[59] Even the display of the Rule on May 25th therefore violated the Moratorium.

In rare instances in which "substantial justice" so requires, courts will consider the precise moment a bill is actually signed into law—for instance, when a statute is criminal or penal in nature. *See, e.g.*, *Burgess v. Salmon*, 97 U.S. 381, 384 (1878) (holding that federal

---

[58] The Moratorium evinces a specific Congressional mandate that CMS not "finalize or otherwise implement" the Rule for one year—not merely to delay the Rule from taking effect. *Holloway v. United States*, 526 U.S. 1, 6 (1999) ("[T]he language of the statutes that Congress enacts provides the most reliable evidence of its intent.").

[59] At least one commentator highlighted the extensive errors throughout the Rule to illustrate the haste with which CMS purported to finalize the Rule. *See* Adm. Rec. 104-109, Letter from Carol A. Herrmann-Steckel, Commissioner, Alabama Medicaid Agency to Leslie V. Norwalk (Jul. 10, 2007).

legislation making it an offense to distribute tobacco without a proper tax stamp could not be applied to the defendant who had sold tobacco in the morning, where the law was not signed until later that afternoon); *Taylor v. Brown*, 147 U.S. 640, 645-46 (1893) ("[A]s to the general doctrine that the law does not allow of fractions of a day, it is settled that when substantial justice requires it courts may ascertain the precise time when a statute is approved or an act done."). "Substantial justice" is not in the agency's favor here. CMS was well aware that Congress intended to prevent CMS from implementing the proposed version of the Rule, via legislation awaiting an expected Presidential signature. *See supra* at 10-11 & Ex. 1. Rather, CMS blatantly rushed the Rule in an attempt to evade Congressional intent. Thus, substantial justice calls for strict enforcement of the Moratorium.

In fact, CMS has continued to disregard the Moratorium. After CMS' invalid issuance of the Rule, the only course of action in keeping with the clear will of Congress would have been formally to withdraw it. The Moratorium prohibits the Secretary from taking "any action," including "other administrative action," to implement the Proposed Rule. Under the APA, "agency action" includes an agency's "failure to act." 5 U.S.C. § 551(13). As a result, CMS' failure to act to withdraw the Rule amounts to a continuing violation of the Moratorium.

## REMEDY

Plaintiffs have established that both the cost limit provisions of the Rule and the unit of government provisions of the Rule violate the Medicaid Statute as amended, are not reasonable constructions of the Medicaid Statute, and are arbitrary and capricious. Furthermore, the Rule violates the Moratorium.

The Moratorium violation requires that the entire Rule be vacated. Moreover, Defendants have characterized the cost limit and unit of government provisions as the key components of their efforts to ensure the "integrity of federal-state financial partnership." Adm.

Rec. 1, 72 Fed. Reg. at 29748.  Accordingly, in light of the violations described above, the

appropriate remedy is for the Court to vacate the entire Rule,[60] require Defendants to withdraw

the Rule, and enjoin Defendants and their agents from enforcing it or otherwise enforcing a cost

limit or the unit of government definition contained therein.  *See, e.g., Kmart Corp. v. Cartier,*

*Inc.*, 486 U.S. 281 (1988) (affirming in part the D.C. Court of Appeals grant of Plaintiff's request

for injunctive and declaratory relief in a challenge to a Customs Service regulation); *National*

*Mining Ass'n v. United States Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) (affirming

summary judgment and enjoining enforcement of a U.S. Army Corps of Engineers regulation);

## CONCLUSION

For the foregoing reasons, Plaintiffs urge the Court to grant their Motion for Summary

Judgment.

Dated:  April 4, 2008

<div align="right">

Respectfully submitted,
WILLIAM C. CRENSHAW
D.C. Bar No. 968545
POWELL GOLDSTEIN LLP
901 New York Avenue, N.W., Third Floor
Washington, DC  20001
(202) 347-0066

/s/ Nathan A. Brown
NATHAN A. BROWN
D.C. Bar No. 468750
ROPES & GRAY LLP
700 12th Street, N.W., Suite 900
Washington, DC  20005
(202) 508-4600

</div>

Of Counsel:
LARRY S. GAGE

---

[60] *Davis County Solid Waste Mgmt. & Energy Rec. Sp. Service District v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (citing *North Carolina v. FERC*, 730 F.2d 790, 795-96 (D.C. Cir. 1984) ("Severance and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own.").

D.C. Bar No. 165332
BARBARA D.A. EYMAN
D.C. Bar No. 439684
CHARLES A. LUBAND
D.C. Bar No. 458319
ROPES & GRAY LLP
700 12th Street, N.W., Suite 900
Washington, DC  20005
(202) 508-4600

Attorneys for Plaintiffs

# APPENDIX

## Exhibits

Exhibit No.                          Title

1.        Timeline of Rule and Congressional Action.

2.        Declaration of Wright Lassiter, Chief Executive Officer of Alameda County Medical Center.

      A.    Comment Letter to Proposed Rule from Alameda County Medical Center to Acting Administrator Leslie Norwalk (Mar. 16, 2007).

      B.    Comment Letter to Final Rule from Alameda County Medical Center to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

3.        Declaration of Patrick R. Wardell, President and Chief Executive Officer of Hurley Medical Center.

      A.    Comment Letter to Final Rule from Hurley Medical Center to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

      B.    Letter from the IRS to Hurley Medical Center (Oct. 18, 1995).

      C.    Michigan Sales and Use Tax Certificate of Exemption

4.        Declaration of James R. Nathan, President and Chief Executive Officer of Lee Memorial Health System.

      A.    Comment Letter to Final Rule from Lee Memorial Health System to Acting Administrator Leslie Norwalk (Mar. 16, 2007).

      B.    Comment Letter to Proposed Rule from Lee Memorial Health System to Acting Administrator Leslie Norwalk (Jul. 18, 2007).

5.        Declaration of Peter Rapp, Executive Vice President of Oregon Health & Science University.

      A.    Comment Letter to Proposed Rule from Oregon Health & Science University to Acting Administrator Leslie Norwalk (Mar. 7, 2007).

      B.    Comment Letter to Final Rule from Oregon Health & Science University to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

6.        Declaration of James N. Valenti, Chief Executive Officer of R.E. Thomason General Hospital.

A.    Resolution of the Board of Managers of the El Paso County Hospital District Opposing Proposed Medicaid Rule (Mar. 13, 2007).

B.    Comment Letter to Proposed Rule from Thomason General Hospital to Acting Administrator Leslie Norwalk (Mar. 19, 2007).

7.    Declaration of Bruce Schroffel, President and Chief Executive Officer of University of Colorado Hospital Authority.

A.    Comment Letter to Proposed Rule from University of Colorado Hospital to Acting Administrator Leslie Norwalk (Mar. 19, 2007).

B.    Comment Letter to Final Rule from University of Colorado Hospital to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

8.    Declaration of David Entwistle, Chief Executive Officer of the University of Utah Hospitals and Clinics.

A.    Comment Letter to the Proposed Rule from A. Lorris Betz and David Entwistle to Acting Administrator Leslie Norwalk (Mar. 16, 2007).

9.    Declaration of Christine Capito Burch, Executive Director of National Association of Public Hospitals and Health Systems ("NAPH").

A.    Letter from Sens. Jeff Bingaman, Elizabeth Dole, *et al.*, to Senate Finance, Energy & Commerce and Ways & Means Committees (December 12, 2007).

B.    Letter from Sens. Richard Durbin, Elizabeth Dole, *et al.*, to Senate Finance Committee (Feb. 15, 2007).

C.    Letter from Representatives Ann Eshoo, Peter King, *et al.*, to Energy & Commerce and Ways & Means Committees (February 26, 2007).

D.    Comment Letter to Proposed Rule from NAPH to Acting Administrator Leslie Norwalk (Mar. 8, 2007).

E.    Letter from Representatives Gene Green, Michael Burgess, *et al.*, to Sec. Michael Leavitt (Mar. 8, 2007).

F.    Letter from Chairman John Dingell, *et al.*, to Sec. Michael Leavitt (Mar. 12, 2007).

G.    Letter from Sens. John Rockefeller, Gordon Smith, *et al.*, to Sec. Michael Leavitt (Mar. 16, 2007).

H.    Letter from Rep. Henry Waxman, *et al.*, to Sec. Michael O. Leavitt (Mar. 19, 2007).

I.      Comment Letter to Final Rule from NAPH to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

10.     Declaration of Melinda Reid Hatton, Senior Vice President and General Counsel of the American Hospital Association ("AHA").

A.      Comment Letter to Proposed Rule from AHA to Acting Administrator Leslie Norwalk (Mar. 15, 2007).

B.      Comment Letter to Final Rule from AHA to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

11.     Declaration of Ivy Baer, Regulatory Counsel of the Association of American Medical Colleges ("AAMC").

A.      Comment Letter to Proposed Rule from AAMC to Acting Administrator Leslie Norwalk (Mar. 19, 2007).

B.      Comment Letter to Final Rule from AAMC to Acting Administrator Leslie Norwalk (Jul. 13, 2007).

12.     Declaration of Lawrence A. McAndrews, President and Chief Executive Officer of the National Association of Children's Hospitals ("N.A.C.H.").

A.      Comment Letter to Proposed Rule from N.A.C.H. to Acting Administrator Leslie Norwalk (Mar. 12, 2007).

13.     Declaration of George B. Hernández, Jr, President/Chief Executive Officer of University Health System.

A.      Letter from Rick Perry, Governor of the State of Texas, to Speaker Nancy Pelosi, et. al. (Dec. 17, 2007).

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 4th day of April 2008, I caused a true and accurate copy of

the foregoing to be filed electronically and therefore available for viewing and downloading

from the Electronic Case Filing system. Electronic service of the Notice of Electronic Case

Filing constitutes service of this document on the following:

Tamra T. Moore
Lead Counsel for Defendants
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

<u>/s/ Nathan A. Brown</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) ) ) |
| *et al.* | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,** | ) ) ) ) ) ) |
| *et al.* | ) ) |
| **Defendants.** | ) ) ) |

**Civil Action No. 1:08-00422**

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs, Alameda County Medical Center, the National Association of Public Hospitals and Health Systems, the American Hospital Association, and the Association of American Medical Colleges (collectively "Plaintiffs"), submit the following Statement of Undisputed Material Facts:

1.    Plaintiff, Alameda County Hospital Authority, doing business as Alameda County Medical Center ("Alameda"), is a non-profit public hospital authority located in Alameda County, California, which was established as a government entity separate and apart from the County pursuant to State law and Alameda County ordinance.  Ex. 2, Declaration of Wright Lassiter, ¶¶ 5, 15.

2.     Plaintiff, National Association of Public Hospitals and Health Systems ("NAPH"), is a non-profit corporation, organized and existing under the laws of the District of Columbia.  NAPH is a national association comprised of approximately 100 of the nation's largest urban and metropolitan area safety net hospitals and health systems, committed to providing health care services to all individuals without regard to ability to pay.  NAPH members rely heavily on Medicaid revenues to support their operations and mission.  Ex. 9, Declaration of Christine Capito Burch, ¶¶ 4, 6, 8.

3.     Plaintiff, American Hospital Association ("AHA"), is a non-profit corporation organized and existing under the laws of the State of Illinois.  Headquartered in Chicago, Illinois, AHA's members include approximately 5,000 hospitals, health systems, networks, and other providers of medical care.  Ex. 10, Declaration of Melinda Reid Hatton, ¶¶ 4, 5.

4.     Plaintiff, the Association of American Medical Colleges ("AAMC"), is a non-profit corporation organized and existing under the laws of the State of Illinois and headquartered in Washington, D.C.  AAMC represents approximately 400 major public and private teaching hospitals and health systems, all 129 accredited U.S. allopathic medical schools, approximately 94 professional and academic societies, and medical students and residents.  Ex. 11, Declaration of Ivy Baer, ¶¶ 4, 5.

5.     Defendant, the Honorable Michael O. Leavitt, is the Secretary of the United States Department of Health and Human Services ("HHS").  The Secretary is sued in his official capacity only.

6.     HHS is responsible for implementing the provisions of the Medicaid Statute, 42 U.S.C. §§ 1396—1396v, through the Centers for Medicare & Medicaid Services ("CMS").

7.    Defendant, the Honorable Kerry N. Weems, is the Acting Administrator of CMS. The Acting Administrator is sued in his official capacity only.

8.    On January 18, 2007, HHS, through CMS, published a Proposed Rule at 72 Fed. Reg. 2236 (the "Proposed Rule").

9.    CMS received over 400 comment letters responding to the Proposed Rule.  No commenter uniformly approved of the Proposed Rule.  Ex. 9, Declaration of Christine Capito Burch, ¶ 14.

10.    On May 29, 2007, HHS published a Rule at 72 Fed. Reg. 29748 (the "Rule"). The Rule was published purportedly as a final rule, with an effective date of July 30, 2007.

11.    In both its Fiscal Year 2005 and 2006 budget proposals CMS requested that Congress enact proposals limiting Medicaid payments for governmental providers to cost and restricting the use of intergovernmental transfers ("IGTs").  Budget of the United States Government, Fiscal Year 2005, at 149-50; Budget of the United States Government, Fiscal Year 2006, at 143.

12.    In August 2005,CMS submitted to Congress detailed legislative language substantially similar to the provisions of the Rule and requesting that Congress give the language prompt and favorable consideration.  Letter from Sec. Michael O. Leavitt, Secretary of CMS, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives (Aug. 5, 2005).

13.    Congress declined to enact legislation effectuating CMS' request.  *See* Letter from Sens. John Rockefeller, Gordon Smith, et al., to Sec. Michael Leavitt (Mar. 16, 2007); Letter from Rep. Henry Waxman, *et al*., to Sec. Michael O. Leavitt (Mar. 19, 2007).

14.    In March of 2007, Congress approved a one-year moratorium to prevent HHS from taking any further action on the Proposed Rule.  The moratorium was attached to an emergency supplemental appropriations bill that was vetoed.  H.R. 1591, 110th Cong. (2007).

15.    In May of 2007, Congress again included a one-year moratorium in the U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, which it passed on May 24, 2007 ("Moratorium").  Pub. L. No. 110-28, § 7002(a), 121 Stat. 112 (2007).

16.    On May 25, 2007, the President signed the U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007 into law.  The Moratorium will remain in place through May 24, 2008.  121 Stat. 112 (2007).

17.    On May 25, 2007, HHS placed the Rule on display in the Office of the Federal Register.  72 Fed. Reg. at 29836.

18.    On May 29, 2007, HHS published the Rule in the Federal Register.  72 Fed. Reg. 29748.

19.    The following are some examples of the financial harm that hospitals will suffer if the Rule goes into effect:

   (a)    Alameda would lose $85 million annually, which constitutes 19 percent of its $460 million operating budget.  Ex. 2, Declaration of Wright Lassiter, ¶¶ 10, 28.

   (b)    University Health System would lose $31 million, which is 5.4 percent of the System's operating budget.  Ex. 13, Declaration of George B. Hernández, Jr., ¶ 17.

(c)     Lee Memorial Health System would lose $23.2 million annually, which constitutes 52 percent of its $44 million budgeted margin from operations. Ex. 4, Declaration of James R. Nathan, ¶¶ 24, 25.

(d)     University of Colorado Hospital would lose $30-35 million annually, which constitutes 6 percent of its operating revenues. Ex. 7, Declaration of Bruce Schroffel, ¶¶ 21, 22.

(e)     El Paso County Hospital District (R.E. Thomason General Hospital) would lose $22 million annually, which constitutes nearly 7 percent of its overall operating budget. Ex. 6, Declaration of James N. Valenti, ¶ 16.

(f)     Hurley Medical Center would lose approximately to $12.8 million annually, which constitutes 4 percent of the Medical Center's operating budget. Ex. 3, Declaration of Patrick R. Wardell, ¶ 25.

(g)     Oregon Health & Science University would lose $2.8 million annually, which constitutes 18 percent of its net income budget. Ex. 5, Declaration of Peter Rapp, ¶ 13.

(h)     University of Utah Hospitals & Clinics would lose at least $25 million annually, which constitutes more than 3.5 percent of its operating budget. Ex. 8, Declaration of David Entwistle, ¶ 13.

20.    Plaintiff Alameda and the other hospitals submitting Declarations referenced above will be unable to recover the funding lost due to the Rule. Ex. 2, Declaration of Wright Lassiter, ¶¶ 29, 30; Ex. 4, Declaration of James R. Nathan, ¶ 26; Ex. 7, Declaration of Bruce Schroffel, ¶ 24; Ex. 6, Declaration of James N. Valenti, ¶ 18; Ex. 3, Declaration of Patrick R.

Wardell, ¶ 23; Ex. 5, Declaration of Peter Rapp, ¶¶ 15, 16; Ex. 8, Declaration of David

Entwistle, ¶ 15; Ex. 13, Declaration of George B. Hernández, Jr., ¶ 19.

     21.    A survey of State Medicaid Directors undertaken by the Committee on Oversight

and Government Reform of the U.S. House of Representative in February 2008 regarding the

expected impact of the Rule on individual States found that the expected loss of federal funding

across the 43 States and the District of Columbia that responded to the survey was $21 billion

over five years.  Committee on Oversight and Government Reform, *The Administration's*

*Medicaid Regulations: State-by-State Impacts*, March 2008.

Dated:  April 4, 2008

                      Respectfully submitted,

                      WILLIAM C. CRENSHAW
                      D.C. Bar No. 968545
                      POWELL GOLDSTEIN LLP
                      901 New York Avenue, NW, Third Floor
                      Washington, DC 20001
                      (202) 347-0066

                      /s/ Nathan A. Brown
                      NATHAN A. BROWN
                      D.C. Bar No. 468750
                      ROPES & GRAY LLP
                      700 12th Street, NW, Suite 900
                      Washington, DC 20005
                      (202) 508-4600

Of Counsel:

LARRY S. GAGE
D.C. Bar No. 165332
BARBARA D.A. EYMAN
D.C. Bar No. 439684
CHARLES LUBAND
D.C. Bar No. 458319

ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4600

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of April 2008, I caused a true and accurate copy of the foregoing to be filed electronically and therefore available for viewing and downloading from the Electronic Case Filing system. Electronic service of the Notice of Electronic Case Filing constitutes service of this document on the following:

Tamra T. Moore
Lead Counsel for Defendants
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

/s/ Nathan A. Brown

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) |
| | ) |
| *et al.* | ) |
| | ) |
| | ) **Civil Action No. 1:08-00422** |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,** | ) |
| | ) |
| | ) |
| | ) |
| *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

## <u>SUMMARY JUDGMENT ORDER</u>

Upon consideration of Plaintiffs' Motion for Summary Judgment, it is hereby:

ORDERED that Plaintiffs' Motion for Summary Judgment is granted, and it is further

ORDERED that the regulation, *Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("the Rule"), is hereby invalidated, and it is further

ORDERED that Defendants, Michael O. Leavitt, in his official capacity as Secretary, United States Department of Health and Human Services, the United States Department of Health and Human Services ("HHS"), Kerry Weems, in his official capacity as Acting Administrator, Centers for Medicare & Medicaid Services, and the Centers for Medicare & Medicaid Services ("CMS"), as well as their agents, employees and attorneys, are hereby

permanently enjoined from enforcing the Rule or taking any further action to implement the Rule

or any of its provisions, and it is further

ORDERED that Defendants, Michael O. Leavitt, in his official capacity as Secretary of

HHS, HHS, Kerry Weems, in his official capacity as Acting Administrator of CMS, and CMS

shall take all appropriate action to withdraw the Rule.

SO ORDERED, this __ day of May, 2008.


By:_____
    JAMES ROBERTSON
    United States District Court Judge

# Exhibit 1

## Timeline of Rule and Congressional Action

Budget of the United States Government, Fiscal Year 2005
HHS enacts proposals limiting Medicaid payments for governmental providers to cost and restricting the use of IGTs.

Budget of the United States Government, Fiscal Year 2006
HHS enacts same proposals from Fiscal Year 2005 limiting Medicaid payments for governmental providers to cost and restricting the use of IGTs.

August 5, 2005
HHS transmits draft proposal to Congress requesting that Congress impose a cost limit on governmental providers and require the retention of Medicaid payments. Letter from Sec. Michael O. Leavitt, Secretary of CMS, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives (Aug. 5, 2005).

January 18, 2007
CMS issues Proposed Rule. 72 Fed. Reg. 2236 (Jan. 18, 2007).

February 15, 2007
Senators Dick Durbin (D-IL), Elizabeth Dole (R-NC) and 41 other Senators send a letter to the Senate Finance Committee expressing "serious concern" about the proposed rule. Ex. 9-B, Letter from Sens. Richard Durbin, Elizabeth Dole, et al., to Senate Finance Committee (Feb. 15, 2007).

February 26, 2007
Representatives Ann Eshoo (D-CA), Peter King (R-NY) and 224 other Members of the House of Representatives send a letter to the Energy & Commerce and Ways & Means Committees expressing "serious concern" about the proposed Medicaid rule. Ex. 9-C, Letter from Representatives Ann Eshoo, Peter King, et al., to Energy & Commerce and Ways & Means Committees (February 26, 2007).

March 16, 2007
Senators John Rockefeller (D-WV), Gordon Smith (R-OR) and 58 other Senators submit comments to CMS on the Proposed Rule, expressing "strong opposition" and requesting that the rule be withdrawn. Ex. 9-G, Letter from Sens. John Rockefeller, Gordon Smith, et al., to Sec. Michael Leavitt (March 16, 2007).

March 19, 2007
Representatives Henry Waxman (D-CA), Jim Walsh (R-NY), Jan Schakowsky (D-IL), Peter King (R-NY) and 149 other Members of the House of Representatives submit a letter to CMS asking that the Proposed Rule be withdrawn. Ex. 9-H, Letter from Rep. Henry Waxman, et al., to Sec. Michael Leavitt (Mar. 19, 2007).

March 29, 2007
Senate passes the amendment to appropriations legislation providing supplemental funding for the Iraq and Afghanistan wars to prevent CMS from moving forward for a two-year period with the proposed Medicaid rule as introduced by Senator Dick Durbin on March 22, 2007 in Committee. U.S. Troop Readiness, Veterans' Health, and Iraq Accountability Act of 2007, H.R.1591, 110th Cong. § 2705 (March 29, 2007) (Engrossed Amendment as Agreed to by Senate).

April 24, 2007
Appropriations conferees agree to a one-year moratorium on the proposed Medicaid rule. H.R. Conf. Rep. No. 110-107, § 6002 (April 24, 2007).

May 1, 2007
President vetoes the legislation providing supplemental funding for the Iraq and Afghanistan wars (H.R. 1591). 153 Cong. Rec. H4315-01 (daily ed. May 2, 2007) (Statement of President Bush).

May 24, 2007
The House and Senate pass a revised bill (H.R. 2206) to provide supplemental funding for the Iraq and Afghanistan wars that includes a one-year moratorium on the proposed Medicaid rule. U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, Pub. L. No. 110-28, § 7002(a) (May 24, 2007) (Engrossed Amendment as Agreed to by House).

May 25, 2007
The President signs H.R. 2206 into law (now Public Law No: 110-28); it includes the one-year moratorium on the proposed Medicaid rule. U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, §7002(a), 121 Stat. 112 (2007).

CMS puts the Rule on display at the Office of the Federal Register. 72 Fed. Reg. at 29836.

May 29, 2007
CMS publishes the Rule in the Federal Register [CMS-2258-P]. 72 Fed. Reg. 29748 (May 29, 2007).

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER,<br><br>*et al.*<br><br>          Plaintiffs,<br><br>       v.<br><br>THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,<br><br>*et al.*<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. |

## DECLARATION OF WRIGHT LASSITER

I, Wright L. Lassiter III, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am Chief Executive Officer of plaintiff Alameda County Medical Center ("Alameda"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary and permanent injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge based on information contained in Alameda's files upon which I normally rely, upon publicly available information, and other factual matters known to me.

3. In my capacity as Chief Executive Officer, I am responsible for all aspects of Alameda's operations, including its financial operations and its participation in and payments from Medi-Cal, the California Medicaid program.

4. I have served as Alameda's Chief Executive Officer since September, 2005.

5. Alameda is the public hospital and health system for Alameda County, California, with its roots in the Alameda County Infirmary opened as Fairmont Hospital in 1864 and Highland Hospital in 1927. For over 140 years, the Medical Center's mission has been to maintain and improve the health of all Alameda County residents regardless of ability to pay. Highland Hospital has been the major emergency medical services provider for Alameda County residents since the facility first opened its doors. It is the official Trauma Center for Northern Alameda County. John George Psychiatric Pavilion (JGPP) provides 80 in-patient psychiatric beds and Psychiatric Emergency services. JGPP is the primary service provider for 99% of all acute psychiatric emergencies in Alameda County. Alameda County Medical Center operates three freestanding health centers providing full service primary care to adults and children. The Medical Center is the sole provider of specialty care services to Alameda County's indigent, and one of a very few facilities in the County providing specialty care to Medi-Cal patients. In December 1993, the clinics merged organizationally with the Alameda County Medical Center. As detailed in Paragraph 12 below, Alameda is now an independent Public Hospital Authority, specifically established by County Code under the authority granted by State statute.

6. Alameda's mission, as defined by State statute and County code, is a commitment "to maintaining and improving the health of all Alameda County residents, regardless of ability to pay. [Alameda] . . . provide[s] comprehensive, high quality medical treatment, health promotion and health maintenance through an integrated system of hospitals, clinics, and health services staffed by individuals who are responsive to the diverse cultural needs of our community. [Alameda], as a training institution, is committed to maintaining an environment that is supportive of a wide range of educational programs and activities. Education, including

continuing education, of medical students, residents, nursing and other staff, along with clinical

research, are all essential components of our environment." Alameda County Code, Sec.

2.120.050; Cal. Health & Safety Code Sec. 101850.

7.  Alameda provides a full range of basic and specialized health care services in several

facilities primarily to Medicaid, low-income and uninsured residents of Alameda County.

Alameda operates Highland Hospital in Oakland, a general acute care hospital with a daily

average patient load of 236 beds, and an acute care psychiatric hospital in San Leandro with a

daily average patient load of 80 beds. Alameda also operates a 159-bed rehabilitation and skilled

nursing facility at Fairmont Hospital, outpatient clinics, and free-standing community health

centers.

8.  Alameda's Level-Two Trauma Center, one of only three in the county, provides the

most intensive and technologically sophisticated trauma care available. In FY 2007, Alameda

provided care to 1,127 trauma patients, and provided 116,272 patient days at three campuses,

with an average daily census of 319. We had 14, 814 admissions at our three campuses. In

addition, Alameda generated 252,234 outpatient visits in 29 specialty and 8 primary care.

9.  Alameda is the most important safety net health care provider in Alameda County.

Highland is the closest hospital with a trauma center to the low income neighborhoods in

Oakland, and we provide care to many more low-income and uninsured patients than any other

facility in the County. Alameda is the single largest provider of Medi-Cal patient days for

patients in Alameda County.

10.  Approximately 53 percent of Alameda's patients are enrolled in Medi-Cal, and 14

percent are Medicare beneficiaries. Only 5 percent of our inpatients are covered by private

insurance. The remaining patients are uninsured. Alameda's revenue budget is $460 million per

year of which approximately $140 million is from patient payors, $116 from federal and state supplemental programs, $102 million from County funded programs for the indigent, inpatient behavioral services and trauma care, $89 million from Measure A sales tax revenue, and approximately $12 million from other sources.

11.   As a direct consequence of our efforts to fulfill our mission of providing high quality health care to all County residents, including Medi-Cal enrollees, Alameda's current financial situation is highly precarious. Although, just recently, Alameda has managed to reverse several years of negative operating margins, it lacks the funds necessary for strategic capital and facility renovation and program enhancements. Mere survival is a constant challenge, as we continuously struggle to keep revenues growing at the same pace as our rising expenses.

12.   Alameda was founded by Alameda County, and historically was owned and operated directly by the County under the governance of the County Board of Supervisors.  In 1998, the Alameda County Hospital Authority was established pursuant to State law and Alameda County ordinance, and the governance of the Medical Center passed to the Board of Trustees of this independent public hospital authority.  *See* Alameda County Administrative Code, Section 2.120.020; California Health and Safety Code § 101850.

13.   As described by the County in our enabling legislation, the system was transferred to the Authority in an effort to improve the efficiency, effectiveness and economy of the community health services provided by the medical center, and was deemed to be "the best way to fulfill [the County's] commitment to the medically indigent, special needs, and general populations of Alameda County in a manner that constitutes an ongoing material benefit to the [C]ounty and its residents."  Alameda County Administrative Code, Section 2.120.010; Cal. Health & Safety Code Section 101850(a)(1).

14. Alameda continues to serve the same role as the County's health system and to be significantly integrated with the County. Alameda County owns the medical center's land and buildings, and the County's Board of Supervisors appoints our governing board. The statute creating the authority commits Alameda to continue its mission of providing care to all county residents regardless of ability to pay. *See* Alameda County Administrative Code, Section 2.120.050. The hospital authority is deemed a public agency for purposes of eligibility with respect to grants and other funding and loan guarantee programs (*see* Alameda County Administrative Code, Section 2.120.030(gg) ; Cal. Health & Safety Code Sec. 101850(i)), and is subject to state and federal taxation laws that are applicable to counties generally. *See* Alameda County Administrative Code, Section 2.120.030(z). In addition, Alameda is presented as a discrete component unit in Alameda County's Comprehensive Annual Financial Report.

15. Alameda is designated a governmental entity by statute. See Cal. Health & Safety Code Sec. 101850(j). All rights and obligations of hospitals owned or operated by a county are conferred on Alameda as a matter of law. Cal. Health & Safety Code Sec. 101850(m). Alameda employees are public employees within the meaning of the Meyers-Milias- Brown Act. Alameda, as a public entity, is subject to the open meeting requirements of the Brown Act and its documents are public records within the meaning of the California Public Records Act.

16. In 2004 Alameda County residents approved a sales tax increase of 0.5% known as Measure A, which passed with greater than the required 2/3 vote, with 75% of proceeds to help prevent closure of Alameda clinics and hospital facilities. The Measure specifically cited Alameda's role as provider of care to the county's indigent population.

17. California operates its Medicaid program, Medi-Cal, under a demonstration approved by the Department of Health and Human Services ("HHS") (through the Centers for Medicare

and Medicaid Services ("CMS")). Through Medicaid demonstrations, States are permitted to

waive certain federal requirements for Medicaid programs in order to try new ways to expand

coverage to targeted populations, institute new services for certain groups of Medicaid

beneficiaries, etc. States must follow the written Terms and Conditions of their demonstration,

as approved by CMS, which detail the rules and financing of the demonstration and also specify

which federal requirements have been waived.

 18. California does not have waivers of Section 1902(a)(2) of the Social Security Act or

of 42 CFR § 433.50, the relevant authorities for the unit of government definition under the Rule.

 19. The Terms and Conditions contain a change of law provision requiring the State to

conform its demonstration to changes in federal statutes or regulations that take effect after the

demonstration was approved. *See* Special Terms and Conditions, Medi-Cal Hospital/Uninsured

Care Demonstration, Sec. II.3.

 20. The demonstration is for five years ending August 31, 2010. Although the

demonstration is eligible for renewal, the renewal will be subject to conformity with all

applicable statutes and regulations, unless waived by CMS.

 21. For over a decade, Alameda has contributed funds to help the State finance its Medi-

Cal program. Alameda is currently expressly authorized under the Special Terms and Conditions

of the Medi-Cal demonstration to contribute to the funding of Medicaid expenditures, through

certifications that we have expended funds on items and services eligible for federal match under

the Medicaid program. Thus, at the outset of the demonstration (before issuance of the Rule),

CMS approved Alameda's designation as a "government-operated hospital[] to be reimbursed on

a certified public expenditure basis." *See* Attachment C, Special Terms and Conditions, Medi-

Cal Hospital/Uninsured Care Demonstration. The certifications by Alameda and other public

providers support the non-federal share of supplemental Medicaid payments not only to public hospitals, but to children's hospitals and other private safety net hospitals as well. These supplemental payments are targeted additional payments that States typically make above and beyond base Medicaid payments to help support the range of additional services and benefits provided by safety net providers and to support their mission of providing services to the indigent. As a result of Alameda's ability to certify expenditures and receive resulting federal matching funds, Alameda currently receives supplemental safety net payments. Without these supplemental safety net payments we would expect the following impact to the care provided to the residents of Alameda County, 1) Longer waits in the emergency room for inpatient beds, aggravating an already significant problem for Alameda, 2) Forced ration-based healthcare, longer wait times in the clinics for specialists and primary care, delayed surgeries. Some outpatient primary and specialty clinics may close entirely, 3) Closure of inpatient units , 4) Focus on acute services rather than preventative services, and as a result, would be seeing sicker patients, 5) Reduction in HIV services, physician training programs, health education and outreach programs, and dental services,  and 6) Reduction in work force.

22.  Based on Alameda's analysis of the purported new CMS Rule, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007), Alameda would not meet the new restrictive definition of a unit of government, despite its historic and continued role as the public hospital and health system for Alameda County.  Under the Rule, an entity may qualify as a unit of government only if it 1) has taxing authority; 2) has direct access to generally applicable tax revenues as an integral part of a unit of government with taxing authority which is legally obligated to fund the health care provider's expenses, liabilities, and deficits; 3) receives

appropriated funding as a State university teaching hospital; or 4) is an Indian Tribe or Tribal organization.

23. Alameda does not have taxing authority. Because of our Public Hospital Authority governance structure, we are not sufficiently integrated with the County, which is not legally obligated to fund Alameda's liabilities. *See* Alameda County Code, Section 2.120.030; Cal. Health & Safety Code Sec. 101850(k)(3). Alameda is not a state teaching hospital, nor is it a Tribal organization. Based on these factors, we do not believe Alameda would qualify as a unit of government under CMS's new, overly-restrictive definition.

24. As a result of losing its status as a governmental provider for Medicaid financing purposes under the Rule, Alameda would no longer be eligible to certify the substantial expenditures it incurs from providing care to Medicaid patients, and CMS would eliminate federal matching funds for its share of these significant expenditures.

25. Because Alameda would not qualify as a unit of government under the Rule, California would be required to remove Alameda from the list of hospitals eligible to make certifications and receive supplemental Medicaid funding under the terms of the waiver. The terms of the California waiver require that California make changes to comply with federal law (see ¶ 19 above), and the State does not have a waiver of the regulation at issue or the statutory authority that CMS claims in support of the new Rule.

26. CMS stated in the preamble to the final version of the Rule that it is unlikely that budget neutrality under the Medi-Cal waiver would be affected by the regulation. CMS did not indicate, however, that the unit of government definition would not be applied and that demonstrations would not have to be changed accordingly. Moreover, California would at the

very least be required to comply with the Rule and eliminate Alameda from the list of certifying providers when the waiver comes up for renewal in 2010.

27. Based on failure to meet the restrictive definition of a unit of government and the inability to certify public expenditures, Alameda expects to lose approximately $85 million annually in supplemental Medicaid payments.

a.  Specifically, Alameda would no longer be eligible to receive approximately $62 million annually in Disproportionate Share Hospital (DSH) payments. Currently, Alameda receives DSH payments for government-operated hospitals; these payments are funded by CPEs from the list of governmental providers in an attachment to the waiver. *See* Special Terms and Conditions, Medi-Cal Hospital/Uninsured Care Demonstration, Sec. IV.30. While the waiver provides for a DSH pool for private hospitals, this pool is significantly smaller, and we have estimated that the available funds would be significantly less than current payments.

b.  In addition, Alameda would no longer be eligible to receive approximately $23.million in Safety Net Care Pool funding, as the waiver terms limit these payments to "[t]he 22 government-operated hospitals listed in Attachment C, the State, a county, or a city." *See* Special Terms and Conditions, Medi-Cal Hospital/Uninsured Care Demonstration, Sec. IV.35

28. The loss of 19% of $460 million operating budget will threaten Alameda's ongoing viability. Since Alameda operates at a near break-even level, the loss of this funding will increase the annual deficit by $85 million. Faced with this magnitude of a loss, we cannot assure our survival by making only incremental changes, like eliminating certain services (e.g. care for the uninsured, trauma care, specialty services, acute rehabilitation services, acute psychiatric services, and outpatient specialty clinic services), decreasing capacity, or laying off a certain percentage of our staff. Instead, we have been forced to begin modeling around whether

Alameda will even be able to continue to operate, and if so, whether it would essentially cease to exist in its current form and reopen in a new form.  Alameda County would face dissolution of the Hospital Authority and would lose the efficiency and greater flexibility achieved under the hospital authority model.

29.  California is already experiencing a $16 billion budget deficit.  Based on recent communications with State officials, it is my understanding that while the State would prefer not to amend the demonstration to make Alameda ineligible for the payments Alameda now receives, I am not aware of any replacement State or local funding to compensate our hospital for the loss of federal funds resulting from the new Rule.

30.  Furthermore, based on communications with State officials, I understand that it is highly unlikely that the State would be able to replace the non-federal share funds that Alameda currently certifies.  I understand that this would mean the loss of federal funding for payments to other California public hospitals, as well, for the services we provide to Medicaid and other vulnerable patients. This would be devastating to the ability of Alameda and the rest of the State's safety net providers to care for California's medically underserved population.

31.  Alameda submitted comment letters to CMS on March 16, 2007 regarding the proposed version of the Rule, and on July 13, 2007 in response to the final version of the Rule. These letters are attached as Exhibits A and B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 10, 2008

(Signature): _____

Wright Lassiter
Chief Executive Officer
Alameda County Medical Center

# Exhibit 2-A



# ALAMEDA COUNTY
# MEDICAL CENTER

*Highland Hospital Campus ~ Fairmont Hospital Campus*
*John George Psychiatric Pavilion*
*Ambulatory Health Care Services*

**March 16, 2007**

Leslie Norwalk, Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-2258-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Re: Comments on Proposed Rule CMS-2258-P
Medicaid Program Cost Limit for Providers Operated by Units of Government and
<u>Provisions to Ensure the Integrity of Federal-State Financial Partnership</u>

Dear Ms. Norwalk:

On behalf of Alameda County Medical Center (ACMC), I am writing to express our opposition to CMS' Proposed Rule CMS 2258-P, which imposes cost limits on Medicaid payments to public providers. Alameda County Medical Center urges CMS to withdraw this proposed rule.

We are highly concerned that the proposed rule would have a severe negative impact on California's public hospital safety net and the patients and communities they serve. If the rule is implemented, ACMC anticipates that it will lose upwards of $21 million per year in Medi-Cal funding primarily related to costs associated with our uninsured patient population. If this were to happen, we would expect the following potential impacts:

> 1) Longer waits in the emergency department for inpatient beds - aggravating an already significant problem for ACMC;
> 2) Longer wait times in the clinics for specialists and primary care, and delayed surgeries, and potentially the closure of some outpatient primary and specialty clinics – further exacerbating the existing paucity of access for Medi-Cal recipients and the uninsured;
> 3) Potential closure of inpatient bed capacity;
> 4) An unbalanced focus on acute services rather than preventative services.

We are concerned about a number of troubling provisions contained in the rule.

It will limit our Medi-Cal reimbursement to the costs of providing services to our Medi-Cal patients. This will eliminate funding for our Medi-Cal and uninsured patients, who make up 67% of our patient population and whose costs are currently covered under the Safety Net Care Pool. The pool exists under California's CMS-approved hospital financing waiver specifically for the purpose of providing financial assistance to safety net hospitals that incur significant costs in treating uninsured patients.

Alameda County Medical Center provides a full range of services to vulnerable populations and specialty services to both the uninsured and insured that are not provided elsewhere in our communities.

If the rule is applied to the waiver, ACMC could be forced to limit critical services to our patients, including care for the uninsured, trauma care, specialty services, acute rehabilitation inpatient services, acute psychiatric services, and outpatient specialty clinics, including Cardiology, Orthopedics, Podiatry, Oral Surgery, Ophthalmology, Endoscopy and Urology, to name just a few.

These limitations also could result in an increased number of uninsured patients seeking care in private hospitals, creating a domino effect that could be harmful to California's entire health care system.

In addition, the proposed rule inappropriately limits states' ability to fund the nonfederal share of Medicaid expenditures by narrowing the types of public entities that can participate in that funding and by restricting the states' ability to use public funds for the Medicaid program. The impact of these restrictions will be dramatic for the ACMC and for California's Medi-Cal program as a whole. Notwithstanding the clear intent of Congress to allow states to use public teaching hospital dollars to fund their Medicaid expenditures, the proposed definition would preclude ACMC from participating in Medi-Cal financing in California. For over a decade, the ACMC has contributed its funds to help the State finance its Medi-Cal program. Currently ACMC, through its hospitals, makes approximately $204 million in expenditures annually for services to Medi-Cal beneficiaries and the uninsured that are matched with federal dollars under the hospital waiver. The loss of the related $78+ million in federal Medicaid matching funds will be devastating for State, ACMC and for the patients we serve.

This substantial loss of federal funds would be caused by the proposed amendments to sections 433.50 and 433.51, which inappropriately limit those entities qualified to provide the nonfederal share of Medicaid expenditures to units of government with generally applicable taxing authority. A provider will be treated as a unit of government only if it is operated by, or is an integral part of, a unit of government with taxing authority. Based in the language of the proposed rule and the discussion in the preamble, ACMC is concerned that it will not meet these narrow requirements under its current structure.

The Alameda County Medical Center, a public hospital authority, is the independent legal entity that operates ACMC. The Authority was established pursuant to State law and County ordinance. (See, Health & Safety Code Section 101850.) The medical center, formerly owned and operated by the County of Alameda, was transferred to the Authority in an effort to improve the efficiency, effectiveness and economy of the community health services provided at the medical center. Alameda County owns the medical center's land and buildings and the County's Board of Supervisors appoints ACMC's governing board. However, the Authority, which is the legal entity that holds the license for ACMC, is separate and apart from the County of Alameda. Although the County helps finance ACMC through payments for services and provides loans for ACMC's operations, the liabilities and obligations of ACMC are liabilities of the Authority, not of the County. Based on the proposed rule and the preamble discussion, it appears that CMS is attempting to exclude public entities, like ACMC, from participating in funding the Medi-Cal program, because ACMC has no independent taxing authority and it is not sufficiently integrated with Alameda County, which clearly has the requisite taxing authority.

CMS has provided no rationale; however, that justifies this restriction on the use of ACMC's public funds in support of Medi-Cal services in California. Moreover, the legal analysis presented in support of the proposed rule is seriously flawed. First, there is nothing in Section 1902(a) (2) of the Social Security Act that supports restrictions on the types of units of government that can make Medicaid CPEs or IGTs. That section of the Medicaid statute, which has remained unchanged since 1987, recognizes the states' authority to use public funds, in addition to state funds, to finance Medicaid expenditures. The current regulation at Section 433.51 properly reflects the longstanding interpretation that allows a broad range of public agencies to do so.

Second, the proposed regulatory definition is inconsistent with the plain language of the statutory definition of unit of government. The proposed rule simply adds the requirement of "generally applicable taxing authority" to the statutory definition in Section 1903(w) (7) (G) of the Act. If Congress had intended to impose this additional requirement, it would have done so. Instead, Congress adopted a broad definition, which includes "a special purpose district, or other governmental unit." Congress clearly was aware that it could not expressly identify all types of public agencies that can properly fund the nonfederal share of Medicaid and that a narrow definition could inadvertently exclude unique governmental structures like ACMC. As a result, Congress was careful to adopt a broad, inclusive definition that would protect entities, like ACMC, that were properly participating in Medicaid funding under then-existing Medicaid policy.

Third, the rule would apply the term "unit of government" well beyond its stated applicability. Section 1903(w) (7) expressly limits the scope of the terms defined there to be used only "for purposes of this subsection." CMS goes far beyond this limitation and would apply the term and its statutory definition to change the interpretation of Section 1902(a) (2) of the Act to limit the use of local funds under a completely different section of the Medicaid law.

Fourth, the proposed rule is directly inconsistent with the reason that Congress included these provisions in the 1991 Medicaid amendments. While Section 1903(w) generally, was designed to limit certain types of Medicaid financing methods, paragraphs (6) and (7) (G) were intended to protect the states' ability use of local public funds to finance the nonfederal share of Medicaid expenditures. The purpose of these provisions was to make it clear that IGTs were not to be restricted like provider related taxes and donations, which were considered abusive. The Conference Committee stated:

> The conferees note that current transfers from county or other local teaching hospitals continue to be permissible if not derived from sources of revenue prohibited under this act. The conferees intend the provision of section 1903(w) (6) (A) to prohibit the Secretary from denying Federal financial participation for expenditures resulting from State use of funds referenced in that provision.

H.R. CONF. REP. No. 102-409 (1991).

By limiting the definition of unit of government, the proposed rule is directly contrary to this Congressional directive and would result in the denial federal financial participation for legitimate Medicaid expenditures made by ACMC.

There is no legitimate federal interest in imposing these restrictions on California's ability to fund its Medi-Cal program and the proposed rule should be withdrawn. In the event that CMS goes forward with these rules, however, it should modify the definition of unit of government to exclude the taxing authority requirement.

A related concern is based on language in the preamble, where CMS states that tax revenue is the only valid source of intergovernmental transfers. 72 Fed. Reg. 2238. While neither current law nor the proposed regulations expressly impose such a requirement, the preamble statements suggest that CMS intends to adopt an interpretation that would limit local Medicaid funding to those funds derived directly from taxes. Any such limitation on the use of public funds would seriously limit the ACMC's ability to participate in Medi-Cal funding, would be directly inconsistent with the long-standing implementation of the Medicaid statute, and would negate the protections intended by Congress in Section 1903(w)(6) of the Act.

Section 1902(a) (2) is the statutory provision that has long been interpreted as granting states authority to use public funds, in addition to state funds, to finance Medicaid expenditures.

**Page 4 of 4    Re: Comments on Proposed Rule CMS-2258-P**

Beyond a broad reference to the adequacy of "local sources" of funds, the provision imposes no restriction on the sources of local funds that may be used by the states. Until 1991, when Congress imposed strict limitations on federal financial participation designed to preclude the use of provider-related taxes and donations to finance Medicaid expenditures, there were no statutes or regulations in place that imposed any such restrictions. At the same time, however, Congress chose to protect, rather than restrict, the use of public funds for Medicaid expenditures.

CMS has expressed no rationale for, or legitimate federal interest in, limiting Medicaid funding to tax revenues. Public entities obtain funds from a number of sources. For example, ACMC earns interest on amounts deposited in financial institutions, receives donations from individuals, and earns revenues from the operation of the medical center. CMS has identified no valid policy reason to preclude California form using these public funds to support the Medicaid program.

Again, Alameda County Medical Center opposes the Medicaid rule and strongly urges CMS to withdraw it. If the rule goes into effect, we will suffer extremely harmful effects that will affect our ability to care for our patients and communities. CMS should recognize the damage that this rule will have on our community's health care system and stop its efforts to move forward with the rule.

Sincerely,

Wright L. Lassiter III
Chief Executive Officer

# Exhibit 2-B



# ALAMEDA COUNTY
# MEDICAL CENTER



*Highland Hospital Campus  Fairmont Hospital Campus*
*John George Psychiatric Pavilion*
*Ambulatory Health Care Services*

July 13, 2007

Leslie Norwalk, Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-2258-FC
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, Maryland 21244-1850

**Re: Comments on Provisions of Final Regulations (CMS-2258-FC)**
**Medicaid Program Cost Limit for Providers Operated by Units of Government and**
**Provisions to Ensure the Integrity of Federal-State Financial Partnership**

Dear Ms. Norwalk:

On behalf of Alameda County Medical Center ("ACMC"), I am writing to express
continued opposition to the Medicaid rule regarding providers operated by units of
government. (CMS-2258-FC) [1] In particular, we appreciate the opportunity to comment
on the revised definition of "unit of government" in Section 433.50. Even as revised,
however, the definition improperly fails to recognize ACMC as a unit of government for
Medicaid purposes. ACMC provides a full range of services to vulnerable populations
and specialty services to both the uninsured and insured that are not provided elsewhere
in our communities. If the rule is implemented and ACMC can no longer participate in
Medi-Cal funding, ACMC could be forced to limit critical services to our patients,
including care for the uninsured, trauma care, specialty services, acute rehabilitation
inpatient services, acute psychiatric services, and outpatient specialty clinic services.
Therefore, ACMC urges you to withdraw the final rule.

In addition to the adverse impact on ACMC, the definition of unit of government
improperly limits states' ability to fund the nonfederal share of Medicaid expenditures.
The rule narrows the types of public entities that can participate in Medicaid funding and
restricts the states' ability to use local public funding for the Medicaid program.

*The People's Choice in Health Care*

*1411 East 31ˢᵗ Street   Oakland, California 94602   Phone (510) 437-4800*

---

[1] 72 Fed. Reg. 29749 (May 29, 2007).

These restrictions are not authorized by statute and are inconsistent with Congressional intent. As a member of the California Association of Public Hospitals and Health Systems ("CAPH"), ACMC joins in the comments submitted by CAPH in response to the final regulation. Along with CAPH, ACMC urges you to withdraw the entire final rule, including the provision addressing units of government in Section 433.50.

The Alameda County Hospital Authority is the independent legal entity that operates ACMC. The Authority was established pursuant to State law and County ordinance. (See, Health & Safety Code Section 101850.) The medical center, formerly owned and operated by the County of Alameda, was transferred to the Authority in an effort to improve the efficiency, effectiveness and economy of the community health services provided at the medical center. Alameda County owns the medical center's land and buildings and the County's Board of Supervisors appoints ACMC's governing board. However, the Authority, which is the legal entity that holds the license for ACMC, is separate and apart from the County of Alameda. Although the County helps finance ACMC through payments for services and provides loans for ACMC's operations, the liabilities and obligations of ACMC are liabilities of the Authority, not of the County.

Since its creation as a public hospital authority, ACMC has participated in Medi-Cal funding through intergovernmental transfers ("IGT") or certified public expenditures ("CPE") of its public funds. ACMC's contribution of the non-federal share of Medi-Cal expenditures is consistent with the Medicaid statute. Moreover, ACMC is expressly authorized to contribute to the funding of Medicaid expenditures under California's Hospital/Uninsured Care Demonstration Project ("Hospital Waiver") pursuant to the Special Terms and Conditions for that program.

Under Section 433.50, the Centers for Medicare and Medicaid Services ("CMS") will preclude ACMC from using its public funds to support the Medi-Cal program. CMS has provided no rationale that justifies this restriction. As discussed in ACMC's comments in response to the proposed regulations, the legal analysis relied upon by CMS to support the rule is seriously flawed. (Please see the attached copy of those comments for a full discussion of ACMC's concerns.) Notwithstanding the changes in the final rule, nothing in Section 1902(a) (2) or Section 1903(w) of the Social Security Act, or the legislative history of those provisions, supports Section 433.50.

The regulatory definition continues to be inconsistent with the plain language of the statutory definition of unit of government. The rule simply adds requirements to the statutory definition in Section 1903(w) (7) (G) of the Act. If Congress had intended to impose these additional requirements, it would have done so. Instead, Congress adopted a broad definition, which includes "a special purpose district, or other governmental unit." Congress clearly was aware that it could not expressly identify all types of public agencies that can properly fund the nonfederal share of Medicaid and that a narrow definition could inadvertently exclude unique governmental structures like ACMC. As a result, Congress was careful to adopt a broad, inclusive definition that would protect entities, like ACMC, that were properly participating in Medicaid funding under then-existing Medicaid policy.

CMS did not adequately respond to these concerns in the May 29, 2007 publication of the final rule.[2] For example CMS comments that "States have been ignoring the statutory limitation" by allowing entities like ACMC to participate in Medicaid funding through IGTs and CPEs in the past. This statement is entirely inconsistent with CMS' express recognition of ACMC as a governmentally operated hospital in California's Hospital

---

[2] 72 Fed. Reg. 29754-55.

Waiver. CMS' suggestion that no loss of federal funds will occur as a result of the rule is similarly without merit. The assumption that states will appropriate other funds to replace the public funds that can no longer be used to fund Medicaid services simply disregards the political reality in California and throughout the county. Contrary to CMS' assertion that the rule is designed to protect ACMC and similar entities, as numerous commenters noted, Section 433.50 and the related cost limit on governmentally operated providers will adversely affect overall Medicaid funding for safety net providers in California and nationally.

In conclusion, there is no legitimate federal interest in imposing these restrictions on California's ability to fund its Medi-Cal program and the rule should be withdrawn. Even if the congressionally imposed moratorium is permitted to expire in May 2008, CMS should reconsider the rule. In the event that CMS goes forward with implementing this rule, however, it should modify the definition of unit of government to make the definition consistent with the statute.

Sincerely,

Wright Lassiter III
Chief Executive Officer

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | **Civil Action No.** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,** | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**DECLARATION OF PATRICK R. WARDELL**</u>

I, Patrick R. Wardell, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am President and Chief Executive Officer of Declarant Hurley Medical Center ("Hurley"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in Hurley Medical Center's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as President and Chief Executive Officer of Hurley since 2005.

4. In my capacity as President and Chief Executive Officer, I am responsible for all aspects of Hurley's operations and finances, including participation in the Michigan Medicaid program and payments received thereunder.

5. Hurley Medical Center is a publicly owned, nonprofit teaching hospital in the City of Flint, Genesee County, Michigan.

6. The mission of Hurley Medical Center is *"Clinical Excellence and Service to People"*. Hurley's vision is to be a premier public teaching medical center recognized as a regional resource for advanced specialized health care.

7. Hurley is the largest hospital in Genesee County with 461 beds and is the region's safety net health care provider and premier public medical center and teaching hospital, providing safe, reliable, high-quality care for thousands of Genesee County residents each year. Hurley is one of the largest employers in Genesee County and provides about 2,445 full time jobs to local residents, the majority of whom belong to one of nine organized labor unions.

8. Hurley Medical Center is the only medical center in the region that provides specialty care in: Trauma, emergency and critical care services, advanced burn center, kidney transplantation, neonatal intensive care, pediatric intensive care, high risk pregnancy care, and psychiatric services. Hurley's Bariatric Center received the verification of "Center of Excellence" by the American College of Surgeons in 2007. The volume of patients seeking care and treatment in Hurley is tremendous. In FY 2006, Hurley served 22,495 inpatients (including Newborn). The number of outpatient visits totaled 472,208. The number of babies born at Hurley was 2,893 and more than 75,751 patients visited Hurley's Emergency Department. Hurley currently averages treating about 1500 patients a week.

9. It is Hurley's mission to provide medical care to everyone, without regard to ability to pay. Almost 20 percent of Genesee County residents rely on Medicaid. One in five children in Genesee County lives in poverty. 27 percent of the people of Flint live in poverty, significantly more than the national average of 11.7 percent. The Flint and Genesee County community,

particularly the poor, has depended on Hurley Medical Center for the past 100 years. As the primary Medicaid health care provider in the region, Hurley provides more than $36 million a year in uncompensated and charity care to the community. Hurley provides over 66 percent of the region's uncompensated health care. For fiscal year ended 6/30/07, Hurley provided $45 million in uncompensated care. 36.8 percent of our revenues for the period ending December 31, 2007 were from Medicaid, and 6.5 percent of our revenues are from self-pay/uninsured patients. Uninsured and Medicaid beneficiaries comprise a significant portion of the Medical Center's patient population and is far greater than the typical hospital.

10. The following table lists the Net Income of the Medical Center for the fiscal year ended June 30th for years indicated:

| | |
|---|---|
| 2005 | $ 771,000 |
| 2006 | $ (13,344,000) |
| 2007 | $ (807,000) |
| Six Months FY 2008 | $ (209,000) |

The cumulative loss of the Medical Center over this period is $13.6 million. These losses are a result of the large proportion of patients served that have no or inadequate insurance coverage. The Hospital has managed to absorb these losses through management of balance sheet reserves. Unfortunately, current reserves have diminished to a level that is not sustainable.

11. Hurley Medical Center was established by the City of Flint as a part of the city government in 1906. It is a city-chartered hospital with a governing Board of Hospital Managers appointed by the Mayor of the City of Flint, with approval of the Flint City Council. Hurley has enjoyed governmental status for more than 100 years.

12. More specifically, Hurley was established as a city hospital under Sections 6-101 and 6-201 of the Flint City Charter in 1906, as amended in 1974. The City Charter classifies Hurley as a "multiple member body of the City of Flint", and provides that "[m]ultiple member bodies,

including boards and commissions, may be established by the City by ordinance or resolution."

Hurley was established by Resolution passed by the Flint City Council on or about 1906, which

accepted a bequest of land and money made by James J. Hurley pursuant to the terms of a will

that provided that the City was to build a "free hospital" for the people of the City of Flint and

that the hospital was to be called "Hurley Hospital." The City Charter further provides that such

bodies may exercise those powers and duties granted by the City, provided that they do not

conflict with provisions of this Charter or State law." *Id.,* 6-101.

13. Section 6-201 of the City Charter established the "Board of Hospital Managers,"

appointed by the Mayor with the approval of the City Council. Section 6-202 of the Flint City

Charter provides that "[t]he Board shall have the supervision and exclusive management of all

hospitals owned by the City and shall make and enforce all rules for such supervision and

management in accordance with Section 1-801 of this Charter." *Id.* 6-202. In 1985, the United

States Department of Treasury documented in a letter to Hurley, attached as Exhibit B, its status

as a governmental entity, declaring it to be an instrumentality of a political subdivision of the

state of Michigan, and thus, exempt from Federal income tax as provided under Section

115(a)(2) of the Code. *See also* Ex. C, Hurley Tax Certificate of Exemption.

14. The City of Flint, as a Home Rule City, has defined Hurley Medical Center in its

City Charter to be a multiple member body of the City, and thus, a unit of government. The

State of Michigan has defined a "Home Rule City" (The Home Rule City Act – M.C.L. 117.1 et.

seq.), which the city of Flint qualifies, and mandates and delegates to such cities full executive

and legislative authority in accordance with the terms of their duly enacted city charters.

15. Hurley has participated in financing the State's non-federal share of Medicaid

through Certified Public Expenditures ("CPEs") and Intergovernmental Transfers ("IGTs") for a

number of years. For the purposes of these Michigan programs, Hurley has always been treated as a unit of government. It is our understanding that these programs have been approved by CMS through the State of Michigan Department of Community Health.

16. Through several CPE and IGT programs in concert with the State of Michigan Department of Community Health, Hurley received a net benefit of approximately $7.0 million in the current fiscal year. These funds are provided to Hurley to support its mission to serve its patients as a public safety net hospital. Without this support Hurley would be required to severely curtail services.

17. Based on Hurley's analysis of the purported new HHS regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("Rule"), it does not appear that Hurley meets the new restrictive definition of a unit of government, despite its status as a political subdivision of the State and a multiple member body of the City of Flint.

18. Under the Rule, an entity may qualify as a unit of government if it 1) has taxing authority, 2) has direct access to generally applicable tax revenues as an integral part of a unit of government with taxing authority which is legally obligated to fund the health care provider's expenses, liabilities, and deficits, 3) receives appropriated funding as a State university teaching hospital, or 4) is an Indian Tribe or Tribal organization. As a multiple member body of the City of Flint, with a separate governing board pursuant to Charter, Hurley does not have independent taxing authority, nor does it have direct access to generally applicable tax revenues as an integral part of a unit of government with taxing authority which is legally obligated to fund the health care provider's expenses, liabilities, and deficits, since the City of Flint is not legally obligated to fund Hurley's expenses, liabilities and deficits under the terms of the Charter. Hurley does not

receive appropriated funding as a State university teaching hospital, nor is it an Indian Tribe or Tribal organization.

19. If it were determined that Hurley does not meet this new restrictive definition of a unit of government, Hurley would no longer be eligible to certify the substantial expenditures it incurs in providing care to Medicaid patients or to make intergovernmental transfers, and would therefore lose the supplemental Medicaid payments funded by the federal match for these Medicaid-eligible expenditures.

20. The CPE amount of benefit to Hurley for 2008 is approximately $3.5 million, and for IGTs, the benefit for 2007 is approximately $2.5 million. We estimate that Hurley will lose at least this amount of funding annually if Hurley were determined not to be a unit of government due to the new definition under this Rule. By excluding Hurley from the definition of entities eligible to make CPEs/IGTS for Medicaid financing purposes, the State will lose the federal matching funding for the expenditures certified by Hurley and or funds transferred by Hurley, that currently supports these payments.

21. Hurley Medical Center currently operates in a deficit that is not sustainable. The CPE and IGT support that Hurley receives represents approximately 2 percent of the Medical Center's operating budget. The impact of this loss of funds on hospital services would be catastrophic, and would have serious consequences such as possible reductions in staffing and curtailment of plans for future capital projects that are greatly needed by the hospital and the community, such as a much need renovation and expansion of Hurley's existing Emergency Department. As I have stated above, Hurley's Emergency Department ("ED") receives almost 80,000 visits per year and this number is expected to grow in keeping with national trends which show a 15 percent increase in ED visits while the total number of EDs in the U.S. decreased by

12 percent. As a Level I Trauma Center in Michigan's only public safety net hospital, Hurley's

ED currently treats a challenging caseload of patients critically in need of our 24-hour specialty

trauma care services. Hurley's ED patients include children who require the specialized staff and

services of our separate Pediatric Emergency Department, uninsured patients who frequently

utilize the ED as their only source of health care, patients victimized by the city's extremely high

violent crime rate (third in the nation), patients injured in automobile accidents on the State's

major I-75 highway corridor, and patients who are being evaluated for involuntary admission to

Hurley's inpatient psychiatric unit. Additionally, Hurley's ED is the tri-county region's center

for disaster preparedness and receives federal block grant money as part of the bioterrorism

defense network. We are also the designated hospital should the U.S. President require

emergency/trauma care during visits to our area. The resulting impact on access and services for

Medicaid beneficiaries would be detrimental to the Genesee County community and the more

than 22 additional counties we serve.

22. Maintaining the viability of Hurley's Level I Trauma Unit and Emergency

Department is significant to the economic status and growth of this entire region of the State, as

well as the health status of the community we serve. The hospital's ED acts as a major safety net

for residents of Flint and Genesee County, as well as those representing the central and northern

parts of our state; 29.1 percent of our patients originate from outside the City of Flint limits, but

within Genesee County, and 13.4 percent of our patients originate outside Genesee County from

various northern parts of the State. Hurley is situated in a city where one in three children live in

poverty, a city with one of the highest violent crime rates in the U.S., and a city with pervasive

economic and health issues. In an era where many public inner-city hospitals have been forced

to close due to increased numbers of indigent patient care and reduced Medicaid and Medicare

reimbursements, this year Hurley celebrates 100 years of community service. With over 2,400 employees, Hurley is one of the area's largest employers and works closely with community partners to improve the health and quality of life for our community. Hurley acts as an anchor for the north end of the Flint River District which includes Kettering University, University of Michigan-Flint, and downtown Flint. Hurley is currently undertaking to coordinate neighborhood and community development initiatives for the Flint River District Strategy to revitalize these Flint neighborhoods into prosperous, stable, safe and environmentally friendly community. A severe reduction in funding would seriously undermine Hurley's ability to focus and dedicate resources to this initiative, which is of extreme importance to the continued viability and development of the Flint community.

23. Considering the prolonged and serious budgetary deficits faced by the State of Michigan, we understand based on our communications with state legislators that the State of Michigan is not in a financial position to make up for any significant losses in federal funding with significant additional State revenues.

24. In a recently-released report from the United States House of Representatives Committee on Oversight and Government Reform, the Michigan Medicaid director estimated a $225.9 million for fiscal year 2008 and $1.25 billion impact over the net five years based on the Rule, that could impact all Medicaid beneficiaries and the public hospitals that receive Medicaid support.

25. In the event that Hurley continues to qualify as a unit of government under this Rule, Hurley would stand to lose significant federal Medicaid funding due the Rule's cost limit on payments to governmental providers. The imposition of the cost limit on Hurley would reduce its funding by approximately $12.8 million. Such a reduction would severely impact Hurley's

ability to continue its role as a public safety net hospital. This estimate represents approximately 4 percent of the hospital's operating budget.

26. When Hurley learned that CMS had proposed this Rule last January, we recognized the impact that this magnitude of loss in funding would have on our facilities. Members of Hurley's management team, under my direction, drafted a comment letter which I submitted to the Centers for Medicare and Medicaid Services ("CMS") in the Department of Health and Human Services ("HHS") explaining Hurley's circumstances and our concerns with the Rule. This letter is attached as Exhibit A.

27. Hurley is a member of the National Association of Public Hospitals and Health Systems, the American Hospital Association, and the Association of American Medical Colleges.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: March 10, 2008

(Signature): _____
Patrick R. Wardell
President & Chief Executive Officer
Hurley Medical Center

# Exhibit 3-A

July 13, 2007

Leslie Norwalk, Acting Administrator
Centers for Medicare & Medicaid Services (CMS)
200 Independence Avenue, S.W., Room 445-G
Washington, DC 20201

RE:    **Hurley Medical Center's Comments to the Provisions Regarding Cost
       Limits For Public Providers and "Unit of Government" Definition in the
       Final CMS Rule 2253-FC Published May 25, 2007**

Hurley Medical Center appreciates the opportunity to offer additional comments on the
specific provisions of the CMS *Final Rule* which redefine "Units of Government". I
would first like to present you an overview of who we are to put the impact of these
provisions in proper context.

## *WHO WE ARE – An Overview of Hurley Medical Center:*

Hurley Medical Center was established by the City of Flint as a part of the city
government in 1905. It is a city-chartered hospital with a governing Board of Hospital
Managers appointed by the Mayor of the City of Flint, with approval of the Flint City
Council. Hurley has enjoyed governmental status for more than 100 years. In 1985, the
United States Department of Treasury documented in a letter to Hurley, its status as a
governmental entity, declaring it to be an instrumentality of a political subdivision of the
state of Michigan, and thus, exempt from Federal income tax as provided under Section
115 (a)(2) of the Code. The federal government's affirmation of Hurley's governmental
status is consistent with the City of Flint's designation of Hurley as a governmental entity
in its City Charter. However, if CMS takes the position that HMC is not a unit of
government, there is a contradiction involving two (2) federal agencies, as discussed fully
herein.

Hurley is the largest hospital in Genesee County with 461 beds. Hurley is this region's
premier public medical center and teaching hospital, providing safe, reliable, high-quality
care for thousands of Genesee County residents each year. Hurley is one of the largest
employers in Genesee County and provides about 2,200 jobs to local residents. Nine (9)
unions represent Hurley's employees. Hurley enjoys a positive and productive
relationship with all its workers.

Hurley Medical Center is the only medical center in the region that provides specialty
care in: Trauma, emergency and critical care services, advanced burn center, kidney
transplantation, neonatal intensive care, pediatric intensive care, high risk pregnancy care,
and psychiatric services. The volume of patients seeking care and treatment at Hurley is
tremendous. In 2005, Hurley served 23,211 inpatients. The number of outpatient visits

totaled 472,208. The number of babies born at Hurley was 2,824 and more than 78,084 patients visited Hurley's Emergency Department. Almost 20 percent of Genesee County residents rely on Medicaid. One in five children in Genesee County lives in poverty. 27 percent of the people of Flint live in poverty, significantly more than the national average of 11.7 percent. The Flint and Genesee County community, particularly the poor, has depended on Hurley Medical Center for the past 100 years.

It is Hurley's mission to provide care to everyone, without regard to ability pay. As the primary Medicaid health care provider in the region, Hurley provides more than $20 million a year in uncompensated care to the community. Without sufficient governmental assistance, Hurley's ability to continue to provide medical services critical to our community will be jeopardized, and maybe lost.

***Comments on the Final Rule definition of "Unit of Government":*** It is our view that in the Proposed Rule, CMS had proposed a restrictive new definition of "unit of government" which would substantially limit the types of entities authorized to provide non-federal share funding and determine which healthcare providers would be subject to the new cost limit. These comments address the following specific points discussed in this Final CMS Rule.

*Providers with Direct Access to Tax Revenues:* CMS has proposed to include in the "unit of government" definition governmental entities that do not have taxing authority but do have "direct access to tax revenues" of a related unit of government. We understand this to mean that with respect to providers, direct access to tax revenues means that the provider can directly access funding as an integral part of a unit of government with taxing authority that is legally obligated to fund the provider's expenses, liabilities and deficits. We note that this change is apparently not intended to be substantive, as the Proposed Rule had already considered providers with such direct access to tax revenues to be "operated by" units of government - the Final Rule would consider them to be units of government. Despite now defining such providers directly as units of government, this revised definition, nevertheless, impermissibly narrows the statutory definition of a unit of government and usurps the sovereign, constitutionally guaranteed power of the states, to define its own units of government.

*Prospective Application of Unit of Government Definition.* We understand that the Final Rule intends to clarify that the new definition will be applied prospectively only, effective 60 days after publication of the Final Rule (subject to the moratorium. Prospective application of the Final Rule does not lessen the infringement on states' rights.

***The provisions of the Final Rule, granting CMS the ultimate determination as to who is a "unit of government", create a conflict among the various branches of government.*** We understand that the agency will now allow states to make the initial determination of a health care provider's governmental status using a slightly revised Tool to Evaluate the Governmental Status of Health Care Provider. The revised Tool, originally issued with the Proposed Rule, now includes a question asking for the state's

initial determination. CMS reserves the right, however, to disagree with the State's determination. CMS will require that States maintain copies of the Tool on file for CMS examination upon request. In addition, each State must report to CMS on its universe of governmentally-operated health care providers within ninety (90) days of the effective date of the regulation (subject to the moratorium). Despite these changes and consideration of state input, Hurley submits that CMS wrongfully rejected commenter proposals to defer to States on the definition of governmental providers and that the ultimate determination of who is a unit of government should remain entirely with the states. *The provisions of the Final Rule, as it applies to Hurley Medical Center, create a conflict among the various branches of government, including the federal government; the state; and, the local city government. The federal government, specifically, the Internal Revenue Service, has already defined Hurley Medical Center, as a political subdivision of the state, and thus, a "unit of government" with tax-exempt status. The State of Michigan has already defined a "Home Rule City" (The Home Rule City Act - M.C.L. 117.1 et. seq.), which the city of Flint qualifies, and mandates and delegates to such cities full executive and legislative authority in accordance with the terms of their duly enacted city charters. The City of Flint, as a Home Rule City, has defined Hurley Medical Center to be a multiple member body of the City, and thus, a unit of government. This authority, to define governmental units, which CMS now attempts to assume, therefore clearly lies with the state, and for purposes of tax-exempt status, the Internal Revenue Service.*

It is hoped and expected that CMS will give serious consideration to the comments of public providers on this *Final Rule,* and will not hastily implement these new provisions upon expiration of the President's moratorium. Thank you.

Sincerely,


Patrick Wardell
President & Chief Executive Officer

# Exhibit 3-B

**Internal Revenue Service**

District
Director

Hurley Medical Center
One Hurley Plaza
Flint, MI  48502

**Department of the Treasury**

P.O. Box 3159
Cincinnati, Ohio  45201

Person to Contact:

Lois Parrott
Telephone Number:

513-684-3863
Refer Reply to:

CSEP-31016192
Date:

OCT 18 1985

Dear Sir or Madam:

   The information you furnished discloses that you are an instrumentality
of a political subdivision of the State of Michigan and as such you are not
subject to Federal income tax, as provided under Section 115 (a)(2) of the
Code.

   Donors may deduct contributions to you as provided in Section 170(c) of
the Code.  Bequests, legacies, devices, transfers or gifts to you or for your
use are deductible for Federal estate and gift tax purposes under Section 2055,
2106 and 2522 of the Code.

   Under provisions of Code Section 6033, you are not required to file Form
990, "Return of Organization Exempt from Income Tax," because you are a State
institution, the income of which is excluded from gross income under Code Section
115(a)(2).

Sincerely yours,

James J. Ryan
District Director

# Exhibit 3-C

Michigan Department of Treasury, SUW
3372 (Rev. 11-01)

# Michigan Sales and Use Tax Certificate of Exemption

TO BE RETAINED IN THE SELLER'S RECORDS - DO NOT SEND TO TREASURY.

This certificate is invalid unless all four sections are completed by the purchaser.

## SECTION 1 - CHECK ONE OF THE FOLLOWING

[ ] One time purchase          [XX] Blanket certificate (Note: A blanket certificate is valid for four years from the date of signature unless an earlier expiration date is listed below) Expiration date, if less than four years: _____.

The purchaser hereby claims exemption on the purchase of tangible personal property and selected services made under

this certificate from _____ and certifies
                                          (Vendor's Name)
that this claim is based upon the purchaser's proposed use of the items or services, or the status of the purchaser.

## SECTION 2: ITEMS COVERED BY THIS CERTIFICATE

[XX] All items purchased
[ ] Limited to the following items: _____

## SECTION 3: BASIS FOR EXEMPTION CLAIM

[ ] For Resale at Retail - Sales Tax Registration Number: _____
[ ] For Resale at Wholesale - No Number Required
[ ] For Lease - Use Tax Registration Number: _____
[ ] Agricultural Production - No Number Required (Describe) _____
[ ] Industrial Processing - No Number Required
[XX] Government Entity, Nonprofit School, Nonprofit Hospital, and Church  (Circle type of organization.)
[ ] Nonprofit Internal Revenue Code Section 501(c)(3) and 501(c)(4) Exempt Organizations (Attach copy of IRS letter ruling).
[ ] Nonprofit Organizations with an Exempt letter from the State of Michigan (Attach a copy of State's letter)
[ ] Other (explain): _____

## SECTION 4: CERTIFICATION

I declare, under penalty of perjury, that the information on this certificate is true, that I have consulted the statutes, administrative rules and other sources of law applicable to my exemption, and that I have exercised reasonable care in assuring that my claim of exemption is valid under Michigan law. In the event this claim is disallowed, I accept full responsibility for the payment of tax, penalty and any accrued interest, including, if necessary, reimbursement to the vendor for tax and accrued interest.

| Hurley Medical Center | One Hurley Plaza | | |
|---|---|---|---|
| Purchaser | Street Address | | |
| 810-257-9000 | Flint | MI. | 48503 |
| Area Code / Telephone No. | City | State | Zip Code |
| _Michael Tripp_ (signature) | Director Internal Audit | | |
| Signature and Title | Date Signed | | |
| Michael Tripp | 38-6005601 | | |
| Name (Print or Type) | Social Security No. or FEIN | | |

# Exhibit 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER, <br><br> *et al.* <br><br><br> Plaintiffs, <br><br> v. <br><br> THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, <br><br> *et al.* <br><br> Defendants. | Civil Action No. |

## DECLARATION OF JAMES R. NATHAN

I, James R. Nathan, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am President and Chief Executive Officer ("CEO") of Lee Memorial Health System ("Lee Memorial"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in Lee Memorial's files upon which I normally rely, upon publicly available information, and other factual matters known to me.

3. I have served as CEO of Lee Memorial from 1982 through 1997 and again from 2001 to the present.

4. In my capacity as CEO, I am responsible for all aspects of Lee Memorial's operations, including its financial operations and its participation in and payments from Florida's Medicaid program.

5. Lee Memorial is a public healthcare system created by the state legislature as a unit of government known in Florida as an independent special district. 1963 Fla. Laws ch. 63-1552 and recodified at 2000 Fla. Laws ch. 2000-439. Forty-five (45) years ago, the healthcare system was established to serve as the public hospital "for the use and benefit of the residents of" Lee County, Florida. 1963 Fla. Laws ch. 1552, §1. Lee Memorial is owned and operated by the citizens of Lee County through a publicly elected board of directors. 1963 Fla. Law ch. 1552. The Florida legislature declared the operation and maintenance of the health system to be a public purpose. 2000 Fla. Laws ch. 2000-439.

6. Our core mission is to improve the health status of the people of Southwest Florida and to provide quality healthcare services to all patients regardless of their ability to pay. Our original enabling legislation states: "The public county hospital established under this act shall be for the use and benefit of the residents of the county...The hospital may care for and treat without charge those patients who are found by the hospital board to be indigent." 1963 Fla. Laws ch. 1552, § 14. The Florida legislature in 2000 recognized that although the health care system is primarily for the use and benefit of the residents of Lee County, the health system provides services to all persons, including

nonresidents of the county, who may seek such services. 2000 Fla. Laws ch. 2000-439, §11.

7. Lee Memorial includes seven hospitals as well as a system of primary care clinics, home health services and a skilled nursing home: Lee Memorial Hospital, a 367 bed hospital in Fort Myers, providing emergency, trauma, specialty, and rehabilitative care services; Southwest Florida Regional Medical Center, a 400-bed acute care facility in Fort Myers; HealthPark Medical Center, a 360-bed facility in Fort Myers; Gulf Coast Hospital, a 120-bed facility Fort Myers; The Children's Hospital of Southwest Florida in Fort Myers, the only comprehensive child healthcare facility between Tampa and Miami; the Rehabilitation Hospital in Fort Myers; and, Cape Coral Hospital, a 291-bed hospital with Cape Coral's largest emergency department.

8. Lee Memorial is the only trauma center in the region, providing a critical service on which we lose more than $2 million each year.

9. Lee Memorial is a significant safety net provider for the residents of Lee County. Approximately 12 percent of our patients are enrolled in Medicaid, roughly 8 percent of our patients are self-pay (uninsured), and roughly 3.2 percent of that number are charity care patients.

10. Lee Memorial budgeted for a margin of $44 million or 4.4 percent of operating revenues. Through the first four months of Fiscal Year 2008, Lee Memorial has fallen short of the budgeted gain by $6.7 million. If there is a shortfall in our projected margin, Lee Memorial will be unable to reinvest in the capital needs that support the mission of the organization. Twelve (12) percent of our revenues are from Medicaid. We provide roughly $28.5 million in cost of charity care per year.

11. Lee Memorial has significant attributes of governmental status. The Florida Legislature created Lee Memorial for a public purpose as set forth in sections 5 and 6 above.

12. The United States 11th Circuit Court of Appeals held that Lee Memorial is a "political subdivision of the State of Florida," as a "healthcare authority created by the Florida Legislature as a special purpose unit of local government," and therefore entitled to state action immunity from antitrust liability. *FTC v. Hospital Board of Directors of Lee County*, 38 F.3d 1184 (11th Cir. 1994)

13. Lee Memorial's board consists of ten (10) members who are publicly elected by a vote of the electorate of the county at large. Board members are public officials subject to the Code of Conduct for Public Officers. Meetings of the Board are noticed in accordance with Florida law governing special districts. Board meetings are open to the public in accordance with Florida law governing meetings of public officials. Minutes are recorded in accordance with Florida's sunshine law and documents and materials made or received by Lee Memorial in connection with official business of the health system are subject to the Public Records Act.

14. As a governmental unit, Lee Memorial and its public employees are entitled to the provisions of the Florida Waiver of Sovereign Immunity Act, which limits the recovery of damages in ordinary negligence cases against governmental agencies and provides personal immunity to Lee Memorial's officers, agents and employees. §768.28 Fla. Stat.

15. Florida operates its Medicaid program under a demonstration approved by the Department of Health and Human Services ("HHS") (through the Centers for Medicare

and Medicaid Services ("CMS")). Through Medicaid demonstrations, States are permitted to waive certain federal requirements for Medicaid programs in order to try new ways to expand coverage to targeted populations, institute new services for certain groups of Medicaid beneficiaries, etc. States must follow the written Terms and Conditions of their demonstration, as approved by CMS, which detail the rules and financing of the demonstration and also specify which federal requirements have been waived.

16. Florida does not have waivers of Section 1902(a)(2) of the Social Security Act or of 42 C.F.R. § 433.50, the relevant authorities for the unit of government definition under the Rule.

17. The Terms and Conditions contain a change of law provision requiring the state to conform its demonstration to changes in federal statutes or regulations that take effect after the demonstration was approved. *See* Special Terms and Conditions, Medicaid Reform Section 1115 Demonstration, Agency for Health Care Administration, Sec. III.3.

18. The demonstration is for five years ending June 30, 2011. Although the demonstration is eligible for renewal, the renewal will be subject to conformity with all applicable statutes and regulations, unless waived by CMS.

19. Lee Memorial currently receives supplemental Medicaid payments that support its provision of services to Medicaid patients and its role as a safety net provider. For example, Lee Memorial receives: low income pool payments to support the provision of, and offset the significant losses associated with, providing services to Medicaid and uninsured populations; enhanced reimbursement based on Medicaid utilization rates;

funding to support our Level II trauma services; and disproportionate share hospital payments based on its volume of care to Medicaid, as well as uninsured populations. Lee Memorial serves as Southwest Florida's only state designated Regional Perinatal Intensive Care Program and serves a disproportionate number of uninsured and Medicaid high risk mothers and complex neonates. Our midwife and obstetrical outreach services provide services to our neighboring county and Lee County's Medicaid and uninsured population.

20. Based on our analysis of the purported new CMS Rule, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007), Lee Memorial would not meet the new restrictive definition of a unit of government, despite its continued role as the public hospital and health system for Lee County. Under the Rule, an entity may qualify as a unit of government if it 1) has taxing authority, 2) has direct access to generally applicable tax revenues as an integral part of a unit of government with taxing authority which is legally obligated to fund the health care provider's expenses, liabilities, and deficits, 3) receives appropriated funding as a State university teaching hospital, or 4) is an Indian Tribe or Tribal organization.

21. Lee Memorial does not have taxing authority. Further, as an independent special district under State law, the County and local municipalities are not legally obligated to fund Lee Memorial's liabilities. *See* Florida Statutes, § 189.404. Lee Memorial is not a state teaching hospital, nor a Tribal organization. Based on these factors, it is my understanding that Lee Memorial would not qualify as a unit of government under this overly-restrictive definition even though based on all of the above,

Lee Memorial was created as a public entity, has received legal rulings as a public entity and fully operates as a public entity. It simply does not have taxing authority or direct access to tax revenue.

22. We believe that the Rule will impact Lee Memorial under the Florida Medicaid waiver, as the terms of the waiver require that Florida make changes to comply with federal law (see ¶ 17) and the State does not have a waiver of the regulation at issue or the statutory authority that CMS claims in support of the new Rule.

23. CMS stated in the preamble to the final version of the Rule that it was working with the State on which Low Income Pool expenditures would still be eligible for matching funds under the Rule. 72 Fed Reg. 29748, 29814 (May 29, 2007). CMS did not indicate, however, that the unit of government definition would not be applied and that demonstrations would not have to be changed accordingly.

24. As a result of losing its status as a governmental provider for Medicaid financing purposes under the Rule, we estimate that Lee Memorial will no longer be eligible for $23.2 million in safety net payments it currently receives under the Medicaid demonstration waiver, as the current level of payments we receive are available only to governmental hospitals, or hospitals able to provide intergovernmental transfers to support these payments.

25. The loss of 52 percent of our $44 million budgeted margin from operations will dramatically impact our health system's ability to maintain its current levels of care. Given the current shortfall from budget combined with the loss of these funds, we will be forced to consider whether the safety net services described in this Declaration can continue, absent another source of funding (of which we are not aware). At a time when

the need for these services is growing, these cuts will increase barriers to access for Medicaid patients. In addition, a shortfall causes significant capital expenditures related to direct patient care to be delayed or cease.

26.  We have attempted to determine whether the State would provide funding to offset this loss. Based on our communications with the State, I am not aware of any replacement State or local funding to compensate our hospital for the loss of federal funds resulting from the new Rule. The State is already facing a budget crisis, and significant decreases in sales tax revenues and proposals to cut taxes further make the prospect of new funding to replace the funding lost by our hospital unlikely.

27.  Lee Memorial submitted a comment letter to CMS in response to the Proposed Rule, and a supplemental letter in response to the Final Rule, describing the impact of this rule on our health system and its patients. These letters are attached as Exhibits A and B. CMS went forward with the Rule without addressing our concerns.

28.  Lee Memorial is a member of the National Association of Public Hospitals and Health Systems, the American Hospital Association, the Safety-Net Hospital Alliance of Florida and the Florida Hospital Association.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 7, 2008

(Signature) _James R Nathan_

James R. Nathan
Chief Executive Officer
Lee Memorial Health System

# Exhibit 4-A

**LEE MEMORIAL
HEALTH SYSTEM**

P.O. BOX 2218

FORT MYERS, FLORIDA 33902

239-332-1111

CAPE CORAL HOSPITAL

GULF COAST HOSPITAL

HEALTHPARK CARE CENTER

HEALTHPARK MEDICAL CENTER

HEALTHPARK OF THE ISLANDS

LEE CONVENIENT CARE

LEE MEMORIAL HOSPITAL

LEE PHYSICIAN GROUP

SOUTHWEST FLORIDA
REGIONAL MEDICAL CENTER

THE CHILDREN'S HOSPITAL

THE REHABILITATION HOSPITAL

BOARD OF DIRECTORS

DISTRICT ONE
John D. Donaldson, MD
Marilyn Stout

DISTRICT TWO
Richard B. Akin
Nancy M. McGovern, RN, MSM

DISTRICT THREE
Lois C. Barrett, MBA
Linda L. Brown, MSN, ARNP

DISTRICT FOUR
Frank T. La Rosa
Jason A. Yost

DISTRICT FIVE
Kerry Babb
James Green

◆VHA

July 18, 2007

Ms. Leslie V. Norwalk, Esq.
Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building, Room 445-G
200 Independence Avenue, SW
Washington, D.C. 20201

**Ref: Comments on Unit of Government Definition (§ 433.50) contained in CMS–2258–FC: Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership, 72 Fed. Reg. 29748 (May 29, 2007).**

Dear Ms. Norwalk:

On behalf of Lee Memorial Health System (LMHS), I am submitting comments to reiterate our opposition to the proposed definition of a unit of government contained in 42 C.F.R. § 433.50, which was published by the Centers for Medicare and Medicaid Services (CMS) in CMS-2258-FC (the Final Rule).[1]  The Final Rule does not fundamentally change the most damaging provisions of CMS-2258-P (the Proposed Rule) for LMHS and the Florida Medicaid program. *On behalf of LMHS, I urge you to defer to state law in the determination of "unit of government" and to withdraw the Final Rule.*

LMHS is aware that recently-passed legislation prohibits CMS from taking any steps to implement this proposal until May 25, 2008.[2]  By submitting these comments, LMHS does not concede that CMS has the authority to receive or review comments during the period of the moratorium.  If the moratorium expires without further action from Congress, commenters should be permitted a fresh opportunity to provide input on the definition of a unit of government at that time.

LMHS has served a critical public health role in Southwest Florida for over forty years.  At the time of LMHS's creation, Lee County had approximately 55,000 residents; by 2005, that population had grown tenfold to 550,000 residents, and LMHS's public health obligation likewise grew.  Currently, LMHS incurs over $50 million annually in charity care costs (actual costs, not charges) and is a key source of safety net care in the region.  LMHS relies upon supplemental Medicaid payments, including Medicaid disproportionate share hospital (DSH) payments and payments from Florida's Low Income Pool (LIP) to offset the significant losses associated with providing services to Medicaid patients and the uninsured.  In 2005, these losses were more than $38 million.

LMHS again urges CMS to reconsider its new definition of a unit of government.  Despite the significant concerns raised in our comments on CMS-2258-P (the Proposed Rule) as well as the hundreds of other comment letters submitted, CMS has not fundamentally altered this new definition.

**CMS' modifications of the unit of government definition (§ 433.50) are insufficient, as LMHS and similar public hospitals still will not qualify as a unit of government.**

---

[1] 72 Fed. Reg. 29748 (July 6, 2007).
[2] Pub. L. No. 110-28, § 7002.

Page 2

The Final Rule imposes on states a restrictive new definition of a "unit of government" for purposes of Medicaid financing, requiring that an entity must have "taxing authority, ha[ve] direct access to tax revenues, [be] a State university teaching hospital with direct appropriations from the State treasury, or [be] an Indian tribe…" in order to be considered a unit of government.[3] Providers that are not determined to be units of government under this new definition are prohibited from contributing funding to the non-federal share of Medicaid expenditures. While the Final Regulation appears to expand the number of entities considered governmental compared with the Proposed Rule, the definition would still illogically exclude hospitals, such as LMHS, that are clearly governmental under state law but without tax revenues.

It is unreasonable and unnecessary for CMS to impose such a restrictive definition of a unit of government that it would exclude an institution that is clearly considered governmental under its enabling legislation as well as state and federal case law. In 1963, the Florida Legislature enacted House Bill 1635, which created the Hospital Board of Directors of Lee County (Board) and authorized the Board to establish a "public hospital" in the county for "public and county purposes."[4] In subsequent legislation that officially changed the hospital's name, the Legislature confirmed that LMHS is indeed a "public body."[5] The citizens of Lee County own and operate LMHS through a publicly-elected board of directors, the number, term limit, composition, and eligibility requirements of which are specified in state law. LMHS was originally funded through a Lee County bond issuance and the Board is now authorized to issue its own notes or bonds to carry out the legislation, and to receive appropriations, which it does on a sporadic basis. Clearly, pursuant to both the explicit terms of LMHS's creation and based on the level of state oversight to which LMHS is subject, the state of Florida considers LMHS to be a unit of government.

LMHS has also been consistently treated as a unit of government by federal and state courts. Indeed, the United States Court of Appeals for the Eleventh Circuit identified LMHS as a "political subdivision" of the state, holding that the Board, unlike private companies, was entitled to state action immunity from antitrust liability. Similarly, in a holding that LMHS is subject to Florida's Public Records Law, a Florida state court declared LMHS to be a "public agency."

The governmental status of LMHS has been conclusively and comprehensively established. LMHS's funds are governmental funds. It confounds common sense to treat LMHS as a nongovernmental entity simply because tax revenues are not a source of revenues.

This restrictive definition of "unit of government" for Florida will not eliminate any perceived or real abuse; it will simply deprive Florida Medicaid of an important and legitimate source of public funding. On behalf of LMHS, I urge CMS to show deference to state law in the determination of a unit of government for purposes of Medicaid financing. This requires more than the nominal deference incorporated into the Final Rule by allowing states to make an initial determination subject to being overturned by CMS.

**CMS should provide a generous transition period for states and providers to implement the changes of the Final Rule and should not require states and providers to prepare during the one-year moratorium.**

Although CMS has not specifically solicited comments on the effective dates of the various provisions of the regulation, LMHS reiterates that CMS should provide adequate time for states and providers to adopt the changes necessary to come into compliance with this regulation. The Florida Legislature must be given an opportunity to appropriately react to the financing shortfall that will inevitably be caused by the inability of hospitals, such as LMHS, to make intergovernmental transfers in support of the non-federal share of Medicaid financing. Further, the state Medicaid agency requires time to develop and obtain approval for any state plan amendments that may be required to adopt changes to states rules and provider manuals.

---

[3] 42 C.F.R. §433.50(a)(1)(i) (as adopted in the Final Rule).
[4] 1963 Fla. Laws ch. 1552, §§ 1, 7.
[5] 2000 Fla. Laws ch. 439.

Page 3

Given the existence of the legislative moratorium and the expressed intent of Congress to review the issues addressed the rule, CMS cannot reasonably expect states to take any actions towards implementing a regulation that is unlikely to go into effect in its current form.  To the extent CMS intends to provide further clarification (e.g., in the context of determining governmental provider status[6]), such guidance cannot be made available until after the end of the moratorium.  Basic principles of fairness require CMS to provide a time period after the end of the moratorium before this Final Rule would take effect.

Finally, CMS must provide adequate time for states to come into compliance with the cost limit regulation.  The Final Rule indicates that institutional governmentally-operated health care providers must comply with the Medicaid cost limit beginning with the Medicaid state plan rate year 2008.  For most states, this rate year begins on July 1, 2007.[7]  As a practical matter, given all of the steps that states need to take to prepare for the implementation of a cost limit (including developing new or modifying existing cost reports, adopting state plan amendments, making changes to their state budgets, etc.) it would be inappropriate to implement the cost limit for institutional providers prior to rate year 2010 (i.e., the first rate year that begins no less than sixty days after the expiration of the legislative moratorium).  Again, basic principles of fairness require that CMS provide states with the time necessary to come into compliance.

\* \* \*

LMHS appreciates the opportunity to submit these additional comments and to reiterate its strong opposition to the provisions of this Final Rule, in particular the definition of a unit of government.  Given the devastating impact that it would have on LMHS, on our patients, and on the greater community in Southwestern Florida, I respectfully request that you withdraw the regulation.

If you have any questions about the content of this letter, please feel free to contact me at (239) 985-3502.

Respectfully submitted,

James R Nathan

James R. Nathan
President

---

[6] 72 Fed Reg. at 29764-65.
[7] This oddly predates and thus conflicts with the Effective Date listed in the Final Rule, July 30, 2007.

# Exhibit 4-B

*89*

## LEE MEMORIAL
## HEALTH SYSTEM

P.O. BOX 2218

FORT MYERS, FLORIDA 33902

239-332-1111

CAPE CORAL HOSPITAL

GULF COAST HOSPITAL

HEALTHPARK CARE CENTER

HEALTHPARK MEDICAL CENTER

HEALTHPARK OF THE ISLANDS

LEE CONVENIENT CARE

LEE MEMORIAL HOSPITAL

LEE PHYSICIAN GROUP

SOUTHWEST FLORIDA
REGIONAL MEDICAL CENTER

THE CHILDREN'S HOSPITAL

THE REHABILITATION HOSPITAL

B O A R D   O F   D I R E C T O R S

DISTRICT ONE
John D. Donaldson, MD
Marilyn Stout

DISTRICT TWO
Richard B. Akin
Nancy M. McGovern, RN, MSM

DISTRICT THREE
Lois C. Barrett, MBA
Linda L. Brown, MSN, ARNP

DISTRICT FOUR
Frank T. La Rosa
Jason A. Yost

DISTRICT FIVE
Kerry Babb
James Green

◇VHA

March 16, 2007

MAR 1 6 2007

Leslie V. Norwalk, Esq.
Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Ave, SW
Washington, DC 20201

**Re: Comments for CMS-2258-P, Medicaid Program; Cost Limit
for Providers Operated by Units of Government and Provisions
to Ensure the Integrity of the Federal-State Financial
Partnership, 72 Fed. Reg. 2236 (Jan. 18, 2007)**

Dear Ms. Norwalk:

On behalf of Lee Memorial Health System (LMHS), I am submitting
comments in opposition to the above captioned proposed rule issued
by the Centers for Medicare and Medicaid Services (CMS),
published in the January 18, 2007 Federal Register and relating to
the Medicaid program (CMS-2258-P) (the "Proposed Rule").

LMHS has served a critical role in the public health system in
Southwest Florida for over forty years.  At the time of LMHS's
creation, Lee County had approximately 55,000 residents; by 2005,
that population had grown tenfold to 550,000 residents, and LMHS'
public health obligation likewise grew.  Currently, LMHS incurs over
$50 million annually in charity care costs (actual costs, not charges)
and is a key source of safety net care in the region.  LMHS relies
upon supplemental Medicaid payments, including Medicaid
disproportionate share hospital (DSH) payments and payments from
Florida's Low Income Pool (LIP), to offset the significant losses
associated with providing services to Medicaid patients and the
uninsured.  In 2005, these losses were more than $38 million.  The

1

cuts in Medicaid reimbursement that could result from the proposed regulation would be financially devastating to LMHS. Implementation of the Proposed Rule would have the effect of pushing LMHS' marginally positive financial bottom line into the negative and would dramatically compromise its ability to continue serving many of Florida's neediest residents. Current reimbursement rules already force hospitals such as LMHS to shift costs to private third party payors. A further forced "cost shift" cannot be sustained.

## Defining a Unit of Government (§ 433.50)

The Proposed Rule would impose on states a new definition of a "unit of government," requiring a provider to either have generally applicable taxing authority or be an integral part of a unit of government with generally applicable taxing authority in order to be considered governmental. Providers that are *not* determined to be units of government under this new definition would be prohibited from contributing funding to the non-federal share of Medicaid expenditures.

It is clear from LMHS' enabling legislation, as well as state-specific and federal case law, that LMHS is a public entity. In 1963, the Florida Legislature enacted House Bill 1635 which created the Hospital Board of Directors of Lee County (Board) and authorized the Board to establish a "public hospital" in the county for "public and county purpose."[1] In subsequent legislation that officially changed the hospital's name, the Legislature confirmed that LMHS is indeed "a public body."[2] Further, the citizens of Lee County own and operate LMHS through a publicly-elected board of directors, the number, term limit, composition, and eligibility requirements of which are specified in state law. Finally, LMHS was originally funded through a Lee County bond issuance and the Board is now authorized to issue its own notes or bonds to carry out the operation of LMHS. LMHS is authorized, by virtue of its enabling legislation, to receive appropriations, which it does on a sporadic basis. Clearly, pursuant to both the explicit terms of LMHS' creation and based on the level of state oversight to which LMHS is subject, LMHS is a public agency.

---

[1] 1963 Fla. Laws ch. 1552, §§1, 7.
[2] 2000 Fla. Laws ch. 439.

2

LMHS has also been consistently treated as a public entity by federal and state courts. More specifically, a decision by the federal Eleventh Circuit of Appeals identified LMHS as a "political subdivision" of the state in holding that the Board, unlike private companies, was entitled to state action immunity from antitrust liability. Similarly, in holding that LMHS is subject to Florida's Public Records Law, a Florida state court declared that LMHS was a "public agency".

The public status of LMHS has been conclusively and comprehensively established through its creation by the Florida Legislature, the public election of its governing board of directors, its judicial treatment by state and federal courts as a state agency, and by its important role in the community as a safety net provider willing to treat all residents regardless of their ability to pay. Accordingly, it seems to confound common sense to believe that CMS now intends, by virtue of the Proposed Rule, for LMHS to be considered *not* public, simply because LMHS does not possess generally applicable taxing authority and is not part of another governmental entity that does have such authority.

CMS has never claimed that the funding mechanisms utilized by Florida (including intergovernmental transfers made by LMHS) were abusive. Adopting an unnecessarily restrictive definition of "unit of government" for Florida will not eliminate any perceived or real abuse. It will simply deprive Florida Medicaid of an important and legitimate source of public funding. On behalf of LMHS, I urge you to defer to state law in the determination of "unit of government" for purposes of Medicaid financing.

**Impact on Waiver States (72 Fed. Reg. 2240)**

The preamble to the Proposed Rule states that "all Medicaid payments . . . made under . . . Medicaid waiver and demonstration authorities are subject to all provisions of this regulation."[3] In 2005, Florida successfully negotiated an extremely complex Section 1115 demonstration program designed to significantly revise the ways in which care for the uninsured is delivered and reimbursed in

---

[3] 72 Fed. Reg. 2240.

Florida. The underpinning of this demonstration project is the establishment of a Low Income Pool intended to help safety net hospitals in Florida continue their mission to serve Medicaid individuals and the uninsured in the midst of changes to the Medicaid program. Funding for this demonstration has been authorized by CMS through its authority under Section 1115(a)(2) of the Social Security Act to provide federal financial participation for expenditures that are not otherwise matchable. Under the terms of the demonstration, Florida has agreed to limit Medicaid reimbursement to governmental hospitals to costs, similar to the limit now being put forward in the Proposed Rule. The savings generated from this voluntary agreement to keep payments lower than what would otherwise be allowed under the upper payment limit regulations have been reinvested in the Low Income Pool.

Given that the Special Terms and Conditions of the Medicaid Reform Demonstration in Florida require CMS to incorporate any changes in federal law into the budget neutrality expenditure cap, I seek clarification, on behalf of LMHS, as to whether implementation of the Proposed Rule will result in the reduction of funding available for the demonstration. Such an outcome would be unthinkable particularly given that Florida negotiated the waiver, in good faith, for a five year term with the expectation that CMS would honor the painstakingly negotiated deal and highly resource-intensive implementation process associated with the demonstration. Although we hope and anticipate that the Proposed Rule will not vitiate the terms of that deal, the unconditional preamble statement that payments made pursuant to waiver and demonstration authorities are subject to provisions of the Proposed Rule is deeply concerning. Therefore, I am requesting that CMS state, unequivocally and without qualification, that the funding authorized for the Low Income Pool will be neither reduced nor eliminated.

**Effective Date (§§ 447.206(g); 447.272(d)(1); 447.321(d)(1))**

CMS proposes to implement the Proposed Rule as of September 7, 2007. Doing so suggests an astonishingly ambitious implementation schedule, particularly given the sweeping and substantive nature of the changes proposed. Assuming that a final regulation is not issued until this summer, states will have very little time to adopt

4

the changes necessary to come into compliance.  The Florida
Legislature has traditionally had a very abbreviated Spring
schedule.  As a practical matter, it is difficult to imagine the
Legislature being able to appropriately react to the financing
shortfall that will inevitably be caused by the inability of hospitals,
such as LMHS, to make intergovernmental transfers in support of
the non-federal share of Medicaid financing.  Further, it is highly
unlikely that the Florida Medicaid agency would have time to
develop and obtain approval for any state plan amendments that
may be required or to adopt changes to state rules and provider
manuals.  Indeed, establishing appropriate cost-reporting
mechanisms, as envisioned in the Proposed Rule, will, in and of itself,
require months of diligent work.

Moreover, given the longstanding payment policies and financing
arrangements that would be substantively disrupted by
implementation of the Proposed Rule in its current form, CMS
should provide a generous transition period for states and providers
to adjust to these enormous changes.  I would recommend a
minimum transition period of ten years

* * *

I appreciate the opportunity to comment on the Proposed Rule.
Given the devastating impact that it would have on LMHS, on our
patients, and on the greater community in Southwestern Florida, I
respectfully request that you withdraw the regulation immediately.

If you have any questions about the content of this letter, please
feel free to contact me at (239) 985-3502.

Respectfully submitted,

James R. Nathan
President

# Exhibit 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,**<br><br>*et al.*<br><br><div align="center">**Plaintiffs,**</div><br><div align="center">**v.**</div><br>**THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,**<br><br>*et al.*<br><br><div align="center">**Defendants.**</div> | )<br>)<br>)<br>)<br>)<br>)  **Civil Action No.**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF PETER RAPP

I, Peter Rapp, make the following declaration pursuant to 28 U.S.C. § 1746:

1.  I am the Executive Vice President of the Declarant Oregon Health and Science University ("OHSU") and the Executive Director of the OHSU Hospitals and Clinics of the OHSU Hospitals and Clinics.  I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2.  I am of legal age and competent to testify.  This declaration is made on personal knowledge, information contained in OHSU's files upon which I normally rely, publicly available information, and other factual matters known to me.

3.  I have served as Executive Director of the OHSU Hospitals and Clinics since April 2002.

4. In my capacity as Executive Director of the OHSU Hospitals and Clinics, I am responsible for all aspects of OHSU's operations and finances, including participation in the Oregon Medicaid program and payments received thereunder.

5. OHSU, the only academic health center in the State of Oregon, is a public corporation operating under specific authority granted by the Oregon legislature. *See* Oregon Statutes Chapter 353.020 and 353.030 where the Oregon Legislative Assembly established OHSU as a governmental entity that is designated to carry out missions of the state of Oregon, including:

(a) Provide high quality educational programs appropriate for a health and science university;

(b) Conduct research in health care, engineering, biomedical sciences and general sciences;

(c) Engage in the provision of inpatient and outpatient clinical care and health care delivery systems throughout the state;

(d) Provide outreach programs in education, research and health care;

(e) Serve as a local, regional and statewide resource for health care providers; and

(f) Continue a commitment to provide health care to the underserved patient population of Oregon.

6. OHSU is the only academic health center in the State of Oregon, consisting of hospitals and clinics, and schools of medicine, dentistry, nursing, science and engineering. We train over 350 medical residents annually.

7. OHSU serves as the tertiary care center for the State of Oregon and Southwest Washington State, and is a regional Level I Trauma Center and a major transplant center.

8. OHSU operates primary care clinics throughout the state of Oregon.

9. OHSU serves a significant safety net role in Portland and in Oregon, both in terms of serving large numbers of underserved populations with Medicaid and with no third party coverage, and in terms of providing specialized services not available from other hospitals in the State. Of the 395,000 patients we treat every year, 16.52% are Medicaid beneficiaries, 3.69% are charity patients, and 5.47% are self-pay patients with no coverage.

10. OHSU relies heavily on Medicaid program funding. Our revenues from Medicaid are 16.59%. OHSU currently receives Pro-Share payments up to an upper payment limit (UPL) and graduate medical education (GME) payments above its reported GME costs. The Oregon Medicaid agency has paid Pro-Share payments to OHSU up to the UPL since 2001, in recognition of OHSU's public mission and role as a public academic teaching hospital. This funding supports the hospital's ability to provide Medicaid services and enables OHSU to serve as the sole provider in the State of certain under-compensated but critical specialty services.

11. CMS reviewed and approved State plan amendments authorizing these payments. OHSU retains 100% of the Medicaid funds paid to use and have used it for patient care services.

12. Under the purported new HHS regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("Rule"), OHSU will be treated as a unit of government. As a result, OHSU will be subject to the cost limit on payments to governmental providers under the Rule, and will lose the federal share of the Pro-Share and

GME payments we currently receive over our costs. We estimate that OHSU will lose $2.8 million annually in federal Medicaid funding.

13. This $2.8 million loss, which would be 18 percent of our net income budget for FYE2007 of $15.6 million, will severely damage our ability to continue to provide health care services as set forth in our public missions of ORS 353, including our teaching mission.

14. If these losses go through as projected OHSU will be forced to consider cuts to its programs to address this shortfall, including under-reimbursed specialty services, and Medicaid and charity care.

15. I am not aware of any plans for States to make up for the significant losses in federal funding with additional State revenues.

16. Given the State's difficult financial situation, new state funding to make up for lost federal funds is unlikely. The loss of this federal funding will mean less funding for payments to OHSU as the State's primary safety net provider , for the services we provide to Medicaid and other vulnerable patients. This will be devastating to the ability of OHSU to care for Oregon's medically underserved population.

17. When we learned that CMS had proposed this Rule last January, and purported to finalize the Rule in May, we recognized the impact that Rule would have on our facilities. We drafted a comment letter to the Centers for Medicare and Medicaid Services (CMS) in the Department of Health and Human Services (HHS) in response to the Proposed Rule, and a supplemental letter in response to the Final Rule, explaining our hospital's circumstances and our concerns with the provisions of the Rule. These letters are attached as Exhibits A and B. While CMS changes the definition of a unit of

government to include certain state teaching hospitals, which we appreciate, CMS went forward with the Rule without addressing our concerns about the cost limit or our overall concerns about the restrictive definition of a unit of government.

18.  OHSU is a member of the American Hospital Association and the Association of American Medical Colleges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 10, 2008

Peter Rapp
Oregon Health & Sciences University

# Exhibit 5-A



**OREGON**
**HEALTH**
**& SCIENCE**
**UNIVERSITY**

Office of the President

Mail code: L101
3181 S.W. Sam Jackson Park Rd.
Portland, Oregon 97239-3098
tel  503 494-8252
fax 503 494-8935
www.ohsu.edu

Joseph E. Robertson, Jr., M.D., M.B.A.
President

March 7, 2007

Leslie Norwalk, Esq.
Acting Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-2258-P
P.O. Box 8017
Baltimore, MD 21244

**Re:    Comments for CMS-2258-P, *Proposed Rule: Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 2236 (Jan. 18, 2007)**

Dear Ms. Norwalk:

On behalf of Oregon Health and Science University (OHSU), I am submitting comments on the above captioned proposed rule issued by the Centers for Medicare and Medicaid Services (CMS), published in the January 18, 2007 Federal Register, relating to the Medicaid Program (CMS-2258-P) (Proposed Rule).

OHSU is the only academic health center in the State of Oregon, consisting of hospitals and clinics, schools of medicine, dentistry, nursing, science and engineering, as well as operations with major grant awards for health related research. OHSU serves as the tertiary care center for the State of Oregon and Southwest Washington State, is a Level 1 trauma center and a major transplant center, and trains over 350 medical residents annually. OHSU is a public corporation operating under specific authority granted by the Oregon legislature.[1] OHSU receives substantial funding, in the form of appropriations, from the state legislature annually.

OHSU serves a significant safety net role in Portland and in Oregon, both in terms of serving large numbers of underserved populations with Medicaid and with no third party coverage and in terms of providing specialized services not available from other hospitals in the State. OHSU relies heavily on Medicaid program funding. The cuts in Medicaid reimbursement that could result from the proposed regulation would be financially devastating. According to our calculations, the Proposed Rule could cut between $4.4 and $36.3 million in annual funding to OHSU and would compromise our ability to continue our public mission.

    1.   **The Proposed Rule would erode supplemental payments that support OHSU's mission.**

CMS proposes to abandon, for government owned hospitals, the current aggregate upper payment limit (UPL) based on Medicare payment principles that

---

[1] Oregon Statutes Chapter 353.

currently acts as a ceiling for Medicaid funding, and to replace it with an as-yet undefined "cost limit." The Oregon Medicaid agency, since 2001, paid Pro-Share payments to OHSU up to the current UPL in recognition of OHSU's public mission and, in particular, role as a public academic teaching hospital. CMS reviewed and approved state plan amendments authorizing these payments. Since Medicare pays OHSU more than governmental calculations of cost, CMS' Proposed Rule will significantly lower reimbursement to OHSU. Our conservative estimates are that OHSU would likely lose at least $4.4 million annually in Pro-Share related revenues should the Proposed Rule be finalized.

Given that the federal government monitors and sets Medicare rates based on a complicated and sophisticated formula, it seems hard for us to believe that Medicare rates in the Medicaid context are not reasonable.

**In the final rule, CMS should reinstate Medicare payment rates as the UPL for government hospitals, instead of the as yet undefined cost limit.**

2. **The Proposed Rule's conditions on the definition of a unit of government exceed CMS's statutory authority and intrude on State prerogatives.**

OHSU is clearly recognized by state law as a public entity. According to OHSU's authorizing statute, OHSU is a "governmental entity performing governmental functions and exercising governmental powers." OHSU is proud of the governmental history and status of its hospitals, which have their origins in both the governmental hospitals created by the state's medical school built in 1956 and in the Multnomah County hospital created in 1923, as well as other institutions. OHSU's mission is a longstanding public mission to provide excellence in health care to all residents or Oregon and beyond, including a "commitment to provide health care to the underserved patient population of Oregon." Although we believe that OHSU's status as a unit of government (or at least an integral part of a unit of government) is not in question under the Proposed Rule due to the significant appropriations OHSU receives from the State of Oregon in the annual legislative appropriations process, we believe that CMS's definition of unit of government is an inappropriate intrusion into State prerogatives and beyond its statutory authority.

Under the federal system of government in the United States, it is a fundamental concept embodied in the Tenth Amendment to the Constitution that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." One of the powers reserved to the states is the power to create and dictate its own constituent units of government. The Medicaid statute recognizes this broad flexibility by including a definition of unit of local government that includes "or other government unit" as part of its definition. 42 U.S.C. 1396b(w)(7)(G). CMS, in the Proposed Rule, would introduce new conditions that are not permitted either by the Constitution or the Medicaid statute.

**In the final rule, CMS should not restrict the definition of unit of government beyond what is contained in the Medicaid statute.**

### 3. Restrictions on Medicaid financing would further jeopardize OHSU and go beyond CMS's statutory authority.

CMS proposes to limit the participation of local government entities in financing the Medicaid program. OHSU has traditionally participated in the financing of Medicaid payments to OHSU. If OHSU were not able to assist the State in financing the Medicaid program, $36.3 million per year in OHSU revenues could be at risk. A loss of those funds would severely compromise our ability to serve Medicaid and non-sponsored patients.

OHSU's participation in the financing of the Medicaid program, as well as the participation of other entities of local government is protected by the Medicaid statute. According to the Medicaid statute, the Secretary of HHS "may not restrict States' use of funds where such funds are derived from State or local taxes (or funds appropriated to State university teaching hospitals) transferred from or certified by units of government within a State as the non-Federal share of [Medicaid] expenditures." 42 U.S.C. 1396b(w)(6)(A). Given OHSU's status as a State university teaching hospital, it is difficult to see how the Proposed Rule could even purport to restrict OHSU's participation in the Medicaid program.

**In the final rule, CMS should clarify that it is not restricting States' use of funds appropriated to State university teaching hospitals such as OHSU, consistent with the Medicaid statute.**

### 4. CMS' rationale that the Proposed Rule is necessary to curb improper Medicaid financing mechanisms is flawed.

CMS' rationale for issuing the Proposed Rule was based in large part on the agency's belief that current Medicaid payments to public providers in excess of cost are being used by providers to return some or all of the federally-matched payments to the state. We wish to stress that, under current rules, OHSU has retains 100% of the Medicaid funds paid to us and have used it for patient care services. As a result, the Proposed Rule is unnecessarily punitive to OHSU and other similarly situated safety net providers.

In summary, I appeal to CMS to reconsider the proposed regulations. Current reimbursement rules already force hospitals to shift costs to private third party payors. A further forced "cost shift" cannot be sustained by those payors. The ultimate result will be a total breakdown of the health care safety net for Medicaid and non-sponsored individuals here in the State of Oregon, and I fear, across the nation.

Respectfully submitted,

Joseph E. Robertson, Jr., M.D., M.B.A.
OHSU President

# Exhibit 5-B



OREGON
HEALTH
&SCIENCE
UNIVERSITY

President's Office

Mail code L 101
3181 S.W. Sam Jackson
Park Road
Portland, OR 97239-3098
tel 503 494-8224
fax 503 494-8935
www.ohsu.edu

Bradley N. King, C.P.A.,
M.B.A., M.P.A.
Vice President and Chief
Financial Officer
kingbr@ohsu.edu

July 13, 2007

Ms. Leslie V. Norwalk, Esq.
Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building, Room 445-G
200 Independence Avenue, SW
Washington, D.C. 20201

Re:    **Comments on Unit of Government Definition (§ 433.50) contained
in CMS–2258–FC: Medicaid Program; Cost Limit for Providers
Operated by Units of Government and Provisions to Ensure the
Integrity of Federal-State Financial Partnership, 72 Fed. Reg.
29748 (May 29, 2007).**

Dear Ms. Norwalk:

On behalf of Oregon Health and Science University (OHSU), I am submitting
comments on the new definition of a unit of government contained in 42
C.F.R. § 433.50 of the regulation published by the Centers for Medicare and
Medicaid Services (CMS) as CMS-2258-FC (the Final Rule). Although
OHSU appreciates the fact that the Final Rule clarifies the status of state
university teaching hospitals such as OHSU as units of government, OHSU
continues to believe that the regulation impermissibly narrows the statutory
definition of a unit of government and is an inappropriate intrusion into state
prerogatives.

OHSU is the only academic health center in the State of Oregon, consisting of
hospitals and clinics, schools of medicine, dentistry, nursing, science and
engineering, as well as operations with major grant awards for health related
research. In addition, OHSU serves as the tertiary care center for the State of
Oregon and southwest Washington State, is a Level 1 trauma center and a
major transplant center, and trains over 350 medical residents annually.
OHSU also serves a significant safety net role in Portland and in Oregon, both
in terms of providing care to large numbers of underserved Medicaid and
uninsured populations and in terms of providing specialized services not
available from other hospitals in the state. As a result, OHSU relies heavily
on Medicaid program funding. We continue to believe that the Final Rule will
cut up to $36 million in annual funding to OHSU, and will compromise our
ability to continue our public mission.

1. **The Final Rule's definition of a unit of government continues to exceed CMS's statutory authority and intrudes on State prerogatives.**

In the Final Rule, CMS modified the definition of a "unit of government" included in the proposed regulation to clarify the governmental status of an undetermined number of additional entities, including certain teaching hospitals and Indian tribes. OHSU supports and appreciates the inclusion of State university teaching hospitals in the definition of a unit of government. In addition, in its responses to comments on the proposed rule, CMS stated that "inclusion in a State's consolidated financial report is also indicative of a unit of government." OHSU also supports inclusion of that indicator in the Final Rule.

Notwithstanding the changes and the clarifications made in the Final Rule and the preamble, OHSU reiterates its basic opposition to CMS' definition. Notwithstanding the inclusion of teaching hospitals, CMS' definition impermissibly narrows the definition of a unit of government adopted by Congress and inappropriately intrudes into state prerogatives. The Medicaid statutory definition of unit of local government includes "or other government unit" as part of its definition. 42 U.S.C. 1396b(w)(7)(G). CMS' new Final Rule introduces new conditions — specifically taxing authority, direct access to tax revenues, receipt of direct appropriations by state teaching hospitals, or status as an Indian tribe —that are not included in the Medicaid statute.

On behalf of OHSU, I urge CMS to show genuine deference to state law in the determination of a unit of government for purposes of Medicaid financing. This requires more than the nominal deference incorporated into the Final Rule by allowing states to make an initial determination subject to being overturned by CMS.

2. **Providers determined to be units of government under this Final Rule should not be subject to a cost limit.**

Limiting Medicaid payments to governmental providers to cost will erode the supplemental payments that support OHSU's hospital. The Oregon Medicaid agency, since 2001, has paid Pro-Share payments to OHSU up to the UPL in recognition of OHSU's public mission and role as a public academic teaching hospital. CMS reviewed and approved State plan amendments authorizing these payments. Since Medicare pays OHSU more than most calculations of cost, CMS' rule will significantly lower reimbursement to OHSU. As CMS has not fundamentally altered the provisions of the Proposed Rule, our conservative estimates are that OHSU would likely lose at least $2.8 million in Pro-Share related revenues under the Final Rule.

As we emphasized in our comments to the Proposed Rule, CMS' rationale for issuing the this rule was based in large part on the agency's belief that current Medicaid payments to public providers in excess of cost are being used by providers to return some or all of the federally-matched payments to the state. We wish to reiterate that OHSU retains 100% of the Medicaid funds paid to us and have used it for patient care services. As a result, the Final Rule is unnecessarily punitive to OHSU and other similarly situated safety net providers.

2

* * *

In summary, I appreciate the opportunity to submit these additional comments and to reiterate OHSU's strong opposition to the provisions of this Final Rule, in particular the definition of a unit of government. I appeal to CMS to defer to states regarding governmental status and to withdraw the Final Rule.

Respectfully submitted,

*Bradley N. King*

Bradley N. King, C.P.A., M.B.A., M.P.A.
OHSU Vice President and Chief Financial Officer

# Exhibit 6

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,**<br><br>*et al.*<br><br><br>           **Plaintiffs,**<br><br>      **v.**<br><br>**THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,**<br><br>*et al.*<br><br>           **Defendants.** | )<br>)<br>)<br>)<br>)<br>)     **Civil Action No.**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JAMES N. VALENTI

I, James N. Valenti, make the following declaration pursuant to 28 U.S.C. § 1746:

1.  I am Chief Executive Officer ("CEO") of Declarant El Paso County Hospital District, doing business as R.E. Thomason General Hospital ("Thomason"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2.  I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in Thomason's files upon which I normally rely, publicly available information, and other factual matters known to me.

3.  I have served as CEO of Thomason since September 2004.

4. In my capacity as CEO, I am responsible for all aspects of Thomason's operations and finances, including participation in the Texas Medicaid program and payments received thereunder.

5. Thomason is a hospital district of the State of Texas established under state statute and a governmental entity. Texas Health & Safety Code, Chapter 281.

6. Thomason is El Paso's only not-for-profit, community-owned hospital and healthcare system and a regional referral center for patients in need of specialty care.

7. Our mission is to enhance the health and wellness of the El Paso community by making high quality, affordable healthcare services accessible to all. Our tradition of respectful service is enriched by our participation in healthcare-related education, research and innovation.

8. Thomason is the primary teaching institution of the Texas Tech University School of Medicine's Regional Academic Health Sciences Center in El Paso. As such, the Thomason/Texas Tech campus is the only academic healthcare setting in far West Texas and Southern New Mexico.

9. Thomason is the region's only Level 1 Trauma Center within a 250-mile radius of El Paso. Thomason's Emergency Department is among the busiest in El Paso, treating more than 62,000 patients annually. Our emergency department is also home to a unique nighttime pediatric service not available at any other local hospital.

10. Thomason also operates Thomason C.A.R.E.s Clinics, neighborhood primary care centers we established to reduce unnecessary and expensive trips to the emergency department. More than 35,000 people a year receive close-to-home, affordable, family medical care at the clinics.

11. Thomason is a significant provider of care to Medicaid patients in El Paso County, and the major safety net provider in our community. Of the patients we treat every year, 25 percent are Medicaid beneficiaries, 19 percent are charity patients, and 26 percent are self-pay patients with no coverage.

12. Thomason has an operating budget of $330 million. Based on this budget (and without implementation of the Medicaid cost limit rule), Thomason anticipates having a 2.7 percent [$9 million] operating margin, which, as a governmental, non-profit entity, Thomason plans to reinvest into the health system to provide additional services to the uninsured, recruit additional providers for this historically underserved community, and recapitalize the District with sorely needed equipment and technology.

13. Thomason is particularly reliant on Medicaid payments. 25 percent of our revenues are from Medicaid. Thomason currently receives Medicaid payments above its costs. These payments, the Texas public upper payment limit (UPL) payments, are limited by the lesser of hospital charges or the combined cost of services to Medicaid patients and patients without insurance. These payments allow Thomason to invest in the services described above, which are particularly essential to Medicaid patients.

14. Thomason has taxing authority as a hospital district under Texas law and direct access to tax revenues as a component unit of El Paso County. Thomason has not had an increase in its tax rate to support the growing demand for services or to help offset the rising costs of prescription drugs, medical supplies, physician contracts, technology, salaries or utilities since the late 1980's.

15. Under the purported new HHS regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State*

*Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("Rule"), Thomason will be treated as a unit of government, based on our taxing authority and direct access to tax revenues. As a result, Thomason will be subject to the cost limit on payments to governmental providers under the Rule, and will lose the federal share of the payments we currently receive over our costs. We estimate that Thomason will lose $22 million annually in federal Medicaid funding.

16.  This $22 million loss, constituting nearly 7 percent of our operating budget, is two and a half times our estimated operating margin and will leave our system with a significant deficit of approximately $13 million (which does not include potential negative impacts of State cuts as a result of Medicaid reform plans). This is too great a financial reduction for Thomason to offset.

17.  In order to continue operating, Thomason will be forced to develop an immediate action plan which would have to include curtailing or eliminating services to a community that is already underserved. This will include limiting further expansion of some services despite growing community need, and cutting particularly costly services. For example, Thomason provides essential Family Planning Services within the community, which are of particular benefit to teenagers who are at-risk. The elimination of this program will mean that the costs incurred by the Medicaid program will increase because of the costs of providing care to unplanned children. These cuts will increase barriers to access for Medicaid patients. This loss also would be detrimental to our efforts to improve our facilities and equipment.

18.  We have also attempted to determine whether the State would provide funding to offset this loss. Based on communications with State officials, we understand

that this is unlikely. Based on estimates from the Texas Health and Human Services Commission, it is anticipated that the Texas Medicaid Program will lose over $500 million in Medicaid funding in 2008 including $480 million in losses to hospitals.

19. The loss of this federal funding will mean less funding for payments to the State's safety net providers generally, including Thomason, for the services we provide to Medicaid and other vulnerable patients. This will be devastating to the ability of Thomason and the rest of the State's safety net providers to care for Texas's medically underserved population.

20. When we learned that CMS had proposed this Rule last January, and purported to finalize the Rule in May, we recognized the impact that this magnitude of loss in funding would have on our facilities. Our Board of Managers unanimously adopted a Resolution in Opposition to the Medicaid Rules and authorized a comment letter to the Centers for Medicare and Medicaid Services (CMS) in the Department of Health and Human Services (HHS) in response to the Proposed Rule, explaining our hospital's circumstances and the devastating impact on Medicaid recipients and other public hospitals in Texas. The Resolution and Comment Letter are attached as Exhibits A and B. CMS went forward with the Rule without addressing our concerns.

21. Thomason is a member of the National Association of Public Hospitals and Health Systems and the American Hospital Association.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 6, 2008

(Signature): _James N. Valenti_
James N. Valenti
Chief Executive Officer
Thomason Hospital

# Exhibit 6-A

**RESOLUTION OF THE BOARD OF MANAGERS OF THE EL PASO COUNTY
HOSPITAL DISTRICT OPPOSING PROPOSED MEDICAID RULE**

**WHEREAS**, the primary mission of the El Paso County Hospital District is to provide access to critical hospital and healthcare services to the residents of El Paso County, including the indigent and uninsured; and,

**WHEREAS**, the State of Texas has the highest number of uninsured individuals in this country, and over 33% of the population of El Paso County is uninsured; and

**WHEREAS**, R.E. Thomason General Hospital and its clinics rely heavily on Medicaid reimbursement to cover the costs to provide access to critical hospital and healthcare services to thousands of low-income and uninsured individuals; and

**WHERERAS**, the Centers for Medicare and Medicaid Services ("CMS") has proposed regulations published in the Federal Register on January 18, 2007, which would have substantial negative impacts in the El Paso community and the State of Texas and will dramatically reduce the Medicaid payments to Thomason Hospital and other safety net hospitals; and

**WHEREAS**, over 43 members of the Senate and 226 members of the House have signed letters in opposition to the proposed rule; and

**WHEREAS**, the National Association of Counties (NACo) and the National Association of Governors (NGA) have issued letters in opposition to the proposed rule,

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Managers of the El Paso County Hospital District hereby adopts this resolution opposing the proposed regulation and calls upon the administration and CMS to withdraw the proposed rule; and

**BE IT FURTHER RESOLVED**, that the President and Chief Executive Officer is hereby directed to deliver a copy of this resolution to our Senate and House representatives in Congress and request that they take appropriate legislative action to block the implementation of the proposed rule.

SIGNED, this 13th day of March 2007.

Rosemary Castillo, Chairperson                    Carlos Gutierrez, M.D., Board Secretary

# Exhibit 6-B



## JOSÉ R. RODRÍGUEZ
COUNTY ATTORNEY
EL PASO COUNTY, TEXAS

EL PASO COUNTY HOSPITAL DISTRICT LEGAL UNIT
4815 ALAMEDA
8TH FLOOR, SUITE B
EL PASO, TEXAS 79905

OFFICE: (915) 521-7632
FAX:    (915) 521-7209

March 19, 2007

Leslie V. Norwalk, Esq.
Acting Administrator
Center for Medicare and Medicaid Services
Department of Health and Human Services
Attn: CMS-2258-P
P.O. Box 8017
Baltimore, MD  21244-8017

RE:    42 CFR Parts 433, 447 and 457
       Medicaid Program: Cost Limit for Providers Operated
       by Units of Government and Provisions to Ensure the
       Integrity of Federal-State Financial Partnership

Submitted electronically to http://www.cms.gov/eRulemaking

Dear Acting Administrator Norwalk:

The El Paso County Hospital District (R. E. Thomason General Hospital, El Paso, Texas) appreciates the opportunity to respond to the proposed rule "Medicaid Program: Cost Limit for Providers Operated by Units of Government and Provision to Ensure the Integrity of Federal-State Financial Partnership" published in the Federal Register January 18, 2007.

The rules unfairly target public providers and are an ill-disguised cut in crucial Medicaid funding that would have a devastating impact on this community's already fragile health care safety net.

Only public providers would be affected by the rules, necessitating new state funding, an unlikely prospect in a relatively poor state such as Texas, or, more likely, cuts in programs to serve those who most need health care services. There appears to be no logical basis for punishing pubic hospitals, which provide a disproportionate share of care to the uninsured, provide critical services to the community such as trauma care and neonatal intensive care, play a critical role in

*Equal Opportunity Employer*

emergency preparedness, are at the forefront of establishing neighborhood clinics and are leaders in providing culturally sensitive care.

While purportedly addressing concerns with certain Medicaid financing practices the rules are, in actuality, a Medicaid funding cut that will hurt individuals and communities rather than solve some ill-defined problem.    Because a significant percentage of the patient population at Thomason Hospital is self-pay, the cuts targeted at public providers would make it even more difficult for this institution to provide health care services to the uninsured who compromise 33 % of the population of El Paso County.  In fact, the proposed rules would undermine the federal requirement to assure access to care and services for Medicaid recipients that is equal to that available to the general population.

The Board of Managers and Administration of the El Paso County Hospital District urge you to withdraw the proposed rules and allow safety net hospitals to fulfill their mission of providing quality, cost effective health care to those in our society who are the least able to afford it.

Sincerely,

Connie Crawford
Assistant County Attorney

# Exhibit 7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,**<br><br>*et al.*<br><br>          **Plaintiffs,**<br><br>          v.<br><br>**THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,**<br><br>*et al.*<br><br>          **Defendants.** | )<br>)<br>)<br>)<br>)          **Civil Action No.**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF BRUCE SCHROFFEL

I, Bruce Schroffel, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am President and Chief Executive Officer of University of Colorado Hospital Authority ("UCH"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge based on information contained in UCH's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as President and Chief Executive Officer of UCH since January 17, 2006.

4. In my capacity as President and Chief Executive Officer, I am responsible for all aspects of UCH's operations and finances, including participation in the Colorado Medicaid program and payments received thereunder.

5. UCH, located in Aurora, Colorado, is a "body corporate and political subdivision" of the State of Colorado, pursuant to state law. Colorado Revised Statutes § 23-21-503(1).

6. UCH has served since 1921 as a main teaching hospital for the University of Colorado, a component of the State government, and is one of two academic medical centers in the Rocky Mountain region.

7. By state statute, UCH's mission is "the operation of university hospital as a state of the art teaching and research hospital providing comprehensive medical care, including tertiary care, and patient care of limited availability." State statute also requires that UCH provide space and facilities as necessary for the operation of the clinical programs of the University of Colorado's health sciences schools and that UCH provide medical care to those eligible for payment assistance through any program for the benefit of the medically indigent. Colorado Revised Statutes § 23-21-504(1).

8. UCH is the Rocky Mountain region's leading specialty care and referral center, providing among its services the only comprehensive cancer center in the Rocky Mountain region. The hospital also operates primary care clinics in Denver metro locations.

9. We have long served as one of Colorado's leading providers of care for the State's medically underserved population and are currently Colorado's second largest safety net provider. For the fiscal year ending June 30, 2007, 20% of the care provided at UCH was provided to Medicaid patients and patients in the Colorado Indigent Care Program, based on total charges.

10.  During the fiscal year ending June 30, 2007, UCH's operating revenues totaled $565.5 million and operating expenses totaled $550.2 million, providing an operating margin of $15.3 million or 2.7%.

11.  UCH was founded in 1921 by the Colorado General Assembly as a component of the State's University of Colorado medical campus governed by the University of Colorado Board of Regents.

12.  Our structure changed in 1991 when the Colorado General Assembly passed a statute establishing the University of Colorado Hospital Authority, a "body corporate and political subdivision" of the State of Colorado, to operate UCH.  Colorado Revised Statutes § 23-21-503(1).  The main reason for this governance change was a concern that UCH was "unable to become and remain economically viable due to constraints imposed by being subject to various kinds of government policy and regulation," and that without economic viability, it would "become ever more dependent upon state subsidies and the quality of medical service and education will inevitably decline."  Colorado Revised Statutes § 23-21-501.  The State Legislature determined that the "needs of the citizens of the state of Colorado and of the University of Colorado health sciences schools" would be best served by this change in governance.  Colorado Revised Statutes § 23-21-501.

13.  In addition to being designated a body corporate and political subdivision of the State, UCH has many characteristics that we believe show that it is a unit of government.

    a.      UCH continues to be obligated, subject to the Colorado Indigent Care Program statute, to provide uncompensated care for the State's underserved population, and is one of the State's two largest indigent care providers.  Colorado Revised Statutes § 23-21-504(1).

b.   The resolutions, proceedings, minutes, monthly financial statements and contracts of the Board of Directors of UCH are "public records" and, like the records of all state and local government units in Colorado, are subject to the State's Open Records law. Colorado Revised Statutes § 23-21-510.

c.   The meetings of the Board of Directors of UCH are subject to the State's open meetings law, and UCH is defined as a "local public body" under this law. Colorado Revised Statutes §§ 24-6-401 through 402.

d.   UCH is designated as a "public entity" and granted governmental immunity status by Colorado courts. Colorado Revised Statutes §§ 24-10-102 through 115. The employees of UCH are designated as "public employees" and also granted governmental immunity under the Colorado Government Immunity Act.

e.   UCH has the ability to issue bonds that are exempt from taxation by the State or any agency, political subdivision or instrumentality of the State. Colorado Revised Statutes § 23-21-514.

f.   UCH has the authority to accept any gifts, grants, and loans of funds, property or any other aid in any form from the State and any State agency.

g.   UCH is exempt from property taxes. Colorado Revised Statutes § 23-21-525.

h.   The Colorado Legislature has reserved its plenary legislative authority over the Hospital, including the authority to enact laws related to it. Colorado Revised Statutes § 23-21-527.

i.   The power to terminate UCH's existence rests with the Colorado Legislature. Colorado Revised Statutes § 23-21-503.

j.    UCH is required to submit to the Governor and the Legislature an annual report
which sets forth a complete and detailed operating and financial statement of
UCH for the prior fiscal year.

k.    The Board of Regents of the University of Colorado continues to control
appointments to UCH's Board of Directors.  Colorado Revised Statutes § 23-21-
506.

14.  UCH has participated in financing the State's non-federal share of Medicaid
expenditures through certification of public expenditures (CPE's) since 1999 for upper payment
limit.  UCH has always been treated as a unit of government for these purposes.

15.  UCH relies on the supplemental Medicaid payments it receives through Colorado
Medicaid's upper payment limit (UPL) and disproportionate share hospital (DSH) programs to
provide health care services to the Medicaid and Indigent Care Program patients who rely on
UCH as a safety net provider.

16.  Based on our analysis of the purported new HHS regulation, *Cost Limit for Providers
Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State
Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) (the "Rule"), UCH would not meet
the new restrictive definition of a unit of government, despite its status as a body corporate and
political subdivision of the State of Colorado.

17.  Under the Rule, an entity may qualify as a unit of government if it 1) has taxing
authority, 2) has direct access to generally applicable tax revenues as an integral part of a unit of
government with taxing authority which is legally obligated to fund the health care provider's
expenses, liabilities, and deficits, 3) receives appropriated funding as a State university teaching
hospital, or 4) is an Indian Tribe or Tribal organization.

18.  1) UCH does not have taxing authority.  2) Because of our public hospital authority governance structure, we are not sufficiently integrated with the State, which is not legally obligated to fund UCH's liabilities (consistent with the goal to ensure economic viability without dependence on state subsidies).  *See* Colorado Revised Statutes §§ 23-21-505, 513, 519. 3) While state statute defines UCH's mission to serve as a teaching hospital for the university, UCH does not receive direct appropriations from the State.   4) UCH is also not a Tribal organization.

19.  The Colorado State Medicaid agency, in a response to the Rule, has said "there is a significant risk that Denver Health Medical Center, Memorial Hospital, and University Hospital will no longer have the ability to use certification to draw the available federal funds."  Colorado Department of Health Care Policy and Financing, Updated Impact of CMS January 18, 2007 Proposed Rules (Mar. 12, 2007).

20.  As a result of not meeting this restrictive definition of a unit of government, UCH would no longer be eligible to certify the substantial expenditures it incurs in providing care to Medicaid patients and Colorado Indigent Care Program patients, and would therefore lose the supplemental payments funded by the federal match for these expenditures.

21.  We estimate that UCH will lose $30-35 million annually in DSH and UPL payments due to this Rule, which is twice the operating margin we earned last fiscal year.  By excluding UCH from the definition of entities eligible to make certified public expenditures for Medicaid financing purposes, the State will lose the federal matching funding for the expenditures certified by UCH, funding that currently supports these DSH and UPL payments.

22.  UCH relies on every incoming dollar of support from federal and state programs to operate our programs and provide care to Medicaid patients and care to the vulnerable

populations of the State. A loss of $34 million, which would have been 6% of our fiscal year 2007 operating revenues, is too great a financial reduction for UCH to offset.

23. In order to continue operating, UCH would be forced to reexamine our future participation in the Colorado Indigent Care Program and whether we would be able to provide care to those medically indigent patients.

24. We also have attempted to determine whether the State would provide funding to offset this loss. Based on our communications with the Colorado Legislature's Joint Budget Committee, we understand that the State is not going to be able to offset this loss in federal funding from the State General Fund. The "Taxpayer Bill of Rights" amendment to the Colorado constitution, and other State constitutional limitations, restrict the State's ability to provide any additional funding.

25. Based on our discussions with State officials, we are aware that the State of Colorado Medicaid program as a whole will also lose a significant amount of federal support under this Rule. The analysis completed by the State and presented to the Legislature's Joint Budget Committee a year ago estimated that Colorado would lose $142 million of federal funds. Given the State's difficult financial situation, the loss of this federal funding will mean less funding for payments to the State's safety net providers generally, including UCH, for the services provided to Medicaid and other vulnerable patients. This will be devastating to the ability of UCH and the rest of the State's safety net providers to care for Colorado's medically underserved population.

26. In the event that UCH continued to qualify as a unit of government under this Rule or otherwise, UCH would stand to lose significant federal Medicaid funding due the Rule's cost limit on payments to governmental providers. The change in methodology used to calculate the

cost of care will have an adverse impact on UCH, but the amount of the impact is not known at this time.

27. When we learned that CMS had proposed this Rule last January, we recognized the impact that this magnitude of loss in funding would have on our facilities. We drafted comment letters to the Centers for Medicare and Medicaid Services (CMS) in the Department of Health and Human Services (HHS) in response to the Proposed Rule, and a supplemental comment letter in response to the purported final version of the Rule, explaining our hospital's circumstances and the devastating impact on our facilities and our community. These letters are attached as Exhibits A and B. CMS went forward with the Rule without addressing our concerns.

28. UCH is a member of the National Association of Public Hospitals, the American Hospital Association, and the Association of American Medical Colleges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 5, 2008

(Signature): _____

Bruce Schroffel
President & Chief Executive Officer
University of Colorado Hospital

# Exhibit 7-A





# UNIVERSITY OF COLORADO
## HOSPITAL

March 19, 2007

Centers for Medicare & Medicaid Services
Department of Human Services
  Attn: CMS-2258-P
P.O. Box 8017
Baltimore, MD  21244-8017

**Re:  Proposed Rule CMS-2258-P – "Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership" (Vol. 72, No. 11), January 18, 2007 ("Rule")**

To Whom It May Concern:

Thank you for the opportunity to provide comment regarding the above cited Rule as proposed by the Centers for Medicare and Medicaid Services. As a general opening statement, we oppose the portion of the Rule that proposes to change the definition of "unit of government." Its implementation would have a devastating impact on the University of Colorado Hospital and more than 20 additional "safety net" providers in the State of Colorado greatly compromising our overall ability to care for the State's medically underserved population.

**Background:**
Since 1921, the University of Colorado Hospital (UCH) has served as the major teaching hospital for the University of Colorado, including its schools of medicine, dentistry, nursing, and pharmacy. UCH has historically been one of Colorado's leading providers of care for the state's medically underserved population – today UCH is the state's second largest "safety net" provider.

Until 1991, UCH was a component of the University of Colorado, a "state institution" governed by the University of Colorado Board of Regents. In 1991, the Colorado General Assembly enacted a statute creating the "University of Colorado Hospital Authority" as a "body corporate *and political subdivision*" of the State of Colorado. The primary rationale behind this statutory/structural change was to permit UCH to operate more independently in a rapidly changing healthcare environment and continue to serve as the major teaching hospital for the healthcare professions education programs offered by the University of Colorado.

Comment to Proposed Rule CMS-2258-P
March 19, 2007
Page 2 of 4

In addition, when the state legislature changed the statutory structure of UCH a provision was included in state law (**Colorado Revised Statutes 23-21-504. Mission of the authority – obligation to provide uncompensated care – action of the board of directors**) mandating UCH to provide care for the State's underserved population – now numbering more than 770,000 in Colorado. Not only does UCH have this statutory obligation, but we have historically maintained a strong moral and philosophical commitment to serve the State's medically indigent population. In fiscal year ending June 30, 2006, UCH admitted over 2,000 inpatients, qualifying under our State's Colorado Indigent Care Program (CICP), totaling nearly 11,000 patient days. In addition, UCH saw a total of more than 48,000 CICP outpatient visits during that same fiscal year. In total UCH wrote-off nearly $168 million in net charges for indigent/charity care in FY 2006.

This background is important to set the foundation for our opposition to the change to the definition of "unit of government" proposed by the Rule 42 CFR – CMS-2258-P.

**Proposed Rule 42 CFR – CMS-2258-P:**

University of Colorado Hospital expresses its strong objection to this proposed CMS Rule and its scheduled implementation on September 1, 2007. Should this proposed Rule take effect our hospital stands to lose about $30 to $35 million each year in federal Medicaid Disproportionate Share Hospital (DSH) and Upper Payment Limit (UPL) funds based on our unreimbursed Medicaid and low-income uninsured costs. In addition the State of Colorado as a whole would stand to lose as much as $140 million in federal funding that supports the State's safety net and long term care providers. This loss of federal funding would be devastating to UCH's and the rest of the State's safety net providers' ability to provide care for Colorado's medically underserved population.

Specifically, by CMS's narrowly defining "government" or "public" hospital to be only those supported by "units of government having taxing authority", or hospitals that "have access to a unit of government that has taxing authority", and such taxing authority is "responsible for the expenses, liabilities and deficits" of such hospitals, it excludes Colorado's two largest indigent care providers, University of Colorado Hospital and Denver Health (DH) (also a "state authority"). Through Certification of Public Expenditures (CPE), it is our two hospitals together that have been able to acquire the federal Medicaid matching funds that have supported our institutions and many other safety net hospitals in Colorado. As "public authorities" neither UCH nor DH would meet the proposed definition and thus would not qualify as eligible providers to continue to participate in federal DSH and UPL funding. As statutory "public authorities" in Colorado our hospitals would still be expected to remain as significant providers of care for the medically indigent in the state. However, should the Rule take effect, it would be extremely difficult for UCH (and DH) to continue to serve as models in Colorado as dominant safety net providers. Subsequently, care for our state's medically underserved would be severely compromised; likely reducing access for thousands of Colorado's most medically vulnerable.

Comment to Proposed Rule CMS-2258-P
March 19, 2007
Page 3 of 4

Also, the timing of the September 1, 2007 proposed effective date makes it very difficult for UCH and the State of Colorado to react, develop, and implement appropriate alternatives.

CMS notes in the "Background" discussion accompanying the Rule that title XIX of the Social Security Act (the "Act") requires that states share in the cost of Medicaid expenditures but permits the states to delegate some responsibility for the non-Federal share of the Medicaid expenditures to units of local governments under some circumstances. The Rule's revision to 42 C.F.R. section 433.50 would re-define when a hospital will be considered a "unit of government" and thus eligible to certify public expenditures. The Rule would do this by limiting the "unit of government" definition to a hospital that (1) has "generally applicable taxing authority" or (2) is able to access funding as an integral part of a unit of government that both has taxing authority and is legally obligated to fund the hospital's expenses, liabilities and deficits. The consequence of this re-definition is that a hospital that previously was considered a "unit of government" would no longer be one (in the eyes of CMS) if it is not able to satisfy one of these two new criteria and, significantly, would no longer be able to certify public expenditures.

UCH would not be able to satisfy either of the two new criteria and thus would not be able to certify public expenditures even though it is a political subdivision of the State of Colorado and incurs substantial expenditures from providing medical care to Medicaid and medically indigent patients. The Rule offers no statutory basis to support this proposed change in the definition of "unit of government" nor CMS's authority to make this change through administrative rule making. Further, the Rule offers no public policy rationale for why a hospital that has taxing authority or a hospital that is a component of a taxing authority entity that provides the hospital with funding and is legally obligated for its liabilities should be permitted to certify public expenditures but all hospitals that are a unit of government, but for this re-definition, should not be able to certify public expenditures.

The Rule cites and relies extensively on the fundamental principle of the Act that the Federal government is to pay only its proportional cost of the delivery of medical services under the Medicaid Program and is not to pay more. This principle can hardly be used to support the proposed change to the definition of "unit of government" because UCH and other hospitals that today are units of government and have been certifying their public expenditures have indeed incurred those expenditures which the Federal government is required to match. The Federal government has not been paying these hospitals more than its statutorily-required fifty percent match so, possibly unlike the situation with intergovernmental transfers, this proposed re-definition cannot be justified as needed to ensure that the Federal government is paying more than its match amount. The proposed re-definition will not change the fact that UCH and the other hospitals still have the costs of the medical expenditures but will eliminate the Federal government's payment of the federal match.

It is for the above stated reasons that we strongly encourage CMS to reevaluate the proposed Rule taking into consideration current statutory status of University of Colorado Hospital and the negative fiscal impact on our hospital, the State of Colorado, and numerous other hospitals in our

Comment to Proposed Rule CMS-2258-P
March 19, 2007
Page 4 of 4


State and throughout the country. Accordingly we urge CMS to withdraw this Rule or, at the very least, amend the Rule to broaden the definition of "government" or "public" hospital such that those traditional and statutorily recognized public hospitals, that have demonstrated a long history and commitment to treating Medicaid patients, and the under- and uninsured can continue to provide this much needed care.

Sincerely,

Bruce Schroffel
President & CEO

# Exhibit 7-B



# UNIVERSITY OF COLORADO
## HOSPITAL

July 13, 2007

Leslie Norwalk, Esq.
Acting Administrator
Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building
Room 445-G
200 Independence Ave, SW
Washington, DC  20201
      Attn: CMS-2258-FC (VIA Electronic Submission)

**Re:  Proposed Rule CMS-2258-FC – "Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership" (Fed. Regis. Vol. 72, No. 102), May 29, 2007 ("Rule")**

Dear Ms. Norwalk:

Thank you for the opportunity to provide comment regarding the above cited Rule as proposed by the Centers for Medicare and Medicaid Services.  The University of Colorado Hospital (UCH) remains opposed to the portion of the Rule that proposes to change the definition of "unit of government." Even though modified from the initial proposed Rule (January 18, 2007), we fear that its implementation would still leave our hospital outside proposed (re)definition of "governmental unit" and thus would have a devastating impact on our hospital and more than 20 additional "safety net" providers in the State of Colorado greatly compromising our overall ability to care for the State's medically underserved population.

While we appreciate CMS's modification of the initial Rule recognizing the unique roles and missions of teaching/academic hospitals, the Rule, still requiring "direct appropriation" from the State or other governmental entity would still exclude our hospital from the definition as UCH, *the* major teaching hospital in Colorado *does not* receive direct appropriation from the State.

**Background:**
Since 1921, the University of Colorado Hospital (UCH) has served as the major teaching hospital for the University of Colorado, including its schools of medicine, dentistry, nursing, and pharmacy.  UCH has historically been one of Colorado's leading providers of care for the state's medically underserved population – today UCH is the state's second largest "safety net" provider.

Until 1991, UCH was a component of the University of Colorado, a "state institution" governed by the University of Colorado Board of Regents.  In 1991, the Colorado General Assembly enacted a statute creating the "University of Colorado Hospital Authority" as a "body corporate *and political subdivision*" of the State of Colorado.  The primary rationale behind this

Comment to Proposed Rule CMS-2258-P
July 18, 2007
Page 2 of 4

statutory/structural change was to permit UCH to operate more independently in a rapidly changing healthcare environment and continue to serve as the major teaching hospital for the healthcare professions education programs offered by the University of Colorado.

In addition, when the state legislature changed the statutory structure of UCH a provision was included in state law (**Colorado Revised Statutes 23-21-504. Mission of the authority – obligation to provide uncompensated care – action of the board of directors**) mandating UCH to provide care for the State's underserved population – now numbering more than 770,000 in Colorado. Not only does UCH have this statutory obligation, but we have historically maintained a strong moral and philosophical commitment to serve the State's medically indigent population. In fiscal year ending June 30, 2006, UCH admitted over 2,000 inpatients, qualifying under our State's Colorado Indigent Care Program (CICP), totaling nearly 11,000 patient days. In addition, UCH saw a total of more than 48,000 CICP outpatient visits during that same fiscal year. In total UCH wrote-off nearly $168 million in net charges for indigent/charity care in FY 2006.

This background is important to set the foundation for maintaining our opposition to the change to the definition of "unit of government" proposed by the Rule 42 CFR – CMS-2258-FC.

**Proposed Rule 42 CFR – CMS-2258-FC:**

University of Colorado Hospital expresses its strong objection to this proposed CMS Rule and its scheduled implementation on May 25, 2008. Should this proposed Rule take effect our hospital stands to lose $30 to $35 million each year in federal Medicaid Disproportionate Share Hospital (DSH) and Upper Payment Limit (UPL) funds based on our unreimbursed Medicaid and low-income uninsured costs. In addition the State of Colorado as a whole would stand to lose as much as $140 million in federal funding that supports the State's safety net and long term care providers. This loss of federal funding would be devastating to UCH's and the rest of the State's safety net providers' ability to provide care for Colorado's medically underserved population.

Specifically, by CMS's narrowly defining "government", "public", or "*state university teaching*" hospitals to be only those directly supported by "units of government having taxing authority", or hospitals that "*have access to tax revenues*", and such taxing authority is "responsible for the expenses, liabilities and deficits" of such hospitals, it still excludes Colorado's two largest indigent care providers, University of Colorado Hospital and Denver Health (DH) (also a "state authority"). Through Certification of Public Expenditures (CPE), it is our two hospitals together that have been able to acquire the federal Medicaid matching funds that have supported our institutions and many other safety net hospitals in Colorado. As "public authorities" neither UCH nor DH would meet the proposed definition and thus would not qualify as eligible providers to continue to participate in federal DSH and UPL funding. As statutory "public authorities" in Colorado our hospitals would still be expected to remain as significant providers of care for the medically indigent in the state. However, should the Rule take effect, it

would be extremely difficult for UCH (and DH) to continue to serve as models in Colorado as dominant safety net providers. Subsequently, care for our state's medically underserved would be severely compromised; likely reducing access for thousands of Colorado's most medically vulnerable. Even with the one-year moratorium Congress placed on the implementation of this Rule, the timing of the May 25, 2008 effective date would make it very difficult for UCH and the State of Colorado to react, develop, and implement appropriate alternatives.

CMS notes that title XIX of the Social Security Act (the "Act") requires that states share in the cost of Medicaid expenditures but permits the states to delegate some responsibility for the non-Federal share of the Medicaid expenditures to units of local governments under some circumstances. The Rule's revision to 42 C.F.R. section 433.50 would re-define when a hospital will be considered a "unit of government" and thus eligible to certify public expenditures. The Rule would do this by limiting the "unit of government" definition to a hospital that (1) has "generally applicable taxing authority"; or (2) has "direct access to tax revenues" as an integral part of a unit of government which is legally obligated to fund the hospital's expenses, liabilities and deficits; or (3) is a (government fiscally supported) "state university teaching" hospital. The consequence of this re-definition is that a hospital that previously was considered a "unit of government" would no longer be one (in the eyes of CMS) if it is not able to satisfy one of these three (revised) criteria and, significantly, would no longer be able to certify public expenditures.

UCH would not be able to totally satisfy any of these three criteria and thus would not be able to certify public expenditures even though it is a political subdivision of the State of Colorado and incurs substantial expenditures from providing medical care to Medicaid and medically indigent patients. The Rule offers no statutory basis to support this proposed change in the definition of "unit of government" nor CMS's authority to make this change through administrative rule making. Further, the Rule offers no public policy rationale for why a hospital that has taxing authority or a hospital that is a component of a taxing authority entity that provides the hospital with funding and is legally obligated for its liabilities should be permitted to certify public expenditures but all hospitals that are a unit of government, but for this re-definition, should not be able to certify public expenditures.

The Rule cites and relies extensively on the fundamental principle of the Act that the Federal government is to pay only its proportional cost of the delivery of medical services under the Medicaid Program and *is not to pay more*. This principle can hardly be used to support the proposed change to the definition of "unit of government" because UCH and other hospitals that today are units of government and have been certifying their public expenditures have indeed incurred those expenditures which the Federal government is required to match. The Federal government *has not* been paying these hospitals more than its statutorily-required fifty percent match so, possibly unlike the situation with intergovernmental transfers, this proposed re-definition cannot be justified as needed to ensure that the Federal government is paying more than its match amount. The proposed re-definition will not change the fact that UCH and the other hospitals still have the costs of the medical expenditures but will eliminate the Federal government's payment of the federal match.

# Exhibit 8

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) |
| | ) |
| | ) |
| *et al.* | ) |
| | ) |
| | )     **Civil Action No.** |
|         **Plaintiffs,** | ) |
| | ) |
|      **v.** | ) |
| | ) |
| **THE HONORABLE MICHAEL O.** | ) |
| **LEAVITT, in his official capacity as** | ) |
| **Secretary, United States Department of** | ) |
| **Health and Human Services,** | ) |
| | ) |
| *et al.* | ) |
| | ) |
|        **Defendants.** | ) |
| | ) |

<div align="center">

**DECLARATION OF DAVID ENTWISTLE**

</div>

I, David Entwistle, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am Chief Executive Officer ("CEO") of Declarant University of Utah Hospitals and Clinics ("UUHC"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in UUHC's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as CEO of UUHC since 2007.

4. In my capacity as CEO, I am responsible for all aspects of UUHC's operations and finances, including participation in the Utah Medicaid program and payments received pursuant to that program.

5. UUHC receives State appropriations and is included in the State of Utah's financial reports as a unit of State government.

6. UUHC is an operating unit of the University of Utah, whose School of Medicine is Utah's only medical school. UUHC is the Utah's only academic medical center and is an important safety net provider. UUHC offers services in more than 120 specialties and serves as the clinical training ground for nearly 2,000 students and more than 600 medical residents, fellows, and interns. It is the only significant provider of inpatient psychiatric services. UUHC also provides pain clinic services and community clinic services.

7. Our mission is to serve the public by improving health and quality of life. We accomplish this through our commitment to excellence in education, research and clinical care. Over the years, our reputation of excellence has grown throughout the Intermountain West region. UUHC has been recognized as one of "America's Best Hospitals" for the last 13 years.

8. UUHC is recognized by its unique services for Utah and the Intermountain region. UUHC is Utah's largest hospital-based provider of ambulatory care services with 80 general and specialty clinics for outpatients. UUHC's burn center is the only burn treatment facility in the region, treating critically ill burn patients from Utah and neighboring states. UUHC provides care for Utahns and residents of five surrounding states in a referral area encompassing more than 10% of the continental United States. A

tertiary care referral center for the Intermountain west, UUHC is known for its programs in orthopedics, stroke, ophthalmology, cancer, newborn intensive care, radiology, fertility, radiology, genetic-related diseases and organ transplant. University Hospital is a nationally verified Level I trauma center.

9. UUHC is a significant provider of care to Medicaid patients in Utah, and sees out of state Medicaid patients referred for specialized care. Of the patients we treat annually, 28 percent are Medicaid beneficiaries, 2 percent are charity patients, and 4 percent are self-pay patients with no coverage.

10. UUHC has an annual operating budget over $700 million. Based on this budget (and without implementation of the challenged Medicaid rule), UUHC projects that it will have a 5% [$ 35 million] operating margin for fiscal year 2008, which, as a governmental entity, UUHC would reinvest into the health system to provide additional services to the uninsured, underinsured, and special needs populations; recruit additional providers for this community; upgrade and replace our aging facilities; and maintain or upgrade our specialized equipment necessary for the unique services we provide.

11. UUHC relies significantly on Medicaid payments. 21 percent of our revenues are derived from the Medicaid program. UUHC currently receives Medicaid payments above its direct costs of serving Medicaid patients, in recognition of our unique role in the State as described above. In particular, we receive enhanced funding to support medical education which is in excess of direct costs. These funds are used to support our medical education program to ensure a future supply of physicians in Utah to serve the State's Medicaid population. These enhanced payments allow UUHC to invest

in the services and facilities described above, which are particularly essential to Medicaid patients.

12. Under the purported new HHS regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("Rule"), UUHC will continue to be treated as a unit of government, based on our direct access to tax revenues and clear position as part of State government, and our status as a State university teaching hospital that receives direct appropriations. As a result, UUHC will be subject to the cost limit on payments to governmental providers under the Rule, and will lose the federal share of the payments we currently receive over our costs. We estimate that UUHC will lose at least $25 million annually in federal Medicaid funding.

13. This $25 million loss, constituting more than 3.5 percent of our operating budget, is almost our entire operating margin. This is too great a financial reduction for UUHC to offset without impacting programs and services.

14. UUHC will be forced to develop an immediate action plan which would have to include curtailing or eliminating services to a patient population that is already underserved. This will include having to make cuts or reductions among services that are currently under-reimbursed, such as inpatient psychiatric services, pain clinic services, community clinics, inpatient beds, and medical school support. The cuts will be detrimental to our efforts to make needed improvements to our facilities and equipment and will require us to limit needed expansion of some services despite growing community need. For example, our planned expansion of psychiatric services will need

to be delayed pending funding resources.  These cuts will increase barriers to access for Medicaid patients.

15.  We have attempted to determine whether the State of Utah would provide funding to offset this loss.  Based on communications with State officials, we understand that this is unlikely.  Based on estimates the Utah Department of Health submitted to the House of Representatives Committee on Oversight and Government Reform, it is anticipated that the Utah Medicaid Program will lose $216 million in federal Medicaid funding over five years as a result of this Rule.

16.  The loss of this federal funding will mean less funding for payments to the State's safety net providers generally, including UUHC, for the services we provide to Medicaid beneficiaries and other vulnerable patients.  This will be devastating to the ability of UUHC and the rest of Utah's safety net providers to care for Utah's medically underserved population.

17.  When we learned that the Centers for Medicare & Medicaid Services ("CMS") proposed this Rule last January, and purported to finalize the Rule in May, we recognized the impact that this magnitude of loss in funding would have on our operations.  We submitted comments to CMS and the Department of Health and Human Services ("HHS") in response to the Proposed Rule, explaining our hospital's circumstances and the devastating impact on Medicaid recipients in Utah.  The letter is attached as Exhibit A.  CMS went forward with the Rule without addressing our concerns.

18.  UUHC is a member of the National Association of Public Hospitals and
Health Systems, the American Hospital Association, and the Association of American
Medical Colleges.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: March _ll_ , 2008


(Signature): _____

David Entwistle
Chief Executive Officer
University of Utah Hospitals and Clinics

# Exhibit 8-A



# University Health Care
Hospitals & Clinics

March 16, 2007

Leslie V. Norwalk, Esq.
Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Ave, SW
Washington, DC 20201

**Re: Comments for CMS-2258-P, Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of the Federal-State Financial Partnership**

Dear Ms. Norwalk:

On behalf of the University of Utah Hospitals and Clinics ("UUHC"), we are writing to oppose the proposed Medicaid regulation published on January 18, CMS-2258-P ("the Proposed Rule"). The Proposed Rule jeopardizes nearly$ 40 million (Federal share) in critical Medicaid support payments for UUHC, funding that has been essential to our ability to serve as Utah's major safety net health care system.

| Background: |
| --- |

## ACADEMIC MEDICAL CENTER

UUHC is part of a complex academic health center that fills multiple unique and essential roles for the people of Utah. We offer highly specialized tertiary care services, some of which are unique to the state and region, and many of which are under-reimbursed. Our special services include a Level I trauma center, the only burn treatment facility in the region, newborn intensive care, organ transplants, an air transport service, the only National Cancer Institute-designated cancer center in the Intermountain West, Huntsman Cancer Institute and the largest eye-care and vision-research center, John A. Moran Eye Center, between the Mississippi River and the West Coast, with ten satellite clinics.

The University of Utah
Hospitals & Clinics
Hospital Administration
50 North Medical Drive
Salt Lake City, Utah 84132
Telephone (801) 581-2380
Fax (801) 585-5280



Page 2

## HEALTHCARE ACCESS

UUHC offers accessible(especially to Medicaid, Medicare, and the Uninsured patients) primary and preventive care services through a network of community clinics throughout the region, providing our patients with a medical home that offers access to integrated comprehensive care for all of their medical needs.

## SPECIALTY CARE

UUHC specialty care clinics provide a full range of services, including orthopedics, ophthalmology, diabetes care, stroke services, dialysis, a spine center, women's health and breast care, and Alzheimers treatment. UUHC operates a Medicaid health plan called Healthy U, with enrollment of approximately 25,000 clients. In addition, the University of Utah is the state's only medical school, and UUHC has the largest teaching program in the state, training the next generation of our nation's physicians and other health professionals.

## UNCOMPENSATED CARE

UUHC admits over 20,000 patients annually and provides over 900,000 outpatient visits (more than 32,000 of which are emergency visits). We serve all patients, regardless of ability to pay, and care for a disproportionate number of Medicaid patients. Twenty-three percent of our patients are Medicaid recipients, and another five percent are uninsured. We rely on government payers (Medicaid and Medicare) for 46 percent of our revenues (the highest % of government patients in the State). We also carry the highest rate (approx. 8% of net patient revenues) of uncompensated care in the State Clearly, UUHC is a vital healthcare resource to the state of Utah, but because of our reliance on funding from public healthcare programs, we are highly sensitive to even minute changes in reimbursement policies.

## LOW DSH STATE

The reimbursement changes in the Proposed Rule are significant. They threaten to slash a variety of special Medicaid payments that we rely on to fulfill our safety net role. They also fail to provide some kind of leveling mechanism to offset the low level of Medicaid Disproportionate Share Hospital (DSH) monies we receive as a State.

## REQUEST TO WITHDRAW PROPOSED RULE

**For the reasons noted above, we strongly oppose the Proposed Rule, and respectfully request that you to withdraw it immediately.**

Below we provide more detailed comments on specific aspects of the rule, along with a description of how we believe these provisions would impact UUHC, our patients and our community.

Page 3

| **Cost Limit for Providers Operated by a Unit of Government (§ 447.206)** |
| --- |

## NEW MEDICAID COST LIMIT
Under current regulations, states are permitted to provide Medicaid reimbursement to hospitals and other providers up to the amount that would be payable using Medicare payment principles (Upper Payment Limits (UPL)). The Proposed Rule would reduce that limit to Medicaid costs for governmental providers only, resulting in significant cuts for UUHC and threatening our financial viability.

**We oppose the cost limit.**

## EDUCATION SUPPORT NEEDED
Currently UUHC receives approximately $ 40 million (Federal share) in supplemental Medicaid funding, through a variety of different payment streams, each recognizing the important role we play in Utah's healthcare system. We receive both direct and indirect medical education payments that enable us not only to train properly the 772 interns and residents who come through our doors each year, but to absorb the additional costs that are part and parcel of our teaching role. Our physicians also receive supplemental Medicaid reimbursement in acknowledgement of the substantial financial burden they bear as teaching professionals. And we have separate payment streams that support our dental programs.

## DSH "FAIR SHARE"
These supplemental payments are particularly important for UUHC as compared to many of our counterparts across the country because of Utah's status as a low Disproportionate Share Hospital (DSH) state. Our state DSH allotment, at less than $16 million, is far below the average on a percentage basis, and does not come close to covering the costs of hospital uncompensated care in the state. Using a simple population calculation to identify the ranking of the states that receive DSH, Utah is dead last. If Utah were to receive an average state DSH amount, Utah should receive an additional $70 million (Federal share) in DSH dollars as its "fair share". There are other calculations that could be made relative to the realigning or rationalizing the amount of DSH monies received by each state, but in every case, Utah would be on the receiving end.

## MEDICAID PCN DISPROPORTIONATE IMPACT ON UUHC
Moreover, through Utah's Primary Care Network (PCN) demonstration program we provide hospital care to PCN enrollees for which we are not reimbursed, and we have exceeded our "fair share" commitment to providing this care by more than $1 million annually. In total we provide more than $40 million (cost basis) in uncompensated care to the uninsured and underinsured, for which we receive a DSH

Page 4

payment of only $4 million (Federal share) and we receive no payments through the PCN demonstration. As the largest relative provider of uncompensated care to the uninsured, UUHC struggles daily with the fallout of the inadequate DSH allotment. Because of the lack of sufficient DSH funding, our non-DSH supplemental Medicaid payments play an even more important role in supporting our safety net activities.

## CRUCIAL FUNDING SOURCE

Our other, non-DSH supplemental Medicaid payments, therefore, have become a crucial and irreplaceable funding source. Without these funds, we simply could not continue to operate many or our basic programs and provide all of the services that we now offer. We could not ensure the kind of "soup to nuts" access to services that our patients now enjoy; we could not support the broad scope of teaching programs that we currently run; and we would be a much less effective first responder in the event of a community or national emergency. We would have to scale back important investments we are making that include purchase of new medical technologies and implementation of a health information system. Utah's health and medical education system would be put at risk if the role of UUHC is diminished.

## GOVERNMENT vs. PRIVATE PROVIDER IMPACT

It is particularly damaging for CMS to single out *governmental* providers – and only governmental providers – for this kind of major base funding cut. As compared to our private competitors in Utah, UUHC is the *least* able to absorb this kind of cut. Our relative reliance on governmental payers for support far outweighs that of the private systems in the state, and our ability to cost-shift to commercial payers is significantly less. **Moreover, we do not have access to the kind of non-patient care revenues (e.g. investment income) that other systems do.** In this environment, it is impossible to overstate the importance of the supplemental Medicaid payments to UUHC or the damage that the proposed funding cut would impose on our system, our patients and our community.

| Fiscal Integrity |
| --- |

## SIGNIFICANT FINANCIAL IMPACT ON UUHC

CMS asserts that the Proposed Rule is needed to ensure "fiscal integrity" in the Medicaid program and to ensure that the federal-state funding partnership is not distorted. It is not clear, however, how a funding cut focused only on governmental providers will achieve this goal. We estimate that the new rule impact on UUHC is unreasonable. The CMS proposed national Medicaid budget for next year that has been submitted to Congress is approximately $180 Billion. If the intent of

Page 5

new rule proposed by CMS is to save $ 4 Billion over the next five years, or just under an average of $1 Billion savings per year, the cut is equal to about one-half of one per-cent of the total Federal Medicaid budget each year.

If we were to cut our (UUHC) Medicaid budget by a full 1% per year over the next five years, the cumulative impact would be less than $6 million. The magnitude of the rule change on UUHC over the next 5 years is estimated to be almost $200 million (Federal share) which will far exceed our ability to absorb. Our fiscal integrity is at stake with this new rule and the estimated savings to Medicaid appears to be significantly understated.

## CMS GAVE UTAH A FAVORABLE RATING ON THE USE OF IGT's

UUHC, as a governmental entity (and we believe we will remain governmental even under the narrow new definition of a "unit of government" under the rule), has long contributed to the non-federal share of Medicaid expenditures in our state. Our intergovernmental transfers are legitimate and appropriate. We have not engaged in the types of recycling and other practices to which CMS objects. Indeed, a recently released chart compiled by CMS itself, entitled "Summary of State Use of IGTs and Recycling," lists Utah as among the "States that Use IGTs Appropriately," referring to IGTs for inpatient hospitals, nursing facilities and physician payments. Yet the Proposed Rule would subject us to the governmental provider cost limit, which in our case is no more than a straightforward funding cut, as there are no CMS identified "fiscal integrity" issues to be addressed in Utah.

## UTAH MEDICAID SUPPORTS ALL ASPECTS OF HEALTHCARE DELIVERY

CMS claims that governmental providers use Medicaid payments in excess of costs to "subsidize health care operations that are unrelated to Medicaid." (72 Fed. Reg 2241) Nothing could be further from the truth in the case of UUHC. The types of activities we use our supplemental payments for --- teaching programs, community-based access, specialty care clinics, tertiary services, emergency preparedness, investments in technology, quality initiatives, etc. --- are very much related to Medicaid. Medicaid recipients, like all of our other patients, have a right to expect excellence in each of these areas. Utah Medicaid (State of Utah Department of Health Division) has recognized the essential role that our medical education activities play for the Medicaid program. Utah, like other states, understands the importance of a strong safety net to the viability of their Medicaid programs and has chosen to support it through supplemental payments in excess of the direct costs of serving Medicaid patients.

Page 6

## CMS SHOULD WITHDRAW ITS PROPOSAL

The current regulatory upper payment limits provide an appropriate balance of flexibility for states to target Medicaid payments to areas of need with a reasonable limit on reimbursement (Medicare payment principles). The proposed governmental provider cost limit, adopted in the name of fiscal integrity, does nothing to further that goal. Rather it is simply a funding cut, deep and severe, imposed on those providers already facing the greatest financial challenges. CMS should withdraw its proposal to limit payments to cost and retain the current limits.

---

**Applicability of the Proposed Rule to Professional Providers (§§ 433.50, 447.206)**

---

## IMPACT ON PHYSICIANS?

CMS has approved a state plan amendment that allows our physicians to receive enhanced Medicaid reimbursement. Given the disproportionate burden that our physicians willingly undertake in serving low income Medicaid and uninsured patients, this enhanced funding has been critical to their financial viability as well. The cost limit contained in the Proposed Rule does not specify whether it applies only to institutional providers or also to professional providers and we have estimated zero impact to our physicians payments. If it applies to professional providers, it is unclear how to determine whether such providers are an "integral part" of a unit of government or are "operated by" a unit of government. A cost limit would be particularly inappropriate for professional services. We request that CMS clarify that the provisions of the Proposed Rule do not apply to professionals.

**Effective Date (§§447.206(g); 447.272(d)(1); 447.321(d)(1))**

## IMPLEMENTATION TIMELINE IS UNREASONABLE

CMS proposes to implement the Proposed Rule as of September 1, 2007 – an astonishingly ambitious schedule given the sweeping nature of the changes proposed. Assuming that a final regulation is not issued until this summer, states will have very little time to adopt the changes necessary to come into compliance. In our state, for example, the 2007 legislative session ended on February 28 and the legislature is not scheduled to meet again in a general session until next year. It would not be able to properly consider the changes in our program that may be required under the regulation in time to meet the deadline. Nor would our State Department of Health have time to develop and obtain approval for any state plan amendments that may be required or to adopt changes to state rules and provider manuals. Establishing appropriate cost-reporting mechanisms as envisioned in the Proposed Rule will, in and of itself, require months of work.

Page 7

Moreover, given the longstanding payment policies and financing arrangements that would be disrupted by the Proposed Rule, CMS should provide a generous transition period for states and providers to adjust to these enormous changes.

* * *

**Conclusion---Plea**

We appreciate the opportunity to comment on the Proposed Rule. Given the devastating impact that it would have on UUHC, on our patients and on our community as a whole, we request that you withdraw the regulation immediately.

If you have any questions about this letter, please feel free to contact Gordon Crabtree, Chief Financial Officer at (801) 587-3572 or Barbara Viskochil, Director of Government Programs at (801) 297-4965.

Sincerely,

A. Lorris Betz, M.D., Ph.D.
Senior Vice President for Health Sciences
Executive Dean, School of Medicine
CEO University Health Care

David Entwistle
Chief Executive Officer
University of Utah Hospitals and Clinics

cc    Michael O. Leavitt, Secretary DHHS

Enclosure

**Summary Of State Use Of IGTs And Recycling**

| State | (1) States that Do Not Use IGTs | (2) States that Use IGTs Appropriately | (3) States that have Revised Existing IGTs by Removing Recycling | (4) CMS Identifies Potential Recycling- States May Disagree | (5) Unknown-SPAs Pending Review | (6) No SPAs Submitted |
|---|---|---|---|---|---|---|
| Alabama | | | X(IHDSHNF/HHA)*** | | X(PHYS) | |
| Alaska | X(OP) | | | | | |
| Arizona* | | X(OP/PHYS) | X(IH/NF) | | | |
| Arkansas | X(NF) | X(OP) | X(IH/DSH) | | | |
| California | X(IHNF/PHYS) | | | | | |
| Colorado | X(IHNF/PHYS) | | | | | |
| Connecticut | X(IHNF) | | | | | X |
| Delaware | | | | | | X |
| DC | | X(IHOP/NF/PHYS) | | | | |
| Florida | | | X(IHDSHOP/NF) | | | |
| Georgia | | | | | | |
| Hawaii | X(IHNF) | | | | | |
| Idaho | X(NF) | X(IH)*** | | | | |
| Illinois | | | | X(OSH* XINF) | | |
| Indiana | | X(IHPHYSI/OP/TRANS) | | | | |
| Iowa | | | X(IHDSHNF) | | | |
| Kansas | | | X(DSHNF) | | | |
| Kentucky | X(OP) | X(OLP) | | | | |
| Louisiana | X(DSH) | X(IH) | X(IHNF) (PHYS)** | | | |
| Maine | X(NF/OP) | | X(IHDSHNF) | | | |
| Maryland | X(IHNF/PHYS) | | | | | |
| Massachusetts | | X(PHYS) | X(IHOHNF) | | | |
| Michigan | | | X(IHNF) | X(IH/DSHNF) | | |
| Minnesota | | X(NF) | X(IH-GME) | | X(OP) | |
| Mississippi | | X(PHYS) | X(DSH) | | | |
| Missouri | X(IH) | X(PHYS) | X(NF) | | | |
| Montana | | X(IHTRANS) | X(NF) | | | |
| Nebraska | X(IH) | | X(NF) | | | |
| Nevada | X(NF) | X(IH/CLINIC) | X(NF) | | | |
| New Hampshire | X(IH) | | X(NF) | | | |
| New Jersey | | | | | X(PROF) | |
| New Mexico | | | | | | X |
| New York | X(PHYS) | X(CLINIC) | X(IHDSHOP/NF) | | | |
| N. Carolina | X(IH) | | X(DSH) | | | |
| N. Dakota | X(NF) | | X(NF) | | | |
| Ohio | X(NF) | | X(IH) | | | |
| Oklahoma | | X(PHYS) | X(HHOP) | | | |
| Oregon | | X(IHSBS) | X(NF) | | | |
| Pennsylvania | X(IH) | | | | | |
| Rhode Island | X(IHNF) | | X(DSHNF) | | | |
| S. Carolina | | X(OP) | X(NF) | | X(OLP) | |
| S. Dakota | X(IH) | | X(NF) | | | |
| Tennessee | X(NF) | | | | X(OP/PHYS) | |
| Texas | X(NF) | X(IHHOP) | | | | |
| Utah | X(IHNF) | X(IHNF/PHYS) | X(IHNF/OP) | | | |
| Vermont | | | | | | |
| Virginia | | | X(IHDSH/NF) | | | |
| Washington | | X(NF/HHOP) | X(NF) | | | |
| West Virginia | | X(IH) | X(IHDSH/NF) | | | |
| Wisconsin | | X(IHOP) | X(NF) | | | |
| Wyoming | | X(IHOP) | | | | |
| | *Has not submitted any IHNF SPAs | ** Final documentation of procedures pending | *** Final SPAs to be submitted/approved | *Cook County DSH | | |
| Total States | 23 | 22 | 30 | 3 | 6 | 3 |

Key:
NF - Nursing Facility Services
IH - Inpatient Hospital Services
DSH - Disproportionate Share Hospital
OP - Outpatient Hospital Services
SBS - School Based Services
GME - Graduate Medical Education
Trans - Transportation
Clinic - Clinic Services
Phys - Physician Services
Prof - Professional Services
OLP - Other Licensed Practitioners
HHA - Home Health Agency

As of 11/4/06

Copy of IGT Chart 61.xls

# Exhibit 9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,**<br><br>*et al.*<br><br><br>                    **Plaintiffs,**<br><br>        **v.**<br><br>**THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,**<br><br>*et al.*<br><br><br>                    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case Number:<br>)<br>)<br>)<br>) |

## DECLARATION OF CHRISTINE CAPITO BURCH

I, Christine Capito Burch, make the following declaration pursuant to 28 U.S.C. § 1746:

1.   I am the Executive Director of the National Association of Public Hospitals and Health Systems ("NAPH"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants. I am of legal age and competent to testify.

2.   This declaration is made on personal knowledge, information contained in NAPH's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as Executive Director for NAPH for 18 years. Prior to that, I worked for the New York City Health and Hospitals Corporation, the largest municipal health care system in the country.

4. NAPH is a non-profit corporation incorporated under the laws of the District of Columbia. NAPH is headquartered in the District of Columbia.

5. NAPH represents its members' interests in matters before Congress, the Executive Branch, and the courts, as well as with other public and private entities.

6. NAPH is a trade association that represents more than 100 metropolitan area safety net hospitals. Our members fulfill a unique and critical role in the health care system, providing high intensity services—such as emergency and trauma care, neonatal intensive care, and burn care—to the entire community. In 2005, the latest year for which we have data, NAPH members provided 64 percent of all burn care beds in their communities and represented 54 percent of all Level I trauma centers.

7. NAPH members are also the primary hospital providers of care in their communities for Medicaid recipients and many of the more than 46 million Americans without insurance. NAPH hospitals represent only 2 percent of the acute care hospitals in the country, but provide 22 percent of the uncompensated hospital care provided across the nation. Based on the latest available data, 29 percent of the services provided by our members is to Medicaid patients and 20 percent to self-pay patients, the overwhelming majority of whom are uninsured or are covered by state and local indigent care programs.

8. Because of the services provided by NAPH members, they are highly reliant on federal funding sources to sustain their operations, and they are particularly reliant on Medicaid revenues. In 2005, more than two-thirds of revenues for public hospitals came from federal,

state, and local payment sources: 33 percent from Medicaid, 21 percent from Medicare, and 14 percent from state and local subsidies. An additional 25 percent of revenues came from commercially insured patients, while payments from self-pay patients accounted for 4 percent of net revenues. The remaining 3 percent of revenue were the result of payments from "other" insurance types such as Worker's Compensation and Veterans' Health Care.

9. Public hospitals and health systems, unlike other providers, are unable to shift cost to commercial payers because of their significantly greater amounts of uncompensated care and reduced commercial revenues. Thus, they rely to a much greater extent on Medicaid to help ensure access to care.

10. Public hospitals experience greater financial pressures than other hospitals nationally. In 2005, the average margin for NAPH members was 3.0 percent; this is 2.3 percentage points lower than the average margin of 5.3 percent for all hospitals in the United States. Hospitals with low margins are unable to finance working capital or reinvest in hospital infrastructure and new technology. Furthermore, 40 percent of NAPH members had negative margins, meaning that their expenditures exceeded their revenues in that fiscal year.

11. As the Medicaid program has evolved, States have established critical supplemental Medicaid payments to support safety net providers. These supplemental payments are targeted additional payments that states typically make above and beyond base Medicaid reimbursement to help support their mission or particular aspects of their mission. NAPH members rely heavily on supplemental payments for financial viability. Even with supplemental payments, the majority of NAPH members had margins lower than 2 percent in 2005. Without these payments, overall NAPH member margins would drop to negative (-) 7.8 percent. Public hospitals could

not long survive with such negative margins.  They would be forced to curtail or close services on a large scale.

12.  On January 18, 2007, the Centers for Medicare & Medicaid Services ("CMS") proposed the regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 2236 ("Proposed Rule"), Ex. 16.  Among other things, CMS proposed to upend decades of Medicaid law to 1) limit Medicaid payments for government-operated hospitals to the costs of providing Medicaid services to Medicaid recipients, and 2) narrow the definition of units of government eligible to contribute to the non-federal share of Medicaid expenditures.

13.  NAPH timely filed comments with CMS, outlining our opposition to these new policies and their devastating impact on safety net hospitals and Medicaid beneficiaries' access to care.  A true and correct copy of NAPH's comment letter from March 8, 2007 is attached hereto and made a part hereof as Exhibit D.

14.  Based on our review, CMS received roughly 400 comment letters from stakeholders responding to the proposed version of the Rule.  These commenters included hospitals, numerous State Medicaid agencies, national and State hospital associations, and other providers.  None of these stakeholders wrote in support of the Rule, and the vast majority (over 300) called for CMS to withdraw or delay the Rule.  The remaining comments requested that CMS amend or clarify the Rule's provisions.

15.  We met several times with Administration and CMS officials to explain the concerns laid out in our comment letter and the potentially underestimated impact of this rule on public hospital systems, and to ask CMS to withdraw the Proposed Rule.  Meetings occurred in February and May with officials from the White House and CMS.

16. NAPH and its members turned to Congress to pass a moratorium that would delay implementation of the Proposed Rule, to provide Congress the opportunity to fully consider the complex issues involved and to legislate as necessary. Members of both the House and the Senate expressed significant, bipartisan opposition to the rule. In February 2007, 43 Senators sent a letter to the Finance Committee Leadership (Exhibit B) and 226 Members of the House sent a letter to the Energy & Commerce and Ways & Means Committee leadership (Exhibit C) stating their opposition to the Rule and the negative impact it would have on public providers and their patients. In March 2007, 60 Senators (Exhibit G), 153 Representatives (Exhibit H), and the Texas delegation to Congress (Exhibit E) sent letters to Department of Health and Human Services Secretary Leavitt expressing their concerns. In December, 2007, 62 senators sent a letter to leadership of the Senate Finance Committee, House Ways and Means Committee, and the Energy and Commerce Committee, expressing opposition to the rule. (Exhibit A) Based on these letters, 263 members of the House and 69 Senators are on record in opposition of the Rule as of March 2008.

17. In March of 2007, Congress approved a one-year moratorium attached to an emergency supplemental appropriations bill that was vetoed for unrelated reasons. Two months later, Congress again included the one-year moratorium in the U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, which it passed on May 24, 2007. On May 25th, the President signed the legislation into law. Ex.11, U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Sec. 7002(a) (Pub. L. No. 110-28).

18. CMS purported to issue a final version of the rule by putting it on display at the Federal Register on May 25, 2007. Ex.17, 72 Fed. Reg. 29748 (May 29, 2007) ("Rule") NAPH

submitted a comment letter on July 13, 2007 in response to the Rule. A true and correct copy of NAPH's supplemental comment letter is attached hereto and made a part hereof as Exhibit I.

19. As explained in detail in the attached NAPH comment letters, the Rule, if implemented, will in short order dismantle the intricate system of Medicaid-based support for America's health care safety net, seriously compromising access for Medicaid and uninsured patients. The result of this regulation will be a severely compromised safety net health system, unable to meet current demand for services and incapable of keeping pace with the fast-paced changes in technology, research and best practices that result in the highest quality care.

20. The President's budget for Fiscal Year 2008 estimates that this Rule will cut $5 billion in federal Medicaid participation between 2008 and 2012. Ex.15, FY 2008 Budget of the President of the United States.

21. The comment letters express our concern that a payment limit based on costs would be inefficient and burdensome, and a step back from efforts to bring cost-effective market principles into federal health programs. Prospective payment systems are structured to encourage health care providers to eliminate excess costs by allowing them to keep payments above costs as a reward for efficiency. Cost-based reporting and reimbursement will incentivize providers to increase costs and eschew efficiencies in order to preserve revenues. It will also impose enormous new administrative burdens on states and providers, as they engage in cost reconciliation processes that are not currently required and could last for years beyond when services are provided.

22. This cost-based limit on government-operated providers will eliminate billions of dollars of support payments that have traditionally been used to ensure that the nation's poor and uninsured have access to a full range of primary, specialty, acute and long term care, without any

plan for replacement funding. The cuts will restrict funding that has ensured that our communities are protected with adequate emergency response capabilities, highly specialized but under-reimbursed tertiary services (such as trauma care, neonatal intensive care, burn units and psychiatric emergency care), and trained medical professionals.

23.  Individual NAPH members estimate millions and even hundreds of millions of dollars in lost federal funding.  This magnitude of lost funding will have significant impacts on our members' operations, if they are even to remain viable.  For example, members have reported that they will have to: dismantle significant components of our ambulatory care system and scale down emergency departments; cut services and increase the time that patients wait to get treatment; reduce primary and preventative services, resulting in a much greater downstream cost to all; close nursing units or eliminate inpatient beds, which would have a direct impact on services to the residents; and close down teaching programs, jeopardizing the training of physicians who serve in their communities.  Representatives of beneficiary advocate groups in letters to Congress have asked Congress to stop this rule (along with other Medicaid rules issued by CMS) to avoid reducing access to care for Medicaid patients and the uninsured which they state would be seriously harmed by these rules.

24.  NAPH understands that in testimony before Congress during the week of February 25, governors asked Congress to stop the regulations, noting the severe impact on states and their ability to fund their Medicaid programs, particularly in light of the worsening economy.  Based on communications between NAPH members and their state Medicaid agencies, it is our understanding that states will be unable to make up the shortfalls caused by the lost federal funds. Many of our members are in states that are already facing fiscal crises.  For example, California is now facing a budget deficit of at least $16 billion.

25. The comments further explain that the Rule's severely constrained definition of a unit of government eligible to contribute funds to the non-federal share of Medicaid expenditures is overly restrictive and inconsistent with the language and statutory framework of the Medicaid statute, Title XIX of the Social Security Act.

26. Our membership includes safety net hospitals with a wide range of governmental structures that are not included under the restrictive new definition of a unit of government under the Rule. Some of our public hospital members, many of which were originally created as part of the state or county government, have modified their governance structures to gain the flexibility needed to more efficiently provide care. These public hospitals nevertheless retain their public mission, often as specifically directed by state or local law, and continue to possess many attributes of governmental status, despite not having taxing authority or direct access to tax revenues.

27. The NAPH members excluded from this definition will no longer be eligible to fund the non-federal share of State Medicaid expenditures. The loss of this funding and the resulting federal matching funds will reduce, if not eliminate, supplemental Medicaid payment programs, as such supplemental payments are frequently possible only when a local public entity is willing to provide at least a portion of the non-federal share of funding. NAPH members will be particularly impacted by this change in policy because of their dependence on supplemental payments.

28. The comments also contain our concern that CMS did not provide sufficient data to support its estimated savings from the spending cuts in the Rule. In its Regulatory Impact Analysis, CMS asserts that the Rule will not have a significant impact on providers for which relief should be granted, and it projects "this rule's effect on actual patient services to be

minimal." It estimates $3.9 billion in federal savings from the Rule from 2007 to 2011, but provides no detail on how it derived this estimate or how a reduction of $3.9 billion could result in a "minimal" effect on patient services. The President's Budget for Fiscal Year 2008 estimates that the Rule will cut $5 billion in federal Medicaid participation between 2008 and 2012. Ex. 15.

29. NAPH has surveyed its members, about the impact of the Rule on providers, on patients and on total federal Medicaid funding provided to states. Based on NAPH data assessing impact to public hospitals in these States, the estimated statewide loss of federal dollars is $932 million in Florida, $550 million in California, $103 million in Georgia, $235 million in Tennessee, and $480 million in Texas.

30. NAPH continues to advocate on behalf of its members to prevent implementation of this Rule. Members of Congress have shown significant report for extending the existing moratorium. NAPH members testified before the House of Representatives Committee on Oversight and Government Reform regarding the impact of this Rule and a string of additional Medicaid rules issued by CMS over the last year that would cut billions of dollars more from the Medicaid program.

31. NAPH is authorized by its Executive Committee to bring this suit on behalf of its members.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: March //, 2008
Washington, DC


(Signature): _____
                    Christine Capito Burch
                    Executive Director
                    National Association of Hospitals
                    and Health Systems

# Exhibit 9-A

# United States Senate

WASHINGTON, DC 20510

December 12, 2007

| | |
|---|---|
| The Honorable Max Baucus<br>Chair, Finance Committee<br>United States Senate | The Honorable Charles Grassley<br>Ranking Member, Finance Committee<br>United States Senate |
| The Honorable John Dingell<br>Chair, Energy and Commerce<br>Committee<br>United States House of Representative | The Honorable Joe Barton<br>Ranking Member, Energy and Commerce<br>Committee<br>United States House of Representative |
| The Honorable Charles Rangel<br>Chair, Ways and Means<br>Committee<br>United States House of Representatives | The Honorable Jim McCrery<br>Ranking Member, Ways and Means<br>Committee<br>United States House of Representatives |

Dear Senators and Representatives:

We are writing to urge you to include a one-year extension of the moratorium on the Medicaid public provider and graduate medical education (GME) rules, which expires on May 25, 2008, in any end-of-year legislation that you intend to pass. Hospitals and states are being forced to take action _now_ to prepare for these impending Medicaid cuts. It is therefore important for Congress to act _this year_ to extend the original moratorium that was included in the _U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007_ (P.L. 110-28).

These sweeping cuts circumvent Congress' authority to set Medicaid policy, as well as both chambers' strong bipartisan opposition to these rules. To date, 289 members of the House and 66 senators are on record in opposition to these cuts. The impact of these Medicaid rules on patient services, emergency preparedness, physician training, and state Medicaid programs would be devastating.

We strongly urge you to act now to stop these rules and to reaffirm Congress' role in setting Medicaid policy for this country by including an extension of the Medicaid moratorium in an end-of-year legislative package. Our patients, providers, and Medicaid enrollees can not wait until next year for us to take action.

Sincerely,

Jeff Bingaman
United States Senator

Elizabeth Dole
United States Senator

*(page of signatures)*

# Exhibit 9-B

# Congress of the United States
## Washington, DC 20510

February 15, 2007

The Honorable Max Baucus
Chairman

The Honorable Chuck Grassley
Ranking Member

Committee on Finance
United States Senate
219 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Chairman Baucus and Ranking Member Grassley:

We are writing to express our serious concern about the Centers for Medicare and Medicaid Services' (CMS) plan to dramatically cut Medicaid funding and make major policy changes to the program while disregarding congressional input. The recently proposed cuts to the Medicaid program will have a severe impact on more than 57 million Americans who rely on the program for their health care. It will also tie the hands of individuals and organizations that serve them. Preventing this rule from taking effect requires the immediate attention of Congress.

On January 18, 2007, CMS released a proposed rule (CMS-2258-P) imposing cost limits for public health care providers and altering the definition of "public" status. Specifically, the proposed rule would limit payments to government safety-net providers by capping reimbursement payments, redefining eligible public providers, and imposing new restrictions on non-federal funding sources. According to CMS, the estimated impact of these changes could reach $3.87 billion over five years.

Congress has repeatedly resisted the Administration's efforts to weaken America's safety net. As part of its fiscal year 2007 budget, the Administration proposed cutting the Medicaid program by $12.2 billion over five years, of which $5.8 billion would have directly affected hospital payments. Congress wisely declined to implement the cuts, and they were not included in either the House or Senate fiscal year 2007 budget resolutions. Last year 300 bipartisan Members of Congress and 55 Senators sent letters to Secretary Leavitt urging that he not move forward via the regulatory process with the proposed cuts that could jeopardize health care access for the most vulnerable Americans.

At a time when states are working toward increasing health care coverage for the uninsured, the CMS proposal would thwart their progress by weakening an already fragile safety

net. The Medicaid program is a shared responsibility between the states and federal government, and attempts to shift the cost burden onto states will leave them with no choice but to cut benefits or eliminate coverage. The results would be devastating and will likely increase the number of uninsured Americans rather than help improve our health care system.

We urge you to work with us to include provisions in an appropriate legislative vehicle to prevent CMS from moving forward with the implementation of this rule.

Sincerely,

Richard Durbin
U.S. Senator

Elizabeth Dole
U.S. Senator

_(signatures)_

Cc:   The Honorable Harry Reid, Majority Leader
       The Honorable Mitch McConnell, Republican Leader

# Exhibit 9-C



February 26, 2007

The Honorable John Dingell
Chairman
Committee on Energy and Commerce
U.S. House of Representatives
2125 Rayburn Building
Washington, D.C. 20515

The Honorable Charles Rangel
Chairman
Committee on Ways and Means
U.S. House of Representatives
1102 Longworth Building
Washington, D.C. 20515

The Honorable Joe Barton
Ranking Member
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn Building
Washington, D.C. 20515

The Honorable Jim McCrery
Ranking Member
Committee on Ways and Means
U.S. House of Representatives
1139-E Longworth Building
Washington, D.C. 20515

Dear Chairmen Dingell and Rangel, and Ranking Members Barton and McCrery:

We are writing to express our serious concern about the Centers for Medicare and Medicaid Services' (CMS) plan to dramatically cut Medicaid funding and make major policy changes to the program while disregarding congressional input. The recently proposed cuts to the Medicaid program will have a severe impact on more than 57 million Americans who rely on the program for their health care. It will also tie the hands of individuals and organizations that serve them. Preventing this rule from taking effect requires the immediate attention of Congress.

On January 18, 2007, CMS released a proposed rule [CMS-2258-P] imposing cost limits for public health care providers and altering the definition of "public" status. Specifically, the proposed rule would limit payments to government safety-net providers by capping reimbursement payments, redefining eligible public providers and imposing new restrictions on non-federal funding sources. According to CMS, the estimated impact of these changes could reach $3.87 billion over five years.

Congress has repeatedly resisted the Administration's efforts to undermine America's safety net. As part of its Fiscal Year 2007 budget, the Administration proposed cutting the Medicaid program by $12.2 billion over five years, of which $5.8 billion would have directly affected hospital payments. Congress wisely declined to implement the cuts and they were not included in either the House or Senate FY07 budget resolutions. Last year 300 bipartisan Members of Congress and 55 Senators sent letters to Secretary Leavitt urging that he not move forward via the regulatory process with the proposed cuts that could jeopardize health care access for the most vulnerable Americans.

At a time when states are working toward expanding health care coverage for the uninsured, the CMS's proposal would thwart their progress by weakening an already fragile safety net. The

Medicaid program is a shared responsibility between the states and federal government, and attempts to shift the cost burden onto states will leave them with no choice but to cut benefits or eliminate coverage. The results would be devastating and will likely increase the number of uninsured Americans rather than help improve our health care system.

We urge your immediate attention to this matter. We look forward to working with you to craft a legislative proposal that will prevent CMS from moving forward with the implementation of this dangerous and unfair rule.

Sincerely,

Anna G. Eshoo

Peter T. King

Neil Abercrombie

Gary L. Ackerman

Robert B. Aderholt

Thomas H. Allen

Jason Altmire

Joe Baca

Spencer Bachus

Melissa L. Bean

Xavier Becerra

Shelley Berkley

Howard L. Berman

Marion Berry

Judy Biggert

Brian P. Bilbray

Gus M. Bilirakis

Sanford D. Bishop

Timothy H. Bishop

Jo Bonner

Mary Bono

John Boozman

Leonard L. Boswell

Rick Boucher

Charles W. Boustany, Jr.

Allen Boyd

Nancy E. Boyda

Robert A. Brady

Corrine Brown

G.K. Butterfield

Ken Calvert

Shelley Moore Capito

Lois Capps

Michael E. Capuano

Dennis A. Cardoza

John R. Carter

Kathy Castor

William Lacy Clay

Emanuel Cleaver

Howard Coble

Jim Costa

Jerry F. Costello

Joe Courtney

Joseph Crowley

Henry Cuellar

Artur Davis

Danny K. Davis

Lincoln Davis

Susan A. Davis

Tom Davis

Peter A. DeFazio

Diana DeGette

William D. Delahunt

Rosa DeLauro

Lincoln Diaz-Balart

Norman D. Dicks

John J. Duncan, Jr.

Chet Edwards

Vernon J. Ehlers

Keith Ellison

Jo Ann Emerson

Phil English

Bob Etheridge

Sam Farr

Bob Filner

Vito Fossella

Barney Frank

Louie Gohmert

Charles A. Gonzalez

Bart Gordon

Sam Graves

Al Green

Luis V. Gutierrez

John J. Hall

Ralph M. Hall

Phil Hare

Jane Harman

Robin Hayes

Maurice D. Hinchey

Rush D. Holt

Darlene Hooley

Steve Israel

Jesse L. Jackson, Jr.

Timothy V. Johnson

Steve Kagen

Dale E. Kildee

Alcee L. Hastings

Brian Higgins

Mazie K. Hirono

Michael M. Honda

Jay Inslee

Darrell E. Issa

Eddie Bernice Johnson

Walter B. Jones

Patrick J. Kennedy

Carolyn C. Kilpatrick

Ron Klein

John R. Kuhl, Jr.

James R. Langevin

Rick Larsen

Jerry Lewis

Daniel Lipinski

David Loebsack

Nita M. Lowey

Tim Mahoney

Donald Manzullo

Dennis J. Kucinich

Ray LaHood

Tom Lantos

Barbara Lee

John Lewis

Frank A. LoBiondo

Zoe Lofgren

Stephen F. Lynch

Carolyn Maloney

Jim Marshall

Doris O. Matsui

Carolyn McCarthy

Betty McCollum

Thaddeus G. McCotter

James P. McGovern

Patrick T. McHenry

John M. McHugh

Mike McIntyre

Jerry McNerney

Michael R. McNulty

Martin T. Meehan

Gregory W. Meeks

Michael H. Michaud

Juanita Millender-McDonald

Brad Miller

George Miller

Alan B. Mollohan

Dennis Moore

Gwen Moore

Jerry Moran

Tim Murphy

Sue W. Myrick

Jerrold Nadler

Grace F. Napolitano

Richard E. Neal

James L. Oberstar

David R. Obey

John W. Olver

Solomon P. Ortiz

Ron Paul

Donald M. Payne

Stevan Pearce

Ed Perlmutter

Jon C. Porter

Todd R. Platts

David E. Price

George Radanovich

Nick J. Rahall, II

Jim Ramstad

David G. Reichert

Silvestre Reyes

Thomas M. Reynolds

Ciro D. Rodriguez

Ileana Ros-Lehtinen

Mike Ross

Steven R. Rothman

Lucille Roybal-Allard

C. A. Dutch Ruppersberger

Bobby L. Rush

John T. Salazar

Linda T. Sanchez

Loretta Sanchez

Jim Saxton

Adam B. Schiff

Bobby Scott

David Scott

Jose E. Serrano

Christopher Shays

Brad Sherman

Heath Shuler

Albio Sires

Christopher H. Smith

Vic Snyder

John M. Spratt, Jr.

Ellen O. Tauscher

Mike Thompson

Edolphus Towns

Tom Udall

Nydia M. Velazquez

Debbie Wasserman Schultz

Louise M. Slaughter

Lamar Smith

Hilda L. Solis

Cliff Stearns

Gene Taylor

John F. Tierney

Mark Udall

Chris Van Hollen

James T. Walsh

Maxine Waters

Melvin L. Watt

Anthony D. Weiner

Robert Wexler

Heather Wilson

Lynn Woolsey

Mike Doyle

Collin C. Peterson

Kendrick B. Meek

Mark E. Souder

Henry A. Waxman

Jerry Weller

Roger F. Wicker

Joe Wilson

Allyson Y. Schwartz

Ike Skelton

Julia Carson

Michael F. Doyle

Albert R. Wynn

Cc:    The Honorable Nancy Pelosi, Speaker
       The Honorable John A. Boehner, Minority Leader

Diane Watson

Virgil H. Goode, Jr.

Charles W. Dent

Russ Carnahan

Nick Lampson

Jim Marshall

John Culberson

Charles W. Pickering

Terry Everett

Dennis Rehberg

Christopher S. Murphy

James P. Moran

Ric Keller

John Barrow

# Exhibit 9-D



# NATIONAL ASSOCIATION of PUBLIC HOSPITALS and HEALTH SYSTEMS

1301 PENNSYLVANIA AVENUE, NW, SUITE 950, WASHINGTON DC 20004 | 202.585.0100 | FAX 202.585.0101

March 8, 2007

Leslie Norwalk, Esq., Acting Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

**Re: CMS-2258-P – Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership**

Dear Administrator Norwalk:

The National Association of Public Hospitals and Health Systems (NAPH) is pleased to submit the attached comments expressing our serious concern about the devastating impact of the above-referenced Proposed Rule on the nation's health system. NAPH represents more than 100 metropolitan area safety net hospitals and health systems. Our members fulfill a unique and critical role in the health care system providing high intensity services—such as trauma, neonatal intensive care, and burn care—to the entire community. NAPH members are also the primary hospital providers of care in their communities for Medicaid recipients and many of the more than 46 million Americans without insurance. NAPH hospitals represent only 2 percent of the acute care hospitals in the country but provide 25% of the uncompensated hospital care provided across the nation. Our members are highly reliant on government payers, with nearly 70% of their net revenue from federal, state, and local payers.

We strongly believe that the Proposed Rule will very seriously compromise the future ability of NAPH members and other safety net hospitals to serve Medicaid patients and the uninsured and to provide many essential, community-wide services. The harm that will be inflicted on the health safety net by this rule will also inflict fiscal crises on many states and increase the numbers of uninsured, at a time when we should be searching for ways to improve (not diminish) access and coverage.

In 2000, the Institute of Medicine issued a landmark report, *America's Health Care Safety Net: Intact but Endangered*, which recommended that, "Federal and state policy makers should explicitly take into account and address the full impact (both intended and unintended) of changes in Medicaid policies on the viability of safety net providers and the populations they serve." Last fall, the IOM reconvened the commission that produced the report and emphatically restated the findings and recommendations from 2000. Even without the Proposed Rule, the situation of the health safety net is more fragile than ever.

The attached NAPH comments detail many specific concerns about the Proposed Rule. However, please be aware that our primary recommendation is that CMS withdraw the Proposed Rule and work with the Congress and with state and local stakeholders to develop policy alternatives that would strengthen -- not undermine -- the nation's health safety net (and with it, the entire health system).

NAPH appreciates the opportunity to submit these comments. If you have any questions, please contact me or Charles Luband or Barbara Eyman at NAPH counsel Powell Goldstein (202) 347-0066.

Respectfully,

President



# NATIONAL ASSOCIATION of PUBLIC HOSPITALS and HEALTH SYSTEMS

1301 PENNSYLVANIA AVENUE, NW, SUITE 950, WASHINGTON DC 20004 | 202.585.0100 | FAX 202.585.0101

March 8, 2007

**COMMENTS BY THE NATIONAL ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS ON PROPOSED RULE: CMS-2258-P – Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership**

**Prepared on behalf of NAPH by Powell Goldstein, LLP**

The National Association of Public Hospitals and Health Systems (NAPH) urges the Centers for Medicare and Medicaid Services (CMS) to withdraw Proposed Rule CMS-2258-P (the Proposed Rule). The Proposed Rule exceeds the agency's legal authority, defies the bipartisan opposition of a majority of the Members of Congress and would, in short order, dismantle the intricate system of Medicaid-based support for America's health care safety net, seriously compromising access for Medicaid and uninsured patients. Without any plan for replacement funding, CMS would eliminate billions of dollars of support payments that have traditionally been used to ensure that the nation's poor and uninsured have access to a full range of primary, specialty, acute and long term care. The cuts would restrict funding that has ensured that our communities are protected with adequate emergency response capabilities, highly specialized but under-reimbursed tertiary services (such as trauma care, neonatal intensive care, burn units and psychiatric emergency care), and trained medical professionals. The result of this regulation would be a severely compromised safety net health system, unable to meet current demand for services and incapable of keeping pace with the fast-paced changes in technology, research and best practices that result in the highest quality care.

NAPH endorses CMS' stated goal of ensuring accountability and protecting the fiscal integrity of the Medicaid program. Over the years, Congress and CMS have taken a series of steps to advance these goals with respect to both provider payments and non-federal share financing. These efforts have included restrictions on provider taxes and donations, statewide and hospital-specific limitations on Disproportionate Share Hospital (DSH) payments and a series of modifications to regulatory upper payment limits. All of these steps were taken by or with the consent of Congress.

Over the last three years, CMS has significantly increased its oversight of payment methodologies and financing arrangements in state Medicaid programs, working with states to restructure their programs as necessary to eliminate inappropriate federal matching arrangements. Officials from the Department of Health and Human Services (HHS) have repeatedly claimed success from this initiative, stating that they have largely eliminated "recycling" from those programs under scrutiny. Indeed, since the publication of the Proposed Rule, it is our understanding that CMS provided to Members of Congress data indicating that its efforts have been enormously successful, with 22 states listed as using intergovernmental transfers (IGTs) appropriately, 30 listed as having removed

"recycling" from their programs and 23 with no IGT financing.[1] According to these data, there are only three states about which CMS has any remaining concerns. Clearly the steps taken by Congress and CMS to date have addressed the concerns CMS has raised about state financing mechanisms and it is unclear why CMS feels the need to proceed with this rulemaking. Nor does the agency explain how the restrictive policies in the Proposed Rule will further its stated goals. Instead, the Proposed Rule imposes payment and financing policies that go far beyond merely institutionalizing the oversight procedures CMS has used successfully to date. These policies would cut deep into the heart of Medicaid as a safety net support program with no measurable increase in fiscal integrity.

In its Regulatory Impact Analysis, CMS asserts that the Proposed Rule will not have a significant impact on providers for which relief should be granted, and it projects "this rule's effect on actual patient services to be minimal."[2] It estimates $3.9 billion in federal savings from the Proposed Rule over five years, but provides no detail on how it derived this estimate. From NAPH's survey of its own members, it is clear that CMS has significantly understated the impact of the Proposed Rule on providers, on patients and on total federal Medicaid funding provided to states. Although we do not have sufficient nationwide data to estimate the total amount of funding cuts imposed by the Proposed Rule, data from just a few NAPH members and states illustrates how grossly understated CMS' projections of the impact are.

For example, Florida estimates that its hospitals will lose $932 million. The estimated statewide loss of federal dollars is at least $253 million in Georgia, at least $350 million in New York and is $374 million in Texas. These state programs are not ones that CMS has identified as abusive; on the contrary, CMS has reviewed these hospital payment and financing programs and approved them as legitimate. Despite their current legitimacy, the Proposed Rule will cut payment rates and eliminate approved sources of non-federal share funding in each of these programs. As a result, safety net health systems' ability to serve Medicaid and uninsured patients will be compromised and state Medicaid programs will face substantial budget shortfalls with no apparent gain in fiscal integrity. Moreover, CMS would impose these cuts immediately, effective September 1, 2007, providing no time for state legislators to overhaul their program financing to come into compliance with the new requirements.

CMS's response to concerns about lost funding for important health care needs is that it is Congress' job to determine whether such federal support is needed. NAPH respectfully submits that Congress has already determined that such federal support is needed and that states may use their Medicaid programs to provide it. Above-cost Medicaid payments based on Medicare rates have been part of the Medicaid payment

---

[1] *Summary of State Use of IGTs and Recycling,* as of 11/14/06. Several states are listed in more than one category as they have structured different IGT programs for different types of services.
[2] 72 Fed. Reg. at 2245.

National Association of Public Hospitals                                    Powell Goldstein LLP
& Health Systems

system for years. Congress has explicitly rejected CMS' proposals to impose provider-specific cost-based payment limits;[3] it has required the adoption of regulations with aggregate rather than provider-specific limits;[4] it long ago freed states from mandatory cost-based payment systems to allow for the proliferation of payment systems more tailored to localized needs;[5] and it has acquiesced with no expressed concern in the development of supplemental Medicaid payment systems in which states have used the Medicaid program as the primary source of federal support for safety net health care. If Congress is the only entity that can authorize replacement funding, then Congress should also be the entity to consider the types of sweeping payment and financing changes that CMS proposes.

In the wake of President Bush's FY 2007 budget proposal to restrict funding and payment flexibility by regulation, a substantial majority of the House and Senate went on record urging the Administration not to move forward administratively. Members of the 110th Congress have had a similar response. The National Governors Association has also expressed its deep concern about the impact of the Proposed Rule on the governors' ability to implement health reform options and expand affordable health insurance coverage. Given the overwhelming bipartisan opposition to this Proposed Rule and the means by which it is being adopted, CMS should withdraw its proposal immediately.

After a brief summary in the first section, the second section of these comments raises significant legal and policy concerns about three major aspects of the Proposed Rule:

- The limit on payments to governmental providers to the cost of Medicaid services;
- The definition of a unit of government; and
- The restriction on sources of non-federal share funding;

Thereafter, we raise several technical concerns, comments and questions about various aspects of the Proposed Rule, and comment on CMS' Regulatory Flexibility Act analysis.

---

[3] Budget of the United States Government, Fiscal Year 2005, pages 149-150; Budget of the United States Government, Fiscal Year 2006, page 143; Letter from Michael O. Leavitt, Secretary of Health and Human Services, to the Honorable Richard B. Cheney, President, United States Senate, August 5, 2005 (transmitting legislative language to Senate implementing the fiscal year 2006 proposals); Letter from Michael O. Leavitt, Secretary of Health and Human Services, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives, August 5, 2005 (transmitting legislative language to House of Representatives implementing the fiscal year 2006 proposals). Congress has rejected each of these proposals.
[4] Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), H.R. 5661, 106th Cong., (enacted into law by reference in Pub. L. No. 106-554, § 1(a)(6)), Section 705(a).
[5] Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2173.

4

National Association of Public Hospitals                              Powell Goldstein LLP
& Health Systems

I.    SUMMARY OF COMMENTS

NAPH's major concerns about the Proposed Rule center around (1) the cost limit on Medicaid payments to governmental providers, (2) the new and restrictive definition of a "unit of government" and (3) the restrictions on sources of non-federal share funding.

The cost limit would impose deep cuts in funding for the health care safety net, with serious repercussions on access and quality for low-income Medicaid and uninsured patients.  The cuts would not result in any measurable improvement in the fiscal integrity of the Medicaid program.  Cost-based payments and limits are inherently inefficient, rewarding providers with high costs.  The current upper payment limits, based on what Medicare would pay for the same services and calculated in the aggregate for each category of hospital, are reasonable (Medicare does not pay excessive rates) and allows states appropriate flexibility to target support to communities and providers where it is most needed.

Moreover, governmental providers, who disproportionately serve the uninsured, should not be subject to a more restrictive limit than private providers.  Imposing a cost limit would undermine important policy goals shared by the Administration and providers alike – such as quality, patient safety, emergency preparedness, enhancing access to primary and preventative care, reducing costly and inappropriate use of hospital emergency departments, adoption of electronic medical records and other health information technology and reducing disparities.  Finally, the cost limit would violate federal law in at least four respects.  First, it will prevent states from adopting payment methodologies that are economic and efficient and that promote quality and access in contravention of Section 1902(a)(30)(A) of the Social Security Act (SSA); second, it defies simplicity of administration and ignores the best interests of Medicaid recipients that states are required to safeguard pursuant to Section 1902(a)(19);  third, it would violate Section 705(a) of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 by adopting upper payment limits that are not based on the proposed rule announced on October 5, 2000; and fourth, it would prohibit states from adopting prospective payment systems for their governmentally-operated federally qualified health centers and rural health clinics as required by Section 1902(bb) of the SSA.  CMS should not modify the current upper payment limits.

We also believe that CMS does not have the authority to redefine a "unit of government." The statutory definition contained in Section 1903(w)(7)(G) of the SSA does not limit the term to entities that have taxing authority.  CMS is far exceeding its authority in placing such a significant restriction on the much broader definition adopted by Congress. Congress' definition afforded due deference to states' determination of which of its instrumentalities are governmental, as required by Constitutional principles of federalism. CMS' proposed definition is an unprecedented intrusion into the core of states' rights to organize themselves as they deem necessary.  The definition also undermines the efforts

5

of states and localities to carry out a core governmental function (ensuring access to health care) through the most efficient and effective means. Countless governments have organized or reorganized public hospitals into separate governmental entities in order to provide them with the autonomy and flexibility to deliver high quality, efficient health care services in an extremely competitive market, yet the Proposed Rule would not recognize such structures as governmental. CMS should defer to state designations of governmental entities.

In asserting that intergovernmental transfers (IGTs) can only be derived from tax revenues, the preamble to the Proposed Rule ignores the much broader nature of public funding. States, local governments and governmental providers derive their funding from a variety of sources, not just tax proceeds, and such funds are no less public due to their source. Limiting IGTs to tax revenues will deprive states of long-standing funding sources for the non-federal share of their programs, leaving them with significant budget gaps that can only be filled by diverting taxpayer funds from other important priorities or cutting their Medicaid programs. Moreover, CMS does not have authority to restrict local sources of funding under Section 1902(a)(2) of the SSA without explicit congressional authorization to do so. CMS should allow all public funding, regardless of its source, to be used as the non-federal share of Medicaid expenditures.

NAPH also raises several more technical issues and concerns about the regulation. Our recommendations in this regard include:

Cost Limit

- CMS should clarify that the limit based on the "cost of providing covered Medicaid services to eligible Medicaid recipients" does not exclude costs for disproportionate share hospital payments or payments authorized under Section 1115 demonstration programs.
- The definition of allowable costs should not be restrictive and should include all costs necessary to operate a governmental provider.
- CMS should confirm that graduate medical education costs would be allowable.
- CMS should clarify that the cost limit applies only to institutional governmental providers and not professional providers that may be employed by or affiliated with governmental entities.
- CMS should allow states to calculate the cost limit on a prospective basis.
- CMS should allow states to make direct payments to governmental providers for unreimbursed costs of serving Medicaid managed care enrollees.

6

Unit of Government Definition

- CMS should eliminate the requirement that units of government have taxing authority and should defer to state law determinations of public status.
- CMS should clarify that it is not altering federal or state law interpretations of public status outside of the provisions of the Proposed Rule.

Certification of Public Expenditures

- CMS should allow the use of certified public expenditures (CPEs) to finance payments not based on costs.
- CMS should confirm the mandatory and permissive nature of various steps in the reconciliation process.

Retention of Payments

- CMS should clarify whether the retention provision applies to CPEs.
- CMS should eliminate the provision providing authority for the Secretary to review "associated transactions."

Section 1115 Waivers

- CMS should clarify that states may maintain current levels of funding for the safety net care pools, low income pools and expanded coverage established through Section 1115 demonstration projects notwithstanding the new cost limit.
- CMS should clarify that other states may use waivers to adopt similar pools or coverage based on savings incurred by reducing governmental payments to cost.

Upper Payment Limit (UPL) Transition

- CMS should revise the regulation to ensure that it has no impact on transition payments made pursuant to upper payment limit regulations revised in 2001 and 2002.

Provider Donations

- CMS should clarify that it will not view transfers of taxpayer funding as provider donations.

Effective Date

- CMS should extend the effective date of the regulation and provide at least a ten-year transition period.
- CMS should clarify that all parts of the regulation will be imposed prospectively only.

Consultation with Governors

- CMS should immediately consult with states on the Proposed Rule and modify or withdraw it based on state concerns.

Finally, NAPH believes that in its Regulatory Flexibility Act analysis, CMS has seriously underestimated the impact that the Proposed Rule will have. The Proposed Rule will impose significant costs on states and providers in connection with new administrative burdens it establishes. The cost to states of developing new payment systems, adopting new financing mechanisms to pay for the non-federal share, developing new cost reporting systems and administering and auditing them will be significant. The cost to providers of complying with these new requirements is also substantial. More importantly, however, CMS vastly understates the direct and significant impact that the Proposed Rule will have on patient care, as providers and states struggle to cope with multi-million dollar funding cuts. In addition, the Proposed Rule will negatively impact local economies that are built around providers affected by this regulation. CMS should reevaluate its estimate of the impact of the Proposed Rule and the need for regulatory relief under the Regulatory Flexibility Act.

## II.    MAJOR LEGAL AND POLICY CONCERNS

### A.  Cost Limit for Providers Operated by Units of Government (§ 447.206)

NAPH objects to the new cost limit on Medicaid payments to government providers under the Proposed Rule on a number of grounds.

> *1.  The cost limit under the Proposed Rule imposes deep cuts in safety net support without addressing financing abuses.*

Rather than adopting a narrowly tailored solution to identified concerns with inappropriate Medicaid financing practices, CMS proposes to impose a cost limit on governmental providers that is simply a straightforward funding cut. According to CMS' own data, it has largely eliminated the "recycling" that the cost limit purports to address. Even if recycling were occurring, however, a cost limit would not eliminate it; it would simply limit the net funding for governmental providers. Yet the regulation grossly overreaches by imposing the restrictive limit for governmental providers in states that

<div align="center">8</div>

have removed or never relied on inappropriate financing arrangements. In these cases, the new limit imposes a deep cut to rectify a non-existent problem.

2. *The cost limit imposes inappropriate and antiquated incentives and unnecessary new administrative burdens.*

A payment limit based on costs represents a sharp departure from CMS' efforts to bring cost-effective market principles into federal health programs. Prospective payment systems are structured to encourage health care providers to eliminate excess costs by allowing them to keep payments above costs as a reward for efficiency. Increasingly, CMS is considering new payment models, which would include incentives for providing high quality care as a means to better align payment and desired outcomes. The Proposed Rule would require a return to cost-based reporting and reimbursement that is inconsistent with the efforts of Congress and CMS over the past twenty years to move away from cost-based methodologies and the inefficient incentives these methodologies entail. It would incentivize providers to increase costs and eschew efficiencies in order to preserve revenues. It would also impose enormous new administrative burdens on states and providers, as they engage in cost reconciliation processes that could last for years beyond when services are provided. The massive diversion of scarce resources into such unnecessary bureaucracy is ill-advised at a time when the demands on the health care safety net are greater than ever.

3. *The Medicare upper payment limit is not excessive.*

In proposing the new cost limit, and asserting that it is necessary to ensure economy and efficiency in the program, CMS is effectively stating that the current limit, based on Medicare rates, is unreasonable. Given the substantial effort put into creating the Medicare payment system by both Congress and CMS, it is surprising that CMS would consider payments at Medicare levels to be unreasonable. Moreover, CMS' claim that the Medicare limit is unreasonable for governmental providers is undermined by its perpetuation of that very limit for private providers.

For many providers, Medicare reimbursement, while not excessive, is higher than the direct costs of services for Medicare patients. The prospective payment system is deliberately delinked from costs and is intended to establish incentives for providers to hold down costs by allowing them to retain the difference between prospectively set rates and their costs. Moreover, Medicare reimbursement explicitly recognizes additional costs that are incurred by some providers for public goods from which the entire community benefits, such as operating a teaching program or providing access to a disproportionate share of low income patients. The Medicare reimbursement system is not unreasonable.

9

Moreover, the adoption of aggregate limits within specified groups of governmental and private providers allows states sufficient flexibility to target additional Medicaid reimbursement to individual providers to achieve specified policy objectives. In the preamble to the Proposed Rule, CMS raises concerns about some governmental providers receiving payments that are higher than those for other governmental providers. But variation in payment rates across providers has been a hallmark of Medicaid payment policy since the early 1980s when Congress eliminated the requirement that providers be reimbursed based on reasonable costs and allowed states flexibility to tailor reimbursement to localized needs. Today, state Medicaid programs feature a variety of targeted supplemental payments: for rural providers, children's hospitals, teaching hospitals, public hospitals, financially distressed providers, trauma centers, sole community providers and the like. Eliminating the aggregate nature of the payment limit restricts states' flexibility to address local needs through reimbursement policies. Such action runs counter to the Administration's commitment, and Congress' efforts, to enhance state flexibility in managing their Medicaid programs.

### 4. *Hospitals cannot long survive without positive margins.*

In any competitive marketplace, no business can survive simply by breaking even, earning revenues only sufficient to cover the direct and immediate costs of the services it provides. Any well-run business needs to achieve some margin in order to invest in the future, establish a prudent reserve fund, and achieve the stability which will allow it access to needed capital. Organizations that lose money on one line of business need to make up those losses on other lines in order to survive. These fundamental business concepts are equally applicable to the hospital industry. Margins are essential to survival; they are even more essential to a community-oriented mission.

The proposed cost limit would prohibit governmental hospitals from earning any margin on their largest line of business. Moreover, governmental hospitals, as compared to the hospital industry as a whole, are much more likely to have a line of business – care for the uninsured – in which they must absorb significant losses. For example, in 2004, NAPH members provided, on average, over $76 million in uncompensated care per hospital. Their average margin that same year was a mere 1.2 percent (the industry average was 5.2 percent). Under the Proposed Rule, public hospitals still may be able to achieve a small margin on Medicare and perhaps a slightly larger margin on commercially insured patients, but these two revenue sources constitute less than 45 percent of average NAPH net revenues. With self-pay patients comprising 24 percent of NAPH members' patient populations, margins on Medicare and commercial insurance alone are not sufficient to keep these hospitals afloat if CMS denies any margin on Medicaid patients. CMS would not expect a private business to operate with revenues no greater than direct costs. It should not expect public hospitals, with their disproportionate share of uninsured patient populations, to survive and thrive under this limit.

10

    5.  *It is unreasonable to impose a lower limit on governmental providers than private providers.*

It is unclear why CMS believes that rates that the agency would continue to allow states to pay private providers under the Proposed Rule are excessive with respect to government providers. The needs of governmental providers are often significantly greater than those of private providers as they typically provide a disproportionate share of care to the uninsured and offer critical yet under-reimbursed community-wide services (such as trauma care, burn care, neonatal intensive care, first response services, standby readiness capabilities, etc.). For example, the members of NAPH represent 2 percent of the nation's hospitals but provide a full 25 percent of uncompensated hospital care. A report issued in December by the Congressional Budget Office confirmed that governmental hospitals provide significantly more Medicaid and uncompensated care and other community benefits than private hospitals.[6] Moreover, governmental providers' payer mix is markedly different from that of private providers, with greater reliance on Medicaid revenues to fund operations and a lower share of commercially insured patients on which uncompensated costs can be shifted. By cutting Medicaid reimbursement for governmental providers, the Proposed Rule would slash their primary funding source.

    6.  *The cost limit would have a particularly devastating effect on hospitals in low DSH states.*

Medicaid disproportionate share hospital payments help to offset some of the unreimbursed costs that hospitals incur in caring for uninsured patients, but the adequacy of DSH allotments is declining as costs climb and insurance coverage drops. As a percentage of Medicaid expenditures, DSH has fallen dramatically in the last decade, declining from 14 percent of overall Medicaid expenditures in 1993 to approximately 6 percent in 2004. As DSH falls further and further behind growing uncompensated costs, other types of supplemental payments become an even more important source of support for safety net hospitals. This is especially true for hospitals in "low DSH states," where the statewide DSH allotment is significantly lower than the hospitals' need. Yet it is these non-DSH supplemental Medicaid payments that the proposed cost limit would impact most significantly, undermining the ability of governmental hospitals to continue to provide high volumes of care to the uninsured.

    7.  *The cost limit undermines important public policy goals.*

At a time when the federal government is calling on providers to improve quality and access, and to invest in important new technology, now is not the time to impose unnecessary funding cuts on governmental providers. Although disproportionately reliant on governmental funding sources, NAPH members have, in recent years, made

---

[6] Congressional Budget Office, *Nonprofit Hospitals and the Provision of Community Benefits*, December 2006.

11

significant investments in new (and often unfunded) initiatives that are in line with HHS' policy agenda.

For example, NAPH members have invested millions of dollars in adopting electronic medical records and other new information systems that have a direct impact on quality of care, patient safety and long-term efficiency, all goals promoted by HHS. Similarly, in the heightened security-conscious post-9/11 world, public hospitals have played a critical role in local emergency preparedness efforts, enhancing their readiness to combat both manmade and natural disasters and epidemics. HHS has focused on expanding access to primary and preventative services -- particularly for low-income Medicaid and uninsured patients -- and reducing inappropriate utilization of emergency departments. NAPH members have been at the forefront of this effort, establishing elaborate networks of off-campus, neighborhood clinics with expanded hours, walk-in appointments, assigned primary care providers and access to appropriate follow-up and specialty care. (In 2004 alone, 89 NAPH member hospitals provided 29 million non-emergency outpatient visits.) HHS is striving to reduce the disparities in care provided to minority populations. With an extremely diverse patient population, NAPH members have been leaders in providing culturally sensitive and welcoming care, in providing access to translation and interpretation services, and in adopting innovative approaches to treating the specific needs of different minority groups. All of these initiatives require substantial investments of resources. CMS does not appear to have considered the impact of the cut imposed by the cost limit on shared policy initiatives that HHS itself has established as key goals of America's complex health care system.

### 8. The proposed cost limit violates federal law.

The proposed cost limit violates section 1902(a)(30)(A) and 1902(bb) of the Social Security Act (SSA) and section 705(a) of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA).[7] CMS is therefore without legal authority to impose the limit by regulation.

Under section 1902(a)(30)(A), state Medicaid programs are required:

> to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.[8]

Many states will be unable to meet the requirements of this provision given the restrictive limits imposed by CMS. By incentivizing providers to maximize costs in order to secure a higher reimbursement limit, the proposal clearly does not promote efficiency or

---

[7] H.R. 5661, 106th Cong., enacted into law by reference in Pub. L. No. 106-554, § 1(a)(6) ("BIPA").
[8] 42 U.S.C. § 1396a(a)(30)(A).

12

economy. By removing tools to promote efficiency (such as through prospective payments systems that encourage providers to reduce costs), CMS has hampered states' ability to provide the assurances required by the statute. Similarly, the cost limit thwarts states' efforts to ensure quality of care by eliminating flexibility to provide targeted above-cost incentives to promote and reward high quality care, particularly for providers identified by the state as having particular needs or faced with unique challenges. Finally, to the extent that the cost regulation prohibits states from paying rates that they have determined are necessary to ensure access for Medicaid recipients, CMS's proposed regulation undermines the statutory requirement that states assure access to care and services at least equal to that available to the general population.

Similarly, Section 1902(a)(19) requires states to provide safeguards to assure that "care and services will be provided in a manner consistent with simplicity of administration and the best interests of the recipients."[9] The Proposed Rule hinders states' ability to make both assurances. Far from streamlining administration, the regulation would require states and providers to engage in elaborate cost reporting and reconciliation processes regardless of the volume of services provided. More importantly, however, CMS' single-minded focus on limiting states' use of local dollars to fund Medicaid and in cutting payments to the largest providers (governmental providers) of Medicaid services, the Proposed Rule patently ignores the best interests of recipients. In fact, it is Medicaid recipients who will be most directly and most severely harmed by this regulation.

The proposed cost limit also ignores Congress's explicit instructions to CMS in Section 705(a) of BIPA to adopt an aggregate Medicare-related upper payment limit (UPL). Adopted shortly after CMS proposed a regulation establishing aggregate UPLs within three categories of providers – state owned or operated, non-state owned or operated and private -- BIPA required that HHS "issue ... a final regulation based on the proposed rule announced on October 5, 2000 that ... modifies the upper payment limit test ... by applying an aggregate upper payment limit to payments made to governmental facilities that are not State-owned or operated facilities." The proposed cost limit for government providers deviates significantly from Congress's clear mandate in BIPA that the upper payment limits: (1) be aggregate limits and (2) include a category of facilities that are "not State-owned or operated." The proposed regulation is provider-specific, not aggregate, and eliminates ownership as a factor in determining whether a facility is a government facility. Moreover, in requiring that the final regulation be based on the proposed rule issued on October 5, 2000, Congress explicitly endorsed the establishment of a UPL based on Medicare payment principles, not costs.

Finally, Section 1902(bb) requires states to pay for services provided by federally qualified health centers (FQHCs) and rural health clinics (RHCs) through rates that are prospectively determined (based on historical costs). FQHCs and RHCs had previously

---

[9] 42 U.S.C. § 1396a(a)(19).

been guaranteed cost-based reimbursement under Title XIX, but through the Balanced Budget Act of 1997, Congress began phasing out this guarantee.[10]  Before the phase-out was complete, Congress stepped in again in 2000 to require a new payment methodology for FQHCs that was specifically *not* cost reimbursement.[11]  This evolution of FQHC and RHC payment policy – away from cost reimbursement and towards a prospective payment system that encourages efficiency – is the most recent articulation of Congress' intent with regards to Medicaid reimbursement.  The Proposed Rule would require states to reconcile prospectively made payments to public FQHCs and RHCs and to require the clinics to return any "overpayment" (payments that in retrospect turn out to be in excess of cost).  This required reconciliation process is in direct conflict with Section 1902(bb).

***Recommendation:  CMS should retain the aggregate upper payment limits based on Medicare payment principles for all categories of providers.***

### B.  Defining a Unit of Government (§ 433.50)

NAPH urges CMS to reconsider its proposed new definition of a "unit of government." This proposal would usurp the traditional authority of states to identify their own political subdivisions and exceed the authority provided in the Medicaid statute.  The new definition would undermine efforts to date by states to make units of government more efficient and less reliant on public tax dollars.

> *1.  CMS' restrictive definition of units of government undermines marketplace incentives to operate public providers through independent governmental entities.*

More than a century ago, state and local governments began establishing public hospitals to provide health care services in their communities, including services for their most needy residents.  As the health care system matured, commercial insurance evolved and the Medicare and Medicaid programs were established, public hospitals filled a unique role in serving the poor and uninsured -- patients who were often shunned by other providers.  The public hospitals were typically operated as a department of the state or local government, with control over hospital operations in the hands of an elected legislative body, funding appropriated to plug deficits, surpluses reverting into the general fund of the government, and subject to sunshine laws, public agency procurement requirements, civil service systems and other local laws designed with the operations of traditional monopolistic governmental agencies such as libraries, police and fire departments and public schools in mind.

Over time, some states began authorizing local governments to establish public hospitals as separate governmental entities in recognition of the competitive market in which

---

[10] *See* Balanced Budget Act of 1997, § 4712.
[11] BIPA, § 702,

14

hospitals operate.  Generic state laws authorizing local governments to create hospital authorities, public hospital districts and similar independent governmental structures began to proliferate.

As competition in the health care system intensified and state and local governments became less willing and able to provide open-ended taxpayer funding to ensure access to health care services, many that had previously operated public hospitals as integrated governmental agencies began searching for new ways to organize and operate these entities.  Typically they sought to do so without diminishing their commitment to meeting the health care needs of their residents and without relaxing the accountability of these hospitals to the public for the services provided.  Fueled by these demands and concerns, many state and local governments have restructured their public hospitals to provide them more autonomy and equip them to better control costs and compete in a managed care environment.

These restructurings have taken a wide variety of forms.  Many governments have created hospital authorities, with a separate governing board, appointed by elected officials and dedicated solely to governing the hospital.  Other states created hospital districts, public benefit corporations or non-profit corporations engaged in a public-private partnership with the local government to operate the hospital to fulfill the governmental function of serving the health care needs of the local population.  Many state university medical schools have spun off their clinical operations into a separate governmental entity for similar reasons.

The variations in these public structures are as numerous as the hospitals themselves.  They have been extremely successful in positioning public hospitals to reduce their reliance on public funding sources, to compete effectively with their private counterparts and to continuously enhance the quality of care and access they provide.  The autonomy has allowed them to achieve these goals while still fulfilling their unique public mission of serving unmet needs in the community, providing access where the private market alone does not, and being responsive and accountable to the public.

The Proposed Rule's definition of a unit of government runs exactly counter to this decades-long trend in the provision of governmental health care.  Under the Proposed Rule, only the most traditional of public hospitals would qualify as a governmental entity capable of contributing to the non-federal share of Medicaid funding.  Others simply would not be deemed an "integral part" of a unit of government with taxing authority under the strict criteria set forth in the Proposed Rule.

For example, one very common feature of the restructurings is the establishment of a separate and independent budget and accounting system for the hospital, in which revenues earned by the hospital are retained by the hospital and controlled by the governing board dedicated solely to the hospital rather than automatically reverting to the

15

government's general fund. Such fiscal independence has been viewed as critical to establishing the necessary incentives and accountability for hospital administrators to operate efficiently, to maximize patient care revenues and to invest in new initiatives widely. Similarly, many restructured hospitals are not granted unlimited access to taxpayer support but are forced to manage to a fixed budget, which again has been viewed as furthering the goals of economy and efficiency. In short, the governmental entities that previously owned and operated these hospitals have restructured them deliberately to be both governmental and autonomous. They are governmental under state law and they remain fully accountable to the public. But they are autonomous governmental entities in that the local or state government with taxing authority is no longer legally responsible for their liabilities, expenses and deficits. For this reason, they likely would not meet CMS' new unit of government definition, even though they have retained several governmental attributes and are considered governmental under the laws of the state.

The rule would undermine the efforts of state and local governments to deliver public health care services more efficiently and effectively, and penalize those that have reduced their reliance on taxpayer support. Governments that had restructured their public hospitals deliberately to retain their nature as a governmental entity under state law, in part so that they could continue contributing to funding the non-federal share of Medicaid expenditures, will find the rules suddenly switched on them as the federal government substitutes its judgment for state law regarding whether they remain public or not. Future restructurings will likely reflect CMS' narrow definition, undermining the important public policy goals achieved through the more flexible array of structures available under state law. CMS does not appear to have contemplated the perverse incentives its restrictive definition of units of government would provide.

> 2. *CMS does not have statutory authority to restrict the definition of a "unit of government."*

CMS has exceeded its statutory authority in adopting a definition of a "unit of government" more restrictive than that established in Title XIX of the SSA. Section 1903(w)(7)(G)[12] defines a "unit of local government," in the context of contributing to the non-federal share of Medicaid expenditures, as "a city, county, special purpose district, or other governmental unit in the State." The Proposed Rule narrows the definition of "a unit of government" to include, in addition to a state, "a city, a county, a special purpose district, or other governmental unit in the State (including Indian tribes) *that has generally applicable taxing authority*."[13] Congress never premised qualification as a unit of government on an entity's access to public tax dollars. Rather, Congress' formulation, which includes an "other governmental unit in the State," provides appropriate deference to the variety of governmental structures into which a state may

---

[12] 42 U.S.C. § 1396b(w)(7)(G).
[13] Proposed 42 C.F.R. § 433.50(a)(1)(i) (emphasis added).

16

organize itself. In narrowing this statutory definition, without instruction by Congress, CMS has eliminated the deference to states underlying the statutory formulation.

Section 1903(w)(7)(G) is not the only section of Title XIX which evidences a Congressional intent to allow states to determine which entities are political subdivisions capable of participating in Medicaid financing. The absence of any requirement that units of government have taxing authority in order to contribute to the non-federal share of Medicaid expenditures is supported by the language elsewhere in the Medicaid statute. Section 1903(d)(1) requires states to submit quarterly reports for purposes of drawing down the federal share in which they must identify "the amount appropriated or made available by the State and its political subdivisions." The reference to the participation of political subdivisions in Medicaid funding nowhere includes a requirement that the subdivisions have taxing authority.[14]

In limiting the definition of unit of government, the Proposed Rule also overlooks Congress' specific concern about funds derived from State university teaching hospitals. In 1991, in the course of adopting affirmative limits on states' authority to rely on local funding derived from provider taxes or donations, Congress explicitly stated that the Secretary of HHS "may not restrict States' use of funds where such funds are . . . appropriated to State university teaching hospitals."[15] Clearly, Congress did not want to disrupt longstanding funding arrangements involving these important teaching institutions. In adopting a narrow definition of unit of government, which will have the effect of excluding many of our nation's premier public teaching hospitals, CMS has violated the spirit, and in some cases the letter, of this law.

> ### 3. A federally-imposed restriction on state units of government violates Constitutional principles of federalism.

In creating a new federal regulatory standard to determine which public entities within a state are considered to be "units of government" and which are not, CMS is encroaching on a fundamental reserved right of states to organize their governmental structures as they see fit. This is an extraordinary step for the federal government to take, as the internal organization of a state into units of government has historically been an area in which, out of respect for federalism, the federal government has been loath to regulate. This federal intrusion into the operation and administration of state government violates the very basis of the Medicaid program -- the federal-state partnership and the federalism principles on which it rests.

**Recommendation: CMS should defer to states regarding the definition of a unit of government.**

---

[14] 42 U.S.C. § 1396b(d)(1).
[15] 42 U.S.C. § 1396b(w)(6)(A).

### C. Sources of Non-Federal Share Funding and Documentation of Certified Public Expenditures (§ 433.51(b))

Traditionally, states have been able to rely on public funds contributed by governmental entities, regardless of the source of the public funds.  As long as funds were contributed by a governmental entity, they were considered to be public and a legitimate source of Medicaid funding.

The Proposed Rule rejects the idea that all funds held by a public entity are public (or, in the language of the regulation, all funds held by a unit of government are governmental), notwithstanding a large body of state law to the contrary.[16]  Rather, the regulation (or at least its preamble) would establish a hierarchy of public funds, and only funding derived from taxes would be allowed to fund Medicaid expenditures while those derived from other governmental functions (such as providing patient care services through a public hospital) would be rejected.

The preamble to the Proposed Rule states explicitly that, with respect to intergovernmental transfers, "the source of the transferred funds [must be] State or local tax revenue (which must be supported by consistent treatment on the provider's financial records)."[17]  While the proposed regulatory language itself refers only to *"funds* from units of government"[18] without specifying the source of those funds, the preamble language clearly indicates CMS' intent to further restrict funding for state Medicaid programs by imposing the additional requirement that local funds be derived from tax revenues.  The preamble does not specify the reason for this restriction, nor whether it would serve to bar federal Medicaid match for support provided by a local government to a hospital derived from such routine governmental funding sources such as the proceeds from bond issuances, revenue anticipation notes, tobacco settlement funds and the like.  Moreover, if the regulation does indeed bar the use of such funding sources, how does CMS expect to be able to track the precise source of local support funding, given the fungibility of governmental funding?

The combination of adopting a restrictive definition of a unit of government and then further restricting the source of funds that can be transferred by entities that meet the strict unit of government test will leave state Medicaid programs, including important supplemental payment programs that support the health care safety net, starved for

---

[16] *See, e.g. Adams County Record v. Greater North Dakota Association,* 529 N.W.2d 830, 834 (N.D. 1995) ("public funds" include "all funds derived from taxation, fees, penalties, sale of bonds, or from any other source, which belong to and are the property of a public corporation or of the state ...."); *Kneeland v. National Collegiate Athletic Association,* 850 F.2d 224, 227 (1988) (all revenues, except for trust funds, received by public colleges and universities, as well as various types of property of public colleges and universities are public funds).
[17] 72 Fed. Reg. at 2238
[18] Proposed 42 C.F.R. § 433.51(b).

18

resources. These funding shortfalls will need to be filled either by new broad-based uniform provider taxes (which would ultimately divert Medicaid reimbursement from patient care costs to covering the cost of new taxes), by new general revenue funding (shifting new costs onto state taxpayers) or by a reduction in Medicaid coverage or reimbursement. All of these solutions will ultimately impact the care that Medicaid beneficiaries receive.

In imposing this new restriction on the source of IGTs, CMS is again exceeding its Congressionally delegated authority. Section 1902(a)(2) of the SSA allows states to rely on "local sources" for up to 60 percent of the non-federal share of program expenditures. This provision does not limit the types of local sources that may be used. When Congress has intended to restrict such local sources, it has rejected CMS' attempts to impose limits by regulation and has insisted on legislating the limits itself. For example, in the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991,[19] Congress adopted significant restrictions on sources of local funding, but did so by statute after imposing a series of moratoria on HHS' attempts to restrict local sources of funding administratively.[20] CMS is without legal authority to insist that local funding from units of government be limited to tax dollars only.

*Recommendation: CMS should allow all public funding regardless of its source to be used as the non-federal share of Medicaid expenditures.*

### III.  THE PROPOSED RULE INCLUDES TECHNICAL ERRORS, AMBIGUITIES AND MISGUIDED POLICY CHOICES

The best course, from a legal and policy perspective, would be for CMS to withdraw the Proposed Rule altogether. To the extent that the agency goes forward with the rule, there are several technical issues that need to be clarified, modified or otherwise addressed in the final rule. NAPH raises the following concerns:

### A.  Cost Limit for Providers Operated by Units of Government (§ 447.206)

1. *The Proposed Rule inappropriately limits reimbursable costs to the "cost of providing covered Medicaid services to eligible Medicaid recipients." (§ 447.206(c)(1))*

Proposed 42 C.F.R. § 447.206(c)(1) provides that "[a]ll health care providers that are operated by units of government are limited to reimbursement not in excess of the individual provider's cost of providing *covered Medicaid services to eligible Medicaid recipients.*" By its terms, this provision would prohibit *any* Medicaid reimbursement to

---

[19] Pub. L. No. 102-234, 105 Stat. 1793.
[20] Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 1989 U.S.C.C.A.N. (103 Stat.) 2106; Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 1990 U.S.C.C.A.N. (104 Stat.) 1388.

governmental providers for costs of care for patients who are *not* eligible Medicaid recipients, or for services that are not covered under the state Medicaid plan. Taken literally, states could no longer pay public hospitals for unreimbursed costs for uninsured patients or for non-covered services to Medicaid patients through the disproportionate share hospital program. Similarly, the authority of several states to make payments to public providers pursuant to expenditure authority received through section 1115 demonstration projects to pay for otherwise unreimbursable costs to the uninsured, for infrastructure investments and for other purposes not covered under the state plan would be called into question (including Safety Net Care Pool payments authorized in California and Massachusetts, and Low Income Pool payments authorized in Florida). The cost limit could also extend to Medicaid reimbursement received by governmental providers from managed care organizations (despite CMS' disavowal of any such intent in the preamble). The problem is exacerbated because the regulation defines its scope as applying broadly to all "payments made to health care providers that are operated by units of government ...."[21] By contrast, the UPL regulations are carefully drafted to limit their scope to "rates set by the agency,"[22] and they include an explicit exemption for DSH payments.[23]

We assume that it is CMS' intention either (1) to apply the cost limit only to fee-for-service payments by the state agency for services provided to Medicaid recipients while relying on separate statutory or waiver-based authority to impose cost limits on DSH or demonstration program expenditures, or (2) to apply the cost limit at 42 C.F.R. §447.206 more broadly than the language of the Proposed Rule would suggest. In either case, modifications to the language of the regulation are needed to clarify its scope and the corresponding allowable costs. If the limit is to apply only to fee-for-service rates for Medicaid patients, DSH should be explicitly exempted. If the limit is to be more broadly applied, the language must be expanded to allow costs for the uninsured or non-covered Medicaid services for purposes of DSH payments. In addition, preamble guidance regarding the ongoing validity of expenditure authority granted through existing demonstration projects would help reduce confusion about the intended scope.

***Recommendation: CMS should clarify that the limitation to cost of Medicaid services for Medicaid recipients is not intended to limit Medicaid DSH payments or CMS-approved payments under demonstration programs that expressly allow payment for individuals or services not covered under the state Medicaid plan.***

---

[21] Proposed 42 C.F.R. § 447.206(a)
[22] 42 C.F.R. § 447.272(a), § 447.321(a).
[23] 42 C.F.R. § 447.272(c)(2).

20

NAPH Comments on CMS-2258-P
March 8, 2007

2. *CMS should clarify that allowable costs will include all necessary and proper costs associated with providing health care services. (§ 447.206)*

The calculation of cost for purposes of applying the cost limit is not well-defined under the Proposed Rule. Since the magnitude of the cut imposed by the cost limit will depend on which costs CMS will and will not allow states to reimburse, NAPH requests that CMS provide further guidance on how Medicaid costs would be determined and in particular clarify that any determination of Medicaid "costs" will include all costs necessary to operate a governmental facility. For governmental hospitals, these costs must, at a minimum, include:

- costs incurred by the hospital for physician and other professional services (e.g: salaries for employed professionals, contractual payments to physician groups for services provided to hospitals, physician on-call and standby costs);

- capital costs necessary to maintain an adequate physical infrastructure;

- medical education costs incurred by teaching hospitals;

- investments in information technology systems critical to providing high quality, safe and efficient hospital care;

- investments in community-based clinics and other critical access points to ensure that Medicaid and uninsured patients have adequate access to primary care;

- costs of a basic reserve fund critical to any prudently-operated business enterprise; and

In addition, some costs on a hospital's cost report are allocated to cost centers judged to be unreimbursable for purposes of Medicare reimbursement, but are appropriately reimbursed under Medicaid or DSH. For example, a hospital may have a clinic that exclusively serves Medicaid and uninsured patients that may have been excluded for Medicare purposes, but are appropriately reimbursed under Medicaid. Similarly, some costs that may not be included in a particular reimbursable cost center for purposes of the Medicare cost report should be included under a cost-based Medicaid reimbursement system (including but not limited to interns and residents, organ acquisition costs, etc.). CMS must ensure that states may make appropriate adjustments to the Medicare cost report to accurately capture all costs reasonably allocated to Medicaid – whether or not Medicare fiscal intermediaries have allowed them.

In addition, NAPH strongly believes that allowable costs should also include costs for the uninsured (beyond costs directly reimbursable through the limited available DSH funding). Absent universal coverage or full reimbursement of uninsured costs, hospitals

21

must continue to rely on cross-subsidization from other payers, including commercial payers, Medicare and Medicaid, to pay for this care. CMS should allow state Medicaid programs to shoulder such costs rather than placing the full burden on Medicare and commercial payers. We therefore urge CMS to include uninsured costs among reimbursable Medicaid costs.

***Recommendation: CMS should specify that any determination of Medicaid costs will include all costs necessary to operate a governmental facility including costs for the uninsured.***

> 3.   *The costs of graduate medical education must be allowable costs.*

The President's FY 2008 budget request includes an administrative proposal to eliminate Medicaid reimbursement for graduate medical education (GME) costs. Given the long-standing policy to permit GME payments (as of 2005, 47 states and the District of Columbia provided explicit GME payments to teaching hospitals, according to the Association of American Medical Colleges[24]) and the dozens of approved state plan provisions authorizing such payments, NAPH was surprised to see this proposal described as an administrative rather than legislative initiative. We question CMS' authority to adopt such a policy change without statutory authorization. To the extent that CMS intends to change the policy administratively, however, we assume that the agency would undertake a full notice and comment rulemaking process. In particular, we assume that CMS will allow governmental providers to include all of the costs of their teaching programs in the cost limits under the Proposed Rule unless and until the law is changed to prohibit Medicaid payments for GME. Please confirm our understanding that full GME costs will be includable as reimbursable costs.

***Recommendation: CMS should clarify that graduate medical education costs will be includable in the cost limit under the Proposed Rule.***

> 4.   *The Proposed Rule does not specify whether and under what circumstances professional providers would be considered to be governmentally operated.*

The Proposed Rule applies the cost limit to "health care providers that are operated by units of government."[25]  It is clear from the text of the regulation that it applies not just to hospital and nursing facility providers, but also to "non-hospital and non-nursing facility services."[26]  Beyond this clarification, the scope of the term "providers" is unclear. It might be possible for a state to determine that the cost limit extends as far as

---

[24] Tim M. Henderson, *Direct and Indirect Graduate Medical Education Payments By State Medicaid Programs* (Association of American Medical Colleges), Nov. 2006, at 2.
[25] Proposed 42 C.F.R. § 447.206(a).
[26] Proposed 42 C.F.R. § 447.206(c)(4).

professionals employed by governmental entities. CMS should clarify that it does not intend the regulation's reach to extend this far. Cost-based methodologies are particularly inappropriate for professional services.

***Recommendation: CMS should clarify that the cost limit applies only to institutional government providers and not to professionals employed by or otherwise affiliated with units of government.***

> 5. *A less costly, equally effective alternative to multiple cost reconciliations is available that would reduce the administrative burden on providers.*

It appears that the cost limits under the regulation must be enforced by reconciling final cost reports (often not final until years after the payment year) to actual payments made to ensure that no "overpayments" have occurred.[27] In addition, in order for states using cost-based payment methodologies funded by CPEs to provide payments to providers prior to the finalization of the payment year cost reports, the state must undertake not one, but two reconciliations after the payment year to ensure payments did not exceed costs.[28] It appears, therefore, that under this Proposed Rule, states and providers are going to be reconciling cost reports and payments for years after the actual payments are received.

The time and resources invested in this process will ultimately have no impact whatsoever on the quality or effectiveness of care provided to patients; in fact, these burdensome requirements divert scarce resources that would be much better spent on patient care. Moreover, the precision gained by reconciling payments to actual costs for the payment year as determined by a finalized cost report simply is not worth the massive diversion of such resources.

Instead, CMS should allow states to calculate cost limits prospectively, based on the most recent cost reports trended forward. While such a prospective methodology may result in a limit that is slightly higher or lower than actual costs incurred in the payment year, over time such fluctuations will even out. Moreover, calculations of cost limits to the dollar, as proposed by CMS, are not necessary to achieve the fiscal integrity objectives articulated by CMS. NAPH therefore urges CMS to reconsider the elaborate reconciliation processes it is requiring in this rule and instead allow providers to invest the savings from the use of a prospective process in services that will actually benefit patients.

***Recommendation: CMS should allow states to calculate the cost limit on a prospective basis.***

---

[27] Proposed 42 C.F.R. § 447.206(e).
[28] Proposed 42 C.F.R. § 447.206(d)

National Association of Public Hospitals
& Health Systems

Powell Goldstein LLP

6. *CMS should clarify that costs may include costs for Medicaid managed care patients.*

Under current Medicaid managed care regulations, states are prohibited from making direct payments to providers for services available under a contract with a managed care organization (MCO) and Prepaid Inpatient Health Plan or a Prepaid Ambulatory Health Plan.[29]  There is an exception to this prohibition on direct provider payments for payments for graduate medical education, provided capitation rates have been adjusted accordingly.  Given the extreme funding cuts that will be imposed on many governmental providers by the imposition of the cost limit, NAPH urges CMS to reconsider the scope of the exception to the direct payment provision.  NAPH recommends that states be allowed to make direct Medicaid fee-for-service payments to governmental providers for all unreimbursed costs of care for Medicaid managed care patients (not just GME costs).  Because the payments would be based on costs pursuant to the new regulation, there would not be the danger of "excessive payments" that has concerned CMS in the current system.  Moreover, to avoid double dipping, states could be required to similarly adjust capitation rates to account for the supplemental cost-based payments.  If reimbursement to governmental providers is going to be restricted to cost, it should include costs for all Medicaid patients, not just those in the declining fee-for-service population.

***Recommendation:*** *CMS should amend 42 C.F.R. § 438.6(c)(5)(v) and § 438.60 to allow direct payments to governmental providers for unreimbursed costs of Medicaid managed care patients.*

**B. Defining a Unit of Government (§ 433.50)**

As stated above, we believe CMS's restrictive definition of unit of government is fatally flawed and should be abandoned in favor of permitting state discretion.  However, to the extent this element is included in a final regulation, CMS must clarify certain aspects.  In particular:

1. *CMS should leave the statutory definition of "unit of government" in place.*

The Proposed Rule would permit only units of government to participate in financing the non-federal share of Medicaid expenditures.  The regulatory text then goes on to define a unit of government as "a State, a city, a county, a special purpose district or other governmental unit in the State (including Indian tribes) *that has generally applicable taxing authority.*"[30]  A provider can only be considered to be a "unit of government" if it has taxing authority or it is an "***integral part of a unit of government with taxing***

---

[29] 42 C.F.R. §438.60.
[30] Proposed 42 C.F.R. § 433.50(a)(1)(i).

National Association of Public Hospitals                    Powell Goldstein LLP
& Health Systems

*authority.*"[31] It is clear from this proposed definition that unless a provider has direct taxing authority, CMS will only consider it a "unit of government" if it is an integral part of a unit of government with taxing authority. As explained in Part II of these comments, states and local governments have restructured public hospitals so that they are deliberately autonomous from the state, county or city while retaining their public status under state law. State law, including state law as defined by the state courts, typically looks beyond the presence of taxing authority to other indicia of public status to determine whether an entity is governmental.[32] For example, courts may look to whether an entity enjoys sovereign immunity, to whether its employees are public employees, to whether it is governed by a publicly appointed board, to whether it receives public funding, to whether its enabling statute declares it to be a political subdivision or a public entity. There are a wide variety of factors that go into determining public status beyond whether the provider or the unit of government of which it is an integral part has taxing authority. NAPH urges CMS to eliminate the caveat that units of government must have taxing authority and allow any governmental entity so designated under state law to be treated as public and capable of participating in Medicaid financing.

***Recommendation: CMS should eliminate the requirement that units of government have taxing authority and defer to state law interpretations of public status.***

> 2. *CMS should clarify that the unit of government definition applies only for purposes of the payment limits and financing restrictions and not to other areas of Medicaid law and policy.*

The use of the term "public" appears in several different contexts throughout the Medicaid statute, and many states employ their own definitions of public status within their Medicaid state plans. For example, federal financial participation is available at the rate of 75 percent of the costs of skilled professional medical personnel of the state agency or "any other public agency."[33] A Medicaid managed care organization that is a "public entity" is exempt from certain otherwise applicable solvency standards.[34] "Public institutions" that provide inpatient hospital services for free or at nominal charges are not subject to the charge limit otherwise applicable to inpatient services.[35] Moreover, many states adopt special reimbursement provisions in their state plans for "public hospitals," "governmental hospitals" or other types of public providers. The use of terms such as

---

[31] Proposed 42 C.F.R. §433.50(a)(1)(ii).

[32] *See e.g.*, Colorado Associate of Public Employees v. Board of Regents, 804 P. 2d 138 (1990) (the court based its determination that the hospital was a public entity on the State's role in establishing the hospital and its continued involvement in the control of the hospital's internal operations). Woodward v. Porter Hospital, Inc. 217 A.2d 37, 39 (1966)("a public hospital is an instrumentality of the state, founded and owned in the public interest, supported by public funds, and governed by those deriving their authority from the state.").

[33] 42 U.S.C. § 1396b(a)(2)(A).

[34] 42 U.S.C. §1396b(m)(1)(C)(ii)(II).

[35] 42 U.S.C. §1396b(i)(3).

25

"public," "unit of government" and "governmental" in other areas of state and federal Medicaid law does not incorporate the restrictions CMS is seeking to impose through the Proposed Rule. CMS should clarify that these restrictive definitions are for purposes outlined in the Proposed Rule only.

**Recommendation:  CMS should clarify that the Proposed Rule is not intended to place restrictions on public status designations beyond those explicitly contained in the Proposed Rule.**

### C.  Certified Public Expenditures (§ 447.206(d)-(e))

   *1.  CPEs should be allowed to finance payments not based on costs.*

In the preamble to the Proposed Rule, CMS indicates that CPEs may only be used in connection with provider payments based on cost reimbursement methodologies. This restriction on the use of CPEs is unnecessary.  Providers will incur costs associated with providing care to Medicaid patients whether they are paid on a cost basis or not.  Their costs are no less real or certifiable based on the payment methodology.  For example, if a provider incurs $100 in cost in providing care to a Medicaid patient, but the payment methodology is a prospective one that results in a $90 payment, the provider could still certify that it incurred $100 in costs in connection with care for that patient.  Because the payment is limited to $90, however, only $90 of the certification would be eligible for federal match.  When payment is not based on a cost methodology, CMS should allow providers to certify costs associated with care to Medicaid patients not to exceed the amount of payments provided under the state plan methodology.

**Recommendation:  CMS should permit the use of CPEs for providers regardless of the payment methodology provided under the state plan.**

26

2. *The permissive vs. mandatory nature of the reconciliation process should be clarified.*

In the regulatory language in Proposed 42 C.F.R. § 447.206(d)-(e), CMS alternates between mandatory and permissive language as to state obligations during CPE reconciliations. It appears that it is CMS' intent to *require* the submission of cost reports whenever providers are paid using a cost reimbursement methodology funded by CPEs, to permissively *allow* states to provide interim payment rates based on the most recently filed prior year cost reports, and to *require* states providing interim payment rates to undertake an interim reconciliation based on filed cost reports for the payment year in question and a final reconciliation based on finalized cost reports. In addition, providers whose payments are not funded by CPEs are *required* to submit cost reports and the state is *required* to review the cost reports and verify that payments during the year did not exceed costs. Please confirm this understanding of the regulatory language.

**Recommendation: *CMS should confirm the requirements regarding reconciliation of costs.***

## D. Retention of Payments

NAPH supports CMS' attempts to ensure that health care providers retain the full amount of federal payments for Medicaid services. We do not believe, however, that the requirement in the Proposed Rule that providers receive and retain all Medicaid payments to them is enforceable. Nor do we believe that this provision will have a major impact on the funding of safety net providers. Although CMS asserts that governmental providers will benefit from the Proposed Rule in part because of the retention provision, this new requirement does not come close to undoing the significant damage caused by the cuts to payments and changes in financing required by other provisions of the Proposed Rule.

1. *CMS should clarify whether states will be required to pay all federal funding associated with provider-generated CPEs to the provider.*

The retention provision requires providers to "receive and retain the full amount of the total computable payment provided to them."[36] It is unclear whether this requirement applies to *all* payments, whether financed through IGTs, CPEs, general state revenues or otherwise. Currently, some states claim certified public expenditures based on costs incurred by public providers, but do not pass the federal matching payments to the provider. Would this practice be prohibited under the retention provision and would states be required to pay any match received on public provider CPEs to the provider?

**Recommendation: *CMS should clarify whether the retention provision applies to payments financed by CPEs.***

---

[36] Proposed 42 C.F.R. § 447.207(a).

27

NAPH Comments on CMS-2258-P
March 8, 2007

   2. *CMS' does not have the authority to review "associated transactions"*
      *in connection with the retention provision.*

The retention provision is drafted broadly, requiring, without qualification, providers to
"retain" all payments to them, and providing CMS with authority to "examine any
associated transactions" to ensure compliance. Taken to extremes, the requirement to
retain payments would prohibit providers from making expenditures with Medicaid
reimbursement funds. Certainly, any routine payments from providers to state or local
governmental entities for items or services unrelated to Medicaid payments would come
under suspicion. NAPH members typically have a wide array of financial arrangements
with state and local governments, with money flowing in both directions for a variety of
reasons. We are concerned that CMS' new authority to examine "associated
transactions" will jeopardize these arrangements, and that CMS may use its disallowance
authority to pressure public providers to dismantle such arrangements.

CMS' review and audit authority is limited to payments made under the Medicaid
program. It does not have authority over providers' use of Medicaid payments
received.[37]

**Recommendation: *CMS should delete the authority claimed by CMS to review***
**"associated transactions."**

### E.  Applicability to Section 1115 Waivers

Currently, a number of states have implemented demonstration programs under Section
1115 waiver authority. Medicaid demonstrations typically must comply with a budget-
neutrality expenditure cap calculated based on the Medicaid expenditures that would
have been made in the absence of the waiver. Many recent demonstrations have relied
heavily on money made available by eliminating certain above-cost payments to public
providers. For example, California and Massachusetts established Safety Net Care Pools
funded by agreements to eliminate certain supplemental payments. Florida likewise
established a Low Income Pool on the same basis. Iowa similarly expanded coverage
through Iowa Cares. These demonstrations have been the result of significant and
extended discussions between states and CMS.

---

[37] *See Englund v. Los Angeles County*, 2006 U.S. Dist. LEXIS 82034, at *26 (E.D. Cal. 2006). When
analyzing supplemental Medicaid funding paid to Los Angeles County, the Court noted that "once the
County received the [Medicaid] payment it was not limited to how it used the money" (*citing* testimony of
Bruce Vladeck, Administrator of Health Care Financing Administration, 1993-1997). The Court also cited
Mr. Vladeck's statement that, "money is fungible. Once it was paid to the hospitals, if it was paid for
services that were actually being provided, at that point our [HCFA's] sort of formal jurisdiction over it and
interest of what became of the funds ended." *Id.* at 27.

28

National Association of Public Hospitals                     Powell Goldstein LLP
& Health Systems

All of the demonstrations contain language in the Special Terms and Conditions requiring budget neutrality to be recalculated in the event that a change in Federal law, regulation, or policy impacts state Medicaid spending on program components included in the Demonstration. Throughout the Proposed Rule, CMS confirms that the proposed changes would apply to states that operate Section 1115 waiver programs, but fails to discuss the extent to which the Proposed Rule would affect budget neutrality calculations under Medicaid waivers. Will CMS recalculate budget neutrality applicable to these waivers based on the new regulation? If not, will these states be able to continue their new initiatives beyond the term of the current demonstration project? It will be difficult for these states to establish new programs under their waivers if they are going to be terminated within a few years. Moreover, will CMS allow other states to adopt waivers establishing similar pools or expanded coverage based on the termination of above-cost supplemental payment programs?

*Recommendation: CMS must clarify (i) whether current waiver states will be permitted to preserve their waivers, including safety net care pools and expanded coverage currently funded by the states' agreements to limit existing provider payments to cost; (ii) whether CMS plans to enforce requirements under waiver special terms and conditions (STCs) that budget neutrality agreements be renegotiated upon changes in federal law; (iii) whether CMS will allow other states to adopt similar waivers, which may incorporate savings realized from the Proposed Rule's cost limit into their own safety net care pools or coverage expansion initiatives; and (iv) if CMS does not plan to allow other states to make use of cost limit savings, the legal basis for this decision.*

### F.  UPL Transition

The Proposed Rule preamble states that "transitional UPL payments … are unchanged under this policy."[38] However, the Proposed Rule does implement changes to the UPL endpoint -- reducing it for governmental hospitals from the aggregate estimate of what would be paid under Medicare payment principles to the individual provider's cost of providing Medicaid services to eligible Medicaid recipients. Therefore, transition period payments would appear to be significantly impacted, since the transitional UPLs are largely based on the UPL endpoint. If CMS truly intends that transition period UPL payments be unchanged, CMS must revise the regulatory language to make that clear.

*Recommendation:  CMS should revise the regulatory language to ensure no diminution of transitional UPL payments.*

### G.  Provider Donations

If the Proposed Rule is finalized in its current form, a number of providers that were previously considered public and that provided IGTs or CPEs to help finance the non-

---

[38] 72 Fed. Reg. at 2245.

29

NAPH Comments on CMS-2258-P
March 8, 2007

federal share of Medicaid expenditures will no longer be able to do so. Some of these providers receive appropriations from a unit of government that does have taxing authority, but the provider cannot be considered to be an integral part of such governmental unit under the terms of the Proposed Rule. CMS should make clear that those appropriations will continue to be fully matchable under the new regulation and that it will not disallow such taxpayer funding as an indirect provider donation. We are particularly concerned in this respect about a passage in the preamble stating that "[h]ealth care providers that forego generally applicable tax revenue that has been contractually obligated for the provision of health care services to the indigent … are making provider-related donations."[39] A local government must have full authority to redirect taxpayer dollars to the state Medicaid agency for use as the non-federal share.

For example, a county which provides $20 million to support the provision of indigent care at a hospital deemed to be private under the Proposed Rule should be permitted instead to transfer that funding to the State Medicaid agency for use as the non-federal share of a $40 million DSH payment to the hospital. The preamble language appears to indicate that CMS could view such a transfer as a provider donation even though it is transferred from an entity that is clearly governmental and even though the funds transferred are derived from tax revenues. When taxpayer funding is transferred by a unit of government to the Medicaid agency for use as the non-federal share, CMS should provide federal financial participation without question.

*Recommendation: CMS should clarify that it will not view the transfer of taxpayer funding as an indirect provider donation.*

### H. Effective Date

*1.  The September 1, 2007 effective date is not achievable.*

The stated effective date of the new cost limit is September 1, 2007.[40] An effective date for other portions of the regulation is not provided. Given that many states will need to overhaul their provider payment systems and plug large budgetary gaps resulting from the required changes in non-federal share financing, the proposed effective date is not feasible. State plans amendments will need to be developed, vetted with the public, submitted to CMS and approved, a process which recently has routinely lasted 180 days or significantly longer. By the time a final rule is published, States will have long finalized budgets for fiscal years that include time periods after September 1, 2007 (SFY 2008 or, in some cases, SFY 2009 budgets). For many states, funding levels have already been set. Many state legislatures are in session for a limited period of time, and some meet every other year. Elimination of federal funding of the magnitude proposed in this regulation cannot possibly be incorporated and absorbed at this late date. Moreover, to

---

[39] *Id.*
[40] Proposed 42 C.F.R. § 447.206(g); § 447.272(d)(1); § 447.321(d).

30

the extent that states have had advance warning of at least some of the policies contained in the final rule by virtue of this Proposed Rule and other agency activities, states are under no obligation to modify their programs based on the provisions of a proposed regulation without the force and effect of law, nor would it be wise to undertake such restructuring given that the regulation may undergo significant change.

Moreover, given the widespread impact of the Proposed Rule as discussed elsewhere in these comments, and the longstanding reliance of states on payment and financing arrangements allowable under current law, CMS should adopt generous transition provisions to allow states time to come into compliance and allow providers time to adjust to significantly lower reimbursement rates. Any such transition periods should be at least ten years.

*Recommendation: CMS should revise the effective date of the Proposed Rule and establish a ten-year transition period so that states, health care providers, and other affected entities are provided adequate time to come into compliance.*

### 2. The effective date of portions of the Proposed Rule is ambiguous.

NAPH seeks confirmation that the effective date of the entire regulation is, in fact, proposed to be September 1, 2007. While this date is specifically established as the date by which states must come into compliance with cost limits, effective dates are not provided in connection with other revised sections of the regulations. Moreover, throughout the preamble, CMS characterizes its actions as "clarifying" policies with respect to the definition of units of government, intergovernmental transfers, certified public expenditures and the retention requirement. We are therefore concerned that CMS may view these regulatory changes as being effective immediately and retroactively, as a simple clarification of current policy and not the sweeping regulatory overhaul that it clearly is. Please confirm that these regulations are prospective in their entirety.

Any attempt to impose these policies without going through notice and comment rulemaking would violate the Administrative Procedures Act (APA), which requires legislative rules such as the policy changes articulated in the Proposed Rule to be adopted through a formal rulemaking process.[41] Moreover, in addition to the requirements of the APA, Congress has very explicitly instructed CMS not to adopt policy changes without undertaking notice and comment rulemaking. The Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (the 1991 Amendments) contains an uncodified provision stating that:

> the Secretary may not issue any interim final regulation that changes the treatment (specified in section 433.45(a) of title 42, Code of Federal Regulations) of public

---

[41] 5 U.S.C. § 553.

31

funds as a source of State share of financial participation under title XIX of the
Social Security Act.[42]

The regulation referred to in this provision (which was subsequently moved without
substantive change to 42 C.F.R. § 433.51) is the current regulatory authority for the use
of "public funds" from "public agencies" as the non-federal share of Medicaid
expenditures, including IGTs and CPEs. The Proposed Rule adopts significant
modifications to this provision, including a narrowing of the source and types of funds
eligible for federal match, requiring "funds from units of governments" rather than
"public funds" from "public agencies." Congress' prohibition of changes to this
regulation through an interim final regulation was intended to require HHS to undertake
notice and comment rulemaking. To the extent that CMS contends that the current
regulatory change is effective at any time prior to the finalization of the formal
rulemaking process, it is in violation of both the APA and the 1991 Amendments.

*Recommendation: CMS should clarify that all parts of the regulation are effective on
a prospective basis.*

### I. Consultation with Governors

Section 5(c) of the Medicaid Voluntary Contribution and Provider-Specific Tax
Amendments of 1991[43] requires the Secretary to "consult with the States before issuing
any regulations under this Act." The preamble of the Proposed Rule does not mention
any such consultation with states. Did the agency comply with this statutory mandate,
and if so, how and when? Given that the National Governors Association sent a letter on
February 23, 2007 to Congressional leadership strongly opposing the Proposed Rule, we
also request information on whether the states' concerns have been taken into
consideration at all in the formulation of this policy.

*Recommendation: CMS should immediately consult with states on the Proposed Rule
and modify or withdraw it based on state concerns.*

### IV. CMS' REGULATORY IMPACT ANALYSIS IS DEEPLY FLAWED

> *1. CMS underestimates the administrative burden imposed on states and
> providers.*

The Proposed Rule imposes significant new burdens on health care providers that CMS
fails to acknowledge or severely underestimates. In addition to the significant cut in
federal funding that many providers face under the Rule, compliance with new
requirements proposed by CMS, including the reporting requirements, will place

---

[42] Pub. L. No. 102-234, §5(b), 105 Stat. 1793, 1804.
[43] Pub. L. No. 102-234.

National Association of Public Hospitals                                    Powell Goldstein LLP
& Health Systems

substantial additional costs on states and providers. These costs have not been incorporated into CMS' impact analysis; NAPH requests that CMS correct this oversight. As acknowledged in the Proposed Rule, Executive Order 12866 requires agencies to assess both the costs and the benefits of the proposed rule.

For example, costs that are unrecognized in the Proposed Rule include the cost to States that have already formulated complex provider reimbursement methodologies and payment processes based upon existing rules that now must be overhauled to come into compliance with the new rules. As CMS well knows from its role in administering the Medicare program, developing new payment systems for providers is a considerable and costly undertaking. Similarly, many states are going to have to find alternative sources of funding to finance the non-federal share of Medicaid expenditures. To the extent that these sources will involve a redirection of current general revenue funds to plug Medicaid budget holes, other state programs will suffer. To the extent that new taxpayer funding will need to be raised, that is a significant cost to the state. Some states may turn to provider taxes to finance the shortfall, which would not only impose additional costs on providers (including small entities and rural hospitals protected by the Regulatory Flexibility Act) but would involve a substantial commitment of administrative resources to develop and obtain CMS approval for a tax that is compliant under the complex federal provider tax regulations.

The Proposed Rule mandates the creation of additional cost reporting systems to ensure compliance with the cost limit imposed on governmental providers. Even apart from the potential need to create cost reporting systems for provider types that may never have had to deal with cost reporting systems, such as public school districts, states with existing cost reporting systems for hospital providers that do not comply with the Proposed Rule's requirements will be required either to modify their current Medicaid cost report system or to create new ones specifically for this purpose. For example, some states have Medicaid hospital cost report systems that echo the Medicare cost finding system, but may vary in significant ways. The Proposed Rule may require states to adopt cost reports more closely tied to the Medicare cost report to ensure compliance. Furthermore, even in those states that have existing Medicaid cost reporting systems that would pass CMS muster, these systems may not be equipped to capture measurement of costs for the uninsured population or for Medicaid managed care recipients, both of which are potentially relevant in the context of Medicaid DSH payments (or demonstration program payments) to governmental hospital providers.

In addition to the creation and/or modification of these cost reporting systems, states will need to construct new structures for auditing the new cost reports. In the context of CPEs, "periodic State audit and review"[44] is required explicitly, but it is unclear the extent to which CMS expects states to audit and review all cost report submissions.

---

[44] Proposed 42 C.F.R. § 433.52(b)(4).

33

Reviewing these cost reports would require additional staffing by state Medicaid agencies and additional expenditures by providers in order to complete the required submissions.

All of these costs -- costs related to creation of the new report system, costs related to auditing the reports, and provider costs of compliance– should be included in the cost/benefit analysis.

>   2.  *The Proposed Rule will have a direct and very significant impact on patient care.*

In addition, we vehemently disagree with the assertion in the Regulatory Impact Analysis that the impact on patient care services will be minimal.[45]  As noted above, NAPH members have estimated state-level impacts that anticipate cuts of tens and hundreds of millions of dollars annually per state.  With this amount of money drained from the program, significant impacts on patient care services cannot be avoided.  These potential impacts include closed community clinics, reduced hours in the remaining clinics, increased reliance on emergency departments for routine care, a reduction in emergency preparedness, less outreach and patient education efforts, little or no investment in expanded access, delayed or canceled plans to upgrade information systems and adopt electronic medical records, less ability to provide translation services to non-English speakers, reduced capacity to maintain or launch intensive disease management programs, etc.  The choices available to providers to cope with multimillion dollar funding cuts are not plentiful and are always painful.  There is no "fat" left in the system after years of public and private funding cuts; there are no "easy" cuts to make.  Virtually any decision made by a hospital system to adjust their budgets to cuts of this magnitude will certainly have a direct impact on patient care, no matter how much the hospital may try to avoid it.  CMS ignores the impact this regulation will have, particularly on the poorest and most vulnerable patients.

>   3.  *CMS fails to acknowledge the widespread economic impact on local communities.*

In addition, the Proposed Rule will have a significant economic impact on local communities, as public providers reliant on supplemental Medicaid funding eliminated by this regulation take steps to cut their budgets.  Public hospitals typically are a significant economic force in their communities, and their financial health (or lack thereof) has far-reaching ripple effects.  Many of these budget cuts will necessarily entail layoffs.  The inability to invest in infrastructure will be felt by vendors and contractors in the community.  The impact of reduced access will have effects on the health of the community, including the health of the community's workforce, thereby impacting employers throughout the hospital's service area.  The community's preparedness for emergencies may suffer because of lack of funding, impacting the ability of the

---

[45] 72 Fed. Reg. at 2245.

34

community to attract and retain new businesses and employers crucial to economic vitality. Existing businesses that cater to hospital employees will feel the effects of a shrinking workforce. To the extent that local governments need to step in to fill the gaps caused by the withdrawal of federal funds, every single local taxpayer is affected. A vibrant, dynamic and comprehensive health care safety net is a crucial ingredient in the success of local economies. CMS fails to acknowledge the impact of this Medicaid funding cuts on the economic health of local communities.

*Recommendation: CMS should reevaluate its estimate of the impact of the Proposed Rule and the need for regulatory relief under the Regulatory Flexibility Act. Upon reevaluation of the impact, CMS should either withdraw the proposal or modify as recommended in Part II of these comments.*

35

# Exhibit 9-E

# Congress of the United States
### Washington, DC 20515

March 8, 2007

The Honorable Michael O. Leavitt
Secretary
Department of Health and Human Services
200 Independence Ave, SW
Washington, DC  20201

Dear Secretary Leavitt:

We write today to express our serious concerns regarding the proposed regulation, CMS-2258-P, *Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, published in the *Federal Register* on January 18, 2007.  Specifically, we are concerned about the potential impact on safety net health care providers in the State of Texas, which currently has the highest number of uninsured individuals in this country and relies on a strong federal-state Medicaid partnership to ensure that low-income, uninsured individuals have appropriate access to critical health care services.

In issuing this proposed regulation, the Centers for Medicare & Medicaid Services (CMS) has stated that administrative action is necessary to avoid abusive practices.  While we support efforts to address systemic abuse, we cannot support this disproportionate response to a limited problem when it will have such a substantial negative impact on the State of Texas, which has not engaged in any abusive practices.  In fact, in a July 27, 2004 letter to the Texas delegation, then-CMS Administrator Mark McClellan affirmed that Texas' intergovernmental transfers and disproportionate share hospital program "complies with the necessary statutory requirements" and assured us that CMS' "review of State financing mechanisms should have no impact on DSH payments to hospitals in Texas."[1]  Nevertheless, based on information received from the State of Texas and our constituent hospitals, we are convinced that the proposed regulation would have a substantial negative impact on Texas.   We have specific concerns about the following issues surrounding the proposed rule:

**Limitation to Cost**

Texas pays many of its qualifying governmental hospitals based on Medicare payment principles, which outline the current applicable payment limits.  Since Medicare payment principles allow payments above cost, the proposed limitation to cost will have an immediate and dramatic impact on governmental hospitals receiving payments under Medicaid.  We question CMS's policy rationale that it is unreasonable for a Medicaid agency to pay governmental hospitals Medicare payment rates.  Further, we note that CMS – in the interest of encouraging

---

[1] Please see enclosed July 27, 2004 letter to Rep. Gene Green from former CMS Administrator Mark McClellan.

efficiency – has moved nearly all Medicare reimbursement systems to prospective systems that are not cost-based. Given this stated policy for Medicare payments, we question why CMS would require Medicaid payments to be limited to cost and believe that Medicare rates should remain the payment limit applicable to government providers.

In addition, we are very concerned that CMS's cost limitation may not allow hospitals to include important elements in the cost calculation, such as costs for physician services, on-call availability costs, capital costs, health information technology costs, or costs related to medical education. If hospitals are limited to cost and cannot include all reasonable costs, Texas' public hospitals will be unable to absorb the resulting losses. For this reason, CMS should permit reasonable costs necessary for the continued operation of health care providers in order for entities to comply with this proposed rule. The allowance of reasonable costs as a portion of the cost calculation is more responsive to the practice of medicine in many of the state's public hospitals.

## The Definition of Unit of Government

Currently, the Medicaid statute defines a "unit of local government" as "a city, county, special purpose district, or other governmental unit in the State."[2] Congress explicitly crafted this statutory definition broadly as a principle of federalism and in recognition of the right of individual states to determine their own internal governmental organization. We question CMS' authority under the Medicaid statute to require that units of government have general taxing authority to be considered units of government for payment and Medicaid financing purposes. Congress has left this issue to the discretion of the states since it created the Medicaid program in 1965, and we believe that any narrowing of this definition administratively is in direct contrast to congressional intent.

While many Texas hospitals are part of hospital districts that have taxing authority and therefore may be unaffected by the unit of government provision in the proposed regulation, we are nevertheless concerned that some Texas hospitals that are clearly governmental could be adversely impacted. For example, The University of Texas, which does not have taxing authority, operates a number of hospitals. Although we consider The University of Texas part of the State, this characterization is not necessarily clear under the proposed regulation. We request that CMS provide clarification as to whether the governmental status of hospitals operated by The University of Texas System, or other state universities, would fall within the definition of "governmental" as spelled out in this proposed rule.

## Restrictions on Financing

The proposed regulation is likely to significantly reduce funds that the State currently uses to finance Medicaid payments to providers. Public hospitals in ten large urban areas of Texas estimate that the rule will result in a combined $557.6 million annual loss in supplemental payments and a $338.4 million annual loss in federal Medicaid funds to these ten hospitals. Given that the former-CMS Administrator viewed the Texas system as falling well within the bounds of existing IGT standards in spirit and in rule, we believe that CMS should refrain from

---

[2] 42 U.S.C. § 1396b(w)(7)(G).

any change that impacts Medicaid financing in Texas to the detriment of these public hospitals. We are also concerned that the CMS actuarial analysis of this proposed rule dramatically understates the fiscal impact to safety net hospitals and we urge you to re-evaluate this analysis.

CMS's proposed effective date of September 1, 2007 also would deprive the Texas State Legislature of the opportunity to revise current arrangements to ensure compliance. The Texas State Legislature should have an opportunity to react to Medicaid financing changes that will impact the state-appropriated Medicaid budget. For Texas, the earliest that any change could be implemented under regular order without causing unavoidable harm to providers is January 2009.

**Impact on Waivers**

We understand that CMS in past years allowed a number of other states to receive above cost payments for governmental providers and use those funds, through a demonstration waiver, for low-income or safety net care pools in order to facilitate payments to health care providers who serve uninsured or low-income individuals. It is unfair to force Texas to eliminate Medicaid payments above cost, which in most cases represent reasonable costs to provide a variety of health care services, to government providers when other states have been afforded the opportunity to retain these funds through the waiver process.

While we appreciate your efforts and look forward to working with you in the future, we do not believe that this proposed regulation will accomplish our mutual aims of improving transparency in the Medicaid program and managing program costs without irreparably harming the network the State of Texas relies to provide care to low-income, uninsured Texans and to the influx of undocumented immigrants residing in our State. The Medicaid program's strength lies in the joint federal and state commitment to serving our most vulnerable population. Unfortunately, this proposed regulation represents a dramatic cost shift from the federal government to the states, which are not equipped to single-handedly shoulder the burden of uncompensated health care costs associated with the rising levels of uninsured in this country. We urge you to re-work this proposed rule to address the concerns raised by this letter before allowing it to go into effect.

Thank you in advance for your consideration of our views.

Sincerely,

Gene Green
Member of Congress

Michael Burgess
Member of Congress



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

JUL 27 2004

Administrator
Washington, DC 20201

AUG 0 4 2004

The Honorable Gene Green
House of Representatives
Washington, DC 20515

Dear Mr. Green:

Thank you for your letter regarding the Texas disproportionate share hospital (DSH) payment program and intergovernmental transfer (IGT) arrangement used by the State to fund the DSH program. After thorough review of the State plan amendment requested by Texas, for DSH payments, we have determined that it complies with the necessary statutory requirements. This means that our review of State financing mechanisms should have no impact on DSH payments to hospitals in Texas.

I appreciate your interest and support for our efforts regarding IGTs. I will also provide this response to the cosigners of your letter.

Sincerely,

Mark B. McClellan, M.D., Ph.D.

# Exhibit 9-F

# CONGRESS OF THE UNITED STATES
Washington, D.C

March 12, 2007

The Honorable Michael O. Leavitt
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

**Re: File Code CMS-2258-P**

Dear Mr. Secretary:

As the chairmen of the House and Senate committees and subcommittees with jurisdiction over both the Medicaid program and the Health and Human Services' administration or its oversight, we have grave concerns about the proposed rule (CMS-2258-P) entitled "Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership," issued January 18, 2007, and its effects on safety net providers throughout the country.

As currently proposed, the rules to implement this provision are not sufficiently clear and in addition will result in unintended harmful consequences. We request that you respond to the attached questions no later than Monday, March 26, 2007, and that our comments be placed in the public record of the rulemaking.

The proposed rule seeks to narrow the definition of government-related health providers and thus limits the funding sources available to States to finance Medicaid, and singles out public providers to limit their reimbursement to cost through the use of certified public expenditures. We are chiefly concerned that the proposed rule will have a severe adverse affect on the nation's public safety net and its ability to continue delivering critical health services to Medicaid beneficiaries and the uninsured. It could also lead to widespread bed closures and loss of vital but generally unprofitable services that benefit everyone in the community, such as trauma centers, burn units, and emergency departments.

We have concerns that limiting reimbursement to Government healthcare providers to "cost" as defined in the proposed rule will prohibit the ability of States to sufficiently fund their portion of Medicaid matching funds, effectively limiting the delivery of necessary healthcare services to low-income Americans. Additionally, we are concerned that the narrow definition of Government healthcare providers will eliminate or reduce funding to State university hospitals, public nursing homes, and other providers, thereby eliminating or reducing access to health care for millions of the Nation's lowest income beneficiaries and the uninsured.

The Honorable Michael O. Leavitt
Page 2

Finally, we are concerned that the policy could adversely affect inpatient capacity and community access to vital services such as trauma centers at a time when our Nation is faced with significant threats to the public.

The attached questions should help clarify the scope of the rule and the effect it will have on these providers and the low-income and uninsured beneficiaries they serve.

If you need further information, please contact any of us, or have your staff contact Bridgett Taylor with the House Committee on Energy and Commerce at (202) 225-2927, Karen Nelson with the House Committee on Oversight and Government Reform at (202) 225-5051, or Alice Weiss with the Senate Committee on Finance at (202) 224-4515.

Sincerely,

John D. Dingell, Chairman
House Committee on Energy and Commerce

Frank J. Pallone, Jr., Chairman
Subcommittee on Health
House Committee on Energy and Commerce

Henry A. Waxman, Chairman
House Committee on Oversight and
Government Reform

Max Baucus, Chairman
Senate Committee on Finance

John D. Rockefeller, Chairman
Subcommittee on Health Care
Senate Committee on Finance

Attachment

cc:    The Honorable Leslie V. Norwalk, Acting Administrator
        Centers for Medicare and Medicaid Services

<div align="right">

**Attachment**
**Letter dated 12, 2007**

</div>

<u>**Questions for the Hon. Secretary Leavitt**</u>
<u>**From Hon. John D. Dingell, Hon. Frank J. Pallone, Jr., Hon. Henry A. Waxman,**</u>
<u>**Hon. Max Baucus, and Hon. John D. Rockefeller**</u>

**Quantifying the Impact of the Regulation**

1. How did the Centers for Medicare and Medicaid Services (CMS) construct the estimate of reduction in Federal Medicaid outlays? Specifically:

    a. What savings are associated with each component of the regulation (i.e., limit to cost, definition of unit of government, retention provision, etc.)?

    b. How were savings estimated for FY2007?

    c. What are the specific policy changes and assumptions that drive differential year-over-year increases? For example, the increase in Federal savings is approximately $300 million between FFY 2008-09 and 2009-10 but the increase is only $30 million between FFY 2010-11.

2. What is the individual state-by-state Federal Medicaid dollar impact by class of facility of: cost limits for public providers; changes in the definition of public hospitals; changes in the definition of certified public expenditures; changes in UPL policy; limits on IGTs and DSH? Please provide answers for both waiver and non-waivered States.

3. Please provide a list of affected States and facilities and a list of States and facilities already in compliance.

4. Please explain how the rule will affect States' existing waiver budget neutrality calculations. Will States have to recalculate their budget neutrality cap as a result of the rule? If so, which States will be adversely affected?

**Other Questions and Clarifications**

1. The Medicaid program has a longstanding history of serving as the principal financial support of the safety net and ensuring access for vulnerable populations—including Medicaid patients and the uninsured—who might otherwise go without care. The regulatory impact analysis asserts that this rule's effect on actual patient services will be minimal (p.49). Please produce the economic and other assumptions used in arriving at this estimate.

2. Section 1903 defines units of local government as a city, a county, a special purpose district, or other governmental unit of State. This regulation narrows that definition dramatically by requiring the entity to have taxing authority in order to be considered a unit of government. Congress's broader definition provides States with much more leeway to identify for themselves which entities are units of local government. Please justify your policy rationale for such a restrictive definition. Please list the entities that, by this definition, would be excluded that are currently considered a unit of local government.

# Exhibit 9-G

# United States Senate

WASHINGTON, DC 20510

March 16, 2007

The Honorable Michael O. Leavitt
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

Dear Secretary Leavitt:

We are writing to express our strong opposition to the Medicaid changes contained in the Proposed Rule CMS-2258-P, which was issued on January 18, 2007. As you know, bipartisan objections to the changes called for in this proposed rule have been raised by Congress and our nation's Governors since 2005. We urge you to withdraw this rule immediately.

The Medicaid program is the foundation of our health care safety net. As our nation's largest insurer, it provides access to meaningful and affordable health care for more than 50 million people. It also keeps hospitals, doctors, nursing homes, and clinics operating in our communities. Without this critical source of funding, many providers would not be able to afford to offer high-quality health care, especially in rural areas.

Since its enactment in 1965, Medicaid has been a federal-state partnership. The federal government has worked together with the states to ensure health care coverage and access for the most vulnerable Americans – children, pregnant women, the elderly and the disabled. This shared responsibility has been paramount, with states implementing the program within broad federal guidelines.

The new proposed rule would usurp state flexibility and fundamentally alter the nature of state funding for the Medicaid program. We are particularly concerned with three aspects of the proposed rule: 1) the new definition of a "unit of government;" 2) the restrictions placed on states' ability to fund their share of Medicaid expenditures; and 3) the "cost" limit imposed on Medicaid provider payments. We are also alarmed by CMS' refusal to provide any state-specific data on the impact of this proposed rule, which we believe could be much greater than a $5 billion reduction in federal Medicaid spending.

The new definition of a "unit of government" contained in the proposed rule is at odds with the definition adopted by Congress in Title XIX (Section 1903(w)(7)(G)), as described in House Report 102-310. The proposed rule adopts a federal definition in which only those governmental entities with taxing authority would be deemed governmental enough to contribute to the non-federal share of Medicaid expenditures. This is not what Congress intended. The statutory definition of a "unit of government" respects the fundamental right of states to establish subdivisions to suit their needs and best carry out governmental functions. In the case of Medicaid, federal law grants states the authority and flexibility to provide health care through the most efficient and effective methods possible. In most states, this means that state university hospitals, public nursing homes, school-based health centers, and other providers become an essential part of the governmental health care infrastructure. We believe the narrow definition of "unit of government" proposed by this new rule would lead to substantial cuts for public

*Leavitt Medicaid Rule Letter – Page 2*
*March 16, 2007*

providers and limit access to the vital health care services that millions of Americans depend upon.

Similarly, CMS is also singling out public providers by restricting the type of public funds that can be used to finance the state share of Medicaid expenditures. Under the proposed rule, only funding derived from state and local taxes would be allowed to fund the state share. By your agency's own admission, inappropriate federal matching arrangements have been largely eliminated over the last three years through CMS' oversight activities. Given these activities, it is unclear why the new restriction on public funds is necessary or how it will further the overall efforts of CMS to reduce Medicaid fraud and abuse.

Furthermore, this aspect of the proposed rule also seems to contradict federal law. Section 1902(a)(2) of the Social Security Act allows states to rely on "local sources" for up to 60 percent of the non-federal share of program expenditures. Current law does not limit the types of local sources that may be used to only those sources derived from tax revenue. Such a policy shift would hamper states abilities to fund their Medicaid programs, and we question CMS' authority to pursue such a far-reaching policy change.

Finally, we are concerned about the cost limit imposed on public providers by this proposed rule. Under current regulations, states are permitted to provide Medicaid reimbursement to hospitals and other providers up to the amount that would be payable using Medicare payment policies. The proposed rule would reduce that limit to Medicaid costs for governmental providers only, with no concurrent change for private providers. Public providers, who disproportionately serve the uninsured, should not be subject to a more restrictive cost limit than private providers. Such a reimbursement policy would have an adverse impact on system-wide health care needs, such as trauma care, school-based health care and medical education.

We understand and respect the efforts of CMS to ensure that the Medicaid program is operating on a fiscally sound and responsible basis; however, we believe the proposed rule has gone far beyond what is necessary to secure fiscal integrity. Instead, the proposed rule would undermine both the federal-state partnership and the shared goal of ensuring health care coverage and access, which are the hallmarks of the Medicaid program.

While we are willing to work with you and CMS to strengthen Medicaid, fundamental changes in Medicaid's financing and payment mechanisms as envisioned in this rule can only be adopted by Congress. For this reason, we request that you withdraw the regulation.

We thank you for your prompt consideration of and attention to this request. We also ask that our comments be placed in the public record of the rulemaking.

Sincerely,

_____                    _____
Senator John D. Rockefeller IV              Senator Gordon H. Smith

*Leavitt Medicaid Rule Letter – Page 3*
*March 16, 2007*

Senator Jeff Bingaman

Senator Richard Durbin

Senator John Kerry

Senator Barack Obama

Senator Hillary Rodham Clinton

Senator Barbara Boxer

Senator Edward M. Kennedy

Senator Susan Collins

Senator Johnny Isakson

Senator Elizabeth Dole

Senator Kay Bailey Hutchison

Senator Thad Cochran

Senator Pete Domenici

Senator Richard Shelby

*Leavitt Medicaid Rule Letter – Page 4*
*March 16, 2007*

Senator Ken Salazar

Senator Olympia Snowe

Senator Dianne Feinstein

Senator Saxby Chambliss

Senator Bill Nelson

Senator Richard Burr

Senator Jim Webb

Senator Wayne Allard

Senator Debbie Stabenow

Senator Christopher Bond

Senator Robert Menendez

Senator Pat Roberts

Senator Evan Bayh

Senator John Warner

*Leavitt Medicaid Rule Letter – Page 5*
*March 16, 2007*

Senator Ron Wyden

Senator Bernard Sanders

Senator Carl Levin

Senator Blanche Lincoln

Senator Joseph Lieberman

Senator Mark Pryor

Senator Sherrod Brown

Senator Frank Lautenberg

Senator Charles Schumer

Senator Russell Feingold

Senator Harry Reid

Senator Maria Cantwell

Senator Joseph Biden

Senator Tom Harkin

*Leavitt Medicaid Rule Letter – Page 6*
*March 16, 2007*

Senator Daniel Akaka

Senator Amy Klobuchar

Senator Barbara Mikulski

Senator Benjamin Cardin

Senator Christopher Dodd

Senator Claire McCaskill

Senator Patrick Leahy

Senator Jon Tester

Senator Patty Murray

Senator Herb Kohl

*Leavitt Medicaid Rule Letter – Page 7*
*March 16, 2007*

# Exhibit 9-H

# Congress of the United States
## Washington, DC 20515

March 19, 2007

The Honorable Michael O. Leavitt
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Dear Secretary Leavitt:

We are writing to request that you withdraw proposed rule CMS-2258-P, which was published on January 18, 2007. We also request that this letter be included in the record of public comments on this proposed rule. The proposal would, among other things, threaten the capacity of safety net hospitals to deliver critical but unprofitable services that benefit entire communities, such as trauma centers, burn units, and emergency departments. In our opinion, by proposing this rule, the Centers for Medicare & Medicaid Services (CMS) exceeded its statutory authority and ignored the direct opposition of a majority of Congress.

Your proposal would fundamentally change current financing and payment arrangements in many state Medicaid programs. By your own estimates, this would result in the loss of at least $3.8 billion in the federal share of Medicaid payments to safety net providers over the next five years. As you know, Congress has in the past rejected, on a bipartisan basis, repeated efforts by the Administration to amend the Medicaid statute to make these changes, including proposals in the President's FY 2005 and FY 2006 budget requests. You now propose to make these fundamental changes by administrative action. You have neither the statutory authority nor the Congressional support to do so.

In addition, we are highly concerned about the timing of this proposed rule. U.S. hospitals are already diverting more than 1/2 million ambulances per year due to facility crowding. Our Nation remains at risk of terrorist attacks, and we are currently expending considerable federal, state and local resources preparing for a possible onslaught of avian flu.

Under these circumstances, we question the wisdom of a policy change that will withdraw large amounts of federal and state Medicaid funds from institutions that play an essential part of the health care systems of our nation's largest and most strategic cities. Doing so will inevitably compromise vital emergency and trauma care capacity.

We urge you to withdraw the proposed rule.

Sincerely,

_[Page of signatures]_

[Page of signatures]

Allyson Y. Schwartz

Linda T. Sánchez

Howard L. Berman

E. Pallone

Jim McDermott

Steve Cohen

Lois Capps

Corrine Brown

Phil Hare

Sam Farr

Rahm Emanuel

Hilda L. Solis

Jason Altmire

Raúl M. Grijalva

John Hall

John T. Salazar

Dandy Kuhl

Steven Pearce

Grace F. Napolitano

Emanuel Cleaver

Michael M. Honda

Betty McCollum

Chris Shays

Betty Sutton

_[Page of signatures]_

_(page of signatures)_

_(signatures)_

_[Page of signatures]_

_Stephen F. Lynch_    _Thomas Reynolds_

_Yvette D. Clarke_    _Vito Fossella_

# Exhibit 9-I



National
Association
of Public
Hospitals
and Health
Systems

1301 Pennsylvania Avenue, NW
Suite 950
Washington, DC 20004
202 585 0100 tel / 202 585 0101 fax
www.naph.org

July 13, 2007

Ms. Leslie V. Norwalk, Esq.
Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building, Room 445-G
200 Independence Avenue, SW
Washington, D.C. 20201

**Re:    Comments on Unit of Government Definition (§ 433.50) contained in CMS–
2258–FC: Medicaid Program; Cost Limit for Providers Operated by Units of
Government and Provisions to Ensure the Integrity of Federal-State Financial
Partnership, 72 Fed. Reg. 29748 (May 29, 2007).**

Dear Ms. Norwalk:

The National Association of Public Hospitals and Health Systems (NAPH) writes to
convey its continued serious concerns regarding the Centers for Medicare and Medicaid
Services' (CMS) proposed definition of a unit of government under 42 C.F.R. § 433.50 as
published in CMS-2258-FC (the Final Rule).  The Final Rule does not fundamentally
change the most damaging provisions of CMS-2258-P (the Proposed Rule) to which
NAPH and a diverse group of other commenters expressed considerable opposition.
*NAPH reiterates its strong request that CMS withdraw the entire Final Rule, including
the definition of a unit of government.*

NAPH represents more than 100 metropolitan area safety net hospitals and health
systems.  Our members fulfill a unique and critical role in the health care system,
providing high intensity services—such as trauma, neonatal intensive care, and burn
care—to the entire community.  NAPH members are also the primary hospital providers
of care in their communities for Medicaid recipients, receiving on average 35% of their
net revenues from Medicaid, and for many of the more than 46 million Americans
without insurance.  Our hospitals represent only 2 percent of the acute care hospitals in
the country but provide 25% of the uncompensated hospital care.

As you know, Congress has prohibited CMS from taking any steps to implement this rule
until May 25, 2008.[1]  NAPH does not believe that CMS has the authority to receive or
review comments during the period of the legislative moratorium, and therefore submits

---

[1] Pub. L. No. 110-28, § 7002.

1

this letter under protest. If the moratorium does expire without further action from Congress, we believe that the public should be permitted a fresh opportunity to comment on the definition of a unit of government based on circumstances in effect at that future time.

Furthermore, if the moratorium expires without further Congressional action, CMS must take into consideration Congress' intent in enacting the moratorium when implementing the effective dates outlined in this Final Rule. The moratorium provides a clear indication that Congress views the issues raised by the rule as being within the legislative domain and intends to address these issues itself. Congress was clearly concerned about CMS implementation of the regulation. An overwhelming bipartisan majority of Congress (65 Senators and 263 members of the House) has gone on record in opposition to the regulation since its release in proposed form in January 2007. The legislative moratorium passed Congress with significant bipartisan support.

In rushing to submit the Final Rule to the Office of the Federal Register *after* Congress had already approved a legislative moratorium and just hours before the President signed it into law, CMS deliberately defied clear Congressional intent to prevent implementation from moving forward and allow Congress to consider the issues raised. When Congress passed the moratorium, the regulation was in proposed form; before it could become effective, the regulation would have needed to be finalized and sixty days would have had to elapse after publication.[2] CMS' clever administrative timing should not undo what Congress thought it had accomplished– providing a year for it to consider alternatives to the regulation, followed (if necessary) by an additional sixty days for Congress to consider whether to reject a final regulation through the procedures outlined in the Congressional Review Act (CRA).[3] Following Congressional intent, no provision of the regulation should become effective prior to sixty days after the moratorium expires. Moreover, States cannot be expected to take any steps before May 25, 2008 towards implementing a regulation that is unlikely to go into effect in its current form.

As solicited in the Final Rule, NAPH and its member hospitals provide the following comments to continue to urge CMS to reconsider its new definition of a unit of government. Despite the significant concerns raised in the hundreds of comment letters submitted in response to the Proposed Rule, CMS has not fundamentally altered this new definition. NAPH's previous comment letter laid out in extensive detail the flawed legal and policy assumptions underlying the proposed imposition of a narrow and inappropriate definition on States, and our concerns continue to apply in large part to the revised definition. We therefore are attaching our previously-submitted comments to this letter in the hopes that CMS will reconsider this ill-advised approach. Specifying any definition of a unit of government would usurp the traditional authority of States to identify their own political subdivisions, exceed the authority provided in the Medicaid statute, and undermine past and future efforts to date by States to make units of government more efficient and less reliant on public tax dollars.

---

[2] Congressional Review Act § 801(a)(3), 5 U.S.C. § 801(a)(3)(2006).
[3] *Id.* §§ 801-808.

2

The comments in this letter focus on the modifications to the unit of government definition between the Proposed and Final Rules. Our comments center around five themes:

1. The modifications of the unit of government definition are insufficient to address the legal and policy concerns underlying the original proposal.

2. Allowing States only to make an initial determination of the governmental status of their providers based on the CMS form does not show adequate deference to State law interpretations of governmental status.

3. CMS does not adequately acknowledge the burden of identifying all governmental providers within 90 days.

4. CMS's clarification regarding the scope and prospective application of the unit of government definition is appropriate.

5. CMS should acknowledge the impact of the one-year moratorium on the effective dates of the provisions of the Final Rule and ensure adequate time for Congressional review and State and provider compliance.

We elaborate on each of these points below.

**1. The modifications of the unit of government definition are insufficient to address the legal and policy concerns underlying the original proposal.**

In the Final Rule, CMS modified the definition of a "unit of government" included in the proposed regulation in a manner that will allow an undetermined number of additional entities to qualify as governmental, including certain teaching hospitals and Indian tribes. The modifications adopted by CMS merely tinker around the edges of the definition and do not address the underlying fundamental flaws of CMS' attempt to impose a uniform and restrictive Federal definition on States.

*a. CMS has impermissibly narrowed the statutory definition*

Notwithstanding the changes made in the final regulation, CMS has still impermissibly sought to impose a narrow definition of a unit of government that is inconsistent with the statutory definition at Section 1903(w)(7)(G) of the Social Security Act.[4] The Medicaid statute defines the term "unit of local government" to mean "with respect to a State, a city, county, special purpose district, or other governmental unit in the State."[5] The Final Regulation defines it as these same types of entities but narrows the universe of units of government by requiring the entity to meet further criteria in order to qualify – the entity must also have "direct access to tax revenues, [be] a State university teaching hospital

---

[4] 42 U.S.C. § 1396b(w)(7)(G).
[5] *Id.*

3

with direct appropriations from the State treasury, or [be] an Indian tribe...."[6] While the Final Rule expands the definition to include entities with direct access to tax revenues, State university teaching hospitals and Indian tribes, the definition is still significantly more narrow than that adopted by Congress, and would still impermissibly exclude a wide range of entities that are clearly governmental under State law but that do not have direct access to tax revenues or otherwise meet CMS' additional criteria. The statutory definition includes an undefined catchall category of "other governmental unit[s] in the State," indicating Congress' recognition of the wide variety of structures into which a State may subdivide itself. The Final Rule continues to override the statutory deference granted to various forms of units of government and imposes a single, narrow Federal standard.

      *b.   State University Teaching Hospitals May Be Units of Government without Direct Appropriations*

NAPH supports CMS' recognition that State university teaching hospitals are included in the definition of a unit of government, but believes that CMS has not gone far enough. As with other governmental hospitals, State university teaching hospitals have been established through (or in some cases converted to) a wide variety of organizational structures, many of which would not meet CMS' narrow definition of a unit of government. Some of these governmental teaching hospitals receive direct appropriations, some do not. Some are considered units of government by States, while others are not. There is no statutory basis for requiring the receipt of appropriations as a prerequisite to being governmental. The reference to "funds appropriated to State university teaching hospitals" in the statute does not appear in the section defining a unit of government; it is included as an example of the types of protected funds that the Secretary may not restrict from use as the non-Federal share. The Medicaid statute requires CMS to defer to States in determining which State university teaching hospitals should be defined as governmental.

      *c.   The addition of "direct access to tax revenues" to the proposed definition is one of form, not substance.*

CMS has proposed to include in the "unit of government" definition at 42 C.F.R. § 433.50(a)(1)(i) entities that do not have taxing authority but do have "direct access to tax revenues" of a related unit of government. This change does not, however, substantively expand the universe of health care providers that would be considered governmental, as the definition in the Proposed Rule had already regarded providers with such direct access to tax revenues as "operated by" units of government and therefore considered units of government under § 433.50(a)(1)(ii). This modified regulation in the Final Rule therefore does not provide any additional flexibility to include a broader group of public providers, and NAPH continues to object to CMS' proposed definition as impermissibly narrowing the statutory limitation on units of government.

---

[6] 42 C.F.R. §433.50(a)(1)(i) (as included in the Final Rule).

   *d. CMS' deviation from a narrow unit of government definition with respect to*
   *Indian tribes should be extended to all entities*

NAPH supports the inclusion of all Indian tribes regardless of taxing authority in the
definition of a unit of government. We note, however, that there is no statutory basis for
treating Indian tribes any differently from other entities that are units of government
under State law, and CMS does not attempt to base its exception on any statutory
language. Rather, CMS appears to have adopted an expansive and deferential unit of
government definition for Indian tribes based solely on its policy preferences. We agree
with the policy choices adopted by CMS for Indian tribes. We submit, however, that
CMS' recognition that its proposed definition was too narrow an interpretation of the
statute with respect to Indian tribes is simply more evidence that Congress did not intend
such a narrow definition in the first place.

2. **Allowing States only to make an initial determination of the governmental status
   of their providers based on the CMS form does not show adequate deference to
   State law interpretations of governmental status.**

CMS acknowledged receiving many comments that the creation of a new Federal
regulatory standard to determine which public entities within a State are considered to be
"units of government" violates the Federal-State partnership of the Medicaid program
and the principles of federalism on which it rests. CMS' response, however, was not to
defer to State interpretations, but instead to require that States make the initial
determination of the governmental status of their providers subject to the proposed
narrow definition and final agency review. If CMS disagrees with the State's
determination, the State will be considered out of compliance with Federal statutory and
regulatory criteria and may be subject to denial of Medicaid reimbursement, State plan
amendments, and/or disallowances of claims for Federal financial participation.

Congress' statutory definition of a unit of government affords due deference to States'
determinations of which of their instrumentalities are governmental, as required by
Constitutional principles of federalism. CMS shows no such deference by nominally
allowing States to make the initial determination but requiring them to do so according to
restrictive Federal criteria and with the possibility of their determination being overturned
by CMS. The proposed definition continues to be an unprecedented intrusion into the
core of States' rights to organize themselves as they deem necessary.

3. **CMS does not adequately acknowledge the burden of identifying all
   governmental providers within 90 days.**

In the preamble to the Final Rule, CMS newly requires each State to report its universe of
governmentally-operated health care providers with the first quarterly expenditure report
due ninety (90) days after the effective date of the regulation. Multiple commenters
noted in response to the Proposed Rule that for some health care providers, completion of
the form may require extensive legal research and analysis. NAPH underscores this point
given the proposed deadline for States to submit the list. Whether an entity has "direct

5

access to generally applicable tax revenues," whether it is an "integral part" of a "unit of government with taxing authority," whether the unit of government is "legally obligated" to fund the provider's "expenses, liabilities, and deficits," and whether a "contractual arrangement with the State or local government" is the "primary or sole basis for the health care provider to receive tax revenues" are often extremely complex questions under State law, requiring constitutional, statutory, regulatory, administrative and case law research.  In many cases the answers are not clear-cut, and they are sometimes contradictory.  States and their lawyers will be required to make judgment calls, balancing factors that do not all point in the same direction.  To the extent that there are many governmental providers (or potential governmental providers) in a State, the burden of making these determinations could be substantial.  Considering the potential complexity of this determination, and that CMS may be issuing additional guidance on use of the "Tool to Evaluate the Governmental Status of Heath Care Providers" form as warranted, States may have difficulty in completing these determinations within the required timeframe.[7]

NAPH believes that ninety days (90) is entirely insufficient to accurately identify all governmental providers.  Furthermore, as explained in more detail in Comment 5, CMS should not require or expect States to expend the time and resources necessary to do so during the period of the legislative moratorium.  Given the expressed intent of Congress to override at least portions of the regulation, States cannot be expected to take any steps before May 25, 2008 towards implementing a regulation that is unlikely to go into effect in its current form.

**4.  CMS' clarification regarding the scope and prospective application of the unit of government definition is appropriate.**

NAPH supports CMS' clarification in the Final Rule that the new definition of unit of government will be applied prospectively only.

NAPH further appreciates CMS' clarification that the proposed definition of a unit of government is limited to the purposes of financing the non-Federal share of Medicaid payments and application of a Medicaid upper payment limit on such governmental health care providers, and is not intended to otherwise alter Federal or State law interpretations of public or governmental status.

**5.  CMS should acknowledge the impact of the one-year moratorium on the effective dates of the provisions of the Final Rule and ensure adequate time for Congressional review and State and provider compliance.**

Although CMS has not specifically solicited comments on the effective dates of the various provisions of the regulation, given the enactment of a Congressional moratorium on implementation of the regulation within hours of the issuance of the Final Rule, NAPH believes it important to address the impact of the moratorium on the effective

---

[7] Of course, given the Congressional moratorium on implementation of the regulation, CMS should not expect states to begin to undertake this analysis during the period in which the moratorium is in effect.

dates outlined in the rule. The moratorium prohibits the Secretary of Health and Human Services from taking "*any action* (through promulgation of regulation, issuance of regulatory guidance, *or other administrative action)*" to finalize or "otherwise implement" the Proposed Rule or any "rule or provisions" similar to those in the Proposed Rule.[8]

Congress' concern about implementation of the regulation could not be clearer. Since the proposed Medicaid rule was released in January 2007, an overwhelming bipartisan majority of Congress (65 Senators and 263 members of the House) has gone on record in opposition to it. The moratorium passed Congress with significant bipartisan support. Furthermore, the legislative history of the moratorium provides clear indication that Congress views the issues raised by the rule as legislative domain and intends to address these issues itself during the period of the moratorium. For example, Senator Richard Durbin, Assistant Majority Leader of the Senate and one of the prime sponsors of the moratorium, stated that "the purpose of this amendment is simply to declare a moratorium on this new rule until we can put together this new approach through the Finance Committee."[9] Senator Max Baucus, Chair of the Senate Finance Committee, also suggested that "[i]t is Congress's job to make major changes to the law. A 1-year moratorium will give the Finance Committee enough time to study this issue and determine the right approach."[10] Senator Charles Grassley, Ranking Member of the Finance Committee, stated "If some people think CMS has gone too far, then we should review their actions in the Finance Committee. . . If we think there are things we should have done differently, then we should legislate."[11] Indeed, Sen. Grassley voiced specific concern about the definition of governmental provider and suggested that these concerns should be dealt with in the Finance Committee.[12] In rushing to submit the Final Rule to the Federal Register office *after* Congress had already approved the moratorium and just hours before the President signed it into law, CMS deliberately defied clear Congressional intent to slow down the implementation of the regulation and allow Congress to consider the issues raised.

Notwithstanding CMS' rush toward implementation, Congress' intent in enacting the moratorium must be taken into consideration in implementing the effective dates outlined in the Final Rule. Congress has clearly stated that it does not want implementation of the regulation to move forward in any way during the period of the moratorium. That intent must be respected if the moratorium should expire without further Congressional action.

> *a. If Congress takes no further action, CMS should provide at least 60 days after the moratorium expires before the provisions of the Final Rule take effect.*

When Congress passed the moratorium, the regulation was in proposed form; it would have needed to be finalized and sixty days would have had to elapse before any portion of

---

[8] Pub. L. No. 110-28, § 7002 *(emphasis added)*.
[9] 153 Cong. Rec. S4026 (Mar. 28, 2007).
[10] 153 Cong. Rec. S5138 (Apr. 26, 2007).
[11] 153 Cong. Rec. S4020 (Mar. 28, 2007).
[12] *Id.*

it could become effective.[13]  CMS waited until after final Congressional action on the moratorium but before the President signed the legislation to issue the Final Rule.  CMS' clever administrative timing, however, should not undo what Congress thought it had accomplished through the moratorium – providing a year for it to consider alternatives to the regulation, followed (if necessary) by an additional sixty days for Congress to consider whether to reject any final regulation through the procedures outlined in the CRA.[14]  At a minimum, no provision of the regulation should become effective prior to sixty days after the moratorium expires.

A sixty day period is the minimum that should be afforded to States to come into compliance as well.[15]  Given the existence of the moratorium and the expressed intent of Congress to override at least portions of the regulation, States cannot be expected to take any steps before May 25, 2008 towards implementing a regulation that is unlikely to go into effect in its current form.  Furthermore, to the extent that States or providers may require further clarifications from CMS in order to do so (as CMS acknowledges may be necessary related to the form for determining governmental provider status[16]), such guidance cannot be made available until after the end of the moratorium.  Basic principles of fairness require CMS to provide a time period after the end of the moratorium before this Final Rule would take effect.

> b. The comment period related to the new definition of a unit of government should not begin until after the moratorium expires.

The language of the moratorium clearly prohibits CMS from taking "any action (through promulgation of regulation, issuance of regulatory guidance, or *other administrative action*)" to implement any provisions of this rule.[17]  NAPH believes that accepting comments on the definition of unit of government is an "administrative action" prohibited by this language.  If the moratorium were to expire without further legislation by Congress, the 45-day comment period should begin on May 25, 2008.  Furthermore, it is consistent with the underlying principles of notice and comment rulemaking that the public should be permitted a contemporaneous opportunity to comment based on circumstances in effect at that future time.  CMS should initiate a new comment period for the unit of government definition upon expiration of the moratorium.

> c. The effective date of the cost limit violates the CRA and should be postponed until at least rate year 2010.

The Final Rule indicates that institutional governmentally-operated health care providers must comply with the Medicaid cost limit beginning with the Medicaid State plan rate year 2008.  Even absent the moratorium, it is clear that this compliance date violates the

---

[13] Congressional Review Act § 801(a)(3), 5 U.S.C. § 801(a)(3)(2006).
[14] *Id.* §§ 801-808.
[15] NAPH believes that sixty days is far too short of a time for states to come into compliance with many of the provisions of the regulation, as discussed in our comments to the Proposed Rule.
[16] 72 Fed. Reg. 29748, 29764-65 (May 29, 2007).
[17] Pub. L. No. 110-28, § 7002 (*emphasis added*).

CRA. Section 801(a)(3) of the CRA states that the earliest that a rule may be effective is sixty (60) days from publication.[18] Since the Final Rule was published on May 29, 2007, the earliest it could be effective under the CRA (moratorium aside) is July 30, 2007. In most States, the State plan rate year 2008 begins July 1, 2007 (i.e., prior to July 30, 2007). To the extent that the Final Rule requires compliance as of rate year 2008, the cost limit provision of the Final Rule clearly violates CRA requirements.

Furthermore, if the legislative moratorium expires on May 25, 2008 without further Congressional action, we believe (as explained above) that the regulation could not become effective until 60 days thereafter (or July 24, 2008), which will be after the beginning of rate year 2009 for most States. As a practical matter, therefore, given all of the steps that States need to take to prepare for the implementation of a cost limit (including developing new or modifying existing cost reports, adopting State plan amendments, making changes to their State budgets, etc.) it would be inappropriate to implement the cost limit for institutional providers prior to rate year 2010 (or the first rate year that begins after sixty days after the expiration of the moratorium). With respect to non-institutional providers, the cost limit should be implemented one year after the implementation for institutional providers. Again, basic principles of fairness require that CMS provide States with the time necessary to come into compliance.

<center>* * *</center>

NAPH appreciates the opportunity to submit these additional comments and to reiterate our strong opposition to the provisions of this Final Rule. If you have any questions, please contact Barbara Eyman, Charles Luband or Sarah Mutinsky of NAPH counsel Powell Goldstein at (202) 347-0066.

Respectfully,

Larry S. Gage
President

::ODMA\PCDOCS\WSH\426205\8

---

[18] 5 U.S.C. § 801(a)(3) (2006).

<center>9</center>

 NATIONAL ASSOCIATION of PUBLIC HOSPITALS and HEALTH SYSTEMS

1301 PENNSYLVANIA AVENUE, NW, SUITE 950, WASHINGTON DC 20004 | 202.585.0100 | FAX 202.585.0101

March 8, 2007

Leslie Norwalk, Esq., Acting Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

**Re: CMS-2258-P – Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership**

Dear Administrator Norwalk:

The National Association of Public Hospitals and Health Systems (NAPH) is pleased to submit the attached comments expressing our serious concern about the devastating impact of the above-referenced Proposed Rule on the nation's health system. NAPH represents more than 100 metropolitan area safety net hospitals and health systems. Our members fulfill a unique and critical role in the health care system providing high intensity services—such as trauma, neonatal intensive care, and burn care—to the entire community. NAPH members are also the primary hospital providers of care in their communities for Medicaid recipients and many of the more than 46 million Americans without insurance. NAPH hospitals represent only 2 percent of the acute care hospitals in the country but provide 25% of the uncompensated hospital care provided across the nation. Our members are highly reliant on government payers, with nearly 70% of their net revenue from federal, state, and local payers.

We strongly believe that the Proposed Rule will very seriously compromise the future ability of NAPH members and other safety net hospitals to serve Medicaid patients and the uninsured and to provide many essential, community-wide services. The harm that will be inflicted on the health safety net by this rule will also inflict fiscal crises on many states and increase the numbers of uninsured, at a time when we should be searching for ways to improve (not diminish) access and coverage.

In 2000, the Institute of Medicine issued a landmark report, *America's Health Care Safety Net: Intact but Endangered*, which recommended that, "Federal and state policy makers should explicitly take into account and address the full impact (both intended and unintended) of changes in Medicaid policies on the viability of safety net providers and the populations they serve." Last fall, the IOM reconvened the commission that produced the report and emphatically restated the findings and recommendations from 2000. Even without the Proposed Rule, the situation of the health safety net is more fragile than ever.

The attached NAPH comments detail many specific concerns about the Proposed Rule. However, please be aware that our primary recommendation is that CMS withdraw the Proposed Rule and work with the Congress and with state and local stakeholders to develop policy alternatives that would strengthen -- not undermine -- the nation's health safety net (and with it, the entire health system).

NAPH appreciates the opportunity to submit these comments. If you have any questions, please contact me or Charles Luband or Barbara Eyman at NAPH counsel Powell Goldstein (202) 347-0066.

Respectfully,

President

 **NATIONAL ASSOCIATION of PUBLIC HOSPITALS and HEALTH SYSTEMS**

1301 PENNSYLVANIA AVENUE, NW, SUITE 950, WASHINGTON DC 20004 | 202.585.0100 | FAX 202.585.0101

March 8, 2007

**COMMENTS BY THE NATIONAL ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS ON PROPOSED RULE: CMS-2258-P – Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership**

**Prepared on behalf of NAPH by Powell Goldstein, LLP**

The National Association of Public Hospitals and Health Systems (NAPH) urges the Centers for Medicare and Medicaid Services (CMS) to withdraw Proposed Rule CMS-2258-P (the Proposed Rule). The Proposed Rule exceeds the agency's legal authority, defies the bipartisan opposition of a majority of the Members of Congress and would, in short order, dismantle the intricate system of Medicaid-based support for America's health care safety net, seriously compromising access for Medicaid and uninsured patients. Without any plan for replacement funding, CMS would eliminate billions of dollars of support payments that have traditionally been used to ensure that the nation's poor and uninsured have access to a full range of primary, specialty, acute and long term care. The cuts would restrict funding that has ensured that our communities are protected with adequate emergency response capabilities, highly specialized but under-reimbursed tertiary services (such as trauma care, neonatal intensive care, burn units and psychiatric emergency care), and trained medical professionals. The result of this regulation would be a severely compromised safety net health system, unable to meet current demand for services and incapable of keeping pace with the fast-paced changes in technology, research and best practices that result in the highest quality care.

NAPH endorses CMS' stated goal of ensuring accountability and protecting the fiscal integrity of the Medicaid program. Over the years, Congress and CMS have taken a series of steps to advance these goals with respect to both provider payments and non-federal share financing. These efforts have included restrictions on provider taxes and donations, statewide and hospital-specific limitations on Disproportionate Share Hospital (DSH) payments and a series of modifications to regulatory upper payment limits. All of these steps were taken by or with the consent of Congress.

Over the last three years, CMS has significantly increased its oversight of payment methodologies and financing arrangements in state Medicaid programs, working with states to restructure their programs as necessary to eliminate inappropriate federal matching arrangements. Officials from the Department of Health and Human Services (HHS) have repeatedly claimed success from this initiative, stating that they have largely eliminated "recycling" from those programs under scrutiny. Indeed, since the publication of the Proposed Rule, it is our understanding that CMS provided to Members of Congress data indicating that its efforts have been enormously successful, with 22 states listed as using intergovernmental transfers (IGTs) appropriately, 30 listed as having removed

"recycling" from their programs and 23 with no IGT financing.[19] According to these data, there are only three states about which CMS has any remaining concerns. Clearly the steps taken by Congress and CMS to date have addressed the concerns CMS has raised about state financing mechanisms and it is unclear why CMS feels the need to proceed with this rulemaking. Nor does the agency explain how the restrictive policies in the Proposed Rule will further its stated goals. Instead, the Proposed Rule imposes payment and financing policies that go far beyond merely institutionalizing the oversight procedures CMS has used successfully to date. These policies would cut deep into the heart of Medicaid as a safety net support program with no measurable increase in fiscal integrity.

In its Regulatory Impact Analysis, CMS asserts that the Proposed Rule will not have a significant impact on providers for which relief should be granted, and it projects "this rule's effect on actual patient services to be minimal."[20] It estimates $3.9 billion in federal savings from the Proposed Rule over five years, but provides no detail on how it derived this estimate. From NAPH's survey of its own members, it is clear that CMS has significantly understated the impact of the Proposed Rule on providers, on patients and on total federal Medicaid funding provided to states. Although we do not have sufficient nationwide data to estimate the total amount of funding cuts imposed by the Proposed Rule, data from just a few NAPH members and states illustrates how grossly understated CMS' projections of the impact are.

For example, Florida estimates that its hospitals will lose $932 million. The estimated statewide loss of federal dollars is at least $253 million in Georgia, at least $350 million in New York and is $374 million in Texas. These state programs are not ones that CMS has identified as abusive; on the contrary, CMS has reviewed these hospital payment and financing programs and approved them as legitimate. Despite their current legitimacy, the Proposed Rule will cut payment rates and eliminate approved sources of non-federal share funding in each of these programs. As a result, safety net health systems' ability to serve Medicaid and uninsured patients will be compromised and state Medicaid programs will face substantial budget shortfalls with no apparent gain in fiscal integrity. Moreover, CMS would impose these cuts immediately, effective September 1, 2007, providing no time for state legislators to overhaul their program financing to come into compliance with the new requirements.

CMS's response to concerns about lost funding for important health care needs is that it is Congress' job to determine whether such federal support is needed. NAPH respectfully submits that Congress has already determined that such federal support is needed and that states may use their Medicaid programs to provide it. Above-cost Medicaid payments based on Medicare rates have been part of the Medicaid payment

---

[19] *Summary of State Use of IGTs and Recycling,* as of 11/14/06. Several states are listed in more than one category as they have structured different IGT programs for different types of services.
[20] 72 Fed. Reg. at 2245.

National Association of Public Hospitals
& Health Systems

Powell Goldstein LLP

system for years.  Congress has explicitly rejected CMS' proposals to impose provider-specific cost-based payment limits;[21] it has required the adoption of regulations with aggregate rather than provider-specific limits;[22] it long ago freed states from mandatory cost-based payment systems to allow for the proliferation of payment systems more tailored to localized needs;[23] and it has acquiesced with no expressed concern in the development of supplemental Medicaid payment systems in which states have used the Medicaid program as the primary source of federal support for safety net health care.  If Congress is the only entity that can authorize replacement funding, then Congress should also be the entity to consider the types of sweeping payment and financing changes that CMS proposes.

In the wake of President Bush's FY 2007 budget proposal to restrict funding and payment flexibility by regulation, a substantial majority of the House and Senate went on record urging the Administration not to move forward administratively.  Members of the 110th Congress have had a similar response.  The National Governors Association has also expressed its deep concern about the impact of the Proposed Rule on the governors' ability to implement health reform options and expand affordable health insurance coverage.  Given the overwhelming bipartisan opposition to this Proposed Rule and the means by which it is being adopted, CMS should withdraw its proposal immediately.

After a brief summary in the first section, the second section of these comments raises significant legal and policy concerns about three major aspects of the Proposed Rule:

- The limit on payments to governmental providers to the cost of Medicaid services;
- The definition of a unit of government; and
- The restriction on sources of non-federal share funding;

Thereafter, we raise several technical concerns, comments and questions about various aspects of the Proposed Rule, and comment on CMS' Regulatory Flexibility Act analysis.

---

[21] Budget of the United States Government, Fiscal Year 2005, pages 149-150; Budget of the United States Government, Fiscal Year 2006, page 143; Letter from Michael O. Leavitt, Secretary of Health and Human Services, to the Honorable Richard B. Cheney, President, United States Senate, August 5, 2005 (transmitting legislative language to Senate implementing the fiscal year 2006 proposals); Letter from Michael O. Leavitt, Secretary of Health and Human Services, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives, August 5, 2005 (transmitting legislative language to House of Representatives implementing the fiscal year 2006 proposals).  Congress has rejected each of these proposals.
[22] Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), H.R. 5661, 106th Cong., (enacted into law by reference in Pub. L. No. 106-554, § 1(a)(6)), Section 705(a).
[23] Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2173.

4

National Association of Public Hospitals                                    Powell Goldstein LLP
& Health Systems

## I.    SUMMARY OF COMMENTS

NAPH's major concerns about the Proposed Rule center around (1) the cost limit on Medicaid payments to governmental providers, (2) the new and restrictive definition of a "unit of government" and (3) the restrictions on sources of non-federal share funding.

The cost limit would impose deep cuts in funding for the health care safety net, with serious repercussions on access and quality for low-income Medicaid and uninsured patients. The cuts would not result in any measurable improvement in the fiscal integrity of the Medicaid program. Cost-based payments and limits are inherently inefficient, rewarding providers with high costs. The current upper payment limits, based on what Medicare would pay for the same services and calculated in the aggregate for each category of hospital, are reasonable (Medicare does not pay excessive rates) and allows states appropriate flexibility to target support to communities and providers where it is most needed.

Moreover, governmental providers, who disproportionately serve the uninsured, should not be subject to a more restrictive limit than private providers. Imposing a cost limit would undermine important policy goals shared by the Administration and providers alike – such as quality, patient safety, emergency preparedness, enhancing access to primary and preventative care, reducing costly and inappropriate use of hospital emergency departments, adoption of electronic medical records and other health information technology and reducing disparities. Finally, the cost limit would violate federal law in at least four respects. First, it will prevent states from adopting payment methodologies that are economic and efficient and that promote quality and access in contravention of Section 1902(a)(30)(A) of the Social Security Act (SSA); second, it defies simplicity of administration and ignores the best interests of Medicaid recipients that states are required to safeguard pursuant to Section 1902(a)(19); third, it would violate Section 705(a) of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 by adopting upper payment limits that are not based on the proposed rule announced on October 5, 2000; and fourth, it would prohibit states from adopting prospective payment systems for their governmentally-operated federally qualified health centers and rural health clinics as required by Section 1902(bb) of the SSA. CMS should not modify the current upper payment limits.

We also believe that CMS does not have the authority to redefine a "unit of government." The statutory definition contained in Section 1903(w)(7)(G) of the SSA does not limit the term to entities that have taxing authority. CMS is far exceeding its authority in placing such a significant restriction on the much broader definition adopted by Congress. Congress' definition afforded due deference to states' determination of which of its instrumentalities are governmental, as required by Constitutional principles of federalism. CMS' proposed definition is an unprecedented intrusion into the core of states' rights to organize themselves as they deem necessary. The definition also undermines the efforts

<center>5</center>

of states and localities to carry out a core governmental function (ensuring access to health care) through the most efficient and effective means. Countless governments have organized or reorganized public hospitals into separate governmental entities in order to provide them with the autonomy and flexibility to deliver high quality, efficient health care services in an extremely competitive market, yet the Proposed Rule would not recognize such structures as governmental. CMS should defer to state designations of governmental entities.

In asserting that intergovernmental transfers (IGTs) can only be derived from tax revenues, the preamble to the Proposed Rule ignores the much broader nature of public funding. States, local governments and governmental providers derive their funding from a variety of sources, not just tax proceeds, and such funds are no less public due to their source. Limiting IGTs to tax revenues will deprive states of long-standing funding sources for the non-federal share of their programs, leaving them with significant budget gaps that can only be filled by diverting taxpayer funds from other important priorities or cutting their Medicaid programs. Moreover, CMS does not have authority to restrict local sources of funding under Section 1902(a)(2) of the SSA without explicit congressional authorization to do so. CMS should allow all public funding, regardless of its source, to be used as the non-federal share of Medicaid expenditures.

NAPH also raises several more technical issues and concerns about the regulation. Our recommendations in this regard include:

<u>Cost Limit</u>

- CMS should clarify that the limit based on the "cost of providing covered Medicaid services to eligible Medicaid recipients" does not exclude costs for disproportionate share hospital payments or payments authorized under Section 1115 demonstration programs.
- The definition of allowable costs should not be restrictive and should include all costs necessary to operate a governmental provider.
- CMS should confirm that graduate medical education costs would be allowable.
- CMS should clarify that the cost limit applies only to institutional governmental providers and not professional providers that may be employed by or affiliated with governmental entities.
- CMS should allow states to calculate the cost limit on a prospective basis.
- CMS should allow states to make direct payments to governmental providers for unreimbursed costs of serving Medicaid managed care enrollees.

6

NAPH Comments on CMS-2258-P
March 8, 2007

Unit of Government Definition

- CMS should eliminate the requirement that units of government have taxing authority and should defer to state law determinations of public status.
- CMS should clarify that it is not altering federal or state law interpretations of public status outside of the provisions of the Proposed Rule.

Certification of Public Expenditures

- CMS should allow the use of certified public expenditures (CPEs) to finance payments not based on costs.
- CMS should confirm the mandatory and permissive nature of various steps in the reconciliation process.

Retention of Payments

- CMS should clarify whether the retention provision applies to CPEs.
- CMS should eliminate the provision providing authority for the Secretary to review "associated transactions."

Section 1115 Waivers

- CMS should clarify that states may maintain current levels of funding for the safety net care pools, low income pools and expanded coverage established through Section 1115 demonstration projects notwithstanding the new cost limit.
- CMS should clarify that other states may use waivers to adopt similar pools or coverage based on savings incurred by reducing governmental payments to cost.

Upper Payment Limit (UPL) Transition

- CMS should revise the regulation to ensure that it has no impact on transition payments made pursuant to upper payment limit regulations revised in 2001 and 2002.

Provider Donations

- CMS should clarify that it will not view transfers of taxpayer funding as provider donations.

7

NAPH Comments on CMS-2258-P
March 8, 2007

Effective Date

- CMS should extend the effective date of the regulation and provide at least a ten-year transition period.
- CMS should clarify that all parts of the regulation will be imposed prospectively only.

Consultation with Governors

- CMS should immediately consult with states on the Proposed Rule and modify or withdraw it based on state concerns.

Finally, NAPH believes that in its Regulatory Flexibility Act analysis, CMS has seriously underestimated the impact that the Proposed Rule will have. The Proposed Rule will impose significant costs on states and providers in connection with new administrative burdens it establishes. The cost to states of developing new payment systems, adopting new financing mechanisms to pay for the non-federal share, developing new cost reporting systems and administering and auditing them will be significant. The cost to providers of complying with these new requirements is also substantial. More importantly, however, CMS vastly understates the direct and significant impact that the Proposed Rule will have on patient care, as providers and states struggle to cope with multi-million dollar funding cuts. In addition, the Proposed Rule will negatively impact local economies that are built around providers affected by this regulation. CMS should reevaluate its estimate of the impact of the Proposed Rule and the need for regulatory relief under the Regulatory Flexibility Act.

## II.    MAJOR LEGAL AND POLICY CONCERNS

### A. Cost Limit for Providers Operated by Units of Government (§ 447.206)

NAPH objects to the new cost limit on Medicaid payments to government providers under the Proposed Rule on a number of grounds.

> 1. *The cost limit under the Proposed Rule imposes deep cuts in safety net support without addressing financing abuses.*

Rather than adopting a narrowly tailored solution to identified concerns with inappropriate Medicaid financing practices, CMS proposes to impose a cost limit on governmental providers that is simply a straightforward funding cut. According to CMS' own data, it has largely eliminated the "recycling" that the cost limit purports to address. Even if recycling were occurring, however, a cost limit would not eliminate it; it would simply limit the net funding for governmental providers. Yet the regulation grossly overreaches by imposing the restrictive limit for governmental providers in states that

8

National Association of Public Hospitals
& Health Systems

Powell Goldstein LLP

have removed or never relied on inappropriate financing arrangements. In these cases, the new limit imposes a deep cut to rectify a non-existent problem.

> 2. *The cost limit imposes inappropriate and antiquated incentives and unnecessary new administrative burdens.*

A payment limit based on costs represents a sharp departure from CMS' efforts to bring cost-effective market principles into federal health programs. Prospective payment systems are structured to encourage health care providers to eliminate excess costs by allowing them to keep payments above costs as a reward for efficiency. Increasingly, CMS is considering new payment models, which would include incentives for providing high quality care as a means to better align payment and desired outcomes. The Proposed Rule would require a return to cost-based reporting and reimbursement that is inconsistent with the efforts of Congress and CMS over the past twenty years to move away from cost-based methodologies and the inefficient incentives these methodologies entail. It would incentivize providers to increase costs and eschew efficiencies in order to preserve revenues. It would also impose enormous new administrative burdens on states and providers, as they engage in cost reconciliation processes that could last for years beyond when services are provided. The massive diversion of scarce resources into such unnecessary bureaucracy is ill-advised at a time when the demands on the health care safety net are greater than ever.

> 3. *The Medicare upper payment limit is not excessive.*

In proposing the new cost limit, and asserting that it is necessary to ensure economy and efficiency in the program, CMS is effectively stating that the current limit, based on Medicare rates, is unreasonable. Given the substantial effort put into creating the Medicare payment system by both Congress and CMS, it is surprising that CMS would consider payments at Medicare levels to be unreasonable. Moreover, CMS' claim that the Medicare limit is unreasonable for governmental providers is undermined by its perpetuation of that very limit for private providers.

For many providers, Medicare reimbursement, while not excessive, is higher than the direct costs of services for Medicare patients. The prospective payment system is deliberately delinked from costs and is intended to establish incentives for providers to hold down costs by allowing them to retain the difference between prospectively set rates and their costs. Moreover, Medicare reimbursement explicitly recognizes additional costs that are incurred by some providers for public goods from which the entire community benefits, such as operating a teaching program or providing access to a disproportionate share of low income patients. The Medicare reimbursement system is not unreasonable.

Powell Goldstein LLP

Moreover, the adoption of aggregate limits within specified groups of governmental and private providers allows states sufficient flexibility to target additional Medicaid reimbursement to individual providers to achieve specified policy objectives.  In the preamble to the Proposed Rule, CMS raises concerns about some governmental providers receiving payments that are higher than those for other governmental providers.  But variation in payment rates across providers has been a hallmark of Medicaid payment policy since the early 1980s when Congress eliminated the requirement that providers be reimbursed based on reasonable costs and allowed states flexibility to tailor reimbursement to localized needs.  Today, state Medicaid programs feature a variety of targeted supplemental payments: for rural providers, children's hospitals, teaching hospitals, public hospitals, financially distressed providers, trauma centers, sole community providers and the like.  Eliminating the aggregate nature of the payment limit restricts states' flexibility to address local needs through reimbursement policies.  Such action runs counter to the Administration's commitment, and Congress' efforts, to enhance state flexibility in managing their Medicaid programs.

### 4.  *Hospitals cannot long survive without positive margins.*

In any competitive marketplace, no business can survive simply by breaking even, earning revenues only sufficient to cover the direct and immediate costs of the services it provides.  Any well-run business needs to achieve some margin in order to invest in the future, establish a prudent reserve fund, and achieve the stability which will allow it access to needed capital.  Organizations that lose money on one line of business need to make up those losses on other lines in order to survive.  These fundamental business concepts are equally applicable to the hospital industry.  Margins are essential to survival; they are even more essential to a community-oriented mission.

The proposed cost limit would prohibit governmental hospitals from earning any margin on their largest line of business.  Moreover, governmental hospitals, as compared to the hospital industry as a whole, are much more likely to have a line of business – care for the uninsured – in which they must absorb significant losses.  For example, in 2004, NAPH members provided, on average, over $76 million in uncompensated care per hospital.  Their average margin that same year was a mere 1.2 percent (the industry average was 5.2 percent).  Under the Proposed Rule, public hospitals still may be able to achieve a small margin on Medicare and perhaps a slightly larger margin on commercially insured patients, but these two revenue sources constitute less than 45 percent of average NAPH net revenues.  With self-pay patients comprising 24 percent of NAPH members' patient populations, margins on Medicare and commercial insurance alone are not sufficient to keep these hospitals afloat if CMS denies any margin on Medicaid patients.  CMS would not expect a private business to operate with revenues no greater than direct costs.  It should not expect public hospitals, with their disproportionate share of uninsured patient populations, to survive and thrive under this limit.

10

NAPH Comments on CMS-2258-P
March 8, 2007

> 5. *It is unreasonable to impose a lower limit on governmental providers than private providers.*

It is unclear why CMS believes that rates that the agency would continue to allow states to pay private providers under the Proposed Rule are excessive with respect to government providers. The needs of governmental providers are often significantly greater than those of private providers as they typically provide a disproportionate share of care to the uninsured and offer critical yet under-reimbursed community-wide services (such as trauma care, burn care, neonatal intensive care, first response services, standby readiness capabilities, etc.). For example, the members of NAPH represent 2 percent of the nation's hospitals but provide a full 25 percent of uncompensated hospital care. A report issued in December by the Congressional Budget Office confirmed that governmental hospitals provide significantly more Medicaid and uncompensated care and other community benefits than private hospitals.[24] Moreover, governmental providers' payer mix is markedly different from that of private providers, with greater reliance on Medicaid revenues to fund operations and a lower share of commercially insured patients on which uncompensated costs can be shifted. By cutting Medicaid reimbursement for governmental providers, the Proposed Rule would slash their primary funding source.

> 6. *The cost limit would have a particularly devastating effect on hospitals in low DSH states.*

Medicaid disproportionate share hospital payments help to offset some of the unreimbursed costs that hospitals incur in caring for uninsured patients, but the adequacy of DSH allotments is declining as costs climb and insurance coverage drops. As a percentage of Medicaid expenditures, DSH has fallen dramatically in the last decade, declining from 14 percent of overall Medicaid expenditures in 1993 to approximately 6 percent in 2004. As DSH falls further and further behind growing uncompensated costs, other types of supplemental payments become an even more important source of support for safety net hospitals. This is especially true for hospitals in "low DSH states," where the statewide DSH allotment is significantly lower than the hospitals' need. Yet it is these non-DSH supplemental Medicaid payments that the proposed cost limit would impact most significantly, undermining the ability of governmental hospitals to continue to provide high volumes of care to the uninsured.

> 7. *The cost limit undermines important public policy goals.*

At a time when the federal government is calling on providers to improve quality and access, and to invest in important new technology, now is not the time to impose unnecessary funding cuts on governmental providers. Although disproportionately reliant on governmental funding sources, NAPH members have, in recent years, made

---

[24] Congressional Budget Office, *Nonprofit Hospitals and the Provision of Community Benefits*, December 2006.

11

significant investments in new (and often unfunded) initiatives that are in line with HHS' policy agenda.

For example, NAPH members have invested millions of dollars in adopting electronic medical records and other new information systems that have a direct impact on quality of care, patient safety and long-term efficiency, all goals promoted by HHS. Similarly, in the heightened security-conscious post-9/11 world, public hospitals have played a critical role in local emergency preparedness efforts, enhancing their readiness to combat both manmade and natural disasters and epidemics. HHS has focused on expanding access to primary and preventative services -- particularly for low-income Medicaid and uninsured patients -- and reducing inappropriate utilization of emergency departments. NAPH members have been at the forefront of this effort, establishing elaborate networks of off-campus, neighborhood clinics with expanded hours, walk-in appointments, assigned primary care providers and access to appropriate follow-up and specialty care. (In 2004 alone, 89 NAPH member hospitals provided 29 million non-emergency outpatient visits.) HHS is striving to reduce the disparities in care provided to minority populations. With an extremely diverse patient population, NAPH members have been leaders in providing culturally sensitive and welcoming care, in providing access to translation and interpretation services, and in adopting innovative approaches to treating the specific needs of different minority groups. All of these initiatives require substantial investments of resources. CMS does not appear to have considered the impact of the cut imposed by the cost limit on shared policy initiatives that HHS itself has established as key goals of America's complex health care system.

8. *The proposed cost limit violates federal law.*

The proposed cost limit violates section 1902(a)(30)(A) and 1902(bb) of the Social Security Act (SSA) and section 705(a) of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA).[25] CMS is therefore without legal authority to impose the limit by regulation.

Under section 1902(a)(30)(A), state Medicaid programs are required:

> to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.[26]

Many states will be unable to meet the requirements of this provision given the restrictive limits imposed by CMS. By incentivizing providers to maximize costs in order to secure a higher reimbursement limit, the proposal clearly does not promote efficiency or

---

[25] H.R. 5661, 106th Cong., enacted into law by reference in Pub. L. No. 106-554, § 1(a)(6) ("BIPA").
[26] 42 U.S.C. § 1396a(a)(30)(A).

National Association of Public Hospitals                              Powell Goldstein LLP
& Health Systems

economy. By removing tools to promote efficiency (such as through prospective payments systems that encourage providers to reduce costs), CMS has hampered states' ability to provide the assurances required by the statute. Similarly, the cost limit thwarts states' efforts to ensure quality of care by eliminating flexibility to provide targeted above-cost incentives to promote and reward high quality care, particularly for providers identified by the state as having particular needs or faced with unique challenges. Finally, to the extent that the cost regulation prohibits states from paying rates that they have determined are necessary to ensure access for Medicaid recipients, CMS's proposed regulation undermines the statutory requirement that states assure access to care and services at least equal to that available to the general population.

Similarly, Section 1902(a)(19) requires states to provide safeguards to assure that "care and services will be provided in a manner consistent with simplicity of administration and the best interests of the recipients."[27] The Proposed Rule hinders states' ability to make both assurances. Far from streamlining administration, the regulation would require states and providers to engage in elaborate cost reporting and reconciliation processes regardless of the volume of services provided. More importantly, however, CMS' single-minded focus on limiting states' use of local dollars to fund Medicaid and in cutting payments to the largest providers (governmental providers) of Medicaid services, the Proposed Rule patently ignores the best interests of recipients. In fact, it is Medicaid recipients who will be most directly and most severely harmed by this regulation.

The proposed cost limit also ignores Congress's explicit instructions to CMS in Section 705(a) of BIPA to adopt an aggregate Medicare-related upper payment limit (UPL). Adopted shortly after CMS proposed a regulation establishing aggregate UPLs within three categories of providers – state owned or operated, non-state owned or operated and private -- BIPA required that HHS "issue ... a final regulation based on the proposed rule announced on October 5, 2000 that ... modifies the upper payment limit test ... by applying an aggregate upper payment limit to payments made to governmental facilities that are not State-owned or operated facilities." The proposed cost limit for government providers deviates significantly from Congress's clear mandate in BIPA that the upper payment limits: (1) be aggregate limits and (2) include a category of facilities that are "not State-owned or operated." The proposed regulation is provider-specific, not aggregate, and eliminates ownership as a factor in determining whether a facility is a government facility. Moreover, in requiring that the final regulation be based on the proposed rule issued on October 5, 2000, Congress explicitly endorsed the establishment of a UPL based on Medicare payment principles, not costs.

Finally, Section 1902(bb) requires states to pay for services provided by federally qualified health centers (FQHCs) and rural health clinics (RHCs) through rates that are prospectively determined (based on historical costs). FQHCs and RHCs had previously been guaranteed cost-based reimbursement under Title XIX, but through the Balanced

---

[27] 42 U.S.C. § 1396a(a)(19).

13

Budget Act of 1997, Congress began phasing out this guarantee.[28]  Before the phase-out was complete, Congress stepped in again in 2000 to require a new payment methodology for FQHCs that was specifically *not* cost reimbursement.[29]  This evolution of FQHC and RHC payment policy – away from cost reimbursement and towards a prospective payment system that encourages efficiency – is the most recent articulation of Congress' intent with regards to Medicaid reimbursement.  The Proposed Rule would require states to reconcile prospectively made payments to public FQHCs and RHCs and to require the clinics to return any "overpayment" (payments that in retrospect turn out to be in excess of cost).  This required reconciliation process is in direct conflict with Section 1902(bb).

*Recommendation:  CMS should retain the aggregate upper payment limits based on Medicare payment principles for all categories of providers.*

### B.  Defining a Unit of Government (§ 433.50)

NAPH urges CMS to reconsider its proposed new definition of a "unit of government." This proposal would usurp the traditional authority of states to identify their own political subdivisions and exceed the authority provided in the Medicaid statute.  The new definition would undermine efforts to date by states to make units of government more efficient and less reliant on public tax dollars.

> *1.  CMS' restrictive definition of units of government undermines marketplace incentives to operate public providers through independent governmental entities.*

More than a century ago, state and local governments began establishing public hospitals to provide health care services in their communities, including services for their most needy residents.  As the health care system matured, commercial insurance evolved and the Medicare and Medicaid programs were established, public hospitals filled a unique role in serving the poor and uninsured -- patients who were often shunned by other providers.  The public hospitals were typically operated as a department of the state or local government, with control over hospital operations in the hands of an elected legislative body, funding appropriated to plug deficits, surpluses reverting into the general fund of the government, and subject to sunshine laws, public agency procurement requirements, civil service systems and other local laws designed with the operations of traditional monopolistic governmental agencies such as libraries, police and fire departments and public schools in mind.

Over time, some states began authorizing local governments to establish public hospitals as separate governmental entities in recognition of the competitive market in which hospitals operate.  Generic state laws authorizing local governments to create hospital

---

[28] *See* Balanced Budget Act of 1997, § 4712.
[29] BIPA, § 702,

14

NAPH Comments on CMS-2258-P
March 8, 2007

authorities, public hospital districts and similar independent governmental structures began to proliferate.

As competition in the health care system intensified and state and local governments became less willing and able to provide open-ended taxpayer funding to ensure access to health care services, many that had previously operated public hospitals as integrated governmental agencies began searching for new ways to organize and operate these entities. Typically they sought to do so without diminishing their commitment to meeting the health care needs of their residents and without relaxing the accountability of these hospitals to the public for the services provided. Fueled by these demands and concerns, many state and local governments have restructured their public hospitals to provide them more autonomy and equip them to better control costs and compete in a managed care environment.

These restructurings have taken a wide variety of forms. Many governments have created hospital authorities, with a separate governing board, appointed by elected officials and dedicated solely to governing the hospital. Other states created hospital districts, public benefit corporations or non-profit corporations engaged in a public-private partnership with the local government to operate the hospital to fulfill the governmental function of serving the health care needs of the local population. Many state university medical schools have spun off their clinical operations into a separate governmental entity for similar reasons.

The variations in these public structures are as numerous as the hospitals themselves. They have been extremely successful in positioning public hospitals to reduce their reliance on public funding sources, to compete effectively with their private counterparts and to continuously enhance the quality of care and access they provide. The autonomy has allowed them to achieve these goals while still fulfilling their unique public mission of serving unmet needs in the community, providing access where the private market alone does not, and being responsive and accountable to the public.

The Proposed Rule's definition of a unit of government runs exactly counter to this decades-long trend in the provision of governmental health care. Under the Proposed Rule, only the most traditional of public hospitals would qualify as a governmental entity capable of contributing to the non-federal share of Medicaid funding. Others simply would not be deemed an "integral part" of a unit of government with taxing authority under the strict criteria set forth in the Proposed Rule.

For example, one very common feature of the restructurings is the establishment of a separate and independent budget and accounting system for the hospital, in which revenues earned by the hospital are retained by the hospital and controlled by the governing board dedicated solely to the hospital rather than automatically reverting to the government's general fund. Such fiscal independence has been viewed as critical to

15

establishing the necessary incentives and accountability for hospital administrators to operate efficiently, to maximize patient care revenues and to invest in new initiatives widely. Similarly, many restructured hospitals are not granted unlimited access to taxpayer support but are forced to manage to a fixed budget, which again has been viewed as furthering the goals of economy and efficiency. In short, the governmental entities that previously owned and operated these hospitals have restructured them deliberately to be both governmental and autonomous. They are governmental under state law and they remain fully accountable to the public. But they are autonomous governmental entities in that the local or state government with taxing authority is no longer legally responsible for their liabilities, expenses and deficits. For this reason, they likely would not meet CMS' new unit of government definition, even though they have retained several governmental attributes and are considered governmental under the laws of the state.

The rule would undermine the efforts of state and local governments to deliver public health care services more efficiently and effectively, and penalize those that have reduced their reliance on taxpayer support. Governments that had restructured their public hospitals deliberately to retain their nature as a governmental entity under state law, in part so that they could continue contributing to funding the non-federal share of Medicaid expenditures, will find the rules suddenly switched on them as the federal government substitutes its judgment for state law regarding whether they remain public or not. Future restructurings will likely reflect CMS' narrow definition, undermining the important public policy goals achieved through the more flexible array of structures available under state law. CMS does not appear to have contemplated the perverse incentives its restrictive definition of units of government would provide.

> 2. *CMS does not have statutory authority to restrict the definition of a "unit of government."*

CMS has exceeded its statutory authority in adopting a definition of a "unit of government" more restrictive than that established in Title XIX of the SSA. Section 1903(w)(7)(G)[30] defines a "unit of local government," in the context of contributing to the non-federal share of Medicaid expenditures, as "a city, county, special purpose district, or other governmental unit in the State." The Proposed Rule narrows the definition of "a unit of government" to include, in addition to a state, "a city, a county, a special purpose district, or other governmental unit in the State (including Indian tribes) *that has generally applicable taxing authority*."[31] Congress never premised qualification as a unit of government on an entity's access to public tax dollars. Rather, Congress' formulation, which includes an "other governmental unit in the State," provides appropriate deference to the variety of governmental structures into which a state may

---

[30] 42 U.S.C. § 1396b(w)(7)(G).
[31] Proposed 42 C.F.R. § 433.50(a)(1)(i) (emphasis added).

16

organize itself. In narrowing this statutory definition, without instruction by Congress, CMS has eliminated the deference to states underlying the statutory formulation.

Section 1903(w)(7)(G) is not the only section of Title XIX which evidences a Congressional intent to allow states to determine which entities are political subdivisions capable of participating in Medicaid financing. The absence of any requirement that units of government have taxing authority in order to contribute to the non-federal share of Medicaid expenditures is supported by the language elsewhere in the Medicaid statute. Section 1903(d)(1) requires states to submit quarterly reports for purposes of drawing down the federal share in which they must identify "the amount appropriated or made available by the State and its political subdivisions." The reference to the participation of political subdivisions in Medicaid funding nowhere includes a requirement that the subdivisions have taxing authority.[32]

In limiting the definition of unit of government, the Proposed Rule also overlooks Congress' specific concern about funds derived from State university teaching hospitals. In 1991, in the course of adopting affirmative limits on states' authority to rely on local funding derived from provider taxes or donations, Congress explicitly stated that the Secretary of HHS "may not restrict States' use of funds where such funds are . . . appropriated to State university teaching hospitals."[33] Clearly, Congress did not want to disrupt longstanding funding arrangements involving these important teaching institutions. In adopting a narrow definition of unit of government, which will have the effect of excluding many of our nation's premier public teaching hospitals, CMS has violated the spirit, and in some cases the letter, of this law.

> 3. *A federally-imposed restriction on state units of government violates Constitutional principles of federalism.*

In creating a new federal regulatory standard to determine which public entities within a state are considered to be "units of government" and which are not, CMS is encroaching on a fundamental reserved right of states to organize their governmental structures as they see fit. This is an extraordinary step for the federal government to take, as the internal organization of a state into units of government has historically been an area in which, out of respect for federalism, the federal government has been loath to regulate. This federal intrusion into the operation and administration of state government violates the very basis of the Medicaid program -- the federal-state partnership and the federalism principles on which it rests.

**Recommendation: CMS should defer to states regarding the definition of a unit of government.**

---

[32] 42 U.S.C. § 1396b(d)(1).
[33] 42 U.S.C. § 1396b(w)(6)(A).

### C. Sources of Non-Federal Share Funding and Documentation of Certified Public Expenditures (§ 433.51(b))

Traditionally, states have been able to rely on public funds contributed by governmental entities, regardless of the source of the public funds. As long as funds were contributed by a governmental entity, they were considered to be public and a legitimate source of Medicaid funding.

The Proposed Rule rejects the idea that all funds held by a public entity are public (or, in the language of the regulation, all funds held by a unit of government are governmental), notwithstanding a large body of state law to the contrary.[34] Rather, the regulation (or at least its preamble) would establish a hierarchy of public funds, and only funding derived from taxes would be allowed to fund Medicaid expenditures while those derived from other governmental functions (such as providing patient care services through a public hospital) would be rejected.

The preamble to the Proposed Rule states explicitly that, with respect to intergovernmental transfers, "the source of the transferred funds [must be] State or local tax revenue (which must be supported by consistent treatment on the provider's financial records)."[35] While the proposed regulatory language itself refers only to *"funds from units of government"*[36] without specifying the source of those funds, the preamble language clearly indicates CMS' intent to further restrict funding for state Medicaid programs by imposing the additional requirement that local funds be derived from tax revenues. The preamble does not specify the reason for this restriction, nor whether it would serve to bar federal Medicaid match for support provided by a local government to a hospital derived from such routine governmental funding sources such as the proceeds from bond issuances, revenue anticipation notes, tobacco settlement funds and the like. Moreover, if the regulation does indeed bar the use of such funding sources, how does CMS expect to be able to track the precise source of local support funding, given the fungibility of governmental funding?

The combination of adopting a restrictive definition of a unit of government and then further restricting the source of funds that can be transferred by entities that meet the strict unit of government test will leave state Medicaid programs, including important supplemental payment programs that support the health care safety net, starved for

---

[34] *See, e.g. Adams County Record v. Greater North Dakota Association*, 529 N.W.2d 830, 834 (N.D. 1995) ("public funds" include "all funds derived from taxation, fees, penalties, sale of bonds, or from any other source, which belong to and are the property of a public corporation or of the state ...."); *Kneeland v. National Collegiate Athletic Association*, 850 F.2d 224, 227 (1988) (all revenues, except for trust funds, received by public colleges and universities, as well as various types of property of public colleges and universities are public funds).

[35] 72 Fed. Reg. at 2238

[36] Proposed 42 C.F.R. § 433.51(b).

18

resources. These funding shortfalls will need to be filled either by new broad-based uniform provider taxes (which would ultimately divert Medicaid reimbursement from patient care costs to covering the cost of new taxes), by new general revenue funding (shifting new costs onto state taxpayers) or by a reduction in Medicaid coverage or reimbursement. All of these solutions will ultimately impact the care that Medicaid beneficiaries receive.

In imposing this new restriction on the source of IGTs, CMS is again exceeding its Congressionally delegated authority. Section 1902(a)(2) of the SSA allows states to rely on "local sources" for up to 60 percent of the non-federal share of program expenditures. This provision does not limit the types of local sources that may be used. When Congress has intended to restrict such local sources, it has rejected CMS' attempts to impose limits by regulation and has insisted on legislating the limits itself. For example, in the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991,[37] Congress adopted significant restrictions on sources of local funding, but did so by statute after imposing a series of moratoria on HHS' attempts to restrict local sources of funding administratively.[38] CMS is without legal authority to insist that local funding from units of government be limited to tax dollars only.

***Recommendation: CMS should allow all public funding regardless of its source to be used as the non-federal share of Medicaid expenditures.***

### III.    THE PROPOSED RULE INCLUDES TECHNICAL ERRORS, AMBIGUITIES AND MISGUIDED POLICY CHOICES

The best course, from a legal and policy perspective, would be for CMS to withdraw the Proposed Rule altogether. To the extent that the agency goes forward with the rule, there are several technical issues that need to be clarified, modified or otherwise addressed in the final rule. NAPH raises the following concerns:

#### A.  Cost Limit for Providers Operated by Units of Government (§ 447.206)

1. *The Proposed Rule inappropriately limits reimbursable costs to the "cost of providing covered Medicaid services to eligible Medicaid recipients." (§ 447.206(c)(1))*

Proposed 42 C.F.R. § 447.206(c)(1) provides that "[a]ll health care providers that are operated by units of government are limited to reimbursement not in excess of the individual provider's cost of providing ***covered Medicaid services to eligible Medicaid recipients.***" By its terms, this provision would prohibit *any* Medicaid reimbursement to

---

[37] Pub. L. No. 102-234, 105 Stat. 1793.
[38] Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 1989 U.S.C.C.A.N. (103 Stat.) 2106; Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 1990 U.S.C.C.A.N. (104 Stat.) 1388.

governmental providers for costs of care for patients who are *not* eligible Medicaid recipients, or for services that are not covered under the state Medicaid plan. Taken literally, states could no longer pay public hospitals for unreimbursed costs for uninsured patients or for non-covered services to Medicaid patients through the disproportionate share hospital program. Similarly, the authority of several states to make payments to public providers pursuant to expenditure authority received through section 1115 demonstration projects to pay for otherwise unreimbursable costs to the uninsured, for infrastructure investments and for other purposes not covered under the state plan would be called into question (including Safety Net Care Pool payments authorized in California and Massachusetts, and Low Income Pool payments authorized in Florida). The cost limit could also extend to Medicaid reimbursement received by governmental providers from managed care organizations (despite CMS' disavowal of any such intent in the preamble). The problem is exacerbated because the regulation defines its scope as applying broadly to all "payments made to health care providers that are operated by units of government ...."[39] By contrast, the UPL regulations are carefully drafted to limit their scope to "rates set by the agency,"[40] and they include an explicit exemption for DSH payments.[41]

We assume that it is CMS' intention either (1) to apply the cost limit only to fee-for-service payments by the state agency for services provided to Medicaid recipients while relying on separate statutory or waiver-based authority to impose cost limits on DSH or demonstration program expenditures, or (2) to apply the cost limit at 42 C.F.R. §447.206 more broadly than the language of the Proposed Rule would suggest. In either case, modifications to the language of the regulation are needed to clarify its scope and the corresponding allowable costs. If the limit is to apply only to fee-for-service rates for Medicaid patients, DSH should be explicitly exempted. If the limit is to be more broadly applied, the language must be expanded to allow costs for the uninsured or non-covered Medicaid services for purposes of DSH payments. In addition, preamble guidance regarding the ongoing validity of expenditure authority granted through existing demonstration projects would help reduce confusion about the intended scope.

***Recommendation: CMS should clarify that the limitation to cost of Medicaid services for Medicaid recipients is not intended to limit Medicaid DSH payments or CMS-approved payments under demonstration programs that expressly allow payment for individuals or services not covered under the state Medicaid plan.***

---

[39] Proposed 42 C.F.R. § 447.206(a)
[40] 42 C.F.R. § 447.272(a), § 447.321(a).
[41] 42 C.F.R. § 447.272(c)(2).

2. *CMS should clarify that allowable costs will include all necessary and proper costs associated with providing health care services.*
   *(§ 447.206)*

The calculation of cost for purposes of applying the cost limit is not well-defined under the Proposed Rule. Since the magnitude of the cut imposed by the cost limit will depend on which costs CMS will and will not allow states to reimburse, NAPH requests that CMS provide further guidance on how Medicaid costs would be determined and in particular clarify that any determination of Medicaid "costs" will include all costs necessary to operate a governmental facility. For governmental hospitals, these costs must, at a minimum, include:

- costs incurred by the hospital for physician and other professional services (e.g. salaries for employed professionals, contractual payments to physician groups for services provided to hospitals, physician on-call and standby costs);

- capital costs necessary to maintain an adequate physical infrastructure;

- medical education costs incurred by teaching hospitals;

- investments in information technology systems critical to providing high quality, safe and efficient hospital care;

- investments in community-based clinics and other critical access points to ensure that Medicaid and uninsured patients have adequate access to primary care;

- costs of a basic reserve fund critical to any prudently-operated business enterprise; and

In addition, some costs on a hospital's cost report are allocated to cost centers judged to be unreimbursable for purposes of Medicare reimbursement, but are appropriately reimbursed under Medicaid or DSH. For example, a hospital may have a clinic that exclusively serves Medicaid and uninsured patients that may have been excluded for Medicare purposes, but are appropriately reimbursed under Medicaid. Similarly, some costs that may not be included in a particular reimbursable cost center for purposes of the Medicare cost report should be included under a cost-based Medicaid reimbursement system (including but not limited to interns and residents, organ acquisition costs, etc.). CMS must ensure that states may make appropriate adjustments to the Medicare cost report to accurately capture all costs reasonably allocated to Medicaid – whether or not Medicare fiscal intermediaries have allowed them.

In addition, NAPH strongly believes that allowable costs should also include costs for the uninsured (beyond costs directly reimbursable through the limited available DSH funding). Absent universal coverage or full reimbursement of uninsured costs, hospitals

21

must continue to rely on cross-subsidization from other payers, including commercial payers, Medicare and Medicaid, to pay for this care. CMS should allow state Medicaid programs to shoulder such costs rather than placing the full burden on Medicare and commercial payers. We therefore urge CMS to include uninsured costs among reimbursable Medicaid costs.

***Recommendation: CMS should specify that any determination of Medicaid costs will include all costs necessary to operate a governmental facility including costs for the uninsured.***

> 3.  *The costs of graduate medical education must be allowable costs.*

The President's FY 2008 budget request includes an administrative proposal to eliminate Medicaid reimbursement for graduate medical education (GME) costs. Given the long-standing policy to permit GME payments (as of 2005, 47 states and the District of Columbia provided explicit GME payments to teaching hospitals, according to the Association of American Medical Colleges[42]) and the dozens of approved state plan provisions authorizing such payments, NAPH was surprised to see this proposal described as an administrative rather than legislative initiative. We question CMS' authority to adopt such a policy change without statutory authorization. To the extent that CMS intends to change the policy administratively, however, we assume that the agency would undertake a full notice and comment rulemaking process. In particular, we assume that CMS will allow governmental providers to include all of the costs of their teaching programs in the cost limits under the Proposed Rule unless and until the law is changed to prohibit Medicaid payments for GME. Please confirm our understanding that full GME costs will be includable as reimbursable costs.

***Recommendation: CMS should clarify that graduate medical education costs will be includable in the cost limit under the Proposed Rule.***

> 4.  *The Proposed Rule does not specify whether and under what circumstances professional providers would be considered to be governmentally operated.*

The Proposed Rule applies the cost limit to "health care providers that are operated by units of government."[43] It is clear from the text of the regulation that it applies not just to hospital and nursing facility providers, but also to "non-hospital and non-nursing facility services."[44] Beyond this clarification, the scope of the term "providers" is unclear. It might be possible for a state to determine that the cost limit extends as far as professionals employed by governmental entities. CMS should clarify that it does not

---

[42] Tim M. Henderson, *Direct and Indirect Graduate Medical Education Payments By State Medicaid Programs* (Association of American Medical Colleges), Nov. 2006, at 2.
[43] Proposed 42 C.F.R. § 447.206(a).
[44] Proposed 42 C.F.R. § 447.206(c)(4).

intend the regulation's reach to extend this far. Cost-based methodologies are particularly inappropriate for professional services.

*Recommendation: CMS should clarify that the cost limit applies only to institutional government providers and not to professionals employed by or otherwise affiliated with units of government.*

> 5. *A less costly, equally effective alternative to multiple cost reconciliations is available that would reduce the administrative burden on providers.*

It appears that the cost limits under the regulation must be enforced by reconciling final cost reports (often not final until years after the payment year) to actual payments made to ensure that no "overpayments" have occurred.[45] In addition, in order for states using cost-based payment methodologies funded by CPEs to provide payments to providers prior to the finalization of the payment year cost reports, the state must undertake not one, but two reconciliations after the payment year to ensure payments did not exceed costs.[46] It appears, therefore, that under this Proposed Rule, states and providers are going to be reconciling cost reports and payments for years after the actual payments are received.

The time and resources invested in this process will ultimately have no impact whatsoever on the quality or effectiveness of care provided to patients; in fact, these burdensome requirements divert scarce resources that would be much better spent on patient care. Moreover, the precision gained by reconciling payments to actual costs for the payment year as determined by a finalized cost report simply is not worth the massive diversion of such resources.

Instead, CMS should allow states to calculate cost limits prospectively, based on the most recent cost reports trended forward. While such a prospective methodology may result in a limit that is slightly higher or lower than actual costs incurred in the payment year, over time such fluctuations will even out. Moreover, calculations of cost limits to the dollar, as proposed by CMS, are not necessary to achieve the fiscal integrity objectives articulated by CMS. NAPH therefore urges CMS to reconsider the elaborate reconciliation processes it is requiring in this rule and instead allow providers to invest the savings from the use of a prospective process in services that will actually benefit patients.

*Recommendation: CMS should allow states to calculate the cost limit on a prospective basis.*

---

[45] Proposed 42 C.F.R. § 447.206(e).
[46] Proposed 42 C.F.R. § 447.206(d)

6. *CMS should clarify that costs may include costs for Medicaid managed care patients.*

Under current Medicaid managed care regulations, states are prohibited from making direct payments to providers for services available under a contract with a managed care organization (MCO) and Prepaid Inpatient Health Plan or a Prepaid Ambulatory Health Plan.[47] There is an exception to this prohibition on direct provider payments for payments for graduate medical education, provided capitation rates have been adjusted accordingly. Given the extreme funding cuts that will be imposed on many governmental providers by the imposition of the cost limit, NAPH urges CMS to reconsider the scope of the exception to the direct payment provision. NAPH recommends that states be allowed to make direct Medicaid fee-for-service payments to governmental providers for all unreimbursed costs of care for Medicaid managed care patients (not just GME costs). Because the payments would be based on costs pursuant to the new regulation, there would not be the danger of "excessive payments" that has concerned CMS in the current system. Moreover, to avoid double dipping, states could be required to similarly adjust capitation rates to account for the supplemental cost-based payments. If reimbursement to governmental providers is going to be restricted to cost, it should include costs for all Medicaid patients, not just those in the declining fee-for-service population.

*Recommendation: CMS should amend 42 C.F.R. § 438.6(c)(5)(v) and § 438.60 to allow direct payments to governmental providers for unreimbursed costs of Medicaid managed care patients.*

## B. Defining a Unit of Government (§ 433.50)

As stated above, we believe CMS's restrictive definition of unit of government is fatally flawed and should be abandoned in favor of permitting state discretion. However, to the extent this element is included in a final regulation, CMS must clarify certain aspects. In particular:

1. *CMS should leave the statutory definition of "unit of government" in place.*

The Proposed Rule would permit only units of government to participate in financing the non-federal share of Medicaid expenditures. The regulatory text then goes on to define a unit of government as "a State, a city, a county, a special purpose district or other governmental unit in the State (including Indian tribes) *that has generally applicable taxing authority.*"[48] A provider can only be considered to be a "unit of government" if it has taxing authority or it is an *"integral part of a unit of government with taxing*

---

[47] 42 C.F.R. §438.60.
[48] Proposed 42 C.F.R. § 433.50(a)(1)(i).

National Association of Public Hospitals                        Powell Goldstein LLP
& Health Systems

*authority.*"[49]  It is clear from this proposed definition that unless a provider has direct taxing authority, CMS will only consider it a "unit of government" if it is an integral part of a unit of government with taxing authority.  As explained in Part II of these comments, states and local governments have restructured public hospitals so that they are deliberately autonomous from the state, county or city while retaining their public status under state law.  State law, including state law as defined by the state courts, typically looks beyond the presence of taxing authority to other indicia of public status to determine whether an entity is governmental.[50]  For example, courts may look to whether an entity enjoys sovereign immunity, to whether its employees are public employees, to whether it is governed by a publicly appointed board, to whether it receives public funding, to whether its enabling statute declares it to be a political subdivision or a public entity.  There are a wide variety of factors that go into determining public status beyond whether the provider or the unit of government of which it is an integral part has taxing authority.  NAPH urges CMS to eliminate the caveat that units of government must have taxing authority and allow any governmental entity so designated under state law to be treated as public and capable of participating in Medicaid financing.

***Recommendation:  CMS should eliminate the requirement that units of government have taxing authority and defer to state law interpretations of public status.***

> 2.  *CMS should clarify that the unit of government definition applies only for purposes of the payment limits and financing restrictions and not to other areas of Medicaid law and policy.*

The use of the term "public" appears in several different contexts throughout the Medicaid statute, and many states employ their own definitions of public status within their Medicaid state plans.  For example, federal financial participation is available at the rate of 75 percent of the costs of skilled professional medical personnel of the state agency or "any other public agency."[51]  A Medicaid managed care organization that is a "public entity" is exempt from certain otherwise applicable solvency standards.[52]  "Public institutions" that provide inpatient hospital services for free or at nominal charges are not subject to the charge limit otherwise applicable to inpatient services.[53]  Moreover, many states adopt special reimbursement provisions in their state plans for "public hospitals," "governmental hospitals" or other types of public providers.  The use of terms such as

---

[49] Proposed 42 C.F.R. §433.50(a)(1)(ii).
[50] *See e.g.,* Colorado Associate of Public Employees v. Board of Regents, 804 P. 2d 138 (1990) (the court based its determination that the hospital was a public entity on the State's role in establishing the hospital and its continued involvement in the control of the hospital's internal operations). Woodward v. Porter Hospital, Inc. 217 A.2d 37, 39 (1966)("a public hospital is an instrumentality of the state, founded and owned in the public interest, supported by public funds, and governed by those deriving their authority from the state.").
[51] 42 U.S.C. § 1396b(a)(2)(A).
[52] 42 U.S.C. §1396b(m)(1)(C)(ii)(II).
[53] 42 U.S.C. §1396b(i)(3).

"public," "unit of government" and "governmental" in other areas of state and federal Medicaid law does not incorporate the restrictions CMS is seeking to impose through the Proposed Rule. CMS should clarify that these restrictive definitions are for purposes outlined in the Proposed Rule only.

***Recommendation: CMS should clarify that the Proposed Rule is not intended to place restrictions on public status designations beyond those explicitly contained in the Proposed Rule.***

### C. Certified Public Expenditures (§ 447.206(d)-(e))

*1. CPEs should be allowed to finance payments not based on costs.*

In the preamble to the Proposed Rule, CMS indicates that CPEs may only be used in connection with provider payments based on cost reimbursement methodologies. This restriction on the use of CPEs is unnecessary. Providers will incur costs associated with providing care to Medicaid patients whether they are paid on a cost basis or not. Their costs are no less real or certifiable based on the payment methodology. For example, if a provider incurs $100 in cost in providing care to a Medicaid patient, but the payment methodology is a prospective one that results in a $90 payment, the provider could still certify that it incurred $100 in costs in connection with care for that patient. Because the payment is limited to $90, however, only $90 of the certification would be eligible for federal match. When payment is not based on a cost methodology, CMS should allow providers to certify costs associated with care to Medicaid patients not to exceed the amount of payments provided under the state plan methodology.

***Recommendation: CMS should permit the use of CPEs for providers regardless of the payment methodology provided under the state plan.***

26

NAPH Comments on CMS-2258-P
March 8, 2007

2. *The permissive vs. mandatory nature of the reconciliation process should be clarified.*

In the regulatory language in Proposed 42 C.F.R. § 447.206(d)-(e), CMS alternates between mandatory and permissive language as to state obligations during CPE reconciliations. It appears that it is CMS' intent to *require* the submission of cost reports whenever providers are paid using a cost reimbursement methodology funded by CPEs, to permissively *allow* states to provide interim payment rates based on the most recently filed prior year cost reports, and to *require* states providing interim payment rates to undertake an interim reconciliation based on filed cost reports for the payment year in question and a final reconciliation based on finalized cost reports. In addition, providers whose payments are not funded by CPEs are *required* to submit cost reports and the state is *required* to review the cost reports and verify that payments during the year did not exceed costs. Please confirm this understanding of the regulatory language.

*Recommendation: CMS should confirm the requirements regarding reconciliation of costs.*

### D. Retention of Payments

NAPH supports CMS' attempts to ensure that health care providers retain the full amount of federal payments for Medicaid services. We do not believe, however, that the requirement in the Proposed Rule that providers receive and retain all Medicaid payments to them is enforceable. Nor do we believe that this provision will have a major impact on the funding of safety net providers. Although CMS asserts that governmental providers will benefit from the Proposed Rule in part because of the retention provision, this new requirement does not come close to undoing the significant damage caused by the cuts to payments and changes in financing required by other provisions of the Proposed Rule.

1. *CMS should clarify whether states will be required to pay all federal funding associated with provider-generated CPEs to the provider.*

The retention provision requires providers to "receive and retain the full amount of the total computable payment provided to them."[54] It is unclear whether this requirement applies to *all* payments, whether financed through IGTs, CPEs, general state revenues or otherwise. Currently, some states claim certified public expenditures based on costs incurred by public providers, but do not pass the federal matching payments to the provider. Would this practice be prohibited under the retention provision and would states be required to pay any match received on public provider CPEs to the provider?

*Recommendation: CMS should clarify whether the retention provision applies to payments financed by CPEs.*

---

[54] Proposed 42 C.F.R. § 447.207(a).

27

> 2. *CMS' does not have the authority to review "associated transactions" in connection with the retention provision.*

The retention provision is drafted broadly, requiring, without qualification, providers to "retain" all payments to them, and providing CMS with authority to "examine any associated transactions" to ensure compliance. Taken to extremes, the requirement to retain payments would prohibit providers from making expenditures with Medicaid reimbursement funds. Certainly, any routine payments from providers to state or local governmental entities for items or services unrelated to Medicaid payments would come under suspicion. NAPH members typically have a wide array of financial arrangements with state and local governments, with money flowing in both directions for a variety of reasons. We are concerned that CMS' new authority to examine "associated transactions" will jeopardize these arrangements, and that CMS may use its disallowance authority to pressure public providers to dismantle such arrangements.

CMS' review and audit authority is limited to payments made under the Medicaid program. It does not have authority over providers' use of Medicaid payments received.[55]

**Recommendation:** *CMS should delete the authority claimed by CMS to review "associated transactions."*

### E. Applicability to Section 1115 Waivers

Currently, a number of states have implemented demonstration programs under Section 1115 waiver authority. Medicaid demonstrations typically must comply with a budget-neutrality expenditure cap calculated based on the Medicaid expenditures that would have been made in the absence of the waiver. Many recent demonstrations have relied heavily on money made available by eliminating certain above-cost payments to public providers. For example, California and Massachusetts established Safety Net Care Pools funded by agreements to eliminate certain supplemental payments. Florida likewise established a Low Income Pool on the same basis. Iowa similarly expanded coverage through Iowa Cares. These demonstrations have been the result of significant and extended discussions between states and CMS.

---

[55] *See Englund v. Los Angeles County*, 2006 U.S. Dist. LEXIS 82034, at *26 (E.D. Cal. 2006). When analyzing supplemental Medicaid funding paid to Los Angeles County, the Court noted that "once the County received the [Medicaid] payment it was not limited to how it used the money" (*citing* testimony of Bruce Vladeck, Administrator of Health Care Financing Administration, 1993-1997). The Court also cited Mr. Vladeck's statement that, "money is fungible. Once it was paid to the hospitals, if it was paid for services that were actually being provided, at that point our [HCFA's] sort of formal jurisdiction over it and interest of what became of the funds ended." *Id.* at 27.

28

All of the demonstrations contain language in the Special Terms and Conditions requiring budget neutrality to be recalculated in the event that a change in Federal law, regulation, or policy impacts state Medicaid spending on program components included in the Demonstration. Throughout the Proposed Rule, CMS confirms that the proposed changes would apply to states that operate Section 1115 waiver programs, but fails to discuss the extent to which the Proposed Rule would affect budget neutrality calculations under Medicaid waivers. Will CMS recalculate budget neutrality applicable to these waivers based on the new regulation? If not, will these states be able to continue their new initiatives beyond the term of the current demonstration project? It will be difficult for these states to establish new programs under their waivers if they are going to be terminated within a few years. Moreover, will CMS allow other states to adopt waivers establishing similar pools or expanded coverage based on the termination of above-cost supplemental payment programs?

*Recommendation: CMS must clarify (i) whether current waiver states will be permitted to preserve their waivers, including safety net care pools and expanded coverage currently funded by the states' agreements to limit existing provider payments to cost; (ii) whether CMS plans to enforce requirements under waiver special terms and conditions (STCs) that budget neutrality agreements be renegotiated upon changes in federal law; (iii) whether CMS will allow other states to adopt similar waivers, which may incorporate savings realized from the Proposed Rule's cost limit into their own safety net care pools or coverage expansion initiatives; and (iv) if CMS does not plan to allow other states to make use of cost limit savings, the legal basis for this decision.*

### F. UPL Transition

The Proposed Rule preamble states that "transitional UPL payments … are unchanged under this policy."[56] However, the Proposed Rule does implement changes to the UPL endpoint -- reducing it for governmental hospitals from the aggregate estimate of what would be paid under Medicare payment principles to the individual provider's cost of providing Medicaid services to eligible Medicaid recipients. Therefore, transition period payments would appear to be significantly impacted, since the transitional UPLs are largely based on the UPL endpoint. If CMS truly intends that transition period UPL payments be unchanged, CMS must revise the regulatory language to make that clear.

*Recommendation: CMS should revise the regulatory language to ensure no diminution of transitional UPL payments.*

### G. Provider Donations

If the Proposed Rule is finalized in its current form, a number of providers that were previously considered public and that provided IGTs or CPEs to help finance the non-

---

[56] 72 Fed. Reg. at 2245.

National Association of Public Hospitals                    Powell Goldstein LLP
& Health Systems

federal share of Medicaid expenditures will no longer be able to do so. Some of these providers receive appropriations from a unit of government that does have taxing authority, but the provider cannot be considered to be an integral part of such governmental unit under the terms of the Proposed Rule. CMS should make clear that those appropriations will continue to be fully matchable under the new regulation and that it will not disallow such taxpayer funding as an indirect provider donation. We are particularly concerned in this respect about a passage in the preamble stating that "[h]ealth care providers that forego generally applicable tax revenue that has been contractually obligated for the provision of health care services to the indigent … are making provider-related donations."[57] A local government must have full authority to redirect taxpayer dollars to the state Medicaid agency for use as the non-federal share.

For example, a county which provides $20 million to support the provision of indigent care at a hospital deemed to be private under the Proposed Rule should be permitted instead to transfer that funding to the State Medicaid agency for use as the non-federal share of a $40 million DSH payment to the hospital. The preamble language appears to indicate that CMS could view such a transfer as a provider donation even though it is transferred from an entity that is clearly governmental and even though the funds transferred are derived from tax revenues. When taxpayer funding is transferred by a unit of government to the Medicaid agency for use as the non-federal share, CMS should provide federal financial participation without question.

***Recommendation: CMS should clarify that it will not view the transfer of taxpayer funding as an indirect provider donation.***

### H. Effective Date

> *1. The September 1, 2007 effective date is not achievable.*

The stated effective date of the new cost limit is September 1, 2007.[58] An effective date for other portions of the regulation is not provided. Given that many states will need to overhaul their provider payment systems and plug large budgetary gaps resulting from the required changes in non-federal share financing, the proposed effective date is not feasible. State plans amendments will need to be developed, vetted with the public, submitted to CMS and approved, a process which recently has routinely lasted 180 days or significantly longer. By the time a final rule is published, States will have long finalized budgets for fiscal years that include time periods after September 1, 2007 (SFY 2008 or, in some cases, SFY 2009 budgets). For many states, funding levels have already been set. Many state legislatures are in session for a limited period of time, and some meet every other year. Elimination of federal funding of the magnitude proposed in this regulation cannot possibly be incorporated and absorbed at this late date. Moreover, to

---

[57] *Id.*
[58] Proposed 42 C.F.R. § 447.206(g); § 447.272(d)(1); § 447.321(d).

the extent that states have had advance warning of at least some of the policies contained in the final rule by virtue of this Proposed Rule and other agency activities, states are under no obligation to modify their programs based on the provisions of a proposed regulation without the force and effect of law, nor would it be wise to undertake such restructuring given that the regulation may undergo significant change.

Moreover, given the widespread impact of the Proposed Rule as discussed elsewhere in these comments, and the longstanding reliance of states on payment and financing arrangements allowable under current law, CMS should adopt generous transition provisions to allow states time to come into compliance and allow providers time to adjust to significantly lower reimbursement rates. Any such transition periods should be at least ten years.

***Recommendation: CMS should revise the effective date of the Proposed Rule and establish a ten-year transition period so that states, health care providers, and other affected entities are provided adequate time to come into compliance.***

### 2. The effective date of portions of the Proposed Rule is ambiguous.

NAPH seeks confirmation that the effective date of the entire regulation is, in fact, proposed to be September 1, 2007. While this date is specifically established as the date by which states must come into compliance with cost limits, effective dates are not provided in connection with other revised sections of the regulations. Moreover, throughout the preamble, CMS characterizes its actions as "clarifying" policies with respect to the definition of units of government, intergovernmental transfers, certified public expenditures and the retention requirement. We are therefore concerned that CMS may view these regulatory changes as being effective immediately and retroactively, as a simple clarification of current policy and not the sweeping regulatory overhaul that it clearly is. Please confirm that these regulations are prospective in their entirety.

Any attempt to impose these policies without going through notice and comment rulemaking would violate the Administrative Procedures Act (APA), which requires legislative rules such as the policy changes articulated in the Proposed Rule to be adopted through a formal rulemaking process.[59] Moreover, in addition to the requirements of the APA, Congress has very explicitly instructed CMS not to adopt policy changes without undertaking notice and comment rulemaking. The Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (the 1991 Amendments) contains an uncodified provision stating that:

> the Secretary may not issue any interim final regulation that changes the treatment (specified in section 433.45(a) of title 42, Code of Federal Regulations) of public

---

[59] 5 U.S.C. § 553.

National Association of Public Hospitals                                 Powell Goldstein LLP
& Health Systems

NAPH Comments on CMS-2258-P
March 8, 2007

funds as a source of State share of financial participation under title XIX of the Social Security Act.[60]

The regulation referred to in this provision (which was subsequently moved without substantive change to 42 C.F.R. § 433.51) is the current regulatory authority for the use of "public funds" from "public agencies" as the non-federal share of Medicaid expenditures, including IGTs and CPEs. The Proposed Rule adopts significant modifications to this provision, including a narrowing of the source and types of funds eligible for federal match, requiring "funds from units of governments" rather than "public funds" from "public agencies." Congress' prohibition of changes to this regulation through an interim final regulation was intended to require HHS to undertake notice and comment rulemaking. To the extent that CMS contends that the current regulatory change is effective at any time prior to the finalization of the formal rulemaking process, it is in violation of both the APA and the 1991 Amendments.

*Recommendation: CMS should clarify that all parts of the regulation are effective on a prospective basis.*

### I. Consultation with Governors

Section 5(c) of the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991[61] requires the Secretary to "consult with the States before issuing any regulations under this Act." The preamble of the Proposed Rule does not mention any such consultation with states. Did the agency comply with this statutory mandate, and if so, how and when? Given that the National Governors Association sent a letter on February 23, 2007 to Congressional leadership strongly opposing the Proposed Rule, we also request information on whether the states' concerns have been taken into consideration at all in the formulation of this policy.

*Recommendation: CMS should immediately consult with states on the Proposed Rule and modify or withdraw it based on state concerns.*

### IV.    CMS' REGULATORY IMPACT ANALYSIS IS DEEPLY FLAWED

> *1.  CMS underestimates the administrative burden imposed on states and providers.*

The Proposed Rule imposes significant new burdens on health care providers that CMS fails to acknowledge or severely underestimates. In addition to the significant cut in federal funding that many providers face under the Rule, compliance with new requirements proposed by CMS, including the reporting requirements, will place

---

[60] Pub. L. No. 102-234, §5(b), 105 Stat. 1793, 1804.
[61] Pub. L. No. 102-234.

National Association of Public Hospitals                                  Powell Goldstein LLP
& Health Systems

NAPH Comments on CMS-2258-P
March 8, 2007

substantial additional costs on states and providers. These costs have not been incorporated into CMS' impact analysis; NAPH requests that CMS correct this oversight. As acknowledged in the Proposed Rule, Executive Order 12866 requires agencies to assess both the costs and the benefits of the proposed rule.

For example, costs that are unrecognized in the Proposed Rule include the cost to States that have already formulated complex provider reimbursement methodologies and payment processes based upon existing rules that now must be overhauled to come into compliance with the new rules. As CMS well knows from its role in administering the Medicare program, developing new payment systems for providers is a considerable and costly undertaking. Similarly, many states are going to have to find alternative sources of funding to finance the non-federal share of Medicaid expenditures. To the extent that these sources will involve a redirection of current general revenue funds to plug Medicaid budget holes, other state programs will suffer. To the extent that new taxpayer funding will need to be raised, that is a significant cost to the state. Some states may turn to provider taxes to finance the shortfall, which would not only impose additional costs on providers (including small entities and rural hospitals protected by the Regulatory Flexibility Act) but would involve a substantial commitment of administrative resources to develop and obtain CMS approval for a tax that is compliant under the complex federal provider tax regulations.

The Proposed Rule mandates the creation of additional cost reporting systems to ensure compliance with the cost limit imposed on governmental providers. Even apart from the potential need to create cost reporting systems for provider types that may never have had to deal with cost reporting systems, such as public school districts, states with existing cost reporting systems for hospital providers that do not comply with the Proposed Rule's requirements will be required either to modify their current Medicaid cost report system or to create new ones specifically for this purpose. For example, some states have Medicaid hospital cost report systems that echo the Medicare cost finding system, but may vary in significant ways. The Proposed Rule may require states to adopt cost reports more closely tied to the Medicare cost report to ensure compliance. Furthermore, even in those states that have existing Medicaid cost reporting systems that would pass CMS muster, these systems may not be equipped to capture measurement of costs for the uninsured population or for Medicaid managed care recipients, both of which are potentially relevant in the context of Medicaid DSH payments (or demonstration program payments) to governmental hospital providers.

In addition to the creation and/or modification of these cost reporting systems, states will need to construct new structures for auditing the new cost reports. In the context of CPEs, "periodic State audit and review"[62] is required explicitly, but it is unclear the extent to which CMS expects states to audit and review all cost report submissions.

---

[62] Proposed 42 C.F.R. § 433.52(b)(4).

National Association of Public Hospitals
& Health Systems

Powell Goldstein LLP

Reviewing these cost reports would require additional staffing by state Medicaid agencies and additional expenditures by providers in order to complete the required submissions.

All of these costs -- costs related to creation of the new report system, costs related to auditing the reports, and provider costs of compliance-- should be included in the cost/benefit analysis.

> 2. *The Proposed Rule will have a direct and very significant impact on patient care.*

In addition, we vehemently disagree with the assertion in the Regulatory Impact Analysis that the impact on patient care services will be minimal.[63] As noted above, NAPH members have estimated state-level impacts that anticipate cuts of tens and hundreds of millions of dollars annually per state. With this amount of money drained from the program, significant impacts on patient care services cannot be avoided. These potential impacts include closed community clinics, reduced hours in the remaining clinics, increased reliance on emergency departments for routine care, a reduction in emergency preparedness, less outreach and patient education efforts, little or no investment in expanded access, delayed or canceled plans to upgrade information systems and adopt electronic medical records, less ability to provide translation services to non-English speakers, reduced capacity to maintain or launch intensive disease management programs, etc. The choices available to providers to cope with multimillion dollar funding cuts are not plentiful and are always painful. There is no "fat" left in the system after years of public and private funding cuts; there are no "easy" cuts to make. Virtually any decision made by a hospital system to adjust their budgets to cuts of this magnitude will certainly have a direct impact on patient care, no matter how much the hospital may try to avoid it. CMS ignores the impact this regulation will have, particularly on the poorest and most vulnerable patients.

> 3. *CMS fails to acknowledge the widespread economic impact on local communities.*

In addition, the Proposed Rule will have a significant economic impact on local communities, as public providers reliant on supplemental Medicaid funding eliminated by this regulation take steps to cut their budgets. Public hospitals typically are a significant economic force in their communities, and their financial health (or lack thereof) has far-reaching ripple effects. Many of these budget cuts will necessarily entail layoffs. The inability to invest in infrastructure will be felt by vendors and contractors in the community. The impact of reduced access will have effects on the health of the community, including the health of the community's workforce, thereby impacting employers throughout the hospital's service area. The community's preparedness for emergencies may suffer because of lack of funding, impacting the ability of the

---

[63] 72 Fed. Reg. at 2245.

NAPH Comments on CMS-2258-P
March 8, 2007

community to attract and retain new businesses and employers crucial to economic vitality. Existing businesses that cater to hospital employees will feel the effects of a shrinking workforce. To the extent that local governments need to step in to fill the gaps caused by the withdrawal of federal funds, every single local taxpayer is affected. A vibrant, dynamic and comprehensive health care safety net is a crucial ingredient in the success of local economies. CMS fails to acknowledge the impact of this Medicaid funding cuts on the economic health of local communities.

***Recommendation: CMS should reevaluate its estimate of the impact of the Proposed Rule and the need for regulatory relief under the Regulatory Flexibility Act. Upon reevaluation of the impact, CMS should either withdraw the proposal or modify as recommended in Part II of these comments.***

35

# Exhibit 10

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ALAMEDA COUNTY MEDICAL
CENTER,

*et al.*

           **Plaintiffs,**

    v.

THE HONORABLE MICHAEL O.
LEAVITT, in his official capacity as
Secretary, United States Department of
Health and Human Services,

*et al.*

           **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No.**

## DECLARATION OF MELINDA REID HATTON

I, Melinda Reid Hatton, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am the Senior Vice President and General Counsel for Plaintiff the American Hospital Association ("AHA"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in AHA's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as AHA's General Counsel since 2007, and prior to that as Chief Washington Counsel for AHA beginning in October 2000.

4. AHA is a non-profit corporation incorporated under the laws of the State of Illinois. AHA has offices in Washington, D.C.

5. AHA is the primary national membership organization for hospitals in the United States. Its membership includes approximately 5,000 hospitals, health systems, networks, and other providers of care. AHA's mission is to promote high quality health care and health services through leadership and assistance to hospitals in meeting the health care needs of their communities.

6. AHA represents its members' interests in matters before Congress, the Executive Branch, and the courts, as well as with other public and private entities. AHA has a long history of advocating on behalf of its members on matters related to payment for services provided to Medicaid recipients and the financing of the Medicaid program.

7. On January 18, 2007, the Centers for Medicare & Medicaid Services ("CMS") proposed the regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 2236 ("Proposed Rule"). Among other things, CMS proposed to upend decades of Medicaid law to: 1) limit Medicaid payments for government-operated hospitals to the costs of providing Medicaid services to Medicaid recipients, and 2) narrow the definition of units of government eligible to contribute to the non-federal share of Medicaid expenditures.

8. AHA submitted a comment letter to CMS on March 15, 2007, outlining our concerns with the Proposed Rule's unauthorized and unwarranted new policies, and their detrimental impact on safety net hospitals and Medicaid beneficiaries' access to care. A true and correct copy of AHA's comment letter is attached hereto and made a part hereof as Exhibit A.

9. AHA was involved in advocacy efforts to achieve a legislative moratorium on implementation of the Proposed Rule to provide Congress the opportunity to fully consider the complex issues involved and to legislate as necessary. Congress passed this moratorium on May 24, 2007, and the President signed the legislation containing the moratorium into law on

May 25, 2007. U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Sec. 7002(a) (Pub. L. No. 110-28).

10. CMS purported to issue a final version of the rule by putting it on display at the Federal Register on May 25, 2007. 72 Fed. Reg. 29748 (May 29, 2007) ("Rule"). AHA submitted a comment letter on July 13, 2007 in response to the Rule. A true and correct copy of AHA's supplemental comment letter is attached hereto and made a part hereof as Exhibit B.

11. The Rule, if implemented, will result in significantly reduced funding for Medicaid providers, in particular safety net hospitals and health systems, and will put at risk their ability to continue to provide critical medical services to those in their communities with nowhere else to turn.

12. The attached comment letters detail AHA's concerns that a cost-based limit on hospital payments only to government-operated providers is arbitrary and capricious, inappropriately differentiates between government-operated hospitals and other hospitals with no rational basis, is precluded by clear statements in the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000, and would create an unwarranted burden on providers and States.

13. The comments further explain that the Rule's severely constrained definition of a unit of government eligible to contribute funds to the non-federal share of Medicaid expenditures is inconsistent with the language and statutory framework of the Medicaid statute, Title XIX of the Social Security Act.

14. The comments also contain our concern that CMS did not provide sufficient data to support its estimated savings from the spending cuts in the Rule, raising questions about the rationale upon which CMS based these sweeping changes.

15. AHA and its members have an interest in delivering quality health care to Medicaid and other low-income recipients in an efficient manner and at payment rates sufficient to enable them to continue to meet their patients' needs. If the provisions of this Rule are implemented, many of AHA's safety net hospital members will be required to make deep cuts in essential services that they have struggled to provide in the past.

16. These cuts will undermine the ability of states and hospitals to ensure quality of care and access to services for Medicaid beneficiaries, as well as to continue their substantial investments in health care initiatives to promote the policy goals of CMS and the Department of Health and Human Services ("HHS"), including adoption of electronic health records, reducing disparities in care provided to minority populations, and enhancing access to primary and preventative care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 10, 2008
Washington, DC

(Signature): _____
Melinda Reid Hatton
Senior Vice President &
General Counsel
American Hospital Association

# Exhibit 10-A



**American Hospital Association**

Liberty Place, Suite 700
325 Seventh Street, NW
Washington, DC 20004-2802
(202) 638-1100 Phone
www.aha.org

#728

March 15, 2007

Leslie Norwalk
Acting Administrator
Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W., Room 445-G
Washington, DC 20201

*Re: (CMS-2258-P) Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership, (Vo. 72, No. 11), January 18, 2007*

Dear Ms. Norwalk:

On behalf of our nearly 5,000 member hospitals, health systems and other health care organizations, and our 37,000 individual members, the American Hospital Association (AHA) appreciates the opportunity to comment on the Centers for Medicare & Medicaid Services' (CMS) proposed rule restricting how states fund their Medicaid programs and pay public hospitals. The AHA opposes this proposed rule and would like to highlight the harm it would cause to our nation's hospitals and the patients they serve.

The rule represents a substantial departure from long-standing Medicaid policy by imposing new restrictions on how states fund their Medicaid programs. The rule further restricts how states reimburse safety-net hospitals. In addition, CMS fails to provide data justifying the need or basis for these restrictions. This unauthorized and unwarranted shift in policy will have a detrimental impact on providers of Medicaid services, particularly safety-net hospitals, and on patient access to care.

CMS estimates the rule will cut $3.9 billion in federal funds over five years. This amounts to a budget cut for safety-net hospitals and state Medicaid programs that bypasses the congressional approval process and comes on the heels of vocal congressional opposition to the Administration's plans to regulate in this area. Last year, 300 representatives and 55 senators signed letters to Health and Human Services (HHS) Secretary Mike Leavitt opposing the Administration's attempt to circumvent Congress and restrict Medicaid payment and financing policy. Recently, Congress restated its position with 226 representatives and 43

Leslie Norwalk
March 15, 2007
Page 2 of 12

senators having signed letters to the House and Senate leadership urging them to stop this proposed rule from moving forward.

Policy changes of this magnitude must be made in a way that will ensure the health care needs of Medicaid recipients are met. Historically, whenever there has been a substantial change to Medicaid funding policy – such as prohibiting provider-related taxes and donations, modifying disproportionate share (DSH) hospital allotments, or modifying application of Medicaid upper payment limits (UPLs) – those changes have been made, or at the very least, supported by Congress. If CMS intends to make further sweeping changes to Medicaid, they should first be made by legislation, not regulation. Indeed, the Administration recognized this in its fiscal year 2006 budget submissions to Congress, where it proposed that Congress pass legislation to implement the very policy changes contained in this rule.

The AHA also is concerned that in several places in the preamble discussion, CMS describes its proposed changes as "clarifications" of existing policy, suggesting that these policies have always applied, when in fact, CMS is articulating them for the first time. By describing many changes as clarifications, CMS appears to be trying to do an "end run" around the notice-and-comment process. Any attempt to implement these proposals in a retrospective nature would violate the *Administrative Procedures Act*.

Attached to this letter is a detailed discussion of our concerns relating to:

- The cost-based reimbursement limitation and the individual provider-based UPL to be applied to government-operated providers;
- The proposed narrowing of the definition of "unit of government;"
- The proposed restrictions on intergovernmental transfers and certified public expenditures and the characterization of CMS' proposed changes as "clarifications" rather than changes in policy; and
- The absence of data or other factual support for CMS' estimate of savings under the proposed rule.

If these policy changes are implemented, the nation's health care safety net will unravel, and health care services for millions of our nation's most vulnerable people will be jeopardized. We urge CMS to permanently withdraw its proposed rule.

If you have any questions, please feel free to contact me or Molly Collins Offner, senior associate director for policy, at (202) 626-2326 or mcollins@aha.org.

Sincerely,


Rick Pollack
Executive Vice President

Leslie Norwalk
March 15, 2007
Page 3 of 12

**The American Hospital Association's
Detailed Comments on CMS-2258-P**

**Table of Contents**

COST LIMIT FOR PUBLIC HOSPITALS ................................................4

    COST LIMIT ................................................................................4

    DIFFERENTIAL TREATMENT OF PUBLIC AND PRIVATE HOSPITALS .....................7

    REQUIREMENTS OF THE MEDICARE, MEDICAID AND SCHIP BENEFITS

    IMPROVEMENT AND PROTECTION ACT OF 2000 ............................................7


PROPOSED DEFINITION OF "UNIT OF GOVERNMENT" ...................................8

LIMITATIONS ON INTERGOVERNMENTAL TRANSFERS AND
CERTIFIED PUBLIC EXPENDITURES................................................10

    RESTRICTIONS ON IGTS ........................................................10

    RESTRICTIONS ON CPEs........................................................11


INSUFFICIENT DATA TO SUPPORT CMS' ESTIMATE OF SPENDING
CUTS.................................................................................12

Leslie Norwalk
March 15, 2007
Page 4 of 12

## Cost Limit for Public Hospitals

The rule proposes to limit reimbursement for government-operated hospitals to the cost of providing Medicaid services to Medicaid recipients. In addition, the rule restricts states' ability to make supplemental payments to providers with financial need by setting the Medicaid UPL for government-operated hospitals at the individual facility's cost. This proposal is effectively a cut in funding for those public hospitals[1] and safety-net providers that – as CMS has recognized – are in stressed financial circumstances and are most in need of enhanced payments. These cuts will undermine the ability of states and hospitals to ensure quality of care and access to services for Medicaid beneficiaries, as well as to continue their substantial investments in health care initiatives to promote HHS' policy goals, including adoption of electronic health records, reducing disparities in care provided to minority populations, and enhancing access to primary and preventative care.

As explained below, the AHA believes that it is arbitrary and capricious to impose a cost-based limitation on hospital reimbursement and to deny states the flexibility to reward hospitals – both public and private – whose costs for services are less than the rates states might pay, for example, under a prospective payment system. Further, imposing a hospital-based UPL is contrary to the requirement of the *Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000* (BIPA) that CMS establish an aggregate UPL, and it will create an unwarranted burden on providers and states.

In proposing a cost-based reimbursement system for government hospitals, CMS also fails to define allowable costs. The AHA is very concerned that in CMS' zeal to reduce federal Medicaid spending, important costs, such as graduate medical education, physician on-call services or clinic services, would not be recognized and therefore would no longer be reimbursed. The AHA is further concerned that the Administration plans to eliminate all federal funding for Medicaid graduate medical education as outlined in the president's fiscal year 2008 proposed budget. Congress should have the opportunity to review any change to the Medicaid program's support for graduate medical education, and we urge CMS not to move forward with any proposed rule that would implement the president's budget proposal.

## Cost Limit

In the preamble to the proposed rule, CMS says that it does not find Medicaid payments in excess of cost to government-operated health care providers to be consistent "with the statutory principles of economy and efficiency as required by section 1902(a)(30)(A)" of the *Social Security Act* (the "Act"). If CMS' goal is to assure that Medicaid payments are consistent with economy and efficiency, then there is no basis for imposing a cost-based reimbursement system to only government-operated hospitals. The AHA, however, opposes limiting any individual hospital's reimbursement to 100 percent of costs.

In the Regulatory Impact Analysis of its January 2001 final rule modifying the Medicaid UPL, CMS concluded:

---

[1]    Although the AHA confines its comments to hospitals, it recognizes the broader implications of the proposed rule for non-hospital providers of Medicaid services.

Leslie Norwalk
March 15, 2007
Page 5 of 12

> While a facility-specific limitation may be the most effective
> method to ensure state service payments are consistent with
> economy and efficiency, when balanced against the additional
> administrative requirements on states and HCFA, coupled with
> congressional intent for states to have flexibility in rate setting, *we
> are not sure that the increased amount of cost efficiency, if any,
> justifies this approach as a viable option.*

66 Fed. Reg. 3148, 3174 (Jan. 12, 2001) (emphasis added).

In the preamble to its January 18, 2002 final rule removing the 150 percent UPL for hospital
services furnished by non-state, government-owned or -operated hospitals, CMS stated that
the revised UPL of 100 percent for non-state government providers "will assure that
payments will be consistent with 'efficiency, economy and quality of care' as required by
section 1902(a)(30)(A) of the *Social Security Act*." 67 Fed. Reg. 2602, 2608 (Jan. 18, 2002).

CMS does not provide any explanation in the proposed rule why the 100 percent aggregate
UPL is now insufficient to meet the efficiency and economy requirements of section
1902(a)(30)(A) and must be replaced with a UPL based on each individual provider's costs
and a cost-based reimbursement limit. As CMS is aware, Congress moved away from cost-
based reimbursement under Medicaid when it adopted the so-called "Boren Amendment" in
1980. Since then, hospital reimbursement systems have evolved following the model of the
Medicare program and its use of prospective payment systems. These reimbursement
systems are intended to improve efficiency by rewarding hospitals that can keep costs below
the amount paid. Many state Medicaid programs have adopted this method of hospital
reimbursement, yet CMS is proposing to resurrect a cost-based limit.

CMS says that it has examined state Medicaid financing arrangements and found that "many"
states are making supplemental payments to government-operated providers in excess of cost,
and that this excess payment is used to subsidize health care operations unrelated to Medicaid,
or is returned to the state as a source of revenue. The agency provides no data or factual
support for how many states are making such "excess payments" nor any specific information
regarding how providers in these states are using these excess payments. Moreover, as CMS
has repeatedly recognized, the aggregate UPL system affords states the flexibility to tailor
reimbursement policy to meet local needs by making supplemental payments to particular
hospitals in financial stress.

In a brief filed in federal court litigation over the 2002 UPL rule[2] (the "UPL Brief"), CMS
described the "concept" behind the UPL as being able "to set aggregate payment amounts for
specifically-defined categories of health care providers and specifically-defined groups of
providers, but leave the states considerable flexibility to allocate payment rates within those
categories and groupings." UPL Brief, page 9. In the preamble to the 2002 final rule, CMS
stated that, under the 100 percent UPL, "states also retain some flexibility to make enhanced
payments to selected public hospitals under the aggregate limit." 67 Fed. Reg. at 2603. CMS

---

[2]    Defendant's Memorandum in Support of His Motion for Summary Judgment and in
Opposition to Plaintiffs' Motion for a Permanent Injunction, *Ashley County Medical Center v.
Thompson*, 205 F. Supp. 2d 1026 (E.D. Ark.) (No. 4:02CV00127).

Leslie Norwalk
March 15, 2007
Page 6 of 12

reiterated this position on pages 3-4 of the UPL Brief, stating that "[t]he new rules leave states considerable flexibility to direct higher Medicaid payments to particular hospitals that may be in stressed financial circumstances."

CMS also has expressly recognized the potential financial implications of limiting reimbursement to an individual provider's costs, and the importance of the aggregate UPL system for preserving access to Medicaid services, particularly with regard to safety-net hospitals. In the UPL Brief on page 39, CMS pointed out that "the upper payment limit is an aggregate limit for all institutions in the category of non-state public hospitals, not an individual limit for each hospital." Responding to the allegation that several public hospitals in Arkansas would be jeopardized by the 100 percent UPL, CMS reasoned that

> the state could increase payments for those particular hospitals and decrease payment levels at other county and local hospitals (perhaps in more affluent parts of the state) where the low-income patient load was less heavy. . . There is no reason to merely suppose that state governments will be indifferent to the special needs of particular urban or rural hospitals in deciding how aggregate Medicaid payments will be allocated among non-state public hospitals. An equal and across-the-board reduction in Medicaid payments for county and local hospitals -- the assumption on which all of plaintiffs' fiscal speculations are apparently premised – is neither mandated nor even contemplated by the 100 percent rule.

Id. at 39-40 (emphasis in original).

CMS is now mandating just such an "across-the-board reduction," disregarding without explanation its prior statements regarding the importance of the flexibility allowed states under the UPL system to make enhanced payments to hospitals in special need. This policy change will penalize states and providers that have never utilized abusive or inappropriate funding mechanisms by denying those states the ability to pay public hospitals more than 100 percent of costs. Moreover, CMS has not provided clear direction in the proposed rule as to which costs CMS will permit states to reimburse.

CMS' proposal will directly harm the ability of states to meet their statutory obligation to ensure access to care for Medicaid beneficiaries. Under section 1902(a)(30)(A) of the Act, states must assure that Medicaid payments "are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." By prohibiting states from reimbursing a provider for more than costs, and restricting states from making enhanced payments to providers in financial need, CMS is imposing a funding restriction that will ultimately be passed on from the states to government providers. To the extent that these cuts in funding will lead to a curtailment in beneficiary care and services, it is the states – and not CMS – that will be subject to challenge or complaint by beneficiary advocates and to witnessing their citizens' care compromised.

Leslie Norwalk
March 15, 2007
Page 7 of 12

### DIFFERENTIAL TREATMENT OF PUBLIC AND PRIVATE HOSPITALS

Under CMS' proposal, the cost-based limit on reimbursement and the individual provider-based UPL, will apply only to government-operated providers. States will continue to be able to make Medicaid payments to private hospitals that exceed costs, and private hospitals will continue to be reimbursed under an aggregated UPL. If, as CMS suggests, its policy is consistent with the requirements of economy and efficiency under section 1902(a)(30)(A) of the Act, there is no rational basis for distinguishing between public and private hospitals. Requiring differential treatment of public and private Medicaid hospitals also is inconsistent with the equal protection clause of the Constitution, as well as CMS' own repeated statements regarding the importance of payment equality for all categories of Medicaid hospitals.

As discussed above, CMS' rationale for proposing a cost limitation on reimbursement for government-operated providers is the requirement of economy and efficiency in section 1902(a)(30)(A) of the Act. CMS does not provide any explanation of why subjecting public, but not private, hospitals to a cost limitation is economic and efficient. To the contrary, CMS has repeatedly emphasized the importance of payment equality among categories of Medicaid providers. Restoring such "payment equity" was one of the Secretary's stated rationales for implementing the 100 percent UPL in the 2002 final rule. CMS agreed with the statement of commenters to the 2002 final rule that "one group of providers should not have a financial benefit over another group of providers who provide the same type of services." 67 Fed. Reg. at 2604. CMS went on to explain that its intent in the rule was "to treat all facilities equally, and apply the same aggregate UPL to each group of facilities, regardless of who owns or operates the facilities." Id. This notion of payment equity across groups of Medicaid providers is repeated throughout the preamble to the 2002 final rule,[3] and the "equity rationale" was highlighted in CMS' 2002 UPL Brief as "standing alone . . . sufficient to sustain the 100 percent rule against a claim that it is arbitrary and capricious, in violation of the Administrative Procedures Act." CMS provides no explanation for how it is now consistent with economy and efficiency to reverse its stance on the importance of payment equity by imposing a discriminatory and unfair reimbursement limit on government-operated providers. There is no rational basis for a policy that prevents public Medicaid providers from availing themselves of the same benefits afforded private Medicaid providers, and it is contrary to the equal protection afforded under the Constitution. Moreover, the AHA opposes limiting any individual hospital's Medicaid reimbursement to 100 percent of costs.

### REQUIREMENTS OF THE MEDICARE, MEDICAID AND SCHIP BENEFITS IMPROVEMENT AND PROTECTION ACT OF 2000

Section 705(a) of BIPA required CMS to issue a final regulation modifying the UPL test applied to state Medicaid spending "by applying an *aggregate* upper payment limit to

---

[3]    *See, e.g.,* 67 Fed. Reg. at 2604 ("this rule is critical for maintaining the fiscal integrity of the Medicaid program and ensuring that all facilities are treated equally under Federal Medicaid UPL regulations"); *id.* at 2605 ("We believe the reduction of the UPL from 150 percent to 100 percent will be sufficient to maintain the fiscal integrity of the Medicaid program and ensure that all facilities are treated equally under the Federal Medicaid UPL regulations").

Leslie Norwalk
March 15, 2007
Page 8 of 12

payments made to government facilities that are not state-owned or -operated facilities."
(Emphasis added.)  Section 701(a)(3) of BIPA, which addressed modifications to DSH
payments, used the same language in describing the final regulation required under section
705(a), as "relating to the application of an *aggregate* upper payment limit test for state
Medicaid spending . . . [for services] provided by government facilities that are not state-
owned or -operated facilities."  (Emphasis added.)  Congress explicitly contemplated that
CMS' final regulation regarding UPLs would apply an aggregate limit.  CMS' proposed rule,
which removes the aggregate UPL and imposes a limit based on the individual provider's
costs, is precluded by the clear statement in BIPA that UPLs be based on an aggregate limit
for each provider class.

## PROPOSED DEFINITION OF "UNIT OF GOVERNMENT"

CMS proposes to define the term "unit of government" by reference to a provision of the
Medicaid statute that defines the distinct and more narrow term "unit of *local* government."
Both of these terms are used in the subsection of the statute regarding provider donations and
taxes, but by picking and choosing which provisions it will apply, CMS has ignored both the
statutory framework and purposes of these distinct terms.  Moreover, even if the statutory
definition of "unit of local government" were applicable to CMS' proposal, it cannot
reasonably be read to have the narrow meaning that CMS sets forth in the proposed rule.

CMS proposes to add new language to its rules governing state financial participation in
Medicaid.  Specifically, CMS proposes to define a unit of government to "conform" with the
definition of "unit of local government" in the provider tax and donations provisions of the
Medicaid statute (1903(w)(7)(G)).  Under the proposed rule, only those entities that meet
CMS' new definition of "unit of government" will be permitted to fund the state's share of
Medicaid expenditures.  CMS inappropriately limits its definition of "unit of local
government" to entities with "generally applicable taxing authority."  There is no basis for
this restriction in the Medicaid statute.  CMS' proposed definition ignores the principles of
federalism that afford states discretion in structuring their political subdivisions and will
impose substantial harm on public hospitals.  We urge CMS not to finalize this proposal.

In the rule, CMS proposes to use Congress' definition for a unit of *local* government as the
basis for its proposed definition of the broader term "unit of government."  Section
1903(w)(7)(G) of the Act defines the term "unit of local government."  This term is used in
subsection 1903(w)(1)(A) of the Act, which reduces the federal contribution to Medicaid by
revenues received by states or units of local government from certain provider donations or
health care-related taxes.  The proposed rule has no connection to this subsection.  Rather,
CMS is using the definition of unit of local government to define a different, broader term –
"unit of government" – which is the term used in the subsection 1903(w)(6)(A) of the Act
restricting CMS' authority to regulate intergovernmental transfers (IGTs).

CMS' reliance on the definition of unit of local government is misplaced.  "Where Congress
includes particular language in one section of a statute but omits it in another section of the
same Act, it is generally presumed that Congress acts intentionally and purposely in the

Leslie Norwalk
March 15, 2007
Page 9 of 12

disparate inclusion or exclusion."[4]  Congress used the narrower term "unit of *local* government" to define those government entities subject to the prohibition on provider donations and taxes (1903(w)(1)(A)), but recognized that other government entities may permissibly make IGTs, and thus purposely used the broader and different term "unit of government" in the IGT section of the statute (1903(w)(6)(A)).

Not only is CMS basing its proposal on the wrong statutory definition, it has narrowed the definition in a way that is incompatible with the terms of the statute.  Section 1903(w)(7) (G) defines a unit of local government to mean, "a city, county, special purpose district, or other governmental unit in the state."  The proposed rule, by comparison, limits the definition of a unit of government to those entities that have "generally applicable taxing authority."  It further states that a health care provider may be considered a unit of government,

> only when it is operated by a unit of government as demonstrated by a showing of the following:
> - The health care provider has generally applicable taxing authority; or
> - The health care provider is able to access funding as an integral part of a unit of government with taxing authority which is legally obligated to fund the health care provider's expenses, liabilities, and deficits, so that a contractual arrangement with the state or local government is not the primary or sole basis for the health care provider to receive tax revenues.

CMS states in its preamble discussion that the proposed provisions are modified "to be consistent" with the statute.  The AHA respectfully disagrees with this characterization.  The definition of "unit of government" in section 1903(w)(7)(G) does not include the words "generally applicable taxing authority" nor any of the other restrictive language that CMS proposes.  Instead, Congress defined the term in a way that affords deference to the states' right to structure their own governmental subdivisions, in accordance with the constitutional principles of federalism.  Rather than "conforming" the regulation to this statutory definition, CMS narrows it in a manner that is not authorized by the plain text of the statute and intrudes upon the traditional authority of the states.

The deference that Congress provided to states under its definition of unit of local government is reinforced by section 1903(d)(1) of the Act, which requires the Secretary to estimate the amount of the federal Medicaid payment based on the state's reported estimate of Medicaid expenditures for the quarter and the amount "appropriated or made available by the state and its political subdivisions for such expenditures in such quarter."  There is no limitation in section 1903(d)(1) on which political subdivisions may make funding available for Medicaid expenditures, and certainly no requirement that such subdivisions have "generally applicable taxing authority."

---

[4]    *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F. 2d 720, 722 (5th Cir. 1972).  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Leslie Norwalk
March 15, 2007
Page 10 of 12

CMS' restrictive definition will have significant practical implications for public hospitals, particularly those that have restructured to achieve gains in efficiency. For example, the University of Colorado Hospital Authority was established as a quasi-governmental and corporate entity based on a finding by the Colorado General Assembly that the University of Colorado University Hospital Authority was "unable to become and remain economically viable due to constraints imposed by being subject to various kinds of government policy and regulation." Colo. Rev. Stat. § 23-21-501(1)(d). In a February 20 letter to Colorado Gov. Bill Ritter, University of Colorado Hospital President and CEO Bruce Schroffel stated that the University of Colorado Hospital could lose $30 million in funding a year because it would not meet CMS' restrictive new definition of "unit of government" and would be unable to generate certified public expenditures (CPEs). Similarly, in a March 14 letter to CMS Acting Administrator Leslie Norwalk, the California Hospital Association Disproportionate Share Task Force noted that the University of California's medical centers and Alameda County (CA) Medical Center may be at risk of losing essential funding because they would appear not to meet CMS' stringent proposed definition.

## LIMITATIONS ON INTERGOVERNMENTAL TRANSFERS AND CERTIFIED PUBLIC EXPENDITURES

CMS' proposed rule imposes significant new restrictions on a state's ability to fund the non-federal share of Medicaid payments through IGTs and CPEs, including limiting the source of IGTs to funds generated from tax revenue. The AHA believes these proposed restrictions directly conflict with the purpose and plain language of the Medicaid statute. In 1991, Congress identified certain provider donations and provider-related taxes as an inappropriate means of funding the non-federal share of Medicaid payments and restricted the use of these financing mechanisms. In doing so, however, Congress included a specific provision in section 1903(w)(6)(A) of the Act to make clear that these restrictions would not affect the use of IGTs. CMS is now using this provision, which was intended to limit the Secretary's authority to regulate IGTs derived from state or local taxes, as the basis for a new requirement that *all* IGTs must be made from state or local taxes.

In the proposed rule's preamble, CMS states that it has systematically eliminated inappropriate financing arrangements, such as recycling mechanisms, through the state plan amendment process. If these abusive practices have been addressed, it is unclear why CMS is proposing an unauthorized restriction on the source of IGTs. This proposal is inconsistent with Medicaid law and historic CMS policy.

### RESTRICTIONS ON IGTs

Under the proposed rule, only entities that meet CMS' restrictive new definition of "unit of government" are permitted to make IGTs. As discussed above, CMS says that it has based this definition on section 1903(w)(7)(G) of the Act, which defines a unit of *local* government, not a "unit of government." Additionally, in the preamble to the proposed rule, CMS claims that, "generally," for the state to receive the federal match where a government-operated heath care provider has transferred the non-federal share, the state must demonstrate "(1)

Leslie Norwalk
March 15, 2007
Page 11 of 12

[t]hat the source of the transferred funds is state or local tax revenue (which must be supported by consistent treatment on the provider's financial records); and (2) that the provider retains the full Medicaid payment and is not required to repay, or in fact does not repay, all or any portion of the Medicaid payment to the state or local tax revenue account." This fundamental change in IGT policy appears to be discussed only in the preamble and is not addressed in the text of the proposed regulations. The use of the term "clarify" suggests that CMS views the fundamental changes it is proposing as merely clarifications of existing Medicaid funding policy. However, CMS is articulating for the first time a substantial shift in Medicaid policy. The proposed changes go far beyond mere clarifications and, as a result, any attempt to implement them on a retrospective basis would be contrary to the notice and comment requirements of the *Administrative Procedure Act*.

As noted above, CMS claims that the basis for these new limitations on the use of IGTs is the agency's intent "to conform" its regulatory language to section 1903(w)(6)(A) of the Act, which sets forth an exception from restrictions on provider-related donations and taxes. Rather than "conforming" the proposed rule to this statutory exception, CMS does the opposite. Congress included this statutory exception to permit states to continue using state or local taxes to make IGTs. It did not authorize CMS to require states to only use state or local taxes to make IGTs, nor did it preclude the use of other sources of funds, such as patient care revenues.

Section 1903(w)(6)(A) is not the only place where Congress made clear that the state share of Medicaid payments could come from local sources other than local tax revenue. Section 1902(a)(2) of the Act permits up to 60 percent of the state's share of financial participation to come from "local sources," without restriction. If Congress had wanted to limit state financial participation to funding from state or local tax revenue, it would have included that requirement explicitly.

CMS itself has acknowledged that it has limited authority to regulate IGTs. In the 2002 final rule, CMS stated that, "[u]nder section 1903(w)(6)(A) of the Social Security Act, the Congress limited [CMS'] authority to regulate states' certain uses of IGTs." 67 Fed. Reg. at 2606. CMS stated further, in response to a comment that public hospitals be required to have a net gain of at least two-thirds of additional federal funds collected under hospital-based UPL plans, "[i]t is not clear what the commenter believes would be the legal authority for CMS to limit a hospital's use of its own funds." Id. at 2605. Moreover, although CMS "gave consideration to formulating a policy with respect to" IGTs in the Regulatory Impact Analysis of its 2001 final rule, CMS said that it "did not pursue this alternative because we recognize that states, counties, and cities have developed their own unique arrangements for sharing in Medicaid costs. Furthermore, there are statutory limitations placed on the Secretary which limit the authority to place restrictions on IGTs." 66 Fed. Reg. at 3175. Now, contrary to these prior statements, CMS is inappropriately construing the same statutory terms to impose restrictions on states that Congress did not authorize or intend.

RESTRICTIONS ON CPES

The AHA is troubled by CMS' new standards for generating and documenting CPEs and is concerned about the administrative burden on both hospitals and states. CMS proposes new standards for the documentation of CPEs that are used to fund the non-federal share of

Leslie Norwalk
March 15, 2007
Page 12 of 12

expenditures. The government entity will be required to submit to the state Medicaid agency a certification statement including an attestation regarding compliance with the Medicaid state plan and the Medicaid regulations. The certification must be submitted by the state to CMS as the basis for the state claim for federal funds within two years of the date of the expenditure. In addition, CMS states that a public provider may generate a CPE from its own costs only if the state plan contains an actual cost reimbursement methodology.

Under the proposed rule, in order for the states to develop interim payment rates for providers that are paid using a cost reimbursement methodology funded by CPEs, the state must undertake two separate reconciliations. Additionally, while generating little real benefit, the new documentation standards are likely to result in substantial administrative burden on hospitals and may even subject Medicaid providers to unwarranted allegations of *False Claims Act* violations. AHA members take seriously their obligations to report Medicaid expenditures properly, and CMS can ensure the accuracy of Medicaid claims without imposing this burdensome certification requirement.

## INSUFFICIENT DATA TO SUPPORT CMS' ESTIMATE OF SPENDING CUTS

The proposed rule is subject to the arbitrary and capricious standard of review under the *Administrative Procedure Act*. Before a rule is finalized, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'"[5] CMS says that the proposed rule is estimated to result in $3.87 billion in savings over five years, but does not provide any relevant data or facts to support this conclusion. The basis for this estimate appears to be that CMS has "examined Medicaid state financing arrangements across the country" and, in doing so, has "identified numerous instances in which state financing practices do not comport with the Medicaid statute." CMS does not indicate what these financing practices might be or how many states are currently employing them. Moreover, CMS expressly says that it has systematically required states to eliminate problematic financing arrangements through the state plan amendment process. This raises further questions about the estimated savings and casts doubt on the rational upon which CMS has based these sweeping policy changes to how states finance their share of Medicaid and how states reimburse their public providers.

---

[5]    *Ashley County Medical Center v. Thompson*, 205 F. Supp. 2d 1026, 1048 (E.D. Ark. 2002)

# Exhibit 10-B



**American Hospital Association**

Liberty Place, Suite 700
325 Seventh Street, NW
Washington, DC 20004-2802
(202) 638-1100 Phone
www.aha.org

July 13, 2007

Leslie Norwalk, Esq.
Acting Administrator
Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W., Room 445-G
Washington, DC 20201

**Re:** *(CMS-2258-FC) Final Rule - Medicaid Program; Cost Limit for Providers Operated by Units of Government (Vol. 72, No. 102), May 29, 2007*

Dear Ms. Norwalk:

On behalf of our nearly 5,000 member hospitals, health systems and other health care organizations, and our 37,000 individual members, the American Hospital Association (AHA) submits the following comments on the Centers for Medicare & Medicaid Services' (CMS) final rule restricting how states fund their Medicaid programs and pay public hospitals.

Congress' one-year moratorium on the final rule, we believe, precludes CMS from taking action regarding this rule. As a result, the agency should withdraw the rule. However, CMS has chosen to publish the final rule and is soliciting comments on the definition of units of government while noting that it cannot move forward until May 2008. The AHA opposes CMS' policy changes set forth in the rule.

CMS' new definition of "unit of government" will determine which government hospitals and other providers are eligible to participate in funding states' non-federal share of their Medicaid programs. The new definition also will determine which providers will be subject to further restrictions on the Medicaid payments they receive.

The final rule makes the following changes from the proposed rule in the definition of "unit of government":

- **Providers with direct access to revenue.** The final rule allows providers that do not have taxing authority, but have direct access to tax revenue, to be defined as "units of government."

Leslie Norwalk, Esq.
July 13, 2007
Page 2 of 4

- **State university teaching hospitals.** The final rule recognizes state teaching hospitals with direct appropriations from the state as a "unit of government." The rule also recognizes that state university teaching hospitals that are receiving appropriated funding and provide supervised teaching experiences to graduate medical school interns and residents enrolled in a state university as providers that are <u>operated</u> by a unit of government.

Through these changes from the proposed rule, CMS has slightly broadened the definition of "unit of government," which may allow a few more providers to qualify as governmental. However, the underlying rationale upon which CMS has based its change to the definition of "unit of government" remains flawed. CMS continues to ignore the principles of federalism that afford states discretion in structuring their political subdivisions, and will impose substantial harm on our public hospitals.

## ANALYSIS OF AND RESPONSES TO PUBLIC COMMENTS – "UNIT OF GOVERNMENT" DEFINITION SECTION 433.50

CMS continues to base its definition of "unit of government" on a subsection of the Medicaid statute regarding provider donations and taxes, which, in fact, define the distinct and more narrow term "unit of *local* government." The AHA, in this letter, reiterates the arguments outlined in our March 15 comment letter on the proposed rule regarding the definition of "unit of government."

CMS defines a unit of government to "conform" with the definition of "unit of local government" in the provider tax and donations provisions of the Medicaid statute (1903(w)(7)(G)). Under this final rule, only those entities that meet CMS' new definition of "unit of government" will be permitted to fund the state's share of Medicaid expenditures. CMS inappropriately limits its definition of "unit of local government" to entities with "taxing authority or direct access to tax revenues." There is no basis for this restriction in the Medicaid statute.

In fact, CMS acknowledges in the final rule that the term "unit of government" is not specifically defined in the statute. CMS uses the definition of a different term, "unit of local government," in section 1903(w)(7)(G) of the *Social Security Act* as the basis for its proposed definition of the term "unit of government." CMS' rationale for this approach is the agency's consideration of the "characteristics generally shared by the entities specifically referenced in the statute" and the statute's "underlying intent."

CMS uses circular reasoning to justify its decision. Without explanation or support, the agency concludes that taxing authority is the "shared" characteristic of the entities in section 1903(w)(7)(G) of the Act as well as the "underlying intent" of Congress in section 1903(w)(6)(A) of the Act. CMS then explains in the final rule that, in order for the statute to be implemented consistently, it must read a link to taxing authority in both the definition of "unit of government" and "unit of local government."

Leslie Norwalk, Esq.
July 13, 2007
Page 3 of 4

CMS' reliance on the definition of "unit of local government" is misplaced. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[1] Congress used the narrower term "unit of *local* government" to define those government entities subject to the prohibition on provider donations and taxes (1903(w)(1)(A)), but recognized that other government entities may permissibly make intergovernmental transfers (IGT), and thus purposely used the broader and different term "unit of government" in the IGT section of the statute (1903(w)(6)(A)).

Not only is CMS basing its final rule on the wrong statutory definition, but it has narrowed the definition in a way that is incompatible with the terms of the statute. Section 1903(w)(7)(G) defines a unit of local government to mean: "a city, county, special purpose district, or other governmental unit in the state." CMS is proposing to limit the definition of a "unit of government" to entities that have taxing authority or direct access to tax revenues. This approach appears to be the agency's interpretation of the "overall statutory rationale" and its reading of "the statutory definition of governmental entities to require certain common qualities, such as taxing authority, or the ability to directly access tax funding." The AHA respectfully disagrees with this characterization of the statute's plain language.

The definition of "unit of government" in section 1903(w)(7)(G) does not include the words "taxing authority" nor any of the other restrictive language that CMS proposes. Instead, Congress defined the term in a way that affords deference to the states' right to structure their own governmental subdivisions, in accordance with the constitutional principles of federalism. Rather than "conforming" the regulation to this statutory definition, CMS narrows it in a manner that is not authorized by the plain text of the statute and intrudes upon the traditional authority of the states.

The deference that Congress provided to states under its definition of unit of local government is reinforced by section 1903(d)(1) of the Act, which requires the Secretary to estimate the amount of the federal Medicaid payment based on the state's reported estimate of Medicaid expenditures for the quarter and the amount "appropriated or made available by the state and its political subdivisions for such expenditures in such quarter." There is no limitation in section 1903(d)(1) on which political subdivisions may make funding available for Medicaid expenditures, and certainly no requirement that such subdivisions have "taxing authority."

---

[1]     *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F. 2d 720, 722 (5th Cir. 1972). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Leslie Norwalk, Esq.
July 13, 2007
Page 4 of 4

CMS' restrictive definition will have significant practical implications for our nation's public hospitals.  If these policy changes are implemented, the nation's health care safety net will unravel, and health care services for millions of our nation's most vulnerable people will be jeopardized.  We urge CMS to permanently withdraw its final rule.

If you have any questions, please feel free to contact me or Molly Collins Offner, senior associate director for policy, at (202) 626-2326 or mcollins@aha.org.

Sincerely,


Rick Pollack
Executive Vice President

# Exhibit 11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER, <br><br> *et al.* <br><br><br> Plaintiffs, <br><br> v. <br><br> THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, <br><br> *et al.* <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Civil Action No. |

## DECLARATION OF IVY BAER

I, Ivy Baer, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am the Regulatory Counsel of Plaintiff the Association of American Medical Colleges ("AAMC"). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in the AAMC's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as the AAMC's Regulatory Counsel since 1996.

4. The AAMC is a non-profit corporation organized and existing under the laws of the State of Illinois. The AAMC is headquartered in Washington, D.C.

5.  The AAMC represents approximately 400 major public and private general acute and specialty teaching hospitals and health systems, all 129 accredited U.S. allopathic medical schools, approximately 94 professional and academic societies, and the nation's medical students and residents.  The mission of the AAMC is to improve the health of the public by enhancing the effectiveness of academic medicine.  The AAMC pursues its mission by assisting academic medicine's institutions, organizations and individuals in carrying out their responsibilities for: educating the physician and medical scientist workforce; discovering new medical knowledge; developing innovative technologies for prevention, diagnosis and treatment of disease; and providing health care services in academic settings.

6.  The AAMC represents its members' interests in matters before Congress, the Executive Branch, and the courts, as well as with other public and private entities.  AAMC has a long history of advocating on behalf of its members on matters related to payment for services provided to Medicaid recipients and the financing of the Medicaid program.

7.  Teaching hospitals are key participants in the health care safety net, providing a disproportionate amount of health care to Medicaid recipients and uninsured patients while maintaining their core missions of education, research, and innovative patient care.  While they represent only 6 percent of all hospitals, about 25 percent of Medicaid discharges are from major teaching hospitals.  Medicaid accounts for 16 percent of the health care provided by faculty practice groups, compared to only 10 percent provided by community-based multi-specialty groups.

8.  Teaching hospitals also have unique roles beyond being important participants in the health care safety net.  These include being sites for the clinical education of all types of health professional trainees; providing environments in which clinical research can flourish; and being

sources of specialized, unique referral/standby services. Major teaching hospitals also play a critical preparedness role as front-line responders in the event of an attack or natural disaster, and they are constantly refining their capabilities to fulfill this role.

9. Major teaching hospitals face significant financial challenges as a result of their missions. The aggregate total margin for the nation's major teaching hospitals is consistently and significantly below that of other hospital groups.

10. State Medicaid programs and the academic medical community have worked together over many years to ensure that the health care needs of Medicaid patients are met while allowing teaching hospitals and their faculty to also fulfill their other missions.

11. On January 18, 2007, the Centers for Medicare & Medicaid Services ("CMS") proposed the regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 2236 ("Proposed Rule"). Among other things, CMS proposed to upend decades of Medicaid law to 1) limit Medicaid payments for government-operated hospitals to the costs of providing Medicaid services to Medicaid recipients, and 2) narrow the definition of units of government eligible to contribute to the non-federal share of Medicaid expenditures.

12. The AAMC submitted a comment letter to CMS on March 19, 2007, outlining our concerns with the proposed rule's unauthorized and unwarranted new policies, and their its detrimental impact on safety net hospitals and Medicaid beneficiaries' access to care. A true and correct copy of the AAMC's comment letter is attached hereto and made a part hereof as Exhibit A.

13. AAMC was involved in advocacy efforts to achieve a legislative moratorium on implementation of the Proposed Rule to provide Congress the opportunity to fully consider the

complex issues involved and to legislate as necessary. Congress passed this moratorium on May 24, 2007, and the President signed the legislation containing the moratorium into law on May 25, 2007. U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Sec. 7002(a) (Pub. L. No. 110-28).

14. CMS purported to issue a final version of the rule by putting it on display at the Federal Register on May 25, 2007. 72 Fed. Reg. 29748 (May 29, 2007) ("Rule") AAMC submitted a comment letter on July 13, 2007 in response to the Final Rule. A true and correct copy of AAMC's supplemental comment letter is attached hereto and made a part hereof as Exhibit B.

15. The Rule, if implemented, will result in significantly reduced funding for Medicaid providers, in particular safety net hospitals and health systems, and will put at risk their ability to continue to provide critical medical services to those in their communities with nowhere else to turn. We are concerned that the changes in the Rule will significantly upset the delicate balance of resources upon which many teaching hospitals rely to fulfill their patient care and other missions.

16. The attached comment letters detail AAMC's concerns that imposing a cost-based limit on hospital payments to government-operated providers would be returning to an ineffective policy. Over time, Medicaid has moved away from cost-based reimbursement because it does not provide incentives for efficient performance. Increasingly, States have followed the Medicare model and established prospective payment systems for their Medicaid programs. This approach encourages efficiency by rewarding hospitals that constrain their costs below the payment amount.

17. The comments further express our concern that the cost limit inappropriately differentiates between government-operated hospitals and other hospitals, and is precluded by clear statements in the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000.

18. The comments further explain our belief that the Rule's severely constrained definition of a unit of government eligible to contribute funds to the non-federal share of Medicaid expenditures is inconsistent with the language and statutory framework of the Medicaid statute, Title XIX of the Social Security Act. Although the definition was revised in the final Rule to include state university teaching hospitals that receive direct appropriations from the State, some state university teaching hospitals do not receive appropriations and yet are nonetheless considered governmental under state law.

19. AAMC and its members have an interest in delivering quality health care to Medicaid and other low-income recipients in an efficient manner and at payment rates sufficient to enable them to continue to meet their patients' needs. If the provisions of this Rule are implemented, many of AAMC's member hospitals would be forced to take steps to offset this financial loss, which in some cases would include cutting essential services to Medicaid and other low-income patients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 6, 2008
Washington, DC

(Signature):

Ivy Baer
Regulatory Counsel
Association of American Medical
Colleges

# Exhibit 11-A



March 19, 2007

**Association of
American Medical Colleges**
2450 N Street, N.W., Washington, D.C. 20037-1127
**T** 202 828 0400 **F** 202 828 1125
www.aamc.org

**Via Hand Delivery**

Leslie Norwalk, Esq.
Acting Administrator
Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building
Room 445-G
200 Independence Ave, SW
Washington, DC  20201

Attention:  **CMS-2258--P**

Dear Administrator Norwalk:

The Association of American Medical Colleges (AAMC) welcomes this opportunity to
comment on the Centers for Medicare & Medicaid Services' (CMS or the Agency)
proposed rule entitled *"Medicaid Program; Cost Limit for Providers Operated by Units
of Government and Provisions to Ensure the Integrity of Federal-State Financial
Partnership."* 72 Fed. Reg. 2236 (January 18, 2007).  The Association represents nearly
300 general acute nonfederal major teaching hospitals and health systems.  The
Association also represents all 125 accredited U.S. allopathic medical schools; 94
professional and academic societies; 90,000 full-time clinical faculty; and the nation's
medical students and residents.

We agree with the American Hospital Association (AHA) and the National Association
of Public Hospitals and Health Systems (NAPH) that the proposed rule should be
withdrawn.  Its sweeping changes, many of which are not authorized under the Medicaid
statute, would seriously compromise an already fragile safety net system—of which
teaching hospitals are key participants—that ensures access and quality care for Medicaid
beneficiaries and uninsured persons.  The proposed rule estimates that the changes would
result in $3.9 billion in federal savings over five years, although the President's FY 2008
budget proposal estimates the savings at $5 billion.  While such numbers are daunting in
and of themselves, based on conversations with our members we believe the actual
overall reduction in Medicaid payments would be much higher.

The proposed rule provides neither data nor rationales justifying the restrictions the
Agency seeks to impose.  We urge CMS to work with Congress to determine whether,
and to what extent, policy changes to the Medicaid program are needed.  If

Leslie Norwalk, Esq.
March 19, 2007
Page 2 of 6

notwithstanding the widespread opposition CMS moves forward with a final rule, the Agency should allow for a sufficient transition period that allows both states and providers to adjust their long-standing approved practices to ensure that the needs of Medicaid and other patients are met during the adjustment period.

In the remainder of this letter, we discuss the important relationship between state Medicaid programs and teaching hospitals and their clinical faculties. We then provide comments on specific aspects of the proposed rule.

## MEDICAID AND TEACHING HOSPITALS AND THEIR CLINICAL FACULTY

Major teaching hospitals and their clinical physician faculty take seriously their commitment to treating the nation's poor by providing a disproportionate amount of healthcare to Medicaid recipients and uninsured patients while maintaining their core missions of education, research and innovative patient care. While they represent only 6 percent of all hospitals, about 25 percent of Medicaid discharges are from major teaching hospitals. In 2004, these institutions provided nearly half of all hospital charity care in the country. Medicaid accounts for 16 percent of the healthcare provided by faculty practice groups, compared to only 10 percent provided by community-based multi-specialty groups.

In addition to being important participants in the nation's health care "safety net," teaching hospitals have unique roles that extend beyond the normative patient care services. These include being sites for the clinical education of all types of health professional trainees; providing environments in which clinical research can flourish; and being sources of specialized, unique, and referral/standby services. Because of their education and research missions, teaching hospitals typically offer the newest and most advanced treatments and technologies, and often care for the nation's sickest and most complex patients. Today, major teaching hospitals also are looked to as front-line responders in the event of a biological, chemical or nuclear attack and they are constantly refining their capabilities to fulfill this role.

Undertaking these missions has important financial consequences. Thus, it is not surprising that the aggregate total margin for the nation's major teaching hospitals is consistently and significantly below that of other hospital groups. In some years, the margins have hovered near zero. In 2004, the most recent and most complete data available, the aggregate total margin for major teaching hospitals (those with an intern/resident-to-bed (IRB) ratio of 0.25 or more) was only 3.4 percent; the average and median total margins were 1.5 percent and 2.4 percent respectively. By contrast, the aggregate total margin for other teaching hospitals was 5.0 percent, and 4.7 percent for nonteaching hospitals.

State Medicaid programs and the academic medical community have worked together over many years to ensure that the health care needs of Medicaid patients are met while allowing teaching hospitals and their faculty to also fulfill their other missions.

Leslie Norwalk, Esq.
March 19, 2007
Page 3 of 6

Consequently, it is important that changes to the Medicaid program are viewed within this context. We are concerned that the totality of the changes in the proposed rule, if finalized, would significantly upset the delicate balance of resources that teaching hospitals rely on to fulfill their patient care and other missions.

## THE PROPOSED COST LIMIT ON MEDICAID PAYMENTS TO PUBLIC PROVIDERS

The proposed rule would limit reimbursement for government-operated hospitals to each entity's cost of providing Medicaid services to Medicaid recipients. Currently, state Medicaid programs have "upper payment limits (UPLs)" which, for government-operated providers, are based on what Medicare would pay for the same services and are calculated at an aggregate level. This allows states the flexibility to vary the amount paid to hospitals within the category, so long as the aggregate limit is not exceeded.

Over time, Medicaid has moved away from cost-based reimbursement because it does not provide incentives for efficient performance. Increasingly, states have followed the Medicare model and established prospective payment systems for their Medicaid programs. This approach encourages efficiency by rewarding hospitals that constrain their costs below the payment amount. Returning to cost-based limits would be returning to an ineffective policy that has been soundly rejected not only by Medicare but by many private payers as well.

CMS asserts in the proposed rule that facility level cost limits are necessary because providers "use the excess of Medicaid revenue over cost to subsidize health care operations that are unrelated to Medicaid, or they may return a portion of the supplemental payments to the State as a source of revenue." (72 Fed. Reg. at 2241). However, the proposed rule presents no data or other facts to support its assertion. Moreover in court filings, the Agency has explicitly recognized the value of allowing states flexibility to direct higher payments to certain hospitals having special needs (See AHA Comment Letter at 5-6).

The proposed rule position also is at odds with the current policy that establishes an aggregate UPL for private hospitals. The policy is the right policy for private hospitals and there is no reason to establish a separate and unequal policy for government providers.

Finally, section 705(a) of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA) directed CMS to apply an "aggregate upper payment limit to payments made to government facilities that are not state-owned or operated facilities." The proposed rule is in direct contradiction to this Congressional mandate and thus this proposal must be rescinded.

Leslie Norwalk, Esq.
March 19, 2007
Page 4 of 6

## DEFINITION OF "COSTS" FOR PURPOSES OF APPLYING A FACILTY-SPECIFIC LIMIT

The proposed rule does not address specifically what costs would be included in the determination of the facility specific-cost limits. We assume, but would like CMS to confirm, that such costs include all those costs necessary to operate the hospital. For teaching hospitals, such costs include those associated with graduate medical education.

The President's fiscal year 2008 budget request includes an administrative proposal to eliminate federal Medicaid matching payments for graduate medical education (GME) funding . Along with Medicare, Medicaid is a key contributor in helping to offset some of teaching hospitals' GME costs. As of 2005, Medicaid programs in 47 states and the District of Columbia provided funds for GME costs.[1]

We strongly oppose this budgetary proposal. We also question whether the Administration can implement such a proposal without explicit statutory direction. If the Administration does choose to raise this as a regulatory issue, we believe it would be necessary for CMS to issue a distinct and explicit notice and comment rulemaking process.

## THE PROPOSED RE-DEFINITION OF "UNIT OF GOVERNMENT"

The proposed rule would redefine the phrase "unit of government" by requiring that:

- The health care provider has generally applicable taxing authority; or
- The health care provider is able to access funding as an integral part of a governmental unit with taxing authority (that is legally obligated to fund the governmental health care provider's expenses liabilities, and deficits) so that
- A contractual arrangement with the State or local government is not the primary or sole basis for the health care provider to receive tax revenues.

Source: 72 Fed. Reg. at 2240.

We agree with comments by the AHA and NAPH that this redefinition is both incompatible with and contrary to the Medicaid statute.

Such a narrow redefinition would drastically limit the number of providers that may participate in the state financing of Medicaid through allowable intergovernmental transfers (IGTs) or certified public expenditures (CPEs). It also would pre-empt long-standing state authority to define governmental entities.

---

[1] Henderson, Tim. "Medicaid Direct and Indirect Graduate Medical Education Payments: A 50 State Survey (November, 2006).

Leslie Norwalk, Esq.
March 19, 2007
Page 5 of 6

Perhaps most importantly, this proposal runs counter to the trend of states and their associated hospitals to identify ways that maintain important state-provider relationships while allowing such providers to pursue enhanced efficiencies that are unobtainable under traditional state relationships. By reorganizing the governance structures, a number of public teaching hospitals have been given the autonomy and flexibility to implement efficiency and cost-containment measures that yield hospital and program savings, and often result in improved access and higher quality care for patients.

NAPH's comments eloquently and articulately describe such restructuring arrangements. They also discuss how these reconfigurations enhance the fiscal viability of the health care safety net, as well as improve access, quality, program responsiveness and public accountability. While perhaps not fully contemplated by the Agency, we believe CMS's proposal would result in an operational retrenchment of no benefit to states, hospitals and, most importantly, Medicaid beneficiaries.

We urge the Agency to withdraw the proposed redefinition.

## PROPOSED LIMITATIONS ON INTERGOVERNMENTAL TRANSFERS (IGTS) AND CERTIFIED PUBLIC EXPENDITURES (CPEs)

If finalized, in combination with its redefinition of "unit of government," the proposed rule would drastically restrict states' abilities to use allowable IGTs to finance the non-federal share of Medicaid payments. Specifically, the proposed rule preamble states that where a governmentally operated health care provider has transferred the non-Federal share in order to receive matching federal payments, the state must be able to demonstrate that "the source of the transferred funds is State or local tax revenue (which must be supported by consistent treatment on the provider's financial records)." (72 Fed. Reg. at 2238).

In the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (Public Law 102-234), Congress modified the use of provider taxes and donations to finance the non-federal share of Medicaid payments, but explicitly made clear that those restrictions did not affect IGTs (see Social Security Act 1903(w)(6)(A)). Given Congress' clear intent to protect states' uses of IGTs and CPEs as financing mechanisms, such direction must come from Congress and should not be unilaterally implemented through regulation.

We also have serious concerns on the proposed rule's treatment of CPEs, specifically the proposal to impose new documentation standards including the limitation to cost-based policies. We believe that there are less burdensome ways to ensure the accuracy of Medicaid claims submitted for purposes of CPEs.

Leslie Norwalk, Esq.
March 19, 2007
Page 6 of 6

## EFFECTIVE DATE AND TRANSITION PERIOD

As stated above, we believe the prudent course of action is for CMS to withdraw this proposed rule and work closely with the Congress and the health care community to address Agency concerns about current Medicaid policies. However, if CMS decides to move forward with some form of final regulation, we believe that a) the effective date for the new cost limit, unit of government definition, and limitations on IGTs and CPEs must be extended beyond September 1, and b) the final rule must be accompanied by a significant transition period. Both states and providers will need time to accommodate to the new policies and find alternative funding sources to minimize access and financing problems. We support NAPH's recommendation that such a transition period be 10 years.

## CONCLUSION

The Medicaid program and teaching hospitals have a long history that has helped to ensure that poor and uninsured patients have access to high quality care. The proposed rule runs the grave risk of unraveling this fragile structure. We urge the Agency to rescind the proposed rule and work with states and providers alike to initiate improvements to the Medicaid program that both strengthen it and ensure its long term financial viability.

If you have questions concerning these comments, please do not hesitate to contact me or Karen Fisher, Senior Associate Vice President. We both may be reached at (202) 828-0490.

Sincerely,

/s/

Robert M. Dickler
Senior Vice President
Division of Health Care Affairs

# Exhibit 11-B



**Association of**
**American Medical Colleges**
2450 N Street, N.W., Washington, D.C. 20037-1127
**T** 202 828 0400 **F** 202 828 1125
www.aamc.org

July 13, 2007

**Via Hand Delivery**

Leslie Norwalk, Esq.
Acting Administrator
Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building
Room 445-G
200 Independence Ave, SW
Washington, DC 20201

Attention: **CMS-2258--FC**

Dear Administrator Norwalk:

The Association of American Medical Colleges (AAMC) welcomes this opportunity to provide additional comments on the Centers for Medicare & Medicaid Services' (CMS or the Agency) final rule with comment period entitled *"Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership."* 72 Fed. Reg. 29748 (May 29, 2007). The Association represents nearly 300 general acute nonfederal major teaching hospitals and health systems. The Association also represents all 125 accredited U.S. allopathic medical schools; 94 professional and academic societies; 90,000 full-time clinical faculty; and the nation's medical students and residents.

As requested in the final rule preamble, we are limiting our comments to the definition of "unit of government" contained in the final rule under 42 C.F.R. §433.50. At the outset, we would like to emphasize that pursuant to the Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007 (Pub. Law 110-28) CMS is prohibited from implementing a final rule until May 25, 2008. We believe this moratorium precludes CMS from collecting or reviewing comments on the May 29, 2007 rule. However, out of an abundance of caution we are submitting these comments now.

## STATE UNIVERSITY TEACHING HOSPITALS

The final rule with comment period clarifies that state university teaching hospitals should be viewed as units of government for purposes of sharing in the financing of the non-Federal portion of Medicaid expenditures. Specifically, the May 29 rule proposes the following regulatory language under 422 C.F.R. §433.50(a)(1)(ii)(C):

Leslie Norwalk, Esq.
July 13, 2007
Page 2 of 3

> "The health care provider receives appropriated funding as a State university
> teaching hospital providing supervised teaching experiences to graduate medical
> school interns and residents enrolled in a State university in the State."

## A. The Regulatory Definition of "State University Teaching Hospital" Should Be Modified

We appreciate CMS specifically addressing state university teaching hospitals in the
regulatory language. However, we believe the definition of these entities must be modified.

First, because they have graduated from medical schools, residents may or may not be
"enrolled" in the state university. In fact, we are aware of only a few instances in which the
residents are enrolled as students in the university. Residents and residency programs are
generally delineated by "sponsorship," that is, what entity sponsors the residency program as
defined by the accrediting body. Residency programs generally are sponsored by either a
teaching hospital or a medical school. We believe the issue of enrollment can be excluded
from the definition without altering Agency intent.

Second, many state university teaching hospitals receive appropriated funding through a
general university appropriation. While we believe the current regulatory language
encompasses such situations, it would be helpful to add language such as "receives
appropriated funding, *either directly or through the university* . . ."

Finally, while most, if not all, state university teaching hospitals provide medical educational
experiences to graduates from medical schools, known as "residents" or "physician
residents," there may exist now, or in the future, state university teaching hospitals that
educate only medical students. Consequently, we believe the definition should be modified
to reflect such situations.

In sum, we believe that the regulatory provision should be modified to say:

> "The health care provider receives appropriated funding, either directly or through
> the university, as a State university teaching hospital providing supervised
> teaching experiences to medical school students or graduates of medical schools
> who participate in graduate medical education programs as residents or fellows."

## B. State University Teaching Hospitals May Be Units of Government Without Receiving Appropriations

Not all state university teaching hospitals receive appropriations. Some of these institutions have
organizational arrangements such that they do not receive state appropriations but are

Leslie Norwalk, Esq.
July 13, 2007
Page 3 of 3

nonetheless considered governmental under state law.  We believe these entities should also be considered "units of government" for Medicaid purposes.

## OTHER "UNITS OF GOVERNMENT"

We believe CMS should reconsider other aspects of its "unit of government" definition.  While we appreciate the addition of the phrase "has direct access to tax revenues," we do not believe this modification will significant increase the number of health care providers that will be considered governmental.  The definition contained in the May 29 rule will still exclude many public and other hospitals that are clearly governmental under state law but that do not have direct access to tax revenues or otherwise meet CMS's additional criteria.

Like the proposed rule, the May 29 rule runs counter to the trend of states and their associated hospitals to identify ways that maintain important state-provider relationships while allowing such providers to pursue enhanced efficiencies that are unobtainable under traditional state relationships.  By reorganizing the governance structures, a number of public teaching hospitals have been given the autonomy and flexibility to implement efficiency and cost-containment measures that yield hospital and program savings, and often result in improved access and higher quality care for patients.

We urge the Agency to reconsider its definition of "unit of government" so that these important safety net providers are included.

*    *    *    *    *    *

If you have questions concerning these comments, please do not hesitate to contact me or Karen Fisher, Senior Associate Vice President.  We both may be reached at (202) 828-0490.

Sincerely,

/s/

Robert M. Dickler
Senior Vice President
Division of Health Care Affairs

# Exhibit 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER, <br><br> *et al.* <br><br> **Plaintiffs,** <br><br> v. <br><br> **THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,** <br><br> *et al.* <br><br> **Defendants.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **Civil Action No.** |

## DECLARATION OF LAWRENCE A. McANDREWS

I, Lawrence A. McAndrews, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am the President and Chief Executive Officer for the National Association of Children's Hospitals ("N.A.C.H."). I submit this declaration in support of Plaintiffs' complaint and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in N.A.C.H.'s files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as N.A.C.H.'s President and Chief Executive Officer since 1995 and President and Chief Executive Officer of the National Association for Children's Hospitals and

Related Institutions since 1992. Prior to that, I served as the President and Chief Executive Officer for Children's Mercy Hospital in Kansas City, Missouri.

4. N.A.C.H. is a non-profit corporation organized and existing under the laws of the State of Georgia. N.A.C.H.'s offices are in Alexandria, Virginia. N.A.C.H. is the public policy affiliate of the National Association of Children's Hospitals and Related Institutions (NACHRI). NACHRI is an organization of children's hospitals with 218 members in the United States, Canada, Australia, the United Kingdom, Italy, China, Mexico and Puerto Rico. NACHRI promotes the health and well-being of all children and their families through support of children's hospitals and health systems that are committed to excellence in providing health care to children.

5. N.A.C.H. is a trade organization of 141 children's hospitals in the United States and supports children's hospitals in addressing public policy issues that affect their ability to fulfill their missions to serve children and their families. N.A.C.H. fulfills its mission and vision through federal advocacy, collaboration, and communication designed to strengthen the ability of children's hospitals and health systems to influence public policy makers, understand federal and state policy issues, advance access and quality of health care for all children, and sustain financially their missions of clinical care, education, research and advocacy. N.A.C.H. represents its members' interests in matters before Congress, the Executive Branch, and the courts, as well as with other public and private entities.

6. N.A.C.H. has a long history of advocating on behalf of its members on matters related to payment for services provided to Medicaid recipients and the financing of the Medicaid program.

7. Although they are only about 3 percent of all hospitals, children's hospitals provide 43 percent of all inpatient care days for low income children. Children's hospitals also provide almost all the hospital care for children with complex conditions, such as heart conditions or cancer.

8. Our member hospitals are particularly dependent on Medicaid funding. Children are the majority of Medicaid enrollees, and one in four children in the United States currently rely on Medicaid for health insurance coverage. Children insured by Medicaid account for over half of all inpatient days of care provided at freestanding acute care children's hospitals. Children insured by Medicaid accounted for 50% of all outpatient visits at free-standing children's hospitals and 57% of emergency room visits in 2006.

9. On January 18, 2007, the Centers for Medicare & Medicaid Services ("CMS") proposed the regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 2236 ("Proposed Rule"). Among other things, CMS proposed to upend decades of Medicaid law to 1) limit Medicaid payments for government-operated hospitals to the costs of providing Medicaid services to Medicaid recipients, and 2) narrow the definition of units of government eligible to contribute to the non-federal share of Medicaid expenditures.

10. N.A.C.H. submitted a comment letter to CMS on March 12, 2007 outlining our concerns with the Proposed Rule's unwarranted new policies, and their detrimental impact on safety net providers and Medicaid beneficiaries', particularly children's, access to care. A true and correct copy of N.A.C.H.'s comment letter is attached hereto and made a part hereof as Exhibit A.

11. HHS purported to issue a final version of the rule by putting it on display at the Federal Register on May 25, 2007. 72 Fed. Reg. 29748 (May 29, 2007) ("Rule").

12. The Rule, if implemented, threatens to eliminate hundreds of millions of dollars annually in federal funding from State Medicaid programs.

13. The vast majority of N.A.C.H.'s members are not governmental hospitals and have not been treated as such under State Medicaid programs. Therefore, they are not faced with losing the ability to contribute to the non-federal share or being subject to a cost limit under the Rule. However, our members are so reliant on Medicaid revenues that this Rule's drastic impact on State Medicaid programs would have a substantial deleterious impact on our member hospitals and their Medicaid patients.

14. Changes to the way States finance their Medicaid programs would have real consequences for the 29 million children in the country who rely on Medicaid for health insurance coverage. Because children are the majority of Medicaid enrollees any changes made to the program, such as those in the Rule, would have a disproportionate impact on them.

15. The children treated at children's hospitals rely on Medicaid and the coverage it provides for all medically necessary care. With insufficient financing for their share of Medicaid, States would be forced to find new funding sources (of which N.A.C.H. is not aware) or make cuts to the program, which would directly affect children's eligibility and the benefits and services provided. These types of cuts would have a significant impact on children's hospitals' patients and threaten our members' ability to provide quality health care to all children.

16. States faced with budget shortfalls would likely institute reimbursement cuts, which would likely include disproportionate share hospital payment decreases, to make up for the loss

of federal funds.  Because such a large percentage of our patients rely on Medicaid for their health insurance coverage, any decreases in reimbursement can have a profound impact on our ability to provide care to all children, including our Medicaid patients.   Significant reductions in Medicaid funding will put at risk the ability of children's hospitals to continue to provide critical medical services to those in their communities with nowhere else to turn.

17.  When faced with payment decreases, children's hospitals face tough decisions about the effect of such decreases on the services provided.  The resulting reduction of services would affect all children, not just children on Medicaid.

18.  N.A.C.H. and its members have an interest in delivering quality health care to Medicaid and other low-income children in an efficient manner and at payment rates sufficient to enable them to continue to meet their patients' needs.  If the provisions of this Rule are implemented, many of N.A.C.H.'s safety net hospital members will be required to make deep cuts in essential services that they have struggled to provide in the past and will be unable to maintain their current levels of support for low-income and uninsured patients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 5, 2008
Washington, DC

(Signature): *Lawrence A. McAndrews*
                        Lawrence A. McAndrews
                        President and CEO
                        National Association of Children's
                        Hospitals

# Exhibit 12-A

National Association of
Children's Hospitals

 **N · A · C · H** · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

March 12, 2007

Centers for Medicare & Medicaid Services
U.S. Department of Health and Human Services
Attn:  CMS-2258-P
7500 Security Boulevard
Mail Stop C4-26-05
Baltimore, MD 21244-1850

Attn:    CMS—2258--P
         Medicaid Program; Cost Limit for Providers Operated by Units of Government
         and Provisions to Ensure Integrity of Federal-State Financial Partnership


Dear Centers for Medicare and Medicaid Services:

The National Association of Children's Hospitals (N.A.C.H.) is pleased to provide
comments to the Centers for Medicare and Medicaid Services (CMS) on its Medicaid
administrative rule published in the January 18th *Federal Register*.  The changes
proposed in this regulation would have a negative impact on children's hospitals and
the children they serve.  We ask that you stop implementation of this regulation until
the significant direct and indirect effects of the proposed changes can be closely
examined and addressed.

The regulation as proposed would cut Medicaid funding by $3.8 billion, which would
significantly limit the funding available for state Medicaid programs.  If this regulation
were to go into effect as planned in September 2007, most states could face significant
Medicaid funding shortfalls that could result in cuts to the program.  Therefore, the new
restrictions in the proposed rule would not only impact public providers, but also all
beneficiaries, especially children, and all health care providers participating in the
program.

Over the years, Congress and CMS have repeatedly addressed the need for limitations
on state financing.  Some of the most recent regulatory changes related to upper
payment limits are still being phased in.  The need for additional restrictions on state
financing is unsubstantiated.  Not only would additional changes have a negative effect
on children and children's providers, but they are unnecessary.

The annual growth in federal Medicaid spending has declined significantly due to both
improvements in the economy and cost containment policies adopted by states in

401 Wythe Street, Alexandria, VA 22314
(703) 684-1355    Fax (703) 684-1589
www.childrenshospitals.net

An Affiliate of the National Association of
Children's Hospitals & Related Institutions

recent years. Federal spending on Medicaid is not out of control and does not warrant changes such as those proposed, which would have a negative impact on the health care safety net.

We understand the need to protect the fiscal integrity of the Medicaid program, but we do not agree with the proposed changes that would negatively impact the nation's most vulnerable children and the providers who care for them.

**Negative Impact on Children Covered by Medicaid**
Changes to the way states finance their Medicaid programs would have real consequences for the 29 million children in the country who rely on Medicaid for health insurance coverage. Because children are the majority of Medicaid enrollees any changes made to the program, such as those in the proposed regulation, would have a disproportionate impact on them.

The children treated at children's hospitals rely on Medicaid and the coverage it provides for all medically necessary care. With insufficient financing for their share of Medicaid, states would be forced to find new funding sources or make cuts to the program, which could directly affect children's eligibility and the benefits and services provided. These types of cuts would have a significant impact on our patients and threaten our ability to provide quality health care to all children.

As several states and Congress discuss ways to expand coverage to more uninsured children, this regulation would threaten funding for the program that provides health insurance coverage for more than one in four children in the United States.

**Threatens the Viability of Children's Hospitals – the Safety Net for All Children**
Not only does the proposed regulation threaten the financial viability of public safety net providers, it would also threaten reimbursement for children's hospitals. Children insured by Medicaid account for over half of all inpatient days of care provided at free-standing acute care children's hospitals. Children's hospitals, on average, are reimbursed 78 percent of the cost of care provided even when disproportionate share hospital payments are included in the calculation of total payment. Because Medicaid is such a large payer and existing Medicaid payments do not cover costs, any changes to Medicaid can have a profound impact on children's hospitals and their ability to serve all children.

States faced with budget shortfalls would likely institute reimbursement cuts, which could include disproportionate share hospital payment decreases, to make up for the loss of federal funds. Because a large percentage of our patients rely on Medicaid for their health insurance coverage, any decreases in reimbursement impact our ability to provide care to all children.

When faced with payment decreases, our hospital faces tough decisions about the potential for service cutbacks. These cutbacks affect all children, not just children on Medicaid. Any efforts to address these financing mechanisms should consider the

significant impact changes would have on children's hospitals' ability to receive adequate funding and continue to provide health care services to all children.

**Conclusion**

As you can see from our comments, we are extremely concerned about this proposed regulation and the impact it would have on children enrolled in Medicaid and on children's hospitals. We encourage CMS to delay the implementation of the regulation to allow time for a thorough review of the proposed regulation's impact on children enrolled in Medicaid and the providers who serve them.

We appreciate the opportunity to present our comments and would be pleased to discuss them further. For additional information, please contact Aimee Ossman at 703-797-6023 or aossman@nachri.org. Thank you for your consideration.

Sincerely,

*Peters D. Willson*

Peters D. Willson
Vice President, Public Policy
National Association of Children's Hospitals

# Exhibit 13

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALAMEDA COUNTY MEDICAL CENTER,    )
*et al.*,                          )
                                   )
                   Plaintiffs,     )
                                   )
              v.                   )
                                   )   Case Number:  1:08-00422
MICHAEL O. LEAVITT, in his official )
capacity as Secretary, United States Department )
of Health and Human Services, *et al.*, )
                                   )
                   Defendants.     )
                                   )
                                   )

## DECLARATION OF GEORGE B. HERNÁNDEZ, JR

I, George B. Hernández, Jr, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am President/Chief Executive Officer ("CEO") of Bexar County Hospital District, doing business as University Health System. I submit this declaration in support of Plaintiffs' complaint, motion for summary judgment, and motion for a preliminary injunction in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge based on information contained in University Health System's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. I have served as CEO of University Health System since 2005. Prior to that, I served as Executive Vice President/Assistant Administrator of University Health System since 2000.

1

4. In my capacity as CEO, I am responsible for all aspects of University Health System's operations and finances, including participation in the Texas Medicaid program and payments received thereunder.

5. University Health System is a hospital district and governmental entity established under Article IX, Section 4 of the Texas Constitution and Texas Health & Safety Code, Chapter 281. Its Board members are "public officers" under the Texas Constitution and exercise sovereign functions of government. University Health System has taxing authority as a hospital district under Texas law and direct access to tax revenues as a component unit of Bexar County.

6. The mission of the University Health System is to provide medical and hospital care to the needy residents of Bexar County, Texas. It carries out this responsibility by promoting the health and wellness of the community, by providing the highest quality of care to both inpatients and outpatients, by teaching the next generation of health professionals and by supporting research to advance medical knowledge and improve the delivery of patient care.

7. The average number of patients without health insurance nationwide is 15 percent. Texas has the highest rate of uninsured persons of any State in the Nation. Approximately 25 percent of all Texans, or 5.6 million persons, are uninsured. Bexar County, with over 400,000 uninsured residents, and South Texas have the highest number of uninsured persons in the State. The Center for Public Policy Priorities, a research and policy center located in Austin, Texas, estimates the rate of uninsured Texans in Bexar County and South Texas to vary between 27 and 37 percent.

8.  University Health System owns and operates University Hospital, located in Bexar County, Texas.  University Hospital serves as the principal public hospital in the region and provides a significant percentage of its services to the uninsured. It also serves as the primary teaching hospital for the medical school, nursing school and allied health school of The University of Texas Health Science Center at San Antonio, playing a critical role in training health professionals for our region and Texas.  In addition to providing facilities, the University Health System provides $15.9 million annually in support of graduate medical education.

9.  University Hospital is one of just eleven civilian Level I Trauma Centers in the State of Texas and serves as the lead Level I Trauma Center for Bexar County and the 21 other South Texas counties comprising Texas Trauma Service Area P.  Currently operating 498 beds, University Hospital cares for the majority of all seriously injured patients from this region, which is geographically larger than 17 U.S. States.  Additionally, critically injured patients from the remaining areas of South Texas and certain portions of Central Texas are routinely flown to University Hospital for trauma care.  Like fire and police, the Trauma Center at University Hospital responds around the clock, 365 days a year, with highly-trained trauma surgeons, nurses and technicians in the hospital at all times.  The Emergency Center at University Hospital averages 70,000 emergency patients each year; about 5,000 of these patients are seriously injured trauma patients.

10.  University Hospital and the other four public Level I Trauma Centers in Texas are vital to Texas' emergency preparedness efforts. These trauma centers are absolutely critical to Texas' ability to respond to natural disasters – as experienced during Hurricane Katrina in 2005 and the deadly 2007 tornado in Eagle Pass, Texas.  In both instances

University Hospital responded even though neither New Orleans nor Eagle Pass is within our designated trauma region. Trauma centers like University Hospital are also critical components to our nation's emergency preparedness and homeland defense, whether manmade disasters or acts of terrorism.

11.  University Health System also provides primary and specialty care and prevention services close to home through its network of community health centers, including the University Health Center - Downtown, San Antonio's largest and busiest ambulatory care center, the University Center for Community Health, home to the renowned Texas Diabetes Institute, four University Family Health Centers located throughout Bexar County and ten preventive health clinics.  Outpatient pharmacies at Health System community centers and clinics dispense over 800,000 prescription medications annually to Health System patients.

12.  University Health System is a major provider of care to Medicaid patients in Bexar County and the major safety net provider in this community.  Of the 22,000 inpatients University Hospital treats every year, 19 percent are Medicaid beneficiaries and 39 percent are self-pay patients with no coverage.

13.  The University Health System's hospital and clinics have  an operating budget of $572 million for 2008.  Based on this budget (and without implementation of the Medicaid cost limit rule), University Health System anticipates having a $48,000 operating margin, which is less than one tenth of one percent.

14.  Medicaid  charges at University Health System are significant, about  18 percent of 2007 gross revenues. Medicare charges and charges of other payers represent

about 21 percent 19 percent of gross revenues, respectively. The remaining 42 percent of charges are generated by needy patients who are uninsured.

15. Unfortunately, Medicaid base payments are less than Medicare rates and do not cover actual costs of providing Medicaid services. To provide additional financial support, the Texas Public Upper Payment Limit ("UPL") Program provides reimbursement to University Health System for a portion of the difference between Medicare and Medicaid rates. The Texas Medicaid State Plan provides in Attachment 4.19-A that these supplemental Medicaid payments are "made in accordance with the applicable regulations regarding the Medicaid upper limit provisions codified at 42 C.F.R. § 447.272." In addition, they are limited by the lesser of the hospital's net charges for Medicaid patients or the combined unreimbursed net cost of serving Medicaid patients and patients without insurance. University Health System provides an intergovernmental transfer of approximately $29 million in local tax revenues to the State of Texas to serve as the non-federal share of Medicaid payments.

16. The supplemental UPL payments are 5.5 percent of University Health Systems total operating revenues. The existing reimbursement has allowed the Health System to continue operating while caring for the needy, supporting graduate medical education and assuring life saving trauma services remain readily available to the two million people residing in our trauma region. These payments in turn have allowed the Health System to fund the replacement of ongoing capital needs and to begin the implementation of a plan for the replacement of clinically outdated and obsolete facilities. The elimination of supplemental UPL payments would require the Health System to reduce its already lean

operating budget, limit its ability to address critical infrastructure needs and reduce its ability to carry out its mission to both the needy and to trauma patients of South Texas.

17. Under the purported new HHS regulation, *Cost Limit for Providers Operated by Units of Government and Provisions To Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("Rule"), University Health System will be treated as a unit of government, based on our taxing authority and direct access to tax revenues. As a result, University Health System will be subject to a new and much stricter cost limit to governmental providers under the Rule, including revised 42 C.F.R. § 447.272, which limits Medicaid payments for a governmental hospital exclusively to that hospital's cost of serving Medicaid patients. University Heath System will lose the portion of the payments we currently receive over this new cost limit, which is much lower than the current limits on our Medicaid payments. We estimate that University Health System will lose $31 million annually in federal Medicaid funding.

18. This $31 million loss, constituting 5.4 percent of our operating budget, will leave our System with a significant deficit. This is too great a financial reduction for University Health System. Plans to address the proposed impact cannot be answered hypothetically. All solutions require significant planning and discussion with our Board, our elected officials and the community we serve. Nevertheless, the impact of this loss of funds on medical and hospital services would be significant, and would have serious consequences such as curtailment of plans for future capital projects that are greatly needed by the hospital and the community. These plans include a much-needed expansion of University Hospital and its Emergency Center, which is currently operating at 200 percent capacity. Failure to address these important capital needs will negatively contribute to

timely, efficient and good patient care. Moreover, in the long run and across our state, it

will undermine the ability of public hospitals to effectively partner in graduate medical

education or provide emergency response and trauma care.

19. The magnitude of the impact of the cuts can be translated more effectively if

one compares the loss of the $31 million with important services currently funded in the

2008 operating budget. For example, the Health System incurs $15.9 million annually in

graduate medical education costs. The $31 million reduction reflects almost two years of

salaries, benefits and administrative support for 313 resident physicians working in Health

System facilities. Similarly, the Health System net expense for prescription medications on

an annual basis is $6.5 million. The loss of the $31 million is equivalent to 57 months of

medication expenses for needy Bexar County residents. Likewise, the direct cost of

operating primary and specialty care clinics in the community is $35.6 million annually.

The loss of $31 million equates to about ten and one-half months of the operating costs of

these clinics or nearly 500,000 patient visits.

20. We have attempted to determine whether the State would provide funding to

offset this loss. Based on discussions with State officials, we are not aware of any offsets

that will be provided. In fact, we are also aware that the State of Texas Medicaid program,

as a whole, will also lose a significant amount of federal support under this Rule. The

Governor confirmed the impact of the rule on public hospitals in a recent letter (Exhibit A)

to Congressional leaders, stating "This rule will have serious consequences for public

hospitals and safety net providers in Texas. The state estimates a potential impact to

hospitals and other Medicaid providers of more than $480 million in lost federal revenue

due to the provisions in this rule."

21.  University Health System is a member of the National Association of Public Hospitals and Health Systems, the American Hospital Association, and the American Association of Medical Colleges.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _____ April 2 _____, 2008


(Signature): _____
George B. Hernández, Jr.
President/Chief Executive Officer
University Health System

# Exhibit 13-A



OFFICE OF THE GOVERNOR

RICK PERRY
GOVERNOR

December 17, 2007

The Honorable Nancy Pelosi
Speaker
U.S. House of Representatives
H-232, The Capitol
Washington, D.C. 20515

The Honorable Harry Reid
Majority Leader
U.S. Senate
S-221, The Capitol
Washington, D.C. 20515

The Honorable John Boehner
Republican Leader
U.S. House of Representatives
H-204, The Capitol
Washington, D.C. 20515

The Honorable Mitch McConnell
Republican Leader
U.S. Senate
S-230, The Capitol
Washington, D.C. 20515

Dear Speaker Pelosi, Majority Leader Reid, Republican Leader Boehner, and Republican Leader McConnell:

I am writing out of concern for several proposed administrative actions by the Centers for Medicare and Medicaid Services (CMS) that will shift billions of dollars in Medicaid costs from the federal government to states, local governments and school districts. Texas relies on federal participation to provide quality health care to low-income citizens through a Medicaid program that accounts for more than $21 billion dollars of the annual state budget. Texas is dedicated to upholding its commitment to Medicaid and I urge Congress to take action to ensure that the federal government does not abandon its financial responsibility to the program.

CMS' recent actions are a noteworthy departure from past practices and will place a significant new fiscal burden on states. At the same time, it will limit states' ability to maintain flexibility and authority over state programs. In particular, Texas has concerns about the following proposed CMS regulatory actions:

- <u>Government Provider Cost Limit Regulation</u> – This regulation imposes new restrictions on payments to providers operated by units of government and clarifies that those entities involved in the financing of the non-federal share of Medicaid payments must meet a restrictive new definition of unit of government.

The Honorable Nancy Pelosi
The Honorable Harry Reid
The Honorable John Boehner
The Honorable Mitch McConnell
December 17, 2007
Page 2 of 3

This rule will have serious consequences for public hospitals and safety net providers in Texas.
The state estimates a potential impact to hospitals and other Medicaid providers of more than
$480 million in lost federal revenue due to the provisions in this rule.

- **School-based Medicaid Services – Administration and Transportation** – CMS is
  proposing to eliminate funding for school-based administration and transportation
  activities covered by Medicaid.

Texas independent school districts receive approximately $12.6 million in annual federal funding
for school-based administrative services. In addition, specialized transportation is the third
largest claim total of all school-based medical services in Texas. Texas will lose a significant
amount of federal funding for these programs with the implementation of this rule.

- **Rehabilitation Services** – CMS seeks to redefine the definition of rehabilitative services
  and to determine the difference between habilitative and rehabilitative services.

This rule would no longer allow reimbursement for a number of currently reimbursable Medicaid
rehabilitative services. This action could result in an end to federal Medicaid funding for early
childhood intervention services, rehabilitative mental health services, adult day health care, and
other services in Texas.

- **Eliminating Medicaid Reimbursement for Graduate Medical Education (GME)** – CMS
  maintains that GME is not within the scope of medical assistance that is authorized for
  payment by Medicaid and would no longer allow Medicaid funding to be used for GME.

Texas has supported teaching hospitals in the past through the use of GME dollars. While the
state does not currently have an active GME program, I understand the important role that
teaching hospitals play in the training of doctors. Further, Texas may very well elect to
implement a GME program in the future. It is imperative that the state maintains the flexibility it
currently has to provide future financial support to facilities that train future medical
professionals. Considering the shortage of medical professionals, this rule could not have come
at a worse time.

- **Targeted Case Management** – CMS published an interim final rule on December 4, 2007,
  that clarifies the definition of targeted case management services (TCM) as required by
  Section 6052 of the Deficit Reduction Act (DRA).

The Honorable Nancy Pelosi
The Honorable Harry Reid
The Honorable John Boehner
The Honorable Mitch McConnell
December 17, 2007
Page 3 of 3

CMS' overreaching interpretation of the DRA provision will dramatically diminish access to a service used by the most vulnerable populations in the Texas Medicaid program.

The end result of these new federal regulations is to impose significant cost shifting to states while limiting states' flexibility to pursue innovative approaches to providing cost-effective and quality health care to Medicaid clients. Congress has been successful in enacting moratoriums on the implementation of a number of these provisions. However, the delays are temporary, and without further action, Texas and other states will face significant impacts to crucial components of the Medicaid program.

I urge you to take immediate congressional action to extend the current moratoriums on the government provider cost limit and graduate medical education rules, and to stop the implementation of the other proposed rules and rule changes. These policy changes require a more thorough and thoughtful review to ensure that a strong federal-state partnership continues to be the cornerstone of the Medicaid program. Congress should act quickly to restore the financial and programmatic flexibility for states to provide accessible, cost-effective health care to low-income citizens.

Sincerely,

Rick Perry

Rick Perry
Governor

RP:jok

cc: Texas Delegation