**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
ALAMEDA COUNTY MEDICAL                  )
CENTER, et al.                          )
                                        )
                    Plaintiffs,         )
                                        )
            v.                          )        Civ.  No. 1:08CV0422 (JR)
                                        )
THE HONORABLE MICHAEL O. LEAVITT,       )
in his official capacity as             )
Secretary of Health and                 )
Human Services, et al.                  )
                    Defendants.         )
_____)

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants, Michael O. Leavitt, in his official capacity as Secretary of Health and

Human Services, the United States Department of Health and Human Services, Kerry Weems, in

his official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services,

and the Centers for Medicare & Medicaid Services (collectively, "the Secretary" or "HHS"), by

and through undersigned counsel, respectfully submit this Cross-motion for Summary Judgment

and in Opposition to Plaintiffs' Motion for Summary Judgment.  As set forth in the

accompanying Memorandum In Support of Defendants' Cross-Motion for Summary Judgment,

the Secretary is entitled to summary judgment as a matter of law on Plaintiffs' Administrative

Procedure Act ("APA") claims because the challenged regulations are consistent with the

Medicaid Act, do not involve agency action that is arbitrary, capricious, or an abuse of

discretion, and the promulgation of the challenged regulations did not violate the one-year

statutory moratorium signed into law on May 25, 2007.

In support of this motion, the Secretary relies on the accompanying Memorandum in Support of Defendants' Cross-Motion for Summary Judgment, the Administrative Record, and Defendants' Statement of Undisputed Material Facts.

Accordingly, for the above-stated reasons, and those explained more fully in the accompanying Memorandum, the Secretary respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment, grant this motion, and enter judgment in favor of the Secretary on Plaintiffs' APA claims.

|  |  |
|---|---|
|  | Respectfully submitted, |
| OF COUNSEL: | JEFFREY S. BUCHOLTZ<br>Acting Assistant Attorney General |
| JAMES C. STANSEL<br>Acting Attorney General | JEFFREY A. TAYLOR<br>United States Attorney |
| JANICE L. HOFFMAN<br>Associate General Counsel | SHEILA M. LIEBER<br>Deputy Branch Director |
| MARK D. POLSTON<br>Deputy Associate General<br>    Counsel for Litigation | /s/ Tamra T. Moore<br>TAMRA T. MOORE D.C. Bar No. 488392<br>Trial Attorney<br>U.S. Department of Justice |
| GERARD KEATING<br>BRIDGETTE L. KAISER<br>Attorneys | Civil Division, Federal Programs Branch<br>20 Massachusetts Avenue, N.W.<br>Washington, D.C.  20530<br>Telephone: (202) 514-8095 |
| U.S Department of Health<br>    and Human Services | Facsimile: (202) 616-8470<br>Email: Tamra.Moore@usdoj.gov |
| Dated: April 11, 2008 | Attorneys for Defendants |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 11th day of April 2008, I caused the foregoing Defendants' Cross-Motion for Summary Judgment and attachments hereto to be filed with the Clerk of the Court via the CM/ECF system, causing them to be served electronically.  The documents are available for viewing and downloading from the ECF system.


<u>/s/ Tamra T. Moore                              </u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
ALAMEDA COUNTY MEDICAL                )
CENTER, et al.                                          )
                                                                )
                              Plaintiffs,                   )
                                                                )
              v.                                               )          Civ.  No. 1:08CV0422 (JR)
                                                                )
THE HONORABLE MICHAEL O. LEAVITT,  )
in his official capacity as                            )
Secretary of Health and                            )
Human Services, et al.                              )
                              Defendants.               )
_____)

# DEFENDANTS' MEMORANDUM IN SUPPORT
# OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT AND IN
# OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Federal-State Partnership in Medicaid . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    A Brief History of States' Abusive Financing Schemes Under the Medicaid Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Challenged Rules: the Government Provider Payment Rule & the Unit of Government Definition    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    CONGRESS DID NOT PRECLUDE THE SECRETARY FROM PROMULGATING A RULE THAT REASONABLY LIMITS THE FEDERAL SHARE OF MEDICAID TO THE ACTUAL COSTS INCURRED BY STATES IN PROVIDING MEDICAL CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.    The Terms "Efficiency," "Economy," and "Quality of Care" In the Medicaid Act Are Ambiguous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    The Government Provider Payment Rule Does Not Violate BIPA . . . . . 19

    III.    THE SECRETARY REASONABLY DETERMINED THAT THE GOVERNMENT PROVIDER PAYMENT RULE WAS NEEDED TO ELIMINATE THE POTENTIAL FOR ABUSIVE FINANCING SCHEMES CONCERNING PAYMENTS TO CERTAIN PUBLIC HOSPITALS . . . . . . . 21

        A.    The Secretary Had A Rational Basis For Concluding That Prior UPL Rules Left Too Much Room For Abusive Financing Arrangements Between States and Government Providers . . . . . . . . . . . . . . . . . . . . . . 22

    IV.    THE SECRETARY'S DEFINITION OF "UNIT OF GOVERNMENT" IS A PERMISSIBLE CONSTRUCTION OF THE MEDICAID ACT . . . . . . . . . . . 32

        A.    The References to "Other Governmental Unit" in the Medicaid Act Are

i

Ambiguous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    The Secretary Reasonably Defined "Unit of Government" To Require
The Provider To Have Taxing Authority Or Direct Access To
Tax Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV.    THE SECRETARY DID NOT VIOLATE THE STATUTORY MORATORIUM
ON ISSUING OR IMPLEMENTING THE CHALLENGED RULES . . . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES

### CASES

Advocates for Highway & Automobile Safety v. Federal  Motor Carrier Safety Admin., 429
    F.3d 1136 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Alaska Department of Health & Social Services v. Ctrs. for Medicare & Medicaid
    Services, 424 F.3d 931 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16, 17

America Bioscience, Inc. v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001) . . . . . . . . . . . . . . . 13

Anna Jacques Hospital v. Leavitt, No. 05-625, 2008 WL 510337 (D.D.C. Feb. 26, 2008) . . . 18

Arkansas Pharmacists Associate v. Harris, 627 F.2d 867 (8th Cir. 1980) . . . . . . . . . . . . . . . . 31

Automobile Workers v. Brock, 477 U.S. 274 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Baker Norton Pharm. v. U.S. Food & Drug Admin., 132 F. Supp. 2d 30 (D.D.C. 2001) . . . . . 13

Barnhart v. Peabody Coal Co., 537 U.S. 149 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Barnhart v. Walton, 535 U.S. 212 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Brewster v. Gage, 280 U.S. 327 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

National Association of Clean Air Agencies v. EPA, 489 F.3d 1221 (D.C. Cir. 2007) . . . . . . . 13

Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984) . . 13, 21,
    32, 35

Children's Seashore House v. Waldman, 197 F.3d 654 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . 16

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . 21

Commercial Drapery Contractors v. U.S., 133 F.3d 1 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . 13

Corp. v. AT&T Co., 512 U.S. 218 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . 14, 17, 32

Duncan v. United States, 949 F.2d 1134 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Frieman v. Walsh, 481 F. Supp. 137 (W.D. Mo. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

General Instrument Corp. v. FCC, 213 F.3d 724 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 22

General Electric Co. v. U.S. Environmental Prot. Agency, 53 F.3d 1324 (D.C. Cir. 1995) . . . 37

Massachusetts v. HHS, 749 F.2d 89 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

McCarron v. United States, Civ. No. 87-1548, 1988 WL 25418 (Fed. Cir. 1988) . . . . . . . . . 16

McGill v. Environmental Prot. Agency, 593 F.2d 631 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . 34

Minnesota v. Ctrs. for Medicare & Medicaid Services, 495 F.3d 991 (8th Cir. 2007) . . . . . . . 14

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance
    Co., 463 U.S. 29 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 22, 31

National Association of Broadcasters v. Librarian of Congress, 146 F.3d 907 (D.C. Cir.
    1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

National Rifle Assoc. of Am. v. Reno, 216 F.3d 122 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . 18

New York State Bar Association v. F.T.C., 276 F. Supp. 2d 110 (D.D.C. 2003) . . . . . . . . . . . 21

Northpoint Technology, Ltd. v. FCC, 412 F.3d 145 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . 22

Preterm, Inc. v. Dukakis, 591 F.2d 121 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5,
                                                                                                                                    6

Reynolds v. Sims, 377 U.S. 533 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Rollins Environmental Services v. U.S. Environmental Prot. Agency, 937 F.2d 649 (D.C.
    Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rust v. Sullivan, 500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Schweiker v. Gray Panthers, 453 U.S. 34 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Shays v. F.E.C., 337 F. Supp. 2d 28 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Small Refiner Lead Phase-Down Task Force v. E.P.A., 705 F.2d 506 (D.C. Cir. 1983) . . 31, 37

State of Colo. v. U.S. Department of Interior, 880 F.2d 481 (D.C. Cir. 1989) . . . . . . . . . . . . 33

Thomas Jefferson v. Shalala, 512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Transmission Access Policy Study Group v. F.E.R.C., 225 F.3d 667 (D.C. Cir. 2000) . . .   32, 33

In re United Mine Workers of America Intern. Union, 190 F.3d 545 (D.C. Cir. 1999) . . . . . .   20

United States Air Tour Associate v. F.A.A., 298 F.3d 997 (D.C. Cir. 2002)....................23, 36, 41

Wisconsin Department of Health & Family Services v. Blumer, 534 U.S. 473 (2002) . . . . . . .   4

## STATUTES AND LEGISLATIVE MATERIALS

42 U.S.C. § 1395oo(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

42 U.S.C. § 1396 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

42 U.S.C. §1396a(a)(30)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

42 U.S.C. § 1396b(w) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

42 U.S.C. § 1396d(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

42 U.S.C. § 1396r-4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000
    ("BIPA"), Pub. L. No. 106-554, app..............................................................19, 20

Pub. L. 110-28, § 7002(a)..........................................................................................43

Pub. L. No. 105-33, 111 Stat. 251, 507 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

S. Rep. No. 97-139, at 431, 97th Cong. 1st Sess. 1981 . . . . . . . . . . . . . . . . . . . . . . . . .   17

## REGULATIONS AND OTHER REGULATORY MATERIALS

42 C.F.R. § 412.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

42 C.F.R. §§ 413.20(b), 413.24(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

42 C.F.R. § 430.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

65 Fed. Reg. at 60151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9, 14, 19

66 Fed. Reg. 17657 (April 3, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31, 37

66 Fed. Reg. 3148 (Jan. 12, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31, 37

66 Fed. Reg. at 58694  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

66 Fed. Reg. 46397 (Sept. 5, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37

67 Fed. Reg. 2602 (Jan. 18, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37

47 Fed. Reg. 55119 (Nov. 24, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

61 Fed. Reg. 60151 (Oct. 10, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

61 Fed. Reg. at 28141. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

72 Fed. Reg. 2236 (Jan. 18, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

72 Fed. Reg. at 2237. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36, 38

72 Fed. Reg. 29748, 29750 (May 29, 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

72 Fed. Reg. at 29748-29750, 29772-29804  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

72 Fed. Reg. at 29748-29751, 29727-29797  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

52 Fed. Reg. at 28144. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 14, 19

**INTRODUCTION**

Created over four decades ago, the Medicaid program finances health care for millions of low-income Americans.  As created, Medicaid is the shared responsibility of the federal government and states, pursuant to which the federal government provides federal matching funds to states that choose to reimburse the costs of treating Medicaid-eligible beneficiaries. Given the substantial financial resources dedicated to the program, the proliferation of abusive financing schemes created by states seeking to shift financial responsibility to the federal government is perhaps unsurprising.  The states' utilization of these financing schemes effectively increases the amount of federal funding for state Medicaid programs while state contributions remain unchanged or even decrease.  The states then often use the "excess" funds generated by these financing schemes for non-Medicaid purposes.  For over 20 years, Congress and the Department of Health and Human Services ("HHS") have struggled to rein in these abusive financing schemes through numerous legislative and regulatory actions.  Although these efforts have been somewhat effective, states continue to find innovative ways to divert billions of Medicaid dollars for non-Medicaid uses and to exaggerate the states' actual Medicaid expenditures by counting excess payments that states make to Medicaid providers, which, in turn, funnel these excess payments back to the states.  For this reason, HHS recently engaged in notice-and-comment rulemaking in an effort to eliminate the last vestiges of these pernicious state financing arrangements.  The regulations challenged in this suit seek, *inter alia*, to end states' ability to divert Medicaid funds for non-Medicaid purposes and to claim excessive federal matching funds by artificially inflating the states' own Medicaid payments, by clarifying that the only health care providers permitted to finance the states' share of Medicaid expenditures are

governmentally-operated providers ("government providers") which have taxing authority or direct access to tax revenues, and by limiting Medicaid reimbursement for government providers to each provider's cost of furnishing covered services for Medicaid recipients.

