IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) | |
| | ) | |
| *et al.* | ) | |
|       **Plaintiffs,** | ) | |
| | ) | **No: 1:08-cv-00422-JR** |
|       **vs.** | ) | |
| | ) | |
| | ) | |
| **LEAVITT,** | ) | |
| | ) | |
| *et al.* | ) | |
|       **Defendants.** | ) | |

**THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES
AND FEDERATION OF AMERICAN HOSPITALS'
JOINT MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF**

For the reasons set forth in the accompanying Brief in Support of Catholic Health Association of the United States and Federation of American Hospitals' Joint Motion for Leave to File Amici Curiae Brief, the Catholic Health Association of the United States and Federation of American Hospitals, hereby move for leave to file an amici curiae brief in the above captioned matter. Amici have consulted with the parties and plaintiffs have consented to this motion and the government does not oppose or consent to the motion.

Dated:  April 16, 2008

Drew W. Marrocco, D.C. Bar #453205
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC 20005
(202) 408-6387  (Telephone)
(202) 408-6399  (Facsimile)
dmarrocco@sonnenschein.com

*Attorney for The Catholic Health
Association of the United States and
The Federation of American Hospitals*

OF COUNSEL:

LISA J. GILDEN, ESQ.
Vice President, General Counsel
The Catholic Health Association
        of the United States
1875 Eye Street, NW, Suite 10000
Washington, DC  20006-2213
(202) 296-3993


JEFFREY G. MICKLOS, ESQ.
Senior Vice President, Business Operations & General Counsel
Federation of American Hospitals
801 Pennsylvania Avenue, N.W., Suite 245
Washington, DC 20004
(202) 624-1521


HOLLEY THAMES LUTZ, ESQ.
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC 20005
(202) 408-6836

25239474\V-1

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of April, 2008, I filed the foregoing:

THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES AND
FEDERATION OF AMERICAN HOSPITALS' JOINT MOTION FOR LEAVE
TO FILE AMICI CURIAE BRIEF

BRIEF IN SUPPORT OF THE CATHOLIC HEALTH ASSOCIATION OF
THE UNITED STATES AND FEDERATION OF AMERICAN HOSPITALS'
MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF

AMICI CURIAE BRIEF ON BEHALF OF THE CATHOLIC HEALTH
ASSOCIATION OF THE UNITED STATES AND THE FEDERATION OF
AMERICAN HOSPITALS

PROPOSED ORDER

DECLARATION OF DREW W. MARROCCO IN SUPPORT OF
THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES AND
FEDERATION OF AMERICAN HOSPITALS AMICI CURIAE BRIEF

with the Court using the Court's generic ECF e-mail address, and sent the same via e-mail to:

**Nathan A. Brown**
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC 20005-3333
(202) 508-4600
Email: nathan.brown@ropesgray.com

**William C. Crenshaw**
POWELL GOLDSTEIN LLP
901 New York Avenue, NW
Third Floor
Washington, DC 20001-4413
(202) 624-7380
Fax: (202) 624-7222
Email: wcrenshaw@pogolaw.com

**Tamra Tyree Moore**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514-8095
Email: tamra.moore@usdoj.gov

**Wendy Lee Kahn**
ZWERDING. PAUL, KAHN & WOLLY, PC
1025 Connecticut Avenue, NW
Suite 712
Washington, DC 20036-5420
(202) 857-5000
Fax: (202) 223-8417
Email: wlkahn@zwerdling.com

DREW W. MARROCCO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) | |
| | ) | |
| *et al.* | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No: 1:08-cv-00422-JR** |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **LEAVITT,** | ) | |
| | ) | |
| *et al.* | ) | |
| **Defendants.** | | |

## BRIEF IN SUPPORT OF THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES AND FEDERATION OF AMERICAN HOSPITALS' MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF

The Catholic Health Association of the United States ("CHA") is the national leadership organization representing the Catholic Health Care Ministry in this country.  Founded in 1915, CHA now has over 1950 members in all 50 states, forming the nation's largest group of nonprofit health care systems, hospitals, long term care facilities and related health care organizations serving as safety net providers throughout the healthcare community.  CHA's members operate in urban, suburban and rural settings and their hospitals range in size from 750 beds to critical access hospitals with fewer than 15 beds.

