## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
ALAMEDA COUNTY MEDICAL )
CENTER, *et al.*, )
)
      Plaintiffs, )
)
)
v. )     Civ. No. 08-0422 (JR)
)
MICHAEL O. LEAVITT )
in his official capacity as )
SECRETARY OF HEALTH AND )
HUMAN SERVICES, *et al.*, )
)
      Defendants, )
)
———————————————————————)

### MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

      The Kansas Health Policy Authority, Kentucky Cabinet for Health and Family Services, Missouri Department of Social Services, MO HealthNet Division, North Carolina Department of Health and Human Services, Ohio Department of Job and Family Services, Oklahoma Health Care Authority, Pennsylvania Department of Public Welfare, Tennessee Department of Health, Utah Department of Health, Washington Department of Social and Health Services, and Rod R. Blagojevich, Governor of the State of Illinois (collectively, "*Amici*") respectfully request leave to appear as *amici curiae* and to file the attached *amicus curiae* brief in support of Plaintiffs' Motion for Summary Judgment.

### INTEREST OF AMICI CURIAE

      *Amici* are the agencies and officials responsible for administering the Medicaid program in the States of Illinois, Kansas, Kentucky, Missouri, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Utah, and Washington. *Amici*'s brief provides relevant information

and legal argument regarding the scope, effect, and legality of the Medicaid rule, titled *Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, purportedly finalized and published in the Federal Register at 72 Fed. Reg. 29748 (May 29, 2007) (the "Rule"), at issue in this case.

   As the agencies responsible for implementing and administering Medicaid in their respective States, *amici* have a significant interest in the legality and enforceability of the challenged Rule. The Rule contains extremely restrictive provisions that will severely impact the States' ability to finance their Medicaid programs. Among other things, the Rule contains a impermissibly narrow definition of "unit of government" that limits the States' traditional authority over their internal governmental structure, contrary to principles of federalism and the longstanding practice under Title XIX. The Rule also impermissibly restricts the sources of funds eligible to draw federal financial participation in the Medicaid program, which hampers States' flexibility in allocating their resources among political subdivisions to serve the needs of their citizens.

   Moreover, the Rule violates the one-year moratorium enacted by Congress on May 24, 2007 and signed by the President on May 25, 2007, expressly forbidding the agency from taking "any action" to finalize or implement the (then-proposed) rule. Pub. L. No. 110-28, § 7002(a), 121 Stat 112 (2007).

   Defendants' actions have led to considerable uncertainty as to the States' obligations, as the Rule contains a number of compliance deadlines during the moratorium period, which CMS has not been able to enforce. *See*, *e.g.*, §§ 447.206(d), (g), 447.272(d), 447.321(d), 72 Fed. Reg. 29748, 29834-35. Even without the moratorium, the Rule did not provide for an adequate transition period, given the scope and extent of the changes it will

require—changes that will require modifications to state budgets, state rules, and the state

Medicaid plans on file with the federal government.  If CMS were to take the position that the

Rule is fully effective immediately upon the expiration of the moratorium, *Amici* will have not

have had the benefit of even the minimal transition period envisioned by the Rule.  Because

Defendants did not withdraw the Rule once the moratorium was passed, A*mici* now face the

possibility that they will not be afforded sufficient time in which to comply with the Rule.

      *Amici* have a significant interest in the legality and enforceability of the Rule.

Accordingly, *Amici* respectfully request leave to appear in this case and to file the attached brief

in this action.  Plaintiffs have consented to *Amici*'s filing of an *amicus curiae* brief.  Defendants

take no position regarding the filing of the brief, though counsel for Defendants have informed

*Amici*'s counsel that Defendants may seek additional time to respond to arguments raised in

*amicus* briefs.

April 18, 2008

                          Respectfully Submitted,

                          /s/ Charles A. Miller
                          Charles A. Miller (D.C. Bar No. 8904)
                          Caroline M. Brown (D.C. Bar No. 438342)
                          Theodore P. Metzler, Jr. (Bar No. 486339)
                            (admission pending)
                          COVINGTON & BURLING LLP
                          1201 Pennsylvania Ave., N.W.
                          Washington, D.C.  20004
                          (202) 662-5410 (telephone)
                          (202) 778-5410 (facsimile)

                          Attorneys for *Amici Curiae* Kansas Health Policy
                          Authority, Kentucky Cabinet for Health and Family
                          Services, Missouri Department of Social Services,
                          MO HealthNet Division, North Carolina
                          Department of Health and Human Services, Ohio
                          Department of Job and Family Services, Oklahoma
                          Health Care Authority, Pennsylvania Department of
                          Public Welfare, Tennessee Department of Health,

Utah Department of Health, Washington
Department of Social and Health Services, and Rod
R. Blagojevich, Governor of the State of Illinois

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
ALAMEDA COUNTY MEDICAL                        )
CENTER, *et al.*,                             )
                                              )
             Plaintiffs,                      )
                                              )
                                              )
v.                                            )          Civ. No. 08-0422 (JR)
                                              )
MICHAEL O. LEAVITT                            )
in his official capacity as                   )
SECRETARY OF HEALTH AND                       )
HUMAN SERVICES, *et al.*,                     )
                                              )
             Defendants,                      )
                                              )
_____)


**BRIEF OF STATE AGENCIES AND OFFICIALS AS *AMICI CURIAE***
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*Amici curiae* Kansas Health Policy Authority, Kentucky Cabinet for Health and

Family Services, Missouri Department of Social Services, MO HealthNet Division, North

Carolina Department of Health and Human Services, Ohio Department of Job and Family

Services, Oklahoma Health Care Authority, Pennsylvania Department of Public Welfare,

Tennessee Department of Health, Utah Department of Health, Washington Department of Social

and Health Services, and Rod R. Blagojevich, Governor of the State of Illinois respectfully

submit this brief in support of Plaintiffs' Motion for Summary Judgment.

