**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ALAMEDA COUNTY MEDICAL CENTER,**

***et al*.**

**Plaintiffs,**

**v.**

**MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,**

***et al*.**

**Defendants.**

**Civil Action No. 1:08-00422**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................3

I. The Cost Limit Rule Is Inconsistent with the Medicaid Statute, as Amended. ..................3

A. Congress has "Directly Spoken" to the Issue of Whether the Federal Government Should Impose a Provider-Specific Cost Limit. ...................................3

B. Defendants' Construction of the Medicaid Statute is Not Reasonable as it Relates to the Cost Limit and is Arbitrary and Capricious........................................9

II. The Unit of Government Definition Contradicts the Medicaid Statute and is an Unreasonable and Arbitrary Interpretation........................................................................15

A. Congress Did Not Intend for the Non-Federal Share to Derive Only from Entities with Access to Tax Revenues............................................................15

B. It Is Unreasonable and Arbitrary to Predicate the Non-Federal Share of Medicaid Payments on Access to Tax Revenues ................................................18

III. CMS Has Willfully Violated the Congressional Moratorium ..........................................23

CONCLUSION..................................................................................................................27

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anna Jacques Hosp. v. Leavitt*,
No. 05-625, 2008 WL 510337 (D.D.C. Feb. 26, 2008) ........ 8

*Board of Trustees, Container Mechanics Welfare Pension Fund v. Universal Enters., Inc.*,
751 F.2d 1177 (11th Cir. 1985) ........ 27

*Bulletin Broadfaxing Network, Inc. v. Times Mirror Co.*,
No. 91-1614, 1992 WL 121477 (D.D.C. May 13, 1992) ........ 25

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ........ 18

**Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ........ *passim*

*Children's Seashore House v. Waldman*,
197 F.3d 654 (3d Cir. 1999) ........ 7

*City of Columbus v. Ours Garage & Wrecker Serv.*,
536 U.S. 424 (2002) ........ 26

**Consumers Union v. Heimann*,
598 F.2d 531 (D.C. Cir. 1978) ........ 17

*County of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ........ 19

*Dazo v. Globe Airport Sec. Servs.*,
295 F.3d 934 (9th Cir. 2002) ........ 25

*Duncan v. United States*,
949 F.2d 1134 (Fed. Cir. 1991) ........ 6

*Englund v. Los Angeles County*,
No. Civ. S-04-282, 2006 U.S. Dist. LEXIS 82034 (E.D. Cal. Oct. 31, 2006) ........ 14

*Estey v. Commissioner, Maine Dep't of Human Servs*,
21 F.3d 1198 (1st Cir. 1994) ........ 17

**FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........ 8

*In re Request for Assistance From Ministry of Legal Affairs*,
848 F.2d 1151 (11th Cir. 1988) ....................8

*Lankford et al. v. Sherman*,
451 F.3d 496 (8th Cir. 2006) ....................26

*McCarron v. United States*,
Civ. No. 87-1548, 1988 WL 25418 (Fed. Cir. 1988) ....................6

*MCI Telecomms. Corp. v. AT& T Co.*,
512 U.S. 218 (1994)....................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)....................10, 13, 19

**National Ass'n of Broadcasters v. Librarian of Congress*,
146 F.3d 907 (D.C. Cir. 1998)....................7, 8

*Public Citizen v. Farm Credit Admin.*,
No. 89-2094, 1990 U.S. Dist. LEXIS 11713 (D.D.C. Sept. 6, 1990), *aff'd*, 938 F.2d 290 (D.C. Cir. 1991) ....................17

*Rowell v. Andrus*,
631 F.2d 699 (10th Cir. 1980) ....................24

*Rust v. Sullivan*,
500 U.S. 173 (1991)....................13

*Transmission Access Policy Study Group v. FERC*,
225 F.3d 667 (D.C. Cir. 2000)....................19

*United States v. Two Hundred Thousand Dollars ($200,000) in United States Currency*,
590 F. Supp. 866 (S.D. Fla. 1984) ....................24

*Westside Mothers v. Olszewski*,
454 F.3d 532 (6th Cir. 2006) ....................26

**STATUTES AND LEGISLATIVE MATERIALS**

5 U.S.C. § 552....................24

5 U.S.C. § 801....................24, 27

42 U.S.C. § 1302....................25

42 U.S.C. §§ 1396-1396v ....................5

42 U.S.C. § 1396a .......... *passim*

42 U.S.C. § 1396b .......... *passim*

Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA") § 705 .......... 5, 9

Pub. L. No. 102-234, 105 Stat. 1793 (1991) .......... 16, 21

Pub. L. No. 106-554, § 1(a)(6), 114 Stat. 2763 (2000) .......... 5

**REGULATIONS AND OTHER REGULATORY MATERIALS**

42 C.F.R. § 447.207 .......... 11, 22

72 Fed. Reg. 29748 (May 29, 2007) .......... *passim*

72 Fed. Reg. 55160 (Sept. 28, 2007) .......... 26

H.R. Rep. No. 105-149 (1997) .......... 7

H.R. Rep. No. 97-158 (1981) .......... 6

**OTHER**

Government Accountability Office, GAO-07-214, Medicaid Financing: Federal Oversight Initiative Is Consistent with Medicaid Payment Principles but Needs Greater Transparency (Mar. 30, 2007) .......... 10, 11

Medicare Payment Advisory Commission, *A Data Book: Healthcare Spending and the Medicare Program*, at 81, 90, 92 (June 2007) .......... 14

18 Moore's Federal Practice § 131.40[3][e][iv] (3rd ed. 2007) .......... 27

*Protecting the Medicaid Safety Net Act: Hearings on H.R. 5613 Before the House Energy and Commerce Committee Subcommittee on Health*, 110th Cong. (April 3, 2008) (statement of Dennis Smith, Director of Center for Medicaid and State Operations of CMS)) .......... 26

Restatement (Second) Of Agency § 1(1) (1958) .......... 25

## INTRODUCTION

For the reasons stated in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Memo"), and for the reasons set forth below, summary judgment should be granted in favor of Plaintiffs, vacating the Medicaid rule entitled *Medicaid Program; Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership*, 72 Fed. Reg. 29748 (May 29, 2007) ("the Rule"). For the same reasons, Defendants' Cross-Motion for Summary Judgment should be denied.

Plaintiffs demonstrated in their initial Memorandum that:

- The cost limit provisions of the Rule are inconsistent with the Medicaid Statute, as it has been amended through the years, and the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), are an unreasonable construction of the Medicaid Statute, and are arbitrary and capricious.
- The unit of government provisions of the Rule are inconsistent with the Medicaid Statute, are an unreasonable construction of the Medicaid Statute, and are arbitrary and capricious.
- Issuance of the Rule violated the Moratorium.

With regard to the cost limit on governmental providers, the Rule violates the Medicaid Statute, as amended by Congress to repeal the very same provider-specific cost limit that Defendants now seek to re-impose. The Rule also violates a Congressional mandate for regulations allowing for aggregate limits based on Medicare prospective payment principles, as contained in BIPA. In both respects, the Rule is contrary to Congressional intent and thus violates step one of the *Chevron* analysis. The Rule is also an unreasonable construction of the Statute and is arbitrary and capricious, in violation of *Chevron* step two.

With regard to the unit of government issue, the Rule contravenes the Medicaid Statute by unduly constricting the statutory definition of "unit of local government," in violation of *Chevron* step one (and for related reasons is both an unreasonable construction of the Statute and is arbitrary and capricious under *Chevron* step two). It also violates the Statute (and both *Chevron* steps) by impermissibly restricting the sources of the non-federal share of Medicaid expenditures, by conditioning them on direct access to tax revenues, contrary to the Statute's grant of broad discretion to States to fund their Medicaid programs through local sources.

As to the Moratorium, Defendants displayed, purportedly finalized, and otherwise published and circulated the Rule after a Congressional Moratorium had taken effect on May 25, 2007. Acting on its strong opposition to the challenged policies, Congress commanded Defendants not to take "any action" on this Rule prior to the end of the Moratorium. Defendants' only response is to cite to a letter pre-dating the Moratorium by one day, which actually highlights their willful, yet unavailing, effort to evade Congressional intent by attempting to issue the Rule. The violation of the Moratorium is a wholly separate basis to strike down the Rule.

