## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALAMEDA COUNTY MEDICAL CENTER,** )<br>)<br>*et al.* )<br>)<br>)<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**THE HONORABLE MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,** )<br>)<br>*et al.* )<br>)<br>)<br>**Defendants.** | **Civil Action No. 1:08-00422** |

## SUPPLEMENTAL DECLARATION OF CHRISTINE CAPITO BURCH

I, Christine Capito Burch, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am the Executive Director of the National Association of Public Hospitals and Health Systems ("NAPH"). I submit this declaration in support of Plaintiffs' opposition to Defendants' cross-motion for summary judgment and in reply to Defendants' opposition to Plaintiffs' motion for summary judgment in the above-referenced action against Defendants.

2. I am of legal age and competent to testify. This declaration is made on personal knowledge, information contained in NAPH's files upon which I normally rely, publicly available information, and other factual matters known to me.

3. On Friday, May 25, 2007, the Centers for Medicare and Medicaid Services (CMS) sent an email to members of the United States House of Representatives and Senate in

1

committees of jurisdiction relevant to Medicaid and other interested Hill Staff notifying them that CMS had placed on display at the Federal Register that morning the Final Rule on the Cost Limits for Providers Operated by Units of Government and Other Provisions (the "Rule"). A Hill staffer forwarded this email to a member of my staff on the morning of May 25, 2007. A true and correct copy of the email is attached as Exhibit A. A version of this Hill Notification was later posted as a publicly available document on the CMS website. My staff downloaded this Capitol Hill Notification, a true and correct copy of which is attached as Exhibit B.

4. On October 5, 2007, CMS sent an approval letter to the California Health and Human Services Agency regarding California's Medi-Cal Hospital/Uninsured Care waiver that references the Rule. A true and correct copy of a letter, which is available on the CMS website and which NAPH has in its records, is attached as Exhibit C.

5. Members of the United States House of Representatives Energy and Commerce Committee, Subcommittee on Health, held a hearing on April 3, 2008 regarding a bill, H.R. 5613, Protecting the Medicaid Safety Net Act of 2008, which would extend the existing moratorium on the Rule as well as extend or implement moratoria on a string of additional Medicaid rules issued by CMS. A true and correct copy of the written testimony of Dennis G. Smith, which my staff member who attended the hearing received and which is publicly available on the House Energy and Commerce Committee website, is attached as Exhibit D.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 18, 2008
Washington, DC

(Signature): _____
                Christine Capito Burch
                Executive Director
                National Association of Hospitals
                and Health Systems

Exhibit 1-A

**From:** Hall, Elizabeth P. (CMS/OL) [mailto:elizabeth.hall@cms.hhs.gov]
**Sent:** Friday, May 25, 2007 9:23 AM
**Subject:** Hill Notification: Final Rule on Costs Limits for Providers Operated by Units of Government and Other Provisions

**U.S. House and Senate Notification**
**Friday, May 25, 2007**

To:      Senate Finance Committee
         House Ways and Means Committee
         House Energy and Commerce Committee
         House and Senate Appropriations Committees
         House and Senate Budget Committees
         Other Interested Hill Staff

From:    Elizabeth P. Hall
         Director, Office of Legislation
         Centers for Medicare & Medicaid Services

Re:      Final Rule on Costs Limits for Providers Operated by Units of Government and Other Provisions

Today, the Centers for Medicare & Medicaid Services (CMS) placed on display at the Federal Register a final rule with comment period regarding cost limits for providers operated by units of government (CMS-2258-FC). Over the last few years, CMS has been closely examining reimbursement state plan amendments and their associated funding arrangements due to agency concerns about questionable methods of State Medicaid financing. The General Accountability Office (GAO) and the Office of the Inspector General (OIG) have expressed similar concerns about Medicaid financing practices, and in 2003 the GAO placed Medicaid on its list of "high risk" programs.

CMS-2258-FC addresses a number of key Medicaid financing issues and strengthens accountability to ensure that statutory requirements within the Medicaid program are met. Particularly, the final rule (1) reiterates that only units of government are able to participate in the financing of the non-Federal share of Medicaid payments; (2) establishes minimum requirements for documenting cost when using a certified public expenditure; (3) limits providers operated by units of government to reimbursement that does not exceed the cost of providing covered services to eligible Medicaid recipients; (4) provides that providers receive and retain the total computable amount of their Medicaid payments; and (5) makes appropriate conforming changes to the State Children's Health Insurance Program (SCHIP) regulations.

