IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAMEDA COUNTY MEDICAL CENTER, *et al.* | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No: 1:08-cv-00422-JR ) ) |
| LEAVITT, *et al.* | ) ) ) ) |
| Defendants. | ) |

### AMICI CURIAE BRIEF ON BEHALF OF
### THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES AND
### THE FEDERATION OF AMERICAN HOSPITALS

The Catholic Health Association of the United States ("CHA") is the national leadership organization representing the Catholic health care ministry in this country. Founded in 1915, CHA now has over 1950 members in all 50 states including 614 hospitals, forming the nation's largest group of nonprofit health care systems, hospitals, long term care facilities and related health care organizations serving as safety net providers throughout the healthcare community. CHA's members operate in urban, suburban and rural settings and their hospitals range in size from 750 beds to critical access hospitals with fewer than 15 beds.

The Federation of American Hospitals ("FAH") is the national leadership organization representing investor-owned hospitals and health care systems in this country. Founded in 1967, FAH now represents over 1100 hospitals operating in virtually every state, forming the largest group of investor-owned health care systems and hospitals in the United States.

As discussed below, any decision by this Court allowing the United States Department of Health and Human Services Centers for Medicare & Medicaid Services ("CMS") to implement and enforce the "Cost Limits for Providers Operated by Units of Government and Provisions to Ensure the Integrity of the Federal-State Financial Partnership"[1] ("Cost Limit Rule") will have significant ramifications for CHA's and FAH's members, and for the hospital community as a whole, not just the parties in this case.

## ARGUMENT

### A. The Role of Non-Public Providers in Delivering Care to Medicaid Beneficiaries, Uninsureds and Other Vulnerable Populations

The uninsured, poor and other vulnerable populations rely on an intricate and delicate web of providers, *i.e.*, non-public safety net providers and committed investor-owned providers, for essential medical care. Given the significant negative impact of the Cost Limit Rule on the Medicaid system as a whole, all providers of care to Medicaid beneficiaries and other vulnerable populations will be significantly and critically impaired as a result.

America's safety net institutions are not limited to public hospitals. Rather, in a 2000 report by the Institute of Medicine ("IOM") recognized that providers that furnish "a significant level of health care and other health-related services to uninsured, Medicaid, and other vulnerable patients," are considered safety net providers.[2] As mission-driven providers, Catholic hospitals across America

---

[1] 72 Fed. Reg. 29748 (May 29, 2007).
[2] IOM Report: AMERICA'S HEALTH CARE SAFETY NET: INTACT BUT ENDANGERED, at 21 (National Academy Press, Washington D.C., 2000) ("IOM Safety Net Report"), *attached as EXHIBIT A of the Declaration of Drew. W. Marrocco (hereafter "Marrocco Decl.)*. In most communities there is a subset of the safety net providers that the IOM describes as "core safety net providers," *i.e.*, providers distinguished by a: (1) legal mandate or explicitly adopted mission to maintain an "open door" policy to offer access to patients regardless of their ability to pay; and (2) substantial share of their patient mix is uninsured, Medicaid, and other vulnerable patients. "Substantial" is defined as providers that have a high market share of uncompensated care and high commitment to such care as demonstrated by its ratio of uncompensated care to its total payer mix. *Id.* at 21-22. Core safety net providers are a subset of safety net providers, all of which will be negatively impacted by the application of the Cost Limit Rule.

should satisfy this definition and have long served as an integral part of their communities' health care safety net system. In addition, FAH members are a well recognized essential component to care for Medicaid beneficiaries, the uninsured and other vulnerable populations. Combined, these critical members of the safety net hospital system service furnished inpatient care to over 1.7 million Medicaid patients in 2006.[3]

### B. The Cost Limit Rule's Anticipated Harm to CHA and FAH Member Hospitals

The Cost Limit Rule, if implemented, will have a direct and alarmingly negative impact on the very foundation of core safety net providers - public hospitals - as detailed in Alameda County Medical Center et al.'s ("Plaintiffs") Motion for Summary Judgment and accompanying declarations ("Plaintiffs' Motion for Summary Judgment").[4] As noted therein, the financial impact will not be mitigated by other sources. For some providers, the adverse effect threatens their very existence, and for others, it likely will require them to limit access to critical Medicaid services and reduce staff infrastructure.[5]

