# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
ALAMEDA COUNTY MEDICAL                  )
CENTER, et al.                          )
                                        )
            Plaintiffs,                 )
                                        )
        v.                              )        Civ.  No. 1:08CV0422 (JR)
                                        )
THE HONORABLE MICHAEL O. LEAVITT,       )
in his official capacity as             )
Secretary of Health and                 )
Human Services, et al.                  )
                    Defendants.         )
_____)

## DEFENDANTS' REPLY IN SUPPORT
## OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT

Plaintiffs concede that the Secretary has the authority to eliminate the states' obvious abuse of recycled payments, see Pls. Reply Br., at 2-3, but nevertheless claim the right to receive excess payments to be used for non-Medicaid purposes.  The Secretary, however, is only obligated to pay for the costs incurred for providing Medicaid covered services, not other services which the state or private entities would otherwise fund.  No matter how beneficial those services may be, they simply fall outside the scope of the Medicaid program.  Therefore, whether excess payments are recycled back to the states themselves  – which Plaintiffs concede is a proper subject for regulation by the Secretary – or whether they are used by the governmental providers to provide additional services for which the state would otherwise pay, is of no consequence.

Plaintiffs' claims fail because neither the statutory text nor the legislative history of the

Medicaid Act demonstrates Congress's unequivocal intent either (1) to require (or even allow) states to pay government providers in excess of the actual cost of the covered services they provide to Medicaid-eligible patients ("the government provider payment rule"), or (2) to allow entities that are **not** units of local or state governments to finance the non-federal share of Medicaid expenditures ("the unit of government definition").[1]  Furthermore, as set forth in the Secretary's opening brief (Defs.' Mem., at 42-44) and contrary to Plaintiffs' assertions, the Secretary did not take any action in contravention of the statutory moratorium enacted on May 25, 2007.

Where, as here, the Administrative Record sets forth in detail the Secretary's rationale for promulgating the challenged rules (*i.e.,* to eliminate states' ability to manipulate the Medicaid program through abusive financing schemes), under the deferential standard applicable to agency action, this Court must uphold the Secretary's regulations.[2]  <u>Lomont v. Summers</u>, 135 F. Supp.

---

[1]As of the date of the filing of the Secretary's reply brief, the Court had not yet not ruled on the state Medicaid agencies' Motion for Leave to File Brief of *Amicus Curiae* In Support of Plaintiffs' Motion for Summary Judgment (Dkt. No. 19).  In the event that the Court grants the state Medicaid agencies' Motion at a time subsequent to this filing, the Secretary has addressed some of the arguments raised by the state Medicaid agencies herein but due to the short time frame (as well as page limitations), has not had the opportunity to fully respond.

[2]Contrary to Plaintiffs' assertion, to the extent that members of Plaintiff Associations seek to raise challenges identical to those pursued by the Plaintiff Associations in this case in subsequent litigation, those member suits would likely be barred for *res judicata* purposes.  <u>See General Foods Corp. v. Mass. Dep't of Pub. Health</u>, 648 F.2d 784, 788 (1st Cir. 1981) (barring claims of members of trade association for *res judicata* purposes where trade association had previously brought action on behalf of its members, the challenged regulation did not directly affect trade association but only its members, and trade association's standing to sue in earlier proceeding had depended on its claimed right to represent its members as the real parties in interest).  Here, Plaintiff Associations not only purport to bring their APA claims on behalf of their respective members but claim that they have standing because at least one of their respective members has standing in its own right.  Compl., ¶¶ 14-17.  Accordingly, in the event that the Secretary prevails in this action, members of Plaintiff Associations should be barred

2d 23, 27 (D.D.C. 2001) (observing that the court's role "'is to determine neither whether [the agency's] approach was 'ideal,' nor whether it was the 'most appropriate,' but only whether it was reasonable'" ) (internal citation omitted).

## ARGUMENT

I.    **THE GOVERNMENT PROVIDER PAYMENT RULE IS CONSISTENT WITH THE MEDICAID ACT AND ITS PROMULGATION IS NEITHER ARBITRARY NOR CAPRICIOUS**

### A.    Congress Has Never Expressly Rejected The Application Of A Medicaid Cost-Based Rule to Government Providers

Although Plaintiffs correctly note that Congress deleted the "reasonable cost" language from 42 U.S.C. § 1396a(13)(A) ("§ (13)(A)") and the "reasonable charge" language from 42 U.S.C. § 1396a(30)(A) (" § (30)(A)"), they mischaracterize the significance of this congressional act by arguing that Congress rejected all cost-based payment rules.  In the prior version of § (13)(A), the "reasonable cost" language contained in that statutory provision referred to the application of Medicare principles to Medicaid hospital reimbursement.[3]  See S. Rep. 97-139,

_____

from re-litigating the claims the Plaintiff Associations have brought here.  See id.; see also Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 287-88 (2d Cir. 2000) (noting that associations' financial resources, special expertise, and research resources are "advantageous both to the individuals represented and to the judicial system as a whole, [and] justify the potential cost of [claim] preclusion imposed on individual members") (internal quotation and citation omitted).

[3]Congress explained that the proposed Boren Amendment "modifies the current requirement that payments to hospitals under Medicaid cannot exceed the reasonable cost of such services as defined **under Medicare**."  S. Rep. 97-139, 97th Cong., 1st Sess. 1981, _reprinted in_ 1981 U.S.C.C.A.N. 396, 744 (emphasis added).  As the Secretary explained in the challenged rule, "Medicare is not a federal-state program, but is federal- only[ . . . and] the incentive structure for governmentally-operated health care providers is different" because Medicare does not distinguish between government and non-government providers.  72 Fed. Reg. 29748, 29775 (May 29, 2007).

97th Cong., 1st Sess. 1981, *reprinted in* 1981 U.S.C.C.A.N. 396, 744.  Likewise, the

"reasonable charge" language in the prior version of § (30)(A) also referred to Medicare

reimbursement principles.  See  H.R. Conf. Rep. 97-208, 97th Cong., 1st Sess. 1981, *reprinted in*

1981 U.S.C.C.A.N. 1010, 1327 (explaining that the House bill repeals the requirement that state

Medicaid payments for physicians' services . . . cannot exceed reasonable charge levels

**established under Medicare**") (emphasis added).

The legislative history makes clear that Congress deleted the "reasonable cost" language

from § (13)(A) in 1981 after determining that "application of the reasonable cost reimbursement

principles **of the Medicare program** for hospital services [were] not entirely satisfactory." S.

