UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALAMEDA COUNTY MEDICAL CENTER, :
*et al.*,                      :
                               :
        Plaintiffs,            :
                               :
    v.                         :  Civil Action No. 08-0422 (JR)
                               :
MICHAEL O. LEAVITT, Secretary, :
U.S. Department of Health and  :
Human Services, *et al.*,      :
                               :
        Defendants.            :

**MEMORANDUM**

In this case, the Court is asked to decide whether a maneuver by the Executive Branch deliberately designed to outfox a clear directive of Congress was successful.  The answer is no.

Reimbursement for Medicaid providers has evolved from a system based on compensation for provider-specific costs to a system based on aggregate approximations of reasonable payment for services.  In the early days of Medicaid, the statute essentially limited reimbursement to the reasonable costs actually incurred by specific Medicaid providers.  See Pub. L. No. 90-248, § 237(b), 81 Stat. 821, 911 (1967); Pub. L. No. 92-603, § 232, 86 Stat. 1329, 1410-1412 (1972).  Amid significant criticism of that system, Congress amended the statute in the early 1980s to eliminate the provider-specific, reasonable-cost cap.  See Pub. L. No. 97-35, § 2174, 95 Stat. 357, 809 (1981).  Thereafter, and throughout the intervening decades, Health and Human Services (HHS) and its Centers for Medicare and Medicaid

Services (CMS) adopted and refined a system based on "upper payment limits" (UPLs), with reimbursements calculated using aggregate, and not provider-specific, cost data. See, e.g., 67 Fed. Reg. 2602 (Jan. 18, 2002); 66 Fed. Reg. 3148 (Jan. 12, 2001); 52 Fed. Reg. 28141 (Jul. 28, 1987); 48 Fed. Reg. 56046 (Dec. 19, 1983). Congress gave its explicit imprimatur to this system in 2000, when it directed HHS to finalize regulations based on aggregate UPLs rather than provider-specific limits. See Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554, § 705(a), 114 Stat. 2763 (2000). The Secretary complied with that congressional order, issuing a final rule in the last days of the Clinton Administration. See 66 Fed. Reg. 3148 (Jan. 12, 2001).

On January 18, 2007, the HHS Secretary in a different administration published a proposal to return by agency rule to a system where, for certain Medicaid institutions, reimbursement would be on a cost-to-provider scheme. See 72 Fed. Reg. 2236 (2007). Congress promptly registered its disapproval, enacting a one-year moratorium on the issuance of the proposed rule or any rule like it. The moratorium was tucked away, however, in the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, H.R. 1591, 110th Cong. § 6002(a) (2007), a bill that the President vetoed because it set a timetable for the withdrawal of American forces from Iraq. See

H.R. Doc. No. 110-31, 153. Cong. Rec. H4315 (2007).  Undeterred, Congress passed the same moratorium as part of its revised war appropriations bill.  See U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 7002(a), 121 Stat 112, 187 (2007).  That bill was passed on May 24, 2007, and the President signed it the next day.

But the Executive Branch thought that it could have its war appropriation and its Medicaid rule too.  On May 24, with full knowledge that the moratorium had been passed but had not yet been signed by the President, the Secretary rushed a typo-ridden final rule to the Office of the Federal Register (OFR) for "emergency display and publication."  See AR-365.  The "emergency" was the impending presidential signature on the legislature's moratorium, and the Secretary urged that rapid display of the rule was necessary to "ensure issuance of this rule and associated savings before passage of legislation that prohibits action to publicize [sic] this rule."  Id.  Complying with the Secretary's request, OFR "displayed" the rule on

May 25,[1] the day the moratorium took legal effect, and published the rule in the Federal Register on May 29.

Plaintiffs bring two complaints: that the promulgation of the rule violates the clearly expressed prohibitions of the moratorium, and that, Chevron deference notwithstanding, the substance of the rule is contrary to congressional intent.  In the Secretary's submission, he did nothing to violate the moratorium because his involvement with the rule ended on May 24, and it was OFR that acted on it thereafter.  On this issue, I find that the Secretary's actions violated Congress's prohibition of "any action . . . to finalize or otherwise implement provisions contained in the proposed rule published on January 18, 2007."  Because the appropriate remedy on such a finding is to vacate the improperly promulgated regulation, and because Congress may yet act upon this rule, it would be improvident to reach the merits of the second complaint, which presents a close question of statutory interpretation.  See, e.g., Shell Oil Co. V. EPA, 950 F.2d 741, 752 (D.C. Cir. 1991).

The prohibitory language of the statutory moratorium is comprehensive.  It provides:

---

[1]   Certain documents filed with OFR must be made available for public inspection, see 44 U.S.C. § 1503, and that display is considered sufficient for constructive notice of their contents. See 44 U.S.C. § 1507.  Public display does not typically make a rule effective, however, because most rules must be published at least 30 days before their effective date.  See 5 U.S.C. § 553(d); Rowell v. Andrus, 631 F.2d 699, 704 (10th Cir. 1980).

> Notwithstanding any other provision of law, the Secretary of Health and Human Services shall not, prior to the date that is 1 year after the date of enactment of this Act, take any action (through promulgation of regulation, issuance of regulatory guidance, or other administrative action) to--
> (A) finalize or otherwise implement provisions contained in the proposed rule published on January 18, 2007, on pages 2236 through 2248 of volume 72, Federal Register (relating to parts 433, 447, and 457 of title 42, Code of Federal Regulations);
> (B) promulgate or implement any rule or provisions similar to the provisions described in subparagraph (A) . . . .