Plaintiffs, which are a public hospital "established as a 'government entity separate and apart from the county'" pursuant to California state law and county ordinance, and national hospital medical and associations with government provider members, have filed a two-count complaint against, among others Michael O. Leavitt, the Secretary of Health and Human Services.  Plaintiffs' suit alleges violations of the Administrative Procedure Act ("APA") and focuses on only two provisions of the regulations the Secretary promulgated in May 2007: (1) the provision establishing the actual cost of providing covered Medicaid services as the new upper payment limit ("UPL") for health care providers operated by units of government (hereinafter "the government provider payment rule"); and (2) the rule clarifying that health care providers involved in financing the states' share of Medicaid expenditures, also called the non-federal share, must be units of state or local government (hereinafter "the unit of government definition") with taxing authority.   The crux of Plaintiffs' claims is that the Secretary, in promulgating the challenged rules, violated the APA by failing to adopt their preferred interpretation of the Medicaid Act.

Despite the fact that Congress gave the Secretary broad authority to ensure that states' Medicaid payments are "consistent with efficiency, economy, and quality of care," 42 U.S.C. § 1396a(a)(30)(A) ["§ (30)(A)"], Plaintiffs contend that Congress prohibited the Secretary from requiring states to limit payments to government providers to the actual cost of the covered services they provide to Medicaid-eligible beneficiaries, and also prevented the Secretary from

limiting the types of providers that may finance the non-federal share of states' Medicaid expenditures to units of government within the state with taxing authority.  Try as they have, however, Plaintiffs have failed to identify any statutory provision that limits the Secretary's discretion in the ways Plaintiffs contend.

Indeed, neither the Medicaid Act nor its legislative history (nor any other statutory provision on which Plaintiffs rely) demonstrates Congress's unequivocal intent to require (or even to allow) states to reimburse government providers in excess of the actual cost of the Medicaid services they provide.  Under the APA, this Court's review of the Secretary's determinations must be based on the Administrative Record ("A.R.").  The Administrative Record demonstrates that the challenged regulations are not only consistent with the Medicaid Act but also based on well-reasoned analysis.   Accordingly, the Secretary is entitled to judgment in his favor.

## BACKGROUND

### A.    The Federal-State Partnership in Medicaid

Medicaid is a federal-state program designed to furnish medical assistance to persons "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396.  The program is administered by the states under state Medicaid plans which must be approved by the Secretary.  42 U.S.C. § 1396a.  These state plans must ensure that payments to health care providers "are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A).  In developing and administering their programs, states have considerable flexibility within broad statutory parameters to set eligibility categories and standards to construct benefit packages.  The federal government then reimburses the states for

Medicaid expenditures on the basis of a formula tied to the per-capita income in each state. 42

U.S.C. § 1396d(b). This federal matching share, known as "Federal financial participation"

("FFP"), 42 C.F.R. § 430.1, varies from a minimum of 50 percent to as much as 83 percent. 42

U.S.C. § 1396d(b).

Medicaid is "designed to advance cooperative federalism," Wisconsin Dep't of Health &

Family Servs. v. Blumer, 534 U.S. 473, 476 (2002), by creating "a partnership between the states

and federal government in defraying Medicaid costs." Massachusetts v. HHS, 749 F.2d 89, 92

(1st Cir. 1984). This "Federal-State fiscal partnership is the most fundamental aspect of the

Medicaid program." Frieman v. Walsh, 481 F. Supp. 137, 143 (W.D. Mo. 1979). Just as "a

complete withdrawal of the federal prop in the system[,] with the intent to drop the total cost of

providing the service upon the states, runs directly counter to the basic structure of the program,"

Preterm, Inc. v. Dukakis, 591 F.2d 121, 132 (1st Cir. 1979), so too removal of the state prop with

the intent to shift greater financial burden to the federal government undermines both the fiscal

integrity of Medicaid and the federal-state partnership created by the Medicaid Act.

**B.      A Brief History of States' Abusive Financing Schemes Under the Medicaid Program**

Over the last two decades, states have found creative ways to shift increased financial

responsibility for the operation of the Medicaid program to the federal government by claiming

as state expenditures (subject to federal matching) excessive payments that the states make to

health care providers which then recycle the excess back to the states, increasing the federal

matching rate beyond that permitted under federal law.[1]  This has been the case with the states'

---

[1]The Administrative Record contains numerous reports and congressional testimony by
the Government Accounting Office (now called the Government Accountability Office)
("GAO"), the HHS Office of the Inspector General, and the Centers for Medicare & Medicaid

manipulation and misuse of intergovernmental transfers ("IGTs").[2]  States have misused IGTs by

making Medicaid payments to government providers, which, in turn, were required to return all

or a portion of the money to the states.  See A.R. 3026.   These boomerang financing

arrangements create "the illusion of valid [Medicaid] expenditures for services [provided] by

[state and/or] local[]government providers . . . and enable states to claim large federal

reimbursements."  A.R. 3026.   In reality, states have used the funds to supplant the states' own

share of Medicaid spending or for non-Medicaid purposes.  Id.  The end result is that the actual

amount the states have spent on Medicaid services is less than the amount the states have

claimed for purposes of obtaining the matching federal share.  As a result, the federal

government bears the burden of a higher proportion of the states' Medicaid expenditures than

contemplated by the Medicaid Act.[3]  Before addressing the specific regulation challenged here, it

is helpful to provide a brief overview of some of the ways in which states have hidden provider

---

Services documenting states' use of various bogus financing schemes to increase the non-federal
share of the Medicaid program over two decades.  See, e.g., 2992-3017 (chronicling the ways
states use financing arrangements with providers to falsely inflate Medicaid expenditures); A.R.
3100-3123 (states' use of recycled disproportionate share hospital payments to increase FFP
dollars); A.R. 3027 (states' use of provider donations and health care-related taxes to improperly
increase FFP).

[2]It is important to note that IGTs do not disrupt the federal-state relationship when the
IGT mechanism is used to transfer state or local tax revenues to fund the state share of **actual**
Medicaid expenditures.

[3]For example, a state plan provides for a $200 Medicaid payment for a medical service
provided by a governmental provider.  The government provider, however, actually expends
only $100 to provide the medical service, and then (or in advance) makes a $100 IGT to the state
(or diverts $100 for other, non-Medicaid purposes).  The state makes a claim for federal funding
based on the $200 state plan rate, and the federal government matches the state's claim with the
appropriate percentage ($100-$164, depending on the state).  However, the only actual (net)
payment by the state as a result of the transaction with the governmental provider was $100,
which is precisely the amount the government provider spent to provide the service (and, in this
example, means that the entire amount was funded by the federal government).

5

returns of Medicaid payments, under the guise of "intergovernmental transfers" to generate

increased federal Medicaid reimbursement:

- **Excessive Payments to State Health Providers**.  In the early 1980s, states made excessive payments to state-owned health facilities, which then returned the excess funds, or a portion thereof, back to the states' treasuries.  To address this problem, the Secretary issued regulations that established upper payment limits for certain classes of providers operated by states. A.R. 3027.

- **Use of Provider "Taxes" and "Donations" and "Hold Harmless" Agreements.**  In the early 1990s, states used revenue derived from provider-specific taxes imposed on hospitals and other health care providers and provider "donations" to increase the states' claimed Medicaid expenditures from which they would then claim federal funding on the inflated amount.  The use of provider taxes and donations enabled states to increase their Medicaid expenditures without actually spending state funds. A.R. 3027.  In response, Congress enacted the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 ("1991 Provider Tax Amendments") that barred, among other things, certain provider donations and restricted states' ability to utilize provider-specific taxes.  Id.

- **Use of Excessive Disproportionate Share Hospital ("DSH") Payments.**  In the early 1980s, Congress enacted a provision permitting states to provide enhanced payments to hospitals "which serve a disproportionate number of low-income patients with special needs."  42 U.S.C. § 1396a(a)(13)(A)(iv).  As originally enacted, DSH payments had no ceiling, or upper payment limit.  Throughout the early 1990s, states utilized the absence of payment limitations to make unusually large DSH payments to certain providers.  These providers then would, by prior agreement, return a portion of the state and federal funds back to the state treasuries.  As with the provider-specific taxes and donation schemes discussed above, states utilized these excessive DSH payments to inflate claims for federal funding above the actual levels available for provider services. A.R. 3027.  In response to the states' abusive use of DSH payments, Congress enacted the Omnibus Budget Reconciliation Act of 1993, which limited providers' eligibility for DSH payments and capped both the amount of DSH payments states could make and the amount of DSH payments providers could receive.  Id.  Despite this congressional enactment, states' abusive use of DSH payments persists.  See A.R. 3299 (noting that of the $738 million one state paid in DSH payments to providers, approximately $632 million of that sum was transferred back to the state).

- **Upper Payment Limits for Local Government Providers.**  In the early 2000s, the Secretary issued a number of regulations that established upper payment

6

limits ("UPLs"), which limited provider reimbursement to a reasonable estimate of the amount that would be paid under Medicare payment principles for comparable services.  Under the Secretary's prior UPL regulations, each UPL applied to payments in the aggregate for each provider type, aggregating both governmental and private providers (except state-operated facilities which, as noted above, had a separate UPL).  These aggregate UPLs allowed states to make excessive Medicaid payments to a few local government providers, which then returned the funds to the states, thereby generating increased federal funding with no net increase in the states' corresponding Medicaid expenditures.  A.R. 3027.  To address this problem, Congress enacted § 705(a) of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), which required the Secretary to issue a final regulation based on a proposed rule that would have established separate UPLs for several classes of providers, including local government providers.  Although the ensuing January 2001 final rule lowered the UPL for local government providers, "[p]roblems with excessive supplemental payment arrangements remain. . . ."[4]  A.R. 3028.

As the foregoing demonstrates, states have consistently taken "advantage of statutory and regulatory loopholes" to create financing schemes using state and/or local governmental providers, which give "the illusion of . . . valid state Medicaid expenditure[s] to a health care provider. Many of these schemes involve payment arrangements between the state and government-owned or government-operated providers, such as local government-operated nursing homes."  A.R. 3049.  These financing arrangements effectively allow states to "claim federal matching funds regardless of whether . . . services paid for had actually been provided,"

_____

[4]Indeed, as the Secretary found, and as HHS as well as other government entities, including the GAO, have documented, the Secretary's promulgation of the January 2001 UPL regulation, the last rulemaking before the one challenged here, left unresolved states' manipulation of IGTs to falsely inflate the non-federal share of the states' Medicaid expenditures.  See A.R.  2414-2415, 2427 (noting the Secretary's concern that "some states used fund transfers between states and local governments" to obtain additional federal reimbursements without contributing a non-federal share); see also A.R. 3138 (finding states' "use of IGT as part of the enhanced payment program was a financing mechanism designed to maximize Federal Medicaid reimbursements, thus effectively avoiding the Federal/State matching requirements"); see also 72 Fed. Reg. at 29823 (commenters supporting the challenged rule's effort to "eliminate abusive financing practices involving 'recycling' of Federal funds").

7

A.R. 3048, 3049, thereby creating a "financial windfall" for states seeking to maximize federal

Medicaid reimbursement and avoid federal/state matching requirements.[5]  A.R. 3144.

## C.  The Challenged Rules: the Government Provider Payment Rule & the Unit of Government Definition

The Secretary has found that many states make supplemental payments to government

providers that are in excess of the cost necessary to provide the services under Medicaid.  72

Fed. Reg. at 29774; A.R. 2803 (documenting states' exploitation of UPLs "to claim excessive

federal matching funds by paying government-owned facilities . . .  much higher than established

Medicaid rates"); see also A.R. 3120-21 ( "CMS discovered that several States were utilizing

financing techniques that do not meet the matching requirements of the Federal-State

partnership").  These government providers then use the excess Medicaid payments to "subsidize

health care (or other) operations that are unrelated to Medicaid," or they return all or a portion of

the supplemental payment to the states as a source of revenue.  72 Fed. Reg. at 29774.