The Federation of American Hospitals ("FAH") is the national leadership organization representing investor-owned hospitals and health care systems in the country.  Founded in 1967, FAH now represents over 1100 hospitals operating in virtually every state, forming the largest group of investor-owned health care systems and hospitals in the United States.

As discussed in the amici curiae brief, any decision by this Court allowing the United States Department of Health and Human Services Centers for Medicare & Medicaid Services ("CMS") to

implement and enforce the "Cost Limits for Providers Operated by Units of Government and Provisions to Ensure the Integrity of the Federal-State Financial Partnership"[1] ("Cost Limit Rule") will have significant ramifications for CHA's and FAH's members, and for the hospital community as a whole, not just the parties in this case.

CHA and FAH members are essential participants in the nation's health care community and provide millions of services (including inpatient and outpatient hospital services) to Medicaid beneficiaries each year. Although the Cost Limit Rule has direct application to governmental providers, its implementation and enforcement also will have significant negative impact on non-public providers (such as CHA and FAH members). These issues have not been fully addressed by the parties in this case. Specifically, by implementing the Cost Limit Rule, CMS would severely constrict Medicaid reimbursement to governmental providers to their costs, causing significant limitations of services throughout the safety net communities. CHA and FAH members would be called upon to step into the breech to provide services to Medicaid beneficiaries, the uninsured and other vulnerable populations disadvantaged by CMS' Cost Limit Rule.[2] Additionally, by changing the definition of a "unit of government," CMS has effectively limited the entities that may make permissible intergovernmental transfers to State Medicaid agencies. Such a limitations constrain the sources of legitimate non-federal share funding to Medicaid programs that is critical to fund the Medicaid system, thus negatively impacting all providers furnishing services to Medicaid beneficiaries, including CHA and FAH members.

Amici have conferred with both parties prior to filing their motion. Plaintiffs have consented to the motion and the government has neither consented nor opposed the motion.

Accordingly, for the reasons set forth herein, CHA and FAH respectfully request that the Court grant their motion for leave to file their amici curiae brief.

---

[1] 72 Fed. Reg. 29748 (May 29, 2007).
[2] Alameda County Medical Center et al.'s ("Plaintiffs") Motion for Summary Judgment and accompanying declarations at 21, n. 27.

25239510\V-1

Dated:  April 16, 2008

_Drew W. Marrocco_

Drew W. Marrocco, D.C. Bar #453205
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC 20005
(202) 408-6387  (Telephone)
(202) 408-6399  (Facsimile)
dmarrocco@sonnenschein.com

*Attorney for The Catholic Health*
*Association of the United States and*
*The Federation of American Hospitals*

OF COUNSEL:

LISA J. GILDEN, ESQ.
Vice President, General Counsel
The Catholic Health Association
  of the United States
1875 Eye Street, NW, Suite 10000
Washington, DC  20006-2213
(202) 296-3993


JEFFREY G. MICKLOS, ESQ.
Senior Vice President, Business Operations & General Counsel
Federation of American Hospitals
801 Pennsylvania Avenue, N.W., Suite 245
Washington, DC 20004
(202) 624-1521


HOLLEY THAMES LUTZ, ESQ.
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC 20005
(202) 408-6836

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ALAMEDA COUNTY MEDICAL CENTER, )
                                        )
*et al.*                                  )
              Plaintiffs,     )
                                          )     No: 1:08-cv-00422-JR
            vs.                      )
                                          )
                                          )
LEAVITT,                           )
                                          )
*et al.*                                )
              Defendants.     )


## AMICI CURIAE BRIEF ON BEHALF OF
## THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES AND
## THE FEDERATION OF AMERICAN HOSPITALS

The Catholic Health Association of the United States ("CHA") is the national leadership organization representing the Catholic health care ministry in this country. Founded in 1915, CHA now has over 1950 members in all 50 states including 614 hospitals, forming the nation's largest group of nonprofit health care systems, hospitals, long term care facilities and related health care organizations serving as safety net providers throughout the healthcare community. CHA's members operate in urban, suburban and rural settings and their hospitals range in size from 750 beds to critical access hospitals with fewer than 15 beds.

The Federation of American Hospitals ("FAH") is the national leadership organization representing investor-owned hospitals and health care systems in this country. Founded in 1967, FAH now represents over 1100 hospitals operating in virtually every state, forming the largest group of investor-owned health care systems and hospitals in the United States.