# INTRODUCTION

For the reasons below and in Plaintiffs' Memorandum in support of the Motion for Summary Judgment, Plaintiffs are entitled to summary judgment, and an injunction should issue forbidding Defendants from enforcing the Medicaid rule titled *Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, purportedly finalized and published in the Federal Register at 72 Fed. Reg. 29748 (May 29, 2007) (the "Rule"), four days after Congress imposed a moratorium expressly forbidding the agency from taking "any action" to finalize or implement the (then-proposed) rule. Pub. L. No. 110-28, § 7002(a), 121 Stat 112 (2007).

*Amici* are particularly concerned that CMS, in the Rule, assumes the authority to decide which entities are sufficiently "public" to be considered entities of a State or its political subdivisions for purposes of Medicaid funding. This aspect of the Rule infringes on a core attribute of the sovereignty of state governments. Both this aspect and the limitation on the sources of funds that may be used to satisfy the non-federal share requirement are in derogation of the way that Medicaid has been operated since its inception, and go far beyond any reasonable construction of the agency's authority. The result of the Rule will be to severely restrict the funds available to States in the operation of their programs. The Rule disrupts longstanding practices and imposes new and onerous administrative and fiscal burdens on state and local governments and other public providers that provide essential health care services to the elderly, the disabled, and other needy populations. Finally, despite CMS's assertions, the Rule is not necessary to "promote the financial integrity of the Medicaid program," *see* 72 Fed. Reg. at 29832, and cannot be justified by reference to alleged abusive Medicaid funding practices.

**BACKGROUND**

Medicaid is "a cooperative federal-state program that provides federal funding for state medical services to the poor." *Frew v. Hawkins*, 540 U.S. 431, 433 (2004).  As set forth in Title XIX of the Social Security Act ("SSA"), the federal government provides financial assistance by matching a percentage of the States' Medicaid expenditures.  *See* SSA § 1902(a)(1), 42 U.S.C. § 1396a(a)(1); 42 C.F.R. § 433.10(b).  Each Medicaid expenditure is thus made up of the "federal share" and what is commonly referred to as the "state share," but is more accurately described (as it is in the Social Security Act) as the "non-federal share."  Since its inception, Title XIX has allowed the non-federal share of expenditures to come from a variety of state and local funding sources.  *See* SSA § 1902(a)(2), 42 U.S.C. § 1396a(a)(2) (requiring that the State fund at least forty percent of the non-federal share and specifically recognizing that funds from "local sources" may contribute to the required non-federal share).

From the earliest days of the program, the federal agency responsible for administration of the Medicaid program—now known as the Centers for Medicare & Medicaid Services ("CMS"), within the Department now known as the Department of Health and Human Services—has acknowledged in its published regulations that a majority of the non-federal share of Medicaid expenditures could be derived from sources other than state sources,[1] and has specifically authorized the use of funds transferred from other public agencies or funds expended by such agencies as the non-federal share.[2]  For certain periods, the regulations expressly authorized the use of private funds as well for the non-federal share if those funds were donated

---

[1] *See* 45 C.F.R. § 205.130(c), as adopted at 36 Fed. Reg. 3862 (Feb. 27, 1971).

[2] *See* 42 C.F.R. § 446.185, as adopted at 42 Fed. Reg. 60564, 60566 (Nov. 28, 1977) (applicable to training costs); 42 C.F.R. § 433.45, as adopted at 50 Fed. Reg. 46652, 46664 (Nov. 12, 1985) (applicable to all costs).

to the state or local governments without restrictions on their use.[3]  This reflected the underlying premise of the Medicaid program—that it was to be devised, funded and operated by the States, subject only to those requirements and limitations imposed by federal statutes and regulations.

The only *restrictions* on the sources eligible as the non-federal share of Medicaid expenditures were enacted as part of the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 ("Provider Tax Amendments"), Pub. L. No. 102-234, 105 Stat 1793. That statute related to two specific sources of funding for Medicaid expenditures, "provider-related donations" and "health-care related taxes."  57 Fed. Reg. 55118 (Nov. 24, 1992). Contrary to the regulations then in effect, the statute made provider-related donations (*i.e.* private donations) ineligible for matching unless they met particular criteria.  *See* SSA § 1903(w), 42 U.S.C. §§ 1396b(w)(1)(A)(i), 1396b(w)(2)(A). The statute also limited the extent to which taxes on providers would be eligible for federal matching.  *Id.* §§ 1396b(w)(1)(A)(ii); 1396b(w)(3)(A)- (B).  Section 5 of the Provider Tax Amendments, which authorized the Secretary to issue regulations on an interim basis to implement the Amendments, expressly prohibited the Secretary from altering the treatment of *public* funds as the source of the non-federal share through such interim regulations (except to the extent the funds were derived from provider taxes or donations that were proscribed by the Amendments).

When it promulgated rules to implement the Provider Tax Amendments in 1992, the agency specifically acknowledged that there were "two issues" that were "affected by this law."  57 Fed. Reg. at 55118.  Those issues were provider donations and health care related

---

[3] *See* 42 Fed. Reg. 60564, 60566 (Nov. 28, 1977), adopting 42 C.F.R. § 446.185, authorizing the use of private donated funds for training expenditures (the section was renumbered 432.60 in 1978 (*see* 43 Fed. Reg. 45199, 45201 (Sept. 29, 1978)); and 50 Fed. Reg. 46652, 46664 (Nov. 12, 1985), amending that regulation to permit the use of private donated funds for all purposes in the Medicaid program (and again renumbering it to 433.45).

taxes. *Id.* With regard to donations, the agency noted that the Provider Tax Amendments did

"not include restrictions on the use of public funds as the State's share of financial participation."

*Id.* at 55119. Accordingly, the agency retained the regulatory language permitting "public

funds" to be used as the non-federal share of financial participation, while removing the

provisions related to "private funds." *Id.*[4] The regulation, as it was repromulgated following the

Provider Tax Amendments, and until it was modified by the currently challenged Rule, provided:

> ### § 433.51  Public funds as the State share of financial participation.
>
> (a) Public funds may be considered as the State's share in claiming FFP if they meet the conditions specified in paragraphs (b) and (c) of this section.
>
> (b) The public funds are appropriated directly to the State or local Medicaid agency, or transferred from other public agencies . . . to the State or local agency and under its administrative control, or certified by the contributing public agency as representing expenditures eligible for FFP under this section.
>
> (c)  The public funds are not Federal funds, or are Federal funds authorized by Federal law to be used to match other Federal funds.