Defendants fail to rebut Plaintiffs' showing on each of these points. Throughout their brief, Defendants primarily rely on the historical "proliferation of abusive financing schemes" to support the Rule. Plaintiffs do not dispute that over the years the Medicaid program has been beset by financing arrangements intended to maximize federal funding. Congress and the Secretary have adopted a series of measures to address this concern, including the Secretary's enormously successful initiative in recent years to end these practices through more careful oversight of financing arrangements in individual States. In the wake of this enhanced oversight, the Administrative Record provides no evidence that such schemes persist; to the contrary, the

record documents the Secretary's success. To the extent the Secretary is concerned about possible recurrences of the problem, he has appropriately used his authority to adopt a provision in the Rule requiring that providers be permitted to retain the Medicaid funds they receive (non-retention of funds being the core source of the identified financing schemes).

Where the Secretary oversteps the line is in adopting policies that contravene clearly articulated Congressional intent, as the challenged cost limit and unit of government policies do. Indeed, these flawed policies will not advance the goal of preventing abuses, and in fact will do more harm than good.

Beyond reliance on past abuse, Defendants fall back on generalized claims of agency discretion; but this general proposition cannot save the Rule's unlawful policies. Indeed, Congress did not grant the agency such discretion as to re-write fundamental precepts of Medicaid financing in this manner.

Plaintiffs respectfully submit that they are entitled to summary judgment as the Rule: (1) is contrary to Congressional intent in violation of *Chevron* step one; (2) is an unreasonable construction of the statutes involved in violation of *Chevron* step two; (3) is arbitrary and capricious; and (4) violates the Moratorium. Accordingly, the Court should enter appropriate declaratory and injunctive relief vacating the Rule, ordering it to be withdrawn, and enjoining Defendants and their agents from implementing it.

## ARGUMENT

### I. THE COST LIMIT RULE IS INCONSISTENT WITH THE MEDICAID STATUTE, AS AMENDED.

#### A. Congress has "Directly Spoken" to the Issue of Whether the Federal Government Should Impose a Provider-Specific Cost Limit.

The parties agree that the initial inquiry under *Chevron* is "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,

467 U.S. 837, 842 (1984). Defendants, however, have mischaracterized the cost limit issues under step one of *Chevron*, arguing that because Congress has never *required* that Medicaid providers be paid above cost, Plaintiffs cannot prevail. Def. Memo at 13. Plaintiffs neither make such a claim, nor need to do so, to prevail.[1] The actual issue for the Court is whether Congress has ever "directly spoken" to the provider-specific cost limit the Rule seeks to impose. Congress has "directly spoken," and with a clear voice rejected such a federally-mandated limit in favor of state flexibility to fashion payment systems consistent with their own policy choices.

In their Memorandum, Plaintiffs recounted in detail the evolution of Sections 1902(a)(13)(A) and 1902(a)(30)(A) of the Social Security Act ("the Act"). Pl. Memo at 17-21. With respect to Section 1902(a)(13)(A), Congress originally required States to make cost-based payments to institutional providers, with provider-specific cost limits based on Medicare reasonable cost principles—a limit that is remarkably similar to the cost limit included in the Rule. In adopting the Boren Amendment over a quarter of a century ago, however, Congress abandoned this restrictive framework in favor of granting States more flexibility to design their own provider payment systems tailored to their own unique needs and policy goals. At the same time, Congress eliminated the provider-specific charge limit that had been contained in Section 1902(a)(30)(A), which it similarly deemed too restrictive for States.[2]

---

[1] On the contrary, Plaintiffs contend that Congress deliberately intended for States to be able to develop provider payment systems free of undue federal mandates, as long as the payments are consistent with efficiency, economy and quality of care. In other words, States may reimburse providers below, above, or at cost, or they may divorce their payment systems from cost entirely, as long as they meet the broad statutory standard. *See* 42 U.S.C. § 1396a(a)(30)(A).

[2] In addition to granting States programmatic flexibility, these amendments also were designed to free State Medicaid programs from the administrative burdens that provider-specific limits entail. As noted in the comments to the Proposed Rule, the administrative burdens on states in complying with the cost limit provisions of the rule are substantial. *See* A.R. 694-731, Letter from Charles A. Miller and Caroline M. Brown to the Department of Health and Human Services (Mar. 19, 2007)); A.R. 534-535, Letter from Michael P. Starkowski to Centers for Medicare & Medicaid Services (Mar. 13, 2007), A.R. 992-998, Letter from Robert L. Robinson to Leslie V. Norwalk (Mar. 19, 2007). Congress specifically sought to relieve States of these kinds of burdens by eliminating such limits. *See* Pl. Memo at 19.

In 1997, Congress went even further and eliminated the substantive payment standards in the Boren Amendment in response to State concerns that even these more flexible standards had unreasonably limited their policy choices and had subjected them to excessive provider litigation. As a result, the statutory framework that remains is one granting maximum flexibility to States to develop provider payment systems, subject only to a broad overall requirement that the resulting payments be consistent with efficiency, economy, and quality of care. 42 U.S.C. § 1396a(a)(30)(A). Moreover, Congress specifically endorsed CMS' previous interpretation of the efficiency, economy and quality of care standard, at least with respect to non-state governmental providers, by requiring the agency to finalize a regulation imposing an aggregate rather than provider-specific payment limit, based on Medicare payment principles rather than cost. BIPA § 705.[3]

Defendants ignore this incontrovertible evidence of Congressional intent rejecting the imposition of federal provider-specific cost limits on States. Instead, they submit that they remain free to disregard the evolution of the Medicaid Statute (42 U.S.C. §§ 1396-1396v) because: (1) Congress repealed the substantive payment standard embodied in the Boren Amendment; and (2) the Secretary of Health and Human Services ("Secretary") retains the

[3] Defendants argue that the BIPA provision merely established a deadline by which CMS was to finalize a then-pending regulation. Def. Memo at 19-21. If such were the case, Congress need only have directed CMS "[n]ot later than December 31, 2000, ... [to] issue ... a final regulation based on the proposed rule announced on October 5, 2000." Instead, Section 705 goes on to prescribe substantive standards that Congress required be in the final rule: the final rule must "apply[] an aggregate upper payment limit to payments made to governmental facilities that are not State-owned or operated facilities." The Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), § 705(a), H.R. 5661, 106th Cong. (1999) (enacted into law by reference in Pub. L. No. 106-554, § 1(a)(6), 114 Stat. 2763 (2000)) § 705. As Plaintiffs pointed out in their opening brief, CMS' interpretation of Section 705 would have allowed the agency to issue the final rule one day and begin the process of repealing it the next. Pl. Memo at 29. Such disregard for Congress' stated policy preferences cannot be allowed to stand.

ability to issue regulations to assure compliance with Section 1902(a)(30)(A)'s "efficiency, economy, and quality of care" standards.[4] Both claims are unsustainable.

Defendants rely on two companion cases for the proposition that legislative history of repealed statutes is not persuasive evidence of Congressional intent. *See* Def. Memo at 15-16 (citing *Duncan v. United States*, 949 F.2d 1134, 1137 (Fed. Cir. 1991); *McCarron v. United States*, Civ. No. 87-1548, 1988 WL 25418 (Fed. Cir. 1988) (unpublished decision)). *Duncan* and *McCarron* both involved attempts by retired warrant officers to use repealed statutes to support their claims for retirement benefits. The primary statute relied upon by the claimants had been repealed in favor of a statute that expressly precluded the claims at issue. Not surprisingly, the Federal Circuit concluded that "repealed statutes cannot override later enactments." *Duncan*, 949 F.2d at 1137.

That non-controversial conclusion in no way undermines Plaintiffs' points here. Plaintiffs do not claim, and need not claim, that the Boren Amendment is alive and well. Rather, Congress has "directly spoken" to the issue that restrictive provider-based cost limits may not be mandated and has not wavered from that principle for over 25 years, repeal of the Boren Amendment notwithstanding.

With regard to the issues in this case, the subsequent repeal of the Boren Amendment in 1997 only would matter if Congress intended to repudiate its prior repeal of the cost limit (*i.e.*, to reinstate a cost limit). Congress had no such intention.[5] Congress repealed the Boren Amendment and replaced it with an even more flexible "public process for determination of rates

[4] Defendants also mischaracterize the broad flexibility inherent in the efficiency, economy, and quality of care standard. That standard grants flexibility to the States, not authority to CMS to re-impose stringent federal standards that Congress explicitly eliminated. *See* H.R. Rep. No. 97-158, at 312, Vol. II (1981) (governing physician payments, hospital payments, and other providers).