In response to the January 18, 2007 proposed rule (CMS-2258-P), CMS received 422 items of timely public correspondence, containing over 1,000 public comments. In light of the concerns about the unit of government definition, CMS revised §433.50 and plans to issue CMS-2258-FC as a final rule with comment, allowing the public 60 additional days to comment specifically on the revised regulatory definition of unit of government. Comments on other sections of the regulation are not requested.

The final rule will be published in the Federal Register on May 29, 2007 with a 60-day comment period. An electronic copy of the proposed rule can be accessed on the CMS website at: <http://www.cms.hhs.gov/MedicaidGenInfo/08 MedicaidRegulations.asp>.

Please contact Alice Lam (202.690.8605 or alice.lam@cms.hhs.gov) in the CMS Office of Legislation with any questions.

# Exhibit 1-B

# Centers for Medicare & Medicaid Services

Print This Page

Return to Previous Page

## Capitol Hill Notifications

### Details for 05/31/2007

Return to List

Shown below are the details for the item you selected from the list.

**Date**          05/31/2007

**Subject**       Final Rule on Costs Limits for Providers Operated by Units of Government
                  and Other Provisions

On May 25, 2007, the Centers for Medicare & Medicaid Services (CMS) placed on display at
the Federal Register a final rule with comment period regarding cost limits for providers
operated by units of government (CMS-2258-FC). Over the last few years, CMS has been
closely examining reimbursement state plan amendments and their associated funding
arrangements due to agency concerns about questionable methods of State Medicaid
financing. The General Accountability Office (GAO) and the Office of the Inspector General
(OIG) have expressed similar concerns about Medicaid financing practices, and in 2003 the
GAO placed Medicaid on its list of "high risk" programs.

CMS-2258-FC addresses a number of key Medicaid financing issues and strengthens
accountability to ensure that statutory requirements within the Medicaid program are met.
Particularly, the final rule (1) reiterates that only units of government are able to participate in
the financing of the non-Federal share of Medicaid payments; (2) establishes minimum
requirements for documenting cost when using a certified public expenditure; (3) limits
providers operated by units of government to reimbursement that does not exceed the cost of
providing covered services to eligible Medicaid recipients; (4) provides that providers receive
and retain the total computable amount of their Medicaid payments; and (5) makes appropriate
conforming changes to the State Children's Health Insurance Program (SCHIP) regulations.

In response to the January 18, 2007 proposed rule (CMS-2258-P), CMS received 422 items of
timely public correspondence, containing over 1,000 public comments. In light of the concerns
about the unit of government definition, CMS revised Section 433.50 and plans to issue CMS-
2258-FC as a final rule with comment, allowing the public 60 additional days to comment
specifically on the revised regulatory definition of unit of government. Comments on other
sections of the regulation are not requested.

The final rule will be published in the Federal Register on May 29, 2007 with a 60-day comment
period. An electronic copy of the proposed rule can be accessed on the CMS web site at the
link below.

**Downloads**

There are no Downloads
**Related Links Inside CMS**
Final Rule on Costs Limits for Providers Operated by Units of Government and Other Provisions
**Related Links Outside CMS**

There are no Related Links Outside CMS

Last Modified Date : 09/26/2007
Help with File Formats and Plug-Ins

Return to Previous Page

# Exhibit 1-C



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

**OCT - 5 2007**

Ms. S. Kimberly Belshe, Secretary
California Health and Human Services Agency
1600 Ninth Street
Sacramento, CA 95814

Dear Ms. Belshe:

We are pleased to inform you that your August 28, 2006, request to amend the California section 1115 Medicaid demonstration, entitled, Medi-Cal Hospital/Uninsured Care (Waiver 11-W-00193/9), under the authority of section 1115(a) of the Social Security Act (the Act), has been approved for the period October 5, 2007, through August 31, 2010.

The California section 1115(a) demonstration approved August 31, 2005, involved stabilizing the financing of the State's safety net hospitals and the implementation of other Medicaid reforms.  The approved demonstration created a Safety Net Care Pool (SNCP), which was to have provided up to $766 million in Federal funds annually for 5 years, totaling $3.83 billion in Federal financial participation.  The pool was to be used to assist providers with unreimbursed costs incurred serving uninsured patients.