When publishing the purported final Cost Limit Rule in May 2007, CMS indicated that the regulatory impact of the Cost Limit Rule was $3.7 billion over a five-year period (FY 2009-2013).[6] On November 1, 2007, the U.S. House of Representatives Committee on Oversight and Government Reform ("House Oversight Committee") held a hearing on this and other CMS proposed Medicaid regulatory cuts. On March 5, 2008, the Committee issued a House Oversight Report, THE ADMINISTRATION'S MEDICAID REGULATIONS: STATE-BY-STATE IMPACTS ("Report")

---

[3] Based on CHA and FAH analysis of data from various sources, including but not limited to, 2006 American Hospital Association Annual Survey and provider specific data.
[4] Plaintiffs' Motion for Summary Judgment, at 13, n. 27.
[5] *Id.* at 13.
[6] 72 Fed. Reg. at 29829.

3

publishing the investigation's findings.[7] Through its investigation and as set forth in the Report, the House Oversight Committee determined that the loss of federal funds over five years, as estimated by the states that responded, was $21.1 billion. We submit to this Court that although a $3.7 billion loss of federal funds projected by CMS would be a significant blow to the American safety net community, a $21.1 billion loss would be devastating.

The adverse impact begins with the public hospitals, but does not stop there. Although CMS properly indicates that non-governmentally-operated health care providers are not subjected to reimbursement based on costs,[8] such providers, and particularly CHA and FAH members, are certainly negatively affected by the Cost Limit Rule. The limitation of services available through public hospitals that will result directly from lost revenue dictated by the Cost Limit Rule will necessitate that the CHA and FAH members step into the breech to shoulder an increasing burden of care to needy, vulnerable populations. While this is certainly within the CHA and FAH member hospitals' mission and reflects their commitment to the poor and uninsured, such increases will require private hospitals to devote an increasing share of finite resources to a lower (or non) paying patient mix, and may place at risk some providers' own financial viability.

The actual financial impact on private hospitals is difficult to quantify at present. However, history has taught us that when a public hospital curtails services, or leaves a market, the cost to dedicated, non-public providers in that same market can be severe. By way of example, in 1998, Mercy Hospital of Detroit ("Mercy"), the then-safety net hospital, had the largest number of Medicaid days of all hospitals in Detroit.[9] Mercy closed in 2000. With its closing, a surge of demand

---

[7] United States House of Representatives Committee on Oversight and Government Reform, Majority Staff, THE ADMINISTRATION'S MEDICAID REGULATIONS: STATE-BY-STATE IMPACTS, March 5, 2008 (http://oversight.house.gov/documents/20080303111450.pdf).
[8] *See* 72 Fed. Reg. at 29754-55, 29776.
[9] A COMMITMENT TO CARING: THE ROLE OF CATHOLIC HOSPITALS IN THE HEALTH CARE SAFETY NET, Georgetown University Institute for Health Care Research and Policy (Nov. 2002). at 42, citing Brennan,

fell to St. John Health System Hospitals, a CHA member, with St. John Detroit Riverview Hospital experiencing a 29 percent increase in emergency department visits during the year after Mercy's closure.[10]

Another impact on non-governmentally operated providers is more fundamental. Simply stated, CMS' first-time (and inappropriate) definition of a "unit of government" limits the public providers that are eligible to furnish intergovernmental transfers ("IGTs") to state Medicaid agencies to those entities that have "generally applicable taxing authority" or "direct access to generally applicable tax revenues."[11] The effect of this change is to significantly limit the public entities, *i.e.*, State and local entities, that can transfer IGT funds to state Medicaid agencies to share in the support of the Medicaid program. This shrinking of legitimate sources of funds only serves to constrict providers' Medicaid revenue and these lost funds will have a direct and immediate negative impact on community health care services.