Rep. 97-139, 97th Cong., 1st Sess. 1981, *reprinted in* 1981 U.S.C.C.A.N. 396, 744 (emphasis

added).  The deletion of the reasonable cost language from § (13)(A) reflected Congress's intent

to give states "flexibility in developing methods of payment for their Medicaid programs . . .

without reference to **Medicare principles of reimbursement**," id. (emphasis added), based on

its conclusion that the application of **reasonable cost Medicare principles** are inherently

inflationary and contain no incentives for efficient performance.  See id.  Thus, Congress's

decision to delete the "reasonable cost" language from § (13)(A) and the "reasonable charge"

language from § (30)(A) does not demonstrate, as Plaintiffs claim, a clear intent to reject all cost-

based payment rules, much less an express statutory command to do so.[4]  Rather, the legislative

---

[4]Plaintiffs' efforts to rehabilitate their misplaced reliance on National Ass'n of Broadcasters v. Librarian of Congress, 146 F.3d 907 (D.C. Cir. 1998), Pls.' Reply Br., at 7 n.6, are unavailing.  As Plaintiffs correctly observe, "[i]n that case, the court held that when Congress replaces language in an act, it is evidence of Congress's intent to apply a different standard and courts must defer to such 'intent [which] is sufficiently clear.'" Id.  Plaintiffs, however, have not, nor could they point to any language in either § (13)(A) or § (30)(A) that was "replaced," which would require the outcome they desire.  Furthermore, Plaintiffs' mischaracterize the Secretary's

history evidences Congress's intent to reject cost-limit rules **based on Medicare principles only**.

Indeed, Plaintiffs' argument that Congress intended to reject all cost-based rules, including the challenged one, is untenable given the statutory language of the current version of § (30)(A). As set forth in the Secretary's opening brief, Congress's decision to delete the "reasonable charge" language from § (30)(A) and retain the undefined terms "efficiency" and "economy" gives the Secretary broad discretion to determine standards for efficient and economical Medicaid reimbursement. See Defs.' Mem., at 16-17. Given Congress's express command that Medicaid payments be efficient and economical, § (30)(A), Plaintiffs' argument that Congress intended states to pay providers in excess of the actual cost of the Medicaid services they provide runs directly counter to the statute's language and legislative history.

Congress has never directly addressed the application of Medicaid cost principles (*i.e.*, what constitutes economy and efficiency) in the Medicaid Act itself.[5] Because Congress has

argument regarding the affect of the repeal of the Boren Amendment. The "reasonable charge" language in the Medicaid Act was a requirement that Medicaid reimbursement reflect "reasonable charges" applying Medicare principles. Congress's decision to delete this requirement from § (30)(A) certainly did not eliminate or restrict the Secretary's discretion to promulgate a reimbursement rule based on "reasonable charges" at a later date if, in his view, changed circumstances required such a rule.

[5]As explained in detail in the Secretary's opening brief, Congress's enactment of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA") does not support Plaintiffs' argument that Congress has expressly rejected cost-based rules based on Medicaid principles. See Defs.' Mem., at 19-21. BIPA is simply Congress's statutory endorsement of the Secretary's October 10, 2000 proposed rule, and the references to aggregate upper payment limits merely describe the text and substance of the Secretary's then-proposed rule. This statutory provision cannot be read as either a requirement that the Secretary maintain that rule in perpetuity or a withdrawal of the Secretary's authority to revisit the appropriateness of aggregate upper payment limits. See id.

never rejected a payment system based on Medicaid principles of efficiency and economy, or indicated that any provider of Medicaid services is entitled to payments that exceed its costs, the Secretary's promulgation of the challenged rule does not contravene the plain language of the statute or congressional intent.[6]

**B.    The Government Provider Payment Rule Is A Reasonable Interpretation Of The Medicaid Act and Is Rationally Related To The Secretary's Continuing Efforts To Eliminate Abusive Financing Schemes Concerning Payments To Certain Government Hospitals**

As the foregoing demonstrates, Plaintiffs' <u>Chevron</u> step one argument fails because the statutory text and legislative history of the Medicaid Act belie their contention that Congress expressly rejected a cost-limit requirement for a category of Medicaid providers based on Medicaid payment principles.  Plaintiffs' <u>Chevron</u> step two argument is equally flawed.  Indeed, Plaintiffs' and amici's preferred interpretation of the Medicaid Act – which would require that states be permitted to pay Medicaid providers rates significantly in excess of the actual cost of the services they provide to Medicaid beneficiaries –  directly contravenes Congress's express intent with regard to Medicaid rate-setting.  <u>See</u> 42 U.S.C. § 1396a(30)(A).  The only reasonable construction of the Medicaid Act is the Secretary's construction, *i.e.*, that Congress's decision to delete the "reasonable charge" language and retain the undefined terms "efficiency" and "economy" conferred upon the Secretary broad discretion to determine standards for efficient

---

[6]Plaintiffs' argument that the agency's efforts to have Congress enact legislation "implicitly acknowledge[] that Congress is the proper body to make these changes to long-standing Medicaid principles,"Pls.' Reply Br., at 9 n.10, is without merit.  The Secretary's position has always been that he has the authority to implement an upper payment limit based on Medicaid cost principles.  <u>See, e.g.</u>, A.R. 2433, n.33.  The agency's decision to propose that Congress implement the challenged rule through congressional enactment simply reflects the Secretary's efforts to "ensure the program's fiscal integrity over time," <u>id.</u>, and to avoid unnecessary lawsuits such as this one.

and economical Medicaid reimbursement, including the authority to establish an upper payment limit based on the actual cost of the Medicaid services provided by government providers.[7]  See Defs.' Mem., at 17-19.  Indeed, it is hard to fathom that a rule that requires states to reimburse government providers in an amount equal to the actual cost of the Medicaid services they provide is inconsistent with efficiency and economy, indeed the excess payments Plaintiffs seek to protect are not **Medicaid** reimbursement at all.  On the other hand, Plaintiffs' and amici's preferred construction – under which states must be allowed to pay providers in excess of the cost of the Medicaid services they provide and claim FFP for these inflated payments – would not fulfill this statutory requirement.