Pub. L. No. 110-28, § 7002(a), 121 Stat 112, 187 (2007). The question presented here is whether the Secretary took "any action . . . to finalize or otherwise implement" the rule.

    1.  Under 5 U.S.C. § 801(a)(1)(A), the Secretary was required to "submit to each House of the Congress and to the Comptroller General a report containing -- (I) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule" before the rule could take effect. On May 25, the day the moratorium took legal effect,[2] the

---

    [2]    Statutes are ordinarily treated as in effect for the entire calendar day on which they are signed. The law does not distinguish between actions taken before or after the actual moment of signing unless "substantial justice requires it." See, e.g., Taylor v. Brown, 147 U.S. 640, 645 (1893). "Substantial justice" problems have been found where innocent action was made criminal or where rights in property or judicial pay raises were at stake. See, e.g., United States v. Will, 449 U.S. 200, 225 n.29 (1980); Taylor, 147 U.S. at 645; Burgess v. Salmon, 97 U.S.

Secretary transmitted by e-mail to various committees of the House and Senate a "notification" that he had placed the new Medicaid rule on display at the Federal Register.  See [22, Exhibit 1-A]; [32, Attachment 1] at ¶ 4 (conceding that the e-mail was the required notification to Congress).  Because that notification was a prerequisite to the effectiveness of the rule, the May 25 e-mail was a proscribed "action . . . to finalize or otherwise implement" the rule, and so violated the moratorium.

    2.  The Secretary also violated the moratorium by calling for and receiving comments on the rule within the moratorium period.  The rule's publication expressly opened a public comment period on its definition of "unit of government," and specified that the period would close on July 30, 2007.  See 72 Fed. Reg. 29748 (2007).  Soliciting and receiving comments, and closing a comment period, are all actions "to finalize or otherwise implement" the rule, and so violate the moratorium.

    3.  Notwithstanding the Secretary's disavowal of responsibility, the publication of the rule on May 29 was a third violation of the moratorium.  The Administrative Procedure Act provides that "[e]ach agency shall separately state and currently publish in the Federal Register . . . substantive rules," and that such rules are ineffective against any person without notice

---

381, 384-85 (1878).  Whatever the reach of "substantial justice," it does not include a race to the presses by the Executive so as to preempt congressional action.

thereof unless so published.  See 5 U.S.C. § 552(a)(1)(D) (emphasis added).  Thus, even if the publication that ultimately finalizes and implements a rule is done by OFR's printing presses (or the GPO's presses, for that matter), such publication is an act assigned by statute to the agency, and must be considered the act of the agency.  Indeed, OFR regulations provide that any document filed but not yet published may be withdrawn by the agency for any reason "with a timely letter," so that it was within the Secretary's power to stop the finalization of the proposed rule at any time during the four days after the moratorium had begun.  At the very least, because the APA treats an agency's failure to act as agency action, see 5 U.S.C. § 551(13), the Secretary violated the moratorium by failing to withdraw the rule on May 25.

In fact, before adopting its current litigation position, the agency seemed freely to recognize that the display and publication of the rule were attributable to it and not solely to OFR.  The agency has routinely issued statements stating that *it* placed the rule on display on May 25, or that *it* published the rule on May 29.  See, e.g., 72 Fed. Reg. 55160 (Sept. 28, 2007); [22, Exhibits 1-B, 1-C, 1-D].  Such statements do not necessarily constitute legal admissions by the agency that it acted to finalize the rule when the moratorium had already begun to run, but they at least reflect the reality that the

agency was in control of the display and publication of the rule, and caused them to take place within the proscribed period.  The Secretary's letter to OFR confirms the agency's effective control over the dates of display and publication.  That letter requested "emergency display" of the rule on early morning of May 25 and emergency publication on May 29, see A.R. 365, and those dates were complied with exactly.

These violations were not technical trespasses.  At bottom, the Secretary treated an act of Congress seeking to control the substantive rules of Medicaid reimbursement as an "emergency," and prioritized issuance of his own rule over Congress's plain intent to prohibit his actions.  See A.R. 365.  Although administrative law has evolved to allow agencies significant leeway to fill in the interstices of broad congressional mandates, see, e.g., Whitman v. Am. Trucking Assns., Inc., 531 U.S. 457 (2001); Chevron v. NRDC, 467 U.S. 847 (1984), control over the substance of the rules that govern the nation has always remained with Congress first.  The Executive must comply with the duly enacted commands of Congress.

The remedy when a rule has been improperly promulgated is to vacate the rule and remand the matter to the agency.  See, e.g., MST Express v. Dep't of Transp., 108 F.3d 401, 402 (D.C. Cir. 1997) (Ginsburg, J.) (vacating a safety rating that relied on an improperly promulgated regulation); Shell Oil Co. V. EPA,

950 F.2d 741, 752 (D.C. Cir. 1991) (vacating and remanding rules enacted without appropriate notice and comment).  Application of that remedy here makes it unclear whether the rule will in fact go into effect, and a decision on the merits is thus premature.

An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                         United States District Judge