According to the Secretary, these financing arrangements brokered between states and

government providers "effectively divert Medicaid funds to non-Medicaid purposes, or overstate

the total computable expenditure that is being made" by the state.  72 Fed. Reg. at 29774.

In an effort to remedy this problem, the Secretary has, consistent with his "responsibility

---

[5]For example, the GAO found that one state netted $28.5 million in excess federal
Medicaid funds as the result of a financing arrangement with one local government provider in
2004.  A.R. 2414-2416.  The state made a $41 million supplemental payment to the hospital.
A.R. 2414.  Under the state's Medicaid matching formula, the state paid $10.5 million and the
federal government paid $30.5 million as the federal share of the supplemental payment.  Id.
The hospital subsequently transferred back to the state approximately $39 million of the $41
million the state originally gave it, retaining only $2 million.  Id.  As the GAO found, "some . . .
states have used the returned funds as the non[-]federal share of additional Medicaid payments to
providers to seek still more additional federal reimbursements, thus recycling federal funds to
produce additional federal funds."  A.R. 2415-2416.

to ensure that Medicaid payment and financing arrangements comply with statutory intent," 72 Fed. Reg. at 29749, promulgated a number of regulations over the years governing UPL payments.  See, e.g., 66 Fed. Reg. at 58694; 65 Fed. Reg. at 60151; 52 Fed. Reg. at 28144; see also A.R. 2806-09 (noting the regulatory steps the Secretary took to limit states' UPL schemes). Although these regulatory actions have significantly reduced the prevalence of the problem, these prior regulations have not eliminated the states' ability to "generate excess federal matching payments" through these financing arrangements between states and government providers.  A.R. 2808; see also A.R. 2427 (noting that the Secretary "recognized the possibility that excessive federal funds could still be obtained under" the January 2001 UPL regulation).

Accordingly, after studying the problem and reviewing and processing over 1,000 proposed Medicaid state plan amendments related to state payments to providers over the last five years, the Secretary developed and published proposed regulations to address finally the states' misuse of enhanced payments and IGTs to circumvent the statutory requirements of the Medicaid program.  See 72 Fed. Reg. 2236 (Jan. 18, 2007).  In response, the Secretary received over 1,000 public comments from, among others, physicians, state Medicaid programs, and state and local government agencies that raised over 260 individual issues regarding the provisions of the Secretary's proposed rule.  72 Fed. Reg. 29748, 29750 (May 29, 2007); see also A.R. 435-2383.  Of the comments the Secretary received, a few supported the challenged rules, while most opposed it.  72 Fed. Reg. at 29750, 29823.

The Secretary considered the comments and determined that the challenged regulations are necessary to "ensure that Medicaid payment and financing arrangements comply with" the Medicaid Act's statutory requirements.  72 Fed. Reg. at 29749, 29773.  To that end, the

9

challenged government provider payment rule establishes the actual costs of providing services to Medicaid-eligible beneficiaries as the upper payment limit for government providers. 72 Fed. Reg. at 29748-29751, 29727-29797. Another provision of the Secretary's regulation requires that all providers (both government and private) retain the full amount of Medicaid reimbursement they receive from the states. 72 Fed. Reg. at 29748-29751, 29797-29804. Thus, the final rule reflects the Secretary's determination that the government provider payment rule "strengthen[s] accountability to ensure" that states' payment plans for government providers satisfy statutory requirements within the Medicaid Act. 72 Fed. Reg. at 29819.

To clarify which entities may permissibly finance the non-federal share of Medicaid expenditures, the Secretary promulgated the unit of government definition. 72 Fed. Reg. at 29748-29763. The purpose of this rule is to ensure that there is "a clear and uniform standard that can be consistently applied in every state to every provider," 72 Fed. Reg. at 29752, by clarifying the permissible scope, for purposes of the Medicaid Act only, of "other governmental units" (a term that Congress did not define in the Medicaid Act) allowed to transfer funds to states and local governments. 72 Fed. Reg. at 29749; see also 72 Fed. Reg. at 29748 (stating that definition clarifies that entities involved in financing the non-federal share of Medicaid payments must be a unit of government). The Secretary explained that the reference to "other governmental unit" in § 1396b(w)(6)(A)'s definition of "unit of local government" was undefined and could reasonably be interpreted to require the governmental unit to have taxing authority or direct access to tax revenues given that the statutory provision lists a number of entities – states, county, and special purpose district – "that generally share the common characteristic of possessing taxing authority" or direct access to tax revenues. 72 Fed. Reg. at

10

29752.  The Secretary determined that this interpretation of the scope of "other governmental units" as referenced in § 13976b(w)(7)(G) is consistent with Congress's mandate in § 1396b(w)(6)(A) that states' non-federal share of Medicaid expenditures derive from state or local taxes.[6]  Id.  (noting that although § 1396b(w)(6)(A) uses the undefined term "unit of government," it refers to the use of "State or local tax revenues"); see also 72 Fed. Reg at 29753. Ultimately, both the government provider payment rule and the unit of government definition seek to end abusive state financing arrangements, thereby "ensur[ing] that Medicaid revenues are used to support Medicaid services and are not diverted for other purposes."  72 Fed. Reg. at 29775, 29829-29830.

## D.    Plaintiffs' Claims

Plaintiffs in this action include the Alameda County Medical Center, which alleges that it operates a public hospital, and three groups – the National Association of Public Hospitals and Health Systems ("NAPH"), the American Hospital Association ("AHA"), and the Association of American Medical Colleges ("AAMC") – which allege that their memberships include government providers.[7]  Plaintiffs contend that the Secretary's promulgation of the government

---

[6]Indeed, without their agreement to participate in these sleight of hand financing schemes with state and local governments, public providers that do not themselves have taxing authority or direct access to tax revenues would not be paying these taxes or making "transfers" to the state.  The ability of these providers (which claim to operate on shoestring budgets) to make large sums of money available to state and local governments here derives from the fact that these entities have received inflated Medicaid payments – far in excess of what they would have received had they not agreed to return the funds to the state (or local government).  The state governments have made the excessive payments to the governmental provider hospitals (and claimed federal matching funds for that amount) knowing full well that the states would get the excess payments back.

[7]The Secretary does not concede that Plaintiffs are government providers within the meaning of the challenged rule and uses this term to refer to Plaintiffs only for purposes of this

provider payment rule and the unit of government definition "will impermissibly . . . shift the burden of paying for the care of the Medicaid population to the States[,]" and "will destabilize State Medicaid programs, thereby threatening the viability of critical hospitals and other providers that constitute the safety net for Medicaid beneficiaries and their communities." Complaint, ¶ 8.

Plaintiffs' Complaint charges that the Secretary violated the APA in promulgating the challenged rules because the government provider payment rule and the unit of government definition violate the Medicaid Act, the Medicare, Medicaid, and SCHIP, Benefits Improvement and Protection Act of 2000 ("BIPA"), and are arbitrary, capricious, and an abuse of discretion. In addition, Plaintiffs assert that the promulgation of the challenged regulations violates a one-year moratorium the President signed into law on May 25, 2007, which prohibits the Secretary from finalizing or otherwise implementing the challenged rules.

## ARGUMENT

### I.    LEGAL STANDARD

To prevail on their APA claims, Plaintiffs must show that the agency action was contrary to the statute or arbitrary and capricious. That is a legal issue that a court resolves on the basis of the statute and the administrative record when deciding either a motion under Rule 12(b) or a

---

brief. In addition, although the Secretary does not contest that Plaintiff Alameda County Medical Center has standing to pursue its claims, it is unclear whether Plaintiffs NAPH, AHA, and AAMC have standing. Nevertheless, the Secretary respectfully requests that, in the event that the Secretary prevails in this action, the Court ensure that all of the members of Plaintiff Associations are bound by the Court's decision and not permitted to litigate the claims at issue in this litigation in other jurisdictions. See Auto Workers v. Brock, 477 U.S. 274, 290 (1986) (noting that in a proper associational standing case, the association's members will be bound by the result). To hold otherwise would in essence create a one-way class action.

motion for summary judgment.  <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir. 2001); <u>Commercial Drapery Contractors v. U.S.</u>, 133 F.3d 1, 7 (D.C. Cir. 1998).  Here, Plaintiffs cannot show that the challenged rules violated the Medicaid Act or BIPA, and the record demonstrates that the rules are entirely reasonable.

## II.    CONGRESS DID NOT PRECLUDE THE SECRETARY FROM PROMULGATING A RULE THAT REASONABLY LIMITS THE FEDERAL SHARE OF MEDICAID TO THE ACTUAL COSTS INCURRED BY STATES IN PROVIDING MEDICAL CARE

The parties agree that this Court must review the merit of Plaintiffs' APA claims under the standard articulated in <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).  <u>Chevron</u> requires this Court to employ a two-part inquiry.  First, the court must look to "'whether Congress has directly spoken to the precise question at issue. . . .'" <u>Baker Norton Pharm. v. U.S. Food & Drug Admin.</u>, 132 F. Supp. 2d 30, 33 (D.D.C. 2001) (internal citation omitted).  If, as here, Congress has not directly spoken on the challenged issue, the Court must proceed to the second step of the <u>Chevron</u> test.  <u>National Ass'n of Clean Air Agencies v. EPA</u>, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  Under this second step, "'the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute.'" <u>Baker Norton Pharm.</u>, 132 F. Supp. 2d at 33-34 (internal citation omitted).

Plaintiffs contend that this Court's inquiry should end at <u>Chevron</u> step one because Congress expressly considered and rejected the Secretary's challenged rules.  However, Plaintiffs cannot prevail on this claim because none of the statutory provisions on which they rely demonstrates that Congress expressly (or even implicitly) required that Medicaid providers (government or otherwise) receive reimbursement from the state – to be subsequently matched by FFP – that is in excess of the actual cost of the Medicaid services they provide.

13

A.    The Terms "Efficiency," "Economy," and "Quality of Care" In the Medicaid
      Act Are Ambiguous

"[A]ppreciating the complexity of what it had wrought" when it established Medicaid in

1965, Congress "conferred on the Secretary exceptionally broad authority to prescribe standards"

for applying the statute.  Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981).  That "broad

authority" includes the power to ensure "that payments are consistent with efficiency, economy,

and quality of care."  42 U.S.C. § 1396a(a)(30)(A).

However, when Congress enacted this statutory provision, it did not define the terms

"efficiency," "economy," or "quality of care."  See Minnesota v. Ctrs. for Medicare & Medicaid

Servs., 495 F.3d 991, 996-98 (8th Cir. 2007) (observing that the terms "efficiency" and

"economy" are undefined in the Medicaid statute); Alaska Dep't of Health & Social Servs. v.

Ctrs. for Medicare & Medicaid Servs., 424 F.3d 931, 940 (9th Cir. 2005) (same).  Accordingly,

"[w]here, as here, Congress enacts an ambiguous provision within a statute entrusted to the

agency's expertise, it has 'implicitly delegated to the agency the power to fill those gaps.'"

County of Los Angeles v. Shalala, 192 F.3d 1005, 1016 (D.C. Cir. 1999) (internal citation

omitted).  To that end, the Secretary has consistently exercised his broad rulemaking authority

under § (30)(A) to fill this gap by promulgating Medicaid payment rules that are consistent with

"efficiency, economy and quality of care."  See, e.g., 61 Fed. Reg. at 28141; 66 Fed. Reg. at

58694; 65 Fed. Reg. at 60151; 52 Fed. Reg. at 28144.  Indeed, Plaintiffs agree that this language

gives the Secretary the authority to establish upper payment limits for hospitals.  See Pls.' Br. at

24-25.