As discussed below, any decision by this Court allowing the United States Department of Health and Human Services Centers for Medicare & Medicaid Services ("CMS") to implement and enforce the "Cost Limits for Providers Operated by Units of Government and Provisions to Ensure the Integrity of the Federal-State Financial Partnership"[1] ("Cost Limit Rule") will have significant ramifications for CHA's and FAH's members, and for the hospital community as a whole, not just the parties in this case.

## ARGUMENT

### A.    The Role of Non-Public Providers in Delivering Care to Medicaid Beneficiaries, Uninsureds and Other Vulnerable Populations

The uninsured, poor and other vulnerable populations rely on an intricate and delicate web of providers, *i.e.*, non-public safety net providers and committed investor-owned providers, for essential medical care. Given the significant negative impact of the Cost Limit Rule on the Medicaid system as a whole, all providers of care to Medicaid beneficiaries and other vulnerable populations will be significantly and critically impaired as a result.

America's safety net institutions are not limited to public hospitals. Rather, in a 2000 report by the Institute of Medicine ("IOM") recognized that providers that furnish "a significant level of health care and other health-related services to uninsured, Medicaid, and other vulnerable patients," are considered safety net providers.[2] As mission-driven providers, Catholic hospitals across America

---

[1] 72 Fed. Reg. 29748 (May 29, 2007).

[2] IOM Report: AMERICA'S HEALTH CARE SAFETY NET: INTACT BUT ENDANGERED, at 21 (National Academy Press, Washington D.C., 2000) ("IOM Safety Net Report"), *attached as EXHIBIT A of the Declaration of Drew. W. Marrocco (hereafter "Marrocco Decl.)*. In most communities there is a subset of the safety net providers that the IOM describes as "core safety net providers," *i.e.*, providers distinguished by a: (1) legal mandate or explicitly adopted mission to maintain an "open door" policy to offer access to patients regardless of their ability to pay; and (2) substantial share of their patient mix is uninsured, Medicaid, and other vulnerable patients. "Substantial" is defined as providers that have a high market share of uncompensated care and high commitment to such care as demonstrated by its ratio of uncompensated care to its total payer mix. *Id.* at 21-22. Core safety net providers are a subset of safety net providers, all of which will be negatively impacted by the application of the Cost Limit Rule.

should satisfy this definition and have long served as an integral part of their communities' health

care safety net system. In addition, FAH members are a well recognized essential component to

care for Medicaid beneficiaries, the uninsured and other vulnerable populations. Combined, these

critical members of the safety net hospital system service furnished inpatient care to over 1.7 million

Medicaid patients in 2006.[3]

### B.     The Cost Limit Rule's Anticipated Harm to CHA and FAH Member Hospitals

The Cost Limit Rule, if implemented, will have a direct and alarmingly negative impact on

the very foundation of core safety net providers - public hospitals - as detailed in Alameda County

Medical Center et al.'s ("Plaintiffs") Motion for Summary Judgment and accompanying declarations

("Plaintiffs' Motion for Summary Judgment").4 As noted therein, the financial impact will not be

mitigated by other sources. For some providers, the adverse effect threatens their very existence,

and for others, it likely will require them to limit access to critical Medicaid services and reduce staff

infrastructure.5

When publishing the purported final Cost Limit Rule in May 2007, CMS indicated that the

regulatory impact of the Cost Limit Rule was $3.7 billion over a five-year period (FY 2009-2013).[6]

On November 1, 2007, the U.S. House of Representatives Committee on Oversight and

Government Reform ("House Oversight Committee") held a hearing on this and other CMS

proposed Medicaid regulatory cuts. On March 5, 2008, the Committee issued a House Oversight

Report, THE ADMINISTRATION'S MEDICAID REGULATIONS: STATE-BY-STATE IMPACTS ("Report")

---

[3] Based on CHA and FAH analysis of data from various sources, including but not limited to, 2006 American Hospital Association Annual Survey and provider specific data.
[4] Plaintiffs' Motion for Summary Judgment, at 13, n. 27.
[5] *Id.* at 13.
[6] 72 Fed. Reg. at 29829.

publishing the investigation's findings.[7]  Through its investigation and as set forth in the Report, the

House Oversight Committee determined that the loss of federal funds over five years, as estimated

by the states that responded, was $21.1 billion.  We submit to this Court that although a $3.7 billion

loss of federal funds projected by CMS would be a significant blow to the American safety net

community, a $21.1 billion loss would be devastating.