Many of the providers that participate in state Medicaid programs are publicly-

owned or operated. These providers include not only hospitals (such as Plaintiffs here), but also

county-owned nursing facilities, state university faculty practice plans, public health clinics,

school health clinics, and other school-based providers. Many of these providers have funds that

do not come from state or local taxes, including revenues from operations, private grants, tuition,

reserve funds, and investment income. Under § 433.51 (prior to the changes put in place by the

challenged Rule), a public provider could use its own funds to provide the non-federal share of

expenditures. This is commonly done by having the provider certify its costs in serving

---

[4] The provision was once again renumbered from 42 C.F.R. § 433.45 to 42 C.F.R. § 433.51.

Medicaid beneficiaries as "representing expenditures eligible for FFP," and the federal government then reimburses the State the federal share of those expenditures. *See* 42 C.F.R. 433.51(b). Alternatively, a public provider may transfer its own funds to the Medicaid agency to use as the non-federal share in Medicaid expenditures. *See id.* While previously an accepted practice, modified CMS policies in recent years (even before promulgation of the new Rule) have made such intergovernmental transfers much less common.

The Rule substantially limits the use of heretofore-valid sources of the non-federal share of Medicaid expenditures in two ways:

(1) it severely confines the entities that may be considered "units of government" that are able to transfer funds to the Medicaid agency or certify expenditures that qualify for federal matching, and

(2) it insists that even those entities that meet the strict "unit of government" definition may only rely upon funds that are derived from state or local taxes.

Many entities that have previously been considered "public," and whose expenditures have therefore been able to draw federal matching funds, would no longer qualify as a "unit of government" under the new Rule and therefore would be unable, through their own funds, to support Medicaid expenditures in their States. Other entities that do qualify as a "unit of government" will be limited in the funds that they can use as the non-federal share, either through certification or through intergovernmental transfers. These changes will seriously impair the ability of the *amici* Medicaid agencies to fund their programs and thereby to fulfill their important mission of serving the health care needs of needy children and their families, and of the elderly and disabled populations that rely upon Medicaid.

## <u>ARGUMENT</u>

The Rule challenged in this litigation runs counter to the forty years of Medicaid laws and regulations that preceded it.  As authority for its restriction on what is a "unit of government" and which funds are considered "public funds," CMS relies on subsection (w)(6) of Section 1903 of the Social Security Act.  That section, which was enacted as part of the Provider Tax Amendments, provides:

> Notwithstanding the provisions of this subsection, the Secretary may not restrict States' use of funds where such funds are derived from State or local taxes (or funds appropriated to State university teaching hospitals) transferred from or certified by units of government within a State as the non-Federal share of expenditures under this title, regardless of whether the unit of government is also a health care provider, except as provided in section 1902(a)(2), unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-Federal share under this section.

Sixteen years after this provision was enacted, and fifteen years after CMS first promulgated the regulations putting the new law into place (and preserving the regulation permitting the use of "public funds" towards the non-federal share), Defendants contend that the final Rule's limitations on who and what can be considered "public" is a "mandate" of and "required by" the 1991 statute.  *See* HHS Br., Docket No. 15-2, at 11, 40.  Far from imposing *additional* limitations on the funds eligible for federal matching, Section 1903(w)(6) in fact *prevents* the agency from restricting the use, as the non-federal share of Medicaid expenditures, of funds transferred or certified by units of government except where derived from impermissible provider taxes or private donations.

In the remainder of this brief we show, in support of the Plaintiffs' Motion for Summary Judgment, that the two aspects of the Rule identified above cannot pass legal muster.[5]

## I.    DEFENDANTS LACK THE STATUTORY AUTHORITY TO ENACT THE "UNIT OF GOVERNMENT" LIMITATIONS.

The Rule sets forth two definitions of the "units of government" whose funds can be considered as making up the non-federal share of Medicaid expenditures.  42 C.F.R. § 433.50(a)(1)(i)-(ii).  The first is "a city, a county, a special purpose district, or other governmental unit in the State that:  has taxing authority, has direct access to tax revenues, is a state university teaching hospital with direct appropriations from the state treasury, or is an Indian tribe."  *Id.* § 433.50(a)(1)(i).  A health care provider may be considered to be a "unit of government" only if the provider itself has "generally applicable taxing authority" or is a part of a unit of government with taxing authority which is "legally obligated to fund the health care provider's expenses, liabilities and deficits, so that a contractual arrangement with the state or local government is not the primary or sole basis for the health care provider to receive tax revenues."  42 C.F.R. § 433.50(a)(1)(ii).  Both aspects of the definition of "unit of government" are flawed.

---

[5] *Amici* are also deeply concerned about the provision of the Rule that limits reimbursement of governmental providers to cost, in part because of the demonstrated value to the program of incentive reimbursement methodologies (which are only effective if they offer the opportunity of a profit to an efficient operator) and in part because of the huge burden of classification of providers and of demonstrating actual costs that are part of the Rule as adopted by the agency. Plaintiffs have persuasively explained why the limitation to cost is not authorized by or consistent with the underlying statute, but rather is directly in conflict with the course of congressional modification of the reimbursement provisions of the statute over the life of the Medicaid program.  *Amici* endorse (without repeating) the presentation of Plaintiffs on this issue.