[5] As Defendants themselves concede, the Boren Amendment was repealed, in significant part, to give States greater flexibility in light of the number of provider challenges to State Medicaid payment rates (Def. Memo at 16 n.10), not to signal a return to cost-based reimbursement policy.

of payment." 42 U.S.C. § 1396a(a)(13)(A). *See also Children's Seashore House v. Waldman*, 197 F.3d 654, 659 (3d Cir. 1999) (discussing effect of Boren Amendment). Because Congress had no intention to reinstate a cost limit by repealing the Boren Amendment, the Court may validly consider the Boren Amendment's repeal of the cost limit to establish Congress' intent to reject mandated cost limits, notwithstanding the subsequent repeal of the Boren Amendment itself.[6]

Defendants next fall back on the general proposition that the Secretary may issue appropriate rules to regulate the Medicaid program.[7] There is no doubt that the Secretary has the authority (indeed, responsibility) to address state financing practices that improperly divert federal Medicaid funding for non-Medicaid purposes. Working in partnership with Congress over the last fifteen years, the Secretary has been enormously successful in terminating these practices. *See infra* at 11 & n.11. Nor do Plaintiffs challenge that the Secretary may issue proper regulations to insure that State Plans provide for methods and procedures "to assure that payments are consistent with efficiency, economy, and quality of care."[8] What the Secretary may not do, however, is issue rules contrary to Congressional intent and the Medicaid Statute as it has evolved over the years.

---

[6] Defendants' attempt to distinguish *National Ass'n of Broadcasters v. Librarian of Congress*, 146 F.3d 907 (D.C. Cir. 1998) based solely on the repeal of the Boren Amendment is similarly ineffectual. In that case, the court held that when Congress replaces language in an act, it is evidence of Congress' intent to apply a different standard and courts must defer to such "intent [which] is sufficiently clear." *Id*. at 919. A further fallacy in Defendants' argument concerning repealed statutes is the fact that Section 1902(a)(30)(A) has not been repealed. Defendants do not claim, and do not have any basis for claiming, that Congress' rejection of the provider-specific charge limit originally found in 1902(a)(30)(A) has been affected by subsequent enactments.

[7] Plaintiffs do not claim that the repeal of the Boren Amendment "eviscerate[d] the Secretary's oversight role," as Defendants' Memorandum implies. Def. Memo at 17. Rather, the Plaintiffs cite the repeal of the Boren Amendment as further evidence of Congress' consistent intent to give greater flexibility to the States for setting their own payments. *See* H.R. Rep. No. 105-149, at 590-91 (1997).

[8] Plaintiffs do not concede that the terms "efficiency, economy, and quality of care" are ambiguous for these purposes. In short, the history of Sections 1902(a)(30)(A) and 1902(a)(13)(A) provides unambiguous evidence that they do not require provider-specific cost limits.

Yet, the Secretary has done exactly that by ignoring the evolution of Section 1902(a)(13) and 1902(a)(30)(A) in developing this Rule. The Medicaid Statute has to be interpreted in light of this clear evidence of Congressional intent, and the Secretary's discretion limited accordingly. Statutes must be "read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (citations omitted). The change in the language of the Medicaid Statute "is plain evidence of the Congress's intent." *National Ass'n of Broadcasters*, 146 F.3d at 919-920 (after noting the specific changes in the standard of review that Congress made to the statutory scheme involved there, the court concluded that to ignore the effect of the statutory changes "would be absurd."); *see also In re Request for Assistance From Ministry of Legal Affairs*, 848 F.2d 1151, 1154 (11th Cir. 1988) ("When the legislature deletes certain language as it amends a statute, it generally indicates an intent to change the meaning of the statute.").

There are limits to the Secretary's authority, even when acting in the name of fiscal integrity. No matter how lofty a purpose CMS claims for itself, the agency simply cannot impose by regulation what Congress has rejected by legislation.[9] In re-imposing a provider-specific cost limit, CMS has contravened Congressional intent plainly articulated in (1) the repeal of provider-specific cost limits in Section 1902(a)(13)(A); (2) the repeal of provider-specific limits based on charges in Section 1902(a)(30)(A); and (3) the directive to finalize

[9] Defendants' attempt to distinguish *MCI Telecomms. Corp. v. AT& T Co.*, 512 U.S. 218, 231-32 (1994) and *Anna Jacques Hosp. v. Leavitt*, No. 05-625, 2008 WL 510337 (D.D.C. Feb. 26, 2008) also fails. *MCI*'s holding that an agency cannot implement a fundamental change to a statute without Congressional authorization applies here, as does *Anna Jacques Hospital*'s holding that the Secretary is not free to ignore statutory amendments. It is difficult to fathom how a change that has been estimated to cost providers between $5 billion and $21 billion over 5 years is not a fundamental change. Given the significance of the issues involved, revisions of the sort envisioned by the Rule should be left to Congress. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (holding that review of tobacco-related legislation supported conclusion that the FDA did not have authority to regulate tobacco).

regulations imposing aggregate, Medicare-related upper payment limits in Section 705(a) of BIPA.

If, based on its extensive study of the problem and its experience in reviewing State Plan Amendments, CMS has come to the conclusion that these Congressionally-imposed limitations on its flexibility to impose provider-specific cost limits no longer make sense, it has one recourse. It can go to Congress and ask Congress to change the law. Recognizing the limits on its administrative authority, this is precisely what CMS originally did in 2004 and again in 2005. *See* A. R. 3095-3096, Letter from Sec. Michael O. Leavitt, Secretary of CMS, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives (Aug. 5, 2005); Office of Mgmt. & Budget, Exec. Office of the President, Budget of the United States Government, Fiscal Year 2005 (2004), at 149-50; Office of Mgmt. & Budget, Exec. Office of the President, Budget of the United States Government, Fiscal Year 2006 (2005), at 143. It was only when Congress declined to act[10] on its proposals that CMS decided to impose its policy choices unilaterally, without involving Congress, and without regard to Congressionally imposed restraints on its otherwise broad regulatory authority. This it cannot do.

### B. Defendants' Construction of the Medicaid Statute is Not Reasonable as it Relates to the Cost Limit and is Arbitrary and Capricious.

Having ignored the Congressional rejection of a provider-specific cost limit, Defendants seek to justify their Rule under step two of the *Chevron* analysis as a reasonable implementation of the "economy, efficiency, and quality of care" standard in Section 1902(a)(30)(A). The crux of the Secretary's claim to reasonableness is the existence of ongoing abusive financing arrangements in the Medicaid program. Def. Memo at 22. The cost limit, however, bears no

[10] Defendants misapprehend the significance of this point. *See* Def. Memo at 18, n.11. It is not Congress' failure to act that is relevant, but rather that the agency's efforts to enact legislation implicitly acknowledged that Congress is the proper body to make these changes to long-standing Medicaid principles.

rational relationship to this justification. As Defendants recognize, their Rule must represent a "reasonable construction" of the Medicaid Statute and must demonstrate a "rational connection between the facts found and the choice made." Def. Memo at 21 (citing *Chevron*, 467 U.S. at 843 and *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Their Rule does neither with regard to the cost limit.

Defendants argue that a cost limit is necessary as a "response to the latest scheme involving the states' use of recycled payments to garner additional FFP." Def. Memo at 22-23 (citing to the Rule's preamble). Defendants claim that "despite the Secretary's oversight and scrutiny, these abusive financing arrangements between states and government providers continue to persist." Def. Memo at 29. The sole authority cited for this statement, however, is A.R. 2413, which is a 2007 report by the Government Accountability Office ("GAO").[11] In fact, the 2007 GAO Report establishes that the abuse involved was the providers' failure to retain the funds in question and that these historical abuses have been addressed. Specifically, the 2007 GAO Report finds:

> From August 2003 through August 2006, 29 states ended Medicaid financing arrangements that CMS determined to be inappropriate as a result of its oversight initiative…. CMS officials informed us that *in all the cases*, they required states to end the financing arrangements because under the arrangements, *government providers did not retain all of supplemental payments made to them but instead returned part or all of the payments to the states.*

A.R. 2409, 2007 GAO Report at 5 (emphasis added).[12]

Any concerns that these abusive recycling arrangements may return is directly addressed by the provisions of the Rule requiring providers to retain funds. A.R. 87, 72 Fed. Reg. at 29834

[11] A.R. 2413, Government Accountability Office, GAO-07-214, Medicaid Financing: Federal Oversight Initiative Is Consistent with Medicaid Payment Principles but Needs Greater Transparency (Mar. 30, 2007) ("2007 GAO Report"), at 10.