Of the $766 million, $180 million was contingent upon the State meeting specified goals in each of the 5 years of the demonstration.  The State did not meet the specified goals in years 1 and 2 of the Demonstration, and the $180 million in potential Federal funding for the SNCP will not be available in each of those years.

The amended section 1115 demonstration authorizes the State to create a Coverage Initiative (CI) to expand health care coverage for eligible low-income, uninsured individuals utilizing an allotment of $180 million in Federal funds per year for the period October 5, 2007, through August 31, 2010.  The benefit package provided in the CI is only to be applied to those eligible individuals enrolled in the approved CI programs connected to this component of the SNCP.

The Department of Health and Human Services' approval of the amended demonstration, including the waivers and the costs not otherwise matchable authority that are described in the enclosed list, are conditioned on the State's acceptance of the Special Terms and Conditions (STCs).  The STCs will be effective October 5, 2007, unless otherwise specified.  All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in this list, shall apply to the Demonstration.

On May 25, 2007, the Centers for Medicare & Medicaid Services (CMS) placed a final rule, CMS-2258-FC (Cost Limit for Providers Operated by Units of Government and Provisions to

Page 2 – Ms. S. Kimberly Belshe

Ensure the Integrity of Federal-State Financial Partnership), on display in the *Federal Register*.
This rule, found at 72 Fed. Reg. 29748 (May 29, 2007), would modify Medicaid reimbursement.
Because of this regulation, some or all of the payments outlined in the STCs may no longer be
allowable expenditures for Federal Medicaid matching funds. Public Law 110-28, enacted on
May 25, 2007, instructed CMS to take no action to implement this final regulation for 1 year.
CMS will abide by the time frames specified by the statute. However, the State is not relieved of
its responsibility to comply with Federal laws and regulations, and to ensure that claims for
Federal funding are consistent with all applicable requirements.

Your project officer is Mr. Steven Rubio. He is available to answer any questions concerning your
section 1115 demonstration. Mr. Rubio's contact information is as follows:

> Centers for Medicare & Medicaid Services
> Center for Medicaid and State Operations
> 7500 Security Boulevard
> Mailstop S2-01-06
> Baltimore, MD 21244-1850
> Telephone: (410) 786-1782
> Facsimile: (410) 786-8534
> E-mail: steven.rubio@cms.hhs.gov

Official communications regarding program matters should be sent simultaneously to Mr. Rubio and
to Ms. Linda Minamoto, Associate Regional Administrator for the Division of Medicaid and
Children's Health in our San Francisco Regional Office. Ms. Minamoto's contact information is as
follows:

> Ms. Linda Minamoto
> Associate Regional Administrator
> 75 Hawthorne Street
> San Francisco, CA 94105

If you have questions regarding this approval, please contact Ms. Jean Sheil, Director, Family and
Children's Health Programs Group, Center for Medicaid and State Operations, at (410) 786-5647.

Again, congratulations on the approval of this amendment to your section 1115 demonstration. We
look forward to the success of the Coverage Initiative.

Sincerely,

Kerry Weems
Acting Administrator

Enclosures

Page 3 -- Ms. S. Kimberly Belshe

bcc:   Linda Minamoto, Associate Regional Administrator, Region IX
       Michelle Baldi, Health Insurance Specialist, Region IX
       Jim Frizzera, Director, Financial Management Group, CMSO

# Exhibit 1-D

STATEMENT OF DENNIS G. SMITH
DIRECTOR, CENTER FOR MEDICAID AND STATE OPERATIONS

CENTERS FOR MEDICARE & MEDICAID SERVICES

ON

H.R. 5613, PROTECTING THE MEDICAID SAFETY NET ACT OF 2008

BEFORE THE HOUSE ENERGY AND COMMERCE COMMITTEE
SUBCOMMITTEE ON HEALTH

APRIL 2, 2008



Testimony of

Dennis G. Smith,

Director of the Center for Medicaid and State Operations at the

Centers for Medicare & Medicaid Services

On

"H.R. 5613, Protecting the Medicaid Safety Net Act of 2008"

Before the

House Energy and Commerce Subcommittee on Health

April 3, 2008

Thank you for inviting me to discuss H.R. 5613, "Protecting the Medicaid Safety Net Act of 2008." The purpose of this legislation is to prevent the Federal government from finalizing and enforcing a number of Medicaid regulations aimed at strengthening the fiscal integrity of the program. Specifically, H.R. 5613 would prevent the Centers for Medicare & Medicaid Services (CMS), from acting on final rules on Cost Limits for Providers Operated by Units of Government; Medicaid Reimbursement for School Administration Expenditures and Costs Related to Transportation of School-Age Children Between Home and School; Health Care-Related Taxes; and Targeted Case Management; as well as, Notices of Proposed Rulemaking on Graduate Medical Education; Rehabilitative Services; and Clarification of Outpatient Clinic and Hospital Facility Services Definition and Upper Payment Limit.