### C. The Cost Limit Rule Is Contrary to Congressional Intent and CMS Prior Interpretation of the Medicaid Statute

As set forth above, CHA and FAH believe that the Cost Limit Rule will severely undermine its members' ability to care for the hundreds of thousands of Medicaid patients they serve each year. CHA and FAH agree with Plaintiffs that CMS' proposed action is an unlawful violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) because: 1) it is contrary to express Congressional actions and directives; and 2) CMS' rejection of its own longstanding interpretation of the Medicaid statute's requirements and its decision to revert back to a flawed and discredited

---

Niall, Stuart Gutterman, and Stephen Zuckerman 2001, THE HEALTH CARE SAFETY NET: AN OVERVIEW OF HOSPITALS IN FIVE MARKETS (*attached as EXHIBIT B of the Marrocco Decl.*). Publication # 2251, kff.org/content/2001/2251/2251.pdf. Washington, D.C.: Kaiser Commission on Medicaid and the Uninsured.
[10] *Id.*
[11] 72 Fed. Reg. at 29832.

5
25239262\V-14

provider-specific cost limit on Medicaid payments can only be characterized as arbitrary and capricious. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

CMS has premised its actions primarily on its assertion that the terms "efficiency," "economy" and "quality of care" as used in the Medicaid statute are ambiguous and as such give CMS the right to alter their meanings as it sees fit. However, CMS' argument ignores years of Congressional actions including the repeal of the very provider-specific cost limits CMS now proposes and the issuance of a legislative moratorium prohibiting CMS from taking the very actions now before the Court. Under the APA, the intent of Congress is determinative: "If the intent of Congress is clear, that is the end of the matter...." *Chevron*, 467 U.S. at 842-43. Congress has clearly rejected CMS' Cost Limit Rule and the agency's attempted end run on Congressional will is unlawful.

Additionally, CMS has not adequately justified its reversal on this issue and its rejection of its own longstanding position that specific-cost limits are inconsistent with the language and goals of the Medicaid statute. As noted by Plaintiffs, normal agency deference is lessened when the agency is changing its interpretation of a statute without a reasoned explanation. *See Watt v. Alaska*, 451 U.S. 259, 273 (1981) ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference."). Prior to the issuance of the Cost Limit Rule, CMS had consistently rejected proposals to abandon the aggregate, rather than individualized, nature of the upper payment limit, and rejected proposals to abandon the use of estimated Medicare payments rather than actual and reconciled costs. CMS has not adequately explained its change in position or justified taking an action that will severely undermine the current functionality of the Medicaid system and specifically the efforts of CHA and FAH within that system.

6

## CONCLUSION

CMS' actions are not supported in law or policy and the purported Final Cost Limit Rule should not be implemented or enforced. CMS' actions threaten the very fabric of the country's health care delivery system aimed at allowing uninsured, underinsured and, indeed, Medicaid beneficiaries access to health care in their communities. Should the Cost Limit Rule be implemented and enforced, there is a direct likelihood of imminent harm to providers, Medicaid beneficiaries and the uninsured, alike.

Dated: April 16, 2008

Respectfully submitted,

DREW W. MARROCCO, D.C. Bar #453205
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW, Suite 600-East
Washington, DC 20005
(202) 408-6387 (Telephone)
(202) 408-6399 (Facsimile)
dmarrocco@sonnenschein.com

Counsel for Amici
The Catholic Health Association
of the United States, and The Federation
of American Hospitals

*OF COUNSEL*

LISA J. GILDEN, ESQ.
Vice President, General Counsel
The Catholic Health Association
of the United States
1875 Eye Street, NW, Suite 10000
Washington, DC 20006-2213
(202) 296-3993

JEFFREY G. MICKLOS, ESQ.
Senior Vice President, Business Operations & General Counsel
Federation of American Hospitals
801 Pennsylvania Ave, NW Suite 245
Washington, DC 20004
(202) 624-1521

HOLLEY THAMES LUTZ
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW, Suite 600-East
Washington, DC  20005
(202) 408-6836