Plaintiffs' and amici's argument that the government provider payment rule is arbitrary and capricious wholly ignores the highly deferential and extremely narrow standard applicable to this Court's review of agency action.  See United States Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001) ("[T]he arbitrary and capricious standard [of review] is extremely narrow.").  Under this standard of review, this Court does not determine "whether [the agency's approach] was 'ideal,' nor whether it was the 'most appropriate,' but only whether it was reasonable." Allied Local & Reg'l Mfrs. Caucus v. EPA, 215 F.3d 61, 73 (D.C. Cir. 2003) (internal citations omitted).  If, as

---

[7]Indeed, Plaintiffs do not dispute that the Secretary has consistently utilized this broad authority to establish regulations governing upper payment limits.  In fact, in 2002, a district court upheld the Secretary's use of this discretion to promulgate an upper payment limit rule applicable only to government providers in an effort to curb some of the same practices at issue in this litigation.  See generally Ashley County Med. Ctr. v. Thompson, 205 F. Supp. 2d 1026 (E.D. Ark. 2002).  The promulgation of the government provider payment rule is a consistent application of that authority.  See Defs.' Mem., at 14 (noting that "the Secretary has consistently exercised his broad rulemaking authority under § (30)(A)" to promulgate reimbursement rules that are consistent with the Medicaid's Act prescription that payments be consistent with efficiency, economy, and quality of care and delineating the rules promulgated pursuant to this authority).

here, the Secretary's "reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld, even though the Court itself might have made different choices." Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision, 271 F. Supp. 2d 264, 269 (D.D.C. 2003). Indeed, the rule and the voluminous Administrative Record belie Plaintiffs' and amici's assertions that the Secretary has offered no "plausible explanation" or "rational defense" of the challenged rule.

For example, Plaintiffs' contention that there is no rational basis for imposing a cost limit because the regulation requiring providers to retain the Medicaid payments they receive is sufficient to address the Secretary's concerns about abusive financing arrangements, Pls.' Reply Br., at 10-11, fails to consider the Secretary's determination that many government providers use the excess funds "to subsidize health care (or other) operations that are **unrelated** to Medicaid" – and for which the state and local governments alone would otherwise be required to pay, which is wholly inconsistent with the purpose of the Medicaid Act. 72 Fed. Reg. at 29774; see also 72 Fed. Reg at 29775 (explaining that "[p]ayments above the actual cost of medical assistance effectively diverts funding from the purposes authorized by the federal statute to be used for other, unauthorized purposes"). As the Secretary explained, using excess Medicaid payments to fund non-Medicaid costs is inconsistent with the statute. See id. To the extent that government providers seek to subsidize these non-Medicaid costs, Congress has permitted states to make disproportionate share payments ("DSH") up to specified limits, which government providers may use to address certain non-Medicaid costs. Id. But, except for allowable Medicare and Medicaid DSH payments, Congress has not authorized other federal subsidization of non-Medicaid costs by the Medicaid program.

8

Plaintiffs' next argument that the Secretary "offer[s] no rational defense of [his] overbroad application of the cost limit [rule] to providers not engaged in abusive financing practices," Pls.' Reply Br., at 11, is also unavailing. As set forth in the Secretary's opening brief, although the Secretary's oversight efforts have been effective in addressing a number of state Medicaid financial abuses, Defs.' Mem., at 28-29, some states have nonetheless persisted with improper state financing schemes. See, e.g., Alaska Dep't of Health & Social Servs. v. Centers for Medicare & Medicaid Servs., 424 F.3d 931 (9th Cir. 2005) (sustaining Secretary's disapproval of a proposed Medicaid state plan amendment under which certain safety net health care providers would have retained only ten percent of $50 million in additional federal reimbursements). See also Minnesota v. Centers for Medicare & Medicaid Servs., 495 F.3d 992 (8th Cir. 2007) (affirming Secretary's disapproval of a proposed Medicaid state plan amendment due to state's failure to adequately explain county government's improper return of payments to the state). Accordingly, the Secretary continues to monitor states' use of various financing arrangements "to ensure that [they] comport with existing laws and regulations and that federal reimbursement is justified." A.R. 2424-2425. Although the Secretary did not highlight in the 2007 rulemaking specific examples of abusive financing arrangements, that does not mean that such schemes no longer exist. Indeed, the Secretary specifically noted that the oversight process is "politically delicate," and thus declined to publicly "[l]ist[] States and questionable arrangements" because it "would not serve the public interest." 72 Fed. Reg. at 29774. In any event, the Secretary determined that there was a need for a uniform, consistent rule that could be applied nationwide because, *inter alia*, "state-by-state reviews and monitoring are costly and

intrusive."[8] See Defs.' Mem., at 30 (citing 72 Fed. Reg. at 29822).[9]  Plaintiffs' argument ignores the Secretary's careful and reasoned approach to eliminating the ability of states to game the Medicaid system through abusive financial arrangements with certain government providers.

Plaintiffs similarly ignore the detailed basis set forth in the Administrative Record for the Secretary's decision to apply the government provider payment rule to government providers only.  See Defs.' Mem., at 30-31 (citing 72 Fed. Reg.  at 29787).  As the Secretary explained in the rule and in his opening brief, he determined that a cost limit rule applicable to government providers only is necessary because there are "'different incentives at work in setting Medicaid payment rates' for government providers, incentives that are not relevant for private providers."[10] See id. (quoting 72 Fed. Reg.  at 29787).  The 1991 Provider Tax Amendments and the Secretary's regulation have already eliminated any incentive for states to make excess payments to private providers.  See, e.g., 42 U.S.C. § 1396b(w)(1).  Because aggregate upper payment

---

[8]The Government Accountability Office ("GAO") has studied the Secretary's oversight approach of states' financing arrangements and found that the Secretary's case-by-case approach raises concerns about whether states have been treated consistently.  See A.R. 2438.  The GAO specifically concluded that those concerns will continue "unless CMS alters its oversight approach."  Id.  The Secretary's decision to promulgate a uniform rule that can be applied nationwide was designed to address those concerns.