Despite Plaintiffs' recognition of this broad authority and Congress's clear instruction to

the Secretary to assure that Medicaid payments are consistent with efficiency and economy, they

claim that the Secretary's decision to promulgate the government provider payment rule exceeded that authority.  Pls.' Br. at 17-22.  Plaintiffs contend that Congress did not intend to authorize the Secretary to limit government provider reimbursement to the actual cost of the Medicaid services they provide.  As a matter of pure logic, it is difficult to conceptualize how limiting payments for services to the actual cost of those services is inconsistent with efficiency and economy, while providing excessive payments to particular group of providers is both efficient and economical.  Indeed, Plaintiffs' "plain language" argument essentially ignores the text of § 30(A) and looks elsewhere for congressional meaning.  The effort, however, is futile.

Plaintiffs' contention that Congress expressly rejected cost-based reimbursement, relying on the legislative history of the Boren Amendment,[8] Pls.' Br. at 20-22, fails for two reasons.  First, as Plaintiffs acknowledge, albeit in a footnote in their brief, the legislative history on which they rely concerns a statutory provision that Congress expressly **repealed** in its entirety in 1997.  See  Pub. L. No. 105-33, 111 Stat. 251, 507 (1997); see also Alaska Dep't of Health & Social Servs., 424 F.3d at 941.  Courts have consistently refused to consider the legislative history of repealed statutes as evidence of Congress's intent.[9]  See, e.g., Duncan v. United States,

---

[8]Prior to the enactment of the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A) ["§ 13(A)"] required that Medicaid reimbursement not exceed "reasonable charges consistent with efficiency, economy, and quality of care."  In 1981, Congress enacted the Boren Amendment, which amended § 13(A) by requiring states to reimburse providers at rates that are "'reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.'"  Alaska Dep't of Health & Social Servs., 424 F.3d at 940-41.  Congress has never, however, authorized excessive payments bearing no relation to actual Medicaid costs, much less required the Secretary to make these payments.

[9]To that point, Plaintiffs' erroneously rely on National Ass'n of Broadcasters v. Librarian of Congress, 146 F.3d 907 (D.C. Cir. 1998).  In that case, Congress originally enacted a judicial review provision that incorporated the APA.  Years later, Congress repealed the APA review provision and enacted another judicial review provision that contained language requiring a more

15

949 F.2d 1134, 1137 (Fed. Cir. 1991) (concluding that reliance on legislative history of repealed statutes is unpersuasive); <u>McCarron v. United States</u>, Civ. No. 87-1548, 1988 WL 25418, *1 (Fed. Cir. 1988) (same).

Second, even assuming that Plaintiffs' reliance on the legislative history of the repealed Boren Amendments were proper, that legislative history does not favor Plaintiffs' position. Plaintiffs argue that it shows that Congress intended to restrict the Secretary's authority to impose provider-specific cost limits on public hospitals.[10]  Pls.' Br. at 21-22.  However, the legislative history of the Boren Amendment demonstrates that Congress not only expected that the Secretary would continue to monitor states' Medicaid reimbursement payments but also

deferential standard of review.  <u>Id.</u> at 919. The court concluded that Congress's intent to change the standard of review in the 1993 Act is clear and unambiguous and specifically noted Congress's "deliberate selection of language so differing from that used in earlier Acts indicates a change in the law."  <u>Id.</u> (citing <u>Brewster v. Gage</u>, 280 U.S. 327, 337 (1930)).  By contrast, when Congress repealed the Boren Amendment, it repealed the amendment in its entirety, replacing it with notice and comment rulemaking provisions that have nothing to do with the statutory provisions at issue in this case.

[10]It is worth noting that, although Congress enacted the Boren Amendment to ameliorate states' administrative burdens and allow states "greater latitude in developing and implementing alternative reimbursement methodologies to promote the efficient and economical delivery of services," it became clear over time that the Boren Amendment had "quite the opposite effect." <u>Alaska Dep't of Health & Social Servs.</u>, 424 F.3d at 941.  Courts interpreting the statutory provision determined that providers had an enforceable right against states under 42 U.S.C. § 1983 to challenge the reasonableness of state rate setting, and many providers took advantage of this statutory right. <u>See id.</u>  As a result of these provider lawsuits challenging the states' rate-setting, courts found that many state systems failed to satisfy the "reasonableness" test established in the Boren Amendment, and many states had to increase payments to these providers.  <u>See</u> <u>Children's Seashore House v. Waldman</u>, 197 F.3d 654, 659 (3d Cir. 1999) (delineating impetus for Congress's repeal of the Boren Amendment).  In the face of a proliferation of provider actions challenging states' rate-setting and the states' growing frustration with these lawsuits, Congress ultimately repealed the Boren Amendment.  <u>See</u> Malcolm J. Harkins, III, *Be Careful What You Ask For: The Repeal of the Boren Amendment and Continuing Federal Responsibility To Assure That State Medicaid Programs Pay For Cost Effective Quality Nursing Facility Care*, 4 J. Health Care L. & Pol'y 159, 186-96 (2001).

conferred upon the Secretary broad authority to promulgate rules designed to ensure that Medicaid payments are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."  See S. Rep. No. 97-139, at 431, 97th Cong. 1st Sess. 1981.  Moreover, Congress's repeal of the Boren Amendment had no effect on § (30)(A)'s requirement that payments be efficient and economical.  Thus, the repeal of the Boren Amendment did not "eviscerate the Secretary's oversight role" to assure that the Medicaid reimbursement rates set by states were reasonable and adequate to meet the costs incurred by efficiently and economically operated government providers.  See Alaska Dep't of Health & Social Servs., 424 F.3d at 941 (observing that Congress's repeal of the Boren Amendments did not "eviscerate the Secretary's oversight role" to assure that the Medicaid reimbursement rates set by states were reasonable and adequate to meet **the costs incurred** by efficiently and economically operated government providers) (emphasis added).

Indeed, contrary to Plaintiffs' assertions, Congress's decision in 1981 to delete the "reasonable charge" language from § (30)(A) and retain the undefined terms "efficiency" and "economy" conferred upon the Secretary broad discretion to determine standards for efficient and economical Medicaid service reimbursement.  See County of Los Angeles, 192 F.3d at 1016. Utilizing this broad authority, the Secretary reasonably decided to address through his rulemaking authority a pervasive problem that Congress itself had never directly addressed, either through the Boren Amendment or any other legislative enactment, *i.e.*, that many States make supplemental payments to governmentally-operated health care providers that are in excess of cost and that these providers, in turn, use that excess Medicaid revenue either to subsidize health care (or other operations) that are unrelated to Medicaid, or they simply return to the state

17

as revenue a portion of those supplemental, in excess of cost payments."[11]  72 Fed. Reg. at

29774.  These practices, the Secretary found, not only divert Medicaid funds to non-Medicaid

purposes and overstate the states' total Medicaid expenditures, they are wholly inconsistent with

the Medicaid Act's requirement that reimbursement made under the Act be consistent with

efficiency and economy.  Id.

     As the foregoing demonstrates, Congress did not unequivocally require (or even permit)

that government providers receive Medicaid reimbursement above the actual cost of the services

they provide under the Medicaid program, nor did Congress expressly reject the application of a

cost-based rule to government providers.[12]  Rather, when Congress deleted the "reasonable

---

[11]In an effort to prove that Congress expressly considered and rejected the Secretary's
challenged rule, Plaintiffs point to Congress's consideration of and failure to enact proposed
legislation substantially similar to the challenged rules.  The Supreme Court, however, has
expressly rejected such arguments, admonishing that courts cannot divine congressional intent
from Congress's failure to act.  See National Rifle Assoc. of Am. v. Reno, 216 F.3d 122, 129
(D.C. Cir. 2000) (explaining that it was heeding the Supreme Court's warning to "'not rely on
Congress's failure to act' as dispositive evidence of congressional intent") (quoting Food &
Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 155 (2000)).

[12]To that point, Plaintiffs' reliance on Anna Jacques Hospital v. Leavitt, No. 05-625,
2008 WL 510337 (D.D.C. Feb. 26, 2008) (GK), motion to alter or amend judgment pending
[Dkt. No. 35], and MCI Telecomm. Corp. v. AT&T Co., 512 U.S. 218 (1994), Pls.' Br. at 22
n.40, are misplaced.  In Anna Jacques Hospital, the court found that the Medicare statute
contained an express provision directing the Secretary to calculate a wage index using a survey.
The Secretary believes that case was wrongly decided, and it is in any event irrelevant to this
case.  Congress has not enacted any provision in the Medicaid statute prohibiting the Secretary
from promulgating a regulation that establishes an upper payment limit of actual cost for
government providers.  Indeed, as previously discussed, Congress's decision to delete the
"reasonable charge" language from § (30)(A), while leaving the undefined terms "efficiency"
and "economy," granted the Secretary broad discretion to ensure that Medicaid state plans are
consistent with these statutory goals.  Similarly, Plaintiffs' reliance on MCI Telecomm. Corp. is
inapposite.  Unlike the action at issue in MCI, the Secretary's rulemaking here does not
constitute a "fundamental revision" of the Medicaid Act, but is in fact consistent with the
Secretary's prior rulemakings in which he revised the UPLs applicable to government and other
providers.

charge" language from § (30)(A) and left undefined the terms "efficiency" and "economy," it removed the limitation on the Secretary's discretion to approve state reimbursement plans based only on "reasonable charges," thereby conferring upon the Secretary broader rulemaking authority to establish Medicaid reimbursement standards consistent with efficiency and economy.   The Secretary has consistently exercised this authority by promulgating regulations governing Medicaid payments for efficient and economically-operated government hospitals and other providers.[13]  See 66 Fed. Reg. at 58694; 65 Fed. Reg. at 60151; 52 Fed. Reg. at 28144.

## B.    The Government Provider Payment Rule Does Not Violate BIPA

Presumably recognizing the weakness in their Chevron step one arguments based on the text and legislative history of the Medicaid Act, Plaintiffs also argue that the government provider payment rule violates a statutory directive from Congress that established a deadline for the Secretary to issue a final rule based on the Secretary's October 10, 2000 proposed rule.  Pls.' Br. at 28-29.  The crux of Plaintiffs' claim is that, by enacting the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554, app. F, § 705(a), 111 Stat. 2763, 2763A-575-2763A-576, Congress unequivocally directed the Secretary to promulgate Medicaid payment rules applying only aggregate, as opposed to provider-specific, upper payment limits.  However, the flaw in this argument is that BIPA, as demonstrated by the statutory provision's heading title and text, requires only that the Secretary issue a final regulation by December 31, 2000, based on the Secretary's October 10, 2000 proposed rule.

---

[13]It is worth noting that Congress itself has not determined that the challenged rules violate any existing statute.  If it had so determined, it would have imposed a permanent ban on the challenged rules rather than a one-year moratorium.

Indeed, BIPA provides in relevant part:

Not later than December 31, 2000, the Secretary of Health and Human Services . . . shall issue under sections 447.272, 447.304, and 447.321 of title 42, Code of Federal Regulations (and any other section of part 447 of title 42, Code of Federal Regulations that the Secretary determines is appropriate), a final regulation based on the proposed rule announced on October 5, 2000, that – (1) modifies the upper payment limit test applied to State medicaid spending for inpatient hospital services, outpatient hospital services, nursing facility services, intermediate care facility services for the mentally retarded, and clinic services by applying an aggregate upper payment limit to payments made to government facilities that are not State-owned or operated facilities; and (2) provides for a transition period in accordance with subsection (b).

Id.  The references to aggregate upper payment limits in BIPA merely describe the text and substance of the Secretary's **own** proposed rule.  See 61 Fed. Reg. 60151 (Oct. 10, 2000).  Furthermore, there is nothing in the express language of BIPA that requires the Secretary to maintain in perpetuity the regulations that the Secretary finalized in 2000, or limits the Secretary's authority to revisit the appropriateness of aggregate upper payment limits.[14]  See Pub. L. No. 106-554, app. F, § 705(a), 114 Stat. 2763, 2763A-575-2763A-576.

In other words, contrary to Plaintiffs' assertion, BIPA is Congress's statutory endorsement of the Secretary's October 10, 2000 proposed rule on upper payment limits and a directive to the Secretary to publish a final rule on the same -- nothing more, nothing less.  See In re United Mine Workers of Am. Intern. Union, 190 F.3d 545, 551 (D.C. Cir. 1999) (concluding that "Congress meant what it said" when it directed the Secretary to issue a final rule or to make a determination not to issue the proposed rule "'within 90 days of the certification of the hearing record'") (internal citation omitted).  It did not prevent the Secretary from changing that rule or any other Medicaid payment rule prospectively based on experience

---

[14]The Secretary issued the final rule required by BIPA at 66 Fed. Reg. 3148 (Jan. 12, 2001).