   The adverse impact begins with the public hospitals, but does not stop there.  Although

CMS properly indicates that non-governmentally-operated health care providers are not subjected to

reimbursement based on costs,[8] such providers, and particularly CHA and FAH members, are

certainly negatively affected by the Cost Limit Rule.  The limitation of services available through

public hospitals that will result directly from lost revenue dictated by the Cost Limit Rule will

necessitate that the CHA and FAH members step into the breech to shoulder an increasing burden

of care to needy, vulnerable populations.  While this is certainly within the CHA and FAH member

hospitals' mission and reflects their commitment to the poor and uninsured, such increases will

require private hospitals to devote an increasing share of finite resources to a lower (or non) paying

patient mix, and may place at risk some providers' own financial viability.

   The actual financial impact on private hospitals is difficult to quantify at present.  However,

history has taught us that when a public hospital curtails services, or leaves a market, the cost to

dedicated, non-public providers in that same market can be severe.  By way of example, in 1998,

Mercy Hospital of Detroit ("Mercy"), the then-safety net hospital, had the largest number of

Medicaid days of all hospitals in Detroit.[9]  Mercy closed in 2000.  With its closing, a surge of demand

---

[7] United States House of Representatives Committee on Oversight and Government Reform, Majority Staff,
THE ADMINISTRATION'S MEDICAID REGULATIONS: STATE-BY-STATE IMPACTS, March 5, 2008
(http://oversight.house.gov/documents/20080303111450.pdf).
[8] *See* 72 Fed. Reg. at 29754-55, 29776.
[9] A COMMITMENT TO CARING:  THE ROLE OF CATHOLIC HOSPITALS IN THE HEALTH CARE SAFETY NET,
Georgetown University Institute for Health Care Research and Policy (Nov. 2002). at 42, citing Brennan,

fell to St. John Health System Hospitals, a CHA member, with St. John Detroit Riverview Hospital

experiencing a 29 percent increase in emergency department visits during the year after Mercy's

closure.[10]

Another impact on non-governmentally operated providers is more fundamental.  Simply

stated, CMS' first-time (and inappropriate) definition of a "unit of government" limits the public

providers that are eligible to furnish intergovernmental transfers ("IGTs") to state Medicaid agencies

to those entities that have "generally applicable taxing authority" or "direct access to generally

applicable tax revenues."[11]  The effect of this change is to significantly limit the public entities, *i.e.*,

State and local entities, that can transfer IGT funds to state Medicaid agencies to share in the

support of the Medicaid program.  This shrinking of legitimate sources of funds only serves to

constrict providers' Medicaid revenue and these lost funds will have a direct and immediate negative

impact on community health care services.

### C.    The Cost Limit Rule Is Contrary to Congressional Intent and CMS Prior Interpretation of the Medicaid Statute

As set forth above, CHA and FAH believe that the Cost Limit Rule will severely undermine

its members' ability to care for the hundreds of thousands of Medicaid patients they serve each year.

CHA and FAH agree with Plaintiffs that CMS' proposed action is an unlawful violation of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) because: 1) it is contrary to express

Congressional actions and directives; and 2) CMS' rejection of its own longstanding interpretation of

the Medicaid statute's requirements and its decision to revert back to a flawed and discredited

---

Niall, Stuart Gutterman, and Stephen Zuckerman 2001, THE HEALTH CARE SAFETY NET:  AN OVERVIEW
OF HOSPITALS IN FIVE MARKETS (*attached as EXHIBIT B of the Marrocco Decl.*). Publication # 2251,
kff.org/content/2001/2251/2251.pdf.  Washington, D.C.: Kaiser Commission on Medicaid and the
Uninsured.
[10] *Id.*
[11] 72 Fed. Reg. at 29832.

provider-specific cost limit on Medicaid payments can only be characterized as arbitrary and capricious. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

CMS has premised its actions primarily on its assertion that the terms "efficiency," "economy" and "quality of care" as used in the Medicaid statute are ambiguous and as such give CMS the right to alter their meanings as it sees fit.  However, CMS' argument ignores years of Congressional actions including the repeal of the very provider-specific cost limits CMS now proposes and the issuance of a legislative moratorium prohibiting CMS from taking the very actions now before the Court.  Under the APA, the intent of Congress is determinative: "If the intent of Congress is clear, that is the end of the matter…." *Chevron,* 467 U.S. at 842-43.  Congress has clearly rejected CMS' Cost Limit Rule and the agency's attempted end run on Congressional will is unlawful.