A.    **The Rule Impermissibly Limits "Units Of Government" To Entities With "Taxing Authority" Or "Direct Access to Tax Revenues."**

The Provider Tax Amendments define a "unit of government" with respect to a State to mean "a city, county, special purpose district, or other governmental unit in the State." SSA § 1903(2)(7), 42 U.S.C. 1396b(w)(7).  The Rule's requirement that a unit of government must also have taxing authority is not only an impermissible addition to that definition, but it is at odds with the recognition in Section 1903(w)(6) that a "unit of government" may be a "health care provider."  42 U.S.C. § 1396b(w)(6).  Many, if not most, publicly owned or operated health care providers do not have taxing authority, and nonetheless have long been able to contribute to state Medicaid programs by using their funds as the non-federal share of Medicaid expenditures. Those contributions would no longer be matchable under the Rule unless a State could establish that the provider was part of some other unit of government that had the requisite taxing authority.  That result not only eliminates a financial backbone of many public hospitals, but the attempt to have a federal agency define, in rulemaking, what constitutes a unit of state government flies in the face of the cooperative federalism on which the program is based.

Few areas are as fundamental to the notion of state sovereignty as the ability to determine what constitutes a unit of government within the State.  *See Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991) ("Through the structure of its government . . . a State defines itself as a sovereign.").  It is well established that "the state is supreme" in creating its political subdivisions and in defining their functions.  *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 179 (1907).  States create political subdivisions, "counties, cities or whatever[,] . . . . 'as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them,' and the 'number, nature and duration of the powers conferred upon [political

subdivisions] . . . rests in the absolute discretion of the state.'" *Reynolds v. Sims*, 377 U.S. 533, 575 (1964) (quoting *Hunter*, 207 U.S. at 178).

The power of taxation is only one of these governmental powers. Taxing authority is not a precondition for an entity to be a unit of government. "Local government units do not have inherent power to tax because, in contrast to the state which creates them, they are viewed as subordinate units exercising only a delegated competence." JOHN MARTINEZ ET AL., LOCAL GOVERNMENT LAW § 23:2 (2006). Thus, while no one would doubt that a municipality is a unit of government, States frequently restrict and may, absent state constitutional considerations, entirely suspend municipalities' powers of taxation. The Rule's "taxing authority" requirement is not authorized by the Provider Tax Amendments and fundamentally interferes with a State's own internal governmental structure. A provision intended to *restrict* agency ability to proscribe intergovernmental relationships (Section 1903(w)(6)) is far too meager a basis to warrant the highly restrictive intrusion that the Rule makes on a State's authority to order its internal political structure.

Given the serious federalism concerns that are raised by the *federal* government dictating what entities shall be considered a unit of the *State*, it is not surprising that Congress in the Provider Tax Amendments did not impose specific requirements for an entity to be considered a "unit of government." Rather, it appears, quite properly, to have left such questions to the determination of each State. Defendants' brief, however, takes the position that CMS's imposition of additional qualifiers is a "reasonable interpretation" of the congressional silence. *See* HHS Br. at 10. That is not the appropriate legal standard. As the Supreme Court stated in *Gregory v. Ashcroft:* "Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States." 501 U.S. at 460 (*quoting Rice v. Santa Fe Elevator*

- 10 -

*Corp.,* 331 U.S. 218, 230 (1947)).  The "clear statement" rule applies with equal force in the

context of programs enacted under Congress's spending clause powers, such as Medicaid.  *See*

*Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1 (1981) ("If Congress intends to

impose a condition on the grant of federal moneys, it must do so *unambiguously*.") (emphasis

added).

   In recognition of these principles, by Executive Order binding on CMS, federal

agencies must "closely examine the constitutional and statutory authority supporting any action

that would limit the policymaking discretion of the States and shall carefully assess the necessity

for such action."  Executive Order 13132, 64 Fed. Reg. at 43256 (August 4, 1999).  In

promulgating the Rule, CMS failed to comply with the Executive Order.  Had it done so, the

agency would not have been able to establish that Congress gave the Secretary the statutory

authority to infringe on a core state function by deciding which entities can or cannot be

considered a part of the State or one of its subdivisions for purposes of the Medicaid program.

Nothing in the Provider Tax Amendments indicates that Congress clearly and unambiguously

authorized or intended for CMS to take such action.

  **B.** **The Rule Impermissibly Restricts The Health Care Providers That May Be Considered A Unit Of Government.**

   Though Section 1903(w)(6) of the Social Security Act, as amended by the

Provider Tax Amendments, recognizes that a "unit of government" can be a "health care

provider," the Rule's definition, contained in revisions to 42 C.F.R. § 433.50(a)(1)(ii), is so

limiting that some quintessentially public providers will be unable to qualify as "governmental."

*See* 42 U.S.C. § 1396b(w)(6).  According to the Rule, a provider must itself have "generally

applicable taxing authority" or else demonstrate that it is an "integral part" of a governmental

unit by showing that the government has an unconditional duty to fund the provider's operations

expenses, losses, and deficits.  72 Fed. Reg. at 29832.  If a provider does not meet this stringent

definition it cannot use its own funds as the non-federal share for Medicaid expenditures that can

earn federal financial participation.  Section 1903(w)(6) authorizes no such restriction.

Three classes of public providers will be most adversely affected by the Rule.

First, many public hospitals receive county, city, or state funding, but operate through

autonomous hospital districts authorized by state law.  Under these state laws, either the city or

county governing body, or voters, may authorize the creation of hospitals.[6]  The authorizing

legislation invests the hospital with governmental status.  State law typically empowers the city

or county government, or the hospital district, to issue bonds or to impose special taxes to

support the hospitals, and frequently requires the governing board of the hospital to be elected by

voters or appointed by government officials.  Federal and state courts have held that these

hospital districts and their governing boards are political subdivisions of the State or are public

bodies for a variety of purposes.[7]  Where (as frequently authorized by state law) a private entity