[12] This conclusion was reiterated later in the Report: "According to CMS, all of these arrangements were inconsistent with Medicaid payment principles because the related payments were not retained in full by these government providers." A.R. 2417, 2007 GAO Report at 13. The findings make clear that any remaining problem with Medicaid financing abuse is as a result of providers not retaining payments.

(May 29, 2007) (adding 42 C.F.R. § 447.207(a)).[13] This provision expressly prohibits States from requiring providers to return Medicaid payments to the State or local government and addresses the Secretary's concern head-on. As a result, there is no need or rational basis for additionally imposing a cost limit, and the Secretary offers none, either in issuing the Rule or in his brief defending the Rule. Defendants' own Administrative Record simply does not show a sufficient correlation between "abuse" and the cost limit.

Similarly, the Defendants offer no rational defense of their overbroad application of the cost limit to providers not engaged in abusive financing practices. The same 2007 GAO Report demonstrates the extent to which the problem already has been addressed. In addition to the 29 states that ended improper financing arrangements between August 2003 and August 2006, the report confirms "18 states other than the 29 that ended arrangements underwent reviews of one of more financing arrangements that met with CMS's approval and therefore did not have to be ended." A.R. 2417, 2007 GAO Report at 13.[14] Ultimately, Defendants have pointed to no instance of ongoing abuse—either in the GAO report or elsewhere in the Administrative Record —that CMS was unable to terminate using its existing authority.

With respect to the Secretary's concern that governmental providers may divert Medicaid payments above cost to non-Medicaid purposes, Defendants offer no plausible explanation for why this concern applies only to governmental providers. Defendants' brief purports to justify this differential treatment based on an unsubstantiated theory regarding State incentives to provide higher payments to governmental providers.[15] Yet, that is beside the point. Regardless

---

[13] "Payment methodologies must permit the provider to receive and retain the full amount of the total computable payment for services furnished under the approved State plan…." A.R. 87, 72 Fed. Reg. at 29834.
[14] Even for the remaining three States and the District of Columbia, there was no documentation of abuse. *Id.*
[15] Contrary to Defendants' assertions (Def. Memo at 24), a State may have legitimate reasons to pay governmental providers at a higher rate than private providers. Governmental providers are often under a legal mandate to provide care to all regardless of ability to pay, which puts additional financial strain on them not borne by their private counterparts. Many governmental providers often offer high cost, under-reimbursed specialty services that the State

of incentives, the ability of a governmental provider to use above cost payments to support non-Medicaid purposes is no different than a private provider's ability to do the exact same thing. The Secretary's "solution" of imposing a cost limit exclusively on governmental providers to prohibit the diversion of Medicaid funds is therefore no solution at all.

Moreover, the ability of State Medicaid programs to make targeted above-cost Medicaid payments is essential for the maintenance of safety net hospitals, including Plaintiff Alameda County Medical Center and many members of the Associations. Such payments help maintain the stability and viability of these providers, and allow them to address local Medicaid needs by expanding services and access.[16] These hospitals, which are disproportionately affected by the Rule, provide a significant amount of care to Medicaid beneficiaries and the uninsured.[17] In other words, such payment levels are often necessary to ensure access to Medicaid services as is required by Section 1902(a)(30)(A). *See infra* at 13.

CMS' assertion that this Rule is necessary to end abuse is, therefore, simply not supported by the record. Given the arbitrary and capricious application of the cost limit to governmental but not private providers, to providers that CMS has determined are not engaged in abusive recycling practices, and to providers that are already prohibited from recycling funds through the retention provision, the Rule cannot be upheld as a reasonable exercise of administrative authority.

---

may seek to support through enhanced Medicaid rates. *See* Ex. 2 to Pl. Memo, Lassiter Decl. ¶ 5; Ex. 3 to Pl. Memo, Wardell Decl. ¶¶ 8, 21; Ex. 4 to Pl. Memo, Nathan Decl. ¶ 19; Ex. 5 to Pl. Memo, Rapp Decl. ¶¶ 6-7, 10; Ex. 6 to Pl. Memo, Valenti Decl., ¶¶ 8-10, 13; Ex. 7 to Pl. Memo, Schroffel Decl. ¶¶ 6-8; Ex. 8 to Pl. Memo, Entwistle Decl. ¶¶ 6,8,14. Indeed, Section 1902(a)(30)(A) obligates States to ensure the availability of high quality services for Medicaid beneficiaries, an obligation met largely through the maintenance of critical safety net providers.

[16] *See* Ex. 2 to Pl. Memo, Lassiter Decl. ¶ 21; Ex. 4 to Pl. Memo, Nathan Decl. ¶ 19; Ex. 5 to Pl. Memo, Rapp Dec. ¶¶ 5, 9; Ex. 6 to Pl. Memo, Valenti Decl. ¶¶ 8-11, 13; Ex. 7 to Pl. Memo, Schroffel Decl. ¶ 15; Ex. 8 to Pl. Memo, Entwistle Decl. ¶¶ 6-9, 11; Ex. 13 to Pl. Memo, Hernández Decl., ¶ 15. Defendants provide no support for their surprising claim of "substantial financial resources available to compensate these hospitals." Def. Memo at 26.

[17] *See* Ex. 9 to Pl. Memo, Burch Decl. ¶ 7; Ex. 11 to Pl. Memo, Baer Decl. ¶ 7; Ex. 12 to Pl. Memo, McAndrews Decl. ¶ 8; Ex. 13 to Pl. Memo, Hernández Decl., ¶¶ 7, 12.

Furthermore, when an agency changes its interpretation of a law, it is required to provide a "reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 (1983); Pl. Memo at 23-24. Defendants nonetheless assert that "the Supreme Court has expressly rejected" Plaintiffs' argument on this point. Def. Memo at 23. Defendants cite *Rust v. Sullivan*, 500 U.S. 173, 186 (1991) for the proposition that "a revised interpretation deserves deference," but fail to note that the same decision explained: "We find that the Secretary amply justified his change of interpetation with a "reasoned analysis.'" 500 U.S. at 187. Thus, a revised interpretation of a statute only is entitled to deference if the agency provides such a "reasoned analysis." Defendants have failed to provide such an analysis here.

In addition to Defendants' failure to justify a rational connection between the Rule and its purported goal of combating ongoing fraud, the Rule also fails because it is an unreasonable construction of the Act. Despite Defendants' claim that Section 1902(a)(30)(A) is ambiguous (*see* Def. Memo at 14), the evolution of this provision and its companion provision, Section 1902(a)(13)(A), make plain that imposition of a provider-specific cost limit is not reasonable. *See* Pl. Memo at 17 & *supra* at 4-9. Since 1981, Section 1902(a)(30)(A) has provided that a State, through its State Plan,

> must provide such methods and procedures ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population....

42 U.S.C. § 1396a(a)(30)(A).

Ignoring its evolution, CMS now interprets this provision to mandate costs as the limit on each governmental provider's Medicaid payments, even though Medicare uses a prospective payment system that may result in payments above cost, and private payers also do not pay based

on cost.[18] CMS' determination that payments above cost to governmental providers violate Section 1902(a)(30)(A) amounts to an unsubstantiated conclusion that both Medicare rates, set by CMS and Congress, and commercial rates, determined through market forces, are inherently uneconomic, inefficient, and inconsistent with quality of care.

A State (and Section 1902(a)(30)(A) affirmatively assigns this task to the State) may reasonably determine that a prospective payment system, based on Medicare rates or otherwise, is the appropriate method by which to ensure payments are both consistent with efficiency and economy, *and* simultaneously are sufficient to enlist enough providers to offer care to Medicaid beneficiaries to the same extent such care is available through Medicare and private payers—the other part of the standard Defendants do not mention.[19] This conclusion is rendered all the more reasonable to the extent governmental providers are permitted to retain their Medicaid payments.

Thus, the Rule fails under both *Chevron* step one and step two, as well as for being arbitrary and capricious.[20]

---

[18] Both the Medicare program and commercial insurers routinely pay above cost to participating providers, without imposing a separate limit for governmental providers. *See* Medicare Payment Advisory Commission, *A Data Book: Healthcare Spending and the Medicare Program*, at 81, 90, 92 (June 2007). "As Bruce Vladeck, the Administrator of Health Care Financing Administration from 1993-1997, testified. . . 'ever since the 1980s . . . it has been the policy of the Federal government and its health insurance programs to move away from a philosophy of cost reimbursement to a philosophy of setting appropriate prices and then letting the provider use the funds received. . . however they think best, provided they are providing the services for which they are billing.'" *Englund v. Los Angeles County*, No. Civ. S-04-282, 2006 U.S. Dist. LEXIS 82034, at *27 (E.D. Cal. Oct. 31, 2006).