These rules will help ensure that Medicaid is paying providers appropriately for services delivered to Medicaid recipients, that those services are effective, and that taxpayers are receiving the full value of the dollars spent through Medicaid. They are rooted in the statutory construction of Medicaid as a matching program and some are the direct result of years of audits and recommendations by the Office of the Inspector General (OIG) for the U.S. Department of Health and Human Services (HHS), and the Government Accountability Office (GAO), as well as our experience in reviewing State plan amendments. These watchdog agencies, for the Executive Branch and Congress respectively, have sounded the alarm about the integrity of the program for years.

Ignoring these findings and recommendations for another twelve months will put billions of dollars of Federal funds at risk.

The Administration strongly opposes H.R. 5613. The legislation would thwart the efforts of the Federal government to apply fiscal accountability in Medicaid. As currently drafted, H.R. 5613 would not simply delay implementation of these regulations, but it could be read to jeopardize policies and interpretations that predate these regulations. Generally, the intent of a moratorium is to preserve the status quo for a period of time until new policies are in place. However, the broad and sweeping language employed by H. R. 5613 would not only delay these rules to accommodate States' timetables for coming into compliance, but could be read to reverse important progress that has been made. For example, CMS has previously testified that 30 states have agreed to eliminate financing schemes that forced providers to return funds intended to compensate the providers for services to Medicaid recipients. Should H. R. 5613 become law, there is a risk that States will seek to reinstate those financing schemes, resulting in continued litigation in order to protect the integrity of the Medicaid program. It is also important to note that H.R. 5613 extends moratoria that date back to last year. CMS is concerned that the inactivity of the past will be repeated and the moratoria will actually mean an abandonment of this important work by the Federal government.

**Preserving the Medicaid Partnership**

CMS believes that these rules are vital to inform policymakers about the nature of activities in the Medicaid program that are all too often hidden from view. When definitions of "rehabilitative services" and "targeted case management" are so broad that they are meaningless, or when the Federal government cannot identify precise spending on Graduate Medical Education or its direct benefits to the Medicaid population, public trust is eroded. These rules will help bring billions of dollars in taxpayer funds out of the shadows and will provide the accountability that is long overdue.

As CMS and others have previously testified, there is a long and complicated history that is marked by States seeking to shift funding of the Medicaid program, to the greatest

extent possible, to the Federal government. Federal recognition of this occurrence dates back to at least 1991 when Congress enacted prohibitions on provider taxes and donations. Many of the policies reflected in these regulations have been advocated or supported by the GAO in the past, or at least have been acknowledged by GAO as a source of potential Federal fiscal vulnerability.

GAO and OIG have provided policymakers with numerous reports on various areas in which States engage in activities to maximize Federal revenues. Here are just a few examples:

- State agencies paid private facilities under a per diem rate for providing room and board, rehabilitation counseling and therapy, educational, and other services to children in State custody, and based their claims on facilities' estimated costs rather than actual costs. This resulted in an increase of $58 million in Federal Medicaid reimbursements.
- Medicaid is frequently billed for costs related to transporting children from home to school and back on a given school day despite the fact that children are transported to school primarily to receive an education, not to receive medical services. In a 2004 review of one state, OIG found that more than 90 percent of transportation claims to Medicaid, made on behalf of almost 700 schools and preschool providers over the September 1, 1993 through June 30, 2001 period, were not in compliance with Federal and State regulations.
- An OIG audit of a State's adult rehabilitative services program found 65 unallowable claims out of a sample of 100. Errors included services that were not rehabilitative; no services actually provided; and conflict of interest because the provider both authorized and rendered the services.