[9]Also, such individualized reviews would be triggered by, *inter alia*, a proposed state plan amendment regarding payments to governmental providers.  There is no assurance that states will propose such amendments, particularly given the Secretary's publicly-known concern about the abusive financing arrangements between states and government providers.

[10]Indeed, Plaintiffs' argument that the Secretary has concluded that Medicare and commercial reimbursement rates "are inherently uneconomic, inefficient, and inconsistent with quality of care," Pls.' Reply Br., at 14, not only misrepresents the analysis set forth in the challenged rule but ignores the Secretary's determination that the type of abuse the challenged rule seeks to eliminate is unique to the Medicaid reimbursement context.  The abusive financing arrangements between the states and government providers targeted by the government provider payment rule do not arise under either the Medicare program, which "is not a federal-state program, but federal only," 72 Fed. Reg. at 29775, or in the private health insurance context.

limits exist and the states can no longer "game the system" by making excess payments to private providers, the Secretary reasonably determined that it was also necessary to prevent states from establishing inflated Medicaid payment rates for government providers. To that point, the Secretary considered promulgating a Medicaid cost-limit rule that would apply to government providers only when states paid those providers differently than private health care providers. 72 Fed. Reg. at 29788. However, the Secretary rejected this approach because it "would have required considerably more oversight resources and would be subject to abuse" by states seeking to "evade the intended limits by segmenting generally applicable payment rates in ways that effectively distinguished between governmentally-operated and private health care providers." Id. Thus, the challenged rule is a targeted approach aimed at eliminating the conflict of interest that arises when states pay excess payments to government providers which are either funneled back to the states, which use them to claim increased federal financial participation ("FFP"), or used by the providers for non-Medicaid purposes.[11] 72 Fed. Reg. at 29787.

The crux of Plaintiffs' and amici's complaint regarding the government provider payment rule is that Plaintiffs and certain amici would like to continue to receive Medicaid payments in

---

[11]Indeed, the existence of this conflict of interest between state and government providers in the context of Medicaid reimbursement highlights both the reason that the Secretary decided to promulgate the government provider payment rule and the flaw in Plaintiffs' argument that other providers, including private health care providers, may also divert Medicaid payments above cost to non-Medicaid purposes. As the Secretary found, these above-cost payments were not simply used by providers to finance non-Medicaid costs but also by states to overstate the amount of the non-federal share the states claimed. See Defs.' Mem., at 27-31; see also 72 Fed. Reg. at 29749-29750, 29772-29797. In any event, as the Secretary expressly noted in the challenged rule, states may determine for themselves whether to use the same payment methodology "for government and private providers, as long as government providers are not paid in excess of cost." See Defs.' Mem., at 27 (citing 72 Fed. Reg. at 29788.)

excess of the actual cost of the services they provide, despite the fact that these excessive

payments are inconsistent with the Medicaid Act's prescription that states establish payment

rates that are consistent with efficiency, economy, and quality of care.  See 42 U.S.C. §

1396a(30)(A).  Indeed, Plaintiffs do not even attempt to demonstrate that the excess payments

adhere to this standard.  According to Plaintiffs and amici CHA/FAH and CIR, these excessive

payments are "essential for the maintenance of safety net hospitals" and their ability to "address

local Medicaid needs by expanding services and access" and without these payments, these

hospitals will face certain doom.  Pls.' Reply Br., at 12; see also CHA/FAH Amicus Br., at 2-5;

CIR Amicus Br., at 5-11.  These hyperbolic arguments, however, grossly overstate the financial

impact of the government provider payment rule for three key reasons.

 First, as the rule expressly states,  government providers will receive Medicaid

reimbursement in an amount equal to the actual cost of the services they provide to Medicaid

beneficiaries.  See 72 Fed. Reg. at 29748.  Second, as set forth in the rule, under the Medicaid

Act, Congress has expressly provided additional federal funding to providers, such as Plaintiffs,

to defray the cost of providing services to non-Medicaid individuals and public health activities,

including DSH payments.[12]  See 72 Fed. Reg. at 29779, 29782; see also Defs.' Mem., at 25-26 &

n.17.  Plaintiffs and amici, however, wish to use these extra monies to fund the states' financing

---

[12]Furthermore, the government provider payment rule will **not** affect those health care
providers that are **not** deemed governmentally-operated under the challenged rule.  See 72 Fed.
Reg. at 29777 (explaining that "[n]on-governmentally-operated health care providers, including
many of the 'public' safety net health care providers, are not affected by the cost limit provision
of the regulation and may therefore continue to receive Medicaid payments in excess of the cost
of providing services to Medicaid individuals within existing Federal requirements").  It is
possible that Plaintiff Alameda County Medical Center, many members of the Plaintiff national
medical and hospital associations, and Amici CHA/FAH will not be affected by this regulation.

of non-Medicaid programs and to lessen the states' actual contribution to its Medicaid program. Third, because the government provider payment rule precludes government providers from diverting excess funds to non-Medicaid purposes, the challenged rule actually "protect[s] Medicaid individuals by ensuring that Medicaid resources are available for their care." 72 Fed. Reg. at 29775. Thus, because Medicaid revenues are an element in setting budgets, the government provider payment rule "will actually result in the expansion of resources available to serve Medicaid individuals." Id.

The government provider payment rule represents a well-reasoned construction of the Medicaid Act. The challenged rule's establishment of an upper payment limit equal to the actual documented cost of services provided under the Medicaid program is entirely consistent with the statute's requirement that Medicaid reimbursement be consistent with efficiency, economy, and quality of care and, as shown by the thorough analysis contained in the preamble to the rule itself, is neither arbitrary nor capricious.[13]  See Rollins Envtl. Servs. v. U.S. Envtl. Prot, Agency, 937 F.2d 649, 652 (D.C. Cir. 1991) (agency action is entitled to deference and must be sustained if it is "logically consistent with the language of the [statute] and [] serves a permissible regulatory function"). Where, as here, the Secretary has reviewed the relevant data and articulated a satisfactory explanation for his action, the challenged rule must be upheld. See Huls Am. Inc. v. Browner, 83 F.3d 445, 452 (D.C. Cir. 1996).