20

with the 2000 rule or for any other reason.  If, as Plaintiffs argue, Congress intended to mandate

aggregate upper payment limits for government providers (or any other providers for that

matter), it certainly could have done so.  That, however, would require amending the Medicaid

Act.[15]

## III.    THE SECRETARY REASONABLY DETERMINED THAT THE GOVERNMENT PROVIDER PAYMENT RULE WAS NEEDED TO ELIMINATE THE POTENTIAL FOR ABUSIVE FINANCING SCHEMES CONCERNING PAYMENTS TO CERTAIN PUBLIC HOSPITALS

Having established that the government provider payment rule is not prohibited by any

express statutory command, it remains for the Secretary only to show that the regulation is a

reasonable construction of the Medicaid Act.  See Chevron, 467 U.S. at 843. This is not difficult.

The Court's inquiry in a § 706(2)(A) challenge to agency action focuses "mainly on the

decision-making process and the rationale behind an agency's decision." New York State Bar

Ass'n v. F.T.C., 276 F. Supp. 2d 110, 140 (D.D.C. 2003).  If the agency has considered the

relevant factors, based the rules on that data, and articulated an explanation for its action, the

court must uphold it.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1982).  The scope of review under the arbitrary and capricious standard is narrow,

highly deferential, and presumes the validity of agency action.  See Citizens to Preserve Overton

Park v. Volpe, 401 U.S. 402, 415-16 (1971).  Indeed, so long as there is a "'rational connection

between the facts found and the choices made,'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, this

Court is required to defer to the agency's judgment.

Given this narrowly-focused and highly deferential standard, Plaintiffs must overcome a

---

[15]It is also worth noting that payments specifically permitted by BIPA are not subject to the government provider payment rule.  See 72 Fed. Reg. at 29775.

substantial burden to prevail on their argument that the government provider payment rule is

arbitrary, capricious and not a reasonable construction of the Medicaid Act.  See Barnhart v.

Walton, 535 U.S. 212, 218 (2002).  Plaintiffs cannot satisfy this heavy burden because the

challenged rule is "consistent with efficiency, economy, and quality of care," 42 U.S.C. §

1396a(a)(30)(A), well-reasoned, and reasonably reflects the Secretary's considerable experience

and expertise in dealing with various abusive state financing schemes designed to shift to the

federal government an increasing proportion of the cost of the program.[16]  See Thomas Jefferson

v. Shalala, 512 U.S. 504, 512 (1994) (the Secretary's interpretation of a "complex and highly

technical regulatory program," such as Medicaid, warrants heightened deference).

A.    **The Secretary Had A Rational Basis For Concluding That Prior UPL Rules Left Too Much Room For Abusive Financing Arrangements Between States and Government Providers**

As demonstrated by both the voluminous Administrative Record and the comprehensive

analysis articulated in the rule itself of its basis and purpose, the Secretary's decision to

promulgate the government provider payment rule was eminently reasonable.  Although

Plaintiffs seem to fault the Secretary for taking so long to address the problem covered by the

rule in a manner they view as impetuous, the rule demonstrates that the Secretary extensively

studied states' use of abusive financing arrangements and developed a well-reasoned and

measured response to the latest scheme involving the states' use of recycled payments to garner

---

[16]Defendants address Plaintiffs' arguments that the Secretary's construction of the Medicaid Act is impermissible and arbitrary and capricious together in this section as the analysis to resolve both claims overlaps substantially.  See Gen. Instrument Corp. v. FCC, 213 F.3d 724, 732 (D.C. Cir. 2000) ("[W]e have recognized that an arbitrary and capricious claim and a Chevron step two argument overlap."); Northpoint Tech., Ltd. v. FCC, 412 F.3d 145, 151 (D.C. Cir. 2005) (same).

additional FFP.  See 72 Fed. Reg. 29748, 29749-29750, 29772-29797 (May 29, 2007).

Essentially ignoring this rationale, Plaintiffs offer only a hodgepodge of objections to what they conceive to be the policy objectives of the regulation.  Pls.' Br. at 22-28.  None of these has any merit.  Plaintiffs' first argument is that the Secretary has reversed a long standing policy of permitting Medicaid reimbursement in excess of the actual cost of the services provided by government providers and failed to explain his reversal.  See Pls.' Br. at 24-25.  That claim is belied by the detailed Administrative Record in this case and the analysis in the rule itself.  If, as here, the Secretary has provided detailed analysis explaining the need to change Medicaid payment policy for government providers, see 72 Fed. Reg. at 29748-29751, 29765-29832, his interpretation is entitled to deference.  See United States Air Tour Assoc. v. F.A.A., 298 F.3d 997, 1006 (D.C. Cir. 2002) (explaining that "[a]n agency is not required to establish 'rules of conduct to last forever'" and may sustain its decision by justifying "the change in course with a 'reasoned analysis'") (internal citation omitted).  Indeed, the Supreme Court has expressly rejected the same argument that Plaintiffs advance here, stating that "a revised interpretation deserves deference because 'an initial agency interpretation is not instantly carved in stone' and 'the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.'" Rust v. Sullivan, 500 U.S. 173, 186 (1991).

Plaintiffs next argue that the government provider payment rule is (1) inherently inflationary, (2) deprives states of the flexibility to adopt incentives to improve care through "pay for performance" and other types of bonus payments for meeting quality standards, and (3) re-imposes administrative burdens that Congress sought to eliminate.  Pls.' Br. at 25.  It is odd

23

(at best) that Plaintiffs describe the government provider payment rule as "inherently inflationary" when the gravamen of Plaintiffs' Complaint is that they want states to be able to pay government providers in excess of the actual cost of the Medicaid services they provide – and then to have the federal government match those payments. The Secretary expressly found that "Medicaid payments in excess of cost to governmentally-operated health care providers are" inconsistent not only "with the statutory principles of economy and efficiency" but also with the "statutory structure requiring that the Federal government match a percentage of State or local government expenditures for the provision of services to Medicaid individuals." 72 Fed. Reg. at 29776-29777. Indeed, the Secretary, after studying the problem for over five years, concluded that these abusive financing arrangements between states and government providers "present risks of inflationary costs being certified and excessive claims for [federal financial participation] FFP." 72 Fed. Reg. at 29830.

Plaintiffs' next contention that the government provider payment rule deprives states of the flexibility to adopt "pay for performance" and other financial incentives to improve quality of care, Pls.' Br. at 25, likewise fails. Indeed, even Plaintiffs do not claim that the excessive (or inflated) payments they seek to retain are warranted because government providers have shown greater efficiency or economy in providing health care services. As the Secretary explained, the government provider payment rule does **not** require cost based methodologies and "does **not** restrict State flexibility to use flexible rate systems for governmentally-operated health care providers that might, for example, encourage certain types of care or include performance incentives." 72 Fed. Reg. at 29773 (emphasis added). Indeed, under the government provider payment rule, "states [maintain the] flexibility to determine the appropriate payment system." 72

Fed. Reg. at 29776.  To that end, the challenged regulation does not "force States to dismantle

any of the existing Medicaid reimbursement rate methodologies they are currently utilizing to

reimburse health care providers."  72 Fed. Reg. at 29788.  For example, states may continue to

use prospective payment systems that reward efficiently operated hospitals that provide quality

care without unduly prolonging hospital stays.  Rather, the only limitation imposed by the

government provider payment rule is that "any such flexible rate system not result in payment in

excess of actual documented costs."  72 Fed. Reg. at 29773.  Indeed, the Secretary expressly

affirmed that the government provider payment rule "is not designed to restrict the ability of the

State to address local needs, since States may provide for payment of the full cost of Medicaid

services," id., and further explained that the government provider payment rule "would only

affect health care providers who are diverting Medicaid funds for other purposes, since that is the

only circumstance in which Medicaid payments would not align with Medicaid costs."  72 Fed.

Reg. at 29773.

     To that point, states may still provide disproportionate share hospital ("DSH") payments

to provide additional compensation to hospitals that serve a disproportionate share of low

income individuals.  See 72 Fed. Reg. at 29778, 29779, 29826.  Under the Medicaid Act, states

may make DSH payments to hospitals, such as Plaintiffs, which "serve a disproportionate

number of low-income patients with special needs."  42 U.S.C. § 1396a(a)(13)(A)(iv).  Pursuant

to a complex formula, states calculate the DSH payment a hospital is eligible to receive.  See

generally 42 U.S.C. §§ 1396r-4(c), (e) and (g).  Although the Medicaid Act places limitations on

the amount of DSH payments a hospital may receive, as the Administrative Record shows, many

providers, such as Plaintiff Alameda, nevertheless may receive millions of dollars in DSH

payments.  See, e.g., A.R. 3110, 3113-3115.  Accordingly, Plaintiffs' claims that the challenged

rules will "threaten[] the viability of critical hospitals and other providers that constitute the

safety net for Medicaid beneficiaries," are hollow given the substantial financial resources

available to compensate these hospitals that care for the country's most vulnerable patients.[17]

Finally, Plaintiffs' complaint that the government provider payment rule "re-imposes . . .

administrative burden[s] that Congress sought to eliminate," Pls.' Br. at 25, is likewise

unavailing.  Although the Secretary acknowledges that there are some administrative burdens

attendant to documenting "the allowability of Medicaid claims through cost reporting," the

Secretary found that the burdens imposed by the new rule are reasonable because "most [] health

care providers are already reporting costs in other contexts."  72 Fed. Reg. at 29777; see also id.

at 29784 (explaining that "the Medicaid cost limit determination will rely on existing reporting

tools used by institutional health care providers").  For example, the Secretary concluded that

government providers already develop much of the relevant cost data for Medicare provider cost

reports,[18] Single Audit Act financial statements, or other audited financial statements.  Id.  The

Secretary reasoned that, although some adjustment for cost data developed for other purposes is

necessary, this is not an unreasonable burden to impose on states and government providers in

---

[17]For example, in fiscal year 2005, states paid a total of $17,089,210,075 in Medicaid DSH payments to providers, such as Plaintiffs, and the federal government's share amounted to $9,626,524,847 in Medicaid DSH payments. See Fiscal Management Report for FY2005 available at  http://cms.hhs.gov/MedicaidBudgetExpendSystem/02_CMS64.asp#TopOfPage.

[18]Annual provider cost reports have been a staple of the Medicare program for decades. See, e.g., 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 413.20(b), 413.24(f).  Based on providers' extensive experience with Medicare cost reporting requirements, the rule's cost reporting provisions for institutional service providers reasonably borrow from the longstanding Medicare cost reporting requirements.  72 Fed. Reg. at 29784, 29833; see also A.R. 385-411 ("protocols" for institutional provider Medicaid cost reports, based on Medicare cost reports).

order to eliminate abusive payment schemes.  Id.

Plaintiffs next assert a number of arguments in support of their claim that the government provider payment rule's application to government providers "defies logic."  Pls.' Br. at 25. Like Plaintiffs' other arguments, these also fail.  First, Plaintiffs argue that the government provider payment rule indirectly concludes that "payments higher than cost may only be consistent with efficiency and economy by dint of a provider's non-governmental status."  Pls.' Br. at 26.  This argument, however, erroneously "assume[s] that this regulation would impose a lower limit on government providers."  72 Fed. Reg. at 29787.  As the Secretary explained, the government provider payment rule "would permit payment of the full cost of Medicaid services to government providers, which could exceed the payments available under limits based on Medicare payment methodologies (for example[,] the Medicare inpatient prospective payment system)."[19]  Id.  To that point, the government provider payment rule "does not preclude States from using the same payment methods for governmental and private providers, as long as governmental providers are not paid in excess of cost" and expressly contemplates that states will have the flexibility to reimburse government providers at a rate higher than private providers.  72 Fed. Reg. at 29788.  In fact, contrary to Plaintiffs' assertions, the Secretary has found that "some States reimburse private health care providers at rates that are less than the cost of serving Medicaid eligible individuals."  Id.