Additionally, CMS has not adequately justified its reversal on this issue and its rejection of its own longstanding position that specific-cost limits are inconsistent with the language and goals of the Medicaid statute.  As noted by Plaintiffs, normal agency deference is lessened when the agency is changing its interpretation of a statute without a reasoned explanation.  *See Watt v. Alaska*, 451 U.S. 259, 273 (1981) ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference.").  Prior to the issuance of the Cost Limit Rule, CMS had consistently rejected proposals to abandon the aggregate, rather than individualized, nature of the upper payment limit, and rejected proposals to abandon the use of estimated Medicare payments rather than actual and reconciled costs.  CMS has not adequately explained its change in position or justified taking an action that will severely undermine the current functionality of the Medicaid system and specifically the efforts of CHA and FAH within that system.

6

## CONCLUSION

CMS' actions are not supported in law or policy and the purported Final Cost Limit Rule should not be implemented or enforced. CMS' actions threaten the very fabric of the country's health care delivery system aimed at allowing uninsured, underinsured and, indeed, Medicaid beneficiaries access to health care in their communities. Should the Cost Limit Rule be implemented and enforced, there is a direct likelihood of imminent harm to providers, Medicaid beneficiaries and the uninsured, alike.

Dated: April 16, 2008

Respectfully submitted,

DREW W. MARROCCO, D.C. Bar #453205
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW, Suite 600-East
Washington, DC 20005
(202) 408-6387 (Telephone)
(202) 408-6399 (Facsimile)
dmarrocco@sonnenschein.com

Counsel for Amici
The Catholic Health Association
of the United States, and The Federation
of American Hospitals

*OF COUNSEL*

LISA J. GILDEN, ESQ.
Vice President, General Counsel
The Catholic Health Association
of the United States
1875 Eye Street, NW, Suite 10000
Washington, DC 20006-2213
(202) 296-3993

7

25239262\V-14

JEFFREY G. MICKLOS, ESQ.
Senior Vice President, Business Operations & General Counsel
Federation of American Hospitals
801 Pennsylvania Ave, NW Suite 245
Washington, DC 20004
(202) 624-1521

HOLLEY THAMES LUTZ
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW, Suite 600-East
Washington, DC  20005
(202) 408-6836

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) | |
| | ) | |
| *et al.* | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No: 1:08-cv-00422-JR** |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **LEAVITT,** | ) | |
| | ) | |
| *et al.* | ) | |
| **Defendants.** | ) | |

### DECLARATION OF DREW W. MARROCCO IN SUPPORT OF THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES AND FEDERATION OF AMERICAN HOSPITALS AMICI CURIAE BRIEF

1.    I am a partner in the law firm of Sonnenschein Nath & Rosenthal LLP and submit this declaration based on my own personal knowledge.  I am admitted to practice law in the District of Columbia and before the United States District Court for the District of Columbia.

2.    Attached hereto as Exhibit A to this Declaration is a true and correct copy of the cited pages from *IOM Report: America's Health Care Safety Net: Intact But Endangered*, National Academy Press, Washington, D.C., 2000.

3.    Attached hereto as Exhibit B to this Declaration is a true and correct copy of the cited pages of *A Commitment to Caring: The Role of Catholic Hospitals in the Health Care Safety Net*, Georgetown University Institute for Health Care Research and Policy (Nov. 2002).

4.    I hereby make the above declaration under penalty of perjury.

Drew W. Marrocco
Dated: _April 16, 2008_

25239473\V-1

EXHIBIT A

TO THE DECLARATION

OF DREW. W. MARROCCO

# America's Health Care SAFETY NET

## Intact but Endangered

Committee on the Changing Market, Managed Care, and the
Future Viability of Safety Net Providers

Marion Ein Lewin and Stuart Altman, *Editors*

INSTITUTE OF MEDICINE

NATIONAL ACADEMY PRESS
Washington, D.C.

of Sciences. All rights reserved.