---

[6] *See, e.g.*, Cal. Health & Safety Code § 32000 *et seq.* (authorizing the creation of hospital districts); *id.* § 101850 (authorizing creation of Alameda County Medical Center Hospital Authority); Fla. Stat. Ann. §§ 189.401-189.429 (authorizing creation of independent special districts); *id.* §§ 155.01-155.45 (authorizing counties to create dependent and independent special districts to operate any county-owned or county-operated health facility that provides charitable health care services); Ga. Code Ann. § 31-7-70 (authorizing creation of hospital authorities); Ill. Comp. Stat. §§ 910/1-910/25 (authorizing the creation of hospital districts to operate hospitals in counties that have less than one million inhabitants); id. §§ 5/11-23-1 to 5/11-23-15 (authorizing cities with populations of less than 100,000 to operate city hospitals); Ky. Rev. Stat. Ann. § 216.010 (authorizing the creation of city and county hospitals); id. § 216.310 (authorizing the creation of hospital districts); Mich. Comp. Laws § 331.1 (authorizing formation of hospital authorities); *id.* § 331.151 (authorizing the creation of county public hospitals); N.C. Gen. Stat. §§ 131E-5 to 131E-14.2 (authorizing creation of municipal hospitals); id. §§131E-15 to 131E-34 (authorizing the creation of hospital authorities); Tenn. Code Ann. § 7-57-101 to 7-57-404 (same); id. § 7-57-501 to 7-57-603 (granting additional powers to hospital authorities and hospital districts created by a private act of the general assembly).

[7] *See, e.g., Jackson, Tenn. Hosp. Co. v. W. Tenn. Healthcare, Inc.*, 414 F.3d 608, 609 (6th Cir. 2005) (Tennessee hospital authority "is a political subdivision of the state of Tennessee" whose (continued…)

manages the hospital, the government has the authority to terminate the lease or agreement for nonperformance. *See, e.g.,* Ohio Rev. Code § 513.171.

While the municipal or county governments participating in a hospital district usually have some responsibility to provide financial support to the hospital, the municipality may, in order to encourage efficiency, provide a capped amount of financial support to the hospital, requiring it to absorb some losses and permitting it to enjoy profits. Hospitals operated under these systems have, until this rulemaking, been treated as public hospitals. *See* 66 Fed. Reg. 3148, 3154 (January 12, 2001) (redefining provider categories for purposes of applying upper payment limits and noting that facilities owned by "quasi-independent hospital districts" are non-state public hospitals). As public hospitals, they have been able to certify their expenditures serving Medicaid beneficiaries as being eligible for federal financial participation and have been able to make intergovernmental transfers of their own funds (to serve as the non-federal share) under the prior version of 42 C.F.R. § 433.51(b). Under the Rule's revisions to 42 C.F.R. 433.51(b), that would no longer be possible, unless those hospitals have generally applicable taxing authority, or are part of other governmental units that have such authority.

The second group adversely affected by the Rule are the many public hospitals directly owned by States, cities, or state-chartered universities that contract with private companies to manage some portion of the hospital business. Commonly, a state or local

_____

acts are subject to the act of state doctrine for antitrust immunity); *Palm Springs Medical Clinic, Inc. v. Desert Hospital*, 628 F. Supp. 454, 456 (C.D. Cal. 1986) (hospital district is a "local government" under the Clayton Act); *Johnson v. Chattanooga-Hamilton County Hosp. Auth.*, 749 S.W.2d 36 (Tenn. 1988) (hospital authority is a subdivision of the State not subject to workers' compensation law); *Stegall v. Joint Twp. Dist. Memorial Hosp.*, 484 N.E.2d 1381, 1383 (Ohio App. 1985); *cf. Matagorda County Hosp. Dist. v. City of Palacios*, 47 S.W.3d 96, 100-101 (Tex. App. 2001) (city had standing to sue hospital district for failing to comply with open meeting requirements).

government or state university, while maintaining active involvement in the business operations of the hospital, may induce the contractor to improve efficiency by varying its payment to the contractor commensurately with the hospital's performance. In 2001, in response to comments, CMS's predecessor agency amended its proposed rule on upper payment limits ("UPL") in order to clarify in the final version that a hospital owned by a local government but managed by a private company was considered a government-owned or -operated facility. 66 Fed. Reg. at 3154. That approach is consistent with the Medicaid program history and purpose. Yet the Rule would not consider such a provider to be part of the "unit of government," even though the governmental entity retains ultimate responsibility for the oversight and business operations of the provider, because the government entity might not be "legally obligated" to fund all of the provider's expenses.

There is no legal basis for the Rule's requirement that the government fund all of a provider's "expenses, liabilities, and deficits" in order to acknowledge the provider as public. 72 Fed. Reg. at 29832. An analogy to state-local government relations demonstrates the flaw in this position: while no one questions that cities are governmental, state constitutional provisions frequently bar the State from lending its credit to a municipality, or at least limit the assistance the State may provide to the city. *See, e.g.,* N.Y. CONST. ART. 9, § 2(b)(2) (State may act in relation to property of a city government only by general law, by special request of two thirds of the legislature, or, for New York City, on a certificate of necessity issued by the Governor).

The third group of adversely-affected public providers are those providers that are supported by their communities (through appropriated funds from a municipality or county) and subject to varying degrees of public oversight and control, but which are organized as nonprofit corporations under Section 501(c)(3) of the Internal Revenue Code. While some of these entities

have been considered to be public by the States in which they operate, in the preamble to the proposed Rule CMS rejected the view that "an entity which is not governmental in nature but has a public-oriented mission (such as a not-for-profit hospital, for example) may participate in the financing of the non-Federal share by CPEs."  72 Fed. Reg. at 2240.

The mere fact that an enterprise is organized in corporate form is not inconsistent with its being considered a public entity.[8]  Even the CMS Medicare regulations recognize that a unit of state or local government may "formally grant[] governmental powers" to a health care provider organized as a public or nonprofit corporation.  *See* 42 C.F.R. § 413.65(e)(3)(ii)(B). Localities or hospital districts frequently choose to organize a hospital as a 501(c)(3) organization in order to ensure that the hospital will be able to accept private charitable donations.  The Provider Tax Amendments do not bar a public provider or unit of government from receiving such donations, as long as the donor is not a provider.  *See* 42 U.S.C. § 1396b(w)(2); *see also* 57 Fed. Reg. at 55120 (noting that States may continue to receive charitable donations from entities other than providers after the Provider Tax Amendments).  The ability to receive private donations actually enhances the public mission of local hospitals, by strengthening their ability to fulfill their safety net function of treating the uninsured.