[19] Furthermore, a State may reasonably determine that a prospective payment system is necessary to "safeguard against unnecessary utilization of" Medicaid services under Section 1902(a)(30)(A). *See* Pl. Memo at 18.

[20] Defendants spend several pages in their brief arguing that Plaintiffs' *Chevron* step two argument must fail because it is based on a "hodgepodge of objections to what they conceive to be the policy objectives of the regulation." Def. Memo at 23. Plaintiffs' "objections" include the Rule's reversal of longstanding Medicaid policy, the inherently inflationary nature of the cost limit, the inability of States to offer incentives such as through prospective payment systems, and the re-imposition of excessive administrative burdens on States. Def. Memo at 23-29. Plaintiffs did not make these points to show that the Rule is unreasonable and arbitrary (although these points support that conclusion). Rather, Plaintiffs highlight each of these implications of the cost limit because they contradict explicit Congressional policy objectives in amending Title XIX over the years, and therefore support Plaintiffs' showing under *Chevron* step one that the cost limit violates Congressional intent reflected in the Medicaid Statute as amended. For example, in adopting the Boren Amendment, Congress explicitly sought to relieve States of the administrative burden of implementing provider-specific Medicare cost limits. Pl. Memo at 19. The fact that the Rule's cost limit re-imposes those burdens is evidence that it is contrary to the express intent of Congress.

## II. THE UNIT OF GOVERNMENT DEFINITION CONTRADICTS THE MEDICAID STATUTE AND IS AN UNREASONABLE AND ARBITRARY INTERPRETATION.

### A. Congress Did Not Intend for the Non-Federal Share to Derive Only from Entities with Access to Tax Revenues.

Plaintiffs' opening memorandum showed that Congress did not intend for the non-federal share of Medicaid payments to be limited to contributions from entities with access to tax revenues, or to tax revenues themselves. Pl. Memo at 30-34. As a result, the Rule's restrictive definition of units of government eligible to contribute to the non-federal share should be set aside under step one of the *Chevron* framework. In response, Defendants claim that Congress left ambiguity in the Medicaid Statute by not further defining the term "other governmental unit." Def. Memo at 32-37. This response is wholly inadequate, as it fails to address the multiple statutory references providing for broader recognition of sources of the non-federal share and limiting CMS authority to regulate in this area. Moreover, Defendants have ignored the limited purpose for which Congress broadly defined "unit of local government." As a result, even if that definition and its reference to "other governmental units" were so ambiguous as to allow CMS' new restrictions (which it is not), it would not support the Rule's new limitations.

Section 1902(a)(2) of the Act grants States broad discretion to use "local sources" for up to 60 percent of the non-federal share of Medicaid expenditures. 42 U.S.C. § 1396a(a)(2). In keeping with this broad scope, Congress provides for States to report the amount of the non-federal share "made available by the State and its political subdivisions." *Id.* § 1396b(d)(1)(A); *see generally* Pl. Memo at 30-31. In neither of these provisions did Congress restrict the sources of the non-federal share to entities with direct access to tax revenues, and neither of these statutory provisions even uses the term "other governmental unit" that Defendants point to as the source of ambiguity purportedly leaving room for drastic new restrictions tied to tax revenues.

Defendants instead rely on two provisions added to the Medicaid Statute by the 1991 Provider Tax Amendments. Pub. L. No. 102-234, 105 Stat. 1793 (1991). Plaintiffs' opening memorandum showed that these provisions, Section 1903(w)(6)(A) and (w)(7)(G), also fail to support the Rule's restrictions on units of government.[21] Pl. Memo at 31-34. First, Defendants claim Section 1903(w)(6)(A) as the basis for its authority to restrict the sources of the non-federal share to the new restrictive unit of government definition. Def. Memo at 10. But on its face that provision grants *no* authority whatsoever to the Secretary. On the contrary, the provision *limits* CMS' authority to restrict sources of the non-federal share. *See* Pl. Memo at 32-33.[22]

Moreover, in Section 1903(w)(7)(G), Congress established a definition of a "unit of local government" that is sharply at odds with the definition of a "unit of government" CMS now attempts to impose through regulation. Congress defines a "unit of local government" to mean, "with respect to a State, a city, county, special purpose district, or other governmental unit in the State."[23] CMS tries to blur the contrast between its definition and Congress' by claiming that Congress implicitly delegated to CMS authority to vastly restrict the scope and nature of the units of government that may participate in non-federal share funding. But CMS

---

[21] Moreover, these provisions, in which Congress delimited two narrow categories of contributions subject to these specific limitations (provider taxes and donations), serve to confirm that Congress did not intend that similar limitations would apply more broadly under Section 1902(a)(2) and Section 1903(d). Defendants assert in passing that these two provisions also grant CMS authority to impose the unit of government limitations in the Rule, because ultimately Congress has defined the term "unit of local government," not "unit of government," in the Medicaid Statute. Def. Memo at 35. Be that as it may, Congress has not used the term "unit of government" in the Medicaid Statute, and it only applied the term "unit of local government" in the limited context of restricting provider taxes and donations. Its use in that limited context signals that Congress did not intend for such distinctions to be made outside that context.

[22] In any event, this provision addresses the actual *use* of funds for the non-federal share, and not the *source* of such funds, which CMS has restricted in the Rule through its constrained definition of units of government. The provision also acknowledges that health care providers may be units of government. 42 U.S.C. § 1396b(w)(6)(A) ("...regardless of whether the unit of government is also a health care provider...").

[23] CMS' definition of a "unit of government," in the Rule adds the State itself to the definition (which is a reasonable construction) but then goes further to layer restrictive requirements regarding access to tax revenues on top of the more general Congressional definition.

mischaracterizes Congress' deliberately broad definition of a unit of local government—which by its plain terms recognizes the wide variation in local governmental structures under state law—as "ambiguity" that it may "interpret" in a manner that distorts the statutory term's meaning beyond recognition. There is simply no evidence that Congress intended the "unit of local government" definition to be so narrow, or for the federal government to take such a prescriptive role in identifying governmental entities within a State.

Both the D.C. Circuit and the D.C. District Court have recognized that where, as here, Congress intentionally has included broad language in a statute, that Congressional intent must be respected. In *Consumers Union v. Heimann*, 598 F.2d 531, 533 (D.C. Cir. 1978), the D.C. Circuit rejected a FOIA challenge based on the broad exemption precluding disclosure of financial institution examination reports, stating: "Thus, if the Congress has intentionally and unambiguously crafted a particularly broad, all-inclusive definition, it is not our function, even in the FOIA context, to subvert that effort."

Similarly, the D.C. District Court in *Public Citizen v. Farm Credit Admin*., No. 89-2094, 1990 U.S. Dist. LEXIS 11713, *5 (D.D.C. Sept. 6, 1990), *aff'd*, 938 F.2d 290 (D.C. Cir. 1991) found that the statutory term "financial institution" "must be read broadly." The court explained, "If Congress intended to limit the term 'financial institution' to banks that accept deposit, it could have done so, rather than use the more inclusive term 'financial institution.'" *Id.* In *Estey v. Commissioner, Maine Dep't of Human Servs*, 21 F.3d 1198 (1st Cir. 1994), the court found that the Food Stamp Act provided no definition for "energy assistance," and yet the Secretary's interpretation of this provision to exclude certain utility reimbursements from energy assistance was contrary to the plain, unambiguous language of the provision.[24] Here, Defendants must

---

[24] "Energy assistance" had a generally understood meaning, and its plain meaning was not contradicted by the structure of the Food Stamp Act or the legislative history. *Estey*, 21 F.3d at 1201, 1204-1205.

respect Congress' choice not to limit the term "other governmental unit"; the Rule cannot narrow the meaning of the term in such a way that disregards Congressional intent.