The package of recent regulatory activity by this Administration is intended to address these types of abuses head-on by ensuring that Federal Medicaid dollars are matching actual State payments for actual Medicaid services to actual Medicaid beneficiaries. Medicaid is already an open-ended Federal commitment for Medicaid services for

3

Medicaid recipients; *it should not become a limitless account for State and local programs and agencies to draw Federal funds for non-Medicaid purposes.*

In many respects, these hidden arrangements take decision-making out of the hands of elected officials at the Federal, State, and local levels. When Medicaid funds are diverted to purposes not expressly authorized by law, legislatures have not had the opportunity to determine if such funding is warranted or desirable. As a result, the legislative decision-making process is weakened. This is especially true at the State level as Medicaid now typically accounts for one out of every five dollars spent by States. The Medicaid program should be based on transparency and trust, not on hidden funding arrangements that result in a "don't ask, don't tell" relationship with oversight agencies.

CMS is often asked why we cannot simply stop these practices through the audit and disallowance process. Audits and disallowances occur on the back end of the process. Obviously it would be better if there were no opening for practices that are inconsistent with the overall statutory and regulatory framework. The rules listed below and targeted by H.R. 5613 would help eliminate some perceived ambiguities and protect the federal-state financial partnership.

*Final Medicaid Governmental Provider Payment Rule*
CMS issued the final rule regarding the Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership (Governmental Provider Payment Rule) on May 25, 2007 with a July 30, 2007 effective date. Congress has imposed a moratorium on this rule through May 25, 2008. The final rule implements the President's FY 2007 Budget proposal to strengthen the fiscal integrity of the Medicaid program by: (1) limiting governmentally-operated health care providers to reimbursement that does not exceed the cost of providing Medicaid covered services to Medicaid individuals; (2) reiterating that only units of government are able to participate in the financing of the non-Federal share of Medicaid payments; (3) establishing specific cost reporting requirements that build upon existing requirements for documenting cost when using a certified public expenditure; and (4) reaffirming that all

4

health care providers receive and retain the total computable amount of their Medicaid payments.

Prior to the effective date of the Governmental Provider Payment Rule, payments to individual State and local governmentally-operated health care providers were not limited to the actual cost of providing these services. Instead, regulations defining the Medicaid Upper Payment Limit (UPL) established aggregate limits on what Medicaid would pay to a group of facilities based on estimates of the amounts that would be paid for similar services using Medicare payment rules. The result of such an aggregate limit would permit a particular governmentally-operated health care provider to receive Medicaid revenue in excess of its Medicaid costs that could be used for non-Medicaid purposes, or returned to the State or local governments (effectively reducing State or local funding obligations).

By requiring that Medicaid payments to governmentally-operated health care providers not exceed an individual provider's cost, the Governmental Provider Payment Rule will ensure that the Federal government pays only its share for Medicaid services delivered by that provider. This reform is critical to strengthening program accountability, consistent with GAO and OIG recommendations.

***The Federal government is not reducing, restricting, or limiting the Federal commitment to pay the full cost of providing medically necessary services to Medicaid recipients as long as the States are contributing their full share as well.*** Restrictions apply to paying units of government *in excess* of their costs. Nor are we restricting States in their ability to share their cost of the Medicaid program with local units of government. Therefore, when providers claim they will lose funding under these rules, it is important to ask:

- Is it really for a service for a Medicaid recipient?
- Is it because they do not believe the State will pay its share or adequate rates for their claims?

- Was the funding arrangement merely an indirect method for claiming Federal funds for activities that would not otherwise be directly allowable, i.e., for non-Medicaid services or non-Medicaid populations?

Finally, this rule does not establish a Medicaid payment limit on "public" health care providers that are not units of government. Public health care providers that are not units of government should realize no loss in existing Federal revenue commitments and could actually realize greater gains in current revenue levels as long as States are contributing their full share. This rule actually protects all health care providers participating in the Medicaid program by ensuring that the health care providers are able to retain the payments they receive for providing medically necessary services to Medicaid recipients.

*Final Rule on the Elimination of Reimbursement for Administrative Claiming and Transportation Costs for School-Based Services*

CMS issued a final rule, published in the Federal Register on December 28, 2007, clarifying that administrative activities performed by schools are not necessary for the proper and efficient administration of the State Medicaid plan. Congress has imposed a moratorium on this rule until June 30, 2008. The rule also specifies that transportation of students from home to school and back is not within the scope of allowable Medicaid-related transportation recognized by the Secretary. Therefore, under the rule, funding for the costs of these activities or services performed would no longer be available under the Medicaid program.

Contrary to the rhetoric surrounding this rule, it is not a limitation on medical services provided by schools. States will continue to receive reimbursement under the Medicaid program for school-based Medicaid service costs under their approved State plans under current law. For example, if a child is Medicaid-eligible and receives physical therapy, this rule does not change the benefit or the level of reimbursement.