---

[13]In his opening brief, the Secretary addressed Plaintiffs' claims that the government provider payment rule is inherently inflationary and imposes administrative burdens on states. See Defs.' Mem., at 23-27. Despite the fact that Plaintiffs made these arguments in support of their claim that the challenged rule is arbitrary and capricious, Pls.' S.J. Br., at 22-25, Plaintiffs now claim that these arguments were actually made in support of their Chevron step one arguments. Pls.' Reply Br., at 14, n.20. In any event, these arguments fail under either prong of the Chevron test. See infra, at 2-4; Defs.' Mem., at 23-27.

II.  **THE "UNIT OF GOVERNMENT" DEFINITION IS CONSISTENT WITH THE MEDICAID ACT AND RATIONALLY RELATED TO THE SECRETARY'S EFFORTS TO ELIMINATE ABUSIVE FINANCING ARRANGEMENTS BETWEEN STATES AND GOVERNMENT PROVIDERS**

A.  **Congress Has Never Defined "Other Governmental Unit" As Set Forth In 42 U.S.C. § 1396b(w)(7)(G)**

Plaintiffs and amici contend that the Medicaid statute itself deprives the Secretary of any

discretion to further define "other governmental unit" for purposes of administering the

Medicaid program.  But despite their arguments, the fact is that Congress has never defined the

reference to "other governmental unit" that is contained in the statutory definition of "unit of

local government" and set forth in § 1396b(w)(7)(G).  See Defs.' Mem., at 32-35.  Because

Congress has failed to define the term "other governmental unit" in § 1396b(w)(7)(G), the

Secretary – whom Congress entrusted to administer and interpret the provisions of the Medicaid

Act –  has the authority to interpret this phrase for purposes of properly administering the

Medicaid program.[14]  See Chevron, 467 U.S. at 842-43 (explaining that an agency's

---

[14]Plaintiffs' argument that the Secretary's litigation position that the provisions at issue are ambiguous is a post-hoc rationalization not entitled to deference, Pls.' Reply Br., at 18-19, fails.  First, this principle of administrative law applies only under the Chevron step two analysis – *i.e.*, whether the Secretary has adequately explained the basis for his promulgation of the challenged rule –  and is not applicable to this Court's determination of whether Congress has directly spoken on this exact issue.  See National Oilseed Proceesors Ass'n, 924 F. Supp. at 1203-1204 (analyzing this argument under the arbitrary and capricious framework).  The Secretary either has the authority to issue the rule or he does not.  And if he does, the precise way in which he previously described the rule is of no consequence.  Second, the Secretary's determination that the regulation "codifies existing statutory criteria" does not provide evidence, as Plaintiffs' suggest, that the Secretary believed that the statutory provisions were unambiguous. Rather, this statement simply demonstrates that the Secretary determined that his interpretation of an otherwise ambiguous statutory provision is consistent with both express statutory authority and congressional intent to preclude states from funding the non-federal share of its Medicaid expenditures with funds not derived from state or local taxes.  See Defs.' Mem., at 40-41 (citing 72 Fed. Reg. at 29750, 29758-29759).

interpretation of an undefined and ambiguous term is entitled to deference).  Indeed, the statutory

provisions on which  Plaintiffs and Amici rely actually support the Secretary's construction of

this otherwise ambiguous term.

      For example, Plaintiffs' point to the reference to "local sources" in § 1396a(a)(2) of the

Medicaid Act to argue that Congress intended a "broader recognition of sources of the non-

federal share" of states' Medicaid expenditures.  Pls.' Reply Br., at 15.  However, as the

Secretary highlighted in his opening brief, Congress has never defined the term "local sources"

in this statutory provision or delineated standards defining permissible local sources.  See Defs.'

Mem., at 32-35.  Thus, the Medicaid Act's reference to "local sources" is ambiguous.[15]

Plaintiffs further contend that the reference to "State and political subdivisions" in §

1396b(d)(1)(A) supports their contention that Congress did not intend to restrict the use of

sources of the non-federal share to entities with direct access to tax revenues.  Pls.' Reply Br., at

_____

[15]Because the term "local sources" is ambiguous, Plaintiffs' reliance on Consumer Union v. Heimann, 589 F.2d 531 (D.C. Cir. 1978), Public Citizen v. Farm Credit Admin., No. 89-2094, 1990 U.S. Dist. LEXIS 11713 (D.D.C. Sept. 6, 1990), and Estey v. Comm'r, Maine Dep't of Human Servs., 21 F.3d 1198 (1st Cir. 1994) is misplaced.  In Consumer Union, the court expressly determined that both the legislative history and subsequent congressional enactments demonstrated Congress's intent to broadly interpret the statutory definition at issue in that case. Here, Plaintiffs and amici have failed to point to **any** legislative history that demonstrates that Congress intended to interpret broadly the term "local sources" as referenced in § 1396a(a)(2). Plaintiffs' reliance on Public Citizen and Estey is likewise misplaced.  In those cases, the courts relied on the "plain meaning" to determine congressional intent.  By contrast, the term "local sources" does not have a "plain meaning," and furthermore, Congress's decision to enact the 1991 Provider Tax Amendments, which makes clear that the Secretary has the authority to restrict states' use of funds **not** derived from state or local taxes, 42 U.S.C. § 1396b(w)(1)(A), indicates that the term "local sources" cannot be granted the broad interpretation that Plaintiffs and amici proffer here.  In any event, these cases actually undermine Plaintiffs' argument regarding the scope of the reference to "local sources" because if Congress had intended to limit the Secretary's discretion to interpret that term, it could have defined the term explicitly.  See Public Citizen, 1990 U.S. Dist. LEXIS 11713, at *5 ("If Congress intended to limit the term 'financial institutions' to banks that accept deposit, it could have done so. . . .").

15.  However, as with the terms "other governmental unit" and "local sources," Congress has

failed to define the term "political subdivisions" as used in § 1396b(d)(1)(A), leaving that task

for the Secretary, in the exercise of his discretion.  In any event, the regulatory definition of "unit

of government" promulgated by the Secretary encompasses the narrower reference to political

subdivisions in § 1396b(d)(1)(A).  See 72 Fed. Reg. at 29761 (explaining that "the definition and

criteria [the Secretary] proposed for the unit of government is broader than a 'political

subdivision' of the State itself").