Plaintiffs' next argument, that the Secretary has overlooked or ignored the fact that

_____

[19]Under the Medicare prospective payment system, "a hospital may keep the difference between its prospective payment rate and its operating or capital-related costs incurred in furnishing inpatient services, and the hospital is at risk for . . . costs that exceed its payment rate."  42 C.F.R. § 412.1(a)(1).

private providers are just as capable of shifting Medicaid revenues to non-Medicaid operations as government providers, Pls.' Br. at 27, wholly ignores that there are "different incentives at work in setting Medicaid payment rates" for government providers than for private health care providers. 72 Fed. Reg. at 29787.   As the Secretary found after years of studying the abusive financing arrangements between states and government providers, there is "the potential for an inherent conflict of interest in setting Medicaid payment rates" for government providers, "arising from the ability of governmental providers to contribute [to] the non-federal share of Medicaid expenditures [by returning to the state or local government the excess payments that the state or local government has provided] and from the interrelated nature of governmental units within a State."  Id.  Since the time when the Secretary and Congress prohibited the vast majority of the Medicaid provider tax and donation schemes discussed *supra*, at 6-7,[20] this "inherent conflict" has not been an issue when private providers receive Medicaid reimbursement.  Id.

Plaintiffs also claim that the government provider payment rule is both inadequate to prevent government providers from returning a portion of the Medicaid payments to their State Medicaid agencies and overbroad to the extent that it applies to governmental providers not engaged in recycling.  Pls.' Br. at 27.  However, the impetus for the government provider payment rule was the Secretary's determination that many states make excess or supplemental payments to government providers which, in turn, use the supplemental payments to "subsidize

---

[20]For years, states brought private providers into abusive state Medicaid financing schemes through "voluntary" provider donations and health care-related taxes.  A.R. 3027. However, these practices were largely ended by statutory amendment.  42 U.S.C. § 1396b(w). See also 42 C.F.R. Part 433, Subpart B.

health care (or other) operations that are unrelated to Medicaid, or they may return a portion of

the supplemental payments in excess of cost to the States as a source of revenue."  72 Fed. Reg.

at 29774.  The Secretary found that these se so-called "financing arrangements" are not only

inconsistent with efficiency, economy, and quality of care (as required by the Medicaid Act) but

also abuse the federal-state relationship created by the Act, pursuant to which the federal

government shares with states and local governments the cost of providing medical assistance to

Medicaid-eligible beneficiaries.[21]  Id.  For that reason, the Secretary promulgated the

government provider rule which, by establishing the actual cost of Medicaid services as the new

upper payment limit for government providers and requiring that these providers retain the full

amount of Medicaid reimbursement, "will ensure that Medicaid revenues are used to support

Medicaid services and are not diverted for other purposes."  72 Fed. Reg. at 29748, 29775.

Likewise, Plaintiffs' assertion that the government provider payment rule is overbroad to

the extent that it applies to governmental providers not engaged in recycling is without merit.

Pls.' Br. at 27.  In the past, the Secretary has attempted to address this problem on a case-by-case

basis.  See A.R. 2425; 72 Fed. Reg. at 29822 (commenters noting that, prior to the challenged

rule, the Secretary reviewed states' financing arrangements with providers on a state by state

basis).  However, as the Administrative Record shows, despite the Secretary's oversight and

scrutiny, these abusive financing arrangements between states and government providers

continued to persist.  See A.R. 2413.  Thus, although the Secretary acknowledges that "existing

Federal oversight mechanisms have been effective in addressing a number of State Medicaid

---

[21]States and counties are, of course, free to provide hospitals with whatever supplemental
payments they choose **outside** of the Medicaid program.

financing abuses," 72 Fed. Reg. at 29794, the government provider payment rule nevertheless is necessary to eliminate excessive payments to government providers thereby ensuring that states and local governments do not unfairly profit from federal taxpayer dollars.  72 Fed. Reg. at 29775.  Indeed, the Secretary reasoned that an upper payment rule based on documented cost "provides a clear, objective test of the reasonableness of a payment methodology for government providers regardless of whether the provider participates in financing the Medicaid program.  72 Fed. Reg. at 29794.  The rule is also "consistent with statutory construction that the Federal government pays only its proportional cost for the delivery of Medicaid services."  Id.   In any event, the Secretary found that "[s]tate-by-state reviews and monitoring are costly and intrusive." 72 Fed. Reg. at 29822.  The challenged regulation "ensures that States will fully understand applicable rules, and will know that the same rules apply nationwide."  Id.

Finally, the Administrative Record belies Plaintiffs' claim that the Secretary has failed to offer any explanation for treating public and private providers differently.  Pls.' Br. at 26-27. The Secretary explained that the basis for the challenged rule's application to government providers is the "different incentives at work in setting Medicaid payment rates" for government providers, incentives that are not relevant for private providers.  72 Fed. Reg. at 29787. Specifically, the Secretary determined that there is a possible conflict of interest in the states' establishment of Medicaid payment rates for government providers that arises from the states' knowledge that government providers have been funneling back to state and local governments the excess payments that they receive while the state claims FFP for the entire amount provided to the government providers.  Id.  Accordingly, given this potential conflict and the fact that the preponderance of states "have separate payment methodologies for" government providers, the

30

Secretary reasonably determined that the challenged rule should apply only to government

providers.  Id.  Where, as here, the Secretary has articulated a rational basis for the separate

classifications, the regulation should be upheld.  Arkansas Pharmacists Assoc. v. Harris, 627

F.2d 867, 871 (8th Cir. 1980) (explaining that "in the context of social and welfare legislation a

classification is not necessarily constitutionally infirm simply because 'it is not made with

mathematical nicety or because in practice it results in some inequality'") (quoting Dandridge v.

Williams, 397 U.S. 471, 485 (1970)).[22]

    As the foregoing demonstrates, the Secretary thought long and hard about the scope of

and necessity for the challenged regulation and considered many issues related to the

government provider payment rule, and addressed public comments received prior to

promulgating the challenged regulation.  See 72 Fed. Reg. at 29748-29750, 29772-29804.  The

Administrative Record contains a well-reasoned and detailed analysis of the basis for the

Secretary's government provider payment rule.  Accordingly, if, as here, the Secretary has

articulated a satisfactory explanation for its action, including a rational connection between the

facts found and the choice made, the regulation is reasonable and must be upheld.  Motor Veh.

Mfrs. Ass'n, 463 U.S at 43; Small Refiner Lead Phase-Down Task Force v. E.P.A., 705 F.2d

506, 520-21 (D.C. Cir. 1983) (If "the agency's reasons and policy choices . . . conform to

'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld.")

(internal citation omitted).

_____

    [22]In any event, the Secretary's prior UPL regulations also classified government and
other providers, including private providers, separately, yet curiously Plaintiffs have not taken
issue with those prior classifications.  See, e.g., 66 Fed. Reg. 3148 (Jan. 12, 2001); 66 Fed. Reg.
17657 (April 3, 2001); 66 Fed. Reg. 46397 (Sept. 5, 2001); 66 Fed. Reg. 58694 (Nov. 23, 2001);
67 Fed. Reg. 2602 (Jan. 18, 2002).

## IV.    THE SECRETARY'S DEFINITION OF "UNIT OF GOVERNMENT" IS A PERMISSIBLE CONSTRUCTION OF THE MEDICAID ACT

### A.    The References to "Other Governmental Unit" in the Medicaid Act Are Ambiguous

The Medicaid Act provides that the "term 'unit of local government' means, with respect to a State, a city, county, special purpose district, or **other governmental unit in the State**."  42 U.S.C. § 1396b(w)(7)(G) (emphasis added).  When Congress enacted this statutory definition, it did not define the reference to "other governmental unit" within § 1396b(w)(7)(G).  Given his finding that states are using recycled funds to finance the non-federal share of Medicaid payments and the ambiguity in the term "other governmental unit," the Secretary promulgated a rule to clarify the reference to "other governmental unit" in the statutory definition.  The regulation provides that "[a] unit of government is a State, a city, a county, a special purpose district, or other governmental unit in the State that: has taxing authority, [and] has direct access to tax revenues[] . . . ."  72 Fed. Reg. at 29832.  Congress did not define that term in the Medicaid Act, a statute entrusted to the Secretary's expertise, thereby "'implicitly delegat[ing] to the [Secretary] the power to" interpret that phrase for purposes of implementing the Medicaid program.  County of Los Angeles, 192 F.3d at 1016; see also Chevron, 467 U.S. at 842-43 (explaining that an agency's interpretation of an undefined and ambiguous term is entitled to deference); Transmission Access Policy Study Group v. F.E.R.C., 225 F.3d 667, 696 (D.C. Cir. 2000) (same).

Despite the ambiguity in the statutory reference to "other governmental unit," Plaintiffs contend that Congress expressly considered and rejected the interpretation proffered by the Secretary in the challenged rule.  See Pls.' Br. at 29-34.  Plaintiffs, however, offer no support for

32

this claim.  Plaintiffs first argue that the Secretary's regulatory definition somehow contradicts the statutory definition of "unit of local government" because Congress did not expressly require that such units have taxing authority or direct access to tax revenues.  Pls.' Br. at 30, 31-32.  But Congress has **never** defined the scope of "other governmental units" as referenced in the "unit of local government" definition, nor directly addressed the question at issue here  – whether taxing authority and direct access to tax revenues is a common characteristic of the entities referenced in § 1396b(w)(7)(G).  See State of Colo. v. U.S. Dep't of Interior, 880 F.2d 481, 487 (D.C. Cir. 1989) (concluding that review of statutory language and structure demonstrates that "Congress did not speak directly and specifically to the proper scope of the type A rules" and therefore agency was "faced with an ambiguous congressional command in that regard"); see also Shays v. F.E.C., 337 F. Supp. 2d 28, 103 (D.D.C. 2004) (concluding that Congress "has not spoken directly" where statutory term is ambiguous).  Plaintiffs' claim that the Secretary's "unit of government" definition contradicts the standards for permissible local funding sources referenced in § 1396a(a)(2), Pls.' Br. at 30, fails for the same reason; Congress has never defined the term "local sources" as set forth in § 1396a(a)(2), nor articulated standards for permissible local sources.  See Transmission Access Policy Study Group, 225 F.3d at 704 (explaining that statutory term was ambiguous because Congress did not directly speak to the precise question at issue – "do economic costs include stranded costs?") (internal quotation omitted).

Plaintiffs next claim that when Congress amended the Medicaid Act in 1991, it did not intend to narrow the "unit of government" definition by requiring "other governmental units" to have taxing authority or direct access to tax revenues.  Pls.' Br. at 31-32.  According to Plaintiffs, if Congress intended to require "other governmental units" to have taxing authority or

33

direct access to tax revenues, it plainly could have done so.  Pls.' Br. at 32.   However, courts are

unwilling to divine congressional intent from silence.  See Barnhart v. Peabody Coal Co., 537

U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude the other unless it

is fair to say that Congress considered the unnamed possibility and meant to say no to it."); see

also McGill v. Envt'l Prot. Agency, 593 F.2d 631, 636 (5th Cir. 1979) ("It would be sophistry

for us to divine a congressional intent on a subject [Congress] did not consider).  In any event, as

discussed above, Congress did not define the statutory reference to "other governmental units"

thereby creating an ambiguity in the statutory definition of "unit of local government" that the

Secretary "permissibly" clarified by promulgating the challenged regulation.  See County of Los

Angeles, 192 F.3d at 1016.

        The same analysis defeats Plaintiffs' efforts to divine congressional intent from

Congress's failure to specifically address permissible sources of local government contributions

in § 1396b(w)(6)(A) of the Medicaid Act.  Pls.' Br. at 33.  Section 1396b(w)(6)(A) states in

pertinent part:

> Notwithstanding the provisions of this subsection, the Secretary may not restrict States'
> use of funds where such funds are derived from State or local taxes . . . transferred from
> or certified by units of government within a State as the non-Federal share of
> expenditures under this [title] . . . , regardless of whether the unit of government is also a
> health care provider, . . . unless the transferred funds are derived by the unit of
> government from donations or taxes that would not otherwise be recognized as the non-
> Federal share under this section.

42 U.S.C. § 1396b(w)(6)(A).  Plaintiffs contend that, because Congress did not specifically

prohibit "contributions from local [governments] that are neither (1) prohibited donations or

taxes under Section 1903(w) (i.e., "that would not otherwise be recognized as the non-Federal

share"), nor (2) 'derived from State or local taxes,'" Pls.' Br. at 33, "sources not mentioned . . .