## KEY DEFINITIONS, STUDY PARAMETERS, AND CAVEATS

### IOM Definition of Safety Net Providers and Core Safety Net Providers

Even though the United States is a nation with vast riches and enormous wealth, it has failed to assure timely and effective access to health care for many populations. For some, the primary barrier is the lack of insurance. For other low income patients who may have insurance, there often remain serious barriers to care because of inadequate coverage, or non-financial impediments related to culture, education, transportation, language differences, homelessness, immigrant status, or difficult health problems (e.g., substance abuse, mental illness, HIV/AIDS). In this study, the IOM committee focuses on the health care problems of these "vulnerable populations" (i.e., uninsured individuals, underinsured individuals with low incomes, Medicaid recipients, individuals residing in medically underserved areas, and patients with special needs[3]) who are most at risk in our fragmented health care delivery system.

The institutions and professionals that by mandate or mission deliver a large amount of care to uninsured and other vulnerable populations are often referred to as "safety net providers." During its various deliberations, workshops, and site visits, the committee observed a general lack of agreement and ongoing debate on which providers constitute the health care safety net. In the absence of a universally accepted definition of the safety net, for the purposes of this study the IOM committee defines safety net providers as

> Those providers that organize and deliver a significant level of health care and other health-related services to uninsured, Medicaid, and other vulnerable patients.

In most communities, there is a subset of the safety net that the committee describes as "core safety net providers."

> These providers have two distinguishing characteristics: (1) by legal mandate or explicitly adopted mission they maintain an "open door," offering access to services to patients regardless of their ability to pay; and (2) a substantial share of their patient mix is uninsured, Medicaid, and other vulnerable patients.

By "substantial" the committee means providers who have a high

---

[3]Patients with special needs are people with serious chronic illnesses or disabilities as well as those who have experienced social dislocation (e.g., homelessness). Special needs populations are discussed in Chapter 6 of this report.

of Sciences. All rights reserved.

market share of uncompensated care and high commitment to such care as demonstrated by its ratio of uncompensated care to its total payer mix.

These core safety net providers typically include federal, state, and locally supported community health centers (CHCs) or clinics, public hospital systems, and local health departments. In some communities they also include mission-driven teaching hospitals, community hospitals, and ambulatory care clinics (which are often located in central city areas or which serve as the sole provider of health care in the community).

The committee discussed at length the desirability and feasibility of identifying a specific threshold or percentage of care to the uninsured that would have to be met before a clinic, hospital, or practitioner could be classified as a "core" safety net provider. During the course of its work, however, the committee was struck by the wide variations that exist across the country in (1) the demand for safety net services as measured primarily by the number of uninsured persons in a community, (2) the composition of the safety net and the concentration of care to the poor and uninsured, and (3) the market, political, and social environment in which local safety net providers operate. A review of the literature indicates that "there is no such things as an official health care safety net" (Rovner, 1996). An attempt to quantify safety net or disproportionate share providers for the purpose of Medicaid DSH funding has not guaranteed that funds are well targeted or allocated (Coughlin and Liska, 1998; Schneider and Spivey, 1999). Part of the problem has been the lack of accurate data on where uninsured people receive their care.

Given these findings and observations, the committee determined that it was inadvisable, if not impossible, to set a specific threshold that would be meaningful or relevant for all communities. There was a consensus that core safety net providers are those providers in a community whose disappearance would most hurt the poor and uninsured populations.

Some questioned whether Medicaid patients should be included in the committee's definition of "vulnerable populations," given their access to insurance coverage. The committee unanimously agreed to include Medicaid patients as "vulnerable" given historic concerns about payment rates to providers, the highly unstable and categorical nature of Medicaid coverage, the low socioeconomic status of Medicaid beneficiaries, and their often more complex health care needs. Moreover, the federal government identifies the uninsured and Medicaid beneficiaries as the two principal groups to be at high risk for medical underservice (Rosenbaum et al., 2000).

In defining "core safety net," the committee considered whether to limit its definition to only those providers who are *legally mandated* to care for uninsured patients and other vulnerable populations. Although this

of Sciences. All rights reserved.

# EXHIBIT B
# TO THE DECLARATION
# OF DREW. W. MARROCCO

# A Commitment To Caring

## The Role of Catholic Hospitals in the Health Care Safety Net

Prepared for

The Catholic Health Association of the United States

by

Alexandra E. Shields, PhD

Ellen O'Brien, PhD

Darrell J. Gaskin, PhD

**Georgetown University**
**Institute for Health Care Research and Policy**
**2233 Wisconsin Ave, NW, Suite 525**
**Washington, DC 20007**

November 2002

# Structure of the Local Health Care Safety Net

With no public hospital anchoring the safety net in Detroit, the main source of emergency and inpatient care for the uninsured is the Detroit Medical Center, which includes six hospitals and provides over $200 million in uncompensated care. Several other hospitals also serve Detroit's poor and uninsured, including the three St. John Health System hospitals on the city's east side (Detroit Riverview, NorthEast Community, and St. John Hospital and Medical Center), the Henry Ford Hospital, and, until it closed in the spring of 2000, Mercy Hospital of Detroit.