Nothing in the Provider Tax Amendments indicates that Congress intended these traditionally public entities to be treated as "private providers" whose funds could not be used as the non-federal share of Medicaid expenditures simply because they do not have generally

---

[8] Well-known examples of federal public entities that operate in corporate form include the Federal Deposit Insurance Corporation, the Tennessee Valley Authority, and the Communications Satellite Corporation.

applicable taxing authority or operate as an "integral part" of another unit of government that has full responsibility for their bottom line.

## II.    DEFENDANTS LACK THE STATUTORY AUTHORITY TO LIMIT THE SOURCES OF FUNDS FOR THE NON-FEDERAL SHARE TO STATE OR LOCAL TAXES.

The challenged Rule revises 42 C.F.R. § 433.51(b) in order to change the funds that may be considered as the non-federal share in Medicaid expenditures from "public funds" to "funds from units of government," which under the amendment to 42 C.F.R. § 433.50(a)(1)(i) are defined as funds from a "city, county, special purpose district, or other governmental unit in the State with generally applicable taxing authority."  In its opposition to Plaintiffs' Motion for Summary Judgment, Defendants take the position that "the Medicaid Act requires that States finance the non-federal share of Medicaid expenditures using funds 'derived from State or local taxes.'"  HHS Br. at 40, citing 42 U.S.C. § 1396b(w)(6)(A).  CMS likewise stated in promulgating the purported final Rule that "a certified public expenditure (CPE) means that State or local *tax dollars* were used to satisfy the cost of servicing Medicaid individuals."  72 Fed. Reg. 29748, 29757 (May 29, 2007) (emphasis added).

Under CMS's new requirement, "[g]overnmentally-operated health care providers are able to certify their costs without having to demonstrate that State or local tax dollars were used to provide Medicaid Services."  *Id.*  But in order for Medicaid expenditures by "non-governmentally-operated health care providers" to be eligible for federal matching, "a State or local government must actually certify that *tax dollars* were provided to the non-governmentally-operated health care provider."[9]  *Id.* (emphasis added).  The Rule thus prohibits state and local

---

[9] CMS asserts that this requirement is necessary "in order to maintain consistency with the Federal statutory instruction governing [certified public expenditures]."  72 Fed. Reg. at 29768. (continued…)

governments from using funding from non-tax sources to support the Medicaid program.

Contrary to Defendants' assertions, the Medicaid law has never restricted federal matching to

expenditures financed through state and local tax revenues, and the Provider Tax Amendments

did not add any such restriction.

As set forth above, Medicaid from its inception has contemplated that public

entities not funded by state appropriations would contribute to the non-federal share of Medicaid

expenditures. *See supra* part I.B. Section 1902(a)(2) permits a State plan to provide for local

participation in as much as 60 percent of the non-federal share of total Medicaid expenditures, as

long as the lack of adequate "funds" from "local sources" does not result in lowering the amount,

duration, scope or quality of care and services under the plan. 42 U.S.C. § 1396a(a)(2). There is

no requirement that the "funds" must come from tax revenues or that the "sources" must be

"units of government" under a federal definition of that term. *See id.* In addition, Section

1903(d)(1) of the Act confirms that the non-federal share may encompass public funds from

"other sources" than the State and its political subdivisions. Under that subsection, the State

must report "the amount appropriated or *made available* by the State and its political

subdivisions" for federal matching; if the amount "is less than the State's proportionate share of

the total sum of such estimated expenditures," the State must report "*the source or sources from*

*which the difference is expected to be derived.*" 42 U.S.C. § 1396b(d)(1) (emphasis added).

Thus, Title XIX expressly recognizes (and has for four decades) that sources of funds *in addition*

---

However, the requirement creates an *inconsistency* between expenditures by governmentally-operated providers and expenditures by providers that are not governmentally operated. Expenditures by a public hospital that meets CMS's new "unit of government" requirement may use funds from user fees or other non-tax sources for Medicaid expenditures (without disqualification from federal matching), while those same expenditures would not be eligible for matching when made by a non-governmentally operated hospital—even if they originated from a "unit of government"—if they could not be traced back to tax revenues.

*to* amounts appropriated by the State or its political subdivisions may supply the non-federal match.

Those longstanding provisions are consistent with the fundamental purpose of Title XIX, in which Congress recognized that the "provision of medical care for the needy has long been a responsibility of the State and local public welfare agencies" and crafted a program in which the federal role would be to "assist[ ] the States and localities in carrying this responsibility by participating in the cost of care provided." H.R. Rep. No. 89-213, at 63 (1965). The statute thus guaranteed that "local funds could continue to be utilized to meet the non-Federal share of expenditures under the plan." H.R. Rep. No. 89-682 (1965) (Conf. Rep.)

Moreover, CMS and its predecessor agencies have long permitted "public funds" to be considered as the non-federal share in claiming federal financial participation if the funds are appropriated directly to the State or local agency, *or* transferred from other "public agencies" to the State or local Medicaid agency, *or* are "certified by the contributing public agency as representing expenditures eligible for [federal matching] under this section." *See* 42 U.S.C. § 433.51(b) (2006), and predecessor regulations. *See supra* pp. 3-5 & nn.2-5.

Contrary to this history, Defendants now assert that "the Medicaid Act requires that states finance the non-federal share of Medicaid expenditures using funds 'derived from State or local taxes.'" HHS Br. at 40, quoting 42 U.S.C. § 1396b(w)(6)(A). But the provision that CMS quotes does *not* require that matching be restricted to funds derived from tax revenues. Section 1903(w)(6)(A) is not a limitation on the nature of public entities contributing to the non-federal share of financial participation but instead is a limitation on *the Secretary's* authority to regulate in this area. The plain language of the provision ("the Secretary may not restrict") makes clear that the Congress intended the provision to bar CMS from promulgating any

- 18 -

regulation restricting States' use of the designated funds as participation in the non-Federal share.[10]  HHS now says that the restriction on the Secretary's authority to regulate certain funds means that only those funds are permissible sources of the non-federal share and that all other funds are prohibited.  The text says no such thing.