**B. It Is Unreasonable and Arbitrary to Predicate the Non-Federal Share of Medicaid Payments on Access to Tax Revenues.**

Defendants simultaneously set forth an interpretation of the Medicaid Statute to which their own Rule does not conform, and rely on a policy rationale that their unit of government definition does not advance. CMS cites cases holding that a regulation is reasonable if it exhibits "rationality" and is "logically consistent with" the Statute. Def. Memo at 37 (citing *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983) and *Rollins Envtl. Servs. v. EPA*, 937 F.2d 649, 652 (D.C. Cir. 1991)). The Rule's unit of government standard is neither, and is therefore unreasonable and arbitrary and capricious under *Chevron* step two.

CMS repeatedly asserts that Congressional failure to define "other governmental units" eligible to contribute to the non-federal share grants CMS delegated authority to define that term itself. Def. Memo at 32-35. This contradicts CMS' contemporaneous explanation premising the Rule on statutory *mandate*, not statutory *silence*. In the preamble to the Rule, CMS asserts that,

> The regulation *codifies existing statutory criteria* for a unit of government that can participate in financing the non-federal share of Medicaid expenditures. This *codification of existing Federal statutory requirements* was set forth in an effort to assist States in identifying the universe of governmentally operated health care providers for this purpose.

A.R. 3, 72 Fed. Reg. at 29750 (emphases added). Defendants' new claim of Congressional silence is therefore a post hoc rationalization, and not entitled to deference. *See, e.g., Burlington*

*Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.[25]

Moreover, CMS' unit of government definition is not in keeping with the statutory provisions upon which the agency relies. CMS has consistently justified its definition by interpreting Section 1903(w) of the Act to limit the non-federal share to funds derived from tax revenues. Defendants claim that, "Because the Medicaid Act requires that states finance the non-federal share of Medicaid expenditures using funds 'derived from State or local taxes,' 42 U.S.C. § 1396b(w)(6)(A), the Secretary interpreted this provision as permitting 'wide flexibility in the use of tax funds, whether State or local.'" Def. Memo at 40 (citing A.R. 11, 72 Fed. Reg. at 29758). In the preamble to the Rule, CMS similarly opined, "we have looked at what characteristics were generally shared by the entities specifically referenced in the [Medicaid] statute, and we have also considered what the underlying intent appears to be. In section 1903(w)(6)(A) of the Social Security Act, Congress clearly expressed the intent that these entities must be able to use 'funds derived from State or local taxes ....'" A.R. 6, 72 Fed. Reg. at 29753.[26]

As an initial matter, this view unreasonably misconstrues the language of the 1991 Provider Tax Amendments, and fails to address the Medicaid Statute's broad allowance for local

[25] Moreover, the cases to which CMS cites regarding agency delegation to implement ambiguous statutes are inapposite. *See* Def. Memo at 32-33. *County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999) examines deference to an agency in the context of adjudication, not rulemaking. In *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 696 (D.C. Cir. 2000), the Court held that the statute at issue "does not define 'facilities used in local distribution' but instead leaves that task to FERC." In the case at hand, the Medicaid Statute does define unit of local government in Section 1903(w)(7)(G); CMS has chosen to narrow that definition dramatically.

[26] *See also* A.R. 9, 72 Fed. Reg. at 29756 (Sections 1903(w)(6)(A) and (w)(7)(G) "refer to ... *the use of* State and local tax revenues") (emphasis added); *id.* at 29757 ("The provision of the regulation regarding certified public expenditures is a clarification to *existing Federal statutory instruction* at section 1903(w)(6)(A) of the Act. Consistent with this explicit statutory instruction, a certified public expenditure (CPE) means that *State or local tax dollars were used* to satisfy the cost of serving Medicaid individuals....) (emphasis added).

sources. *See* Pl. Memo at 31-34 (citing 42 U.S.C. § 1396b(w)(1)(A)) and *supra* at 16.[27] Under CMS' own reading of Section 1903(w)(6) and (w)(7), however, its unit of government definition would still be unsustainable. CMS asserts that Section 1903(w) *requires* the non-federal share to be funded through tax revenues, but the Rule does not accomplish that. Instead, the Rule allows for contributions to the non-federal share from entities that have "generally applicable taxing authority," or "direct access to generally applicable tax revenues," even if the entity does not actually use tax revenues for the non-federal share. A.R. 5, 85; 72 Fed. Reg. at 29752, 29832.

At the same time, the Rule eliminates legitimate contributions to the non-federal share, including in some cases the very tax revenues that CMS claims are sacrosanct. For example, a hospital that receives general tax revenues from a State or local government, but does not meet the Rule's criteria, would not be a unit of government and therefore would be precluded from transferring the tax revenue it receives as a source of non-federal share funds. *See* A.R. 10, 12; 72 Fed. Reg. at 29757, 29759. Plaintiff Alameda County Medical Center, for example receives funding from a County sales tax to support the hospital's mission, yet is not sufficiently integrated with the County as a public hospital authority to participate in supporting the non-federal share under the Rule. *See* Ex. 2 to Pl. Memo, Lassiter Decl. ¶ 16; A.R. 845-848, Letter from Wright Lassiter to Leslie Norwalk (Mar. 16, 2007). CMS is not free to restrict the use of "funds derived from State or local taxes," as these tax revenues clearly would be.

---

[27] Plaintiffs also pointed out that Section 1903(w)(6)(A) is a *limitation* on agency authority to restrict the non-federal share. Defendants' claim that the limitation on agency authority in Section 1903(w)(6)(A) "was a narrow exception to the limitations in § 1396b(w)," Def. Memo at 40, is both incorrect and in any event would be unhelpful to them: Section 1903(w) itself does not authorize restrictions on units of government of the kind imposed in the Rule. Defendants' brief further asserts that this "narrow exception" was "based on Congress's view that 'such repayment does not occur when the health care provider uses state or local tax funding for its contribution." Def. Memo at 40 (citing A.R. 12, 72 Fed. Reg. at 29759). This is not Congress' view, but CMS' view, expressed in the preamble to the Rule.

This interpretation is not supported by the Medicaid Statute, and is belied by CMS' failure to act on this interpretation for so many years.[28] Whether or not CMS is correct that Congress "clearly" intended for this result, A.R. 6, 72 Fed. Reg. at 29753, it is unreasonable and arbitrary and capricious to construe the Medicaid Statute to allow for an outcome in which tax revenues are precluded in some instances while non-tax revenues are permitted. This strained parsing merely confirms why Congress intended broad discretion to the States with regard to the non-federal share.

CMS submits that this restrictive and puzzling approach is nevertheless needed to eliminate "abusive financing arrangements" involving providers that lack access to tax revenues. Defendants go so far as to claim that "States have been ignoring the statutory limitation" of Section 1903(w)(6)(A). Def. Memo at 38 & n.26 (citing A.R. 8, 72 Fed. Reg. at 29755). Of course, this assertion turns upon Defendants' flawed reading of that provision, and contradicts their other assertion that the Rule responds to ambiguity resulting from Congressional silence—silence which would leave no standard for States and providers to have "ignored." *See supra* at 19.

More significantly, this justification only highlights the Rule's lack of any rationality and its flawed underpinnings. According to Defendants' brief (and in stark contrast to the Rule itself), tax revenues are the only source of the non-federal share that are not abusive:

> in instances where government providers actually obtain tax revenues, they have a real source of funds to then contribute to the state. For providers who lack such authority, they are merely kicking back to the state (or local government) excess

[28] Defendants mischaracterize the relevance of CMS' failure to issue regulations more closely following the 1991 Provider Tax Amendments. Pl. Memo at 33-34. If Defendants truly believed that the language of the 1991 Provider Tax Amendments clearly required this restrictive unit of government definition (A.R. 6, 72 Fed. Reg. at 29753), CMS would not have waited until 2007 to issue conforming regulations required by the Amendments. *See* Pub. L. No. 102-234, § 5(a). While Defendants suggest that the Secretary did in fact issue regulations in response to the Amendments, these regulations did not propose any change to the definition of a unit of government Defendants now argue was required by that law. Def. Memo at 36 n.25. Their failure to do so shows that their current interpretation of the Amendments is not what the agency actually understood Congress to intend.

> monies that the states themselves have given these providers. Thus, the result is a net wash for both the providers and the state.