CMS has had long-standing concerns about improper billing under the Medicaid program by school districts for administrative costs and transportation services. Both HHS' OIG

6

and the GAO have identified these categories of expenses as susceptible to fraud and abuse. Congress has also expressed concern over the dramatic increase in Medicaid claims for school-based administrative costs and transportation services, which were the subject of two U.S. Senate Finance Committee hearings.

States reported a total of $849 million of expenditures for administration by schools in FY 2006, of which the Federal share was $428 million. Most of this spending was concentrated in a handful of States. Specifically, two States accounted for 40 percent of the entire claims submitted for administration. Eight States accounted for 80 percent of the claims. Between FY 2002 and FY 2006, two States went from $0 in claims to more than $30 million in claims. Conversely, another State went from $84 million in claims to $3.5 million in claims during the same period. Some States have made larger claims for administration costs than they claimed for actual medical assistance services. In an audit of one county, the OIG determined that $5.8 million out of $12.5 million claimed for administrative costs were in fact not allowable.

Equally notable, school administration and transportation to and from school are basic elements of the operation of public school systems, and are not functions performed to further the Medicaid program. Specifically, transportation to and from schools is furnished for the purpose of ensuring that students have access to a public education, and not for the purpose of facilitating beneficiary access to Medicaid providers. School administration is focused on the education of students and not on the Medicaid program.

*Final Rule on Provider Taxes*
This final rule, published in the Federal Register on February 22, 2008, reflects recent legislative actions and provides clarifications to current provisions, addressing the following areas: (1) revises the threshold from 6 percent of net patient revenue to 5.5 percent under the first prong of the indirect hold harmless guarantee test as enacted by the Tax Relief and Health Care Act of 2006 (TRHCA, P.L. 109-432); (2) clarifies the standard for determining the existence of a hold harmless arrangement under the positive correlation test, Medicaid payment test, and the guarantee test; (3) codifies changes to

permissible class of health care items or services related to managed care organizations (MCO) as enacted by the Deficit Reduction Act of 2005 (DRA, P.L. 109-171); and (4) removes obsolete transition period regulatory language. We believe that this rule faithfully reflects the intent of Congress in enacting the provider tax rules in 1991 and the minor revision in TRHCA.

*Interim Final Rule with Comment on Targeted Case Management*
The interim final rule, published in the Federal Register on December 4, 2007, clarifies the definition of covered case management services and implements Section 6052 of the Deficit Reduction Act of 2005, which redefined the scope of allowable case management services, strengthened State accountability, and required that CMS issue regulations. The work of GAO and the OIG in particular were key in assisting policymakers' understanding of States' misuse of case management, not as a tool to improve health status of Medicaid recipients, but simply as a supplement for state and local budgets.

This interim final rule has a strong emphasis on ensuring that case management will be comprehensive and coordinated, to fully serve beneficiary needs. High quality case management should result in better outcomes for the individual and better value for the taxpayer. People with complex medical needs often face challenges in the community as well. Their special needs confirm the need for highly qualified, well trained case managers. We certainly recognize that these rules challenge the status quo. We believe this is appropriate and we should be raising our expectations about how people on Medicaid are being served.

We are currently engaged with the States to implement the regulation and have held discussions not only with State Medicaid directors but state officials dealing specifically with populations with mental illness and developmental disabilities. We recognize that a number of concerns have been raised in three areas in particular—the limitation to a single case manager, 15 minute billing increments, and transition period for individuals in institutions. We believe, however, that these are policies important to securing greater accountability in the program.

8

*Rehabilitative Services*

CMS issued a proposed regulation, published in the Federal Register on August 13, 2007, that clearly defines allowable services that may be claimed as "rehabilitative services." Congress has imposed a moratorium on this rule until June 30, 2008. Rehabilitation services are optional Medicaid services typically offered to individuals with special needs or disabilities to help restore a lost function and improve their health and quality of life. In recent years, Medicaid rehabilitation services have increasingly become prone to inappropriate claiming and cost-sharing from other programs, because these services are so broadly defined as to become simply a "catch all" phrase. "Rehabilitative services" have become so broad that it has become meaningless and States have taken advantage of the ambiguity and confusion to bill Medicaid for a wide variety of services outside the scope of medical assistance.