Finally, contrary to Plaintiffs' and amici's assertions, § 1396b(w)(6)(A) supports the

Secretary's construction of the Medicaid Act as embodied in the challenged rule: the only

entities permitted to fund the non-federal share of states' Medicaid expenditures are "units of

government" that have taxing authority or direct access to tax revenues.  See Defs.' Mem., at 35,

n.24.  As Plaintiffs and amici correctly observe, that statutory provision limits the Secretary's

authority to restrict states' use of funds only "**where such funds are derived from State or

local taxes**. . . transferred from or certified by units of government with a State."  42 U.S.C. §

1396b(w)(6)(A) (emphasis added).  Indeed, the statute also reflects Congress's recognition that

states finance the non-federal share with funds derived from state or local taxes, not with

payments initially provided by the state's Medicaid program and recycled back to the

government.  See id.

Congress has **never** defined the scope of "other governmental units" in the statutory

definition of "unit of local government," **nor** has Congress articulated the standard for

permissible local funding sources as set forth in § 1396a(a)(2).  Thus, the statutory provisions on

which Plaintiffs and amici rely are either ambiguous or directly support the Secretary's

interpretation that Congress intended to require states to fund the non-federal share of Medicaid

expenditures with funds derived from state or local taxes.  For this reason, Plaintiffs' <u>Chevron</u>

step one argument must fail.

> **B.    The Rule's Definition of "Unit of Government," Which Requires That Government Providers Have Taxing Authority or Access To Tax Revenue, Is A Reasonable Construction of the Statutory Reference To "Other Governmental Unit" In 42 U.S.C. § 1396b(w)(7)(G)**

Plaintiffs' <u>Chevron</u> step two challenge to the "unit of government" definition likewise

fails.  As with this Court's review of the other allegedly invalid aspects of the challenged rule,

the standard applied to this Court's determination of whether the "unit of government" definition

is arbitrary and capricious is "extremely narrow," <u>Gregory</u>, 534 U.S. at 6-7, and "presumes the

validity of agency action."  <u>National Oilseed Processors Ass'n v. Browner</u>, 924 F. Supp. 1193,

1201 (D.D.C. 1996).  Indeed, this Court's review is "only to ensure that the agency 'examine[d]

the relevant data and articulate[d] a satisfactory explanation for its action.'" <u>Huls Am. Inc.</u>, 83

F.3d at 452.  Here, there can be no doubt, as evidenced by the voluminous Administrative

Record and the comprehensive explanation set forth in the challenged rule, that the promulgation

of the "unit of government" definition more than satisfies this standard.

In an effort to expand the scope of this Court's review, Plaintiffs and amici proffer a

number of arguments in support of their contention that the challenged rule is arbitrary and

capricious.  None of these arguments, however, undercuts the record evidence supporting the

Secretary's promulgation of the challenged rule.  For example, Plaintiffs claim that the "unit of

government" definition is arbitrary and capricious because the challenged rule permits

contributions to the non-federal share from entities that have "'generally applicable taxing

authority'" or "'direct access to tax revenues'" even if the entity does not actually use tax

revenues to fund the non-federal share. Pls' Reply Br., at 20. In developing the scope of the challenged rule, however, the Secretary recognized that " funds from different sources can be commingled in health care provider accounts." 72 Fed. Reg. at 29763. Because these funds are commingled, the Secretary concluded that it would not be feasible to require government providers to "trace fund[s] precisely" in order to participate in financing the non-federal share of states' Medicaid payments. Id. Accordingly, the Secretary promulgated the challenged rule that requires that such entities "have taxing authority or direct access to State or local tax funds in at least the amount of the IGT [intergovernmental transfer] or CPE [certified public expenditure]" in order to finance the states' share of Medicaid expenditures.[16] Id.

Plaintiffs next complain that the challenged rule is arbitrary and capricious because it eliminates contributions to the non-federal share from entities, such as Plaintiff Alameda County Medical Center, that receive tax revenues. Pls.' Reply Br., at 20. However, the simple fact is that, if governmental providers were receiving from state and local governments only the amount used to cover their cost of serving Medicaid patients, they would have no excess funds available either (1) to funnel back to the governments that recycled payments or (2) to use for non-

---

[16]The Secretary also recognized that units of government often collect revenue from different sources, including, *inter alia*, fees and grants. 72 Fed. Reg. at 29767. The Secretary reasoned that such revenues are acceptable to finance the non-federal share of states' Medicaid expenditures "as long as the unit of government does not attempt to finance Medicaid payments using . . . impermissible sources (such as, 'recycled' Medicaid payments, Federal grants precluded from use as State match, impermissible taxes, non-bona fide provider-related donations)." Id. The Secretary explained that,"[f]or purposes of Medicaid payment and financing, the relevant characteristics of a governmental entity are those that relate to its financial organization including the source of funding and liability for its debts. These characteristics relate specifically to issues raised by the Medicaid statute . . . [and requiring access to tax revenue] is consistent with the [c]ongressional instruction contained in section [1396b(w)] of [the Medicaid Act]." 72 Fed. Reg. at 29759.

Medicaid programs, which, however laudatory, were not supposed to be subsidized through Medicaid rates.  Indeed, Congress expressly permits government providers to receive DSH payments that reflect the high volume of services they provide to Medicaid and other low income persons.   In any event, the Secretary takes no position on whether Plaintiff Alameda County Medical Center is a unit of government within the meaning of the regulatory definition.  Indeed, the Secretary has not predetermined which entities have governmental status for purposes of participating in financing the non-federal share of states' Medicaid expenditures.[17]  72 Fed. Reg. at 29756.  Rather, the challenged rule establishes criteria to assist state and local governments in making this determination, and simply clarifies which health care providers may participate in financing the non-federal share of state Medicaid expenditures.  Id.