[therefore] continue to be permissible" under 42 U.S.C. § 1396a(a)(2).  Id.  But Congress's

failure to provide with specificity for the limitations contained in the challenged rule does not

mean Congress divested the Secretary of his authority to do so, based on his expertise and

experience in administering the federal aspect of the Medicaid program.  See County of Los

Angeles, 192 F.2d at 1016.  Congress has not defined the term "unit of government" in the

Medicaid Act.[23]  Accordingly, Congress's failure to address the specific parameters for

permissible contributions from local sources does not, as Plaintiffs suggest, prohibit the

Secretary from promulgating a rule that clarifies the scope of an otherwise ambiguous statutory

provision.[24]  See Chevron, 467 U.S. at 842-43 (explaining that an agency's interpretation of an

undefined and ambiguous term is entitled to deference).

Perhaps recognizing the weakness in their congressional intent arguments, Plaintiffs next

take issue with the Secretary's decision to promulgate the "unit of government" definition now.

Pls.' Br. at 31, 33-34.  Plaintiffs' contend that the challenged rule represents a reversal in the

Secretary's longstanding policy on "the broad scope of permissible contributions from 'local

---

[23]Congress defined "unit of **local** government," 42 U.S.C. § 1396b(w)(7)(G) (emphasis added), not "unit of government."  The latter term is defined in the Secretary's regulation, which clarifies the undefined statutory reference to "other governmental unit" (in § 1396b(w)(7)(G)) in terms of entities with taxing authority or direct access to tax revenue.  72 Fed. Reg. at 29832.

[24]Plaintiffs also claim that § 1396b(w)(6)(A) limits the Secretary's authority to promulgate regulations that restrict other forms of contributions by providers. The plain language of the statutory provision, however, belies this assertion.  Indeed, § 1396b(w)(6)(A) limits the Secretary's authority to restrict States' use of funds only **"where such funds are derived from State or local taxes . . . transferred from or certified by units of government within a State**. . . ."  Id. (emphasis added).  The challenged regulation does not purport to restrict states' use of funds derived from state or local taxes.  Furthermore, this statutory provision cannot be read to restrict the Secretary's ability to determine whether states and local governments have satisfied the criteria referenced therein, including the "units of government" provision, a term that Congress did not define.

35

sources' pursuant to" § 1396a(a)(2) of the Medicaid Act, Pls.' Br. at 31, and question why it took

the Secretary until May 2007 to promulgate a rule based on the 1991 enactment of the Provider

Tax Amendments. Pls.' Br. at 34.   As the Secretary explained, however, he promulgated the

challenged rule after reviewing and assessing the impact of over 1,000 proposed individual state

plan amendments over the last five years and finding that many states and providers are engaged

in financing arrangements that effectively divert Medicaid funds to non-Medicaid purposes or

overstate (for purposes of garnering additional FFP) the states' actual Medicaid expenditures.  72

Fed. Reg. at 2237; 72 Fed. Reg. at 29774; see also A.R. 2427-2429.  Based on these findings, the

Secretary determined there was a need to "have a clear and uniform standard that can be

consistently applied in every State and to every provider."  72 Fed. Reg. at 29752; see also 72

Fed. Reg. at 29822 ("This regulation ensures that States will fully understand applicable rules,

and will know that the same rules apply nationwide.").  Indeed, the Secretary's view was based

in part on states' and providers' repeated requests for formal clarification of the rules.  72 Fed.

Reg. at 29822.  Because the Secretary "is not required to establish 'rules of conduct [that] last

forever,' but rather 'must be given ample latitude to adapt [his] rules and policies to the demands

of changing circumstances,'" United States Air Tour Assoc., 298 F.3d at 1006 (internal citation

omitted), and because he has articulated a "'reasoned analysis'" regarding his decision to change

course, his decision must be upheld.[25]  Id.

_____

[25]Contrary to Plaintiffs' assertions, Pls.' Br. at 34, the Secretary did in fact issue
regulations in response to the 1991 Provider Tax Amendments.  See 72 Fed. Reg. at 29749
(stating that, in response to the enactment of the 1991 Provider Amendments, the Secretary
promulgated regulations -- 47 Fed. Reg. 55119 (Nov. 24, 1992) -- to give effect to the statutory
amendments).  However, as the Administrative Record demonstrates, over the last decade, states
have increasingly used new and creative financing schemes to inflate the non-federal share of
Medicaid expenditures, see, e.g., A.R. 2791-2884, A.R. 2992-3017, A.R. 3100-3123, and the

**B.    The Secretary Reasonably Defined "Unit of Government" To Require The Provider To Have Taxing Authority Or Direct Access To Tax Revenues**

The "unit of government" definition must be upheld if the Secretary's "reasons and policy choices . . . conform to certain minimal standards of rationality.'" Small Refiner Lead Phase-Down Task Force, 705 F.2d at 521.  Despite the Secretary's reasonable construction of an undefined and ambiguous statutory term and the voluminous Administrative Record delineating the Secretary's reasons for promulgating the challenged rule, Plaintiffs nevertheless insist that the "unit of government" definition is arbitrary and capricious.  Pls.' Br. at 34-36.  Given the highly deferential standard applicable to the Secretary's interpretation of the Medicaid Act, Plaintiffs face an "uphill battle" to prevail on this claim.  General Elec. Co. v. U.S. Envtl. Prot. Agency, 53 F.3d 1324, 1327 (D.C. Cir. 1995).  Plaintiffs cannot win that battle here.

Plaintiffs first argue that the Secretary has not provided any legal canon to support his interpretation that equates access to tax revenues with governmental status.  Pls.' Br. at 34.  The Secretary, however, is not required to proffer legal citations or canons for his interpretation of the Medicaid Act and is not bound to adhere to any state definitions of that term.  Indeed, his interpretation of the statutory provisions at issue is entitled to deference and must be sustained if it is "logically consistent with the language of the [statute] and [] serves a permissible regulatory function."  Rollins Envtl. Servs. v. U.S. Envtl. Prot. Agency, 937 F.2d 649, 652 (D.C. Cir. 1991).  As discussed above, the Secretary's interpretation of "unit of government" not only is consistent with the Medicaid Act but "strengthens accountability to ensure" that the statutory requirements

---

Secretary has promulgated a number of regulations to address this problem.  See, e.g., 66 Fed. Reg. 3148 (Jan. 12, 2001); 66 Fed. Reg. 17657 (April 3, 2001); 66 Fed. Reg. 46397 (Sept. 5, 2001); 66 Fed. Reg. 58694 (Nov. 23, 2001); 67 Fed. Reg. 2602 (Jan. 18, 2002).  The challenged rules are the Secretary's latest effort to put an end to these abusive financing schemes.

governing states' use of funds to finance the non-federal share of Medicaid expenditures is consistent with the goals of the Medicaid Act.  72 Fed. Reg. at 2237.

Plaintiffs next complain that the challenged definition is arbitrary and capricious because many providers will suddenly be disqualified from contributing to their states' share of Medicaid funding because the providers do not have access to tax revenues.  Pls.' Br. at 34.  However, the impetus for the rule was to eliminate exactly these types of abusive financing arrangements.[26] According to the Secretary, the agency's "concern was [to] preclude arrangements where entities whose access to tax funding was limited to non-Medicaid activities 'borrow' those funds to contribute to the non-federal share of Medicaid expenditures and then 'repay' those funds from Medicaid reimbursements (with the result that the remaining Medicaid funding is federal only)." 72 Fed. Reg. at 29762.  Accordingly, the Secretary promulgated the challenged rule "to assist States in identifying the universe of governmentally-operated health care providers that could receive Medicaid revenues up to the full cost of providing services to Medicaid individuals and clarif[y] which types of health care providers can participate in financing [] the non-Federal share of Medicaid payments."[27]  72 Fed. Reg. at 29767.

─────────────────

[26]Furthermore, Plaintiffs' argument highlights the exact problem the challenged rule seeks to remedy.  That is, Plaintiffs' argument indicates that "States have been ignoring the statutory limitation to 'units of government' in the provision permitting IGTs or CPEs [i.e., certified public expenditures] without regard to provider tax and donation rules." 72 Fed. Reg. at 29755.  See also A.R. 3045-3062 (documenting Medicaid financing schemes, including use of IGTs, utilized by states to falsely inflate their claimed Medicaid expenditures).

[27]In any event, the challenged rule will actually benefit many providers which are no longer required to fund the non-federal share of their respective states' Medicaid expenditures because the states can no longer use these rebound payments to claim additional FFP.  Indeed, the Secretary has stated that "[a] health care provider that is not recognized as governmentally-operated under the Federal statutory and regulatory criteria will not be subject to the cost limitation on Medicaid payments." 72 Fed. Reg. at 29754.  These health care providers may

Plaintiffs also claim that the "unit of government" definition is arbitrary and capricious because of alleged administrative burdens the rule would impose on states. Pls.' Br. at 34. Putting aside the fact that Plaintiffs, a government provider and national medical and hospital associations, do not have standing to raise this claim, their argument is without merit. The Secretary designed the challenged rule to provide a consistent framework in which states may determine the "unit of government" status of a particular provider. 72 Fed. Reg. at 29751. The Secretary recognized that "[s]tates play a major role in the administration of the Medicaid program and that legal and financial arrangements between health care providers and units of government vary on a case by case basis." Id. Accordingly, to ease any perceived administrative burden, the Secretary has created a "Tool to Evaluate the Governmental Status of Health Care Providers," which is "designed to guide State decision making in applying the statutory and regulatory criteria regarding the definition of a unit of government." 72 Fed. Reg. at 29763-29764. Ultimately, states' "decisions will be the major factor in the actual financial impact this regulation will have within each [s]tate."[28] 72 Fed. Reg. at 29805.

---

continue to receive Medicaid payments "up to the applicable regulatory upper payment limit, to the extent States use permissible sources of non-federal funding to make such payments." Id.; see also 72 Fed. Reg. at 29775 (noting that the government provider payment rule will not affect non-governmental health care providers, including many public safety net health care providers , which may continue to receive Medicaid payments in excess of the cost of providing covered medical services). In addition, the Secretary's regulations make clear that non-governmental providers cannot be obligated to fund the non-federal share of their respective states' Medicaid programs. Id. In other words, these health care providers "may realize significantly greater net Medicaid revenues if State or local government funding sources are utilized to fund the non-federal share historically financed by the health care providers." Id. As the Secretary emphasized, these rules "were actually designed to protect health care providers" who "serve our nation's most vulnerable populations." 72 Fed. Reg. at 29755.

[28]Indeed, for this reason, Plaintiffs' argument that the challenged rule will exacerbate states' financial burdens is without merit. As the Secretary explained, the challenged rules

Plaintiffs' argument that the "unit of government" definition is arbitrary and capricious for the additional reason that there is no rational basis for the Secretary's distinction between allegedly similarly situated parties – providers with taxing authority (or access to tax revenues) and those without, Pls.' Br. at 35, – is equally flawed. Because the Medicaid Act requires that states finance the non-federal share of Medicaid expenditures using funds "derived from State or local taxes," 42 U.S.C. § 1396b(w)(6)(A), the Secretary interpreted this provision as permitting "wide flexibility in the use of tax funds, whether State or local." 72 Fed. Reg. at 29758. The Secretary explained that Congress enacted § 1396b(w) generally "to prevent situations in which the health care provider contributed a non-federal share of [the state's] claimed expenditures but was essentially repaid through Medicaid or other payments." 72 Fed. Reg. at 29758-29759. Section 1396b(w)(6)(A) was a narrow exception to the limitations in § 1396b(w) based on Congress's view that "such repayment does not occur when the health care provider uses state or local tax funding for its contribution."[29] 72 Fed. Reg. at 29759. The Secretary reasonably

_____

"should not force cuts to the Medicaid program, nor affect access to services." 72 Fed. Reg. at 29777. Indeed, the challenged regulations will ensure that Medicaid revenues are used to support Medicaid services and are not diverted for other purposes. See id. Moreover, states may still utilize DSH payments to reimburse government and other providers, and to the extent that more flexibility is desired, states "are not precluded from developing demonstration projects to test new payment methodologies." Id. In any event, any alleged "additional financial burden" is merely the result of restricting the states' ability to claim FFP for Medicaid payments that they did not actually spend, in that the excess payments were returned to them.