## St. John Health System Hospitals

St. John Detroit Riverview Hospital

St. John NorthEast Community Hospital

St. John Hospital and Medical Center

The closure of Mercy Hospital has had a tremendous impact on the safety net in Detroit. In 1998, Mercy had the largest number of Medicaid days of all hospitals in Detroit.[1] With its closing, a surge in demand has been felt at all three of the St. John hospitals, with St. John Detroit Riverview Hospital experiencing the greatest increase. Emergency Department (ED) visits in the year after Mercy's closure increased by 29 percent. Riverview also began to admit more obstetrical patients, including a growing number of women with late-term pregnancies who had received no prenatal care, and experienced a sizable increase in uncompensated care.

The question that now arises is how to sustain safety net hospitals, like Detroit Riverview, in the current environment. Three hospitals in Detroit have closed since 1997, continuing a longer-term trend. The number of hospitals fell by almost two thirds over the past two decades, from 25 in 1980 to 9 in 2001. This trend is expected to continue. Moody's Investors Service, the bond-rating agency, anticipates that "there will be less than half a dozen stand-alone facilities in the city by the end of 2005 as facilities either move or close."[2]

Although Mercy's closing has left the most significant gap, other providers have announced service reductions that threaten to further reduce access to care for the poor and the uninsured. Recently, for example, the Detroit Medical Center announced that it might eliminate a substance abuse program and 70 inpatient psychiatric beds unless additional funds could be found to support the services. (The services ultimately continued, but with significant reductions). When Mercy closed, the city also lost about 85 psychiatric beds. Access to primary care for the poor has also eroded in recent years with an unraveling of the city's system of primary care clinics. Since 1998, 15 of the city's 32 primary-care centers closed, with the Detroit Medical Center alone closing nine of its 18 clinics. Today, the primary care clinics available in the city include three Detroit Health Department clinics, three Federally Qualified Health Centers (FQHCs), two free clinics (volunteer-based and part time, one of which is operated by St. John), and the St. John Community Health Center (a full-time primary care clinic operated by the St. John Health System). One sign of a rebuilding of primary care access in the city is the recent opening of a new clinic, Community Health and Social Services, Midtown (CHASS). With the opening of CHASS-Midtown in December 2001, the city is back up to 18 centers.[3] Working in partnership, the city's Health Department, hospital system and primary care clinic administrators hope to gain federal funding for three additional clinics in the near future.

# Demands on the Safety Net

Unique among the nation's ten largest cities, Detroit has declined in size over the past decade, losing more than 76,000 residents between 1990 and 2000, dropping the population to below 1 million.[4] As the suburbs have grown, the racial and economic divide between the city and the suburbs has also grown. Twenty percent of Detroit residents lived in poverty in 2000, the 16th-highest poverty rate among major U.S. cities. (A decade ago, Detroit had the highest poverty rate of any U.S. city—32 percent).[5] The large majority of the city's residents, 82 percent, are

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

**ALAMEDA COUNTY MEDICAL CENTER,**     )
                                                                     )
*et al.*                                                           )
                            **Plaintiffs,**                    )
                                                                     )        **No: 1:08-cv-00422**
              **vs.**                                            )
                                                                     )
                                                                     )
**LEAVITT,**                                                  )
                                                                     )
*et al.*                                                           )
                      **Defendants**.

**ORDER GRANTING MOTION FOR
LEAVE TO FILE AMICI CURIAE BRIEF**

Upon consideration of Amici Curiae, Catholic Health Association of the United States

and Federation of American Hospitals' Motion for Leave to File Amici Curiae Brief and the

brief in support thereof, it is by the Court this _____ day of _____, 2008, hereby ORDERED:

That the Motion is GRANTED.

The Clerk of the Court is directed to file the Amici Curiae Brief of Catholic Health

Association and Federation of American Hospitals.

SO ORDERED.

_____
Judge James Robertson
United States District Judge