The legislative history of the provision, enacted as part of the Provider Tax Amendments, shows that Congress did not intend to narrow the acceptable sources of the non-federal share.  The House Conference Report on the final version of the legislation states:

> The conferees note that *current transfers from county or other local teaching hospitals continue to be permissible* if not derived from sources of revenue prohibited under this act.  The conferees intend the provision of section 1903(w)(6)(A) to prohibit the Secretary from denying Federal financial participation for expenditures resulting from State use of funds referenced in that provision.

H.R. Conf. Rep. 102-409, at 18 (1991), *reprinted in* 1991 U.S.C.A.A.N. 1441, 1444 (emphasis added).  The "current transfers" that continued to be permissible were the "public funds" under the extant version of 42 C.F.R. § 433.51, which were not and had never been limited to tax revenues.

CMS's own actions establish that the Provider Tax Amendments do not require limiting acceptable "public funds" to those derived from tax revenue.  In the regulations it promulgated following the 1991 statute, the agency expressly *declined* to limit the sources of

---

[10] While the section does not prohibit CMS from restricting the use of funds "as provided in section 1902(a)(2)" or funds "that would not otherwise be recognized as the non-Federal share," those provisions do not support the challenged Rule.  Nothing in section 1902(a)(2) or any other provision of the Medicaid statute limits the source of funds that may be recognized as the non-Federal share of Medicaid expenditures (other than the rules specific to provider taxes or provider donations), and CMS has not contended otherwise.

public funds, instead eliminating only the provision that had previously permitted private

donations to be used toward the non-federal share:

> Prior to the enactment of Public Law 102-234, regulations at 42 CFR 433.45 delineated acceptable sources of State financial participation.  The major provision of that rule was that public and private donations could be used as a State's share of financial participation in the entire Medicaid program.  As mentioned previously, *the statutory provisions of Public Law 102-234 do not include restrictions on the use of public funds* as the State share of financial participation.  Therefore, the provisions of  433.45 that apply to public funds as the State share of financial participation have been retained but redesignated as 433.51 for consistency in the organization of the regulations.

57 Fed. Reg. 55118, 55119 (November 24, 1992) (emphasis added).   The agency concluded that

"until the Secretary adopts regulations changing the treatment of intergovernmental transfers,

States may continue to use, as the State share of medical assistance expenditures, transferred or

certified funds derived from any governmental source."  *Id.*  In sum, the plain language of the

statute and the agency's own (contemporaneous) interpretation belie the notion that the Provider

Tax Amendments codified in Section 1903(w)(6) require CMS to limit permissible public funds

to those derived from state or local taxes.

## III.    DEFENDANTS' CONTENTIONS THAT THE RULE IS NECESSARY TO CURB STATE ABUSES ARE WITHOUT MERIT.

Defendants contend that the Rule is in response to financing arrangements that it

believes were abusive of the federal-state partnership underlying the Medicaid program because

they "effectively divert Medicaid funds to non-Medicaid purposes, or overstate the total

computable expenditure that is being made" by a State.  *See, e.g.,* HHS Br. at 8, *quoting 7*2 Fed.

Reg. at 29774.  *Amici* strongly dispute this characterization, but the recitation of the objected-to

arrangements cannot justify the challenged Rule, for not only has CMS already taken other

regulatory actions that have effectively terminated the identified practices, but the provisions of the Rule go well beyond the perceived abuses.

As Plaintiffs correctly explain (Pls.' Br., Docket No. 14-2, at 24-25), the so-called "upper payment limit" rules, as modified in 2001 pursuant to congressional directive, already substantially constrain the levels of state Medicaid payments by providing that Medicaid cannot pay more than the Medicare program would pay for each of three groups of providers: state-owned; other public providers; and private providers. *See* 42 C.F.R. §§ 447.272, 447.321. While payments may exceed an individual provider's costs, it is not legitimate to claim, as Defendants do, that paying providers in amounts comparable to what the federal government would pay under Medicare is abusive. This is especially true because many patients served by public providers are uninsured or are insured only through Medicaid. In those circumstances, while it is not required that a State recognize those additional burdens when it sets its Medicaid rates, it has (until now) been accepted that a State may pay above costs in order to ensure that the provider, which cannot cost shift to other payors, can continue to provide access to quality care for Medicaid patients. Alternatively, it has (until now) been acceptable to pay public providers at prospective rates commensurate with rates paid to private providers—for example, using the "DRG" payment system used by Medicare—which encourages providers to operate efficiently in order to realize a profit that can be used to offset losses from serving the uninsured.

But whatever the merits of limiting payments to public providers to cost—and *Amici* agree with Plaintiffs that such a limit is not justified under Title XIX—few if any of the funding arrangements identified in the Administrative Record that have aroused CMS's objection relate to the definition of who should be considered public or to the source of public funds (other than transfers that it believes to be "recycled" from Medicaid payments). As CMS's

rulemaking makes clear, those aspects of the Rule are based on the agency's (mis)interpretation of what is required by the Provider Tax Amendments in Section 1903(w)(6),  not by any perceived abuses in financing mechanisms.

By limiting those entities that can participate in funding the non-federal share of Medicaid expenditures through their own funds—limitations that extend well beyond any restriction intended to prohibit the "recycling" of federal funds—it is CMS, not the States, that fails to respect the cooperative federal-state partnership that underlies Title XIX and the administration of the Medicaid program.  Prior to the new Rule, a public provider, whether or not it met the new "unit of government" test, was able to spend its own funds to serve Medicaid beneficiaries and to certify those expenditures to the state Medicaid agency, which would then claim the expenditure for federal financial participation.  These additional sources of non-federal share may enable the state Medicaid program to pay higher rates than it might otherwise pay to its most critical providers, or to pay for services that it could not otherwise afford, or to cover individuals who would otherwise lack coverage, all of which are consistent with the worthy goals of Title XIX.  There can be no claim that those types of arrangements are abusive, because in those circumstances the certification of expenditures is equal to the entity's costs.