Def. Memo at 40 n.29. This discussion leaves unexplained how a policy that does *not* limit the non-federal share to "actually obtain[ed] tax revenues" is "logically consistent" with CMS' interpretation of the Statute—as permitting tax revenues as the only "real source" of the non-federal share. The remainder of Defendants' explanation is fundamentally confused and misleading. As demonstrated by comment letters to the Proposed Rule, there are a variety of "real" sources of revenue available to public providers other than tax revenues.[29]

CMS equates all such non-tax contributions from governmental providers as "rebound payments," presumably referring to the "recycling" of federal funds to draw down additional federal financial participation. Def. Memo at 38 n.27; *see also* Pl. Memo at 8 (describing recycling). There is no basis in the Medicaid Statute for disallowing what CMS admits are State funds. Moreover, CMS has already succeeded in curbing the practice of recycling (*see id*.; A.R. 664-671, A.R. 2401-2454), and for good measure has included a separate provision in the Rule requiring that providers be allowed to retain all of the Medicaid funds they receive (which Plaintiffs do not challenge). A.R. 87, 72 Fed. Reg. at 29834 (adding 42 C.F.R. § 447.207(a)). This retention requirement fully eliminates any potential for "rebound payments."

Over the resounding objections of Congress and the public, CMS has put forward a Rule that defines those "units of government" eligible to participate in funding the Medicaid program,

---

[29] *See, e.g.*, A.R. 468, Letter from Larry Gage to Leslie Norwalk (Mar. 8, 2007) at 17 (describing patient care services as a source of public hospital revenue, as well as routine governmental funding sources such as the proceeds from bond issuances); A.R. 845-848, Letter from Wright Lassiter to Leslie Norwalk (Mar. 16, 2007) at 2 (stating that the County provides public funding to the hospital through payments for services and loans); A.R. 1509-1511, Letter from Ron Anderson to Leslie Norwalk (Mar. 16, 2007) at 3 ("Funds held by a public entity are public funds, regardless of where those funds were derived, including patient care revenues."); A.R. 694-731, Letter from Charles A. Miller and Caroline M. Brown to HHS (Mar. 19, 2007) at 4 ("[M]any public hospitals receive county, city, or State funding, but operate through autonomous hospital districts authorized by State law."); A.R. 1529, Letter from Belle S. Shepherd, Josephine County Public Health Department, to Sec. Leavitt (March 15, 2007) (describing fees as a source of county revenues used for matching purposes).

purportedly in furtherance of a newly understood statutory mandate from 1991 that the agency erroneously believes requires the non-federal share to be derived only from tax revenues. This policy is an unreasonable implementation of the Medicaid Statute (*see* Pl. Memo at 29-36), and is not even rationally related to the agency's own stated objectives. It should be discarded.

## III. CMS HAS WILLFULLY VIOLATED THE CONGRESSIONAL MORATORIUM.

Plaintiffs' opening brief demonstrated that Defendants violated a one-year statutory Moratorium passed by Congress, by publishing the Rule on May 29, 2007. Pl. Memo at 37-39. Plaintiffs also showed that Defendants violated the Moratorium by putting the Rule on display with the Office of Federal Register ("O.F.R.") because the Moratorium prohibited "any action" relating to the Rule effective at 12:01 a.m. on May 25, 2007 by operation of law. Pl. Memo. at 35-38. As such, the Rule is invalid, and should be set aside by the Court.

Defendants now try to escape the clear directive from Congress to halt finalization of the Rule by implying that their involvement in its publication ended on May 24th, a few hours before the Moratorium took effect. Def. Memo at 43. Setting aside the fact that the agency went to such great lengths to undercut Congress' will, Defendants' argument cannot be sustained.

Defendants do not dispute that the Moratorium was effective at 12:01 a.m. on May 25, 2007, or that it prohibited the Defendants from taking any action in furtherance of the Rule. Def. Memo at 43. Defendants point to a letter that CMS sent to the O.F.R. on May 24, 2007, the same day Congress passed the Moratorium and the day before it became law, transmitting the Rule and directing its "emergency display" on May 25, 2007 and publication on May 29, 2007—dates chosen and specified by CMS itself. A.R. 365, Letter from Evell Barco, CMS, to Raymond Mosley, O.F.R. (May 24, 2007); *see also* Pl. Memo at 10. Fairly stated, Defendants imply that because the Rule left CMS' office on May 24th, the Secretary had no responsibility for the subsequent acts taken once the Moratorium was in effect:

1) Display of the Rule at the Office of Federal Register on May 25, 2007;[30]

2) Publication of the Rule on the CMS website on May 25, 2007;[31]

3) Congress' receipt of the Rule on May 25, 2007, as required for the Rule to be final pursuant to the Congressional Review Act (5 U.S.C. § 801(a)(1)(A));[32]

4) Official publication of the Rule in the Federal Register on May 29, 2007;[33] and

5) Acceptance of comments during the supplemental comment period held open by CMS, and maintenance of the Rule without withdrawal.[34]

The O.F.R. letter does not excuse these blatant acts by CMS in violation of the Moratorium, which took effect prior to CMS fulfilling the conditions precedent to validation of the Rule.

Under the Administrative Procedure Act ("APA"), it is the issuing agency's obligation to publish a rule: "Each agency shall separately state and currently *publish* in the Federal Register for the guidance of the public, substantive rules of general applicability adopted as authorized by law...." 5 U.S.C. § 552(a)(1)(D) (emphasis added). Mere transmittal of a regulation to the O.F.R. is not sufficient. *Rowell v. Andrus*, 631 F.2d 699, 704 (10th Cir. 1980) ("[c]learly 'publication' in the Federal Register requires more than mere 'filing.'"); *United States v. Two Hundred Thousand Dollars ($200,000) in United States Currency*, 590 F. Supp. 866, 873 (S.D. Fla. 1984) (the publication requirement under the APA "is not satisfied by merely filing the rule with the Office of the Federal Register"). Consequently, publication of the Rule on May 29th

---

[30] A.R. 89, 72 Fed. Reg. at 29836.
[31] A.R. Index.
[32] Ex. 1A to Pl. Opposition Memo, Supplemental Declaration of Christine Capito Burch [hereinafter "Burch Supp. Decl."] (Email from Elizabeth P. Hall, CMS, to Senate Finance Committee, et. al. (May 25, 2007)); 153 Cong. Rec. H6108 (June 6, 2007)(Executive Communications); 153 Cong. Rec. S7003 (June 4, 2007)(Executive and Other Communications). Although the transmittal letter is not included in the Administrative Record, the cited correspondence and Congressional Record excerpt indicate that CMS notified Congress of the Rule on May 25, 2007. This action alone violates the Moratorium and would require Defendants to re-notify Congress once the Moratorium expires (triggering a new 60-day period before the Rule may take effect). 5 U.S.C. § 801(a)(1)(A).
[33] A.R. 1, 72 Fed. Reg. 29748.
[34] *See also* Pl. Memo at 39 (explaining that failure to withdraw the Rule amounts to a continuing violation of the Moratorium).

was CMS' and the Secretary's final action pursuant to the APA's requirements for validly promulgating a rule, and this action was impermissible.

The ministerial functions of the O.F.R. to complete the promulgation of the Rule are attributable to the Secretary. In essence, the O.F.R. merely acts as an agent on the agency's behalf for purposes of complying with the statutory requirement. *See Bulletin Broadfaxing Network, Inc. v. Times Mirror Co.*, No. 91-1614, 1992 WL 121477, at *8 (D.D.C. May 13, 1992) ("The hallmark of an agency relationship is that the agent takes action on behalf of the principal and subjects himself to the orders of the principal) (quoting *Davey v. King*, 595 A.2d 999, 1002 (D.C. 1991)); Restatement (Second) Of Agency § 1(1) (1958). It is a longstanding principle that "when an agent is acting within the scope of its agency, its principal is liable for the agent's acts." *Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934, 939 (9th Cir. 2002) (citing Restatement (Second) of Agency § 216). Consequently, any action taken by the O.F.R. at the direction and on behalf of the Secretary is imputed to the Secretary. Indeed, the O.F.R. has no independent authority to issue rules implementing provisions of the Act. *See* 42 U.S.C. § 1302(a) (delegating rulemaking authority under the Act only to the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services).

Until adopting this litigation position, CMS has willingly acknowledged its own responsibility for its actions to promulgate the Rule on numerous occasions—including those taken after the Moratorium became effective:

- On May 31, 2007, CMS acknowledged: "On May 25, 2007, the Centers for Medicare & Medicaid Services (CMS) placed on display at the Federal Register a final rule with comment period regarding cost limits for providers operated by units of government (CMS-2258-FC)") Ex. 1B to Pl. Opposition Memo, Burch Supp. Decl. (Capitol Hill Notification (May 25, 2007)).[35]

---

[35] *Available at* http://www.cms.hhs.gov/HillNotifications/CHN/ItemDetail.asp?ItemID=CMS1200029 (last visited April 18, 2008).