This regulation will also include important beneficiary protections to improve the quality of care provided to the individuals who need these rehabilitative services. For the first time, rehabilitative services would be required to be furnished through a written plan of care that identifies treatment goals and methods. Our proposed rule contemplates that care will have a clear foundation in clinical practices, and will be designed and delivered in a patient centered environment.

CMS' recent history in dealing with State Plan Amendments reveals that States themselves often have difficulty in identifying what is actually meant by rehabilitative services and what reimbursement rates are based upon. Medicaid will benefit from greater clarity and should not be left vulnerable to other programs, no matter how important, in search of a funding source.

*Proposed Rule on Graduate Medical Education*

CMS issued a proposed rule, published in the Federal Register on May 23, 2007 that makes Medicaid graduate medical education (GME) payments and costs ineligible for Federal financial participation (FFP). Congress has imposed a moratorium on this rule through May 25, 2008. Specifically, the proposed rule no longer allows States to include

GME as a payment under the Medicaid State plan or as an allowable cost in determining Medicaid payments. Medicaid is authorized to pay for medical assistance services. Section 1905 of the Social Security Act describes the services eligible for FFP under an approved Medicaid State Plan. GME is not included as a service, or a component of a service, that is eligible for FFP.

The rule also modifies the upper payment limit (UPL) regulations to eliminate the use of the Medicare direct graduate medical education (DGME) payment as part of the calculation of a State's UPL. States may include the Medicare indirect medical education (IME) payment adjustment when calculating the UPL because the Medicare IME payment is an adjustment to the Medicare inpatient hospital prospective payment system (IPPS) to reflect the estimated higher cost of providing medical services teaching hospitals may face. States may include this service cost adjustment in the UPL. While States may not make IME payments under the State Medicaid plan, States may recognize the additional service costs incurred by teaching hospitals through their rate structure for actual services provided. Thus, the recognition of the IME adjustment in the UPL gives States the ability to increase Medicaid payments, for which FFP would be available.

*Clarification of Outpatient and Clinic Upper Payment Limit*
The proposed regulation, published in the Federal Register on September 28, 2007, intends to clarify the current vague regulatory language in order to define the scope of Medicaid outpatient hospital services and the UPL for those services. Clarifications were made to regulatory language at 42 CFR 440.20 and 42 CFR 447.321. The rule recognizes services paid under the Medicare outpatient prospective payment system or paid by Medicare as an outpatient hospital service under an alternative payment methodology as Medicaid outpatient hospital services. The scope of Medicaid outpatient hospital services may not include a service reimbursed under a distinct State plan payment methodology for another Medicaid covered service. The rule also limits the facilities that may provide outpatient hospital services to hospitals and departments of an outpatient hospital as defined at 42 CFR 413.65.

10

In addition, the rule would codify HHS policy regarding the UPL for Medicaid outpatient hospital services in private facilities by referencing accurate data sources and the formula to calculate a reasonable estimate of the amount that would be paid for outpatient hospital service furnished by hospitals and outpatient departments of hospitals under Medicare payment principles.

The regulation intends to prevent an overlap between outpatient hospital services and other covered benefits.  The potential overlap could result in circumstances in which payment for services is made at the high levels customary for outpatient hospital services instead of the levels associated with the same services under other covered benefits.

By clarifying the UPL definition, CMS seeks to provide additional guidance on accurate data resources and formulas to help States demonstrate compliance with 42 CFR 447.321. CMS has issued this guidance informally to States in the past.  Further, CMS does not anticipate a major impact on providers or beneficiaries under this regulation as we do not believe attempts to inflate UPLs through this manner are widely used currently, but we do believe it is important to clarify this policy.

**Conclusion**

These rules reflect the long-standing work of CMS and others, such as GAO and the OIG, to restore greater accountability to the Medicaid program, while safeguarding limited resources for actual services to those individuals who rely on the Medicaid program.  CMS understands that Medicaid is one of the largest programs in State budgets, generally accounting for more than 20 percent of a State's total spending.  When the Federal government presents a significant disallowance against a State, the effects ripple through State government.  Nevertheless, Medicaid is fundamentally a partnership that relies on both sides to contribute their share to the cost of the program.  As Medicaid competes for resources at the State level against all the other demands that are present, an erosion of confidence in the integrity of the Medicaid program ultimately is not good for Medicaid or for the people who rely on it.  These rules provide greater stability in the program and equity among the States.

12