However, in the event that a state applying the regulatory criteria established by the Secretary determines that a public health care provider, such as Plaintiff Alameda County Medical Center, is not a unit of government, the Medicaid statute itself precludes Plaintiff Alameda County Medical Center, and other non-governmental providers, from financing their respective state's non-federal share of Medicaid expenditures.[18]  Indeed, as the Secretary

---

[17]The state Medicaid agencies claim to have a prophetic ability to predict which providers will not be deemed government providers under the challenged rule.  State Medicaid Agencies Amicus Br., at 12-16.  As discussed in the Secretary's opening brief and herein, states will make this initial determination utilizing the Secretary's regulatory criteria.  See Defs.' Mem., at 38-40.  In any event, even if states ultimately conclude that many of these entities are not government providers within the meaning of the challenged rule, as discussed previously, "[t]here is nothing in the Medicaid statute that would indicate non-governmental units could help a State finance its share of Medicaid payments. . . ."  72 Fed. Reg. at 29760.

[18]This explanation also belies Plaintiffs' unfounded assertion that the challenged rule is unreasonable and arbitrary because it purports to allow for an outcome in which tax revenues are precluded in some instances.  See Pls.' Reply Br., at 21.  Under the challenged rule, "[w]hen funds are received by a health care provider in the course of its normal operations, those funds

expressly explained, "[t]here is nothing in the Medicaid statute that would indicate [that] non-governmental units could help a State finance its share of Medicaid payments, particularly in light of the significant statutory penalties States face for receiving provider-related donations as the non-Federal share of Medicaid payments." 72 Fed. Reg. at 29760.   This rationale forecloses Plaintiffs' and amici's argument, Pls.' Reply Br., at 22; State Medicaid Agencies Amicus Br., at 11-16, that the challenged rule is arbitrary and capricious because the rule precludes the state's use of a variety of "real source[s]" of revenue available to public providers, other than tax revenues, from financing the non-federal share of states' Medicaid payments.[19] Cf. 72 Fed. Reg. at 29758 (explaining that there is nothing in the Medicaid Act that "would indicate [that] non-governmental public units could help a State finance its share of Medicaid payments").

Finally, Plaintiffs' and amici's arguments that the unit of government definition

_____

are **not** 'derived from State or local taxes' **unless** they are tax funds or are funds appropriated by a government entity from tax revenues and paid for Medicaid services at the health care provider." 72 Fed. Reg. at 29762-29763 (emphasis added).

[19]Plaintiffs and amici make much of the fact that the Secretary has allegedly reversed a longstanding policy of permitting "'public funds' to be considered as the non-federal share [of Medicaid expenditures] . . if the funds [we]re appropriated directly to the State or local agency, **or** transferred from other 'public agencies' to the State or local Medicaid agency, **or** [we]re certified by the contributing public agency as representing expenditures eligible for [federal matching]. . . ." State Medicaid Agencies Amicus Br., at 18 (emphasis in original); Pls.' Reply Br., at 21 n.28.  As discussed in his opening brief, the Secretary is not required to "'establish rules of conduct to last forever,'" and must only set forth a "'reasoned analysis' [to justify his] 'change in course,'" see Defs.' Mem., at 23, 41 n.30 (citing, among other cases, United States Air Tour Assoc., 298 F.3d at 1006), and he is free to alter those rules in light of his experience in administering the program.   The record shows that the Secretary has in fact set forth a "reasoned analysis" that details his policy determination that a uniform rule is necessary to clarify which entities may fund (the basis for) the non-federal share of states' Medicaid payments.  Under well-settled law, this determination is entitled to deference and must be upheld.  See Stowell v. Sec'y of Health & Human Servs., 3 F.3d 539, 544 (1st Cir. 1993) ("[A]n agency interpretation that represents a modification of, or even a sharp departure from, a prior interpretation does not necessarily eliminate the expertise-related reasons for judicial deference.").

"fundamentally interferes with States' own internal governmental structure,"[20] State Medicaid

Agencies Amicus Br., at 10, are unavailing.  As explained in both the Secretary's opening brief

(Defs.' Mem., at 41-42) and the challenged rule, the "unit of government" definition does not

affect states' ability to organize themselves for other purposes outside of the Medicaid

program.[21]  72 Fed. Reg. at 29753.  Indeed, "[t]his regulation addresses governmental status for a

very limited purpose," *i.e.*, to provide criteria to assist states in identifying those entities that may

permissibly fund the non-federal share of state Medicaid expenditures.  72 Fed. Reg. at 29759.

Thus, the state Medicaid agencies' assertion that the challenged rule preempts the historic

powers of the state are unfounded.  The United States Constitution does not afford states any

special privileges with respect to federal spending programs (like Medicaid) in which they

choose to participate.  Indeed, courts have uniformly recognized that, given that a state's

"participation in the Medicaid program is purely voluntary and its acceptance of substantial

federal funds uncoerced, once electing to participate, it must fully comply with federal statutes

and regulations administering the program."[22]  Smith v. Miller, 665 F.2d 172, 175 (7th Cir. 1981)

---

[20]As set forth in the Secretary's opening brief, Plaintiffs do not have standing to raise claims on behalf of the states.  Defs.' Mem., at 39, 41.

[21]This belies amicus state Medicaid agencies' claim that the Secretary failed to "closely examine the constitutional and statutory authority supporting any action that would limit the policymaking discretion of the States and [] carefully assess the necessity for such action."  State Medicaid Agencies Amicus Br., at 11.  In promulgating the challenged rule, the Secretary did in fact "closely examine" the constitutional and statutory authority supporting his action and determined that under the voluntary, federally-financed Medicaid program, he had such authority and that the challenged rule was necessary to safeguard the integrity of the Medicaid program.  See Defs.' Mem., at 42 n.32.

[22]The state Medicaid agencies' reliance on Pennhurst State Sch. v. Halderman, 451 U.S. 1 (1981) is misplaced.  As the Supreme Court explained in a subsequent case, "Pennhurst arose in the context of imposing an unexpected condition for compliance – a new obligation for participating States. . . ."  Bell v. New Jersey & Pennsylvania, 461 U.S. 773, 790 n.17 (1983).

(citing, among other cases, <u>Townsend v. Swank</u>, 404 U.S. 282 (1971)).  Thus, "to the extent that a state finds the conditions attached by [the federal government] distasteful, the state has available to it the simple expedient of refusing to yield to what it [believes to be] 'federal coercion.'" <u>South Dakota v. Dole</u>, 791 F.2d 628, 634 (8th Cir. 1986), <i>aff'd</i>, 483 U.S. 203 (1987).