[29]That is because in instances where government providers actually obtain tax revenues, they have a real source of funds to then contribute to the state. For providers who lack such authority, they are merely kicking back to the state (or local government) excess monies that the states themselves have given these providers. Thus, the result is a net wash for both the providers and the state. Moreover, absent initial receipt of excess payments from the state, the government hospital providers would be unable to make these "contributions" to their state or local governments if they were so financially strapped in their Medicaid programs that they could no longer continue to provide Medicaid services – nor would the state or local government

40

determined that, to give full effect to this statutory goal, "the health care provider needs to have either taxing authority or direct access to tax funding."[30] Id.

Finally, Plaintiffs argue that the Secretary's promulgation of the "unit of government" definition is arbitrary and capricious because it contravenes core aspects of state sovereignty and principles of federalism embodied in Executive Orders and the United States Constitution. Pls.' Br. at 36. Again, putting aside the fact that Plaintiffs do not have standing to raise this argument, it is as unavailing as Plaintiffs' other arguments. Indeed, the challenged regulation addresses only "the question of whether, **in determining the amount of federal funds to which a State is entitled under the Medicaid program**, transfer of funds to the State government from a Medicaid health care provider that is an entity other than the State government will be exempt from consideration as a provider tax or donation, and when expenditures of such an entity can be certified as 'public expenditures' that constitute the non-Federal share of Medicaid expenditures." 72 Fed. Reg. at 29753 (emphasis added). To that end, as set forth in the challenged rule (and contrary to Plaintiffs' assertions), although states have the "primary role in identifying units of government," 72 Fed. Reg. at 29753, and thus make the initial determination of government provider status,[31] 72 Fed. Reg. at 29751, the Secretary's rule ensures that – for

expect them to do so.

[30]Given the foregoing, Plaintiffs' additional argument that the Secretary "changed [his] interpretation of the Statute without providing an adequate explanation for doing so," Pls.' Br. at 35, is belied by the Administrative Record. See United States Air Tour Assoc., 298 F.3d at 1006.

[31]Plaintiffs' reliance on Reynolds v. Sims, 377 U.S. 533 (1964) is inapposite. Reynolds involved a Fourteenth Amendment equal protection challenge to the state of Alabama's legislative apportionment scheme, Id. at 536-37, rather than a cooperative federal/state spending program in which the state chooses to participate.

purposes of the Medicaid program only -- identification of units of government is consistent, objectively ascertainable, and not designed to alter the federal/state funding balance which is the core of the Medicaid program.  72 Fed. Reg. at 29753.  Plaintiffs' federalism argument is also flawed because the United States Constitution does not afford states any special privileges with respect to Medicaid funding, and the challenged regulation does not impact the states' ability to organize themselves for other purposes.[32]  Id.

As the foregoing shows, the "unit of government" rule is neither arbitrary nor capricious but rather the result of a well-reasoned and deliberate rulemaking process.  Indeed, the challenged rule reflects the Secretary's vast experience with the states' repeated attempts to game the system by employing boomerang funding schemes in an effort to maximize federal payments.

## IV.    THE SECRETARY DID NOT VIOLATE THE STATUTORY MORATORIUM ON ISSUING OR IMPLEMENTING THE CHALLENGED RULES

In a last ditch effort to convince this Court to strike down the challenged regulation,

---

[32]Plaintiffs' argument that the Secretary has failed to minimize the burdens that uniquely affect state governmental entities or harmonize federal regulatory actions with related state, local, and tribal regulatory and other governmental functions, Pls.' Br. at 36 n.54, is equally unavailing.  The Secretary specifically consulted with state officials and other interested parties on numerous occasions even before the proposed rule was issued.  72 Fed. Reg. at 29754, 29812.  Furthermore, interested parties, including states and Plaintiffs, had ample opportunity to provide their comments regarding the proposed rule following its promulgation and the Secretary considered and addressed those comments including those describing the burdens that the rule might pose for state governmental entities.  See 72 Fed. Reg. at 29812 (stating that "[t]he general principles contained in this regulation have been explored with states over the years").  The Secretary nevertheless concluded that promulgation of the challenged rule was necessary "to safeguard the integrity of the Medicaid program," and to "ensure that federal dollars are spent only when matched by actual, documented[] expenditures from State or local non-federal funds that meet applicable criteria under the law."  72 Fed. Reg. at 29754.

Plaintiffs claim that the Secretary's act of filing the final rule with the Office of the Federal

Register on May 24, 2007, violates a one-year statutory moratorium that President Bush signed

into law on May 25, 2007.  Pls.' Br. at 37-39.  The May 25, 2007 statutory moratorium prohibits

the Secretary from taking "any action to . . . finalize or otherwise implement provisions

contained in the proposed rule published on January 18, 2007. . . ."  Pub. L. 110-28, § 7002(a).

Because the agency submitted the final rule to the Office of Federal Register **one day before** the

statutory moratorium was enacted, the Secretary did not violate the statutory moratorium.  See

A.R. 365 (May 24, 2007 letter from CMS to the Office of the Federal Register attaching original

and two certified copies of the final rule for publication).  Since May 24, 2007, the Secretary has

taken no action to implement the rule.  For instance, the final rule requested that the public

submit additional comments by July 13, 2007, on the "unit of government" definition. 72 Fed.

Reg. at 29748.  Although the agency has received public comments on the "unit of government"

rule, it has not responded to them because of the statutory moratorium.  See A.R. Rulemaking

Index n.1.  Thus, the Secretary has not violated the statutory moratorium because he has taken no

steps to implement the challenged rules.[33]

　　　　Even assuming *arguendo* that this Court finds that the Secretary violated the statutory

moratorium in failing to withdraw the rule from the Federal Register after the moratorium was

---

[33]Plaintiffs' claim that the agency should have withdrawn the rule from the Federal Register (or should never have submitted it to begin with) fails because the express language of the statutory moratorium does not require the Secretary to withdraw the final rule, and he was under no obligation to do so.  Indeed, Congress is fully aware that the Secretary filed the final rule with the Office of the Federal Register on May 24, 2007, and has not, to this date, requested that the Secretary withdraw it, nor has Congress enacted another statutory moratorium to preclude the challenged rules' implementation after the May 25, 2007 statutory moratorium expires.

enacted, the Court should remand the rule to the agency and allow the Secretary to submit the final rule to the Office of the Federal Register after the statutory moratorium expires on May 25, 2008.  See Advocates for Highway & Auto. Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) (noting the discretion trial courts retain to remand without vacating challenged rule).

//

//

//

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary

Judgment, grant Defendants' Cross Motion For Summary Judgment, and enter judgment in favor

of the Defendants.


                                             Respectfully submitted,


OF COUNSEL:                                  JEFFREY S. BUCHOLTZ
                                             Acting Assistant Attorney General
JAMES C. STANSEL
Acting General Counsel                       JEFFREY A. TAYLOR
                                             United States Attorney


JANICE L. HOFFMAN                            SHEILA M. LIEBER
Associate General Counsel                    Deputy Branch Director

MARK D. POLSTON                              /s/ Tamra T. Moore_____
Deputy Associate General                     TAMRA T. MOORE D.C. Bar No. 488392
        Counsel for Litigation              Trial Attorney
                                             U.S. Department of Justice
GERARD KEATING                               Civil Division, Federal Programs Branch
BRIDGETTE L. KAISER                          20 Massachusetts Avenue, N.W.
Attorneys                                    Washington, D.C.  20530
                                             Telephone: (202) 514-8095
U.S Department of Health                     Facsimile: (202) 616-8470
        and Human Services                  Email: Tamra.Moore@usdoj.gov



Dated: April 11, 2008                        Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                       )
ALAMEDA COUNTY MEDICAL                 )
CENTER, et al.                         )
                                       )
                    Plaintiffs,        )
                                       )
        v.                             )        Civ.  No. 1:08CV0422 (JR)
                                       )
THE HONORABLE MICHAEL O. LEAVITT,      )
in his official capacity as            )
Secretary of Health and                )
Human Services, et al.                 )
                    Defendants.        )
_____)

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rules 7.1(h) and 56.1, Defendants, Michael O. Leavitt, in his official capacity as Secretary of Health and Human Services, the United States Department of Health and Human Services, Kerry Weems, in his official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services, and the Centers for Medicare & Medicaid Services (collectively, "the Secretary" or "HHS"), submit the following statement of undisputed material facts in support of Defendants' Cross-Motion for Summary Judgment:

1.  After reviewing and processing over 1,000 proposed Medicaid state plan amendments related to state payments to providers, the Secretary developed and published proposed regulations that established the actual cost of Medicaid services as the upper payment limit for government providers and clarified that "entities involved in the financing of the non-Federal share of Medicaid payments must be a unit of government."  72 Fed. Reg. 2236 (Jan. 18, 2007).

1

2.  In response to the proposed rule, the Secretary received over 1,000 comments from physicians, state Medicaid programs, state and local government agencies, and other interested parties.  72 Fed. Reg. 29748, 29750 (May 29, 2007).

3.  The Secretary reviewed and responded to the comments he received in response to the proposed rule and developed the final rule.  72 Fed. Reg. at 29748-29836.

4.  The Secretary has found that many states make payments to government providers that are in excess of the actual cost of providing health care services to Medicaid recipients.  72 Fed. Reg. 29748, 29774 (May 29, 2007); A.R. 2803.

5.  The Secretary has found that government providers receiving Medicaid payments from states have either used the payments to subsidize health care (or other) operations unrelated to the Medicaid program, or have returned the payment, or a portion thereof, to the states.  A.R. 3120-3121.

6.  The Secretary has found that financing arrangements between states and government providers, pursuant to which government providers return Medicaid payments to states, "effectively divert Medicaid funds for non-Medicaid purposes, or overstate the computable expenditure that is being made" by the states.  72 Fed. Reg. at 29774.

7.  Congress granted the Secretary the authority to ensure that states' Medicaid payments "are consistent with efficiency, economy, and quality of care."  42 U.S.C. § 1396a(a)(30)(A).

8.  Among other things, the regulations clarified the scope of the entities permitted to finance the non-federal share of Medicaid reimbursements on behalf of states, established the actual cost of Medicaid services as a new upper payment limit for government providers, and required all providers (both private and government) to retain the full amount of Medicaid

reimbursement.  72 Fed. Reg. at 29748, 29832-29835.

     9.  On May 24, 2007, the Secretary submitted the rule to the Office of Federal Register

for filing and publication.  A.R. 355.

     10.  On May 25, 2007, the Office of the Federal Register displayed the rule.

     11.  On May 29, 2007, the Office of the Federal Register published the rule at 72 Fed.

Reg. 29748.


                                         Respectfully submitted,


OF COUNSEL:

JAMES C. STANSEL
Acting General Counsel


JANICE L. HOFFMAN
Associate General Counsel


MARK D. POLSTON
Deputy Associate General
      Counsel for Litigation


GERARD KEATING
BRIDGETTE L. KAISER
Attorneys


U.S. Department of Health
     and Human Services

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Branch Director

/s/ Tamra T. Moore
TAMRA T. MOORE D.C. Bar No. 488392
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Telephone: (202) 514-8095
Facsimile: (202) 616-8470
Email: Tamra.Moore@usdoj.gov


Dated: April 11, 2008

Attorneys for Defendants


3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
ALAMEDA COUNTY MEDICAL                    )
CENTER, et al.                                             )
                                                              )
                                    Plaintiffs,            )
                                                              )
                                    v.                      )          Civ.  No. 1:08CV0422 (JR)
                                                              )
THE HONORABLE MICHAEL O. LEAVITT,    )
in his official capacity as                             )
Secretary of the                                         )
United States Department of Health and      )
Human Services, et al.                               )
                                    Defendants.          )
_____)

## [PROPOSED] ORDER

Upon consideration of Plaintiffs' Motion for Summary Judgment, Defendants' Cross-

Motion for Summary, and the record in this case, it is hereby

ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED, and it is further

ORDERED that Defendants' Cross-Motion for Summary Judgment is GRANTED, and it

is further

ORDERED that judgment be entered in favor of Defendants.


Dated:_____          _____
                                                              UNITED STATES DISTRICT JUDGE