Defendants do not point to any evidence in the record that States were rushing to label providers as public, or that heretofore public entities certifying expenditures were "diverting Medicaid funds to non-Medicaid purposes" or "overstat[ing] the total computable expenditure" that were being made.  Other than relying on the discovery, sixteen years after enactment, that its new restrictive definition of public entities and public funds is "mandated by" the Provider Tax Amendments, Defendants offer no explanation why the Rule's restrictive definition of the source of the non-federal share is consistent with the text or purpose of Title

XIX.  Alleged abusive funding arrangements not related to the certification of expenditures by public entities not meeting the new unit-of-government test is not a valid justification for the new Rule's bar on those activities.

### CONCLUSION

*Amici* urge the Court to hold that the Rule was improperly promulgated in violation of the congressional moratorium on finalizing the Rule.  In addition, the Court is asked to hold that the Rule's definition of "unit of government," its limitations on medical providers that may be considered units of government, its limitations on funds eligible the non-federal share of Medicaid expenditures, and its provider cost limitations are not authorized by the Title XIX and are arbitrary and capricious.  Plaintiffs' Motion for Summary Judgment should be granted, and an injunction entered prohibiting Defendants from enforcing the Rule.

April 18, 2008

Respectfully Submitted,

/s/ Charles A. Miller
Charles A. Miller (D.C. Bar No. 8904)
Caroline M. Brown (D.C. Bar No. 438342)
Theodore P. Metzler, Jr. (Bar No. 486339)
   (admission pending)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 662-5410 (telephone)
(202) 778-5410 (facsimile)

Attorneys for *Amici Curiae* Kansas Health Policy Authority, Kentucky Cabinet for Health and Family Services, Missouri Department of Social Services, MO HealthNet Division, North Carolina Department of Health and Human Services, Ohio Department of Job and Family Services, Oklahoma Health Care Authority, Pennsylvania Department of Public Welfare, Tennessee Department of Health, Utah Department of Health, Washington Department of Social and Health Services, and Rod R. Blagojevich, Governor of the State of Illinois

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ALAMEDA COUNTY MEDICAL )
CENTER, *et al.*, )
)
　　　　　Plaintiffs, )
)
)
v. )　　　　　Civ. No. 08-0422 (JR)
)
MICHAEL O. LEAVITT )
in his official capacity as )
SECRETARY OF HEALTH AND )
HUMAN SERVICES, *et al.*, )
)
　　　　　Defendants, )
)
_____)

**(PROPOSED) ORDER**

　　　　　Upon consideration of the Motion for Leave to File *Amicus Curiae* Brief in

Support of Plaintiffs' Motion for Summary Judgment filed by the Kansas Health Policy

Authority, Kentucky Cabinet for Health and Family Services, Missouri Department of Social

Services, MO HealthNet Division, North Carolina Department of Health and Human Services,

Ohio Department of Job and Family Services, Oklahoma Health Care Authority, Pennsylvania

Department of Public Welfare, Tennessee Department of Health, Utah Department of Health,

Washington Department of Social and Health Services, and Rod R. Blagojevich, Governor of the

State of Illinois (collectively, "*Amici*"), the Court finds that:

　　　　　1.　　Amici assert that they will be adversely affected if the Medicaid rule, titled

*Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions*

*to Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29,

2007) (the "Rule"), at issue in this case is enforced.

2.  *Amici*'s brief provides relevant information and legal argument regarding the scope, effect, and legality of the Rule.

3.  Plaintiffs have consented to the submission of *Amici*'s brief.

4.  Defendants take no position regarding the filing *Amici*'s brief.

Accordingly, it is hereby

ORDERED that the Motion for Leave to File *Amicus Curiae* Brief in Support of Plaintiffs' Motion for Summary Judgment filed by the Kansas Health Policy Authority, Kentucky Cabinet for Health and Family Services, Missouri Department of Social Services, MO HealthNet Division, North Carolina Department of Health and Human Services, Ohio Department of Job and Family Services, Oklahoma Health Care Authority, Pennsylvania Department of Public Welfare, Tennessee Department of Health, Utah Department of Health, Washington Department of Social and Health Services, and Rod R. Blagojevich, Governor of the State of Illinois is GRANTED; and it is

ORDERED that the Brief of State Agencies and Officials as *Amici Curiae* In Support Of Plaintiffs' Motion for Summary Judgment be filed in this matter.

DATED: _____, 2008 By:_____

James Robertson
United States District Court Judge

Serve on:

Tamra T. Moore, Esq.
Lead Counsel for Defendants
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
tamra.moore@usdoj.gov
(202) 514-8095

William C. Crenshaw, Esq.
POWELL GOLDSTEIN LLP
901 New York Avenue, N.W., Third Floor
Washington, DC 20001
(202) 347-0066
wcrenshaw@pogolaw.com

Nathan A. Brown, Esq.
ROPES & GRAY LLP
700 12th Street, N.W., Suite 900
Washington, DC 20005
(202) 508-4600
nathan.brown@ropesgray.com

Caroline M. Brown, Esq.
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 662-6000
cbrown@cov.com

## CERTIFICATE OF SERVICE

I certify that on April 18, 2008, I filed the foregoing Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment, Brief of State Agencies and Officials as *Amici Curiae* In Support Of Plaintiffs' Motion for Summary Judgment, and (Proposed) Order with the Court using the generic ECF e-mail address, and sent the same via e-mail and first class mail, postage prepaid, to:

Tamra T. Moore, Esq.
Lead Counsel for Defendants
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
tamra.moore@usdoj.gov
(202) 514-8095

William C. Crenshaw, Esq.
POWELL GOLDSTEIN LLP
901 New York Avenue, N.W., Third Floor
Washington, DC 20001
(202) 347-0066
wcrenshaw@pogolaw.com

Nathan A. Brown, Esq.
ROPES & GRAY LLP
700 12th Street, N.W., Suite 900
Washington, DC 20005
(202) 508-4600
nathan.brown@ropesgray.com

Theodore P. Metzler