- On September 28, 2007, CMS acknowledged: "on May 29, 2007 (72 FR 29748), CMS published a final rule (CMS-2258-FC)...." 72 Fed. Reg. 55160 (Sept. 28, 2007).
- On October 5, 2007, CMS acknowledged: "On May 25, 2007, the Centers for Medicare & Medicaid Services (CMS) placed a final rule, CMS-2258-FC (Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership), on display in the *Federal Register*." Ex. 1C to Pl. Opposition Memo, Burch Supp. Decl. (Letter from Kerry Weems, Acting Administrator of CMS to S. Kimberly Belshe (Oct. 5, 2007)).
- On April 3, 2008, Director of Center for Medicaid and State Operations of CMS, Dennis Smith, testified before Congress that: "CMS issued the final rule regarding the Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership (Government Provider Payment Rule) on May 25, 2007 with a July 30, 2007 effective date"). Ex. 1D to Pl. Opposition Memo, Burch Supp. Decl. (*Protecting the Medicaid Safety Net Act: Hearings on H.R. 5613 Before the House Energy and Commerce Committee Subcommittee on Health*, 110th Cong. (April 3, 2008) (statement of Dennis Smith, Director of Center for Medicaid and State Operations of CMS)).

Far from Plaintiffs' "last ditch effort" to strike down the Rule, *see* Def. Memo at 42, Defendants' violation of the Moratorium is a serious matter for the Court's consideration. Congress emphatically expressed its intention that the Defendants take "no action" to advance a Rule that threatened to make sweeping changes to the Medicaid program as established by Congress and subject to Congress' Constitutional spending powers,[36] and that had engendered widespread public opposition. CMS was fully aware of this Congressional disapproval, which culminated in the legislative Moratorium. *See* Pl. Memo at 37.

What is noteworthy about CMS' May 24, 2007 letter is not that it absolves the agency, for it is unavailing in that respect. Rather, the letter is striking for its documentation of the extraordinary lengths to which CMS went in a failed effort to circumvent the will of Congress. Knowing that Congress and the President were in the process of ratifying the Moratorium, CMS took the drastic step of ordering "emergency publication" of the Rule, fully disclosing its goal to

---

[36] *See City of Columbus v. Ours Garage & Wrecker Serv.*, 536 U.S. 424 (2002) (Referencing the Medicaid Statute as an example of "spending legislation"); *Westside Mothers v. Olszewski*, 454 F.3d 532, 536 (6th Cir. 2006) (Describing Medicaid as a "spending-power program"); *Lankford et al. v. Sherman*, 451 F.3d 496, 508 (8th Cir. 2006) (Referring to "legislation enacted pursuant to Congress's spending power, like the Medicaid Act").

"ensure issuance of this rule and associated savings before passage of legislation that prohibits actions to publicize [*sic*] this rule." A.R. 365, Letter from Evell Barco, CMS, to Raymond Mosley, O.F.R. (May 24, 2007). Of course, the Moratorium did not merely prohibit *publicizing* the Rule; it prohibited *publishing* the Rule. CMS' attempt to publish it when Congress had prohibited precisely that step must be ruled invalid.

At the end of their brief, Defendants suggest that the Court should remand the Rule to CMS and allow the Secretary to resubmit it for publication after the Moratorium expires. Def. Memo at 44. This request only would be proper if the Court finds that the Rule is otherwise proper but for the violation of the Moratorium. Given the myriad violations of law embodied in the Rule and Defendants' attempts to issue it, Plaintiffs submit that the Rule should be vacated and Defendants ordered to withdraw it. In the event that the Court finds that Defendants' only violation is with regard to the Moratorium, Defendants should be ordered to withdraw the Rule. If CMS wishes to implement any provision of the Rule not found to be invalid, CMS would need to re-publish a new rule with a 60-day notice period prior to becoming effective, in accordance with the Congressional Review Act. 5 U.S.C. § 801(a)(1)(A).[37]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs urge the Court to grant their Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment.

---

[37] Defendants request in a footnote that the Court "ensure" that if Defendants prevail that all members of the Plaintiff Associations are "bound" by the Court's decision, citing *United Automobile Workers v. Brock*, 477 U.S. 274 (1986). Def. Memo at 12 n.7. Such a request is improper and overbroad. Even assuming Defendants made a procedurally proper request, issues of claim preclusion, particularly those based on associational representation, are heavily dependent on the facts of each case and accordingly need to be determined in the context of any later litigation. *See* 18 Moore's Federal Practice § 131.40[3][e][iv] (3rd ed. 2007) ("It is obvious that the preclusive effect of organizational litigation will depend heavily upon the facts of each particular case."); *Board of Trustees, Container Mechanics Welfare Pension Fund v. Universal Enters., Inc.*, 751 F.2d 1177, 1183 (11th Cir. 1985) (finding union pension fund board and trustees not precluded from bringing claim despite prior administrative ruling). Given the fact that this case seeks only declaratory and injunctive relief prior to the expiration of a Moratorium, it would be particularly inappropriate for the Court to enter some form of prospective blanket prohibition on individual provider claims that might arise in the future should the Rule ever become effective.

Dated: April 18, 2008

Respectfully submitted,

WILLIAM C. CRENSHAW
D.C. Bar No. 968545
POWELL GOLDSTEIN LLP
901 New York Avenue, N.W., Third Floor
Washington, DC 20001
(202) 347-0066

/s/ Nathan A. Brown
NATHAN A. BROWN
D.C. Bar No. 468750
ROPES & GRAY LLP
700 12th Street, N.W., Suite 900
Washington, DC 20005
(202) 508-4600

Of Counsel:
LARRY S. GAGE
D.C. Bar No. 165332
BARBARA D.A. EYMAN
D.C. Bar No. 439684
CHARLES A. LUBAND
D.C. Bar No. 458319
ROPES & GRAY LLP
700 12th Street, N.W., Suite 900
Washington, DC 20005
(202) 508-4600
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of April 2008, I caused a true and accurate copy of the foregoing to be filed electronically and therefore available for viewing and downloading from the Electronic Case Filing system. Electronic service of the Notice of Electronic Case Filing constitutes service of this document on the following:

Tamra T. Moore
Lead Counsel for Defendants
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

/s/ Nathan A. Brown

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** | ) | |
| ***et al.*** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 1:08-00422** |
| **THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,** | ) | |
| ***et al.*** | | |
| **Defendants.** | | |

**SUPPLEMENTAL DECLARATION OF CHRISTINE CAPITO BURCH**

I, Christine Capito Burch, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am the Executive Director of the National Association of Public Hospitals and Health Systems ("NAPH"). I submit this declaration in support of Plaintiffs' opposition to Defendants' cross-motion for summary judgment and in reply to Defendants' opposition to Plaintiffs' motion for summary judgment in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in NAPH's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. On Friday, May 25, 2007, the Centers for Medicare and Medicaid Services (CMS) sent an email to members of the United States House of Representatives and Senate in

committees of jurisdiction relevant to Medicaid and other interested Hill Staff notifying them that CMS had placed on display at the Federal Register that morning the Final Rule on the Cost Limits for Providers Operated by Units of Government and Other Provisions (the "Rule"). A Hill staffer forwarded this email to a member of my staff on the morning of May 25, 2007. A true and correct copy of the email is attached as Exhibit A. A version of this Hill Notification was later posted as a publicly available document on the CMS website. My staff downloaded this Capitol Hill Notification, a true and correct copy of which is attached as Exhibit B.

4. On October 5, 2007, CMS sent an approval letter to the California Health and Human Services Agency regarding California's Medi-Cal Hospital/Uninsured Care waiver that references the Rule. A true and correct copy of a letter, which is available on the CMS website and which NAPH has in its records, is attached as Exhibit C.

5. Members of the United States House of Representatives Energy and Commerce Committee, Subcommittee on Health, held a hearing on April 3, 2008 regarding a bill, H.R. 5613, Protecting the Medicaid Safety Net Act of 2008, which would extend the existing moratorium on the Rule as well as extend or implement moratoria on a string of additional Medicaid rules issued by CMS. A true and correct copy of the written testimony of Dennis G. Smith, which my staff member who attended the hearing received and which is publicly available on the House Energy and Commerce Committee website, is attached as Exhibit D.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 18, 2008
Washington, DC

(Signature): [signature]
Christine Capito Burch
Executive Director
National Association of Hospitals
and Health Systems