The foregoing demonstrates that the promulgation of the "unit of government" definition was neither arbitrary nor capricious but well-reasoned and deliberate.  Indeed, as the Administrative Record more than demonstrates, the Secretary considered virtually every argument proffered by Plaintiffs, amici and other commenters but nonetheless concluded that the challenged rule is necessary to eliminate the ability of states to manipulate the Medicaid program through financing schemes that effectively divert federal funds for non-Medicaid purposes and/or overstate the states' actual fiscal contribution to the Medicaid program.  Accordingly, because the Secretary's reasons and policy choices "may reasonably be discerned," <u>Formula</u>, 779 F.2d at 760, the challenged rules must be upheld even if this Court, Plaintiffs, or amici "might have made [] different choice[s]."  <u>National Home Equity Mortgage Ass'n</u>, 271 F. Supp. 2d at 269; <u>see also</u> <u>Shays</u>, 508 F. Supp. 2d 10, 31 (D.D.C. 2007).

## III.    THE SECRETARY TOOK NO ACTION IN CONTRAVENTION OF THE STATUTORY MORATORIUM

None of the arguments raised in Plaintiffs' Reply Brief is sufficient to demonstrate that the Secretary violated the statutory moratorium that the President signed into law on May 25, 2007.  As the record demonstrates, on May 24, 2007  – the day **before** the statutory moratorium

---

Here, the challenged rule simply builds on Congress's earlier indicated approval of states' utilizing funds derived from state or local taxes to fund the non-federal share of Medicaid payments.  <u>See</u> 42 U.S.C. § 1396b(w)(6)(A).

was signed into law by the President – the Secretary submitted the challenged rule for filing and

publication to the Office of the Federal Register ("OFR").  See Defs.' Mem., at 42-43 (citing

A.R. 365).  The Secretary has taken no action since that date with respect to the rule.  Plaintiffs

erroneously claim that the OFR "acts as an agent on the agency's behalf" for purposes of

publishing the final rule as required by the APA and thus any action taken by the OFR is

imputable to the Secretary.  Pls.' Reply Br., at 25.  However, the Code of Federal Regulations

that govern the functions and actions of the OFR belie this very assertion.

Indeed, the OFR regulations make clear that the OFR is responsible for filing regulations

submitted by the Executive Branch.  See  1 C.F.R. § 2.5(a) (OFR "is responsible for the central

filing of . . . regulations . . . submitted to the Director by officials of the executive branch of the

Federal Government.").  Moreover, those regulations make clear that "[a] document is filed

[with the OFR] only **after** it has been received, processed, and assigned a publication date [**by

the OFR**] according to the schedule in part 17 of [the OFR regulations]." 1 C.F.R. § 1.1

(emphasis added).  In fact, the OFR's Director "may return to the issuing agency any document

submitted for publication in the Federal Register . . . if in the **Director's judgment** the document

does not meet the minimum requirements of [the OFR regulations]."  1 C.F.R. § 2.4(b)

(emphasis added).

Indeed, although the Secretary's May 24, 2007 letter requested emergency publication of

the challenged rules, under the OFR regulations, such a request will be granted only if "the

Director concurs with [the] request for that action and it is feasible." 1 C.F.R. § 17.4(b).  The

regulations demonstrate that the OFR does not simply perform "ministerial functions," nor is the

OFR merely an agent of the Secretary.  To the contrary, these regulations demonstrate that the

OFR, not the submitting agency, has an independent statutory responsibility for publishing regulations in the Code of Federal Regulations.  See Cervase v. Office of Fed. Register, 580 F.2d 1166, 1169 (3d Cir. 1978).  Accordingly, although the Secretary submitted the challenged rules to the OFR for filing and publication on May 24, 2007, any action taken **after** that date to publish the rules as required by the APA was taken by the OFR, not the Secretary.  See 1 C.F.R. §§ 1.1, 2.5,(a) 17.4(b).

Plaintiffs make much of the fact that the Secretary sought emergency publication of the challenged rules.  However, the emergency publication the Secretary sought on May 24, 2007, merely demonstrates the efforts the Secretary undertook to **avoid** contravening the statutory moratorium signed into law by the President on May 25, 2007.  Indeed, the Secretary certainly understood that the moratorium, if enacted, would prevent the rule from going into effect even if it had already been published.  In compliance with the statutory moratorium, the Secretary has since May 24, 2007, done nothing to implement the challenged regulations.  For this reason, Plaintiffs' claim that the Secretary violated the statutory moratorium must fail.

//

//

//

//

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Memorandum in Support Of Their Cross-Motion For Summary Judgment and In Opposition to Plaintiffs' Motion For Summary Judgment, the Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter judgment in favor of the Secretary on Plaintiffs' APA claims.


Respectfully submitted,


OF COUNSEL:                          JEFFREY S. BUCHOLTZ
                                     Acting Assistant Attorney General
JAMES C. STANSEL
Acting General Counsel               JEFFREY A. TAYLOR
                                     United States Attorney

JANICE L. HOFFMAN                    SHEILA M. LIEBER
Associate General Counsel            Deputy Branch Director

MARK D. POLSTON                      /s/ Tamra T. Moore
Deputy Associate General             TAMRA T. MOORE D.C. Bar No. 488392
        Counsel for Litigation       Trial Attorney
                                     U.S. Department of Justice
GERARD KEATING                       Civil Division, Federal Programs Branch
BRIDGETTE L. KAISER                  20 Massachusetts Avenue, N.W.
Attorneys                            Washington, D.C.  20530
                                     Telephone: (202) 514-8095
U.S Department of Health             Facsimile: (202) 616-8470
        and Human Services           Email: Tamra.Moore@usdoj.gov


Dated: April 25, 2008                Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on this 25th day of April 2008, I caused a copy of the foregoing

Defendants' Reply In Support Of Their Cross-Motion For Summary Judgment to be filed with

the Clerk of the Court via the CM/ECF system, causing them to be served electronically.  The

documents are available for viewing and downloading from the ECF system.


<u>/s/ Tamra T. Moore</u>
Tamra T. Moore